## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>MONTREAL MAINE & ATLANTIC RAILWAY, LTD.<br>        Debtor. | Bk. No. 13-10670<br>Chapter 11 |

### MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Robert J. Keach, the chapter 11 trustee (the "Trustee") in the above-captioned chapter 11 case of Montreal Maine & Atlantic Railway, Ltd. ("MMA" or the "Debtor"), moves, pursuant to 11 U.S.C. §§ 105(a), 363 and 365, as supplemented by Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and D. Me. LBR 6004-1, for authority to sell substantially all of the Debtor's assets to Railroad Acquisition Holdings LLC (the "Stalking Horse"), as more particularly described in that certain Asset Purchase Agreement dated December 12, 2013 (the "APA"), a copy of which is attached hereto as **Exhibit A**.  By this motion (the "Sale Motion"), the Trustee also seeks authority to assume and assign to the Stalking Horse, or to any successful bidder, certain executory contracts and unexpired leases.  The proposed sale shall be free and clear of all liens, claims and encumbrances with all such liens, claims and encumbrances to attach to the proceeds of the proposed sale, except as provided herein.  Finally, the Trustee seeks an order pursuant to Bankruptcy Rules 6004(h) and 6006(d) authorizing him to consummate the proposed sale immediately after entry of this Court's order granting this Sale Motion.  In support hereof, the Trustee states as follows:

1

**I.     JURISDICTION, VENUE AND STATUTORY BASIS FOR RELIEF**

1. The United States District Court for the District of Maine (the "District Court") has original but not exclusive jurisdiction over this chapter 11 case pursuant to 28 U.S.C. § 1334(a) and over this Sale Motion pursuant to 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157(a) and Rule 83.6 of the District Court's local rules, the District Court has authority to refer and has referred this chapter 11 case and this Sale Motion to this Court.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court has constitutional authority to enter final judgment in this proceeding.

3. Venue over this chapter 11 case is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

4. The relief sought in this Sale Motion is predicated upon 11 U.S.C. §§ 105(a), 363 and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and D. Me. LBR 6004-1.

**II.    BACKGROUND**

5. On August 7, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under 11 U.S.C. § 101 et seq. (the "Case"). The Debtor's bankruptcy filing was precipitated by the train derailment in Lac-Mégantic, Québec on July 6, 2013 (the "Derailment"). The Derailment set off explosions, destroyed part of downtown Lac-Mégantic, and is presumed to have killed 47 people. The Derailment also precipitated the filing by Montreal Maine & Atlantic Canada Co. ("MMA Canada" and, together with MMA, the "Debtors"), MMA's subsidiary, under Canada's *Companies' Creditors Arrangement Act* (the "Canadian Case") in Superior Court in Canada (the "Canadian Court").

6. On September 4, 2013, the Court entered an order adopting the *Cross-Border Insolvency Protocol* (the "Protocol") [Docket No. 168], which governs the conduct of all parties

2

in interest in the Case and the Canadian Case. The Canadian Court also adopted the Protocol. Pursuant to the Protocol, counsel to MMA Canada and the monitor appointed in the Canadian Case (the "Monitor") will seek authority from the Canadian Court to sell those assets described in the APA that are owned by MMA Canada.

7.     Contemporaneously with the filing of this Sale Motion, the Trustee has filed a *Motion for Order: (A) Approving Bid Procedures for the Sale of the Debtor's Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures for Certain Executory Contracts and Unexpired Leases; (D) Approving a Break-Up Fee, Expense Reimbursement and Overbid Protections; and (E) Approving a Form of Notice of Sale* (the "Bid Procedures Motion"). The Trustee, by the Bid Procedures Motion, seeks approval of certain procedures by which the Assets may be sold.

### A.     Pre-Petition Secured Indebtedness

8.     Prior to the Petition Date, MMA entered into certain secured financing transactions. Specifically, MMA is indebted to the United States of America, represented by the Secretary of Transportation acting through the Administrator of the Federal Railroad Administration (the "FRA"), under a $34,000,000 Loan and Security Agreement dated March 24, 2005, as such agreement may have been amended, modified, renewed or extended from time to time (the "FRA Credit Facility"). The FRA Credit Facility was issued pursuant to Title V of the Railroad Revitalization and Regulatory Reform Act of 1976, as amended, 45 U.S.C. § 821, et seq. The outstanding balance under the FRA Credit Facility is approximately $27.5 million.

9.     MMA's obligations to FRA under the FRA Credit Facility are secured by the following:

    i.   A first-priority mortgage on substantially all of MMA's real property located in Maine and Vermont, including the U.S. rail corridor

3

        consisting of approximately 220.73 miles of track located in Maine and an estimated 23.47 miles of track located in Vermont, as well as various land and buildings owned by MMA in fee simple;

    ii.    A first-priority security interest in all rail lines and related tracks and improvements located within the United States, including all rail ties, bridges, and related assets;

    iii.    All of MMA's real property located in Québec, Canada;

    iv.    All of MMA's shares in MMA Canada;

    v.    All of the real property owned by MMA Canada and located in Québec, Canada; and

    vi.    All of MMA Canada's personal property.

All mortgages and security agreements securing the FRA Credit Facility were timely and properly perfected by recordings in the United States and Canada.

    10.    MMA also has a $6 million line of credit with Wheeling & Lake Erie Railway Company ("Wheeling") pursuant to a certain Line of Credit and Security Agreement dated as of June 15, 2009, as such agreement may have been amended, modified, renewed or extended from time to time (the "Wheeling LOC"), which, as of the Petition Date, was fully drawn. To secure the Wheeling LOC, Wheeling asserts an interest in MMA's accounts receivable and inventory, along with the proceeds thereof. Wheeling has filed a UCC-1 financing statement in Delaware to perfect its security interest.

    11.    Additionally, the Maine Department of Transportation ("MDOT") has a security interest in all rail, related cross ties, and related track materials incorporated or installed in, attached to, or located on certain rail corridors owned by MMA and located in Maine, the purchase of which rail and related materials was funded by funds advanced under certain Rail Funding Agreements entered into with MMA.

4

12. Finally, Bangor Savings Bank asserts a security interest in certain of the rolling stock owned by MMA. The Debtor leases a substantial portion of its other locomotives, rail cars, hirail vehicles, and rolling stock from several different lessors.

### B. Post-Petition Borrowing

13. Subsequent to the Petition Date, the Trustee filed a motion seeking authority to enter into a secured financing transaction with Camden National Bank ("Camden National"), pursuant to which Camden National would loan the Debtor $3,000,000 (the "Camden Loan"). Pursuant to an Order entered by the Court on October 9, 2013, the Court authorized the Trustee to enter into the Camden Loan [Docket No. 367]. The Camden Loan is, with the consent of the FRA, secured by a first mortgage and security interest on all assets, located in the United States, that secure the FRA Credit Facility.

14. Additionally, pursuant to an Order entered by the Bankruptcy Court on October 18, 2013, the Bankruptcy Court approved a stipulated carve-out from FRA's secured claim (the "Carve-Out") to pay the allowed fees and expenses of the Trustee and professionals retained by the Trustee, in an amount not to exceed $5 million. *See* Docket No. 392. The Carve-Out ensures that administration of MMA's case will be funded, in furtherance of the Trustee's fiduciary duty to creditors of MMA, pending sale of the Assets and confirmation of a plan.

### C. Marketing Process

15. The Trustee, MMA Canada, and the Monitor, in consultation with FRA, have determined that a sale of the assets of both MMA and MMA Canada, on a going concern basis, is in the best interests of the creditors of both Debtors. In order to preserve the going concern value of the Debtors' assets, such sale must occur on an expedited basis.

16. Accordingly, shortly after being appointed, the Trustee sought Court approval to retain Gordian Group ("Gordian") as investment banker. *See* Docket No. 342. With the assistance of Gordian, the Trustee entered into non-disclosure agreements with over twenty prospective purchasers, thereby providing such potential purchasers with access to an electronic data room and confidential and proprietary information regarding the Debtors and their assets. Additionally, a number of prospective purchasers made on-site visits to the Debtors' property. The Trustee and Gordian, in coordination with MMA Canada and the Monitor, have actively and aggressively marketed the Debtors' assets with the aim of maximizing the value of those assets for the benefit of all creditors.

17. As a consequence of the marketing efforts spearheaded by Gordian, the Trustee and MMA Canada entered into the APA with the Stalking Horse.

### III. RELIEF REQUESTED

18. Pursuant to this Sale Motion, the Trustee requests entry of an order authorizing him to sell the Assets (as defined below) to the Stalking Horse (or other such entity, if any, that submits a higher and better offer for the Assets, hereinafter the "Successful Bidder") free and clear of all liens, claims, encumbrances and interests. Additionally, the Trustee seeks authority to assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts and Leases") to the Stalking Horse or the Successful Bidder. In connection with the sale and assignment, the Trustee requests that this Court enter an order approving the proposed sale, which would (i) authorize and approve the proposed sale pursuant to the terms of the APA, and (ii) approve the assumption and assignment of the Assigned Contracts and Leases (or such other executory contracts and/or unexpired leases as the Stalking Horse or Successful Bidder may identify).

## IV. BASIS FOR RELIEF

### A. Summary of Sale

19.  The APA contains the material terms of the Stalking Horse's proposed purchase and should be consulted as to all of the terms of the proposed sale. Certain material terms of the Stalking Horse APA can be summarized as follows:[1]

   a. **Purchased Assets:** All assets of MMA and MMA Canada other than the Excluded Assets (collectively, the "Assets").

   b. **Assigned Contracts and Leases:** all executory contracts and all unexpired leases (the "Assigned Contracts and Leases"), subject to the addition or removal of certain executory contracts and unexpired leases by the Stalking Horse pursuant to the terms of the APA, shall be assigned to the Stalking Horse.

   c. **Excluded Assets:** includes: cash; cash equivalents; accounts; accounts receivable; rights of reimbursement; setoff rights; rights of recoupment and any rights arising out of governmental programs; causes of action other than the Assigned Causes of Action selected by the Stalking Horse pursuant to Section 2.1(a)(xv) and Section 2.1(b)(xv) of the APA; the Debtors' rights and interests under any insurance policies; any and all claims, causes of action, or liabilities relating to or arising out of the Derailment; deposits; contracts and leases not assigned to the Stalking Horse.

   d. **Sale Free and Clear:** The transfer of the Assets to the Stalking Horse shall be free and clear of all liens, claims, encumbrances and interests.

   e. **Purchase Price:** The purchase price for the Assets consists of: Fourteen Million, Two Hundred and Fifty Thousand Dollars ($14,250,000.00) (the "Purchase Price").

   f. **Deposit:** The Stalking Horse will deliver to counsel to the Trustee, as escrow agent, a deposit of $750,000 (the "Deposit") within five (5) Business Days following the execution of the APA. The Deposit (and any interest accrued thereon) shall be credited as a partial payment of the Purchase Price payable at the Closing.

---

[1] The summary of the terms of the APA set forth herein is intended solely to provide a brief overview of certain material terms thereof. This summary is qualified entirely by reference to the APA, and in the event of any conflict or inconsistency between the provisions of this Motion and the APA, the APA shall control.

g. **Cure Costs:** The Stalking Horse shall pay any amounts payable under 11 U.S.C. § 365(b)(1)(A), (B), or (C) in order to effectuate the assumption of the Assigned Contracts and Leases, provided, however, that such cure costs shall not exceed the Cure Cost Cap set forth in the APA.

h. **Closing Costs:** The Stalking Horse shall pay any recording fees and transfer taxes, except as otherwise provided in the Sale Order or Vesting Order. Other costs associated with the closing of the APA shall be allocated as provided elsewhere in the APA.

i. **Break-Up Fee:** The APA requires that, in the event that a higher or better offer or offers is approved by the Bankruptcy Court and/or the Canadian Court, the Debtors pay to the Stalking Horse a break-up fee in the amount of $498,750 (the "Break-Up Fee") and a reimbursement of actual expenses incurred by the Stalking Horse (the "Expense Reimbursement") in an amount not to exceed $500,000.00. The Break-Up Fee and Expense Reimbursement shall constitute administrative expenses under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

j. **Conditions to Closing:** includes: entry of orders by this Court and the Canadian Court approving Bid Procedures, Sale Motion, and assumption, assignment and cure procedures; and all required governmental approvals and permits.

**B.     Request for Authority to Sell Substantially All of MMA's Assets**

20.     Section 363(b)(1) of the Bankruptcy Code provides authority for a trustee, "after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The authority to sell assets conferred upon a trustee by section 363(b) of the Bankruptcy Code includes a sale of substantially all the assets of an estate. *See* In re Coastal Cable T.V., Inc., 24 B.R. 609, 611 (1st Cir. B.A.P. 1982) (vacated on other grounds) ("A sale of all or most of a debtor's assets may occur prior to confirmation of a plan."); In re GSC, Inc., 453 B.R. 132, 155 (Bankr. S.D.N.Y. 2011) ("In addition to a reorganization plan, a section 363(b) sale is an appropriate means of disposing of the debtor's assets. . . . 'A debtor may sell substantially all of its assets as a going concern and later submit a

8

plan of liquidation . . . .'") (quoting In re Chrysler, LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009)); In re CadKey, Inc., 317 B.R. 19, 24 (D. Mass. 2004) (affirming order authorizing sale of substantially all of debtor's assets); Otto Preminaer Films. Ltd. v. Qintex Entm't., Inc. (In re Qintex Entm't Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991) ("Section 363 of the Code allows a debtor to sell assets of the estate . . . including a sale of substantially all the assets of the estate."); In re Haven Eldercare, LLC, 390 B.R. 762, 770 (Bankr. D. Conn. 2008) (same; collecting cases); *see also* Fla. Dep't. Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 37 n.2 (2008) ("[I]n some cases . . . a debtor sells all or substantially all its assets under § 363(b)(1) . . . before seeking or receiving plan confirmation."); In re Envisionet Computer Svcs., Inc., 275 B.R. 664, 666, (D. Me. 2002) (noting that bankruptcy court entered an order approving the sale of substantially all of the debtor's assets).

21. The power to approve a sale under section 363(b) is "within the sound discretion of the trial court." Coastal Cable T.V., 24 B.R. at 611. "[A] chapter 11 debtor may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, when the court finds a good business reason for doing so." In re General Motors Corp., 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009); *see also* In re AMR Corp., 490 B.R. 158, 164 (Bankr. S.D.N.Y. 2013); Lionel Corp. v. Comm. of Equity Security Holders (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (rejecting the requirement that only an emergency situation permits the use of section 363(b) and setting forth the "sound business purpose" test in the context of a sale of substantially all of a debtor's assets under section 363(b)); ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, LLC), 650 F.3d 593, 601 (5th Cir. 2011); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986).

9

22. Assuming that the standard for approval of a sale of substantially all of a debtor's assets applies to the proposed sale of the Assets, the "sound business purpose" test is easily met. MMA has obtained financing sufficient to maintain its operations only through the next few months. A sale of the Assets as a going concern will maximize the value of the estate for the benefit of all stakeholders. In contrast, the delay attendant in confirming and selling under a plan would almost certainly result in a material loss of value.

23. Courts have also required that the sale price be fair and reasonable and that the sale be the result of good faith negotiations with the Stalking Horse. *See, e.g.*, In re Abbotts Dairies of Pa., 788 F.2d 143, 147-50 (3d Cir. 1986); *see also* 11 U.S.C. § 363(m) ("The reversal or modification on appeal of an authorization under [§ 363(b)] of a sale or lease of property does not affect the validity of a sale or lease . . . to an entity that purchased or leased such property in good faith . . . .").

24. As noted above, the Trustee, with the assistance of Gordian, extensively marketed the Assets to numerous potential purchasers and entered into non-disclosure agreements with many potential purchasers to enable such entities to conduct due diligence with respect to the Assets. The Trustee was unable to secure an offer at this time for the Assets that provided more consideration to MMA's estate than the offer made by the Stalking Horse, although such a higher and better offer may occur in connection with the auction.

25. The APA is the product of good faith and arm's length negotiations between the Trustee and the Stalking Horse. Further, the price and the form and structure of the offer proposed by the Stalking Horse will continue to be tested in the marketplace. The bidding procedures, which the Trustee has requested this Court approve pursuant to the Bid Procedures Motion, are fair to all parties and are designed to permit the Trustee to obtain the best possible

price for the Assets. Thus, the Trustee believes that the winning bid or bids that emerge from this process will be the highest and best bid(s) obtainable for the Assets.

26. The Trustee submits that the proposed sale of the Assets to the Stalking Horse is entirely consistent with the guidelines set forth in applicable case law. The Trustee believes that a prompt sale is in the best interests of the Debtors' creditors and their respective estates, and will maximize the amount that the Debtors, their creditors, and their estates may realize from the sale of the Assets.

C. **Sale Free and Clear of Liens, Claims and Interests**

27. The Trustee requests authorization to sell the Assets free and clear of liens, claims, encumbrances, and other interests subject to the provisions contained herein. Section 363(f) of the Bankruptcy Code provides that:

> The trustee may sell property under [§ 363(b)] free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). "Because the language of § 363(f) is in the disjunctive, courts can approve a sale if any one of the five conditions is satisfied." BAC Home Loans Servicing LP v. Grassi, 2011 WL 6096509 at *5 (1st Cir. BAP Nov. 21, 2011).

28. The Trustee expects that he will satisfy, at a minimum, the second and fifth of the requirements under section 363(f). Without limitation, the Trustee anticipates that he will obtain the consent of those entities holding an interest in the Assets.

29. Alternatively, if any of the secured creditors asserting an interest in the Assets are not willing to consent to the sale of the Assets, the Court is nonetheless empowered to authorize the sale free and clear of any such interest as long as that creditor receives the value of its collateral. *See* In re Boston Generating, LLC, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); In re Beker Indus. Corp., 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990). Those secured creditors could be compelled to accept a money satisfaction of their respective interests pursuant to section 363(f)(5) of the Bankruptcy Code. *See, e.g.*, In re James, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997); In re Grand Slam U.S.A., Inc., 178 B.R. 460, 461-62 (E.D. Mich. 1995). Courts considering this issues have held that the "cramdown" provision under the Bankruptcy Code constitutes a "legal or equitable proceeding" and permits a sale under section 363(f)(5). *See, e.g.*, Grand Slam, 178 B.R. at 464; In re Levitt & Sons, LLC, 384 B.R. 630, 648 (Bankr. S.D. Fla. 2008); In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002); Scherer v. Fed. Nat. Mortg. Ass'n (In re Terrace Chalet Apartments, Ltd.), 159 B.R. 821, 829 (N.D. Ill. 1993).

30. All liens against the Assets will attach to the cash proceeds received from the sale of those Assets in the same force, effect and priority as such liens have existed prior to the Petition Date, subject to the rights and defenses, if any, of the Trustee and/or the Debtor or any party in interest.

**D. Assumption and Assignment of Executory Contracts and Unexpired Leases**

31. A trustee is authorized to assume an executory contract and unexpired lease provided that, at the time of assumption, the trustee: (1) cures, or provides adequate assurance that the trustee will promptly cure, any default; (2) compensates, or provides adequate assurance that the trustee will promptly compensate, the counterparty for any actual pecuniary loss

resulting from any default; and (3) provides adequate assurance of future performance under the executory contract or unexpired lease. *See* 11 U.S.C. § 365(a), (b)(1). A default based upon the filing of the bankruptcy case or the insolvency or financial condition of the debtor need not be cured. *See* 11 U.S.C. § 365(b)(2).

32.  In the case of an assumption and assignment, the purchaser or assignee provides the adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2). The Bankruptcy Code does not define the term "adequate assurance," and courts have found that "the term 'adequate assurance' was intended to be given a practical, pragmatic construction." In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009). Adequate assurance is "something less than an absolute guarantee." Id.

33.  In this case, the APA, as well as the Bid Procedures Motion, contemplates that certain unexpired leases and executory contracts will be assumed and assigned to the Stalking Horse or the Successful Bidder. The Trustee, pursuant to this Motion, seeks to assume and assign those executory contracts and unexpired leases designated by the Stalking Horse or Successful Bidder to be assumed.

34.  To accomplish this goal in the most fair and expeditious manner, as provided in the Bid Procedures Motion, the Trustee shall provide the counterparties to such agreements with notice and a reasonable opportunity to object to the proposed assumption and assignment of the agreement, to state cure amounts, if any, that they believe are owing, and for a process to resolve any disputes with respect to such cure amounts.[2]

---

[2] Please see the Bid Procedures Motion and the Assumption and Assignment Procedures attached thereto for a more fulsome description of the procedures by which the Trustee will provide counterparties with notice and an opportunity to object to the proposed assumption and assignment of the Assigned Contracts and Leases and related cure amounts.

35. The Trustee requests that this Court establish a deadline for parties to the Assigned Contracts and Leases to file alleged cure amounts, or to object to the Trustee's proposed assumption and assignment of such agreements, as set forth in the Bid Procedures Motion. To the extent that issues exist as to cure amounts and/or any counterparties raise an issue with respect to the adequate assurance requirement, the Trustee requests that the Court address the matter at the hearing on this Sale Motion.

36. Finally, the Trustee requests that he and the Debtor be relieved from any further liability with respect to the Assigned Contracts and Leases after assumption and assignment to the Stalking Horse or the Successful Bidder. *See* 11 U.S.C. § 365(k).

## V. NOTICE

37. The Trustee shall provide notice as follows: (a) the Sale Notice (as defined in the Bid Procedures Motion) on all creditors, including all plaintiffs and counsel in any and all lawsuits and other actions arising out of or related to the Derailment and (b) the Sale Notice and the Sale Motion (or the similar pleading and notice in the Canadian Case) on:

    a. The United States Trustee;

    b. The twenty largest non-insider unsecured creditors of the Debtor;

    c. Local, state and federal taxing authorities for each jurisdiction in which the Assets are located;

    d. Counsel to the Official Committee of Derailment Victims;

    e. Counsel to the Stalking Horse;

    f. Counsel to MMA Canada;

    g. the Monitor;

    h. Counsel to the Monitor;

  i. Prospective bidders (or their counsel) that are known to the Trustee and his advisors;

  j. The Counter-Parties to the executory contracts and unexpired leases on the Contract & Cure Schedule;

  k. Counsel to the Maine Department of Transportation;

  l. Counsel to the Federal Railroad Administration;

  m. The United States Environmental Protection Agency;

  n. Town of Lac Megantic;

  o. Ministry of Sustainable Development, Environment, Wildlife and Parks;

  p. Transport Canada;

  q. All parties known to the Trustee to have or assert any liens, claims and encumbrances or other interests against the Assets; and

  r. All parties having filed requests for notices in the Debtor's case.

38. The Trustee will also publish the Publication Notice (as defined in the Bid Procedures Motion) in (a) the national edition of *The Wall Street Journal*, (b) the *Journal of Commerce*, (c) the *Portland Press Herald*, (d) the *Globe & Mail*, and (e) the *Montreal Gazette* on or before five (5) days prior to the Sale Hearing.

## **CONCLUSION**

Based upon the foregoing, the Trustee requests that the Court enter the proposed sale order authorizing the sale of the Assets to the Stalking Horse, subject to higher and better offers in accordance with the provisions of the bid procedures approved by this Court. In addition, the

Trustee requests that this Court enter an order waiving the provisions of Bankruptcy Rules 6004(h) and 6006(d).

Dated: December 12, 2013  ROBERT J. KEACH,
CHAPTER 11 TRUSTEE OF MONTREAL
MAINE & ATLANTIC RAILWAY, LTD.

By his attorneys:

/s/  *Michael Fagone*
Michael A. Fagone, Esq.
D. Sam Anderson, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
E-mail: mfagone@bernsteinshur.com