UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:                                                    )
    Montreal Maine & Atlantic Railway Ltd.,    )    Chapter 11
                                                          )    Case No. 13-10670
        Debtor                                  )

**DECISION AND ORDER REGARDING THE PROCEEDS OF TRAVELER'S INSURANCE POLICY**

Montreal Maine & Atlantic Railway Ltd. ("MMA"), the Debtor, commenced this railroad reorganization case under chapter 11 of the Bankruptcy Code on August 7, 2013. Pending before the court is an adversary proceeding brought on October 7, 2013, by Wheeling & Lake Erie Railway Company ("Wheeling") against the trustee, the Debtor and several other parties. Through it, Wheeling seeks a determination that it holds a valid, perfected and/or enforceable security interest in certain property of the Debtor and the bankruptcy estate.[1]

Wheeling's assertion stems from a line of credit note and a security agreement dated June 15, 2009. Upon the commencement of the bankruptcy case, Wheeling was owed the fully extended line of credit in the amount of $6,000,000. By agreement and six sequential court orders, Wheeling has permitted the Debtor to use its cash collateral. Wheeling's balance has been reduced by approximately $1,000,000. By order dated October 11, 2013, the Debtor's use of cash collateral came to a halt when Camden National Bank ("CNB") was authorized to become the Debtor's post-bankruptcy lender.[2]

The current dispute arises from a $7.5 million business interruption insurance policy

---

[1] Wheeling & Lake Erie Railway Co. v. Keach, et al., Adv. Pro. No. 13-1033 (Bankr. D. Me. Oct. 7, 2013).

[2] Effective October 18, 2013, CNB financed operation of the Debtor through a $3,000,000 line of credit agreement (an amount which was later increased) secured by a first priority mortgage and security interest in real and personal property of the Debtor in the U. S.

issued by Travelers Property Casualty Company of America in favor of the Debtor and its Canadian subsidiary, Montreal, Maine & Atlantic Canada Co. ("MMAC"). The Debtor sought payment under the policy for business interruption occasioned by the 2013 Lac-Megantic disaster.[3] Travelers denied payment, and eventually a settlement was reached between the Chapter 11 trustee, MMAC and Travelers whereby Travelers agreed to pay $3.8 million, to be apportioned 65% to MMAC and 35% to the Debtor. Upon motion of the Chapter 11 trustee, the settlement was approved, reserving the issue of whether Wheeling's security interest in the Debtor's inventory, accounts and payment intangibles extended to the insurance policy and proceeds thereof.[4] Following discovery, oral argument and supplemental briefing, the remaining issue of Wheeling's security interest was presented to this court on an agreed record. The parties agree that the determination of the validity and extent of Wheeling's security interest in the proceeds of the Travelers policy will have the same preclusive effect as a judgment on this issue in the adversary proceeding. This decision contains my findings and conclusions pursuant to Fed. R. Bankr. Pro. 7052.

      Wheeling does not contend that it received a specific assignment of the insurance policy or its proceeds. Instead, it asserts that its security interest in accounts and payment intangibles includes the policy proceeds. The security agreement specifies that Maine law controls. Maine has enacted the UCC. See 11 Me. Rev. Stat. Ann. §1-101 et seq. Wheeling argues that the policy proceeds fit within the definition of an "account", defined at 11 Me. Rev. Stat. Ann. §9-

---

[3] On July 6, 2013, a train operated by the Debtor containing 72 tank cars filled with crude oil originating in North Dakota and destined for St. John, New Brunswick, derailed in Lac-Megantic, Quebec, causing a large explosion, the death of 47 people, damage to or destruction of several nearby structures, and significant environmental damage.

[4] That security interest was properly perfected by the recording in Delaware, the state of the Debtor's incorporation, of a UCC financing statement.

1102(2), or a "payment intangible", defined at 11 Me. Rev. Stat. Ann. §9-1102(61).  The problem with this position is that 11 Me. Rev. Stat. Ann. §9-1109(4)(h) provides that Article 9 of the UCC does not apply to "a transfer of an interest in or an assignment of a claim under a policy of insurance".[5]  In Thico Plan, Inc. v. Maplewood Poultry Co. (In re Maplewood Poultry Co.), 2 B.R. 550 (Bankr. D. Me. 1980), the court, after observing that neither the Maine Insurance Premium Finance Act nor the Maine Insurance Code provide for the perfection of a transfer of interests in or under a policy of insurance, noted that "Maine common law requires possession of the collateral as a prerequisite to the enforceability against third parties of a pledge of intangibles."  Id. at 554 (citing Credit Ass'n v. Kent, 143 Me. 145, 148, 56 A.2d 631 (1948) and Peaks v. Smith, 104 Me. 315, 318, 71 A. 884 (1908)).  The court then concluded that a pledge of insurance policies requires that the pledgee maintain physical possession of the policies. Maplewood, 2 B.R. at 554.  More recently, in A-1 Credit Corp. v. Big Squaw Mountain Corp. (In re Big Squaw Mountain Corp.), 122 B.R. 831 (Bankr. D. Me. 1990), the court reiterated the conclusion reached by the court in Maplewood but determined that, in the context of insurance premium financing, the creditor's possession of the financing agreement and its notification of the insurance carriers was sufficient to perfect its interest in the unearned premium payments.

Wheeling did not have possession of the policy and there is no evidence that it did anything else to perfect a security interest in the policy or its proceeds under Maine common law.

Wheeling argues that Maine law recognizes an assignment of payment rights as security,

---

[5]  The exception to this provision, concerning "an assignment by or to a health-care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment", is not implicated here.

citing a number of Maine cases, none of which is persuasive on the issue to be determined here. Sturtevant v. Town of Winthrop, 732 A.2d 264 (Me. 1999) concerned the efficacy of an alleged assignment of a snowblowing contract between a town and a corporation to the corporation's shareholder, and had nothing whatever to do with the assignment of or perfection of an interest in an insurance policy or its proceeds under a security agreement. In Herzog v. Irace, 594 A.2d 1106 (Me. 1991), the court held that a personal injury plaintiff could properly request that proceeds from settlement of a pending claim be made to a doctor for treatment of different injuries, and is also not relevant to the particular issue at stake here. The other Maine cases Wheeling cites are no more helpful.

Wheeling further asserts that the 2000 amendments to the UCC, which expanded the definition of account and add a new defined term, "payment intangible", make clear that payments that arise under a contract may be assigned. True enough. But the 2000 amendments to the UCC did not change the provisions of 11 Me. Rev. Stat. Ann. §9-1109(4)(h), and thus an assignment of an insurance policy or its proceeds is still outside the provisions of UCC Article 9. Further, the revisions to the definition of account in the 2000 amendments comprehended only health-care insurance receivables, and not other types of insurance policies.

Wheeling insists that there is a distinction between a claim and a right to payment. Wheeling argues that a claim is the process that an insured must undertake to satisfy policy conditions. A right to payment, it says, is an economic right to receive money under the terms of a policy. It asserts that the Debtor had a right to payment upon the occurrence of a covered loss. That right to payment, it urges, places the proceeds of the policy within its security agreement. This is a clever argument, but it misses the mark. As noted above, the granting of a security interest in accounts and payment intangibles, without more, does not perfect an interest in an

insurance policy or its proceeds. Therefore, it makes no difference whether the occurrence under the policy resulted in a claim or right to payment.

Wheeling did not properly perfect a security interest in the business interruption policy or its proceeds. Accordingly, the Debtor and MMAC are entitled to the proceeds of that policy free from any claim of Wheeling. In light of this conclusion, there is no need to address Wheeling's objection to the allocation of the proceeds among the Debtor and MMAC.

SO ORDERED.

DATED: April 15, 2014

_____
Louis H. Kornreich, Chief Judge
U. S. Bankruptcy Court