**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

———————————————

**BAP NO. EB 14-033**

———————————————

**Bankruptcy Case No. 13-10670-LHK**

———————————————

**MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,**
**Debtor.**

———————————————

**WHEELING & LAKE ERIE RAILWAY COMPANY,**
**Appellant,**

**v.**

**ROBERT J. KEACH, Chapter 11 Trustee,**
**MONTREAL, MAINE & ATLANTIC CANADA CO., and**
**RICHTER ADVISORY GROUP, INC.,**
**Appellees.**

———————————————

**Appeal from the United States Bankruptcy Court**
**for the District of Maine**
**(Hon. Louis H. Kornreich, U.S. Bankruptcy Judge)**

———————————————

**Before**
**Hillman, Godoy, and Harwood,**
**United States Bankruptcy Appellate Panel Judges.**

———————————————

**George J. Marcus, Esq., David C. Johnson, Esq., and Andrew C. Helman, Esq.,**
**on brief for Appellant.**

**Michael A. Fagone, Esq., and Timothy J. McKeon, Esq., on brief for**
**Appellee, Robert J. Keach, Chapter 11 Trustee.**

———————————————

**December 9, 2014**

———————————————

**Harwood, U.S. Bankruptcy Appellate Panel Judge.**

Wheeling & Lake Erie Railway Company ("Wheeling") appeals from the bankruptcy court's Decision and Order determining that Wheeling does not have a valid, enforceable and perfected security interest in the cash proceeds paid to Montreal, Maine & Atlantic Railway, Ltd. (the "Debtor") and its affiliate under a commercial property insurance policy issued by Travelers Property Casualty Company of America ("Travelers").    For the reasons set forth below, we **AFFIRM.**

## BACKGROUND

The essential facts of this case are not in dispute.

**A.    Wheeling Note and Security Agreement**

Prior to the petition date, in June 2009, the Debtor, its Canadian subsidiary, Montreal, Maine & Atlantic Canada Co. ("MMAC"), and their affiliates executed and delivered to Wheeling a Line of Credit Note with a ceiling amount of $6 million.    To secure their obligations under the note, the Debtor, MMAC, and their affiliates executed a security agreement granting Wheeling a security interest in the following collateral:

> A.    All Accounts and other rights to payment (including Payment Intangibles), whether or not earned by performance, including but not limited to, payment for property or services sold, leased, rented, licensed, or assigned.    This includes any rights and interests (including all liens) that Debtor may have by law or agreement against any account debtor or obligor of Debtor.
>
> B.    All Inventory.
>
> C.    All additions, accessions, substitutions, replacements, products to or for, and all cash or non-cash proceeds of any of the foregoing, including insurance proceeds.

2

The security agreement is, by its terms, governed by Maine law, "except to the extent that the Maine Uniform Commercial Code (the "UCC") provides for the application of the law of the state where Debtor is located."    Wheeling filed a UCC-1 financing statement with the Delaware Secretary of State on August 25, 2009.

**B.      The Travelers' Policy and the Derailment**

In April 2013, Travelers issued a commercial property insurance policy under which the Debtor and MMAC (and some of their affiliates) were insured for total coverage in the amount of $7.5 million (the "Policy").

On July 6, 2013, a train operated by the Debtor containing 72 tank cars filled with crude oil derailed in Lac-Mégantic, Quebec, causing several large explosions, the death of 47 people, damage to or destruction of several nearby structures, and significant environmental damage. After the derailment, the Debtor filed a claim under the Policy for resulting damages to locomotives, railcars, railroad track and roadbed.    The Debtor also asserted a claim under the Policy for loss of business income due to the derailment ("Business Interruption") and for the extra expenses the Debtor incurred as a result of the accident ("Extra Expenses").    The Debtor claimed that it was entitled to the entire Policy limit of $7.5 million premised on the asserted claims.    Travelers denied payment on the grounds that coverage did not exist under the Policy for the type of claims asserted by the Debtor.    Specifically, Travelers claimed there was no Business Interruption coverage or Extra Expenses coverage because the claimed loss did not arise out of "Covered Property" as defined in the Policy.    Travelers also argued that, to the extent Business Interruption coverage existed, it was included in the Policy by mistake.

C.      **The Debtor's Bankruptcy Case**

On August 7, 2013, the Debtor filed a chapter 11 petition in the U.S. Bankruptcy Court

for the District of Maine, and Robert J. Keach was appointed chapter 11 trustee (the "Trustee").

Shortly thereafter, MMAC commenced a parallel proceeding under Canada's Companies'

Creditors Arrangement Act, and Richter Advisory Group was appointed as the monitor in

MMAC's case.[1]

On August 27, 2013, Travelers filed a motion for relief from the automatic stay in order

to file a declaratory judgment action in the U.S. District Court for the District of Maine regarding

the scope of coverage provided by the Policy.    It intended to seek a declaration that any

Business Interruption coverage was included in the Policy by mistake, and that the Policy as

written did not include Business Interruption coverage for the claimed loss.    The Trustee filed a

timely opposition to the motion for relief.    On October 9, 2013, the bankruptcy court entered an

order denying the motion for relief, and Travelers appealed to the U.S. District Court for the

District of Maine.

Eventually the Trustee, MMAC, and Travelers reached a settlement whereby Travelers

agreed to pay $3.8 million (the "Settlement Payment"), to be apportioned 65% to MMAC and

35% to the Debtor.    The parties agreed that the Settlement Payment would be full and final

satisfaction of any and all claims arising under the Policy, Travelers would be released from any

and all liability under the Policy, and the district court appeal would be dismissed.    The Trustee

filed a motion seeking court approval of the settlement with Travelers.    Wheeling objected,

---

[1]      The concurrent proceedings in the United States and Canada are governed by a Cross-Border
Insolvency Protocol, which the bankruptcy court adopted.

arguing that it had a valid, perfected, first-priority security interest in all of the Debtor's

inventory, accounts, and payment intangibles, which included all rights to payment that the

Debtor and its affiliates have under the Policy and the proposed Settlement Payment from

Travelers, and that the settlement impaired its security interest.   It also objected to the 65%-

35% allocation of the Settlement Payment between MMAC and the Debtor.

     After a hearing, the bankruptcy court approved the settlement, reserving the issue of

whether Wheeling's security interest in the Debtor's inventory, accounts, and payment

intangibles extended to the Policy and proceeds thereof, and ordering that the Settlement

Payment be held in escrow in the meantime.[2]   Thereafter, at the bankruptcy court's direction,

the parties filed briefs in support of their respective positions on the reserved issue.

     On March 13, 2014, the bankruptcy court conducted a non-evidentiary hearing on the

legal issue of whether Wheeling has a perfected and enforceable security interest in the

Settlement Payment.   After hearing arguments from the parties, the bankruptcy court requested

further briefing on two discrete issues: (1) whether there is a distinction between a "right to

payment" and a "claim" under an insurance policy and if so, when does each arise; and (2) if

there is such a distinction, then does the Maine UCC's exclusion of "claims" under insurance

---

[2]     The Canadian court also approved the compromise and settlement.

policies from the scope of its Article 9 coverage also exclude "rights to payment" under insurance policies? Thereafter, both Wheeling and the Trustee filed supplemental briefs.

## D.     The Bankruptcy Court's Decision

On April 15, 2014, the bankruptcy court issued a Decision and Order in which it ruled that Wheeling does not hold a valid and enforceable security interest in the Settlement Payment under either the Maine UCC or Maine's common law. Specifically, the bankruptcy court held that "Wheeling did not properly perfect a security interest in the business interruption policy or its proceeds. Accordingly, the Debtor and [MMAC] are entitled to the proceeds of that policy free and clear from any claim of Wheeling." In reaching its holding, the bankruptcy court reasoned:

> Wheeling does not contend that it received a specific assignment of the insurance policy or its proceeds. Instead, it asserts that its security interest in accounts and payment intangibles includes the policy proceeds. The security agreement specifies that Maine law controls. Maine has enacted the UCC. See 11 Me. Rev. Stat. Ann. § 1-101 et seq. Wheeling argues that the policy proceeds fit within the definition of an "account", defined at 11 Me. Rev. Stat. Ann. § 9-1102(2), or a "payment intangible", defined at 11 Me. Rev. Stat. Ann. § 9-1102(61). The problem with this position is that 11 Me. Rev. Stat. Ann. § 9-1109(4)(h) provides that Article 9 of the UCC does not apply to "a transfer of an interest in or an assignment of a claim under a policy of insurance". In Thico Plan, Inc. v. Maplewood Poultry Co. (In re Maplewood Poultry Co.), 2 B.R. 550 (Bankr. D. Me. 1980), the court, after observing that neither the Maine Insurance Premium Finance Act nor the Maine Insurance Code provide for the perfection of a transfer of interests in or under a policy of insurance, noted that "Maine common law requires possession of the collateral as a prerequisite to the enforceability against third parties of a pledge of intangibles." Id. at 554 (citing Credit Ass'n v. Kent, 143 Me. 145, 148, 56 A.2d 631 (1948) and Peaks v. Smith, 104 Me. 315, 318, 71 A. 884 (1908)). The court then concluded that a pledge of insurance policies requires that the pledgee maintain physical possession of the policies. Maplewood, 2 B.R. at 554. More recently, in A-1 Credit Corp. v. Big Squaw Mountain Corp. (In re Big Squaw Mountain Corp.), 122 B.R. 831 (Bankr. D. Me. 1990), the court reiterated the conclusion reached by the court in Maplewood but determined that, in the context of insurance premium financing, the creditor's possession of the financing agreement and its notification of the

6

insurance carriers was sufficient to perfect its interest in the unearned premium
payments.

Wheeling did not have possession of the policy and there is no evidence that it did
anything else to perfect a security interest in the policy or its proceeds under
Maine common law.

In re Montreal Maine & Atlantic Railway Ltd., No. 13-10670, 2014 WL 1491301, at *1-2

(Bankr. D. Me. Apr. 15, 2014).

The bankruptcy court went on to state:

Wheeling argues that Maine law recognizes an assignment of payment rights as
security, citing a number of Maine cases, none of which is persuasive on the issue
to be determined here.   Sturtevant v. Town of Winthrop, 732 A.2d 264 (Me.
1999) concerned the efficacy of an alleged assignment of a snow[p]lowing
contract between a town and a corporation to the corporation's shareholder, and
had nothing whatever to do with the assignment of or perfection of an interest
in an insurance policy or its proceeds under a security agreement.   In Herzog v.
Irace, 594 A.2d 1106 (Me. 1991), the court held that a personal injury plaintiff
could properly request that proceeds from settlement of a pending claim be made
to a doctor for treatment of different injuries, and is also not relevant to the
particular issue at stake here.   The other Maine cases Wheeling cites are no more
helpful.

Wheeling further asserts that the 2000 amendments to the UCC, which expanded
the definition of account and add a new defined term, "payment intangible", make
clear that payments that arise under a contract may be assigned.   True enough.
But the 2000 amendments to the UCC did not change the provisions of 11 Me.
Rev. Stat. Ann. § 9-1109(4)(h), and thus an assignment of an insurance policy or
its proceeds is still outside the provisions of UCC Article 9.   Further, the
revisions to the definition of account in the 2000 amendments comprehended only
health-care insurance receivables, and not other types of insurance policies.

Wheeling insists that there is a distinction between a claim and a right to payment.
Wheeling argues that a claim is the process that an insured must undertake to
satisfy policy conditions.   A right to payment, it says, is an economic right to
receive money under the terms of the policy.   It asserts that the Debtor had a
right to payment upon the occurrence of a covered loss.   That right to payment, it
urges, places the proceeds of the policy within its security agreement.   This is a
clever argument, but it misses the mark.   As noted above, the granting of a
security interest in accounts and payment intangibles, without more, does not
perfect an interest in an insurance policy or its proceeds.   Therefore, it makes no

difference whether the occurrence under the policy resulted in a claim or right to payment.

Wheeling did not properly perfect a security interest in the business interruption policy or its proceeds.    Accordingly, the Debtor and MMAC are entitled to the proceeds of that policy free from any claim of Wheeling.    In light of this conclusion, there is no need to address Wheeling's objection to the allocation of the proceeds among the Debtor and MMAC.

Id. at *2.

This appeal followed.

## **JURISDICTION**

The Panel may consider appeals from final orders.    28 U.S.C. § 158(a)(1).    An order that "'conclusively determines a separable dispute over a creditor's claim or priority'" is a final order.    Perry v. First Citizens Fed. Credit Union (In re Perry), 391 F.3d 282, 285 (1st Cir. 2004) (quoting In re Saco Local Dev. Corp., 711 F.2d 441, 445-46 (1st Cir. 1983)); see also Ramos Delgado v. Sanchez Ramos (In re Ramos Delgado), 360 B.R. 406, 408 (B.A.P. 1st Cir. 2006) ("An order determining the validity or priority of a claim is a final order.") (citation omitted); Orsini Santos v. Lugo Mender (In re Orsini Santos), 349 B.R. 762, 768 (B.A.P. 1st Cir. 2006) (citation omitted).    Here, the order is final because it conclusively determined the question of whether Wheeling holds a valid and enforceable security interest in the Settlement Payment paid to the Debtor under the Policy.    Thus, the Panel has jurisdiction.

## **STANDARD OF REVIEW**

Appellate courts apply the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law.    See Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 592 F.3d 267, 269 (1st Cir. 2010).    There are no facts in dispute, and the issue before the Panel is one of law, which is reviewed *de novo.*

8

## DISCUSSION

Wheeling argues that the bankruptcy court erred, as a matter of law, in determining that Wheeling does not hold a valid, enforceable, and perfected security interest in the Settlement Payment under either the Maine UCC or Maine's common law.    First, Wheeling argues that the bankruptcy court erred in concluding that its security interest in the Settlement Payment is outside the scope of Maine's UCC and cannot be created and perfected by compliance therewith. Second, Wheeling argues that the bankruptcy court erred in concluding that Wheeling did not properly perfect a security interest in the Settlement Payment under Maine common law.

**I.      Whether the bankruptcy court erred in concluding that Wheeling does not hold a valid and enforceable security interest in the Settlement Payment because it is outside the scope of coverage of Maine's UCC.**

As the bankruptcy court noted, Wheeling does not contend that it received a specific assignment of the Policy or its proceeds, nor does it claim an interest in the Policy itself. Rather, it asserts that its security interest in "accounts" and "payment intangibles" includes the proceeds of the Policy, and, therefore, the Settlement Payment.    The prepetition perfection of a security interest in property of the estate normally is determined by reference to applicable state law.    See Indian Motocycle Assocs. III Ltd. P'ship v. Mass. Housing Fin. Agency, 66 F.3d 1246, 1252 (1st Cir. 1995) (citing Butner v. United States, 440 U.S. 48, 55 (1979)).    The security agreement in this case specifies that Maine law is the controlling state law.    Maine has enacted the UCC.    See Me. Rev. Stat. Ann. tit. 11, §§ 1-101, et seq. (the "Maine UCC").

### A.   Article 9 of the Maine UCC

Article 9 of the UCC enables a creditor to obtain a security interest in the personal property or fixtures of a debtor, including goods, documents, instruments, payment intangibles,

chattel paper, or accounts.    It is undisputed that Wheeling has a valid, perfected security interest

in all of the Debtor's "accounts" and "payment intangibles."    The revised Maine UCC defines

those terms as follows:

> "Account," except as used in "account for," means a *right to payment* of a
> monetary obligation, whether or not earned by performance: (a) For property that
> has been or is to be sold, leased, licensed, assigned or otherwise disposed of; (b)
> For services rendered or to be rendered; (c) For a policy of insurance issued or to
> be issued; . . .

> "Payment intangible" means a general intangible under which the account
> debtor's principal obligation is a monetary obligation.

Me. Rev. Stat. Ann. tit. 11, § 9-1102(2) and (61) (emphasis added).    Wheeling argues that the

Settlement Payment squarely fits within the definition of an "account" or a "payment intangible,"

and, therefore, that it perfected its security interest in the Settlement Payment by filing a UCC-1

financing statement.

Section 9-1109 of the Maine UCC specifically provides, however, that Article 9 does not

apply to "[a] transfer of an interest in or an assignment of a claim *under a policy of insurance*."

Me. Rev. Stat. Ann. tit. 11, § 9-1109(4)(h) (emphasis added).[3]    This section operates to exclude

certain secured transactions relating to insurance policies from Article 9's operation.

"Exclusion means that, although the transaction is a secured transaction that would otherwise be

---

[3]    This section provides, in pertinent part:

(4) This Article [9] does not apply to:

(h) A transfer of an interest in or an assignment of a claim under a policy of
insurance, other than an assignment by or to a health-care provider of a health-
care-insurance receivable and any subsequent assignment of the right to payment,
but sections 9-1315 and 9-1322 apply with respect to proceeds and priorities in
proceeds . . . .

11 Me. Rev. Stat. Ann. § 9-1109(4)(h).

subject to Article 9's requirements, the drafters chose to except it because it was of a character that rendered it subject to sufficient regulation by other statutes or because it dealt with a special type of transaction that does not fit easily into the general commercial pattern."   A-I Credit Corp. v. Big Squaw Mountain Corp. (In re Big Squaw Mountain Corp.), 122 B.R. 831, 835 (Bankr. D. Me. 1990) (footnote omitted).   Relying on this exclusionary language, the bankruptcy court ruled that the Settlement Payment does not fall within the scope of Article 9, as it arises from an insurance policy and, therefore, is specifically excluded by Maine UCC § 9-1109(4)(h).

Many of the cases which discuss this exception have done so in the context of unearned insurance premiums, holding that security interests in unearned insurance premiums fall within this exclusion from the scope of Article 9.   See, e.g., In re Big Squaw Mountain Corp., 122 B.R. at 836 (claims "'in or under [a] policy of insurance'" are excluded from the UCC); In re Maplewood Poultry, 2 B.R. at 554 ("Article 9 of the [UCC] does not apply to a secured transaction in which the collateral consists of unearned insurance premiums."); see also Am. Bank, FSB v. Cornerstone Cmty. Bank, 733 F.3d 609 (6th Cir. 2013) (finding that transfers of an interest in an insurance policy and assignment of a claim under an insurance policy are excluded from UCC); Am. Bank & Trust Co. v. Jardine Ins. Servs. Tex., Inc. (In re Barton Indus., Inc.), 104 F.3d 1241, 1246 (10th Cir. 1997) (holding that Article 9 does not apply to unearned return insurance premiums because the security interests were "'in or under [a] policy of insurance'") (citation omitted); In re JII Liquidating, Inc., 344 B.R. 875, 882-83 (Bankr. N.D. Ill. 2006) (ruling that Article 9 is inapplicable to a security interest in unearned insurance premiums); Miller v. Norwest Bank Minn., N.A. (In re Inv. & Tax Servs., Inc.), 148 B.R. 571, 573 (Bankr.

D. Minn. 1992) (noting that Article 9 of the UCC does not apply to "any 'interest or claim in or under' an insurance policy") (citation omitted).   The Trustee argues that there is no meaningful distinction, in the UCC or elsewhere, between an insured's right to receive a refund of unearned premiums (at issue in the cases above) and an insured's right to receive payment for a covered loss under an insurance policy (at issue here) and that both are excluded from the scope of Article 9.   We agree.

The UCC explicitly exempts from Article 9 transactions concerning interests or claims arising under insurance policies.   The Settlement Payment clearly arose from the Traveler's Policy.   Thus, regardless of whether Wheeling has a security interest in an "account" or a "payment intangible" as defined by the UCC, it is expressly excluded from the scope of Article 9 if–as here–it arose from an insurance policy.   Consequently, Wheeling's security interest in the Settlement Payment was not perfected by the filing of a UCC-1 financing statement.

None of the cases cited by Wheeling alter this result.   Wheeling argues that there is case law squarely holding that Article 9 covers payments on account of business interruption insurance, notwithstanding the exclusion in Maine UCC § 9-1109(4)(h).   See MNC Commercial Corp. v. Rouse, No. 91-0615-CV-W-2, 1992 WL 674733 (W.D. Mo. Dec. 15, 1992)), and Meridian Bank v. Bell Fuel Corp. (In re Bell Fuel Corp.), 99 B.R. 602 (E.D. Pa. 1989), aff'd, 891 F.2d 281 (3d Cir. 1989).   Neither Rouse nor Bell Fuel support Wheeling's position.

In Rouse, the bankruptcy court concluded that the secured creditor did not have a security interest in business interruption insurance proceeds because UCC § 9-104(g) (equivalent to Maine UCC § 9-1109(4)(h)) excluded from Article 9 coverage the transfer of an interest in or

12

claim in any insurance policy.    The secured creditor claimed that based upon the broad and

comprehensive terms of its security agreement it had a security interest in all of the debtor's

business income.    The district court rejected the bankruptcy court's rationale, holding that the

secured creditor's right to the insurance proceeds was based upon its security interest in the

debtor's business assets, which would otherwise have embodied or generated the debtor's

business income.    Consequently, the court ruled that the insurance proceeds paid from the

business interruption policy were derivative proceeds, and therefore, were subject to the secured

creditor's perfected security interest under the security agreement.    Rouse is distinguishable

from the present case because the secured creditor in Rouse had a broad security interest in all of

the debtor's business operations and all of its income-producing assets, including the actual

business interruption policy.    Wheeling's security interest in this case was limited to accounts

(including payment intangibles), inventory, and the proceeds thereof; as the Trustee points out, it

did not extend to some of the Debtor's other significant income-producing assets, such as real

estate and railroad tracks.    Moreover, the Rouse court did not adequately distinguish between

proceeds of an "account," which is conventionally within the scope of Article 9, and proceeds

payable under a business interruption insurance policy which, essentially, insures against the

temporal *absence* of accounts and their proceeds.

In Bell Fuel, the district court held that Article 9 applied to funds a debtor received from

an insurer in settlement of a lawsuit based on a business interruption policy because the funds

constituted "proceeds" of the collateral in which the secured creditor had a perfected Article 9

security interest.    99 B.R. at 606-07.    The court reasoned that once the insured-against event

occurred–i.e., interruption of the debtor's business–the debtor's right to collect the proceeds was

13

a chose in action.    Since the creditor had been granted a security interest in the debtor's choses

in action, the court concluded that such interest should similarly extend to the proceeds of the

chose in action, the same way a security interest in collateral extends to the derivative insurance

proceeds of the collateral.    Id.    Addressing the distinction between insurance policies as

original collateral and insurance policies as proceeds, the court stated:

> The 1972 Code change made clear that the Code framers meant to exclude from
> Article 9 only the transfer of life or other insurance policies themselves, and not
> insurance received as proceeds.    The purpose of the change was also to make
> clear that the secured party was fully protected if the secured party had a security
> interest in collateral which is then converted into identifiable cash proceeds by a
> disposition of that collateral that results in insurance proceeds.

Id. (citation omitted).

Wheeling's reliance on Bell Fuel is misplaced.    First, the issue in Bell Fuel was

significantly different from the issue here.    In Bell Fuel, the court determined whether certain

funds fell within the "proceeds" exception to the exclusion set forth in UCC § 9-104(7)

(equivalent to Maine UCC § 9-1109(4)(h)); the "proceeds" exception is not at issue in this case.

Here, the Policy did not provide coverage against loss, damage, or destruction to some other

collateral specifically identified in the security agreement, which collateral was then "converted"

into the Settlement Payment.    Instead, Wheeling argues that the right to receive the Settlement

Payment was a form of original collateral, which we believe brings it squarely within the scope

of the Article 9 insurance exclusion.    Moreover, Bell Fuel has been often criticized.    See, e.g.,

Premium Fin. Specialists, Inc. v. Remcor, Inc. (In re Remcor, Inc.), 186 B.R. 629, 634 (Bankr.

W.D. Pa. 1995) (criticizing Bell Fuel's statement that UCC § 9-104(7) excludes from Article 9

only "commercial" or "special" policies of insurance); Miller v. Norwest Bank Minn., N.A. (In

re Inv. & Tax Servs., Inc.), 148 B.R. 571, 574 (Bankr. D. Minn. 1992) (noting that "[t]he Bell

Fuel court's reasoning is flawed, it has not been followed, and it has been criticized by courts and commentators alike.") (citations omitted).

### B.  Impact of the revised UCC definition of "Account"

Wheeling also argues that the 2000 amendments to Article 9 "expressly extended coverage under the UCC to payment rights that arise from all contracts – including insurance contracts and other forms of contracts that are themselves excluded from UCC coverage."   As noted above, the term "account" now includes rights to payment "[f]or a policy of insurance issued or to be issued," whether or not such payment rights have been earned at the time of the assignment.   And, Wheeling claims, the new term "payment intangible" creates a separate category of collateral that consists of any payment right under any contract, without specification of or regard to the nature or type of contract from which the payment arises.   Thus, Wheeling seems to suggest that the insurance exclusion under Article 9 has been written out of the UCC by the expanded definition of "account."

The bankruptcy court rejected this argument, holding that the 2000 amendments to the UCC did not change the provisions of Maine UCC § 9-1109(4)(h), and thus an assignment of an insurance policy or its proceeds is still outside the scope of Article 9.   Further, the court reasoned, the revisions to the definition of account in the 2000 amendments comprehended only health-care insurance receivables, and not other types of accounts or insurance policies.

We agree with the bankruptcy court's interpretation.   Although the definition of "account" includes some "insurance related rights," see Me. Rev. Stat. Ann. tit. 11, § 9-1102(2)(c), it does not include the insurance related rights involved in this case.   An insured's right to receive payment for a covered loss is not a "right to payment . . . [f]or a policy of

15

insurance issued or to be issued. . . ."   Instead, this refers to the insurer's right to receive premiums from its insureds (which rights could be an important source of collateral for financing the insurer's business) or to an agent's right to be paid a commission on the issuance of a policy. See Jahn v. Cornerstone Cmty. Bank (In re U.S. Ins. Group, LLC), No. 09-1079, 2009 WL 4723466, at *4-5 (Bankr. E.D. Tenn. Dec. 2, 2009) (finding that while "Article 9 generally does not apply to a transfer of an interest in or an assignment of a claim under an insurance policy," insurance agency's right to a commission from insurance company for policies sold fell within Article 9's definition of "account."); Commercial Nat'l Bank of Pa. v. Seubert & Assocs., Inc., 807 A.2d 297, 303-04 (Pa. Super. Ct. 2002) (finding that "interests in commissions and expirations of insurance policies" should be analyzed under Article 9, pursuant to the definition of "account," because Article 9 insurance exclusion applied only to rights under insurance policies).   Thus, the inclusion of "a right to payment . . . for a policy of insurance issued or to be issued" is designed to facilitate financing by insurers or insurance agents, which has nothing to do with an insured's right to receive payment under a policy.   If we were to read the statute as broadly as Wheeling argues, the revised definition of "account" would eviscerate the insurance exclusion, and Wheeling has not cited any authority for the notion that the drafters of Article 9 intended to narrow or eliminate the insurance exclusion when they changed some of the Article 9 definitions in 2000.   So dramatic a change in the scope of Article 9's insurance exclusion would presumably have been heralded much more loudly or starkly if such elimination or exclusion were actually intended, and it is not this court's place to graft such intent into the Maine legislature's enactment of the 2000 amendments.

Finally, Wheeling contends that although Maine UCC § 9-1109(4)(h) excludes transfers or assignments of "claims," it does not exclude transfers or assignments of "rights to payment." According to Wheeling, under the bankruptcy court's faulty analysis, a "claim under a policy of insurance," as set forth in Maine UCC § 9-1109(4)(h), is the same as a "right to payment" of an insurance benefit under such a policy.   As such, even though this right to payment would otherwise be an "account" or a "payment intangible" under the Maine UCC, the transfer or assignment of that right would not fall within the scope of Article 9.   This analysis is incorrect, Wheeling argues, because a right to payment that arises under an insurance policy is legally distinct from the policy itself and from claims that can be made under the policy.   Therefore, the exclusion set forth in Maine UCC § 9-1109(4)(h) does not prevent the granting of an Article 9 security interest in a right of payment that arises under an insurance policy.

According to Wheeling, a claim is the process (the formal demand) that an insured must undertake to satisfy policy conditions, and a right to payment is an economic right to receive money under the terms of a policy.   It asserts that the Debtor had a right to payment either upon the issuance of the Policy or upon the occurrence of a covered loss, and that right to payment places the Settlement Agreement within its security agreement.   The bankruptcy court found this to be a "clever argument," but that it "misses the mark."   According to the bankruptcy court, the granting of a security interest in accounts and payment intangibles, without more, does not perfect an interest in an insurance policy or its proceeds, and, therefore, it makes no difference whether the occurrence under the policy resulted in a claim or right to payment.   We agree with the bankruptcy court's analysis.   Moreover, if, as Wheeling asserts, a "claim" is the process by which an insured makes a formal demand under an insurance policy, then Maine

UCC § 9-1109 would exclude a security interest in the process the insured must undertake, but

include a security interest in an insured's right to receive money under an insurance policy.

This type of oscillation in and out of Article 9's scope could not have been the intention of the

drafters of the UCC.

In light of the foregoing, we conclude that the bankruptcy court correctly determined that

Maine UCC § 9-1109 excluded the Settlement Payment from the scope of the UCC for

perfection purposes, such that Wheeling's filing of a financing statement did not perfect its

security interest in the Settlement Payment.

## II.    Whether the bankruptcy court erred in concluding that Wheeling does not hold a valid and enforceable security interest in the Settlement Payment under Maine common law.

Having determined that the bankruptcy court did not err in holding that Article 9 does not

apply in this case, we turn to the question of whether the court erred in concluding that Wheeling

did not have an enforceable, perfected security interest under Maine's common law.    Where

Article 9 does not apply, security interest disputes may be resolved by examining other statutes

of the state or state common law.    See In re Barton Indus., Inc., 104 F.3d at 1246.

The bankruptcy court concluded that under Maine common law, "possession of the

collateral" is required to enforce a "pledge of intangibles" against third parties and, therefore,

"[a] pledge of insurance policies requires that the pledgee maintain physical possession of the

policies."    Maplewood Poultry, 2 B.R. at 554 n.5.    Wheeling argues that the bankruptcy court

erroneously determined that Maine common law requires actual physical possession of an

insurance policy in order to perfect a common law security interest in payment rights under the

policy.    According to Wheeling, in reaching its erroneous conclusion, the bankruptcy court

18

relied on two cases–Big Squaw and Maplewood Poultry–and that the bankruptcy court erred in its interpretation of these cases. Wheeling opines that these cases held that while possession of an insurance policy was a necessary condition to the creation of a security interest in an insurance policy itself, that rule of possession does not apply to creation of a valid security interest in a payment due under an insurance policy. Such payments were determined to be "intangible rights" as to which possession of the policy might have been a sufficient condition for perfection, but not a necessary one. Thus, Wheeling argues, those cases expressly hold that the perfection requirements for rights to payment under an insurance policy--intangible property --can be satisfied by pledgee-assignee holding evidence of the pledge/assignment itself in the form of a security agreement. Wheeling claims, therefore, that the bankruptcy court confused the common law rules regarding creation of a valid security interest in an insurance policy itself with the common law rules regarding creation of a valid security interest in a related asset, the general intangible consisting of the right to a payment under the insurance policy.

The Trustee counters that Wheeling misapprehends the holding of Big Squaw. Specifically, the Trustee takes issue with Wheeling's assertion that Big Squaw "expressly [held] that the perfection requirements for rights to payment under an insurance policy–intangible property–can be satisfied by the pledgee/assignee holding evidence of the pledge/assignment itself (but not the policy), in the form of a security agreement." In the Trustee's view, that is not the holding of Big Squaw. Rather, the Trustee asserts, the Big Squaw court held the combination of possession of the financing agreement and notification to the insurer was sufficient, stating as follows:

19

> In light of A–I's possession of the financing agreement and its notification of the insurance carriers, this court concludes that filing a notice of the assignment or taking possession of the insurance policies themselves was unnecessary under Maine's common law and that A–I's interest stands valid against subsequent encumbrancers, including the bankruptcy trustee.
>
> Although third parties dealing with the insured may not be aware of such an assignment from the face of the insurance policies, the drafters of the U.C.C. considered the area involving claims to and under insurance policies to be sufficiently distinct and well regulated to warrant their exclusion from Article 9's filing requirements.   The U.C.C. exclusion serves to alert all parties that rights and claims under insurance policies, including rights in unearned premiums, are matters sufficiently unique to require diligent inquiry before advancing credit with the expectation that they may be made to serve as reliable security.

122 B.R. at 838-39 (footnote).

Although it is not clear what is required under Maine common law to perfect a security interest in the proceeds payable under an insurance policy, it is clear that Maine law requires something more than the filing of a UCC-1 financing statement.   It is undisputed that Wheeling did not take any step to perfect its asserted security interest in the Settlement Payment other than to file a UCC-1 financing statement.   There is no evidence in the record that Wheeling notified Travelers of its claimed interest in the Policy or any right to payment under the Policy such that a subsequent creditor exercising the type of diligence contemplated by the court in Big Squaw could have learned of Wheeling's interest.   There is no evidence that Wheeling ever became a loss payee under the Policy, or (to the extent suggested by Maplewood or Big Squaw) had possession of the Policy.   In the absence of any such evidence, the bankruptcy court did not err in holding that Wheeling had failed to perfect its asserted security interest in the Settlement Payment under Maine common law.

## <u>CONCLUSION</u>

For the reasons set forth above, we conclude that the bankruptcy court did not err in

holding that Wheeling does not have an enforceable, perfected security interest in the Settlement

Payment.    Accordingly, the judgment of the bankruptcy court is **AFFIRMED.**