# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:                                                    Bk. No. 13-10670

MONTREAL MAINE & ATLANTIC                                 Chapter 11
RAILWAY, LTD.,

Debtor.

### Canadian Pacific Railway Company's objection to trustee's July 15, 2015 plan of liquidation

*[A] nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity.*[1]

### Preliminary Statement

1.      Canadian Pacific Railway Company (CP) objects to plan confirmation.[2]  The July 15, 2015 liquidation plan is little more than a vehicle to settle private, non-debtor litigation. Rather than administering and distributing estate assets, as specified by the Code, parties willing to pay benefit.  The result pushes bankruptcy law beyond statutory boundaries.

2.      The plan purports to confer releases and injunctions that, under the circumstances, this Court lacks jurisdiction to sanction, the Bankruptcy Code proscribes, the First Circuit has not endorsed, and no U.S. precedent has ever condoned.  The arrangement goes so far as to deprive

---

[1] *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

[2] As a creditor holding an administrative expense claim ($94,310.20 USD, plus $8,556.28 CAD), as well as claims in classes 7 ($214,483.39 USD) and 13 (estimated for voting purposes by the court at $1.00 USD), CP is a party in interest with standing to object to confirmation of the plan. *See* 11 U.S.C. §§ 1109(b), 1128(b).  CP's business address is 1100 Avenue Des Canadiens-De-Montreal Suite G3, Montreal, Quebec, Canada H3B 2S2.

1

CP of contractual rights.  Lacking any rehabilitative purpose and intending to pay creditors a fraction of amounts due, the trustee's proposal is a bankruptcy plan in name only.

### Introduction

3.      Although CP grieves for the victims of the derailment, the railroad bears no fault, must defend, and should be indemnified.  Nevertheless, trustee Keach—the plan proponent—has embraced an ends-justify-the-means approach.  Instead of confronting confirmation burdens with candor, he pursues an otherwise laudable goal through unlawful devices.

4.      Having negotiated what the trustee believes to be favorable settlements, he now asks this Court to confirm the third-party release plan.  But conviction alone does not warrant *nonconsensual* alteration of creditor rights.  *See, e.g.*, *In re Ludlow Hosp. Soc., Inc.*, 124 F.3d 22, 31 (1st Cir. 1997) ("[W]e are not at liberty 'to redistribute rights in accordance with [our] personal views of justice and fairness.'") (*quoting Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (Posner, J.)).  Even if the First Circuit allowed such expediency, the trustee's request lacks (i) full disclosure; (ii) proof of debtor, estate, and creditors best interests, (iii) fairness, equity, reasonableness and good faith; (iv) an individual-by-individual demonstration of an identity of interests between the debtor and each settling party; (v) a rehabilitative purpose; (vi) an overwhelming vote by adversely affected (i.e., non-released) parties; and (vii) full payment of substantially all claims.  Evidence, essential to this third-party release scheme, has not been proffered.

5.      In jurisdictions that have, at times, permitted third-party releases, courts consistently make these showings prerequisites to approval.  *See, e.g.*, *In re Continental Airlines*, 203 F.3d 203, 217 (3d Cir. 2000) ("In summary, we find, based on the record before us, that the Bankruptcy Court and District Court lacked a sufficient evidentiary and legal basis to authorize

the release and permanent injunction of Plaintiffs' claims under any of the standards adopted by courts that have evaluated non-debtor releases and permanent injunctions."). And, without such evidentiary hallmarks, non-consensual releases and injunctions amount "to nothing more than a lockstep discharge of non-debtor liability and fall squarely into the section 524(e) prohibition." *Id*.

6.     Confirmation entails more than the trustee's say so. A robust record must satisfy the congressionally established confirmation standards. Yet this case wants for such a record. While the plan may be a convenient way to fund victim relief, support for the confirmation comes up woefully short. The trustee insists that absent confirmation settlement funds would evaporate, but regardless any settlor who pulls out would remain subject to suit.

7.     Since no evidence supports the terms or necessity of the releases and injunctions, the Court should not equip CP's adversaries with injunctive shields against class action and wrongful death lawsuits while simultaneously stripping CP of the ability to defend and to seek indemnification. If this plan is confirmed on such a flimsy record, settling third parties—rather than the debtor or the derailment victims—would be the real winners. *Id*. at 217 ("[G]ranting permanent injunctions to protect non-debtor parties on the basis of theoretical identity of interest alone would turn bankruptcy principles on their head."). Advantage should not supplant accountability.

8.     Beyond the third-party release and injunction overreach, other obstacles to confirmation abound. First, the trustee's clandestine "Plan Support and Settlement Agreements," requiring some settlors to vote for the plan, violate Code sections 1129(a)(2), 1129(a)(3) and 1125(b). If that were not enough, plan section 10.5 calls for secret agreements to take

precedence over the confirmation order, which has been disclosed, and undisclosed releases not to be limited anything that is disclosed.

9.      Second, plan section 5.1 mandates that confirmation constitutes Court approval of the secret settlements, including findings about debtor, estate, and creditor best interest; fairness, equitableness, reasonableness, and good faith.  Due process required full disclosure before vote solicitation and now obligates the Court to consider more than victim compensation aspirations.

10.     Third, the plan's exculpation clause—section 10.3—and estate representative releases and injunctions—sections 10.5(b)(ii) and 10.6(b)(i)—flout Code sections 524(e) and 1125(e).  These parties are not entitled to a discharge; yet plan provisions afford them the equivalent.

11.     Fourth, the plan does not properly classify claims.  The placement of section Code 1171(a) claims into classes 8 and 12 violates Code section 1123(a)(1); designating section 1171(b) claims as class 7 contravenes controlling precedent; and denoting class 7 claims as unimpaired cannot be squared with Code sections 1123(a)(3) and 1124.

12.     Fifth, the plan lacks a determinate "Effective Date."  Section 9.3 makes plan effectiveness contingent upon the satisfaction of "material and non-waivable" conditions, such as court of last resort final orders, regardless of any stay.  This renders Code section 1129(a)(7)'s best interest test unnavigable.

13.     And sixth, the plan has not been proposed in good faith.  Regardless of derailment victim solicitousness, the totality of the circumstances demonstrate a callous disregard for non-settling party rights, to the point of the denial of due process and the uncompensated taking of property.  Such machinations should not be countenanced: laudable pursuits must nonetheless be lawful.

In sum this Court cannot confirm.


## Background

### A.    The derailment and MMA's bankruptcy

14.    On July 6, 2013, an MMA Canada crude oil train derailed killing 47 Lac
Mégantic residents and extensively damaging village property.  The debtor exercised absolute
dominion over the MMA Canada subsidiary.  In fact the adversary complaint admits that the
debtor and the subsidiary both operated the train before the derailment.  The crude oil  belonged
to Western Petroleum Company, a subsidiary of World Fuel Services Corporation.  MMA
Canada owned the locomotives and the track.  And MMA Canada employed the engineer, who
left the train on an incline without being property secured.

15.    Shortly after the derailment, on July 15, 2013, lawyers brought a Quebec class
action against MMA Canada among others.  MMA Canada responded by seeking CCAA
protection on August 6.  On August 8, a Canadian judge granted the application.  That same day
MMA commenced this chapter 11 proceeding.

16.    On August 16, the class plaintiffs joined CP.  Around the same time, the estates of
several decedents sued MMA and other entities in Illinois.  Those cases have since been
transferred to this district.  During the pendency of this chapter 11 case and the CCAA
proceeding, MMA and MMA Canada sold substantially all assets.  MMA's sale closed on May
15, 2014, and MMA Canada's sale closed on June 30, 2014.  Neither company has operated
since the sale, and neither will ever conduct business again.

### B.    The chapter 11 plan

17.    By this plan the trustee seeks the Court blessing for settlement agreements that no
one other than a select few—i.e., the parties to the agreements—have seen.  But the plan does

not merely afford injunctive and release protection to non-debtor third-party settlors.   Going

beyond that the plan releases an almost endless list, including: (a) the debtor; (b) the trustee and

his agents, attorneys, accountants, financial advisors, restructuring consultants, and investment

bankers; (c) MMA Canada's attorneys; (d) the monitor as well as monitor employees and

attorneys; (e) the wrongful death trustee and respective agents, attorneys, accountants and

financial advisors; (f) the estate representative and the disbursing agent and their respective

agents, attorneys, accountants, and financial advisors, (g) Rail World Holdings, LLC; (h) Rail

World, Inc.; (i) Rail World Locomotive Leasing LLC; (j) The San Luis Central R.R. Co.; (k) Pea

Vine Corporation; (l) Montreal Maine & Atlantic Corp.; (m) LMS Acquisition Corp; (n) Earlston

Associates, L.P.; (o) Chubb; (p) the Hartford; (q) the creditors' committee and members; (r) each

of the shareholders, directors, officers, members or partners of released entities (including

Edward Burkhardt, MMA's chairman); and (s) literally hundreds of additional parties identified

by plan Exhibit 2, most of which/whom are not even mentioned by name.   For ease of reference,

the release provisions, applicable definitions, and exhibits are collected on Exhibit C to the

Declaration of John R. McDonald in support of this objection.

18.   In addition to shielding long lists of parties, the releases and injunctions reach far,

covering:

> *any and all Derailment Claims, Causes of Action, and all other Claims* (including
> any claims or Causes of Action for contribution, indemnity, warranty, forced
> intervention, or seeking the enforcement, attachment, collection, contribution,
> reimbursement or recovery of or from any judgment, award, decree, or order
> against any one or more of the Other Released Parties or property of any one or
> more of the Other Released Parties, or otherwise), debts, obligations, demands,
> liabilities, suits, judgments, damages, *rights (including any right of setoff,
> subrogation, contribution, indemnity, reimbursement or recoupment of any kind)*,
> remedies and causes of action, whatsoever, whether direct or indirect, liquidated
> or unliquidated, fixed or contingent, matured or unmatured, known or unknown,
> whenever arising, in law, equity or otherwise that are based upon, arise from and
> /or are related to events and/or circumstances that occurred or existed on or prior

> to the Effective Date, relating in any way to the Derailment, the Debtor, the
> Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the
> Settlement Agreements, including, without limitation, the Released Parties and
> the Released Parties' counsel's negotiation of the Settlement Agreements or the
> funding of the Settlement Agreements . . ..

Plan § 10.5(vi) (alternate emphasis supplied).

19.     Besides safeguarding the many, the plan divests CP of contractual rights unrelated

to MMA.  The releases and injunctions supposedly extinguish contractual indemnity duties that

non-debtor, released parties voluntarily assumed and would bar CP from proceeding against

released parties even though those same parties are free to sue CP.  For example, by shipping the

crude oil on CP, Western Petroleum Company (WPC) accepted the "Private equipment terms" of

tariff 6 and hence agreed:

> At all times when Private Equipment owned, leased or provided
> by, or on behalf of, Shipper are used on CP, Shipper shall be
> responsible for ensuring that the Private Equipment
>
> * are free from mechanical defects and failures;
>
> * contain no prohibited or obsolete parts;
>
> * comply with all applicable tariffs;
>
> * comply with all applicable industry, federal, provincial, state and
> local laws, regulation, rules, permits, licenses and decisions,
> including without limitation those issued, decided or established by
> the Association of American Railroads ("AAR"), Railway
> Association of Canada ( "RAC" ), Transport Canada, the U.S.
> Department of Transportation and the Federal Railroad
> Administration (FRA) regulations; and
>
> * are otherwise in suitable condition for the safe rail transportation
> of Commodities.
>
> *Shipper shall fully indemnify, defend and hold harmless CP from
> all losses, including, without limitation, attorneys' fees and other
> costs of litigation, damage, injury, death or any other liability
> including fines, penalties and environmental response costs to the
> extend such losses are caused by or otherwise arise from
> mechanical defects in, or failure of Private Equipment or from*

7

> *Shipper's failure to comply with the terms and conditions of this*
> *Tariff.*

*See* Declaration of John R. McDonald, Exh. A (emphasis added).

20.     Yet if the Court confirms the plan CP would be unable to enforce these

contractual rights, even though the debtor had nothing to do with WPC's taking on of these

obligations.

### C.      Secret settlement agreements

21.     The releases and injunctions upon which the plan is founded stem from various

non-debtor, third party settlements.   Those settlors presumably negotiated broad releases and

retained their rights to sue others.   CP presumes these facts because the trustee purposefully hid

all of the settlement agreements, save one.   Even though these accords have not been revealed,

their terms apparently govern in the event the plan and the settlements disagree.

22.     The stealth contracts control creditors payments, and the plan incorporates the

undisclosed arrangements.   *See* Plan § 5.1 (settlement agreements "are incorporated into this

Plan, as if the same were fully set forth herein…").   Accordingly, creditors and interested parties

have been denied access to material plan provisions.   This Court will not even see the controlling

documents until the trustee files the plan supplement and then only under seal, if at all.   *Id.*

### Legal Discussion

### I.      Requirements for confirmation

23.     Confirming a plan, particularly one as complex and far-reaching as this, is no

small endeavor.   Not only should confirmation be denied if the plan does not meet Code section

1129 requirements, confirmation fails unless the plan "complies with the applicable provisions

of" the entire Bankruptcy Code:

> Requirements for confirmation of a chapter 11 plan are enumerated
> principally in § 1129(a) and also, through subsection (a)(1)

> (requiring that a plan comply with applicable provisions of the
> Bankruptcy Code) in, among other sections of the Bankruptcy
> Code, § 1123(a) (specifying what a plan "shall" do).

*In re Irving Tanning Co.*, 496 B.R. 644, 658 (B.A.P. 1st Cir. 2013); *see also* 11 U.S.C. §
1129(a)(1).

24.     A plan's proponent must carry the confirmation burden of proof. *See, e.g.*, *In re
Washington Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011) ("[T]he Plan Supporters bear
the burden of proving that the Plan complies with all of the requirements of the Bankruptcy Code
for confirmation.").   Because the trustee has failed to show, and cannot show, that the plan
complies with the Code, the Court should not confirm.

## II.    The plan cannot meet Code requirements

### A.    The Code does not countenance nonconsensual third-party releases

The plan forces non-debtor, third-party releases and injunctions on CP based upon secret
settlement terms, settlor contributions, and debtor connections.   This Court lacks subject matter
jurisdiction to foist such consequences on non-debtor third parties.   Absent a clear record
supporting "related to" jurisdiction, the plan flounders beyond this Court's capacity to rescue.
And even if the trustee could sufficiently establish jurisdiction, section 524 limits non-debtor
discharges and channeling injunctions to asbestos cases and proscribes nonconsensual releases in
these circumstances.   Code section 1129(a)(3) requires good faith proposals that are not
forbidden by law; accordingly, this provision also precludes confirmation.   Finally, no precedent
permits the kind of releases and injunctions that the trustee wants to impose.   The inclusion of
such relief transgresses section 1129(a)(1)'s mandate about complete adherence to title 11.

### 1.    Subject matter jurisdiction

25.     This Court lacks subject matter jurisdiction to effect the sought after third-party
releases.   Bankruptcy court jurisdiction extends to four types of proceedings, the broadest of

which is "*related to* cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). "Related to"

jurisdiction encompasses non-debtor third parties only when "the outcome of the proceeding

could conceivably have an effect on the estate being administered in bankruptcy." *Celotex Corp.*

*v. Edwards*, 514 U.S. 300, 308 (1995) (citing *Pacor Inc. v Higgins*, 743 F.2d 984, 994 (3d Cir.

1984)); *see In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir. 1991).

26.    The trustee fails to address this statutorily mandated jurisdictional nexus.  The

plan makes the releases and injunction—the settlement funding carrot and stick—a non-waivable

confirmation condition.  Yet, without a record sufficient to connect each released party with

debtor, jurisdiction can only be presumed.  The trustee's decision to not file that information,

prevents the Court from even assessing the requisite evidence.

27.    A debtor cannot conjure up subject matter jurisdiction over a non-debtor, third-

party dispute simply by making the plan dependent on third-party contributions.  *See In re

Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004).  "Subject matter jurisdiction cannot

be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a

dispute, the parties cannot create it by agreement even in a plan of reorganization."  *Binder v.

Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),* 372 F.3d 154, 161 (3d Cir. 2004).

28.    Besides that, the Code's All Writs catchall, section 105(a), does not confer

*jurisdiction*.  Rather, a bankruptcy court can only "issue any order, process or judgment that is

necessary or appropriate to carry out the provisions" of the Code.  11 U.S.C. § 105(a); *see In re

Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("Section 105(a) does not, however,

broaden the bankruptcy court's jurisdiction, which must be established separately[.]").

29.    "Related to" jurisdiction must be independently established.  *In re Zale Corp.*, 62

F.3d 746, 756 (5th Cir. 1995); *In re Combustion Eng'g. Inc.*, 391 F.3d 190, 225 (3d Cir. 2004),

as amended (Feb. 23, 2005) (finding no jurisdiction, even though "it is efficacious to use §

105(a) to extend injunctive relief in favor of non-debtors in order to create 'bigger pot' of

assets").  To secure more assets for derailment claimants, the trustee may find injunctive relief in

favor of non-debtor tortfeasors helpful, but the bankruptcy court must have jurisdiction before

any such result can be accomplished.  Section 105(a) does not so empower this Court.

### 2.    Section 524

30.    Even if this Court had subject matter jurisdiction, Congress restricts the release of

third party liability: "Except as provided in subsection (a)(3) of this section, discharge of a debt

of the debtor does not affect the liability of any other entity on, or the property of any other entity

for, such debt."  11 U.S.C. § 524(e).  This provision "precludes bankruptcy courts from

discharging the liabilities of non-debtors."  *In re Fred Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.

1995), *cert. denied*, 517 U.S. 1243 (1996).  The Supreme Court has never addressed the issue,

and Congress limited the exception to asbestos cases, *see* 11 U.S.C. § 524(g), that enable the

reorganized debtor to become a "going concern, such that it is able to make future payments into

[a] trust to provide an 'evergreen' funding source for future asbestos claimants."  *In re

Combustion Eng'g, Inc.*, 391 F.3d 190, 248 (3d Cir. 2004), *as amended* (Feb. 23, 2005).  In

contrast, this is a non-asbestos bankruptcy involving the liquidation of a non-operating debtor.

31.    Congress obviously knew how to address expansion of discharge rights and chose

to limit them to circumstances not present here.  Yet in violation of section 524(e) and (g), the

trustee's plan purports to release non-debtor, tortfeasors and to enjoin non-debtor/non-settling,

third parties from even asserting setoff rights.  Indeed, the legislative limitation on non-debtor

releases makes sense in the bankruptcy context.  The concept of only discharging the debtor

pervades the Code:  the bankruptcy court exercises jurisdiction over the debtor's entire estate,

but typically has no jurisdiction over non-debtor property; the Code defines eligibility

requirements for debtors, but not for non-debtors; bankruptcy procedures scrutinize debtors, but not non-debtors; debtors must make extensive asset, liability, and financial affairs disclosures, but non-debtors do not; and the Code provides safeguards for and limitations on the discharge of debtor obligations, but section 524 does not entitle non-debtors to a discharge.

32.     If non-consensual discharges could be afforded to non-debtors, those parties would enjoy that relief without bankruptcy procedural safeguards.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("[A] nondebtor release . . . may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.")  The expansive scope of this plan's releases and injunctions conflict with the fundamental policy of preserving non-debtor claims and defenses that do not directly implicate debtor rehabilitation.  If this Court were to confirm the plan, CP's contractual—i.e. property—rights of indemnification and setoff would be confiscated.

### 3.     First Circuit silence

33.     In spite of section 524's express prohibition, the circuits have parted ways regarding third-party releases (though no precedent supports third party releases in this proceeding).  The interplay between section 524 and catchall section 105(a) spawned the split.

34.     The Fifth, Ninth, and Tenth Circuits refuse to allow non-debtor releases.  *See In re Zale Corp.,* 62 F.3d 746, 756 (5th Cir. 1995)*; In re Fred Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995) *cert. denied*, 517 U.S. 1243 (1996); *In re Western Real Estate Fund Inc.*, 922 F.2d 592, 601 (10th Cir. 1990).   In contrast, the Second, Third, Fourth, Sixth, and Seventh Circuits condone such devices, but only in limited circumstances.  *See In re Drexel Burnham Lambert Group Inc.*, 960 F.2d 285, 292 (2d Cir. 1992); *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000); *In re A.H. Robins Co. Inc.*, 880 F.2d 694, 700-02 (4th Cir. 1989); *In re Dow*

*Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Specialty Equipment Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993) (permitted only when creditors consent).   The First Circuit has yet to address the issue.

35.    The First Circuit has twice reviewed the issue of third-party releases in a bankruptcy context:   *In re G.S.F. Corp.*, 938 F.2d 1467 (1st Cir. 1991), and *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995).   Neither precedent, however, controls or approves what the trustee seeks.

36.    In *G.S.F.* the lower court issued an injunction stemming from mutual releases between a debtor and a secured party.   The bankruptcy judge had determined that section 105(a) vested the court with necessary prerogative.   On appeal, the First Circuit noted the "effect on the debtor" limitations on section 105's grant of equitable authority.   But in the end, the higher court expressly found that justification for the injunction below was not that effect.

The court distinguished *G.S.F.* from third-party release cases as follows:

> This case is somewhat extraordinary, however, as what is sought is a relitigation injunction. The justification for the injunction here is not effect on the debtor (although the presence of such an effect certainly strengthens the case for the injunction), but protection of a federal judgment. *See Toucey v. New York Life Ins. Co.*, 314 U.S. 118, 144, 62 S.Ct. 139, 149, 86 L.Ed. 100 (1941) (Reed, J., dissenting); 17 Wright, Miller & Cooper, *Federal Practice and Procedure* Sec. 4226 (2d ed. 1988). A valid original judgment provides the federal court with the power to issue the relitigation injunction.

*G.S.F. Corp.*, 938 F.2d at 1475.  Hence, *G.S.F.* is merely a collateral attack case.

37.    *Monarch*, another collateral attack case, addressed a plan of reorganization releasing non-debtors, including the debtor's attorneys. Post-confirmation, the debtor's wholly-owned subsidiary sued counsel.  The law firm argued, and the bankruptcy court agreed, that the

subsidiary violated a plan injunction. On appeal the subsidiary maintained that the bankruptcy court lacked jurisdiction to so enjoin.

38.    Rather than ruling on the propriety of the injunction, the court deferred:

> Though there is conflicting authority on the `jurisdictional' reach of section 105(a), the confirmation order cited precedent for a broad-based `incidental' injunctive provision . . . We express no view on the soundness of the precedents cited in the confirmation order, nor on their applicability to the particular Plan proposed by Monarch Life.

*Monarch*, 65 F.3d at 983.   Because the subsidiary failed to appeal the confirmation order the appellate court deemed the action to be estopped.   As in *G.S.F. Corp*, the *Monarch* court sidestepped the issue of bankruptcy court authority to issue third-party releases.   A contrary argument would misapprehend, if not misrepresent, the state of First Circuit law.

### 4.    Other jurisdictions

39.    In those jurisdictions that have endorsed third party releases, plan proponents still face an uphill battle.   Non-debtor releases are the exception, rather than the rule.   To confirm a plan of reorganization complete with non-debtor releases, the debtor must demonstrate (1) unusual circumstances, (2) fairness, and (3) debtor reorganization necessity.   *See In re Transit Group, Inc.*, 286 B.R. 811, 817 (Bankr. M.D. Fla. 2002).

40.    *In re Master Mortgage Investment Fund Inc.*, 168 B.R. 930, 934-937 (Bankr. W.D. Mo. 1994) (Koger, J.)—cited in *Monarch* and by many other courts considering third party releases—summarized the judicially developed factors that could support fairness and necessity findings.   Concluding that a *per se* rule against third party releases went too far, the court nevertheless cautioned that such a plan provision "is a rare thing, indeed, and only upon a showing of exceptional circumstances . . ." should that relief be afforded.   *Id*. at 937.   Before granting third-party releases, courts must assess the following:

(1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization. Without the [sic] it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*Id.* at 935 (footnotes omitted).

41.     Close to a decade later, the *Lacy v. Dow Corning Corp. (In re Dow Corning Corp.)*, debtor sought non-debtor releases.  280 F.3d 648 (6th Cir. 2002).  In confirming the plan, the Sixth Circuit cautioned that only "unusual circumstances" justify non-consensual, non-debtor releases.  *Id.* at 658.  Conclusory statements or applicable test recitations do not amount to unusual circumstances.  *Id.*   A release proponent must present evidence regarding each released party's situation; a court cannot collectively evaluate  the circumstances of all released parties.  *Id.*

*Dow Corning's* delineated the test of "unusual circumstances" as follows:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) The non-debtor has contributed substantial assets to the reorganization;

(3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(4) The impacted class, or classes, has overwhelmingly voted to accept the plan;

(5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and;

(7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.*

42.     Hence, third party releases can only be included in a plan of reorganization when the debtor rehabilitates, when third party indemnity rights threaten future debtor operations and cash flow, when prospective debtor-going-concern value can be harnessed to pay creditors in full, and when the record has been fully developed.   Releases in chapter 11 liquidations are not an expedient for resolving claims among non-debtor, third parties, even if such releases glean additional money for the estate.   *See In re Optical Technologies, Inc.*, 216 B.R. 989 (Bankr. M.D. Fla. 1997) (Paskay, J.) (refusing to approve releases because the debtor would be totally liquidated);   *In re Swallen's, Inc.*, 210 B.R. 123, 127 (Bankr. S.D. Ohio 1997) (same); *In re Regency Realty Associates*, 179 B.R. 717 (Bankr. M.D. Fla. 1995) (same).

### 5.     The undisputed facts do not warrant the relief the trustee seeks

43.     With the law in focus, the facts show the way.   Before entering into any of the third party settlements MMA sold all assets and ceased operations.   *See, e.g.*, Disclosure Statement § IV.C.*xix*.   And as the plan's title makes clear, rehabilitation is not contemplated, and future value will not be protected.   Instead, the plan envisions a liquidating trust.   If that were not enough, the disclosure statement reveals that Class 13 claimants "will receive distributions in the range of approximately 3% to 71%" of allowed claims.   This range of potential distributions dispels all doubt about claims being paid in full.   At this stage, MMA is basically being distributed.   Thus the trustee cannot prove "unusual circumstances."

44.    Since the trustee admits these facts, Code section 524(e) deprives the court of prerogative to subject CP to third-party, non-debtor releases; instead, CP's consent must be secured before third-party liability can be jettisoned. *See, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999). Therefore plan provisions purportedly releasing CP's claims against third parties—in the face of CP's objections—cannot pass Code muster. *See, e.g.*, *In re Nickels Midway Pier, LLC*, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (third party releases impermissible when objecting parties receives no consideration and debtor's liquidation obviates the need for releases to enable a reorganization); *In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (objecting shareholders to whom the plan afforded nothing could not be forced to release third parties); *Exide*, 303 B.R. at 74 (approving releases that only bound creditors and equity holders who accepted plan terms); *Zenith*, 241 B.R. at 111 (release provision had to be modified so that only creditors who voted in favor of the plan released non-debtors).

45.    This case presents even less compelling facts than those in which third-party releases have been rejected in other jurisdictions.  If this Court wanted to consider whether unusual circumstance justified third-party releases, the trustee's insistence upon secrecy precludes such an undertaking.  By covering up agreement terms, the trustee disabled himself from adducing facts that would show the necessity of each individual release and injunction or the "substantial contribution" of each settlor. *See, e.g.*, *Dow Corning*, 280 F.3d at 658 (proponent must present evidence regarding *each* released party's situation: a court *cannot collectively* evaluate circumstances of all released parties); *National Heritage Foundation, Inc. v. Highbourne Foundation*, 2014 WL 2900933 (4th Cir. June 27, 2014) (lack of factual support invalidates chapter 11 plan's nonconsensual, third-party releases of non-debtors);   *In re*

17

*Washington Mutual, Inc.*, 442 B.R. 314, 349-350 (Bankr. D. Del. 2011) (debtors cannot grant releases to the debtors' directors, officers and professionals because no evidence supports, *those parties* "substantial contribution"); *In re Continental Airlines*, 203 F.3d at 217 ("[G]ranting permanent injunctions to protect non-debtor parties on the basis of *theoretical* identity of interest alone would turn bankruptcy principles on their head." (emphasis added)).

46.    "A non-debtor third-party release should not be approved absent a finding by the court that 'truly unusual circumstances' exist that render the release terms important to the success of the plan." *Metromedia*, 416 F.3d at 143.   The trustee's concealment of settlement terms and settling party connections render the plan unconfirmable.   Confirmation compliance cannot be accomplished after solicitation and voting.   Instead the trustee must make the requisite showing.   Third-party release non-disclosures preclude such a demonstration.   Inability to satisfy section 524(e) dooms the trustee's quest.

### 6.    CP's indemnification and setoff rights

47.    Importantly, the plan forcibly deprives CP of the contractual indemnity and setoff rights.   By Tariff 6, Item 20, WPC agreed to indemnify CP for fault, including the tank-car compliance with all applicable laws, regulations, and CP tariffs.   A U.S. rail carrier can only be held to the duties prescribed by U.S. railroad laws and regulations, and U.S. hazardous materials regulations.   Beyond those federally dictated obligations CP Tariff 8, Item 20 made WPC responsible for classifying the oil and selecting the packaging.   CP is therefore entitled to indemnification from WPC.

48.    The divestiture of a non-debtor contractual rights against another solvent non-debtor vastly exceeds this Court's power to reorder MMA's debts.   *See, e.g.*, *First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) ("While the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the

obligations and liabilities of third parties."). Bankruptcy courts have limited jurisdiction. Disputes between non-debtors exceed bankruptcy court adjudication power. Bankruptcy judges have final authority only as to "core proceedings," i.e. those set forth in 28 U.S.C. § 157(b)(2). *Stern v. Marshall*, 564 U.S. --, 131 S.Ct. 2594 2603-04 (2011).

49.    Rights among third parties cannot be altered by a bankruptcy proceeding without consent and are beyond "related-to" jurisdiction. *See In re Market Square Inn, Inc.*, 163 B.R. 64, 67 (Bankr. W.D. Pa. 1994) ("we know of nothing which gives the bankruptcy court jurisdiction to adjudicate claims between two non-debtor third parties").

50.    Besides WPC's involvement, Irving Oil put CP on notice of a claim. Declaration of John R. McDonald, Exh. B. That notice reserved Irving Oil's right to recover the $75,000,000.00 CAD contributed to the indemnity fund. The notice also announced that Irving Oil assigned rights against CP to the MMA, and the plan, if confirmed, would extinguish CP right to any setoff against Irving Oil, a released party. Such circumstances enable MMA, as assignee of Irving Oil's claim and the criminally charged wrongdoer, to sue CP with impunity.

51.    Plan confirmation cannot plunder setoff rights; the Constitution protects such property. *See United States v. Continental Airlines (In re Continental Airlines)*, 134 F.3d 536, 542 (3d Cir. 1998), *cert. denied*, 525 U.S. 929 (1998). And section 553 preserves setoffs in bankruptcy as that right exists outside the bankruptcy. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) ("Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy").

## B.    Plan settlements violate the Code

### 1.    Solicitation before disclosure statement dissemination

52.     The trustee has entered into a covert post-petition "Plan Support and Settlement Agreement," requiring settling parties to vote in favor of the plan.    But section 1125(b) proscribes such a scheme:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

53.     As the party who must demonstrate Code compliance (11 U.S.C. §§ 1129(a)(2) and (a)(3)) and as a signatory to the June 2015 plan support agreement, the trustee must explain how he can possibly elude non-solicitation restrictions.    Although the June 17, 2015 Canadian order supposedly prevents production of the settlement agreements, *see* ECF No. 1491-1, Ex. A at ¶ 15, the trustee cannot hide behind that ruling.    The Canadian order provides:

> ALLOWS the third parties to transmit information as it wishes and not in the manner Canadian Pacific wishes to receive it. The redacted settlement agreements and their content will be inadmissible as evidence with the exception of being used for the purposes of the Canadian approval order and the U.S. approval order. The settlement agreements must be filed in court under seal and must be the object of a sealing order prohibiting the disclosure, publication and communication of the redacted settlement agreements and is not to be interpreted as a renunciation by any of the third parties as to the confidentiality of the settlement agreements and to the privileges attaching thereto.

*Id*.

54.     And, nothing relieves the trustee of the U.S. law burden to demonstrate Code compliance—a burden of which this Court must have been mindful in adopting section 7 of the Cross-Border Insolvency Protocol:

> The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceeding and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceeding and the hearing and determination of matters arising in the Canadian Proceedings.

ECF No. 126-1, at § 7; *see also* ECF No. 168 (order adopting protocol).  Regardless of any dilemma faced by the trustee, U.S. law controls.

### 2.    Settlement agreement supremacy violates the Code

55.    In keeping with the requirement Code compliance, *see* 11 U.S.C. § 1129(a)(1), the Court must  know precisely what the plan provides.  But how can a plan be measured against the Code if important provisions are kept out of sight?

Plan section 10.5(a) specifies:

> In the event of any inconsistency between this Plan or the Confirmation Order and the Settlement Agreement(s), the terms of the Settlement Agreement(s) will apply with respect to the particular parties thereto; provided, however, that all Settlement Agreements are subject to Sections 10.5, 10.8 and 10.9 of the Plan.
>
> ***
>
> Nothing herein shall affect any limitation contained in any Settlement Agreement with respect to the release granted to any Released Party.

56.    Despite this paramountcy provision, the settlements that override the plan and the releases that the plan cannot modify remain shrouded.  Such secrecy prevents the trustee from meeting his burden—or this Court from determining whether the burden can be carried.  The Court and the parties must see every provision of every agreement because those terms literally *are* the plan.  Not only that, but how can creditors be asked to vote on a plan that they have never fully reviewed?

57.    On top of everything else, plan section 5.1 provides, in part:

> To the extent not previously approved by the Bankruptcy Court, copies of the Settlement Agreements will be included in the Plan Supplement, <u>although filed under seal (except for the XL Settlement Agreement attached hereto)</u>, and the provisions thereof are incorporated into this Plan, as if the same were fully set forth herein; *provided, however* that the terms of the Settlement Agreements are subject to Sections 10.8 and 10.9 of the Plan, and no Settlement Agreement may provide for a release in favor of MMA Canada as to any Claims of Canada, to the extent provided in the CCAA Plan. In accordance with the terms of any applicable Settlement Agreement(s), any and all otherwise applicable statutes of limitations or repose or other time-related limitations relating to the Released Parties and the Released Parties' Claims (as defined therein) shall be deemed to have been tolled for statute of limitations purposes during the period from the Execution Date (as defined therein) to the Plan Implementation Date (as defined therein) or the date that such Settlement Agreement becomes null and void pursuant to the Settlement Agreement.

Plan § 5.1 (emphasis in original).  Hence, the undisclosed settlement terms purport to toll statutes of limitation and repose without the benefit of a judicial determination regarding tolling permissibility.  The lacing of the plan with such "gotcha" provisions borders on, if not constitutes, bad faith.

### 3.    Settlement agreement approval required

58.    Even if the Code countenanced third party releases and channeling injunctions, the plan cannot be confirmed because the Court cannot scrutinize the foundational settlements for fairness and equitableness.  By denying this opportunity, the plan violates section 1129(a)(1)'s requirement of compliance with all applicable Code provisions.

59.    A reorganization plan can settle claims against a debtor.  11 U.S.C. § 1123(b)(3)(A).  But in doing so, "[i]rrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to separate motion under Bankruptcy Rule 9019, the standards applied for approval are the same. The settlement must be fair and equitable and in the best interest of the estate." *In re Best Products Co., Inc.*, 177 B.R.

791, 794 n.4 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *see also In re Ashford Hotels,*

*Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("The 'range of reasonableness' must

encompass several benchmark principles.  Foremost, the settlement must be supported by

adequate consideration, be fair and equitable, and be in the best interest of the estate."); *In re*

*Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 758-59 (Bankr. S.D.N.Y. 1992)

(Bankruptcy Rule 9019 standards govern).

60.    "[U]nder the 'fair and equitable' standard, the court looks to the fairness of the

settlement to the other parties, i.e., the parties who did not settle." *In re Washington Mutual, Inc.*,

442 B.R. 314, 328 (Bankr. D. Del. 2011) (quoting *Will v. Northwestern Univ. (In re Nutraquest,*

*Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006)). In determining the best interests of the estate, the court

balances the value of the estate's acceptance of a settlement against the claims that will be

compromised. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.1996); *see also*

*Nutraquest*, 434 F.3d at 644–45 (reaffirming the *Martin* test of assessing the compromise of

claims by and against the estate).  Again, the trustee's furtive tactics prevent the Court from

making the requisite assessment.

61.    A bankruptcy judge must come to an educated estimate of the "complexity,

expense, and likely duration of such litigation, the possible difficulties of collecting on any

judgment which might be obtained, and all other factors relevant to the full and fair assessment

of the wisdom of the proposed compromise." *Protective Comm. for Indep. Stockholders of TMT*

*Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157 (1968); *see also In re RFE*

*Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002) (a bankruptcy court should examine four

settlement approval factors: the probability of litigation success; collection difficulties; litigation

complexity; and creditor interests); *Martin*, 91 F.3d at 393 (same).

62.     The disclosure statement fails to reveal settlement amounts, so this Court cannot evaluate fairness.   And such surreptitiousness renders determination of the estate's best interests impossible.   Rather the presenting the facts, the trustee blithely assumes satisfaction of confirmation criteria.   *See* Disclosure Statement at 53.   But the Code demands proof, not assumptions.   *See In re Lion Capital Grp.*, 49 B.R. 163, 175 (Bankr. S.D.N.Y. 1985); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 598 (Bankr. S.D. Tex. 1991), *aff'd* 158 B.R. 421 (S.D. Tex. 1993).

63.     "The settling parties must set forth the facts in sufficient detail that a reviewing court could distinguish it from mere boilerplate approval of the trustee's suggestion." *In re Lion Capital Grp.*, 49 B.R. at 176 (citing *In re Boston & Providence RR Corp.*, 673 F.2d 11, 12 (1st Cir. 1982) and *In re Black Watch Farms, Inc.*, 373 F. Supp. 711, 716 (S.D.N.Y. 1974).   Without essential information, neither CP nor the court can determine whether the plan should be approved.   The disclosure statement attached a single agreement, XL's, with no assurance of substantive uniformity other than the non-evidentiary remarks of the trustee.   The remaining accords (at least 21), involving entities or groups of affiliated entities, are identified in name only.   *See* Plan, Exh. 2 (Released Parties).

64.     And as already noted, these sight-unseen deals are "incorporated into [the plan], as if the same were fully set forth herein." *Id.* at § 5.2.   And the undisclosed arrangements "will apply with respect to the particular parties thereto" so as to overcome "any inconsistency between the Plan or the Confirmation Order and the Settlement Agreement(s)." *Id.* at § 10.5. Yet, the controlling documents remain cloaked in mystery.

65.     The trustee has also covered up supposedly "minor provisions unique to particular Settlement Agreements (*such as certain claims preserved by Released Parties against non-settling parties or insurers*)[.]"   Motion to Seal ¶ 14 (emphasis added).   CP knows of one such

"minor" provision from Irving Oil's a notice of claim. *See* Declaration of John R. McDonald,

Exh. B. That missive announced a $75 million (CDN) settlement and reserved recovery rights,

while reporting the assignment other rights. Hence, at least one concealed agreement implicates

CP, but CP is left to guess about the specifics.

66.     And the World Fuel defendants appear to have entered into a similar, but who can

say, release/assignment arrangement. Other released parties likely reserved or assigned rights.

But because the settlements remains private, the appropriate analysis cannot be performed, and

the paramount interests of creditors cannot be weighed. Simply put, without knowing whether

the settlements are fair and equitable, the Court cannot confirm the plan.

67.     The trustee is obviously apprehensive about allowing this Court to discharge

confirmation duties. The trustee proposes that the mere entry of the confirmation order should

result in secret settlement approval, including findings about: the best interests of the debtor, the

estate, and creditors; fairness, equitableness, and reasonableness; and good faith. Plan section

5.1. Due process requires full disclosure before solicitation and voting and obligates the Court to

base settlement-related findings on more than a trust me evaluation.

**C.      The plan's exculpation provisions violate Code's discharge limitations**

68.     The plan's exculpation clause—section 10.3—and releases and injunctions in

favor of the estate representatives—sections 10.5(b)(ii) and 10.6(b)(i)—fail to comply with Code

sections 524(e) and 1125(e). The court cannot bestow a liability discharge under the

circumstances of this case.

69.     The Code establishes limited protections for entities involved in the plan

confirmation process:

> A person that solicits acceptance or rejection of a plan, in good
> faith and in compliance with the applicable provisions of this title,
> or that participates, in good faith and in compliance with the

> applicable provisions of this title, in the offer, issuance, sale, or
> purchase of a security, offered or sold under the plan, of the debtor,
> of an affiliate participating in a joint plan with the debtor, or of a
> newly organized successor to the debtor under the plan, is not
> liable, on account of such solicitation or participation, for violation
> of any applicable law, rule, or regulation governing solicitation of
> acceptance or rejection of a plan or the offer, issuance, sale, or
> purchase of securities.

11 U.S.C. § 1125(e).  Despite this clear limitation, however, plan section 10.3 provides as

follows:

> As of the Effective Date, none of (a) the Trustee, (b) the Monitor,
> (c) MMA Canada, or (d) the members, representatives,
> accountants, financial advisors, consultants and attorneys of the
> entities described in (a) through (c) of this paragraph shall have or
> incur any liability to any person for any act taken or omission *in
> connection with or related to the Chapter 11 Case . . ..*

Plan §.5.1 (emphasis added).  These two exculpatory provisions—one statutory, the other

contractual—cannot be reconciled.

### D.     Improper classification and impairment

70.     The plan also does not adhere to Code classification requirements.   The

classification of section 1171(a) claims into classes 8 and 12 transgresses Code section

1123(a)(1); the classification of section 1171(b) claims into class 7 flouts controlling First

Circuit precedent; and denoting class 7 claims as unimpaired runs afoul of Code sections

1123(a)(3) and 1124.

### 1.     Classification of section 1171(a) claims

71.     The plan inexplicably assigns derailment personal injury and wrongful death

claims to classes 8 and 12 and states that they "shall not be Allowed Administrative Expenses

Claims."   See Plan § 2.4.   But the Code specifies that such damages "*shall* be paid as an

administrative expense[.]"   11 U.S.C. § 1171(a).   Thus the plan fails to conform with the Code.

The only rationale for misclassifying claims could be plan approval vote rigging.

26

72.    Administrative expense claims "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," must provide "the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(A). Nonetheless, neither the disclosure statement nor the plan specify that wrongful death and personal injury claimants agreed to forgo administrative expense treatment. Importantly, administrative claims are 507(a)(2) claims.    Section 1123(a)(1) prohibits classification and denies a vote.  Hence, the plan's purported classifications are bogus, and Classes 8 and 12 should not be allowed to vote.

73.    A plan proponent can alter the Code's structure and classify administrative expenses of obligees who "agree to a different treatment."  But agreements would not change claim nature, only claim treatment.  The reason that section 507(a)(2), (a)(3), and (a)(8) claims elude classification is that a majority of claimants holding priority claims should not be empowered to bind the minority to a variance with section 1129(a)(9), which requires either payment in full on the effective date or *individual* consent to some other disposition. 11 U.S.C. § 1129(a)(9).  Even Official Form 25B specifies that administrative expenses are "automatically entitled to specific Code treatment.  They are not considered impaired, and holders of such claims do not vote on the Plan."  Classes 8 and 12 should be eliminated and regarded as unclassified administrative expenses that cannot vote.    Anything else renders the plan unconfirmable.

## 2.    Classification and impairment of 1171(b) claims

74.    Additionally, while administrative expense holders have unlawfully been allowed to vote, the plan takes voting rights away from classes that should have them.  At least a portion of CP's unsecured claim qualify for section 1171(b).  The plan lists section 1171(b) claims in Class 7, described as follows:

27

Claims arising under section 1171(b) of the Bankruptcy Code, if any, shall not be treated as Allowed Administrative Expense Claims, but shall be treated as Allowed Priority (Class 7) Claims junior in priority to all other Allowed Priority (Class 7) Claims, to the extent Allowed by a Final Order of the Bankruptcy Court as Claims under section 1171(b).

§ 2.4.   Such a disposition offends the First Circuit's decision in *In re Boston & Maine Corporation*, which requires administrative expenses ministration.  634 F.2d 1359, 1378-79 (1st Cir. 1980).

76.    But even if the plan could classify Section 1171(b) claims, class 7 expectations are anything but unimpaired:

> With respect to Claims, if any, arising under section 1171(b) of the Bankruptcy Code and which, as a matter of law, are junior in priority to other Class 7 Claims, such Claims shall be paid on the later of the Effective Date or thirty (30) days after the date such Claims become Allowed Claims in such amount and upon such terms as the Bankruptcy Court shall determine and as set forth in any Final Order allowing, in whole or in part, such Claims.

Plan § 4.7(b).  Therefore, the plan improperly classifies and, in any event, inaccurately denotes the lack of CP's section 1171(b) claim impairment.

### E.    Best interests test

76.    The "Effective Date" of the plan is indeterminate.  Plan section 9.3 ties that date to the satisfaction of "material and non-waivable" conditions, such as entry of final orders by courts of last resort, regardless of any stay.  *See* Plan § 1.71 (defining "Final Order").  This makes the so-called "best interests test" impossible to assess.  The test is derived from Code section 1129(a)(7), which requires that impaired classes voting to reject a plan must receive property of a value "as of the effective date" that is not less than they would receive in a chapter 7 liquidation.  *See, e.g.*, *Southern Pac. Trans. Co. v. Voluntary Purchasing Grps.*, 252 B.R. 373, 392 (E.D. Tex. 2000) ("[O]nly by determining when a plan's effective date occurs can a court engage in a meaningful analysis of the best interest test.").

77.     "Because such matters as asset valuation and the estimation of liquidation recoveries can be drastically affected by the timing of one's calculations, a court must ensure that all financial projections incorporated into its analysis reflect the resources that are likely to be available to a debtor on a plan's effective date." *Id.*  By making the effective date uncertain, the plan renders section 1129(a)(7) meaningless.

### F.     The plan lacks good faith

78.     Section 1129(a)(3) requires the plan to be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Plan good faith depends on "whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Am. Capital Equip.*, 688 F.3d at 156 (internal quotations omitted).  Such results are achieved when the plan has "a legitimate and honest purpose to reorganize the debtor." *Mercury Capital Corp. v. Milford Conn. Assocs.*, 354 B.R. 1, 7 (D. Conn. 2006) (internal quotation marks omitted).

79.     "The good faith test means that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)).  When evaluating section 1129(a)(3) good faith, the court must consider "the totality of the circumstances surrounding the formulation of the plan." *In re River Valley Fitness One Ltd. P'ship*, No. 01-12829-JMD, 2003 WL 22298573, *3 (Bankr. D.N.H. Sept. 19, 2003).  The good faith requirement "speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)).

80.     The totality of the circumstances of the trustee's proposal reveals a lack of good faith.  The plan's obvious beneficiaries would be settling, non-debtor parties who receive blanket

releases and injunctive protection. That goal – rather than debtor rehabilitation – animates the plan. All assets have been sold, and the debtor will *not* reorganize. In fact, this plan has never been about debtor reorganization. From the outset, the trustee has sought to stretch the Code beyond recognized limits to protect non-debtor entities from lawsuits in exchange for settlement contributions (the terms, extent, and "substantial" character of which are unknown to anyone other than settling parties).

81.    To make matters worse, secret agreements fund the plan, and the trustee solicited creditor votes without disclosing controlling plan terms. The plan benefits certain classes of creditors more than others. The potential range of recovery for unsecured creditors, such as CP, is so broad and lacking in basis to be meaningless.

82.    And the plan pays several other classes of claimant (Class 8 Derailment Moral Damages and Personal Injury Claims, Class 9 Derailment Property Damage Claims, Class 10 Derailment Government Claims, and Class 11 Derailment Property Subrogated Insurance Claims) nothing. Instead, those claimants must look to the CCAA plan for any recovery. Despite receiving no relief, the plan releases and the injunctions bind those classes, meaning that they will have no U.S. recourse even if the Canadian proceedings falters. These circumstances further demonstrate that the plan was formulated with the intent of providing comfort to settling third parties, instead of providing transparency or fairness to creditors. The plan has not been proposed in good faith and should, accordingly, be scuttled.

**Conclusion**

83.    The plan is deficient on its face. No Code purpose is served, and the plan mocks a myriad of Code requirements. The secrecy with which the trustee proceeds alone precludes confirmation. But a legion of other Code provision violations also prevent this Court from confirming the proposed plan.

Dated:  September 10, 2015

**BRIGGS AND MORGAN, P.A.**

By:  */s/ John R. McDonald*
Timothy R. Thornton (pro hac vice)
John R. McDonald (pro hac vice)
2200 IDS Center
80 South 8th St.
Minneapolis, MN 55402
612.977.8400
jmcdonald@briggs.com

**And**

**PEARCE & DOW, LLC**

By:  */s/ Aaron P. Burns*
Aaron P. Burns
Joshua R. Dow
Two Monument Square, Suite 901
PO Box 108
Portland, Maine 04112-0108
(207) 822-9900 (Tel)
(207) 822-9901 (Fax)

**ATTORNEYS FOR CANADIAN PACIFIC
RAILWAY COMPANY**