## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:                                          Bk. No. 13-10670

MONTREAL MAINE & ATLANTIC                       Chapter 11
RAILWAY, LTD.,

                    Debtor.

## DECLARATION OF JOHN R. MCDONALD IN SUPPORT OF CANADIAN PACIFIC RAILWAY COMPANY'S OBJECTION TO THE TRUSTEE'S JULY 15, 2015 PLAN OF LIQUIDATION

1.      I am a shareholder with Briggs and Morgan, P.A., 80 South Eighth Street, Minneapolis, Minnesota 55402. I am one of the attorneys representing Canadian Pacific Railway Company (CP) in connection with this matter and make this Declaration for the purpose of submitting documents to the Court that are referenced in and incorporated into CP's objection to the trustee's July 15, 2015 plan of liquidation in the above-captioned case.

3.      Attached as Exhibit A are true and correct copies of CP's tariff 6 and tariff 8.

4.      Attached as Exhibit B is a true and correct copy of the notice of potential claim received by CP from Irving Oil Limited on April 16, 2015.

5.      Attached as Exhibit C are excerpts of the from the trustee's July 15, 2015 plan of liquidation showing the release provisions, applicable definitions, and exhibits showing the entities and persons to receive releases under the plan.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: September 10, 2015

                                    s/ John R. McDonald
                                    John R. McDonald



connecting you to
your customers

9805

**Private Equipment**
Tariff 6

**CANADIAN PACIFIC**

www.cpr.ca

Exhibit A

Revision 2013.1
Issued November 30, 2012
by Manager, Tariff Publishing
Canadian Pacific
401-9th Ave SW
Calgary, AB T2P 4Z4

Effective January 1, 2013
Expires December 31, 2013

This document is updated
regularly. For the most recent
version and to subscribe
to notifications of updates to
this and other tariffs, please
visit www.cpr.ca.

Changes can be identified
by these icons

 Wording change

 Price decrease

 Price increase

# Tariff 6 - Private equipment

## Application  *Item 1*

In addition to any other applicable tariff, the prices, charges and rules of this Tariff, as amended from time to time, apply. The rates apply as published at the time the service was rendered, in the currency of the country in which it occurs, unless otherwise specified.

## Definitions  *Item 2*

**Private Railcars** or private cars refers to cars not owned by a rail carrier.

**Private Containers** refers to containers not owned by a rail carrier.

**Private Equipment** refers to both Private Railcars and Private Containers.

## Private railcars require approval  *Item 10*

Prior to moving on CP, Private Railcars must be registered and approved as per the terms of industry Circular OT-5 as published in the Official Railway Equipment Register (details of the OT-5 program are available at https://www.railinc.com/rportal/web/guest/cot-5).  CP shall not be required to accept Private Railcars that do not have OT-5 approval.

## Private containers must meet industry standards  *Item 11*

Private Containers must comply with industry standards (e.g. AAR, ISO). CP shall not be required to accept Private Containers that do not comply with such standards.

## Private equipment with hazardous commodities  *Item 15*

For requirements specific to Private Equipment carrying Hazardous Commodities, refer to CP Tariff 8.

Exhibit A



# Private equipment terms

*Item 20*

At all times when Private Equipment owned, leased or provided by, or on behalf of, Shipper are used on CP, Shipper shall be responsible for ensuring that the Private Equipment

- are free from mechanical defects and failures;
- contain no prohibited or obsolete tariffs;
- comply with all applicable tariffs;
- comply with all applicable industry, federal, provincial, state and local laws, regulations, rules, permits, licenses and decisions including without limitation those issued, decided, or established by the Association of American Railroads ("AAR"), Railway Association of Canada ("RAC"), Transport Canada, the U.S. Department of Transportation and the Federal Railroad Administration (FRA) regulations, and
- are otherwise in suitable condition for the safe rail transportation of Commodities.

Shipper shall fully indemnify, defend and hold harmless CP from all losses, including, without limitation, attorneys' fees and other costs of litigation, damage, injury, death or any other liability including fines, penalties, and environmental response costs to the extent such losses are caused by or otherwise arise from mechanical defects in, or failure of, Private Equipment or from Shipper's failure to comply with the terms and conditions of this Tariff.

In addition to any other applicable freight charges, Shipper shall be solely responsible for any and all costs associated with the movement of Private Equipment, including, but not limited to, lease costs, car hire charges, and mileage compensation charges that are in excess of CP's express obligations under this Tariff. At CP's option, Shipper shall either (i) release, defend, indemnify and hold CP harmless from claims for such costs including reasonable attorney's fees and costs of litigation, or (ii) reimburse CP for excess car hire or mileage compensation paid by CP to such Party within thirty (30) days of notice by CP.

Exhibit A

# 📝 Railcar mileage equalization

*Item 30*

The price of a loaded freight move from origin to destination includes the direct empty return of Private Equipment to origin. However, for several reasons, empty car miles generally exceed that of loaded revenue miles on CP. For example, a shipper might request that the empty car be diverted to a maintenance facility or to a destination other than the last point of origin. CP participates in mileage equalization programs in Canada and in the United States which are intended to ensure that carriers are compensated for empty car miles that are in excess of the loaded revenue miles.

## Canadian Mileage Equalization Program

CP's Canadian mileage equalization program applies only to miles on private cars moving in Canada, except for "bridge traffic" which only passes through Canada for routing purposes and is subject to the US program below. CP does not pay historic "distance allowance" fees. Car owners and Shippers are ultimately responsible for fees related to their cars moving on CP.

Each year, ended December 31, all revenue miles are compiled by car type, and car owner. All non-revenue miles are compiled similarly, and compared. When non-revenue miles exceed 106 % of revenue miles, each mile in excess of 106 % is subject to a rate of $1.10 per mile, without minimum. CP will notify the car owner of the amount due by issuing an invoice. Any distance allowance fees will be in Canadian Dollars. Any disputes must be made within the terms of the invoice.

The following types of moves are not eligible as non-revenue shipments, and are to be paid for and counted as revenue miles under the mileage equalization program, subject to freight pricing under CP Tariffs (e.g. CP Tariff 4000) and chargeable to the car owner or party listed on the bill of lading, or freight price quote from your CP sales account manager:

- The empty movement was not immediately preceded by a revenue linehaul move on CP.
- A movement into or out of a repair facility that was not immediately preceded by a revenue line haul move on CP (applicable freight charges are chargeable to the car owner).
- The first move on cars that are new or have been re-stenciled with new initials and/or numbers.
- Cars not listed in UMLER,
- Cars moving for scrap or sale.

A revenue mile above refers to a shipment where CP receives a division of linehaul revenue and does not include switch or inter-switch amounts or other accessorial charges, excluding returned shipments or partially unloaded shipments.

When a car changes ownership, calculation of mileage shall be done separately for each owner based on the calculation period before and after the ownership change, unless otherwise negotiated with CP. CP will only recognize the ownership of a car as indicated on the reporting marks painted or stenciled on the body of the car. Cards, placards, boards, etc, are not recognized. The distance used to compute mileage starts at the CP origin station and ends at the CP destination station, or for shipments moving over more than one railway, is from the origin or destination CP station to the interchange station with the connecting railway (using direct route as guided by tariff OPSL 6000 at the time of shipment). It excludes distance from loading point or unloading point and the nearest origin or destination station.

## The US Mileage Equalization Program

The US Mileage Equalization Program is set out in industry tariff Mileage Allowance RIC 6007 Series (available at http://www.narps.org/national_tariffs.htm) and applies to miles on tank cars moving in the US, and miles in Canada for "bridge traffic" which only passes through the Canada for routing purposes. The US program is calculated separately from CP's Canadian program. The US program shall apply on CP to the extent that it
does not conflict with CP's Tariff 1, Guide to Products and Services, in which case Tariff 1 will govern.

Exhibit A



connecting you to
your customers

# Hazardous Commodities
Tariff 8

**CANADIAN PACIFIC**

www.cpr.ca

Exhibit A

Revision 2013.2
Issued March 12, 2013
by Manager, Tariff Publishing
Canadian Pacific
401-9th Ave SW
Calgary, AB T2P 4Z4

Effective March 13, 2013
Expires December 31, 2013

The document is updated
regularly. For the most recent
version and to subscribe
to notifications of updates to
this and other tariffs, please
visit www.cpr.ca.

Changes can be identified
by these icons

 **TEXT** Wording change

 **-$** Price decrease

 **+$** Price increase

## Tariff 8 - Hazardous commodities

### Application    *Item 1*

In addition to any other applicable tariff, the prices, charges and rules of this Tariff apply to commodities which are Dangerous Goods, Hazardous Materials, Poisonous Inhalation Hazards or Toxic Inhalation Hazards.

# Definitions    *Item 2*

**Toxic Inhalation Hazard (TIH) / Poison Inhalation Hazard (PIH)** means any product considered poisonous or toxic by inhalation in the Canadian Transportation of Dangerous Goods Regulations, the United States Hazardous Materials Regulations, or the Association of American Railroads circular OT-55 (http://boe.aar.com/boe-download.htm). The terms PIH and TIH are used interchangeably.

**Dangerous goods laws** means all applicable Canadian and United States federal, provincial, state, and local laws, rules and regulations governing the handling, packaging, disposing and transportation of dangerous goods in Canada and hazardous materials in the United States, including but not limited to the Transportation of Dangerous Goods Act, 1992, S.C. 1992, c. 34, Title 49 CFR of the United States Code of Federal Regulations, Hazardous Material Transportation Act (49 U.S.C. 1801 et. Seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6901 et. Seq.) and the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. 9601 et. Seq.), and regulations promulgated thereunder.

**Dangerous goods** means the dangerous goods listed in the Schedule 1 of the Transportation of Dangerous Goods Regulations, as amended or replaced from time to time.

**Hazardous materials** means the hazardous materials listed in the table set forth in Title 49 C.F.R. 172.101 of the Hazardous Materials Regulations, as amended or replaced from time to time.

**Hazardous commodities** means PIH, TIH, Dangerous Goods, or Hazardous Materials.

**High Threat Urban Area (HTUA)** means any area as defined in Appendix A to Part 1580 of 49 C.F.R. §1580, as amended or replaced from time to time. CP served areas include Buffalo, Chicago, Detroit, Milwaukee, New York, Philadelphia, Twin Cities. DME served areas include Chicago, Kansas City, Twin Cities.

**Private equipment** means a railcar or container that is owned, leased, or provided by Customer.

**Rail Security-Sensitive Material (RSSM)** means any material as set forth in 49 C.F.R. §1580.100 (b), as amended or replaced from time to time, including but not limited to any TIH/PIH material, division 1.1, 1.2, or 1.3 (explosive) material, or highway route-controlled Class 7 radioactive Material.

Exhibit A



# Surcharges *Item 3*

For your convenience, the below items highlight fees specifically applicable to Hazardous Commodities. Without exception, traffic classified as TIH or PIH is not eligible for storage (item 17 of Tariff 2) on CP property, and may not be tendered for movement in a container.

$5500⁰⁰
$10,000.00 for TIH as outlined in Item 51 of Tariff 2, or item 21 of Tariff 3

## Unsafe or improperly loaded *Item 4*
For any Hazardous Commodities, as detailed in Tariff 2 for railcars or Tariff 3 for containers.

Cost + 25%
Minimum $2000.00 as outlined in item 52 of Tariff 2 or min $1000.00 as outlined in item 22 of Tariff 3

## Major adjustment *Item 5*
For any Hazardous Commodities, as detailed in Tariff 2 for railcars or Tariff 3 for containers.

$160⁰⁰
per day
As outlined in Items 10 - 16 of Tariff 2

## Asset use: hazardous commodity charge *Item 7*
For any railcars of Dangerous Goods or Hazardous Materials, the daily surcharge shall be applied as described in Tariff 2.

$1500⁰⁰
per day
As outlined in Items 10 - 16 of Tariff 2. Includes surcharge described in Item 7

## Asset use: TIH *Item 8*
For any railcars of TIH (loaded or residue), the daily rate of $1500 per day shall apply, calculated as described in Tariff 2.

Exhibit A

**$2500⁰⁰**

Supersedes Item 18 of Tariff 2 Or as outlined in item 71 of Tariff 3

## Unauthorized Shipment/Use Of CP's Assets *Item 9*

For any shipments of RSSM without an effective price authority issued by CP at the time the shipment is tendered (ref item 40), or container not in full compliance with the Intermodal Commodity Restrictions (ref item 30).

**$500⁰⁰**

**+ Extra Switching/Handling**
Fees for the additional handling as per items 31 or 32 of Tariff 2 for railcars, or items 35 or 36 of Tariff 3 for containers

## Failure To Provide Positive Chain Of Custody *Item 10*

For any shipment not attended by the customer as required under regulations included in Dangerous Goods Laws specific to RSSM shipments (ref item 40). Appropriate fees for CP being unable to pick-up or unable to place a shipment, plus any additional movement or switching due to failure of positive chain of custody will apply.

**$80⁰⁰**

per container

## Hazardous Commodity Surcharge Intermodal *Item 11*

This surcharge shall be applied for US Domestic, Cross-Border, and International Import/Export shipments of Dangerous Goods or Hazardous Material.

# Private equipment *Item 20*

All Hazardous Commodities subject to this Tariff shall be transported in Private Equipment, or as detailed in the Intermodal Commodity Restrictions referenced in item 30. It shall be the responsibility of Customer to pay for the costs of the Private Equipment, including, but not limited to, lease costs. It shall be the responsibility of Customer to ensure that the Private Equipment is in serviceable condition for the safe transportation of Hazardous Commodities over rail lines, and is otherwise free of mechanical defects or failure that could result in leakage, release, spillage, dumping or other discharge of the Hazardous Commodities, or could otherwise become unsuitable for the safe transportation of the Hazardous Commodities over rail lines, and complies with:

- all applicable Canadian and United States federal, provincial, state and local laws, regulations, rules, permits and licenses; and
- industry rules, regulations and decisions applicable to private rail cars including without limitation rules established by the Association of American Railroads ("AAR") Railway Association of Canada ("RAC"), Transport Canada, the U.S. Department of Transportation and the Federal Railroad Administration.

Use of Private Equipment to transport Hazardous Commodities is limited to Private Equipment which has been authorized by CP to operate over the rail lines of CP. Where AAR form OT-5 approval is applicable or required, CP shall not be required to accept Private Equipment that does not have OT-5 approval from CP.

CP's acceptance of Private Equipment in interchange shall not relieve Customer of its obligations with respect to Private Equipment under this Tariff and shall not constitute a waiver by CP of Customer's obligations hereunder.

Shippers are responsible for product classification and selection of packaging in accordance with legal requirements.

# Loading and documentation *Item 21*

Customer is responsible for the safe loading, tender and unloading of all shipments of Hazardous Commodities. Customer shall prepare, bill and document for shipment, and load and unload, all shipments of Hazardous Commodities in accordance with and subject to the Dangerous Goods Laws.

Hazardous Commodities shall be properly marked, labelled and placarded by Customer as required by the Dangerous Goods Laws. Hazardous Commodities shall also be accompanied by any manifests required by Dangerous Goods Laws. Each shipping document (including the Bill of Lading) shall contain all information required by the Dangerous Goods Laws. In addition to Bills of Lading, manifests and

Exhibit A

other documentation with each shipment under this Contract, Customer shall, upon CP's request, provide CP with accurate and descriptive chemical and physical data on the character of the Hazardous Commodities to be transported prior to the actual shipment. Customer shall have and will maintain in effect all applicable registrations, permits and licenses required under Dangerous Goods Laws to be a shipper of the Hazardous Commodities.

In the event of any leakage, release, spillage, dumping or other discharge of the Hazardous Commodities while in the custody of CP, Customer shall, at CP's request, provide prompt advice with respect to the proper method of cleanup, disposal and other remedial actions to take with respect to such leakage, release, spillage, dumping or other discharge, and Customer shall cooperate fully with CP to expeditiously and prudently abate or eliminate any hazard and to meet the requirements of all Dangerous Goods Laws; provided, however, that nothing contained in this paragraph shall alter the responsibilities and obligations of Customer under this Tariff.

Customer agrees that CP may enter Customer facilities to inspect and review all aspects of the loading of Hazardous Commodities. CP reserves the right to reject any shipment of Hazardous Commodities that it deems unsafe or otherwise unsuitable for transportation. CP's acceptance of Hazardous Commodities for transportation shall not relieve Customer of its obligations under this Tariff, shall not constitute a waiver by CP of Customer's obligations hereunder, and shall not alter the apportionment of responsibilities and liabilities under this Tariff.

# Additional charges due to government action
*Item 22*

If any action or ruling by any Canadian or United States federal, provincial, state or local government precludes or restricts the transportation of any trains or cars carrying Hazardous Commodities through their jurisdiction, CP will re-price the affected traffic, providing 30 days notice to Customer.

# Intermodal commodity restrictions   *Item 30*

Details on Restricted/Prohibited Commodities, Hazardous Materials, and Overweight Restrictions for Intermodal Containers apply as published in the Appendix to Tariff 1- Intermodal Safety Standards and Restricted Commodities. Any shipments not in full compliance will be assessed penalties for both Unauthorized Use and Unsafe or Improperly loaded as per Tariff 3.

# Removal and disposition of Hazardous Materials at destination   *Item 35*

Final delivery of shipments of Hazardous Materials in the United States is governed by 49 CFR 174.16. Consignees are required to accept Hazardous Material shipments within 48 hours after receiving notice of their arrival in the final serving area. The 49 CFR governs the disposition of Hazardous Material cars after 48 hours.

# Positive chain of custody of RSSM shipments
*Item 40*

Effective April 1st 2009, the US Department of Homeland Security's Transportation Security Administration (TSA) has mandated new security measures (reference 49 C.F.R. §1580) to enhance safe transportation of RSSM. This requires every customer originating an RSSM shipment in the US or any customer receiving an RSSM shipment in an HTUA to provide positive chain of custody, including having a representative physically present to ensure "attended transfers" of RSSM shipments. Every RSSM shipment on CP must have an effective price authority issued by CP before shipping to ensure safe routing of the shipment.



# Transportation of Toxic Inhalation Hazards / Poison Inhalation Hazards

## Application      *Item 51*

In addition to any other applicable Tariffs, contracts, or agreements, the rules of items 52, 53 and 54 of this Tariff apply to commodities which are considered Toxic Inhalation Hazards (TIH) or Poison Inhalation Hazard (PIH) moving on CP without a valid TIH specific contract/agreement between CP and the Customer.

## Definitions      *Item 52*

**The Customer** means any shipper of goods, payer of freight, consignee, or foreign railway that is responsible for the movement of TIH goods on CP.

**A TIH Specific Contract/Agreement** means any signed contract or agreement between CP and the customer for the movement or future movement(s) of the specific TIH commodity where indemnification and liability provisions are identified and agreed to in the contract or agreement between CP and the Customer.

## Insurance provisions      *Item 53*

The Customer shall, at its own cost and expense, take out and maintain in full force and effect a Comprehensive General Liability Insurance Policy with an inclusive limit of not less than TEN (10) MILLION DOLLARS (in the currency of the originating party) per occurrence  for any and all liability and indemnity obligations assumed by Customer under this Tariff. Such insurance shall include no provisions excluding loss, damage or injury arising out of or resulting from any incidents occurring, or doing business or conducting operations, on, near, adjacent to or within fifty (50) feet of any railroad track, right-of-way or facilities. Such insurance shall specifically:

a)   name CP as an additional insured;
b)   contain a "cross-liability" clause which shall have the effect of insuring each person, firm, or corporation insured thereunder in the same manner and to the same extent as if a separate policy had been insured to each; and
c)   provide that the policy shall not be cancelled or materially altered unless written notice is given by the insurer to CP thirty (30) days before the effective date of such cancellation or alteration

The Customer shall, at CP's request, furnish to CP, certified copies of the insurance policies or Certificates of Insurance evidencing the above coverages

The acquisition and maintenance of this insurance policy by the Applicant shall in no manner limit or restrict liabilities incurred by the Applicant under the provisions of this Tariff.

Exhibit A



# Indemnification and liability     *Item 54*

In addition to the provisions set out above, CP shall not be liable to Customer, and Customer shall fully indemnify, defend, and hold harmless CP, from and against any and all claims, lawsuits, actions, applications, demands, complaints, loss, harm, judgments, liens, awards, costs (including, without limitation, attorney's fees and other reasonable costs of litigation), emergency response and evacuation costs, remediation costs, and government oversight costs, damages (including without limitation special and consequential damages), injury to or death of persons, or adverse effects on wildlife or the environment (collectively "Liabilities") which are caused by or arise from:

- Any failure of, or defect in Private Equipment tendered by Customer for the transportation of TIH commodity;
- Any actual or threatened discharge, release, leak or escape of the TIH commodity from the Private Equipment tendered by Customer for the transportation of TIH commodity;
- Loading, sealing and/or securing the TIH commodity by Customer in the Private Equipment;
- Removal, unloading, transfer, delivery, treatment, dumping, storage, or disposal of the TIH commodity carried in the Private Equipment; or
- Failing to properly placard or failing to provide complete and accurate shipping information concerning the TIH commodity in such Private Equipment.

However, the Customer shall have no such obligation to indemnify CP to the extent that Liabilities arise from the negligence or willful misconduct of CP.

Customer's indemnity obligations under this Item do not include claims for alleged loss, damage, or delay to the TIH commodities.

### Joint liability

Where Liabilities are caused in whole, or in part, by the joint, contributory, or concurrent negligence or fault of CP, responsibility for Liabilities shall be adjudicated under principles of comparative fault in which the trier of fact shall determine the percentage of responsibility for CP, Customer, and any other party. CP shall be liable only for the amount of such Liabilities allocated to CP in proportion to CP's percentage of responsibility. Customer shall be liable for all other Liabilities.

Exhibit A

## TIH product codes     *Item 55*

This list of TIH/PIH commodities is for reference only. It includes commodities identified by item 2 of
this Tariff but is not inclusive of all TIH/PIH commodities.

| Hazardous materials response code | Proper shipping name | See note for additional information * | Class | UN number |
|---|---|---|---|---|
| 4821019 | WASTE ALLYL ALCOHOL | | 6.1 | UN1098 |
| 4821029 | WASTE, TOXIC BY INHALATION LIQUID, FLAMMABLE, N.O.S. | | 6.1 | UN3384 |
| 4821722 | WASTE HEXACHLOROCYCLO- PENTADIENE | | 6.1 | UN2646 |
| 4830030 | WASTE SULFURIC ACID, FUMING | | 8 | UN1831 |
| 4904210 | AMMONIA, ANHYDROUS | | 2.2 | UN1005 |
| 4904211 | AMMONIA SOLUTION | | 2.2 | UN3318 |
| 4904879 | AMMONIA, ANHYDROUS | | 2.2 | UN1005 |
| 4907409 | ISOBUTYL ISOCYANATE | | 3 | UN2486 |
| 4907434 | ETHYL ISOCYANATE | | 3 | UN2481 |
| 4909306 | ISOPROPYL ISOCYANATE | | 3 | UN2483 |
| 4909307 | METHOXYMETHYL ISOCYANATE | | 3 | UN2605 |
| 4910370 | METHACRYLONITRILE, STABILIZED | | 3 | UN3079 |
| 4916138 | PENTABORANE | | 4.2 | UN1380 |
| 4918180 | TETRANITROMETHANE | | 5.1 | UN1510 |
| 4918505 | BROMINE PENTAFLUORIDE | | 5.1 | UN1745 |
| 4918507 | BROMINE TRIFLUORIDE | | 5.1 | UN1746 |
| 4920101 | COMPRESSED GAS, TOXIC, CORROSIVE, N.O.S. | | 2.3 | UN3304 |
| 4920102 | COMPRESSED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3305 |
| 4920103 | COMPRESSED GAS, TOXIC OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3306 |
| 4920104 | COMPRESSED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3303 |
| 4920105 | LIQUEFIED GAS, TOXIC, CORROSIVE, N.O.S. | | 2.3 | UN3308 |
| 4920106 | SELENIUM HEXAFLUORIDE | | 2.3 | UN2194 |
| 4920107 | DIBORANE | 1 | 2.3 | UN1911 |
| 4920108 | LIQUEFIED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3309 |
| 4920110 | LIQUEFIED GAS, TOXIC, OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3310 |
| 4920111 | LIQUEFIED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3307 |
| 4920112 | NITRIC OXIDE, COMPRESSED | | 2.3 | UN1660 |
| 4920113 | NITRIC OXIDE AND DINITROGEN TETROXIDE MIXTURES | | 2.3 | UN1975 |
| 4920115 | INSECTICIDE GASES, TOXIC FLAMMABLE, N.O.S. | | 2.3 | UN3355 |
| 4920122 | HYDROGEN SELENIDE ANHYDROUS | | 2.3 | UN2202 |
| 4920135 | ARSINE | | 2.3 | UN2188 |
| 4920160 | PHOSPHINE | | 2.3 | UN2199 |
| 4920164 | LIQUEFIED GAS, TOXIC, FLAMMABLE, N.O.S. | | 2.3 | UN3160 |
| 4920165 | COMPRESSED GAS, TOXIC, FLAMMABLE, N.O.S. | | 2.3 | UN1953 |
| 4920167 | STIBINE | | 2.3 | UN2676 |

Exhibit A

| Hazardous materials response code | Proper shipping name | See note for additional information * | Class | UN number |
|---|---|---|---|---|
| 4920173 | OXYGEN DIFLUORIDE, COMPRESSED | | 2.3 | UN2190 |
| 4920174 | DINITROGEN TETROXIDE | | 2.3 | UN1067 |
| 4920175 | NITROGEN TRIOXIDE | | 2.3 | UN2421 |
| 4920178 | CYANOGEN CHLORIDE, STABILIZED | | 2.3 | UN1589 |
| 4920180 | FLUORINE, COMPRESSED | | 2.3 | UN1045 |
| 4920181 | COMPRESSED GAS, TOXIC, N.O.S. | | 2.3 | UN1955 |
| 4920184 | PHOSGENE | | 2.3 | UN1076 |
| 4920187 | SULFUR TETRAFLUORIDE | | 2.3 | UN2418 |
| 4920188 | TELLURIUM HEXAFLUORIDE | | 2.3 | UN2195 |
| 4920189 | CHLORINE PENTAFLUORIDE | | 2.3 | UN2548 |
| 4920195 | LIQUEFIED GAS, TOXIC, N.O.S. | | 2.3 | UN3162 |
| 4920301 | COMPRESSED GAS, TOXIC CORROSIVE, N.O.S. | | 2.3 | UN3304 |
| 4920303 | COMMPRESSED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3305 |
| 4920304 | COMMPRESSED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3305 |
| 4920305 | COMMPRESSED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3305 |
| 4920307 | COMPRESSED GAS, TOXIC, OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3306 |
| 4920308 | COMPRESSED GAS, TOXIC, OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3306 |
| 4920309 | COMPRESSED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3303 |
| 4920310 | COMPRESSED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3303 |
| 4920311 | LIQUEFIED GAS, TOXIC, CORROSIVE, N.O.S. | | 2.3 | UN3308 |
| 4920312 | LIQUEFIED GAS, TOXIC, OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3310 |
| 4920313 | LIQUEFIED GAS, TOXIC, CORROSIVE, N.O.S. | | 2.3 | UN3308 |
| 4920314 | LIQUEFIED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3309 |
| 4920315 | LIQUEFIED GAS, TOXIC, CORROSIVE, N.O.S. | | 2.3 | UN3308 |
| 4920316 | LIQUEFIED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3309 |
| 4920317 | LIQUEFIED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3307 |
| 4920318 | LIQUEFIED GAS, TOXIC, FLAMMABLE, CORROSIVE, N.O.S. | | 2.3 | UN3309 |
| 4920319 | LIQUEFIED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3307 |
| 4920320 | LIQUEFIED GAS, TOXIC, OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3310 |
| 4920321 | LIQUEFIED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3307 |
| 4920324 | COMPRESSED GAS, TOXIC CORROSIVE, N.O.S. | | 2.3 | UN3304 |
| 4920325 | LIQUEFIED GAS, TOXIC, OXIDIZING, CORROSIVE, N.O.S. | | 2.3 | UN3310 |
| 4920326 | PHOSPHORUS PENTAFLUORIDE | 2 | 2.3 | UN2198 |
| 4920331 | COMPRESSED GAS, TOXIC, CORROSIVE, N.O.S. | | 2.3 | UN3304 |
| 4920337 | COMPRESSED GAS, TOXIC, OXIDIZING, N.O.S. | | 2.3 | UN3303 |
| 4920342 | ETHYLENE OXIDE AND CARBON DIOXIDE MIXTURE | | 2.3 | UN3300 |
| 4920343 | CARBON MONOXIDE AND HYDROGEN MIXTURE, COMPRESSED | | 2.3 | UN2600 |
| 4920344 | OIL GAS, COMPRESSED | | 2.3 | UN1071 |
| 4920346 | TRIFLUOROCHLOROETHYLENE, STABILIZED | | 2.3 | UN1082 |

| Hazardous materials response code | Proper shipping name | See note for additional information * | Class | UN number |
|---|---|---|---|---|
| 4920348 | HYDROGEN IODIDE, ANHYDROUS | | 2.3 | UN2197 |
| 4920349 | BORON TRICHLORIDE | | 2.3 | UN1741 |
| 4920351 | CARBONYL SULFIDE | | 2.3 | UN2204 |
| 4920352 | CHLORINE TRIFLUORIDE | | 2.3 | UN1749 |
| 4920353 | ETHYLENE OXIDE | | 2.3 | UN1040 |
| 4920354 | GERMANE | | 2.3 | UN2192 |
| 4920355 | METHYL MERCAPTAN | | 2.3 | UN1064 |
| 4920356 | PERCHLORYL FLUORIDE | | 2.3 | UN3083 |
| 4920357 | SILICON TETRAFLUORIDE | 3 | 2.3 | UN1859 |
| 4920359 | AMMONIA, ANHYDROUS | | 2.3 | UN1005 |
| 4920360 | AMMONIA SOLUTIONS | | 2.3 | UN3318 |
| 4920368 | LIQUEFIED GAS, TOXIC, N.O.S. | | 2.3 | UN3162 |
| 4920369 | LIQUEFIED GAS, TOXIC, N.O.S. | | 2.3 | UN3162 |
| 4920371 | TUNGSTEN HEXAFLUORIDE | | 2.3 | UN2196 |
| 4920373 | COMPRESSED GAS, TOXIC, N.O.S. | | 2.3 | UN1955 |
| 4920375 | COMPRESSED GAS, TOXIC, N.O.S. | | 2.3 | UN1955 |
| 4920378 | COMPRESSED GAS, TOXIC, FLAMMABLE, N.O.S. | | 2.3 | UN1953 |
| 4920379 | COMPRESSED GAS, TOXIC, FLAMMABLE, N.O.S. | | 2.3 | UN1953 |
| 4920380 | LIQUEFIED GAS, TOXIC, FLAMMABLE, N.O.S | | 2.3 | UN3160 |
| 4920381 | LIQUEFIED GAS, TOXIC, FLAMMABLE, N.O.S. | | 2.3 | UN3160 |
| 4920382 | LIQUEFIED GAS, TOXIC, FLAMMABLE, N.O.S | | 2.3 | UN3160 |
| 4920392 | CHLOROPICRIN AND METHYL CHLORIDE MIXTURES | | 2.3 | UN1582 |
| 4920394 | METHYLCHLOROSILANE | | 2.3 | UN2534 |
| 4920395 | CYANOGEN | | 2.3 | UN1026 |
| 4920396 | COMPRESSED GAS, TOXIC, FLAMMABLE, N.O.S | | 2.3 | UN1953 |
| 4920398 | DICHLOROSILANE | | 2.3 | UN2189 |
| 4920399 | CARBON MONOXIDE, COMPRESSED | | 2.3 | UN1016 |
| 4920502 | HYDROGEN BROMIDE, ANHYDROUS | | 2.3 | UN1048 |
| 4920503 | HYDROGEN CHLORIDE, ANHYDROUS | | 2.3 | UN1050 |
| 4920504 | HYDROGEN CHLORIDE, REFRIGERATED LIQUID | | 2.3 | UN2186 |
| 4920508 | SULFUR DIOXIDE | | 2.3 | UN1079 |
| 4920509 | NITROSYL CHLORIDE | | 2.3 | UN1069 |
| 4920510 | GAS IDENTIFICATION SET | | 2.3 | NA9035 |
| 4920511 | CARBON MONOXIDE, REFRIGERATED LIQUID | | 2.3 | NA9202 |
| 4920513 | HYDROGEN SULFIDE | | 2.3 | UN1053 |
| 4920515 | HEXAETHYL TETRAPHOSPHATE AND COMPRESSED GAS MIXTURES | | 2.3 | UN1612 |
| 4920516 | CHLOROPICRIN AND METHYL BROMIDE MIXTURES | | 2.3 | UN1581 |
| 4920518 | METHYL BROMIDE | | 2.3 | UN1062 |
| 4920522 | BORON TRIFLUORIDE | 4 | 2.3 | UN1008 |

Exhibit A

| Hazardous materials response code | Proper shipping name | See note for additional information * | Class | UN number |
|---|---|---|---|---|
| 4920526 | SULFURYL FLUORIDE | | 2.3 | UN2191 |
| 4920527 | COAL GAS, COMPRESSED | | 2.3 | UN1023 |
| 4920528 | HEXAFLUOROACETONE | | 2.3 | UN2420 |
| 4920530 | ORGANIC PHOSPHATE, MIXED WITH COMPRESSED GAS | | 2.3 | NA1955 |
| 4920534 | GAS SAMPLE, NON-PRESSURIZED, TOXIC, FLAMMABLE, N.O.S. | | 2.3 | UN3168 |
| 4920535 | PARATHION AND COMPRESSED GAS MIXTURE | | 2.3 | NA1967 |
| 4920536 | GAS SAMPLE, NON-PRESSURIZED, TOXIC, N.O.S. | | 2.3 | UN3169 |
| 4920547 | CHLOROPICRIN AND METHYL BROMIDE MIXTURES | | 2.3 | UN1581 |
| 4920550 | INSECTICIDE GASES, TOXIC, N.O.S. | | 2.3 | UN1967 |
| 4920559 | CARBONYL FLUORIDE | 5 | 2.3 | UN2417 |
| 4920570 | COMPRESSED GAS, TOXIC, N.O.S. | | 2.3 | UN1955 |
| 4920571 | LIQUEFIED GAS, TOXIC, N.O.S. | | 2.3 | UN3162 |
| 4920715 | BROMINE CHLORIDE | | 2.3 | UN2901 |
| 4921000 | TOXIC BY INHALATION LIQUID, N.O.S. | | 6.1 | UN3382 |
| 4921003 | TOXIC BY INHALATION LIQUID, FLAMMABLE, N.O.S. | | 6.1 | UN3384 |
| 4921004 | ALLYLAMINE | | 6.1 | UN2334 |
| 4921006 | TOXIC BY INHALATION LIQUID, WATER-REACTIVE, N.O.S. | | 6.1 | UN3386 |
| 4921008 | METHYL PHOSPHONOUS DICHLORIDE | | 6.1 | NA2845 |
| 4921009 | CHLOROACETONITRILE | | 6.1 | UN2668 |
| 4921010 | CYCLOHEXYL ISOCYANATE | | 6.1 | UN2488 |
| 4921016 | PHOSPHORUS TRICHLORIDE | | 6.1 | UN1809 |
| 4921019 | ALLYL ALCOHOL | | 6.1 | UN1098 |
| 4921020 | ETHYL CHLOROFORMATE | | 6.1 | UN1182 |
| 4921023 | TOXIC BY INHALATION LIQUID, OXIDIZING, N.O.S. | | 6.1 | UN3388 |
| 4921024 | TOXIC BY INHALATION LIQUID, CORROSIVE, N.O.S. | | 6.1 | UN3390 |
| 4921027 | N-BUTYL ISOCYANATE | | 6.1 | UN2485 |
| 4921028 | HYDROCYANIC ACID, AQUEOUS SOLUTIONS | | 6.1 | UN1613 |
| 4921029 | TOXIC BY INHALATION LIQUID, FLAMMABLE, N.O.S. | | 6.1 | UN3384 |
| 4921063 | TRIMETHYLACETYL CHLORIDE | | 6.1 | UN2438 |
| 4921202 | DIMETHYLHYDRAZINE, UNSYMMETRICAL | | 6.1 | UN1163 |
| 4921207 | SEC-BUTYL CHLOROFORMATE | | 6.1 | NA2742 |
| 4921211 | ISOBUTYL CHLOROFORMATE | | 6.1 | NA2742 |
| 4921213 | TRIMETHOXYSILANE | | 6.1 | NA9269 |
| 4921216 | PHENYL ISOCYANATE | | 6.1 | UN2487 |
| 4921239 | HYDROGEN CYANIDE, SOLUTION IN ALCOHOL | | 6.1 | UN3294 |
| 4921245 | METHANESULFONYL CHLORIDE | | 6.1 | UN3246 |
| 4921248 | CROTONALDEHYDE | 6 | 6.1 | UN1143 |
| 4921251 | DIMETHYLHYDRAZINE, SYMETRICAL | | 6.1 | UN2382 |
| 4921252 | ISOPROPYL CHLOROFORMATE | | 6.1 | UN2407 |

| Hazardous materials response code | Proper shipping name | See note for additional information * | Class | UN number |
|---|---|---|---|---|
| 4921255 | METHYL ORTHOSILICATE | | 6.1 | UN2606 |
| 4921275 | METHYLDICHLOROARSINE | | 6.1 | NA1556 |
| 4921287 | TOXIC BY INHALATION LIQUID, CORROSIVE, N.O.S. | | 6.1 | UN3390 |
| 4921288 | TOXIC BY INHALATION LIQUID, CORROSIVE, N.O.S. | | 6.1 | UN3390 |
| 4921304 | METHYL IODIDE | | 6.1 | UN2644 |
| 4921401 | ACETONE CYANOHYDRIN, STABILIZED | | 6.1 | UN1541 |
| 4921402 | 2-CHLOROETHANAL | | 6.1 | UN2232 |
| 4921404 | ETHYLDICHLOROARSINE | | 6.1 | UN1892 |
| 4921405 | DIMETHYL SULFATE | 7 | 6.1 | UN1595 |
| 4921413 | PHENYL MERCAPTAN | | 6.1 | UN2337 |
| 4921414 | CHLOROPICRIN | | 6.1 | UN1580 |
| 4921420 | ETHYLENE CHLOROHYDRIN | | 6.1 | UN1135 |
| 4921437 | PHOSPHORUS OXYCHLORIDE | | 6.1 | UN1810 |
| 4921438 | METHYL BROMIDE AND ETHYLENE DIBROMIDE MIXTURES, LIQUID | | 6.1 | UN1647 |
| 4921439 | CHLOROACETONITRILE | | 6.1 | UN2668 |
| 4921440 | METHACRYLONITRILE, STABILIZED | | 6.1 | UN3079 |
| 4921441 | TOXIC BY INHALATION LIQUID, FLAMMABLE, CORROSIVE, N.O.S. | | 6.1 | UN3489 |
| 4921447 | TOXIC BY INHALATION LIQUID, CORROSIVE, FLAMMABLE, N.O.S. | | 6.1 | UN3493 |
| 4921458 | TOXIC BY INHALATION LIQUID, WATER-REACTIVE, FLAMMABLE, N.O.S. | | 6.1 | UN3491 |
| 4921462 | TITANIUM TETRACHLORIDE | | 6.1 | UN1838 |
| 4921463 | TETRANITROMETHANE | | 6.1 | UN1510 |
| 4921465 | THIOPHOSGENE | | 6.1 | UN2474 |
| 4921473 | PERCHLOROMETHYLMERCAPTAN | | 6.1 | UN1670 |
| 4921487 | METHYL ISOTHIOCYANATE | | 6.1 | UN2477 |
| 4921495 | 2-METHYL-2-HEPTANETHIOL | | 6.1 | UN3023 |
| 4921497 | ETHYLENE DIBROMIDE | | 6.1 | UN1605 |
| 4921558 | CHLOROACETONE, STABILIZED | | 6.1 | UN1695 |
| 4921587 | PHENYLCARBYLAMINE CHLORIDE | | 6.1 | UN1672 |
| 4921695 | METHYL PHOSPHONIC DICHLORIDE | | 6.1 | NA9206 |
| 4921722 | HEXACHLOROCYCLOPENTADIENE | | 6.1 | UN2646 |
| 4921727 | BROMOACETONE | | 6.1 | UN1569 |
| 4921730 | N-BUTYL CHLOROFORMATE | | 6.1 | UN2743 |
| 4921741 | 3,5-DICHLORO-2,4,6- TRIFLUOROPYRIDINE | | 6.1 | NA9264 |
| 4921742 | ETHYL PHOSPHONOUS DICHLORIDE, ANHYDROUS | | 6.1 | NA2845 |
| 4921744 | ETHYL PHOSPHORODICHLORIDATE | | 6.1 | NA2927 |
| 4921745 | ETHYL PHOSPHONOTHIOIC DICHLORIDE, ANHYDROUS | | 6.1 | NA2927 |
| 4921746 | CHLOROPIVALOYL CHLORIDE | | 6.1 | NA9263 |
| 4921756 | N-PROPYL CHLOROFORMATE | | 6.1 | UN2740 |
| 4923113 | ALLYL CHLOROFORMATE | | 6.1 | UN1722 |

Exhibit A

| Hazardous materials response code | Proper shipping name | See note for additional information * | Class | UN number |
|---|---|---|---|---|
| 4923209 | ARSENIC TRICHLORIDE | | 6.1 | UN1560 |
| 4923298 | THIOPHOSGENE | | 6.1 | UN2474 |
| 4927004 | IRON PENTACARBONYL | | 6.1 | UN1994 |
| 4927006 | ETHYLENEIMINE, STABILIZED | | 6.1 | UN1185 |
| 4927007 | ACROLEIN, STABILIZED | | 6.1 | UN1092 |
| 4927008 | METHYL CHLOROFORMATE | | 6.1 | UN1238 |
| 4927009 | METHYL ISOCYANATE | | 6.1 | UN2480 |
| 4927010 | NICKEL CARBONYL | | 6.1 | UN1259 |
| 4927011 | METHYLHYDRAZINE | | 6.1 | UN1244 |
| 4927012 | METHYL CHLOROMETHYL ETHER | | 6.1 | UN1239 |
| 4927014 | HYDROGEN CYANIDE, STABILIZED | | 6.1 | UN1051 |
| 4927018 | TOXIC BY INHALATION LIQUID, N.O.S. | | 6.1 | UN3381 |
| 4927019 | TOXIC BY INHALATION LIQUID, FLAMMABLE, N.O.S. | | 6.1 | UN3383 |
| 4927022 | METHYL VINYL KETONE, STABILIZED | | 6.1 | UN1251 |
| 4927023 | TOXIC BY INHALATION LIQUID, WATER-REACTIVE, N.O.S. | | 6.1 | UN3385 |
| 4927024 | TOXIC BY INHALATION LIQUID, OXIDIZING, N.O.S. | | 6.1 | UN3387 |
| 4927025 | N-PROPYL ISOCYANATE | | 6.1 | UN2482 |
| 4927026 | TERT-BUTYL ISOCYANATE | | 6.1 | UN2484 |
| 4927028 | TOXIC BY INHALATION LIQUID, CORROSIVE, N.O.S. | | 6.1 | UN3389 |
| 4927029 | TOXIC BY INHALATION LIQUID, CORROSIVE, FLAMMABLE, N.O.S. | | 6.1 | UN3492 |
| 4927031 | TOXIC BY INHALATION LIQUID, FLAMMABLE, CORROSIVE, N.O.S. | | 6.1 | UN3488 |
| 4927034 | TOXIC BY INHALATION LIQUID, WATER-REACTIVE, FLAMMABLE, N.O.S. | | 6.1 | UN3490 |
| 4927035 | ETHYL ISOCYANATE | | 6.1 | UN2481 |
| 4927036 | ISOBUTYL ISOCYANATE | | 6.1 | UN2486 |
| 4927037 | ISOPROPYL ISOCYANATE | | 6.1 | UN2483 |
| 4927038 | METHOXYMETHYL ISOCYANATE | | 6.1 | UN2605 |
| 4927039 | SULFURYL CHLORIDE | | 6.1 | UN1834 |
| 4930024 | HYDROGEN FLUORIDE, ANHYDROUS | | 8 | UN1052 |
| 4930030 | SULFURIC ACID, FUMING | | 8 | UN1831 |
| 4930050 | SULFUR TRIOXIDE, STABILIZED | | 8 | UN1829 |
| 4930204 | CHLOROSULFONIC ACID | | 8 | UN1754 |
| 4930260 | SULFURYL CHLORIDE | | 8 | UN1834 |
| 4931201 | NITRIC ACID, RED FUMING | | 8 | UN2032 |
| 4932010 | BORON TRIBROMIDE | | 8 | UN2692 |
| 4932352 | PHOSPHORUS OXYCHLORIDE | | 8 | UN1810 |
| 4932385 | TITANIUM TETRACHLORIDE | | 8 | UN1838 |
| 4933327 | ETHYL CHLOROTHIOFORMATE | | 8 | UN2826 |
| 4935231 | TRICHLOROACETYL CHLORIDE | | 8 | UN2442 |
| 4936110 | BROMINE | | 8 | UN1744 |

| | | | | * Additional proper shipping name information | | |
|---|---|---|---|---|---|---|
| Note | Hazardous materials response code | UN # | Class | Proper shipping name (International) | Proper shipping name (Canada) | Proper shipping name (US) |
| 1 | 4920107 | UN1911 | 2.3 | DIBORANE | DIBORANE, COMPRESSED | DIBORANE |
| 2 | 4920326 | UN2198 | 2.3 | PHOSPHORUS PENTAFLUORIDE | PHOSPHORUS PENTAFLUORIDE, COMPRESSED | PHOSPHORUS PENTAFLUORIDE |
| 3 | 4920357 | UN1859 | 2.3 | SILICON TETRAFLUORIDE | SILICON TETRAFLUORIDE, COMPRESSED | SILICON TETRAFLUORIDE |
| 4 | 4920522 | UN1008 | 2.3 | BORON TRIFLUORIDE | BORON TRIFLUORIDE, COMPRESSED | BORON TRIFLUORIDE |
| 5 | 4920559 | UN2417 | 2.3 | CARBONYL FLUORIDE | CARBONYL FLUORIDE, COMPRESSED | CARBONYL FLUORIDE |
| 6 | 4921248 | UN1143 | 6.1 | CROTONALDEHYDE | CROTONALDEHYDE, STABILIZED | CROTONALDEHYDE |
| 7 | 4921405 | UN1595 | 6.1 | DIMETHYL SULPHATE | DIMETHYL SULFATE | DIMETHYL SULFATE |

Exhibit A

**CANADIAN PACIFIC**

Exhibit A

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

J. Christian Nemeth
Attorney at Law
Jnemeth@mwe.com
+1 312 984 3292

April 16, 2015

**VIA FAX 612-977-8650**

Timothy R. Thornton, Esq.
Paul Joseph Hemming, Esq.
John R. McDonald, Esq.
Briggs and Morgan, P.A.
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402

Re:    Notice of Potential Claim

Dear Counsel:

On behalf of Irving Oil Limited and its affiliates (collectively, "Irving Oil"), I am sending this letter to inform you about a potential claim that Irving Oil has against Canadian Pacific Railway Company and/or its affiliates (collectively, "CP") for certain losses, damages, and/or liabilities, as set forth below.

As you know, Irving Oil and CP were named as defendants in an adversary proceeding filed on behalf of the Trustee (the "Trustee") for Montreal, Maine & Atlantic Railway, Ltd. ("MMAR") in the U.S. Bankruptcy Court for the District of Maine, Adv. Pro. No. 14-1001 (the "Lawsuit"). In the Lawsuit, the Trustee asserts claims against Irving Oil, CP, and others arising from the train derailment that occurred in Lac-Mégantic, Quebec (Canada) on July 6, 2013 (the "Derailment"). The Trustee alleges, inter alia, that CP acted negligently during the transport of the crude oil at issue, and that its negligence caused MMAR to suffer damages due to the Derailment.  In addition, nineteen personal injury actions have been filed in the United States based on the Derailment.  Although Irving Oil has not been named as a defendant in any of those United States cases to date, Irving Oil understands that there could be an attempt to include Irving Oil in those United States cases.

Irving Oil recently negotiated and executed a settlement agreement (the "Settlement") with the Trustee requiring Irving Oil (i) to pay $75 million (CDN) to a fund designated for the compensation of victims of the Derailment, and (ii) to assign to the Trustee all rights to claims Irving Oil may have against certain third parties, including CP, in connection with the Derailment. The Settlement is subject to court approval, which has not yet been obtained.

Exhibit B

April 16, 2015
Page 2

While Irving Oil has not yet paid the settlement amount or effectuated any assignment of claims, I, on behalf of Irving Oil, am sending this letter at the direction of the Trustee to advise your client about a potential claim to recover the settlement amount that Irving Oil has or will have against CP under applicable Canadian and/or United States law (including under the Carmack Amendment, should a court determine that body of law applies). Irving Oil reserves its rights to seek recovery of all losses, damages, liabilities, and/or any other costs relating to the Settlement, the Lawsuit, and/or any other lawsuits (present or future) relating to the Derailment, including those incurred should the Settlement not receive court approval.

Very Truly Yours,

J. Christian Nemeth

cc.    Robert Keach

Robert J. Keach, Esq., as chapter 11 trustee (the "Trustee") for Montreal Maine & Atlantic Railway, Ltd. ("MMA" or the "Debtor"), the debtor in the above-captioned chapter 11 case, hereby proposes the Revised First Amended Plan of Liquidation Dated July 15, 2015 (the "Plan") to all of the known creditors and Holders of interests of the Debtor, as authorized by section 1121(a) of title 11 of the United States Code (the "Bankruptcy Code"), and moves this Court to enter an order confirming the Plan pursuant to section 1129 of the Bankruptcy Code, including, if required, section 1129(b). This Plan proposes to resolve all Claims against and Equity Interests in the Debtor. **IN PARTICULAR, CREDITORS AND PARTIES IN INTEREST SHOULD REVIEW SECTIONS 10.5 AND 10.6 OF THIS PLAN, WHICH PROVIDE FOR THIRD-PARTY RELEASES AND INJUNCTIONS THAT MAY AFFECT THE RIGHT TO PURSUE CLAIMS AGAINST NON-DEBTOR PARTIES AFTER THE PLAN IS CONFIRMED. CREDITORS AND PARTIES IN INTEREST SHOULD ALSO NOTE THAT THIS PLAN IS COORDINATED WITH, AND DESIGNED TO FUNCTION IN TANDEM WITH, THE CCAA PLAN FILED ON BEHALF OF THE DEBTOR'S CANADIAN SUBSIDIARY IN ITS CCAA CASE IN CANADA (AND WHICH IS ATTACHED AS EXHIBIT 1 HERETO); THE CCAA PLAN SHOULD ALSO BE CAREFULLY CONSIDERED, AS SOME OF ITS PROVISIONS ARE INCORPORATED INTO THE PLAN BY REFERENCE.** The Trustee reserves the right to, among other things, alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date as set forth in Sections 12.8 and 12.9.

# ARTICLE 1

## DEFINITIONS AND INTERPRETATION

**A.** **Definitions.** The following terms when used in the Plan shall, unless the context otherwise requires, have the following respective meanings:

*1.1.* Additional WD Trust Assets means any Cash or Cash equivalent realized by the Estate Representative, solely in his capacity as such, after the Confirmation Date from or as a result of Settlement Agreements entered into prior to the Effective Date, and the proceeds of the sale, monetization, or liquidation of Settlement Non-Cash Assets that the Estate Representative is entitled to sell, monetize or liquidate, in whole or in part, for the benefit of the WD Trust in accordance with the Settlement Agreements, together with all earnings thereon.

*1.2.* Administrative Expense Claim means any Claim constituting a cost or expense of administration of the Chapter 11 Case pursuant to sections 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including, without limitation, (a) any Claim under section 503(b)(9) of the Bankruptcy Code for the value of goods sold to the Debtor in the ordinary course of business and received by the Debtor within twenty (20) days before the Petition Date, (b) any actual and necessary cost and expense, incurred after the Petition Date, of preserving the Estate, (c) any actual and necessary cost and expense, incurred after the Petition Date, of operating the Debtor's business, (d) any indebtedness or obligation incurred or assumed by the Trustee during the Chapter 11 Case, and (e) any compensation for professional services rendered and reimbursement of expenses incurred after the Petition Date; *provided, however*, that (i) any fees or charges assessed against the Estate under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid

Exhibit C

in accordance with Section 12.4 of the Plan; and (ii) claims under 11 U.S.C. § 1171, including any Derailment Claims, shall be <u>excluded</u> from this definition of Administrative Expense Claim.

***1.3.*** <u>Administrative Expense Claims Bar Date</u> means December 1, 2014, the date established by the Bankruptcy Court pursuant to the *Order Establishing the Deadline for Filing Administrative Claims and Approving the Form and Manner of Notice Thereof* [D.E. 1164] as the deadline by which any person or entity asserting an Administrative Expense Claim against the Debtor must file an application for allowance of an Administrative Expense Claim.

***1.4.*** <u>Administrative Expense Fund</u> means the fund maintained by the Trustee, and any successor to the Trustee, sufficient to pay the Administrative Expense Claims of the Trustee and the Trustee's professionals and the professionals retained by the Creditors' Committee, as well as of the Estate Representative and his professionals, which fund shall consist of the Estate's portion of the Settlement Payments (but not including the XL Indemnity Payment) allocable to payment of administrative expenses pursuant to the CCAA Plan and the Settlement Agreements, as well as such portion of Cash and proceeds of Residual Assets as the Trustee, in his reasonable discretion, shall determine is necessary to insure full payment of such Administrative Expense Claims, but, with respect to any portion of the Settlement Payments, subject to any cap on such allocation set forth in the CCAA Plan, as amended.

***1.5.*** <u>Affiliate</u> has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code, and shall include, without limitation, MMA Canada.

***1.6.*** <u>Affiliated Parties Injunction</u> means the injunction described in Section 10.6(b)(ii) of this Plan.

***1.7.*** <u>Affiliate Release</u> means the release set forth in Section 10.5(b)(iii) of this Plan.

***1.8.*** <u>Affiliated Parties Settlement Agreement</u> means the Settlement Agreement between and among the Trustee, MMA Canada and the Affiliated Released Parties.

***1.9.*** <u>Affiliated Released Parties</u> means the Rail World Parties, the Officers and Directors, Chubb and Hartford.

***1.10.*** <u>Allowed</u> means, with reference to any Claim against the Debtor, other than an Administrative Expense Claim, (a) any fixed Claim against the Debtor that has been listed by the Debtor in its Schedules (as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009 and any applicable Local Bankruptcy Rule) as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any Proof of Claim filed on or before the Bar Date (i) as to which no objection has been or is interposed in accordance with any applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court and as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order and to the extent such objection is determined in favor of the respective Holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or as provided in Section 7.20 of the Plan, and (e) any Claim filed in the

Exhibit C

CCAA Case that is deemed filed in the Chapter 11 Case by virtue of the Bar Date Order and which would qualify as Allowed under subsection (b) of this paragraph 1.10 above; *provided*, *however*, that (1) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" and (2) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code. Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Claim" shall not, for any purpose under the Plan, include interest from and after the Petition Date or penalties assessed on any Claim.

*1.11.* <u>Allowed Administrative Expense Claim</u> means an Administrative Expense Claim a request for payment of which was timely filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date and which has been allowed pursuant to a Final Order of the Bankruptcy Court, including, without limitation, the Confirmation Order, but Derailment Claims and Claims under 11 U.S.C. §1171(b) shall not be or become Allowed Administrative Expense Claims.

*1.12.* <u>APA</u> means that certain Asset Purchase Agreement dated as of December 12, 2013 (as amended from time to time), by and among the Trustee, MMA Canada, and the Purchaser.

*1.13.* <u>Asset Sale</u> means the sale of substantially all (but not all) of the Assets of the Debtor and MMA Canada to the Purchaser pursuant to the APA.

*1.14.* <u>Asset Sale Consideration</u> means the total consideration paid and/or provided by the Purchaser under the APA including, without limitation, Cash and assumption of obligations of the Debtor and/or MMA Canada.

*1.15.* <u>Assets</u> means any and all assets, property, property interests and property rights of the Debtor, whether tangible, intangible, vested, contingent, exclusive, joint, real, personal or mixed, that constitute property of the Estate.

*1.16.* <u>Avoidance Actions</u> means any actions commenced, or that may be commenced before or after the Effective Date, pursuant to sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code, including, without limitation, such actions that arise under state law for fraudulent conveyance, insider preference, and other similar avoidance actions.

*1.17.* <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

*1.18.* <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Maine.

*1.19.* <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any applicable local rules of the Bankruptcy Court.

Exhibit C

**1.20.** Bar Date means, as to a particular claim, the deadline for filing a Proof of Claim as to such Claim established by the Bar Date Order.

**1.21.** Bar Date Order means the order of the Bankruptcy Court dated March 20, 2014 and entered at Docket No. 783 establishing deadlines for the filing of Proofs of Claim and establishing other claims filing procedures and requirements, as well as providing for the deemed filings in this Chapter 11 Case, of certain Derailment Claims for which Proofs of Claim were filed in the CCAA Case.

**1.22.** Books and Privileges means all books and records of the Debtor, including, without limitation, all documents and communications of any kind, whether physical or electronic, the right to assert or waive any privilege, including, without limitation, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written, electronic, or oral), and rights to direct current or former agents, attorneys, advisors, and other professionals of the Debtor to deliver such documents or communications.

**1.23.** Business Day means any day other than a Saturday, Sunday, or any other day on which commercial banks are required or authorized to close by law or executive order.

**1.24.** Canada means the Attorney General of Canada, the Government of Canada, Her Majesty the Queen in Right of Canada and the departments, crown corporations and agencies including the Canadian Transportation Agency, and including all past, present and future Ministers, officers, employees, representatives, servants, agents, parents, subsidiaries and affiliated crown corporations and agencies, and their respective estates, successors and assigns.

**1.25.** Cash means lawful currency of the United States of America or Canada, including but not limited to bank deposits, checks, and other similar items.

**1.26.** Causes of Action means any and all Claims, Avoidance Actions, demands, rights, actions, rights of action, causes of action, judgments, proceedings, damages, accounts, defenses, affirmative defenses, rights of setoff, offsets, powers, privileges, licenses, franchises, third-party claims, counterclaims, cross-claims, actions for declaratory or injunctive relief, suits and other rights of recovery of the Debtor, the Trustee, and the Estate (but subject in all cases to the exculpation provisions of Section 10.3 and the release provisions of Section 10.5, and the injunctions set forth in Section 10.6 of the Plan), against or with respect to any Person, including without limitation, Claims of the Debtor, Trustee, or Estate against any affiliate, current or former officer, director or employee of the Debtor or any affiliate or property, wherever located, of any nature whatsoever, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, asserted or unasserted or pending as of the Effective Date, whether direct, indirect, derivative or on any other basis, whether existing or hereafter arising, whether arising in whole or in part prior to, on or after the Petition Date, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case or thereafter, in contract or in tort, at law or in equity, whether pursuant to any federal or state statute or common law or under any theory of law or equity, including, without limitation, the Trustee's Derailment Litigation as well as any available: (a) rights of setoff, counterclaim,

Exhibit C

recoupment, replevin or reclamation, and Claims on contracts or for breaches of duties imposed by law; (b) rights to object to or seek estimation of Claims or Equity Interests; (c) Claims pursuant to section 362 of the Bankruptcy Code; (d) Claims, causes of action and defenses against any Person, including without limitation, for intentional or negligent misrepresentation, fraud, mistake, duress and usury, breach of fiduciary duty, malpractice, negligence, breach of contract, wrongful distribution, aiding and abetting, or inducement, and (e) Avoidance Actions.

**1.27.**  CCAA Approval Order means the Final Order of the CCAA Court sanctioning, conforming and/or confirming the CCAA Plan and, *inter alia*, approving and implementing the Releases and Injunctions.

**1.28.**  CCAA Case means the proceeding under the Canadian Companies' Creditors Arrangement Act of MMA Canada pending before the Québec Superior Court (Commercial Division) and designated by Court File No. 450-11-000167-134.

**1.29.**  CCAA Court means the court presiding over the CCAA Case.

**1.30.**  CCAA Plan means the Amended Plan of Compromise and Arrangement filed by MMA Canada in the CCAA Case and which CCAA Plan, *inter alia*, shall contain Releases and Injunctions for the benefit of Released Parties, a copy of the CCAA Plan is attached to this Plan as Exhibit 1.

**1.31.**  Chapter 11 Case means the Debtor's chapter 11 case.

**1.32.**  Chapter 15 Case means the case commenced or to be commenced under Chapter 15 of the Bankruptcy Code by the Monitor as the foreign representative of MMA Canada in the Bankruptcy Court for the purposes of, without limitation, obtaining the Chapter 15 Recognition and Enforcement Order.

**1.33.**  Chapter 15 Recognition and Enforcement Order means the order entered by the Bankruptcy Court, pursuant to 11 U.S.C. §§ 1507 and 1521, recognizing and enforcing to the fullest extent possible within the United States, the CCAA Approval Order.

**1.34.**  Chubb means the insurer under the Chubb Policy and any other entity providing or contributing to coverage or funding of coverage under the Chubb Policy.

**1.35.**  Chubb Policy means the insurance policy issued by Federal Insurance Company to Rail World, Inc. and Rail World Holdings LLC bearing Policy Number 8210 2375.

**1.36.**  Claim has the meaning set forth in section 101(5) of the Bankruptcy Code and, to the extent same would broaden the definition, as set forth in any order of the CCAA Court.

**1.37.**  Claimant means the Holder of a Claim.

**1.38.**  Claims Objection Date means the date that is one-hundred twenty (120) days from the last to occur of: (a) the Bar Date; (b) with respect to a specified Claim for which a creditor is allowed to file a Proof of Claim after the Bar Date, twenty (20) days after the date on which such Proof of Claim is to be filed; or (c) the Confirmation Date.  The failure to object to any Claim by

Exhibit C

the Claims Objection Date shall not constitute a waiver, acceptance, or release of any Claim or Cause of Action against a creditor, including any Avoidance Actions.

**1.39.** <u>Class</u> means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122 of the Bankruptcy Code.

**1.40.** <u>Class 13 Cash</u> means any Cash generated from the monetization or liquidation of Residual Assets, any unencumbered Cash which was part of, or was generated from the Asset Sale Consideration or the Debtor's operations, and any surplus WD Trust Assets, as determined pursuant to Section 5.16 of the Plan, in all cases to the extent not used to fund the Administrative Expense Fund or to fund payments to Holders of Claims in Classes 1 through 7, inclusive, to the extent provided by the Plan.

**1.41.** <u>Collateral</u> means any property or interest in property of the Estate subject to a Lien, charge, encumbrance, or right of setoff to secure the payment or performance of a Claim, which Lien, charge, encumbrance, or right of setoff is not subject to avoidance under the Bankruptcy Code.

**1.42.** <u>Confirmation Date</u> means the date on which the Confirmation Order becomes a Final Order.

**1.43.** <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as the same may be amended, pursuant to section 1128(a) of the Bankruptcy Code.

**1.44.** <u>Confirmation Order</u> means the Order entered by the Bankruptcy Court confirming the Plan, as the same may be amended, pursuant to section 1129 of the Bankruptcy Code, which shall include, without limitation, approval of the Settlement Agreements and the Releases and Injunctions.

**1.45.** <u>Contingent Claim</u> means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the Debtor now or hereafter exists or previously existed.

**1.46.** <u>Contributing Parties</u> means the parties that have executed Settlement Agreements prior to the Effective Date.

**1.47.** <u>Creditors' Committee</u> means the official committee of Derailment victims appointed by the Bankruptcy Court on October 18, 2013.

**1.48.** <u>D&O Insurance Policies</u> means all primary and excess insurance policies of the Debtor, MMA Canada, the Rail World Parties, or a non-Debtor Affiliate that provides for, among other things, coverage for liability related to the actions or omissions of the directors or officers of the Debtor, MMA Canada or any of all of the Rail World Parties other than the XL

Exhibit C

Policy, Indian Harbor Policy, the Chubb Policy and Hartford Policy, but specifically including, without limitation, the Great American Policy.

**1.49.**   <u>Debtor</u> means Montreal Maine & Atlantic Railway, Ltd.

**1.50.**   <u>Derailment</u> means the July 6, 2013 derailment of an unmanned train owned by the Debtor in Lac-Mégantic, Québec, including any and all events leading up to and related to such derailment and/or any and all consequences of such derailment, including, without limitation, the explosion, crude oil spill, fire and/or other consequences related to such derailment.

**1.51.**   <u>Derailment Claims</u> means all Claims by any Persons or entities against the Debtor, MMA Canada or any other third-party, Person or entity arising out of or relating to the Derailment, including but not limited to those Claims set forth in Sections 1.52, 1.53, 1.55, 1.57 and 1.58.

**1.52.**   <u>Derailment Government Claims</u> means any Derailment Claims held or asserted by any governmental, provincial or municipal entity, against the Debtor, MMA Canada, or any other person or entity including, without limitation, the province of Québec, Canada and/or the Village of Lac Mégantic, Québec, or any agency, division, or instrumentality of such entities.

**1.53.**   <u>Derailment Moral Damages and Personal Injury Claims</u> means a liquidated or unliquidated Claim against the Debtor, MMA Canada or any other person or entity whether in the nature of or sounding in tort, contract, warranty, employer liability or any other theory of law, equity or admiralty, whatsoever, for, attributable to or arising under the laws of any jurisdiction, by reason of, directly or indirectly, physical, emotional or other personal injuries caused by, or allegedly caused by, or arising from, in whole or in part, directly or indirectly, the Derailment including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages (such as, without limitation, medical monitoring, personal or bodily injury, proximate, consequential, general and special damages) and punitive damages. Derailment Moral Damages and Personal Injury Claims shall include, without limitation, any Claim for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law, (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative or indirect Derailment Moral Damages and Personal Injury Claims of any kind whatsoever, whether in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, whatsoever.  Notwithstanding the foregoing, Derailment Moral Damages and Personal Injury Claims <u>shall not include</u> (a) Derailment Property Damage Claims, (b) Derailment Government Claims; (c) Derailment Wrongful Death Claims; (d) Derailment Property Subrogated Insurance Claims; and (e) any workers' compensation claim brought directly against the Debtor or a non-Debtor Affiliate by a past or present employee of the Debtor under an applicable workers' compensation statute and which would be covered by workers' compensation insurance or an applicable and fully funded self-insurance program.

**1.54.**   <u>Derailment Moral Damages and Personal Injury Claims Matrix</u> means the matrix attached to this Plan as Schedule B.

**1.55.**   <u>Derailment Property Damage Claims</u> means a liquidated or unliquidated Claim against, or any debt, obligation or liability of the Debtor, MMA Canada or any other person or

7

Exhibit C

entity arising under the laws of any jurisdiction, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty, for, attributable to or arising by reason of, directly or indirectly, (a) property damages (whenever suffered), including, but not limited to, diminution in the value thereof, or environmental damage or economic loss to property; or (b) business interruption or loss of profits or earnings, in all cases caused by or allegedly caused by, directly or indirectly, the Derailment including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages, and also including, without limitation, any claim for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law, attributable to Derailment Property Damage Claims.  Derailment Property Damage Claims shall not include (a) Derailment Moral Damages and Personal Injury Claims, (b) Derailment Government Claims; (c) Derailment Wrongful Death Claims; (d) Derailment Property Subrogated Insurance Claims; and (e) any workers' compensation claim brought directly against the Debtor or a non-Debtor Affiliate by a past or present employee of the Debtor under an applicable workers' compensation statute, and which would be covered by workers' compensation insurance or an applicable and fully funded self-insurance program.

*1.56.* Derailment Property Damage Claims Distribution Mechanism shall mean Schedule C attached to this Plan.

*1.57.* Derailment Property Subrogated Insurance Claim means a liquidated or unliquidated Claim against, or any debt, obligation or liability of the Debtor, MMA Canada, or any other person or entity, arising under the laws of any jurisdiction, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty, for, attributable to or arising by reason of, directly or indirectly, (a) property damages (whenever suffered), including, but not limited to, diminution in the value thereof, or environmental damage or economic loss to property; or (b) business interruption or loss of profits or earnings caused or allegedly caused, directly or indirectly, by the Derailment and arising or allegedly arising, directly or indirectly, from acts or omissions of the Debtor, or its predecessors and which is held by an Insurance Company that (i) with respect to its obligations, has paid in full all amounts due to an insured who would, but for such payment, hold a Derailment Property Damage Claim; (ii) is subrogated to such insured's claim as a matter of law; and (iii) has timely filed a Proof of Claim in the Chapter 11 Case or the CCAA Case with respect to such Claim (and in the case of a Proof of Claim filed in the CCAA Case, is deemed, under the Bar Date Order, to have been timely filed in the Chapter 11 Case).

*1.58.* Derailment Wrongful Death Claims means a liquidated or unliquidated Claim against the Debtor, MMA Canada, or any other person or entity arising under the laws of any jurisdiction, including, without limitation, held by an executor, administrator, decedent's estate or estate representative, or beneficiary of a decedent's estate, whether in the nature of or sounding in tort, contract, warranty, employer liability or any other theory of law, equity or admiralty, whatsoever, for, attributable to or arising under the laws of any jurisdiction, by reason of the death of an individual person caused, or allegedly caused, in whole or in part, directly or indirectly, by the Derailment  including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages (such as, without limitation, loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages) and punitive damages.  Derailment Wrongful Death Claims shall include, without limitation, any Claim for

8

Exhibit C

contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law, (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative or indirect Derailment Wrongful Death Claims of any kind whatsoever, whether in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, whatsoever, except to the extent that such claims have been released or assigned to the Estate pursuant to a Settlement Agreement.   Notwithstanding the foregoing, Derailment Wrongful Death Claims shall not include (a) Derailment Government Claims; (b) Derailment Moral Damages and Personal Injury Claims; (c) Derailment Property Damage Claims; (d) Derailment Property Subrogated Insurance Claims; or (e) any workers' compensation claim brought directly against the Debtor or a non-Debtor Affiliate by a past or present employee of the Debtor under an applicable workers' compensation statute, and which would be covered by workers' compensation insurance or an applicable and fully funded self-insurance program.

*1.59.*   Disbursing Agent means the Person or entity appointed to make distributions pursuant to the Plan under Article ARTICLE 7 of the Plan.

*1.60.*   Disclosure Statement means that certain amended disclosure statement filed by the Trustee, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time.

*1.61.*   Disputed Claim means a Claim which the Debtor listed on its schedules as contingent, unliquidated or disputed or any Claim against the Debtor which has been the subject of a written objection filed with the Bankruptcy Court by the Claims Objection Date.

*1.62.*   Distribution Date means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent, on which the Disbursing Agent makes a distribution to Holders of Allowed Claims and/or the WD Trust.

*1.63.*   Distribution Record Date means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

*1.64.*   District Court means the United States District Court for the District of Maine.

*1.65.*   Effective Date means a date which is a Business Day and which is set in accordance with Section 9.2 of the Plan, and is the date upon which the Plan becomes effective.

*1.66.*   Equity Interest means the interest of any Holder of equity securities of the Debtor represented by issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in the Debtor, whether or not transferable, or any option, warrant, contractual or other right to acquire any such interest.

*1.67.*   Estate means the estate created in the Chapter 11 Case of the Debtor pursuant to section 541 of the Bankruptcy Code.

*1.68.*   Estate Injunction means the injunction described in Section 10.6(b)(i) of the Plan.

Exhibit C

***1.69.*** <u>Estate Representative</u> means the Trustee or any successor in interest to the Trustee in such capacity, including, but not limited to, the Estate Representative, whether such successor is appointed under the Plan, the Confirmation Order, or otherwise.

***1.70.*** <u>Exculpated Party</u> means any of the Debtor, the Trustee, the Disbursing Agent, the WD Trustee, the Estate, the WD Trust, and their respective professionals retained after the Petition Date and approved by the Bankruptcy Court, each in their respective capacities.

***1.71.*** <u>Final Order</u> means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, amended, modified or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, or any other applicable U.S. or Canadian rule or procedure, may be filed relating to such order shall not prevent such order from being a Final Order.

***1.72.*** <u>45G Proceeds</u> shall have the meaning set forth in the FRA Adequate Protection Order.

***1.73.*** <u>FRA</u> shall mean the United States of America, through the Department of Transportation, Federal Railroad Administration.

***1.74.*** <u>FRA Adequate Protection Order</u> shall mean the order entered in the Chapter 11 Case at Docket No. 742.

***1.75.*** <u>Funds for Distribution</u> shall have the meaning set forth in the CCAA Plan.

***1.76.*** <u>General Unsecured Claim</u> means any Claim against the Debtor other than a Derailment Claim, Administrative Expense Claim, Secured Claim, Priority Tax Claim, Priority Claim, or Subordinated Claim.

***1.77.*** <u>Governmental Unit</u> has the meaning set forth in section 101(27) of the Bankruptcy Code.

***1.78.*** <u>Great American</u> means Great American Insurance Company, but strictly as the insurer under the Great American Policy.

***1.79.*** <u>Great American Policy</u> means the insurance policy issued by Great American to Montréal Maine & Atlantic Corporation, the Debtor and/or MMA Canada and bearing policy number DML 9924 836.

Exhibit C

*1.80.* <u>Hartford</u> means The Hartford Casualty Insurance Company, together with its parents, subsidiaries, affiliates, officers and directors, but strictly as the insurer under the Hartford Policy.

*1.81.* <u>Hartford Policy</u> means the insurance policy issued by Hartford to Rail World, Inc. and bearing policy number 83 SBA PBO432 SA.

*1.82.* <u>Holder</u> means a creditor holding, including by assignment, a Claim against the Estate.

*1.83.* <u>Indian Harbor Policy</u> means the policy issued by Indian Harbor Insurance Company to the Debtor and bearing Policy No. RRL - 003723801.

*1.84.* <u>Initial Distribution</u> means the first distribution that the Disbursing Agent makes to Holders of Allowed Claims or the WD Trust.

*1.85.* <u>Initial Distribution Date</u> means the date occurring on or as soon as reasonably practicable after the Effective Date, but in no event more than one-hundred-and-twenty (120) days after the Effective Date, on which the Disbursing Agent makes the Initial Distribution to Holders of Allowed Claims or the WD Trust.

*1.86.* <u>Initial WD Trust Assets</u> means the share of the Settlement Payments allocable to Derailment Wrongful Death Claims, i.e. 24.1% of the Funds for Distribution and 53.3% of the Reallocated Dividends, which payments shall represent compensatory damages paid upon such Claims only and shall also be deemed to have been made pursuant to the Plan and pursuant to a "court order" necessary to satisfy the requirements of Internal Revenue Code section 468B.

*1.87.* <u>Injunctions</u> means, collectively, the Estate Injunction, the Affiliated Parties Injunction and the Third Party Injunction, as set forth in Section 10.6 of this Plan.

*1.88.* <u>Insurance Action</u> means any Claim, Cause of Action, or right of the Debtor, or of any Person or entity to the extent such Claim, Cause of Action or right is assigned to the Trustee or the Estate Representative pursuant to a Settlement Agreement, under the laws of any jurisdiction, against any Insurance Company, arising from or related to: (a) any such Insurance Company's failure to provide or pay under an insurance policy; (b) the refusal of any such Insurance Company to compromise and settle any Derailment Claim under or pursuant to any insurance policy; (c) the interpretation or enforcement of the terms of any insurance policy with respect to any Derailment Claim; or (d) any conduct of any Insurance Company constituting "bad faith" or other wrongful conduct under applicable law.

*1.89.* <u>Insurance Company</u> means any insurance company, insurance broker, or syndicate insurance broker, guaranty association, or any other entity that may have liability under an insurance policy.

*1.90.* <u>Lien</u> has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.91.* <u>Local Bankruptcy Rules</u> means the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maine, as amended from time to time.

Exhibit C

*1.92.*   MMA Canada means Montreal Maine and Atlantic Canada  Co., the debtor in the CCAA Case.

*1.93.*   Monitor means Richter Advisory Group, Inc. the monitor appointed in the CCAA Case.

*1.94.*   Non-Settling Defendants means any and all Persons who are, could be or may be defendants in any cause of action brought or which could be brought in any court or other forum of competent jurisdiction (including, without limitation, administrative proceedings) asserting a Derailment Claim, including, without limitation, a claim for indemnity, contribution, reimbursement, or by way of subrogation, but who are not Released Parties.  Without limiting the foregoing, Non-Settling Defendants shall include Canadian Pacific Railway Company and any parent, subsidiaries, or affiliates thereof.

*1.95.*   Officers and Directors means the Officers and Directors of the Debtor and MMA Canada as of the date of the Derailment.

*1.96.*   Other Released Parties means the Released Parties other than the Affiliated Released Parties.

*1.97.*   "Person" or "Persons" shall mean (and include) a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company, limited liability partnership, or limited partnership, a proprietorship, joint venture trust, legal representative, or any other unincorporated association, business organization or enterprise, any government entity or other regulatory authority and any successor in interest, Governmental Unit, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity .

*1.98.*   Petition Date means August 7, 2013.

*1.99.*   Plan means the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015, as the same may be amended from time to time.

*1.100.*   Plan Implementation Date with respect to the CCAA Plan, shall have the meaning set forth in the CCAA Plan.

*1.101.*   Plan Supplement means the supplement or supplements, as amended or modified, to the Plan containing certain documents relevant to the implementation of the Plan and which shall include, but will not be limited to, the WD Trust Agreement.  The Plan Supplement shall be filed with the Bankruptcy Court by the Plan Supplement Filing Date.

*1.102.*   Plan Supplement Filing Date means the date that is no later than ten (10) calendar days before the deadline set to file objections to the approval of the Disclosure Statement.

*1.103.*   Post-Confirmation Causes of Action shall mean: (a) any and all Causes of Action, whether arising before or after the Petition Date and whether arising under state or federal law, constituting Avoidance Actions; (b) the Trustee's Derailment Litigation; (c) any Insurance

Exhibit C

Action (except to the extent the underlying insurance policy constitutes a Settlement Non-Cash Asset); (d) any other litigation initiated by the Trustee before or after the Petition Date as to any Causes of Action; and (e) any and all proceeds, whether in the form of cash or otherwise, from any recoveries on or settlement of such Causes of Action.

**1.104.** Post-Effective Date Estate means the Estate, as preserved by this Plan and the Debtor, from and after the Effective Date.

**1.105.** Priority Claim means any Claim (other than an Administrative Expense Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code, and also means any Claim arising under section 1171(b) of the Bankruptcy Code.

**1.106.** Priority Tax Claim means a Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.107.** Pro Rata means, with respect to a particular Claim, as of a particular distribution date, the ratio (expressed as a percentage) of the amount of that particular Claim to the sum of the aggregate amount of all Allowed Claims of the same Class.

**1.108.** Proof of Claim means any proof of claim filed with the Bankruptcy Court or its duly appointed claims agent with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002, unless and to the extent that the Bankruptcy Court has ordered the use of a special or customized form for the particular type of Claim at issue, and in such case, the special or customized form of proof of claim, as well as any proof of claim filed with the CCAA Court and which would be deemed filed in the Bankruptcy Court by virtue of an order of the CCAA Court or the Bar Date Order.

**1.109.** Purchaser means Railroad Acquisition Holdings LLC, now doing business as Central Maine and Québec Railroad.

**1.110.** Rail World Parties means (a) Rail World Holdings, LLC; (b) Rail World, Inc.; (c) Rail World Locomotive Leasing LLC; (d) The San Luis Central R.R. Co.; (e) Pea Vine Corporation; (f) Montreal Maine & Atlantic Corp.; (g) LMS Acquisition Corp; (h) Earlston Associates, L.P.; and (i) each of the shareholders, directors, officers, members or partners of the foregoing (in such capacity only). For the avoidance of doubt, Rail World Parties also include Edward Burkhardt, solely in his capacity as director, officer and shareholder of the Rail World Parties.

**1.111.** Reallocated Dividends shall have the meaning set forth in the CCAA Plan.

**1.112.** Released Parties means (a) the Debtor; (b) the Trustee and his agents, attorneys, accountants, financial advisors, restructuring consultants, and investment bankers; (c) MMA Canada's attorneys; (d) the Monitor and its employees and attorneys; (e) the WD Trustee and its respective agents, attorneys, accountants and financial advisors; (f) the Estate Representative and the Disbursing Agent and their respective agents, attorneys, accountants and financial advisors; (g) Contributing Parties; and (h) any Persons or entities designated as receiving a release in any Settlement Agreements (and only to the extent of the release set forth in that Settlement

Exhibit C

Agreement) executed by any Contributing Party or Parties, the Trustee and MMA Canada. Released Parties shall include the persons or entities listed on Exhibit 2 to this Plan.

**1.113.** Releases means all of the releases set forth in Section 10.5 of this Plan.

**1.114.** Residual Assets means all Assets, if any, belonging to the Debtor, the Estate or MMA Canada and not sold in the Asset Sale, including, without limitation, real estate, Cash, personal property, intangibles, rights to payment, Post-Confirmation Causes of Action, and any other Causes of Action of the Debtor or the Estate not previously released or released pursuant to the Plan or included in the Initial WD Trust Assets, all of which Causes of Action are preserved under the Plan.

**1.115.** Sale Order means that certain Order Granting Motion to Sell entered by the Bankruptcy Court in the Chapter 11 Case on or about January 24, 2014, and authorizing the sale of Assets to the Purchaser.

**1.116.** Schedules means, collectively, the schedules of Assets and liabilities, schedules of executory contracts and unexpired leases, schedules of current income and expenditures and statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Chapter 11 Case, as may have been amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.117.** Secured Claim means a Claim, if any, that is secured by a valid, perfected, and enforceable Lien on property of the Debtor under applicable state law or by reason of a Final Order as well as on property in which the Estate has an interest to the extent of the value of such property or a Claim, if any, that is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff, in each case as determined in accordance with section 506(a) of the Bankruptcy Code, or as otherwise agreed upon in writing by the Trustee and the Holder of such Claim.

**1.118.** Settlement Agreements means any settlement agreement entered into, among the Trustee, MMA Canada and one or more of the Contributing Parties on or before the Effective Date of the Plan.

**1.119.** Settlement Non-Cash Assets means any rights, Assets, or property, other than Cash, transferred to the Trustee, the Monitor, MMA Canada, the Estate or the Estate Representatives, pursuant to any Settlement Agreement, this Plan or the CCAA Plan, including, without limitation, rights under or pursuant to the Chubb Policy, the Great American Policy, and any other D&O Insurance Policies or Policy specifically designated in such Settlement Agreement.

**1.120.** Settlement Payments means any payment funded or to be paid to the Trustee, the Monitor, or the Estate, the WD Trust or other designee of the Trustee or MMA Canada pursuant to a Settlement Agreement.

Exhibit C

**1.121.** Subordinated Claims means all Claims that are subordinated or subject to subordination to any or all General Unsecured Claims, including, without limitation, Claims that are subject to subordination pursuant to sections 509 and 510 of the Bankruptcy Code.

**1.122.** Tax Authority means a federal, state, local, or foreign government, or agency, instrumentality, or employee thereof, court or other body (if any) charged with the administration of any law relating to Taxes.

**1.123.** Tax Code means the United States Internal Revenue Code of 1986, as amended from time to time.

**1.124.** Tax Returns means a return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Taxes, including any schedule or attachment thereto or amendment thereof, including any claim for a Tax refund.

**1.125.** Taxes means all (a) federal, state, local, or foreign taxes, including, without limitation, all net income, alternative minimum, net worth or gross receipts, capital, value added, franchise, profits, estimated, property, transfer, and sales or use taxes; and (b) interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority or paid in connection with any item described in clause (a) hereof.

**1.126.** Third Party Injunction means the injunction described in Section 10.6(b)(iii) of the Plan.

**1.127.** Transferred WD Cases means the civil actions transferred pursuant to 28 U.S.C. §157(b)(5) in connection with the Chapter 11 Case to the District Court, originally filed in the Cook County, Illinois state court, and appearing on the docket of the District Court as Civil Action Nos. 00113-00130NT.

**1.128.** Travelers' Proceeds shall have the meaning set forth in the FRA Adequate Protection Order.

**1.129.** Treasury Regulations means the United States Department of Treasury regulations promulgated under the Tax Code.

**1.130.** Trustee's Derailment Litigation means Adversary Proceeding No. 14-01001 filed in the Bankruptcy Court and captioned Robert J. Keach, solely in his capacity as the chapter 11 trustee for Montreal Maine & Atlantic Railway, Ltd., Plaintiff v. World Fuel Corporation, World Fuel Services, Inc., Western Petroleum Company, World Fuel Services, Canada, Inc., Petroleum Transport Solutions, LLC, Canadian Pacific Railway Company, Irving Oil Limited, and SMBC Rail Services, LLC, Defendants, including without limitation, all claims and counterclaims therein, as same may be amended from time to time.

**1.131.** Unclaimed Property means any distribution of Cash or any other property made to the Holder of an Allowed Claim pursuant to the Plan that (a) is returned to the Disbursing Agent or WD Trustee as undeliverable and no appropriate forwarding address is received within the later of (i) ninety (90) days after the Effective Date and (ii) ninety (90) days after such attempted

Exhibit C

distribution by the Disbursing Agent or WD Trustee is made to such Holder or (b) in the case of a distribution made in the form of a check, is not negotiated within ninety (90) days after remittance of the check and no request for re-issuance is made within such 90-day period.

**1.132.** <u>Unimpaired</u> means, with respect to any Claim, that such Claim is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.133.** <u>Unliquidated Claim</u> means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**1.134.** <u>U.S. Trustee</u> means the United States Trustee for the District of Maine.

**1.135.** <u>UST Fees</u> means the quarterly fees paid and payable to the U.S. Trustee.

**1.136.** <u>WD Trust</u> means the trust organized under Delaware law and established under Article ARTICLE 5 of the Plan for the sole purpose of liquidating and distributing the WD Trust Assets to Holders of Allowed Derailment Wrongful Death Claims.

**1.137.** <u>WD Trust Agreement</u> means the agreement between the Debtor, the Trustee, and the WD Trustee governing the WD Trust, dated as of the Effective Date, to be filed with the Plan Supplement, as same may be amended from time to time.

**1.138.** <u>WD Trust Assets</u> means (a) the Initial WD Trust Assets, which the Estate Representative shall deliver, transfer or cause to be delivered or transferred, as applicable, to the WD Trust, (b) the Additional WD Trust Assets, which, following the Confirmation Date and as soon after receipt as is reasonably practicable, the Estate Representative shall deliver or cause to be delivered to the WD Trust, (c) any additional assets to be disbursed to the WD Trust from the Settlement Agreements in accordance with the Plan and the CCAA Plan, all of which shall constitute compensatory damages payable to the WD Trust Beneficiaries by order or judgment of a court of competent jurisdiction.

**1.139.** <u>WD Trust Beneficiaries</u> means Holders of Allowed Derailment Wrongful Death Claims.

**1.140.** <u>WD Trust Distribution Procedures</u> means the WD Trust Distribution Procedures as used and defined in the WD Trust Agreement, or as subsequently modified or amended, and including, without limitation, Schedule A to this Plan.

**1.141.** <u>WD Trust Expenses</u> means all costs, taxes, and expenses of, or imposed on, the WD Trust, including, but not limited to, WD Trustee compensation, employee compensation, insurance premiums, legal, accounting, and other professional fees and expenses, overhead, disbursements, and expenses relating to the implementation of the WD Trust Distribution Procedures up to a cap of $250,000, but excluding payments to Holders of Allowed Derailment Wrongful Death Claims or reimbursements of such payments.

**1.142.** <u>WD Trustee</u> means the Person designated on or before the Confirmation Date in accordance with the Plan to govern and administer the WD Trust on and after the Effective Date.

Exhibit C

*1.143.* <u>Wheeling</u> shall mean Wheeling & Lake Erie Railway Company, a creditor of the Debtor.

*1.144.* <u>Wheeling Adversary Proceeding</u> shall mean Adversary Proceeding No. 13-01033 pending before the Bankruptcy Court and any claims and counterclaims therein.

*1.145.* <u>Wheeling Appeal</u> shall mean Wheeling's appeal of the order of the United States Bankruptcy Appellate Panel of the First Circuit dated December 9, 2014.

*1.146.* <u>Wheeling Orders</u> shall mean the orders of the Bankruptcy Court entered at Docket Nos. 376 and 1047 to the extent they affect any Claim or Lien, if any, of Wheeling.

*1.147.* <u>Wheeling § 506(c) Motion</u> shall mean the Trustee's Motion Seeking to Surcharge Wheeling's Collateral and filed at Docket No. 854.

*1.148.* <u>Wheeling § 363 Motion</u> shall mean Wheeling's Motion, filed at Docket No. 603 allegedly seeking to enforce certain of the Wheeling Orders.

*1.149.* <u>Wheeling Proceedings</u> mean the Wheeling Adversary Proceeding, the Wheeling Appeal, the Wheeling Orders, the Wheeling § 506(c) Motion, the Wheeling § 363 Motion, and any other proceeding or contested matter that may be initiated by or against Wheeling, including any Avoidance Action.

*1.150.* <u>Wrongful Death Claim Resolution Procedures</u> means the Wrongful Death Claim Resolution Procedures (including the points-based matrix) attached to this Plan as Schedule A.

*1.151.* <u>XL Additional Payment</u> means the payment of US $5 million to be paid to the Monitor and the Trustee pursuant to the XL Settlement Agreement.

*1.152.* <u>XL Companies</u> means Indian Harbor Insurance Company, XL Insurance, XL Group plc and their affiliates.

*1.153.* <u>XL Indemnity Payment</u> means the payment of CDN $25 million to be paid to the Monitor pursuant to the XL Settlement Agreement.

*1.154.* <u>XL Insurance</u> means the Canadian Branch of XL Insurance Company SE (formerly XL Insurance Company Limited).

*1.155.* <u>XL Policy</u> means the insurance policy issued by XL Insurance and bearing policy number RLC003808301.

*1.156.* <u>XL Policies</u> means the Indian Harbor Policy and the XL Policy.

*1.157.* <u>XL Settlement Agreement</u> shall mean the Settlement Agreement attached as <u>Exhibit 3</u> to this Plan.

Exhibit C

*4.13.*   *Class 13: General Unsecured Claims.*

(a)   Impairment and Voting.  Class 13 Claims are impaired by the Plan. Each Holder of an Allowed General Unsecured Claim in Class 13 is entitled to vote to accept or reject the Plan.

(b)   Distributions.  Each Holder of Allowed Class 13 Claims shall receive such Holder's Pro Rata share of the Class 13 Cash.

*4.14.*   *Class 14:  Subordinated Claims.*

(a)   Impairment and Voting.  Class 14 Claims are impaired.  Each Holder of a Class 14 Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  Each Holder of a Class 14 Claim shall not be entitled to, and shall not receive or retain, any property or interest on account of such Claim under the Plan.

**HOLDERS OF CLASS 14 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.**

*4.15.*   *Class 15: Equity Interests.*

(a)   Impairment and Voting.  Class 15 is impaired by the Plan.  Each Holder of an Equity Interest in the Debtor is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  On the Effective Date, all existing Equity Interests in the Debtor shall be cancelled and extinguished and the Holders of Equity Interests in the Debtor shall not be entitled to, and shall not receive or retain, any property or interest on account of such Equity Interests under the Plan.

## ARTICLE 5

## SETTLEMENT AGREEMENTS; THE WD TRUST

*5.1.*   *Settlement Agreements.*

To the extent any Settlement Agreements have not been previously approved by the Bankruptcy Court, the entry of the Confirmation Order shall constitute approval of such Settlement Agreements by the Bankruptcy Court and the Bankruptcy Court's finding that, to the extent required under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Settlement Agreements are in the best interests of the Debtor, the Estate and all Holders of Claims in the Chapter 11 Case, are fair, equitable and reasonable, and have been entered into in good faith by all parties thereto.  Upon the occurrence of the conditions to effectiveness set forth in each of the Settlement Agreements, the Settlement Agreements shall be binding and

Exhibit C

enforceable against the parties to the Settlement Agreements in accordance with their terms. However, nothing in the Plan or the Confirmation Order shall preclude a Released Party from exercising its rights to terminate a Settlement Agreement as provided for under such Settlement Agreement. To the extent not previously approved by the Bankruptcy Court, copies of the Settlement Agreements will be included in the Plan Supplement, <u>although filed under seal (except for the XL Settlement Agreement attached hereto)</u>, and the provisions thereof are incorporated into this Plan, as if the same were fully set forth herein; *provided*, *however* that the terms of the Settlement Agreements are subject to Sections 10.8 and 10.9 of the Plan, and no Settlement Agreement may provide for a release in favor of MMA Canada as to any Claims of Canada, to the extent provided in the CCAA Plan. In accordance with the terms of any applicable Settlement Agreement(s), any and all otherwise applicable statutes of limitations or repose or other time-related limitations relating to the Released Parties and the Released Parties' Claims (as defined therein) shall be deemed to have been tolled for statute of limitations purposes during the period from the Execution Date (as defined therein) to the Plan Implementation Date (as defined therein) or the date that such Settlement Agreement becomes null and void pursuant to the Settlement Agreement.

### 5.2. *Exhaustion of Insurance Policies.*

(a)     On the Effective Date, and upon full payment and performance under the XL Settlement Agreement, the XL Policies shall be deemed completely exhausted and any and all of the XL Companies' obligations under the XL Policies shall be, and are deemed to be, extinguished.

(b)     On the Effective Date, and upon full performance under the relevant Settlement Agreements (and subject to any exceptions contained in such Settlement Agreements), the policy of any Insurance Company that is a Contributing Party shall be deemed completely exhausted and any and all of the Insurance Company's obligations under such policy shall be, and are deemed to be, extinguished.

### 5.3. *Execution of WD Trust Agreement.*

On or before the Effective Date, the Trustee or Estate Representative, on behalf of the Debtor, and the WD Trustee, on behalf of the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, shall execute the WD Trust Agreement, and shall perform all other necessary steps to establish the WD Trust.

### 5.4. *Purpose of WD Trust.*

The WD Trust shall be established for the sole purpose of implementing this Plan on behalf of, and for the benefit of, WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, and to serve as a mechanism for liquidating, converting to Cash and distributing the WD Trust Assets for the benefit of WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the WD Trust. The WD Trust is organized and established as a trust pursuant to which the WD Trustee, subject to the terms and conditions contained in the WD Trust Agreement and in this Plan, is to hold the WD

Exhibit C

Approval Order and the Chapter 15 Recognition and Enforcement Order. The foregoing conditions to confirmation of this Plan are material and non-waivable.

### 9.2. Date of Effective Date.

The Effective Date shall occur on the later of: (a) the first Business Day following fifteen (15) days after the Confirmation Date, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Effective Date will not occur until such stay is dissolved); and (b) the first Business Day on which all other conditions to the Effective Date have been satisfied.

### 9.3. Conditions to Effective Date.

The Effective Date shall not occur until (a) all of the conditions set forth in Section 9.1 have occurred; (b) the CCAA Approval Order has become a Final Order; (c) the Chapter 15 Recognition and Enforcement Order has become a Final Order; (d) the Confirmation Order has become a Final Order; (e) the conditions to implementation of the CCAA Plan have been met; and (f) the Plan Implementation Date shall have occurred. The foregoing conditions to the occurrence of the Effective Date are material and non-waivable.

### 9.4. Satisfaction of Conditions.

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 9.5. Occurrence of Effective Date. The Trustee shall cause the Effective Date to occur as soon as is practicable.

### 9.6. Substantial Consummation Upon Effective Date. On the Effective Date, this Plan will be deemed to be substantially consummated under the applicable sections of the Bankruptcy Code.

## ARTICLE 10

## EFFECT OF CONFIRMATION

### 10.1. Vesting of Assets.

As of the Effective Date, the property of the Estate, other than Claims released pursuant to Section 10.5 of this Plan, shall vest in the Post-Effective Date Estate or such other entity as provided in this Plan.

(a) From and after the Effective Date, the Estate Representative or WD Trustee, as the case may be, may dispose of, or cause to be disposed of, the assets of the Post-Effective Date Estate and the WD Trust, respectively, free of any restrictions of the Bankruptcy Code, but in accordance with the provisions, as the case may be, of this Plan and the WD Trust Documents.

Exhibit C

(b)     As of the Effective Date, all assets of the Post-Effective Date Estate and the WD Trust shall be free and clear of all Claims, except as otherwise provided in this Plan or the Confirmation Order.

### 10.2.  Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind any Holder of a Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, all Holders of Derailment Claims, whether or not the Claim or Equity Interest of such Holder is impaired under this Plan, whether or not such Claim or Equity Interest has been filed or asserted against the Debtor and whether or not such Holder has accepted this Plan, and all other Persons, including, without limitation, any holders of a cause of action arising out of or related to the Derailment.

### 10.3.  Exculpations and Limitation of Liability.

As of the Effective Date, none of (a) the Trustee, (b) the Monitor, (c) MMA Canada, or (d) the members, representatives, accountants, financial advisors, consultants and attorneys of the entities described in (a) through (c) of this paragraph shall have or incur any liability to any person for any act taken or omission in connection with or related to the Chapter 11 Case, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating this Plan (including soliciting acceptances or rejections thereof), (ii) the Disclosure Statement or any contract, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan or the Disclosure Statement, or (iii) any distributions made pursuant to this Plan, except for any acts determined by Final Order to have constituted willful misconduct, bad faith or gross negligence.

### 10.4.  Preservation and Non-Waiver of Estate Defenses and Objections and Related Rights Reserved for the Debtor, its Successors in Interest, Creditors and Parties in Interest.

(a)     **No Limitation on Defenses, Set-Off or Right to Subordination as to Claims Against the Estate.**  Nothing in this Plan (other than the provisions of Sections 10.5 and 10.6 hereof), the Confirmation Order (other than the provisions therein corresponding to Sections 10.5 and 10.6 hereof), or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude any of the Estate's defenses, rights to set-off and/or rights to compel subordination as to any Claim or Administrative Expense Claim of any type asserted against the Estate, as otherwise allowed by law, including the right to assert as a defense, set-off or subordination, any claim that would ordinarily or otherwise have to be asserted in or brought by a cross-claim, cross-complaint or separate action.

(b)     **No Limitation on Right to Object to Claims or Administrative Expense Claims.**  Nothing in this Plan (other than the provisions of Sections 10.5 and 10.6 hereof), the Confirmation Order (other than the provisions therein corresponding to Sections 10.5 and 10.6 hereof), or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of (i) the Estate Representative and all his or her successors in interest to object to any Claim or Administrative Expense Claim or (ii) the WD

47

Exhibit C

Case 13-10670  Doc 1657-1  Filed 09/10/15  Entered 09/10/15 15:47:30  Desc Main
Case 13-10670  Doc 1538-7  Filed 07/16/15  Entered 07/16/15 09:45:59  Desc Main
DECLARATION OF JOHN R. MCDONALD  Page 93 of 191  Page 44 of 78
Document  Page 93 of 191  Page 44 of 78

Trustee and all his or her successors in interest to object to any Class 12 Claim (collectively, the "Permitted Objections"). The Permitted Objections may include, as part of any objection to any Claim or Administrative Expense Claim, a prayer for denial or disallowance of Claim or Administrative Expense Claim, reduction in amount by off-set, disgorgement of amounts previously paid and/or equitable subordination, as otherwise allowed by law, on any ground that could have been brought by way of lawsuit, adversary proceeding or contested matter but for (i) the releases contained in the Settlement Agreements; (ii) the exculpation contained in section 10.3 of this Plan; (iii) the Releases and Injunctions contained in this Plan; and (iv) the Confirmation Order. In addition, the makers of the Permitted Objections may utilize whatever remedies and procedural vehicles are otherwise available under the law, including, if necessary, an adversary proceeding. Objections to Claims shall be heard and determined by the Bankruptcy Court.

Nothing in this Plan (other than the provisions of sections 10.5 and 10.6 hereof), the Confirmation Order (other than the provisions therein corresponding to Sections 10.5 and 10.6 hereof), or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of the Trustee or the Estate Representative, and all his successors in interest, to object to any Claim either for the purpose of determining the holder of such Claim's eligibility to vote on this Plan or the amount of such Claim.

### 10.5. Releases.

(a) **Settlement Agreement Releases Supplemented; No Impact on Rights to Object**. Except as expressly provided in this section 10.5 or sections 10.8 or 10.9, nothing in this Section 10.5 or otherwise in this Plan or the Confirmation Order, shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of the Settlement Agreements. The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements. The following releases shall be in addition to and are intended to supplement any releases included in the Settlement Agreements as between the parties to such Settlement Agreements. In the event of any inconsistency between this Plan or the Confirmation Order and the Settlement Agreement(s), the terms of the Settlement Agreement(s) will apply with respect to the particular parties thereto; provided, however, that all Settlement Agreements are subject to Sections 10.5, 10.8 and 10.9 of the Plan. Except as expressly set forth in the Settlement Agreements, nothing in this Plan or the Releases set forth herein shall affect any rights of the Trustee or the Estate Representative to object to the allowance, amount, priority or secured status of the Claims of any party receiving a release under this Plan as provided in sections 502, 503, 506, 507, 509 or 510 of the Bankruptcy Code, including with respect to any right of setoff or recoupment, to the extent such Claims are not released, discharged or satisfied under any Settlement Agreement, under this particular Plan, or pursuant to the Confirmation Order. Nothing herein shall affect any limitation contained in any Settlement Agreement with respect to the release granted to any Released Party. Notwithstanding the definition of "Claim" in section 1.36 of the Plan, for the purposes of Article ARTICLE 10 of the Plan, including, without limitation, the Releases and Injunctions, "Claim" or "Claims" means, as the context requires, past, present and future claims, causes of action, obligations, rights, liens, suits, judgments, orders, application of any kind including for judicial review, remedies, interests, actions, liabilities, demands, duties, injuries, compensation, damages, expenses, fees, and/or costs of

Exhibit C

whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual responsibility or otherwise, whether statutory, at common law, civil law, public law or in equity, regardless of the legal theory, including but not limited to claims for breach of contract, tort, breach of the implied covenant of good faith and fair dealing, loss of support, loss of consortium, statutory or regulatory violations, for indemnity or contribution, for any damages either moral, material, bodily injury, punitive, exemplary or extra-contractual damages of any type, in any jurisdiction (i) in any way arising out of, based upon, or relating in any way, in whole or in part, directly or indirectly, whether through a direct claim, cross-claim, third-party claim, warranty claim, recursory claim, subrogation claim, forced intervention, contribution claim, indemnity claim, reimbursement claim, class action or otherwise, (A) to the Derailment, including any claims held or asserted by any Person for wrongful death, personal injury, emotional distress, loss of support, loss of consortium, property damage, economic loss, moral damage, material damage and bodily injury or environmental damage, remediation or exposure or (B) to the XL Policies, including the issuance thereof, coverage, reimbursement, or payment thereunder, and any act or omission of an insurer of any type for which a Holder of a Claim might seek relief in connection therewith, or (ii) that would otherwise constitute a claim as against MMA, MMA Canada or their Estates (A) provable in bankruptcy under the Bankruptcy and Insolvency Act, R.S.C. 1985, c.B-3, had MMA Canada become bankrupt on August 6, 2013 and/or (B) within the definition of "claim" set forth in section 101(5) of the Bankruptcy Code. Without limiting the foregoing, "Claim" or Claims" for purposes of this Article ARTICLE 10 of the Plan includes all Claims in Classes 8, 9, 10, 11 and 12.

    (b)    **Releases**.

    **(i)**    **Releases by the Debtor and Estate Representative(s)**. *Subject in all respects to the provisions of Sections 9.1 and 9.3 of this Plan and full performance under the applicable Settlement Agreement(s) applicable to the particular Released Parties, on the Effective Date, the Debtor, the Trustee, the Estate Representative(s) and the Estate shall unconditionally release, and hereby are deemed to forever unconditionally release, the Released Parties, including, without limitation, the Released Parties' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims (including any Claims assigned by the Other Released Parties to the Trustee, MMA Canada or their designee pursuant to a Settlement Agreement, and including any Claims or Causes of Action for contribution, indemnity, reimbursement or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and Post-Confirmation Causes of Action, whatsoever (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date relating in any way to the Debtor, the Derailment, the Chapter 11 Case, this Plan, the Disclosure Statement, the*

Exhibit C

*Estate, the XL Policies, and the Settlement Agreements; <u>provided</u>, <u>however</u>, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this release shall not extend, and shall not be construed as extending to, any Claim brought or that could be brought in the future by the Trustee, the Estate Representative or MMA Canada against any of the Affiliated Released Parties to the extent there is, or may be, coverage for such claims under the Great American Policy, and the assignment of rights under such policies to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage, or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion.*

(ii)    <u>**Releases in Favor of the Estate and Estate Representative(s).**</u>  *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of this Plan, and full performance under the applicable Settlement Agreement(s), and subject to any express limitations and/or obligations contained in each Released Party's respective Settlement Agreement, on the Effective Date, each of the Trustee, the Estate Representative(s), and the Estate shall be forever and unconditionally released from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever by the Released Parties and by all Persons or entities receiving consideration under this Plan (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise,  that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Debtor, including, without limitation, arising from the Derailment, the Chapter 11 Case, this Plan, the Disclosure Statement, any prepetition act or omission of the Debtor, the Estate, the XL Policies and the Settlement Agreements; <u>provided</u>, <u>however</u>, that this release shall not apply to any Claims arising in the ordinary course of business that are unrelated to the Derailment and that are held by Affiliates of any Contributing Party (unless such Claims are expressly released pursuant to any Settlement Agreement).  For the avoidance of doubt, the releases in this Section 10.5(b)(ii) do not extend to any breaches of the Settlement Agreement(s).*

(iii)    <u>**Releases by Affiliated Released Parties.**</u>  *Subject in all respects to the provisions of Sections 9.1 and 9.3 of this Plan and the Affiliated Parties Settlement Agreement, on the Effective Date, each of the Affiliated Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Estate, the Trustee, the Estate Representative(s), the Creditors' Committee, the Creditors' Committee members and the Other Released Parties, including, without limitation, and the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Claims (including any Claims or Causes of Action for contribution, indemnity, reimbursement or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits,*

Exhibit C

*judgments, damages, rights, and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Derailment, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to (A) any Claims or rights, under the Great American Policy, assigned by the Affiliated Released Parties to the Debtor or to the Trustee pursuant to the Affiliated Parties Settlement Agreement, (B) any right to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder, provided, however, that such assigned Claims or rights will not be asserted against Other Released Parties, or (C) any Claims or rights of any of the Rail World Parties and/or the D&O Parties (as defined in the CCAA Plan) to seek recovery from their insurers, including Hartford and the XL Companies, for any attorneys' fees, expenses or costs incurred prior to the Effective Date.*

       **(iv)**    **Releases in Favor of Affiliated Released Parties**. *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of this Plan and full performance under the Affiliated Parties Settlement Agreement, on the Effective Date, all persons and entities shall unconditionally release, and are hereby deemed to forever unconditionally release the Affiliated Released Parties, including, without limitation, the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date relating in any way to the Derailment, the Debtor, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the negotiation or funding of the Settlement Agreements; provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this release shall not extend, and shall not be construed as extending to, any Claim brought or that could be brought in the future by the Trustee, the Estate Representative, MMA Canada or the Holders of Derailment Wrongful Death Claims (as applicable pursuant to the Affiliated Parties Settlement Agreement) against any of the Affiliated Released Parties (or certain of them, as applicable) to the extent there is, or may be, coverage for such claims under the Great American Policy, and the assignment of rights under such policy to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage, or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion.*

       **(v)**    **Releases by Other Released Parties**. *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.5(b)(ii), 10.8 and 10.9 of this Plan and full performance under the Settlement Agreement(s) applicable to the particular Released Parties, on the*

Exhibit C

*Effective Date, each Other Released Party and all other Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Estate, the Trustee, the Estate Representative(s), the Creditors' Committee, the Creditors' Committee members, the Affiliated Released Parties, each additional Other Released Party, and the foregoing Persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Derailment Claims and all other Claims (including any Claims or Causes of Action for contribution, indemnity, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution, indemnity, reimbursement or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise,  that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Derailment, the Debtor, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the Settlement Agreements, including, without limitation, the Trustee's or the Trustee's counsel's negotiation of the Settlement Agreements or the funding of the Settlement Agreements; provided, however, that this release shall not apply to any Claims of Canada against MMA Canada, nor shall it apply to any Claims assigned by the Other Released Parties to the Trustee, MMA Canada or their designee pursuant to a Settlement Agreement (other than any Claims against any Other Released Parties), nor shall it apply to the right to enforce the rights and obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor nor shall it apply or be construed as applying to any Claims or claims or other rights to the extent preserved by any of the Other Released Parties in their respective Settlement Agreement(s) (other than any Claims against any Other Released Parties); provided further, however, that notwithstanding anything to the contrary in this Plan, this release shall not apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against one or more of their insurers; provided further, however, that this release shall not apply to any Claims arising in the ordinary course of business that are unrelated to the Derailment and that are held by Affiliates of any of the Contributing Parties.  For the avoidance of doubt, the releases in this Section 10.5(b)(ii) do not extend to any breaches of the Settlement Agreement(s).*

  **(vi)**  <u>**Releases in Favor of Other Released Parties**</u>.  *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of this Plan and full performance under the Settlement Agreement(s) applicable to the particular Other Released Parties, on the Effective Date, all Persons and entities shall unconditionally release, and hereby are deemed to forever unconditionally release each of the Other Released Parties, including without limitation, the Other Released Parties' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action,  and all other Claims (including any claims or Causes of Action for contribution, indemnity, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution, reimbursement or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the*

Exhibit C

*Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights (including any right of setoff, subrogation, contribution, indemnity, reimbursement or recoupment of any kind), remedies and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise that are based upon, arise from and /or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Derailment, the Debtor, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the Settlement Agreements, including, without limitation, the Released Parties and the Released Parties' counsel's negotiation of the Settlement Agreements or the funding of the Settlement Agreements; provided, however, that this release shall not in any way limit the right of the Estate Representative to enforce the rights and obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in the Estate's favor, nor shall it apply or be construed as applying to any Claims or other rights to the extent preserved by any of the Other Released Parties in their respective Settlement Agreement(s) (other than any Claims against any Other Released Parties, including, without limitation, Canada), provided further, however, that notwithstanding anything to the contrary in this Plan, this release shall not apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against any one or more of their insurers. For the avoidance of doubt, and notwithstanding anything in this Plan to the contrary, the releases in this Section 10.5(b)(vi) do not extend to any breaches of the Settlement Agreement(s).*

    **10.6. Injunctions.**

    (a)    **No Impact on the Rights of the Parties to the Settlement Agreements**. Nothing in this Section 10.6 or otherwise in this Plan or the Confirmation Order shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of their respective Settlement Agreements. The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements; _provided, however,_ that no Settlement Agreement may restrain or limit the effect or scope of the releases set forth in Section 10.5 as to any Released Party without the express written consent of such Released Party.

    (b)    **Injunctions**.

    (i)    **Injunction in Favor of the Debtor and Estate Representative(s)**. Except as to the rights, claims or Claims created or expressly preserved by this Plan, the CCAA Plan, the Settlement Agreements, and the Confirmation Order, upon the Effective Date, the Debtor, the Trustee, and the Estate Representative(s) shall have and be entitled to an injunction forever barring and enjoining all Persons and/or entities from asserting against the Debtor any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen,

Exhibit C

whether direct or indirect, contingent or actual, whether liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (A) the Debtor, (B) the Derailment or (C) the Estate, the Chapter 11 Case, this Plan, the Disclosure Statement, the Settlement Agreements and/or the XL Policies, except with regard to any claims and rights expressly reserved pursuant to Sections 10.3 and 10.5 above.

(ii)    **Injunction in Favor of Affiliated Released Parties.**  Except as to the rights, claims or Claims created or expressly preserved by this Plan, the CCAA Plan, the Affiliated Parties Settlement Agreement, and the Confirmation Order, upon the Effective Date, all Persons and entities, including, without limitation, all Holders of Derailment Claims and Non-Settling Defendants, shall be, and are hereby deemed to be, permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting against the Affiliated Released Parties any and all Derailment Claims, Causes of Action and all other Claims, including, without limitation, any and all past, present and future rights, interests, obligations, damages (including punitive damages), demands (including demands for contribution, indemnity, reimbursement or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on tort, contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (A) the Debtor; (B) the Derailment, or (C) the Estate, (D) the Chapter 11 Case, (E) the Plan, (F) the Disclosure Statement, (G) the Settlement Agreements and/or (H) the XL Policies, provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this injunction shall not extend, and shall not be construed as extending to, any Claim brought or that could be brought in the future by the Trustee, the Estate Representative, MMA Canada or the Holders of Derailment Wrongful Death Claims (as applicable pursuant to the Affiliated Parties Settlement Agreement) against the Affiliated Released Parties (or certain of them, as applicable) to the extent there is, or may be, coverage for such claims under the Great American Policy, and the assignment of rights under such policy to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion.

(iii)    **Injunction in Favor of the Other Released Parties.**  Except as to the rights and claims created or expressly preserved by this Plan, the CCAA Plan, the Settlement Agreements (provided that there are no preserved claims (or Claims) against Other Released Parties except as provided for in Exhibit 2), and the Confirmation Order,

Exhibit C

upon the Effective Date, all Persons and entities, including, without limitation, all Holders of Derailment Claims, Released Parties and other Persons, shall be, and are hereby deemed to be, permanently barred, enjoined, and restrained from commencing, pursuing, prosecuting, continuing or asserting against the Other Released Parties, any and all Derailment Claims, Causes of Action and all other Claims, including, without limitation, Claims or Causes of Action for any and all past, present and future rights (including any right of setoff, subrogation, contribution, indemnity, reimbursement or recoupment of any kind), interests (including creating, perfecting or enforcing any encumbrance of any kind against any one or more of the Other Released Parties), obligations, damages (including actual and/or punitive damages), demands (including any Claims or Causes of Action for contribution, indemnity, reimbursement, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees), and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on tort, contract, negligence, warranty, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance, including, without limitation, all Claims released pursuant to Section 10.5, whenever arising, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date in any way relating to or in connection with (A) the Debtor; (B) the Derailment, (C) the Estate, (D) the Chapter 11 Case, (E) the Plan, (F) the Disclosure Statement, (G) the Settlement Agreements and/or (H) the XL Policies (as to which, in the event of an inconsistency with the Plan, the XL Settlement Agreement will govern).

### 10.7.   *Terms of Pre-Plan Injunction and Stays.*

Unless otherwise provided in this Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, entered in the Transferred WD Cases, or otherwise arising under applicable law in any court order and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order, provided, however, that to the extent against any remaining defendant that is not a Released Party as of the Effective Date, the Trustee will cooperate with the plaintiffs in the Transferred WD Cases in seeking a transfer of such cases to the forum selected by such plaintiffs, and will cooperate in seeking from the District Court, in the order transferring such cases, a finding that the Settlement Agreements and transactions with Released Parties approved and implemented pursuant to this Plan were entered into in good faith pursuant to and in accordance with 740 ILCS 100/2(c).

Exhibit C

### 10.8.   *Canadian Criminal Charges and Related Claims of Canada.*

Notwithstanding anything to the contrary in this Plan, the Confirmation Order, or in any Settlement Agreement:

(a)   Nothing in this Plan shall release or provide an injunction to the benefit of any Person for fraud or criminal and quasi-criminal charges filed or that may be filed by Canada and, for greater certainty, for any fine or penalty arising from any such charges;

(b)   Nothing in this Plan shall bind or in any way limit the Director of Public Prosecutions of Canada acting pursuant to the Act respecting the Office of the Director of Public Prosecutions, S.C. 2006, c.9 § 121, as has been or may be amended or superseded;

(c)   Except for the terms and conditions of the Settlement Agreement entered into by Canada, no Settlement Agreement shall be binding upon Canada; and

(d)   Except with respect to entry of the Confirmation Order as may be entered with the assent of Canada, nothing in this Plan shall be construed as a waiver by Canada of sovereign immunity or as an attornment by Canada to any court of any jurisdiction outside Canada.

### 10.9.   *Claims of the United States of America*

Notwithstanding any provision in this Plan or the Confirmation Order, as to the United States of America, its agencies, departments or agents (collectively, the "United States"), nothing in this Plan or Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of the Debtor to the United States arising on or after the Effective Date; (2) any liability of the Debtor to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid defense of setoff against the Debtor or right of recoupment from the Debtor held by the United States with respect to a Claim; or (4) the United States from, subsequent to the Confirmation Date, pursuing any police or regulatory action against the Debtor.  As to the United States, nothing in this Plan or the Confirmation Order shall limit or expand the scope of the discharge granted to the Debtor pursuant to section 1141(d) of the Bankruptcy Code.

Further, as for Derailment Claims, if any, held by the United States, nothing in either the Confirmation Order or the Plan shall exculpate or release any Person for criminal charges brought by the United States, nor shall anything in the Confirmation Order or Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any such Person for such charges under such criminal laws.  Moreover, nothing in either the Confirmation Order or this Plan shall exculpate or release any Person from liability to the United States unrelated to the Derailment, nor shall anything in the Confirmation Order or Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any Person for such liability unrelated to the Derailment.

Exhibit C

# EXHIBIT 2

## Released Parties

Exhibit C

# SCHEDULE A to DISCLOSURE STATEMENT / EXHIBIT 2 TO PLAN
## List of Released Parties

The list below consists of the parties who have executed settlement agreements with Montreal Maine & Atlantic Canada Co. ("MMAC") and Robert J. Keach in his capacity as Chapter 11 Trustee of Montreal, Maine & Atlantic Railway Ltd. (the "Trustee"). Nothing in this list shall supersede, effect, modify or amend any such settlement agreement and to the extent of any conflict between the descriptions in this list and any such settlement agreement, the settlement agreement shall govern. All such settlement agreements are subject to court approval and other conditions, and the inclusion of any person or entity on this list does not create or imply the release of such person or entity from any claim; in all respects, the settlement agreements, and the court orders pertaining to the settlement agreements, shall govern. The term "Affiliate" used in this Schedule "A" means with respect to any entity, all other entities directly or indirectly controlling, controlled by, or under direct or indirect common control with such entity. The other capitalized terms used herein have the meaning ascribed to them in the Plan. The Released Parties are as follows:

1.  **Devlar Energy Marketing LLC together with their parents Lario Oil & Gas Company and Devo Trading & Consulting Company (collectively "Devlar"),** as well as their subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers, (including St. Paul Fire and Marine Insurance Company and its direct and indirect parents, subsidiaries and Affiliates), but only to the extent of coverage afforded to Devlar by such insurers in relation to the Derailment.

2.  **Oasis Petroleum Inc. and Oasis Petroleum LLC (jointly, "Oasis"),** together with their parents, subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers (including St. Paul Fire and Marine Insurance Company and its direct and indirect parents, subsidiaries and affiliates) but only to the extent of coverage afforded to Oasis by such insurers in relation to the Derailment, as well as the entities identified in Schedule 2 hereto but strictly as non-operating working interest owners or joint venturers

Exhibit C

in the specific Oasis-operated wells that produced oil that was provided and supplied by Oasis that was transported in the train involved in the Derailment.

3. **Inland Oil & Gas Corporation, Whiting Petroleum Corporation, Enerplus Resources (USA) Corporation, Halcón Resources Corporation, Tracker Resources, Kodiak Oil & Gas Corp. (now known as Whiting Canadian Holding Company, ULC) and Golden Eye Resources LLC**, together with each of their respective parents, subsidiaries, Affiliates, and each of their former and current respective employees, officers, directors, successors and permitted assignees and attorneys, but strictly as non-operating working interest owners or joint venturers in any wells that produced oil that was provided, supplied and transported in the train involved in the Derailment.

4. **Arrow Midstream Holdings CCC**. ("**Arrow**") together with its parents, subsidiaries, Affiliates, successors, officers, directors, principals, employees, attorneys, accountants, representatives, and insurers. For the avoidance of doubt, Arrow shall include its current parent Crestwood Midstream Partners LP; and insurers mean only those insurers who have issued liability insurance policies to or in favor of Arrow actually or potentially providing insurance for Claims against Arrow arising from or relating to the Derailment, including without limitation, Commerce and Industry Insurance Company under policy no. 3023278 and National Union Fire Insurance Company of Pittsburgh, Pa. under policy no. 41131539.

5. **Marathon Oil Company ("Marathon")**, together with its parent, subsidiaries, successors and assigns, Affiliates, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to Marathon in relation to the Derailment), as well as the entities identified in schedule 5 attached hereto, but strictly as non-operating working interest owners or joint venturers in the specific Marathon-operated wells that produced and supplied oil that was transported on the train involved in the Derailment. For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of Marathon and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not limited to, Yorktown Assurance

2

Exhibit C

Case 13-10670  Doc 1557-1  Filed 09/10/15  Entered 09/10/15 15:47:30  Desc Main
DECLARATION OF JOHN R. McDONALD  Page 142 of 291  Page 56 of 78
Case 13-10670  Doc 533-7  Filed 07/16/15  Entered 07/16/15 09:45:59  Desc Main
Document  Page 142 of 291  Page 56 of 78

Corporation policy number XSL-7-2013 and Old Maine Assurance Ltd. (reinsurance Agreement).

6.  **QEP Resources, Inc. ("QEP")**, together with its parents, subsidiaries, Affiliates, successors and assigns, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to QEP in relation to the Derailment), as well as those entities identified in schedule 6 attached hereto, but strictly as non-operating working interest owners or joint venturers in the specific QEP-operated wells that produced and supplied oil that was transported on the train involved in the Derailment.  For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of QEP and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not be limited to, National Union Fire Insurance Company of Pittsburgh, Pa. (policy number 194-99-62); American Guarantee & Liability Insurance Company (policy number UMB6692611-02).

7.  **Slawson Exploration Company, Inc. ("Slawson")**, together with its parents, subsidiaries, Affiliates, successors and assigns, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to Slawson in relation to the Derailment), as well as those entities identified on schedule 7 attached hereto, but strictly as non-operating working interest owners in the specific Slawson-operated wells that produced oil that was transported on the train involved in the Derailment.  For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of Slawson and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not be limited to, Federal Insurance Company (policy 3579 09 19 and 7981 72 74), Arch Specialty Insurance Company (policy EE00039761 03), and AIG (policy BE031941993).

8.  **Indian Harbor Insurance Company, XL Insurance, XL Group plc and their Affiliates** (strictly as insurers of MMA and MMAC).

Exhibit C

9.     **Edward A. Burkhardt, Larry Parsons, Steven J. Lee, Stephen Archer, Robert C. Grindrod, Joseph C. McGonigle, Gaynor Ryan, Donald Gardner, Jr., Fred Yocum, Yves Bourdon and James Howard, in their capacity as directors and officers of MMA and MMAC, Montreal, Maine & Atlantic Corporation and/or LMS Acquisition Corporation (the "D&O Parties")**.

10.   **Hartford Casualty Insurance Company, together with its parents, subsidiaries, Affiliates, officers and directors** (strictly as insurer of Rail World, Inc.).

11.   **Chubb & Son, a division of Federal Insurance Company** (strictly as insurers of Rail World, Inc. and Rail World Holdings, LLC).

12.   **Rail World Holdings LLC; Rail World, Inc.; Rail World Locomotive Leasing LLC; The San Luis Central R.R. Co.; Pea Vine Corporation; LMS Acquisition Corporation; MMA Corporation; Earlston Associates L.P.,** and each of the shareholders, directors, officers or members or partners of the foregoing, to the extent they are not D&O Parties (the "**Rail World Parties**"). For the avoidance of doubt, (i) Rail World Parties also includes Edward A. Burkhardt, solely in his capacity as director, officer and/shareholder of certain of the Rail World Parties; and (ii) the inclusion of the above entities within the definition of "Rail World Parties", except for the purpose of the settlement agreement executed with MMAC and the Trustee, shall not be construed to create or acknowledge an affiliation between or among any of the Rail World Parties.

13.   **General Electric Railcar Services Corporation, General Electric Company** and each of its and their respective parents, Affiliates, subsidiaries, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, managers, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of these, as well as any predecessors-

Exhibit C

Case 13-10670 Doc 1657-1 Filed 09/10/15 Entered 09/10/15 15:47:30 Desc Main
Document Page 144 of 291 Page 58 of 78
Case 13-10670 Doc 1534-1 Filed 07/16/15 Entered 07/16/15 09:45:55 Desc Main
DECLARATION OF JOHN R MCDONALD Page 244 of 291 Page 58 of 78

in-interest of, or any assignors or vendors of any equipment involved in the Derailment to, any of the foregoing entities and any of the successors and assigns of any of the foregoing entities.

14. **Trinity Industries, Inc., Trinity Industries Leasing Company, Trinity Tank Car, Inc., and Trinity Rail Leasing 2012 LLC, Trinity Rail Group LLC, RIV 2013 Rail Holdings LLC, and Trinity Rail Leasing Warehouse Trust**, inclusive of each of their respective predecessors, agents, servants, employees, shareholders, officers, directors, attorneys, representatives, successors, assigns, parents, subsidiaries, Affiliates, limited liability companies, insurers, and reinsurers (but strictly to the extent of coverage afforded to the such parties by said insurers and reinsurers), including but not limited to whether such entities are in the business of leasing, manufacturing, servicing or administrating rail cars.

15. **Union Tank Car Company, the UTLX International Division of UTCC, The Marmon Group LLC and Procor Limited (the "UTCC Parties")**, and each of their respective predecessors, servants, employees, owners, members (strictly with respect to The Marmon Group LLC), shareholders, officers, directors, partners, associates, attorneys, representatives, successors, assigns, subsidiaries, Affiliates, and parent companies, insurers, and reinsurers listed in schedule 15 attached hereto, but strictly to the extent of coverage afforded to the UTCC Parties by said insurers and reinsurers, regardless of whether such entities are or were in the business of leasing, manufacturing, servicing, or administering rail car leases or otherwise.

16. **First Union Rail Corporation ("First Union")**, together with its parents, subsidiaries, Affiliates, officers, directors, predecessors, successors, assigns, servants, employees, shareholders, attorneys, representatives and insurers and reinsurers (strictly to the extent limited to coverage afforded to First Union, and including, but not limited to, Lexington Insurance Company (including pursuant to the Pollution Legal Liability Select Policy no. PL52675034 and Stand Alone Excess Liability Policy no. 018403252) and Superior Guaranty Insurance Company (including pursuant to Excess Liability Policy no. 404-1XSCI13)).

Exhibit C

17. **CIT Group, Inc**., and its Affiliates, Federal Insurance Company solely in its capacity as an insurer of CIT Group, Inc. and its Affiliates and not in any other capacity, and Arch Insurance Group solely in its capacity as an insurer of CIT Group, Inc. and its Affiliates, and not in any other capacity.

18. **ConocoPhillips Company ("ConocoPhillips")**, together with its subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to ConocoPhillips by such insurers in relation to the Derailment, as well as those entities identified in Schedule 18 hereto, but strictly as non-operating working interest owners in the specific ConocoPhillips operated wells that produced and supplied oil that was transported on the train involved in the Derailment.

19. **Shell Oil Company and Shell Trading (US) Company,** together with their subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers' direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to Shell Oil Company and Shell Trading (US) Company, by such insurers in relation to the Derailment.

20. **Incorr Energy Group LLC ("Incorr")**, together with its subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers but only with respect to coverage afforded by such insurers to Incorr in relation to the Derailment.

21. **Enserco Energy, LLC**, together with its parent, subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers' direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to Enserco Energy, LLC, by such insurers in relation to the Derailment.

Exhibit C

Case 13-10670   Doc 1657-1   Filed 09/10/15   Entered 09/10/15 15:47:30   Desc Main
Document   Page 60 of 78

Case 13-10670   Doc 1538-7   Filed 07/16/15   Entered 07/16/15 09:45:53   Desc Main
DECLARATION OF JOHN R. MCDONALD   Page 146 of 291

22.     **The Attorney General of Canada, the Government of Canada, Her Majesty the Queen in Right of Canada and the departments, crown corporations and agencies including the Canadian Transportation Agency, and including all past, present and future Ministers, officers, employees, representatives, servants, agents, parent, subsidiary and affiliated crown corporations and agencies, and their respective estates, successors and assigns.**

23.     **(i) Irving Oil Limited, Irving Oil Company, Limited, Irving Oil Operations General Partner Limited and Irving Oil Commercial G.P.**, (ii) any of their Affiliates (as defined in the settlement agreement), (iii) any predecessors, successors and assigns of any of the foregoing Persons named in clauses (i) and (ii) of this paragraph 23, and (iv) any directors, officers, agents and/or employees of any of the foregoing Persons named in clauses (i), (ii) and (iii) of this paragraph 23 (the "**Irving Parties**"), and the insurers listed in Schedule 23 attached hereto, but only in their respective capacities as insurers of the Irving Parties under the insurance policies listed by policy numbers in said Schedule 23 (the "**Irving Insurers**").   Notwithstanding the foregoing or anything else in this list and the Plan, the claims (including the Claims) and/or other rights that the Irving Parties have (or may have) against their insurers (including but not limited to the Irving Insurers) or any one or more of them under any applicable policies, at law, in equity or otherwise, are fully preserved and said insurers (including but not limited to the Irving Insurers) are not Released Parties in connection with said claims (including any Claims) and/or other rights of the Irving Parties.

24.     **(i) World Fuel Services Corporation, World Fuel Services, Inc., World Fuel Services Canada, Inc., Petroleum Transport Solutions, LLC, Western Petroleum Company, Strobel Starostka Transfer LLC ("SST"), Dakota Plains Marketing LLC, Dakota Plains Holdings, Inc., DPTS Marketing Inc., Dakota Plains Transloading LLC, Dakota Petroleum Transport Solutions LLC (the "World Fuel Parties"),** (ii) any of their Affiliates, (iii) any predecessors, successors and assigns of any of the foregoing Persons named in clauses (i) and (ii) of this paragraph 24, and (iv) any directors, officers, agents and/or employees of any of the foregoing Persons named in clauses (i), (ii) and (iii) of this paragraph 24. and the insurers listed in schedule 24 attached hereto, but only

Exhibit C

in their respective capacities as insurers under the insurance policies listed by policy number in said schedule 24 (the "**World Fuel Insurers**"). Notwithstanding the foregoing or anything else in this list and the Plan, the claims (including the Claims) and/or other rights that the World Fuel Parties have (or may have) against their insurers (including but not limited to the World Fuel Insurers), SST or its insurers, or any one or more of them under any applicable policies, at law, in equity or otherwise, are fully preserved and SST, as well as said insurers (including but not limited to the World Fuel Insurers) are not Released Parties in connection with said Claims and/or other rights of the World Fuel Parties.

25.     **The SMBC Parties, namely: SMBC Rail Services, LLC f/k/a Flagship Rail Services, LLC, and its respective predecessors, servants, employees, independent contractors, owners, shareholders, officers, directors, associates, attorneys, accountants, representatives, successors, assigns, agents, subsidiaries, affiliates, and parent companies, and including without limitation Sumitomo Mitsui Financial Group, Inc., Sumitomo Mitsui Finance & Leasing Company, Limited, Sumitomo Mitsui Banking Corporation of Canada, Sumitomo Mitsui Banking Corporation, SMBC Capital Markets, Inc., SMBC Leasing and Finance, Inc., SMBC Nikko Securities America, Inc., JRI America, Inc., Manufacturers Bank, SMBC Global Foundation, Inc., SMBC Financial Services, Inc., SMBC Cayman LC Limited, SMBC Capital Partners LLC, SMBC Leasing Investment LLC, SMBC Marine Finance, Inc., Sakura Preferred Capital (Cayman), Limited, TLP Rail Trust I, FRS I, LLC, and FR Holdings, LLC and its subsidiaries. "SMBC Parties" also means TLP Rail Trust I, a Delaware Statutory Trust, SMBC Rail Services, LLC, as the owner participant and beneficiary of TLP Rail Trust I, and Wilmington Trust Company, Trustee of TLP Rail Trust I.** "SMBC Parties" also means Liberty Mutual Holding Company, Inc. and its subsidiaries and affiliates, Liberty Mutual Group Inc., Liberty Mutual Insurance Company, Liberty Insurance Underwriters Inc., Liberty Surplus Insurance Corporation, and Liberty International Underwriters (collectively, "**Liberty**") and any reinsurers that Liberty has any policy, agreement, contract, or treaty with that relates in any way to any of the SMBC Parties or any insurance policy issued by Liberty to any of the SMBC Parties.

Exhibit C

Notwithstanding the foregoing or anything else in this list, and without implying or providing any limitation, the term "Released Parties" as used herein or above <u>does not include, and shall not be deemed to include</u> Canadian Pacific Railway Company.

Exhibit C

Case 13-10670   Doc 1657-1   Filed 09/10/15   Entered 09/10/15 15:47:30   Desc Main
Document   Page 149 of 291   Page 63 of 78
Case 13-10670   Doc 1533-1   Filed 07/16/15   Entered 07/16/15 09:45:55   Desc
DECLARATION OF JOHN R MCDONALD   Page 149 of 291 Page 63 of 78

## SCHEDULE 2
## LIST OF NON-OPERATING WORKING INTEREST OWNERS OR
## JOINT VENTURERS IN OASIS OPERATED WELLS

Whiting Oil And Gas Corporation;
Hess Corporation;
Hess Bakken Investments II LLC
Continental Resources Inc.;
Sinclair Oil And Gas Company;
Conoco Phillips Company;
Black Bear Resources, LLP;
Castlerock Resources Inc.;
Deep Creek Exploration;
Enerplus Resources Usa Corporation;
Fidelity E&P Company:
Fidelity Exploration &Production Co;
Inland Oil & Gas Corporation;
Jake Energy Inc.;
Kerogen Resources Inc.;
Lilley & Company;
Lilley And Associates LLC;
Linn Energy Holdings LLC;
Lone Rider Trading Company;
Mayhem Oil And Gas Inc.;
Missouri River Royalty Corp;
Nj Petroleum LLC;
Northern Energy Corporation;
Northern Oil & Gas Inc.;
O.T. Cross Oil LLC;
Ottertail Land & Permit Services;
Penroc Oil Corporation;
Reef 2011 Private Drilling Fund LP;
Shakti Energy LLC;
Slawson Exploration Company Inc.;
Statoil Oil & Gas LP;
WHC Exploration LLC;

Exhibit C

## SCHEDULE 5

## LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT VENTURERS IN MARATHON OPERATED WELLS

ALAMEDA ENERGY INC
ARTHUR FRANK LONG JR
BEARTOOTH RIDGE RESOURCES
CARL W STERUD JR
CHUGASH EXPLORATION LP
CONDOR PETROLEUM INC
CONTINENTAL RESOURCES INC
DISPUTED STATE-TRIBAL INTEREST
ENDEAVOR ENERGY RESOURCES LP
ENERPLUS RESOURCES CORPORATION
ESTATE OF KARL WILLIAM STERUD
ESTATE OF WALLACE HICKEL
EVERTSON ENERGY PARTNERS LLC
GADECO LLC
GOLDENEYE RESOURCES LLC
HALCON WILLISTON I LLC
HESS BAKKEN INVESTMENTS II LLC
ILAJEAN REAMS
JENNIFER BYSTROM
JOSEPHINE ANN KJONAAS
KOOTENAI RESOURCE CORP
LA PETROLEUM INC
LGFE-M LP
LINDA ELWOOD
LOUIS WALTER LONG
MARCIN PRODUCTION LLC
MICHAEL HARVEY STERUD
MISSOURI RIVER ROYALTY CORPORATION
MONTANA OIL PROPERTIES INC
MONTE TEDDY LONG
NATURAL RESOURCE PARTNERS LP
NORTHERN ENERGY CORP
NORTHERN OIL AND GAS INC
PETROGULF CORP
QEP ENERGY COMPANY
RAINBOW ENERGY MARKETING CORP
RONALD KNIGHT
S REGER FAMILY INC

Exhibit C

SLAWSON EXPLORATION COMPANY INC
SLAWSON RESOURCES COMPANY
SPOTTED HAWK DEVELOPMENT LLC
STEWART GEOLOGICAL INC
TDB RESOURCES LP
USG PROPERTIES BAKKEN II LLC
VERSA ENERGY LLC
VITESSE ENERGY LLC
VITESSE OIL LLC
W NORTH FUND II LP
ZAGOIL COMPANY LLC

Exhibit C

**SCHEDULE 6**

**LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT
VENTURERS IN QEP OPERATED WELLS**

3LAND INC
ACTION REALTORS INC
ADELE L. SKODA
AMERADA HESS CORPORATION
ANDREW J HORVAT REVOCABLE TRUST
ARMSTRONG CHILDREN'S TRUST
ARMSTRONG MINERALS, LLC
AVALON NORTH LLC
BADLANDS HOLDING COMPANY
BANDED ROCK LLC
BIG PRAIRIE INVESTMENTS, LLC
BLACK STONE ENERGY COMPANY, LLC
BORGOIL RESOURCES, LLP
BRUCE P. IVERSON
BURLINGTON RESOURCES OIL & GAS
BXP PARTNERS III, LP
CHUGASH EXPLORATION LP
CONTINENTAL RESOURCES INC
COPPERHEAD CORPORATION
CRESCENT ENERGY, INC.
CRS MINERALS LLC
DAKOTA WEST LLC
DALE LEASE ACQUISITIONS 2011-B LP
DAVIS EXPLORATION
DEBRA KAY TORNBERG
DEEP CREEK EXPLORATION LLC
DEVON ENERGY PRODUCTION CO. LP
DIAMOND EXPLORATION INC
DORCHESTER MINERALS LP
DUANE A. IVERSON
E. W. BOWLES
ENDEAVOR ENERGY RESOURCES LP
ENERPLUS RESOURCES (USA)
ESTATE OF ROBERT J MCCANN JR
EZ OIL, LLC

Exhibit C

FORESTAR PETROLEUM GROUP
GAEDEKE WILLISTON BASIN HOLDINGS
GARY LEE MCCORMICK
GREEN RIVER ENERGY LLC
HALCON RESOURCES CORP COMPANY
HESS BAKKEN INVESTMENTS II LLC
HESS CORPORATION
INTERNATIONAL PETROLEUM CORPORATION
INTERNOS, INC.
J KAMP OIL LLC
JEFF GARSKE
JERALDINE BJORNSON
JJS WORKING INTERESTS LLC
JOEL ALM
JOHN B. BJORNSON
JT ENERGY, LLC
JTT OIL LLC
JUNE ANN GREENBERG
KENNETH STEVENSON
KODIAK OIL & GAS (USA) INC
L LOWRY MAYS
LANDSOUTH PROPERTIES, LLC
LEE MCCORMICK MARITAL TRUST
LEGION LAND & EXPLORATION CORP
LELAND STENEHJEM, JR.
LGFE-M L.P.
LINDSEY K MULLENIX
LMAC, LLC
LONE RIDER TRADING COMPANY
LONETREE ENERGY & ASSOCIATES
M & M ENERGY INC
MADDOX FAMILY TRUST
MARATHON OIL COMPANY
MBI OIL & GAS LLC
MCBRIDE OIL & GAS CORPORATION
MILBURN INVESTMENTS, LLC
MISSOURI RIVER ROYALTY COMPANY
MUREX PETROLEUM CORPORATION
NORTHERN ENERGY CORPORATION
NORTHERN OIL AND GAS, INC.

Exhibit C

NORTHLAND ROYALTY CORPORATION
NOWITZKI OIL & GAS LP
O. A. HANSON
OPINOR ANNA PTY KAISER FUND
PETROGLYPH ENERGY
PETROVAUGHN INC.
PHILIP R. BISHOP
PRADERA DEL NORTE, INC.
RALPH MADDOX FAMILY TRUST
RAVEN OIL PROPERTIES INC
REEF 2011 PRIVATE DRILLING FUND LP
ROBERT J. MCCORMICK
ROBERT POST JOHNSON
SCOTT ENERGY, LLC
SCOTT K. BJORNSON
SCOTT WARD
SIDNEY K. LEACH
SIERRA RESOURCES INC
SINCLAIR OIL & GAS COMPANY
SIXTY NINE OIL & GAS LP
SKLARCO LLC
SLAWSON EXPLORATION CO INC
SM ENERGY COMPANY
SOUTH FORK EXPLORATION, LLC
SPOTTED HAWK DEVELOPMENT LLC
SRP ENTERPRISES, INC.
STEVEN H HARRIS FAMILY LIMITED
STUBER MINERAL RESOURCES LLC
SUNDHEIM OIL CORPORATION
SUSAN D STENEHJEM
THE ERICKSON FAMILY TRUST
THE MILLENNIUM CORPORATION
THE TRIPLE T INC.
TIMOTHY J. RITTER
TL & JH KAISER SUPERANNUATION
TURMOIL INC
TWIN CITY TECHNICAL, LLC
USG PROPERTIES BAKKEN II LLC
VINNIE CORP
VINTAGE OIL & GAS, LLC

Exhibit C

Case 13-10670  Doc 1337  Filed 07/16/15  Entered 07/16/15 09:45:55  Desc
Document  Page 155 of 291

VIVIAN MCCORMICK WARREN
WESTERN ENERGY CORPORATION
WILLIAM G SEAL ESTATE
WOLF ENERGY LLC
XTO ENERGY INC
XTO OFFSHORE INC
ZACHARY D  VANOVER

Exhibit C

# SCHEDULE 7

## LIST OF NON OPERATING WORKING INTEREST OWNERS
## OR JOINT VENTURERS IN SLAWSON OPERATED WELLS

A.G. Andrikopoulos Resources, Inc.

Abercrombie Energy, Inc.

Alameda Energy, Inc.

Anthony J. Klein

Bakken HBT II, LP

Beartooth Ridge Resources, Inc.

Beck Sherven Legion Post #290

Benjamin Kirkaldie

BigSky Oil & Gas, LLC

Bob Featherer LLC

Brendall Energy, LLC

Burlington Northern & Sante Fe

C King Oil

Cedar Creek Wolverine, LLC

Centaur Consulting, LLC

Chugash Exploration, LP

Comanche Exploration Company

Continental Resources, Inc.

Craig A. Slawson

D. Sumner Chase, III 2001 Irr. Trust

David L. Hilleren

David W. Strickler Trust

Davis Exploration, LLC

Deep Blue, LLC

Dogwood Hill Farms, LLC

DS&S Chase, LLC

Enerplus Resources (USA) Corp

Formation Energy LP

Frederic Putnam

Gadeco, LLC

Exhibit C

Gaedeke Williston Basin, Ltd.

Gasco Limited Partnership

GHG Partners, LLC

Great Plains Oil Properties, LLC

Greenhead Energy, Inc.

Gulfport Energy Corporation

HRC Energy, LLC

Huston Energy Corporation

Icenine Properties, LLC

Inland Oil and Gas Corporation

James H Bragg

John Schell

Kenneth Lyson and Claudia G. Lyson

Kodiak Oil & Gas (USA), Inc.

Kootenai Resources Corporation

L D Davis & Marilyn Davis, JTS

Lario Oil and Gas Company

Linn Energy Holdings, LLC

Marcin Production, LLC

Mark Lee

Marshall & Winston, Inc.

Mary Newman

Melby Gas III, LLC

Missouri River Royalty Corporation

Montana Oil Properties, Inc.

MRG Holdings, LLC

Mwiley Resources, Inc.

Nadel and Gussman Bakken, LLC

Northern Oil and Gas, Inc.

Oxy USA, Inc.

Pegasus Group Inc.

Petro-Huston, LLC

Petroshale (US) Inc.

Pine Oil Co.

Pine Petroleum, Inc.

Piscato Oil, LLC

Exhibit C

Polish Oil & Gas, Inc.

Raymond Resources Inc.

Riley Resources, Inc.

Robert A. Erickson & Cleo

S. Reger Family, Inc.

Sheringham Corporation

Slawson Resources Co.

Statoil Oil & Gas, LP

Stewart Geological, Inc.

Stuart F. Chase

Stuart F. Chase 2001 Irr. Trust

Thomas Lambert

Todd Slawson

Todd Slawson Trust

Tracker Resource Development III, LLC

U S Energy Development Corporation

USG Properties Bakken II, LLC

Vitesse Energy, LLC

Vitesse Oil, LLC

W B Oil LLC

Whiting Oil and Gas

Windsor Dakota, LLC

Zagoil Company, LLC

Exhibit C

# SCHEDULE 15

## LIST OF UTCC'S INSURERS AND REINSURERS

<u>Canadian Insurance Companies</u>

ACE INA Insurance

Chartis Insurance Company of Canada (n/k/a AIG Insurance Company of Canada)

Westport Insurance Corporation

<u>U.S. Insurance Companies</u>

ACE American Insurance Company

American Zurich Insurance Company

Lexington Insurance Company

North American Capacity Insurance Company

Starr Indemnity & Liability Company

<u>Bermudian Insurance Companies</u>

ACE Bermuda Insurance Ltd.

Allied World Assurance Company Ltd.

Argo Re Ltd.

Chartis Excess Limited (n/k/a American International Reinsurance Company Ltd.)

Chubb Atlantic Indemnity Ltd.

Hanseatic Insurance Company (Bermuda) Limited

Iron-Starr Excess Agency Ltd. / Ironshore Insurance Ltd. / Starr Insurance & Reinsurance Limited

Starr Insurance & Reinsurance Limited

XL Insurance (Bermuda) Ltd.

Exhibit C

Case 13-10670   Doc 1537-1   Filed 07/16/15   Entered 07/16/15 09:45:55   Desc Main
DECLARATION OF JOHN R. MCDONALD   Page 160 of 191

## SCHEDULE 18

## LIST OF NON-OPERATING INTEREST OWNERS OR JOINT VENTURERS IN BURLINGTON RESOURCES OIL & GAS COMPANY LP (A WHOLLY OWNED SUBSIDIARY OF CONOCOPHILLIPS) OPERATED WELLS

Continental Resources Inc.

Hess Corporation

Hess Bakken Investment II, LLC

JAG Oil Limited Partnership

Linn Energy Holdings LLC

Newfield Production Company

Northern Oil & Gas, Inc.

Twin City Technical LLC

WM ND Energy Resources II, LLC

QEP Energy Co.

Questar Exploration & Production Co.

Exhibit C

Case 13-10670   Doc 1657-1   Filed 09/10/15   Entered 09/10/15 15:47:30   Desc Main
DECLARATION OF JOHN R. MCDONALD   Page 101 of 291   Page 75 of 78
Case 13-10670   Doc 1534   Filed 07/16/15   Entered 07/16/15 09:45:55   Desc Main
Document   Page 101 of 291   Page 75 of 78

# SCHEDULE 23

## LIST OF IRVING INSURERS

1. ACE INA Insurance
   - CGL 523952
   - XBC 602712

2. Zurich Insurance plc, UK Branch
   - B0509E1149413
   - B0509E1181313

3. Zurich lnsurance Company Ltd
   - 8840960
   - 8838799

4. AEGIS, Syndicate AES 1225
   - B0509E1149413

5. Mitsui Sumitomo, Insurance Corporate Capital, Limited as sole member of Syndicate, 3210 at Lloyds
   - B0509E1181113

6. QBE Casualty Syndicate 386
   - B0509E1181113

7. QBE Syndicate 1886
   - B0509E1181113

8. Underwriters at Lloyd's and Lloyd's Syndicates, Subscribing to Policy No. B0509HM231013, including the following
   - AEGIS Syndicate AES 1225
   - Syndicate CNP 4444
   - Syndicate MKL 3000
   - Syndicate HIS 33
   - Syndicate LIB 4472
   - Syndicate ANV 1861
   - Syndicate MFM 2468
   - Syndicate AUW 609
   - Syndicate TUL 1301

Exhibit C

Case 13-10670   Doc 1537-1   Filed 07/16/15   Entered 07/16/15 09:45:55   Desc Main
DECLARATION OF JOHN R. MCDONALD   Page 102 of 191

- Syndicate SKD 1897
- Syndicate AML 2001
- Syndicate NAV 1221
- Syndicate TRV 5000

9. XL Insurance (Bermuda) Ltd.
   - XLUMB-742875

10. Oil Casualty Insurance, Ltd.
    - U920303-0313

11. Argo Re Ltd.
    - ARGO-CAS-OR-000227.1

12. Chubb Atlantic Indemnity Ltd.
    - 3310-17-91

13. Zurich Insurance Company Ltd
    - 8838799

14. Iron-Starr Excess Agency Ltd.
    - 1S0000822

15. AIG Excess Liability Insurance International Limited
    - 1657346

16. ACE Bermuda Insurance Ltd.
    - 1OC-1338/5

17. Liberty Mutual Insurance Company
    - XSTO-631084-013

18. ACE Underwriting Agencies Limited, as managing agency of Syndicate 2488 at Lloyd's, and ACE European Group Limited
    - B0509EI181413

Exhibit C

# SCHEDULE 24

## LIST OF WORLD FUEL INSURERS (Subject to Note 1 below)

1.  Zurich American Insurance Company ("Zurich").  Zurich is included in Schedule A only with respect to its indemnity limits, and not with respect to its obligation to defend or pay defense costs to the World Fuel Parties.  Zurich is included on Schedule A solely with respect to the following policies:

    - Zurich American Insurance Company Policy GLO 5955601-00 (eff. 07/01/2013 – 07/01/2014); and
    - Zurich American Insurance Company Policy ZE 5761197-00 (eff. 07/01/2013 – 07/01/2014)

2.  Federal Insurance Company (GL) ("Federal (GL)").  Federal (GL) is included in Schedule A only with respect to its indemnity limits, and not with respect to its obligation to defend or pay defense costs to the World Fuel Parties.  Federal (GL) is included on Schedule A solely with respect to the following policy:

    - Federal Insurance Company Policy 3597-82-72 NHO (eff. 11/07/2012 – 11/07/2013)

3.  Alterra Excess & Surplus Insurance Company ("Alterra").  Alterra is included on Schedule A solely with respect to the following policy:

    - Alterra Excess & Surplus Insurance Company Policy MAX3EC50000211 (eff. 11/07/2012 – 11/07/2013)

4.  ACE Property and Casualty Insurance Company ("ACE"). Ace is included on Schedule A solely with respect to the following policy:

    - ACE Property and Casualty Insurance Company Policy XOO G27047026 (eff. 07/01/2013 – 07/01/2014)

5.  Ironshore Specialty Insurance Company ("Ironshore").  Ironshore is included on Schedule A solely with respect to the following policy:

    - Ironshore Specialty Insurance Company Policy 001709800 (eff. 07/01/2013 – 07/01/2014)

6.  *XL Insurance America, Inc. ("XL").  XL is included on Schedule A solely with respect to the following policy:

    - XL Insurance America, Inc. Policy US00065550LI13A (eff. 07/01/2013 – 07/01/2014)]
    - * settlement  subject to determination of WFS's ultimate derailment liability

Exhibit C

7. Federal Insurance Company and Chubb Custom Insurance Company (Pollution) ("collectively, Chubb").  Chubb is included on Schedule A solely with respect to the following policies:

- Federal Insurance Company Policy 37313421 (eff. 10/1/2010 – 10/1/2020);
- Chubb Custom Insurance Company Policy 37313810 (eff. 4/17/2012 – 4/17/2017); and
- Chubb Custom Insurance Company Policy 37313496 (eff. 12/31/2010 – 12/31/2020)

8. Lexington Insurance Company and Chartis Specialty Insurance Company (collectively, "AIG").  AIG is included on Schedule A solely with respect to the following policies:

- Lexington Insurance Company Policy PLS 5652718 (eff. 06/01/11 – 07/01/14);
- Chartis Specialty Insurance Company Policy PLS 1951951 (eff. 07/01/11 – 07/01/14); and
- Chartis Specialty Insurance Company PLS 18809548 (eff. 05/11/12 – 05/11/15)

9. Crum and Forster Specialty Insurance Company ("Crum & Forster").  Crum & Forster is included on Schedule A solely with respect to the following policies:

- Crum & Forster Specialty Insurance Company Policy EPK 101162 (eff. 03/16/13-03/16/14); and
- Crum & Forster Specialty Insurance Company Policy EFX 100400 (eff. 03/16/13-03/16/14)]

Note 1.  Notwithstanding anything above or elsewhere in the Plan or the CCAA Plan, no insurer shall be included in this Schedule 24 or as a Released Party in the Plan or the CCAA Plan, or otherwise obtain the benefits of the Plan or the CCAA Plan, unless and until that insurer enters into a separate settlement agreement with the World Fuel Parties (mutually acceptable to the World Fuel Parties and that insurer) relating to insurance coverage for the Derailment.  Any such separate settlement agreement between the World Fuel Parties and an insurer shall be specifically subject to the terms and conditions thereof, notwithstanding anything to the contrary in the Plan, the CCAA Plan, or the Approval Orders (as defined in the CCAA Plan).  The releases set forth in the Plan, the CCAA Plan, and the Approval Orders are not intended to, and shall not, extend to or otherwise release or discharge any Claims, rights, privileges, or benefits held by the World Fuel Parties against the World Fuel Insurers or any other insurer of the World Fuel Parties, which shall be governed by such separate settlement agreement between the World Fuel Parties and such World Fuel Insurer or other insurer of the World Fuel Parties.

Exhibit C