# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

MONTREAL MAINE & ATLANTIC
RAILWAY, LTD.,

           Debtor.

Bk. No. 13-10670
Chapter 11

**TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF, AND OMNIBUS REPLY TO OBJECTIONS TO, CONFIRMATION OF TRUSTEE'S REVISED FIRST <u>AMENDED PLAN OF LIQUIDATION DATED JULY 15, 2015</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ I

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 2

    A.    The Derailment............................................................................................................. 2

    B.    Commencement of the Chapter 11 and Canadian Cases.................................. 3

    C.    Sale of the Debtor's and MMA Canada's Assets ........................................... 4

    D.    Settlement Negotiations ........................................................................................... 5

    E.    The Canadian Plan Process and the Chapter 15 Proceedings ..................... 6

    F.    The Trustee's Chapter 11 Plan ............................................................................. 8

        *i.*    *Approval of the Disclosure Statement and the Solicitation Process* ......................... *8*

        *ii.*    *Overview of the Plan* ............................................................................................ *9*

        *iii.*    *The Voting Results* .............................................................................................. *13*

        *iv.*    *Objections to Confirmation* ................................................................................. *14*

ARGUMENT ................................................................................................................................ 15

    A.    The Plan Meets All Applicable Requirements of  11 U.S.C. § 1129
        and Thus Should be Confirmed ........................................................................... 16

        *i.*    *Section 1129(a)(1)—Plan Compliance with the Bankruptcy Code* ......................... *16*

            (a)    Section 1122—Classification of Claims and Interests .................................................16

            (b)    Section 1123(a)—Mandatory Contents of Plan.........................................................17

            (c)    Section 1123(b)—Permissive Contents of Plan ........................................................21

            (d)    Section 1172—Contents of Railroad Reorganization Plan.........................................28

        *ii.*    *Section 1129(a)(2)—Trustee Compliance with the Bankruptcy Code*.................... *28*

        *iii.*    *Section 1129(a)(3)—Plan Proposed in Good Faith
            and Not by Any Means Forbidden by Law* ........................................................... *31*

        *iv.*    *Section 1129(a)(4)—Payment of Certain Administrative Expenses
            Subject to Approval as Reasonable* ...................................................................... *32*

        *v.*    *Section 1129(a)(5)—Disclosure of Post-Confirmation  Officers and Directors* ...... *33*

        *vi.*    *Section 1129(a)(6)—Disclosure of Applicable Rate Changes* ............................... *34*

        *vii.*    *Section 1129(a)(7)—"Best Interests Test"*............................................................ *34*

        *viii.*    *Section 1129(a)(8)—Acceptance by All Impaired Classes*..................................... *36*

        *ix.*    *Section 1129(a)(9)—Payment of Priority Claims* ................................................. *37*

            a)    Administrative Claims ..................................................................................................38

            b)    Priority Tax Claims and Other Priority Claims ..........................................................41

        *x.*    *Section 1129(a)(10)—Acceptance by Impaired Class*............................................ *42*

        *xi.*    *Section 1129(a)(11)—"Feasibility"*..................................................................... *42*

        *xii.*    *Section 1129(a)(12)—Payment of Statutory Fees* ................................................. *43*

        *xiii.*    *Section 1129(a)(13)—Payment of Retiree Benefits* ................................................ *43*

*xiv.*    *Section 1129(a)(14), (15) and (16)—Domestic Support Obligations, Unsecured*
        *Claims Against Individual Debtors and Transfers by  Nonprofit Organizations* ...... *43*

B.    The Plan Satisfies the "Cram-Down" Requirements of Section 1129(b) ..................... 44

C.    Other Bankruptcy Code Confirmation Requirements .................................................... 46

D.    Certain Objecting Parties Lack Standing to Object to Confirmation ........................... 48

E.    The Release, Exculpation, and Injunction Provisions
       of the Plan Should Be Approved ..................................................................................... 50

*i.*    *Subject Matter Jurisdiction* ...................................................................................... *50*

*ii.*    *The Legal Standard for Granting Third-Party Releases* ......................................... *53*

*iii.*    *The Releases and Injunctions Are Appropriate Under the Circumstances* .............. *58*

**CONCLUSION** ..................................................................................................................... **61**

## TABLE OF AUTHORITIES

### Cases

In re Airadigm Comm'ns, Inc., 519 F.3d 640 (7th Cir. 2008) .................................................. 55

Allen v. Wright, 468 U.S. 737 (1984) ...................................................................................... 48

In re Am. Cartage, Inc., 656 F.3d 82 (1st Cir. 2011) ................................................................ 22

Austin v. Raymark, 841 F. 2d 1184 (1st Cir. 1988) ................................................................... 60

In re Bally Total Fitness of Greater N.Y., Inc.,
   No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) .................................... 15

BealBank, S.S.B. v. Waters Edge L.P., 248 B.R. 668 (D. Mass 2000) ...................................... 32

Behrmann v. Nat'l Heritage Found., Inc., 663 F.3d 704 (4th Cir. 2011) .................................. 54

Billington v. Winograde, (In re Hotel Mt. Lassen, Inc.),
   207 B.R. 935 (Bankr. E.D. Cal. 1997) ................................................................................ 55

In re Boston & Maine Corp., 600 F.2d 307 (1st Cir. 1979) ...................................................... 40

In re Boston & Maine Corp., 634 F.2d 1359 (1st Cir. 1980) ......................................... 19, 39, 40

In re Boston & Maine Corp., 46 B.R. 930 (D. Mass. 1983) ...................................................... 41

In re Boston Reg. Med. Ctr., Inc., 410 F.3d 100 (1st Cir. 2005) .......................................... 51, 52

Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94 (3d Cir. 1988) ............................. 30

In re Charles Street African Methodist Episcopal Church of Boston,
   499 B.R. 66 (Bankr. D. Mass. 2013) ............................................................................ 50, 54

In re Chicago Invests., LLC, 470 B.R. 32 (Bankr. D. Mass. 2012) .......................... 51, 54-56, 58

In re Clamp–All Corp., 233 B.R. 198 (Bankr. D. Mass. 1999) ................................................ 30

In re Colfer, 159 B.R. 602 (Bankr. D. Me. 1993) ............................................................... 15, 17

Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33 (E.D. Pa. 1996) ........... 44, 46

In re Dana Corp., 412 B.R. 53 (S.D.N.Y. 2008) ................................................................. 24, 25

In re Dow Corning Corp., 244 B.R. 673 (Bankr. E.D. Mich. 1999) .......................................... 32

In re Dow Corning Corp., 255 B.R. 445 (E.D. Mich. 2000) ..................................................... 58

In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002) .......................................................... 55

In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................. 28

In re Gaston & Snow, No. 93-8517, 1996 WL 694421 (S.D.N.Y. Dec. 4, 1996) ...................... 48

In re Genco Shipping & Trading Ltd., 513 B.R. 233 (Bankr. S.D.N.Y. 2014) .......................... 56

Gillman v. Continental Airlines (In re Continental Airlines),
   203 F.3d 203 (3d Cir. 2000) ............................................................................................... 54

In re Global Indus. Techs., Inc., 645 F.3d 201 (3d Cir. 2011) .................................................. 54

United States v. Energy Resources Co., 495 U.S. 545 (1990) ................................................... 53

In re G.S.F. Corp., 938 F.2d 1467 (1st Cir. 1991) .................................................. 51, 53

Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II
(In re Briscoe Enters., Ltd. II), 994 F.2d 1160 (5th Cir. 1993) ............................... 15

In re Heritage Org., 376 B.R. 783 (Bankr. N. D. Tex. 2007) ..................................... 30

In re Indianapolis Downs, LLC, 486 B.R. 286 (Bankr. D. Del. 2013) ................................. 30, 48

In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1987)............................................. 48

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
843 F.2d 636 (2d Cir. 1988) ..................................................................................... 16, 48

In re Keach, 243 B.R. 851 (1st Cir. B.A.P. 2000) ..................................................... 31

In re Kellogg Partnership, 160 B.R. 336 (Bankr. D. Minn. 1993)................................. 30

In re Master Mtg. Inv. Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994)........................ passim

In re McLean Industs., 103 B.R. 424 (Bankr. S.D.N.Y. 1989)..................................... 40

Monarch Life Insurance Co. v. Ropes & Gray, 65 F.3d 973 (1st Cir. 1995) ............................. 53

Nat'l Heritage Found. v. Highbourne Found., 760 F.3d 344 (4th Cir. 2014)............................ 26

In re New England Compounding Pharmacy, Inc.,
No. 12-19882 (HJB) (Bankr. D. Mass. May 19, 2015) ................................... 57, 59

In re New England Compounding Pharmacy, Inc.,
No. 12-19882 (HJB) (Bankr. D. Mass. May 20, 2015) ................................... 53

In re Orlando Investors, L.P., 103 B.R. 593 (Bankr. E. D. Pa. 1989)........................................ 48

In re Otero County Hosp. Assoc., Inc. v. Quorum Health Resources, LLC,
527 B.R. 719, 758 (Bankr. D. N.M. 2015) ....................................................... 51, 52

In re Patriot Place, Ltd., 486 B.R. 773 (Bankr. W.D. Tex. 2013).............................................. 55

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000)............................................................ 26

In re Railworks Corp., 345 B.R. 529 (Bankr. D. Md. 2006) ..................................................... 54

In re River Village Assoc., 161 B.R. 127 (Bankr. E.D. Pa. 1993).............................................. 32

In re RiverValley Fitness One L.P., No. 01–12829,
2003 WL 22298573 (Bankr. D.N.H. Sept. 19, 2003).......................................... 32

In re S. Edge LLC, 478 B.R. 403 (D. Nev. 2012)...................................................................... 26

SE Property Holdings, LLC v. Seaside Engineering & Surveying, Inc.
(In re Seaside Engineering & Surveying Inc.), 780 F. 3d 1070 (11th Cir. 2015)................... 55

SEC v. Drexel Burnham Lambert Grp., Inc., 960 F.2d 285 (2d Cir. 1992)............................... 54

In re Sentinel Mgmt. Group, Inc., 398 B.R. 281 (Bankr. N.D. Ill. 2008).................................. 16

In re Sherwood Square Assocs., 107 B.R. 872 (Bankr. D. Md. 1989) ........................................ 33

So. Pac. Trans. Co. v. Voluntary Purchasing Grps., 252 B.R. 373 (W. D. Tex. 2000) .............. 36

In re Texaco, Inc., 81 B.R. 813 (Bankr. S.D.N.Y. 1988)............................................................ 30

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988)............................................ 33

In re Trans World Airlines, Inc., 185 B.R. 302 (Bankr. E.D. Mo. 1995) .................................. 33

In re Tribune Co., 464 B.R. 208 (Bankr. D. Del. 2011) ............................................ 60

United States v. Energy Resources Co., 495 U.S. 545 (1990).................................... 53

In re U.S. Fidelis, Inc., 481 B.R. 503 (Bankr. E.D. Mo. 2012) ................................ 57

Virginia ex rel. Itegra REC LLC v. Countrywide Secs. Corp., No. 3:14-cv-706,
  2015 WL 1237084, at *2 (E.D. Va Mar. 17, 2015).......................................... 51-52

In re Waterville Valley Town Square Assoc., 208 B.R. 90 (Bankr. D.N.H. 1997)................... 31

In re W.E. Parks Lumber Co., Inc., 19 B.R. 285 (Bankr. W.D. La. 1982)................................. 33

Whyte v. Kivisto (In re Semcrude), No. 08–11525,
  2010 WL 4814377 (Bankr. D. Del. Nov. 19, 2010) ............................................... 60

In re Worldcom, Inc. ERISA Litigation, 339 F. Supp. 2d 561 (S.D.N.Y. 2004)....................... 60

**Statutes**

11 U.S.C.
  § 105 ................................................................................................................. 27
  § 105(a) ...................................................................................................... 53, 54
  § 363(m) ..................................................................................................... 25-26
  § 363(n) ............................................................................................................ 26
  § 502(i) ............................................................................................................. 41
  § 507(a)(1) ...................................................................................................... 41
  § 507(a)(4) ...................................................................................................... 41
  § 507(a)(5) ...................................................................................................... 41
  § 507(a)(6) ...................................................................................................... 41
  § 507(a)(7) ...................................................................................................... 41
  § 507(a)(8) ...................................................................................................... 41
  § 1122 .............................................................................................................. 17
  § 1122(a) ......................................................................................................... 16
  § 1123 .............................................................................................................. 27
  § 1123(a) ......................................................................................................... 17
  § 1123(a)(1) ..................................................................................................... 17
  § 1123(a)(1)-(3) ............................................................................................... 17
  § 1123(a)(4) ..................................................................................................... 19
  § 1123(a)(5) ......................................................................................... 19, 20, 27
  § 1123(a)(6) ..................................................................................................... 20
  § 1123(a)(7) ..................................................................................................... 21
  § 1123(a)(8) ..................................................................................................... 21
  § 1123(b).............................................................................. 15, 21, 27, 53
  § 1123(b)(3)........................................................................................... 21, 26
  § 1123(b)(4) ..................................................................................................... 31
  § 1123(b)(5) ..................................................................................................... 53
  § 1123(b)(6) ..................................................................................................... 55
  § 1125 .............................................................................................................. 28

§ 1126 .............................................................................................................. 28, 30
§ 1126(c).............................................................................................................. 37
§ 1129 ...................................................................................... 16, 27, 46, 61
§ 1129(a)............................................................................................................ 15
§ 1129(a)(1)........................................................................................................ 16
§ 1129(a)(2)................................................................................................... 28, 30
§ 1129(a)(3)................................................................................................... 31, 32
§ 1129(a)(4)........................................................................................................ 32
§ 1129(a)(5)........................................................................................................ 32
§ 1129(a)(6)........................................................................................................ 33
§ 1129(a)(7)....................................................................................... 34, 36, 46, 47
§ 1129(a)(8)................................................................................................. 36-37, 44
§ 1129(a)(9)................................................................................................... 37-42
§ 1129(a)(10)...................................................................................................... 42
§ 1129(a)(11)............................................................................................. 42-43, 47
§ 1129(a)(12)...................................................................................................... 43
§ 1129(a)(13)...................................................................................................... 43
§ 1129(a)(14)...................................................................................................... 43
§ 1129(a)(15)................................................................................................... 43-44
§ 1129(a)(16)...................................................................................................... 44
§ 1129(b)................................................................................................. 37, 44-46
§ 1129(c).............................................................................................................. 47
§ 1129(d)......................................................................................................... 47-48
§ 1163 ................................................................................................................. 3
§ 1171(a)........................................................................................................ 17, 18
§ 1171(b)........................................................................................... 14, 19, 39-41
§ 1172 ................................................................................................................ 28
§ 1173 ................................................................................................................ 46
§ 1173(a)......................................................................................................... 46-47
§ 1173(b)............................................................................................................ 47

28 U.S.C.
§ 1334 (a)........................................................................................................... 27
§ 1334 (b)........................................................................................................... 27
§ 1334 (d)........................................................................................................... 27

**Other Authorities**

COLLIER ON BANKRUPTCY ........................................................................ 39, 41, 47
H.R. Rep. No. 95-595 at 412 (1977); S. Rep. No. 95-989 at 126 (1978) ............................. 28-29
Joshua M. Silverstein, *Hiding in Plain View:  A Neglected Supreme Court Decision
Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations,*
23 EMORY BANKR. DEV. J. 13 (Fall 2006)......................................................... 53

Robert J. Keach, the chapter 11 trustee (the "Trustee") in the above-captioned case of

Montreal Maine & Atlantic Railway, Ltd. (the "Debtor"), by and through his undersigned

counsel, hereby files this *Memorandum of Law in Support of, and Omnibus Reply to Objections*

*to, Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015*

(the "Memorandum") in support of confirmation of the Trustee's Revised First Amended Plan

of Liquidation Dated July 15, 2015 [Docket No. 1495] (the "Plan")[1] and in response to certain

objections and responses thereto.   As discussed more fully below and as set forth in the

Declarations in Support[2], the Plan meets all requirements for confirmation of a chapter 11 plan

and, therefore, should be confirmed.   In support of the Plan, the Trustee respectfully states as

follows:

## PRELIMINARY STATEMENT

1.      After over two years of hard-fought litigation and comprehensive cross-border

negotiations, the Trustee is pleased to present the Plan for confirmation by the Court.   Since the

Derailment that caused the tragic loss of so many lives, and damage to the property and lives of

so many others, the Trustee, along with his Canadian counterparts, has negotiated with twenty-

five potentially liable parties to accumulate a settlement fund to compensate the victims of the

Derailment.   In addition, the Trustee has prosecuted various other causes of actions to recover

assets for the benefit of the Debtor's Estate.   Over the course of the Chapter 11 Case, the

Trustee has worked extensively with MMA Canada's counsel, the Monitor, the Committee (as

defined below), and various counsel for the Derailment victims, and has involved various other

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and/or the Revised First Amended Disclosure Statement for the Trustee's Plan of Liquidations Dated July 15, 2015 [D.E. 1497] (the "Disclosure Statement").

[2] The "Declarations in Support" means, collectively, the declarations or certifications filed contemporaneously herewith or to be filed in advance of the Confirmation Hearing in support of confirmation of the Plan.

significant constituents to garner consensus while striving for efficient resolution of major issues.

2.      It is for that reason that the Trustee has received only three objections to confirmation of the Plan.   In the course of analyzing and asserting compliance with the requirements for confirmation of a chapter 11 plan, this Memorandum also responds in detail to each of the filed objections in the specific context of the section 1129(a) requirement addressed by the objection.   No objection stands in the way of confirmation of the Plan, and the Plan satisfies all requirements of the Bankruptcy Code and the Bankruptcy Rules.   Accordingly, the Trustee requests that the Court confirm the Plan and overrule all objections not otherwise resolved.

## FACTUAL BACKGROUND

### A.    The Derailment

3.      On July 6, 2013, an unmanned eastbound MMA train with 72 carloads of crude oil, a buffer car, and 5 locomotive units derailed in Lac-Mégantic, Quebec (the "Derailment"). The transportation of the crude oil had begun in New Town, North Dakota by the Canadian Pacific Railway ("CP"), and the Debtor's wholly-owned subsidiary, Montreal Maine & Atlantic Canada Co. ("MMA Canada"), later accepted the rail cars from CP at Saint-Jean, Quebec.  The crude oil was to be transported via the Saint-Jean-Lac-Mégantic line through Maine to its ultimate destination, an Irving Oil refinery in Saint John, New Brunswick.

4.      The Derailment set off several massive explosions, destroyed part of downtown Lac-Mégantic, and is presumed to have killed 47 people.[3]  A large quantity of oil was released into the environment, necessitating an extensive cleanup effort.  As a result of the Derailment

---

[3] Tragically, a forty-eighth death occurred when a volunteer fireman, who had been among the first responders at the Derailment, committed suicide.

and the related injuries, deaths, and property damage, lawsuits were filed against the Debtor in both the United States and Canada.

**B.    Commencement of the Chapter 11 and Canadian Cases**

5.    On August 7, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code. On August 8, 2013, MMA Canada also commenced proceedings (the "CCAA Case") in the Superior Court of Canada pursuant to the Companies' Creditors Arrangement Act ("CCAA"). Richter Advisory Group Inc. ("Richter") was appointed as the monitor in the CCAA Case (the "Monitor").

6.    On August 21, 2013, the Office of the United States Trustee (the "U.S. Trustee") appointed the Trustee to serve as trustee in the Chapter 11 Case pursuant to 11 U.S.C. § 1163. [D.E. No. 64]. Shortly after his appointment, the Trustee negotiated a cross-border protocol to be implemented in the Chapter 11 Case and the CCAA Case. On August 29, 2013, the Trustee met with various interested parties to discuss coordinating efforts with respect to issues common to both the Debtor's case and the CCAA Case, including issues regarding the operation and funding of the Debtor and MMA Canada, as well as a potential sale process and the development of a coordinated claims process. These talks led to the development of the cross-border protocol (the "Cross-Border Protocol"), which enhanced the coordination and harmonization of proceedings in the two cases. On August 30, 2013, the Trustee filed the *Motion for Order Adopting Cross-Border Insolvency Protocol* [D.E. 126] and on September 4, 2013, the Court entered the *Order Adopting Cross-Border Insolvency Protocol* [D.E. 168]. The Trustee also requested and participated in a cross-border settlement conference with various creditor constituencies at a status and settlement conference presided over by both courts—a historic first in cross-border cases.

3

7.     On December 13, 2010, the U.S. Trustee appointed an Official Committee of Victims (the "Committee").  No examiner has been appointed in this Chapter 11 Case.

### C.     Sale of the Debtor's and MMA Canada's Assets

8.     The Trustee, MMA Canada, and the Monitor, in consultation with the Federal Railroad Administration ("FRA"), determined that a sale of the assets of both the Debtor and MMA Canada, on a going concern basis, was in the best interests of creditors of both debtors. In order to preserve the going concern value of the Debtor's and MMA Canada's assets, the sale had to occur on an expedited basis.

9.     The Trustee, with MMA Canada and the Monitor, held discussions and negotiations with potential purchasers to sell substantially all of the Debtor's assets in conjunction with a sale of substantially all of the assets of MMA Canada (the "Sale").  These discussions and negotiations eventually led to the selection of Railroad Acquisition Holdings LLC ("RAH") as a stalking horse bidder in an auction for the Sale.

10.     On December 12, 2013, the Trustee filed the *Motion for Order: (A) Approving Bid Procedures for the Sale of the Debtor's Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures for Certain Executory Contracts and Unexpired Leases; (D) Approving a Break-Up Fee, Expense Reimbursement and Overbid Protections; and (E) Approving a Form of Notice of Sale* [D.E. 488] (the "Bid Procedures Motion"), along with the *Motion for Authority to Sell Substantially All of the Debtor's Assets and to Assume and Assign Certain Executory Contracts and Unexpired Leases* [D.E. 490] and an asset purchase agreement between the Trustee, MMA Canada, and RAH.

11.     On December 19, 2013, the Court entered an order approving the Bid Procedures Motion [D.E. 535], and the auction was held on January 21, 2014, wherein the bid of RAH was

declared the successful bid.  On January 24, 2014, this Court entered an order approving the sale of substantially all of the Debtor's assets to RAH [D.E. 594].

12.    The Trustee, the Debtor, the Monitor, and RAH all worked diligently to reach a consummation of the Sale.  On May 5, 2014, the Trustee filed the *Trustee's Motion for an Order Approving the Third Amendment to the Asset Purchase Agreement* [D.E. 847], seeking Court approval of, among other things, a bifurcation of the Sale closing process due to delayed regulatory approvals for the sale of the MMA Canada assets, and the lease, instead of sale, of certain real property and facilities of the Debtor located in Derby, Maine.  On May 8, 2014, the Court entered the *Order Approving the Third Amendment to the Asset Purchase Agreement* [D.E. 865].

13.    The sale of the Debtor's assets closed on May 15, 2014, and upon final regulatory approval, the sale of the MMA Canada assets closed on June 30, 2014.  In total, the Sale resulted in a $14,250,000 net payment to the Debtor and MMA Canada.  In conjunction with the closing of the Sale, some of the proceeds of the Sale were used, among other things, to: (i) make cure payments to contracts assumed by the Debtor and assigned to RAH; (ii) pay outstanding real estate property taxes in Maine, Vermont, and Quebec; and (iii) pay employees of the Debtor on account of severance, vacation, and medical Claims.

D.    **Settlement Negotiations**

14.    The Trustee, the Monitor and MMA Canada worked collectively from the commencement of the cases to engage in settlement discussions with various parties identified as potentially liable for damages arising from the Derailment.  As a result of these negotiations, approximately twenty-five (25) entities or groups of affiliated entities entered into Settlement Agreements, whereby the Released Party will contribute Settlement Funds in exchange, *inter alia*, for a full and final release of all Claims arising out of the Derailment, including any

Claims for contribution and/or indemnity (including contractual indemnity) asserted by third parties, as well as the protection of a global injunction barring assertion of any Derailment-related Claims against the Released Parties.  The Settlement Funds constitute, as of the date hereof, approximately CAD$446 million.  The Released Parties are listed on <u>Schedule A</u> to the Disclosure Statement.[4]

15.    As of the date hereof, the only Non-Settling Defendant is CP.  CP may, however, become a Released Party by entering into a Settlement Agreement on or before the Effective Date of the Plan.  To the extent a settlement is not reached with CP, litigation will continue against CP to recover damages in various courts and other tribunals in the United States and Canada.

### E.    <u>The Canadian Plan Process and the Chapter 15 Proceedings</u>

16.    On March 31, 2015, MMA Canada filed the Plan of Compromise and Agreement (as amended from time to time, the "<u>CCAA Plan</u>").  The Monitor and MMA Canada held information sessions on the CCAA Plan for creditors on May 27, 2015 and June 3, 2015, and on June 8, 2015 filed the *Amended Plan of Compromise and Agreement*.  The CCAA Plan provides for, among other things, treatment of Derailment Claims and for Releases and Injunctions substantially identical to those set forth in the Plan.

17.    The meeting of creditors to vote on the CCAA Plan was held on June 9, 2015, and the creditors voted unanimously to accept the CCAA Plan.  *See generally* Adessky Decl., <u>Exhibit A</u> (the "<u>Monitor's 20[th] Report</u>") (describing, among other things, (i) the process for providing notice to parties entitled to vote on the CCAA Plan, (ii) the breadth of notice

---

[4] The Trustee has made public, including in the Disclosure Statement, (i) the aggregate Settlement Funds, (ii) the identities of each of the Released Parties, and (iii) a representative form of Settlement Agreement (the XL Settlement Agreement, attached as <u>Exhibit 3</u> to the Plan).  In addition, counsel to CP has received redacted copies of each Settlement Agreement pursuant to an order by the CCAA Court, and counsel to the Committee has received unredacted copies of each Settlement Agreement.  In addition, CP's counsel has received redacted versions of all of the Settlement Agreements, as well as <u>unredacted</u> versions of the Irving Oil Limited, CIT and World Fuels Settlement Agreements.

provided, including to Holders of Derailment Wrongful Death Claims, (iii) the procedures for

voting on the CCAA Plan, and (iv) the voting results).  On June 17, 2015, the CCAA Court held

a hearing to consider whether to sanction (i.e. confirm) the CCAA Plan.  The CCAA Plan was

sanctioned by the CCAA Court on July 13, 2015 (an English version of which is attached to the

Adessky Declaration as Exhibit B, the "Sanction Order").

18.    After entry of the Sanction Order, on July 20, 2015, the Monitor filed the

following pleadings:

(a)    *Chapter 15 Voluntary Petition of Montreal, Maine & Atlantic Canada Co.* [No. 15-20518, D.E. 1];

(b)    *Verified Petition for Recognition of Foreign Proceeding and Related Relief (With Memorandum of Law)* [No. 15-20518, D.E. 2];

(c)    *Motion for Entry of an Order Recognizing and Enforcing the Plan Sanction Order of the Québec Superior Court* [No. 15-20518, D.E. 3] (the "Motion for Recognition and Enforcement");

(d)    *Declaration of Roger A. Clement, Jr., Esq. in Support of Verified Petition for Recognition of Foreign Proceeding and Related Relief* [No. 15-20518, D.E. 4]; and

(e)    *Memorandum of Law in Support of Motion for Entry of an Order Recognizing and Enforcing the Plan Sanction Order of the Québec Superior Court* [No. 15-20518, D.E. No. 5] ((a) through (e) collectively, the "Chapter 15 Pleadings").

The Chapter 15 Pleadings were scheduled to be heard on August 20, 2015.

19.    On July 24, 2015, the Trustee filed an English translation of the Sanction Order

in the Chapter 11 Case [D.E. 1550] (the "Translated Sanction Order").

20.    On August 20, 2015, following a hearing, and over CP's objection, the Court

granted the Monitor's Motion for Recognition and Enforcement, and entered an order granting

the same on August 26, 2015 [No. 15-20518, D.E. 74] (the "Enforcement Order").   On

September 9, 2015, CP appealed the Enforcement Order [No. 15-20518, D.E. 78, 80, 81] (the

"Enforcement Order Appeal").  The Enforcement Order Appeal is currently pending.

**F.**     **The Trustee's Chapter 11 Plan**

    *i.*     *Approval of the Disclosure Statement and the Solicitation Process*

21.     On March 31, 2015, the Trustee filed the *Trustee's Plan of Liquidation Dated March 31, 2015* [D.E. 1384] and the *Disclosure Statement with Respect to Trustee's Plan of Liquidation Dated March 31, 2015* [Docket No. 1385].

22.     On May 18, 2015, the Trustee filed the *Trustee's Motion for an Order (I) Approving Proposed Disclosure Statement; (II) Establishing Notice, Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan* [D.E. 1432] (the "Disclosure Statement Motion").

23.     On June 5, 2015, the Trustee filed the *Notice of Filing Plan Supplement* [D.E. 1450] (as may be amended, the "Plan Supplement").

24.     On July 7, 2015, the Trustee filed the *Trustee's First Amended Plan of Liquidation Dated July 7, 2015* [D.E. 1495] and the *First Amended Disclosure Statement with Respect to Trustee's Plan of Liquidation Dated July 7, 2015* [Docket No. 1497].

25.     On July 8, 2015, the Trustee filed the *Notice of Filing Revised Exhibits to Plan Supplement* [D.E. 1502].

26.     On July 15, 2015, the Trustee filed the solicitation versions of the Plan and Disclosure Statement in advance of the hearing on the Disclosure Statement Motion.  The Court held a hearing on the Disclosure Statement Motion on July 15, 2015, and on July 17, 2015, entered an order approving the Disclosure Statement Motion [D.E. 1544] (the "Disclosure Statement Order").

27.     On July 22, 2015, the Trustee filed the Confirmation Hearing Notice [D.E. 1548] and the Derailment Claims Notice [D.E. 1549], each as defined in the Disclosure Statement

Motion. Also on July 22, 2015, the Trustee caused the Confirmation Hearing Notice to be published in the Bangor Daily News; Portland Press Herald; Wall Street Journal; and in the following Canadian newspapers: La Presse (in French); La Tribune (in French); The Gazette (in English); and The Sherbrooke Record (in English), as directed by the Disclosure Statement Order and as set forth in the *Certificate of Publication related to the Confirmation Hearing Notice* [D.E. 1622] (the "Certificate of Publication").

28.     On July 23, 2015, the Solicitation Packages conforming to the requirements of the Disclosure Statement Order were transmitted to creditors and parties-in-interest in accordance with the Disclosure Statement Order, as set forth in the *Affidavit of Service of Solicitation Materials and Chapter 15 Documents* [D.E. 1562] (the "Certificate of Service").

29.     On July 24, 2015, the Trustee caused the Confirmation Hearing Notice to be published in L'Echo de Frontenac (in French), as directed by the Disclosure Statement Order and as set forth in the Certificate of Publication.

### ii.      Overview of the Plan

30.     The Plan is a plan of liquidation of the Debtor's Assets, as well as a plan which creates, implements and distributes a substantial settlement fund (known as the Indemnity Fund under the CCAA Plan) for the benefit of all victims of the Derailment. The primary objective of the Plan is, in conjunction with the CCAA Plan, to compensate the victims of the Derailment from settlement funds created for their exclusive benefit, and also to distribute other Residual Assets to Holders of Claims other than Derailment Claims. The Plan is funded in part by contributions pursuant to Settlement Agreements with various parties with potential liability arising out of the Derailment, and including, without limitation, such parties' insurance companies. In exchange for their contributions, Claims against such parties shall be released,

and future claims enjoined, pursuant to the Plan and in accordance with the Settlement

Agreements entered into by the parties and the Trustee.

31.    The Plan treats Derailment Claims as follows:

(a)    <u>Allowed Derailment Wrongful Death Claims</u> shall, in the aggregate, receive 24.1% of the Funds for Distribution and 53.3% of the Reallocated Dividends in full and final satisfaction of their Allowed Claims as against the Released Parties.  The WD Trust dedicated to the distribution to the Creditors holding Derailment Wrongful Death Claims will make distributions to individual Holders of Claims in accordance with the procedures set forth in <u>Schedule B</u> to the Plan, and as further described in Article 5 of the Plan.  Based on the current amount of Settlement Funds, the Trustee estimates that (without deduction for any attorneys' fees payable from such amount) over CAD$111 million will be distributed for the benefit of Holders of Allowed Derailment Wrongful Death Claims.

(b)    <u>Allowed Derailment Moral Damages and Personal Injury Claims</u> shall, in the aggregate, receive 10.4% of the Funds for Distribution and 26.7% of the Reallocated Dividends in full and final satisfaction of their Allowed Claims as against the Released Parties. This amount will be distributed by the Monitor in accordance with the CCAA Plan and the Matrix set forth in <u>Schedule C</u> to the Plan.  Based upon the current amount of Settlement Funds, the Trustee estimates that (without deduction for any attorneys' fees payable from such amount) over CAD$48 million will be distributed for the benefit of Holders of Allowed Derailment Moral Damages and Personal Injury Claims.

(c)    <u>Allowed Derailment Property Damage Claims</u> shall, in the aggregate, receive 9.0% of the Funds for Distribution and 20% of the Reallocated Dividends in full and final satisfaction of their Allowed Claims as against the Released Parties.  This amount will be distributed by the Monitor in accordance with the CCAA Plan and the mechanism set forth in <u>Schedule D</u> to the Plan.  Based upon the current amount of Settlement Funds, the Trustee estimates that (without deduction for any attorneys' fees payable from such amount) over CAD$41 million will be distributed for the benefit of Holders of Allowed Derailment Property Damage Claims.

(d)    <u>Allowed Derailment Subrogated Insurance Claims</u> shall, in the aggregate, receive 4.1% of the Funds for Distribution in full and final satisfaction of their Allowed Claims as against the Released Parties.  This amount will be distributed by the Monitor in accordance with the CCAA Plan on a *pro rata* basis.  Based upon the current amount of Settlement Funds, the Trustee estimates that (without deduction for any attorneys' fees payable from such amount) over CAD$16 million will be distributed for the

10

benefit of Holders of Allowed Derailment Property Subrogated Insurance Claims.

(e)   Allowed Derailment Government Claims shall, in the aggregate, receive 52.4% of the Funds for Distribution in full and final satisfaction of their Allowed Claims as against the Released Parties.  This amount will be distributed by the Monitor in accordance with the CCAA Plan.  Based on the current amount of Settlement Funds, the Trustee estimates that over CAD$191 million will be distributed for the benefit of Holders of Allowed Derailment Government Claims.[5]

Notwithstanding the foregoing, following the review of the Derailment Property Damage Claims pursuant to the Claims Resolution Order (as defined in the CCAA Plan), if the aggregate value of the Derailment Property Damage Claims is reduced below CAD$75 million, any difference between CAD$75 million and the revised aggregate value of these Claims (the "Economic Savings") will be allocated as follows: (i) first, an amount of Economic Savings up to CAD$884,000 to permit a payment of up to CAD$24,000 to each of the grandparents and grandchildren of the deceased, in which case the grandparents and grandchildren will be removed from Schedule B to the Plan and included in ¶7 of Schedule A to the Plan; (ii) second, an amount of Economic Savings to permit the increase of the carve-out for parents, siblings, grandparents and grandchildren in ¶7 of Schedule A of the Plan to increase from 5% up to the equivalent of 12.5%; and (iii) third, on a pro-rata basis, to the value of the claims in the other categories described in Section 4.2(a), (b), (d) and (e) of the CCAA Plan.  For greater certainty, the total allocation of Economic Savings to increase the allocation to parents, siblings, grandparents and grandchildren to 12.5% in the wrongful death category shall not exceed CAD$4.9 million.

---

[5] A portion (approximately CAD$18.3 million) of the distributions to Holders of Allowed Derailment Government Claims are subject to reallocation under Article 4.3 of the CCAA Plan in favor of holders of Allowed Derailment Wrongful Death Claims (53.3%), Allowed Derailment Moral Damages and Personal Injury Claims (26.7%), and Allowed Derailment Property Damages Claims (20.0%).

32.    With respect to Claims other than Derailment Claims, the Estate Representative will distribute the Debtor's Cash and, after converting to Cash all other remaining property of the Debtor, including Causes of Action, the proceeds therefrom, in accordance with the Plan.  In particular, the Plan provides for Cash or other distributions to certain holders of Allowed Claims, including Administrative Expense Claims, Secured Claims, Priority Tax Claims, Priority Claims, Subordinated Claims and General Unsecured Claims against the Debtor's Estate.  The Plan also provides for certain exculpations and injunctions and the wind-down and dissolution of the Debtor.

33.    The Plan contemplates that the Settlement Payments, Cash, and Residual Assets will be sufficient to (a) pay all Administrative Expense Claims, Priority Tax Claims and Priority Claims that are Allowed on the Effective Date or that may become allowed after the Effective Date, as the distributions on account of such Claims are provided for in the Plan; (b) pay all costs of (i) administering the Plan and expenses incidental to the liquidation of property of the Debtor's Estate, including fees payable to the U.S. Trustee, and (ii) making distributions under the Plan; and (c) pay all other amounts required to be paid on or after the Effective Date under the Plan.

34.    The amount of each distribution to a Holder of an Allowed Claim will depend on which Class the Allowed Claim is in and the treatment afforded to that Class under the Plan. Holders of Claims that are impaired under the Plan, but who will receive distributions, are entitled to vote on the Plan, as discussed further in Section XII of the Plan.

35.    The Trustee estimates that Claims in Class 13 (General Unsecured Claims) aggregate to between approximately $49 and 66 million (taking into account Claims which will be released under Settlement Agreements).  Depending on the amount of Residual Assets, which is dependent on the outcome of various litigations or the amount of any settlements,

holders of Allowed General Unsecured Claims will receive distributions on a range of approximately 1.3% to 88.4% of the Allowed amount of their Claims.  The percentage could increase based upon the success of litigation against, *inter alia*, CP and its affiliates, parent and subsidiaries, as well as certain litigation described below to recover allegedly improper dividends.

36.     There will be no recovery for holders of Subordinated Claims unless and until all Allowed General Unsecured Claims are paid in full.  At this time, the Trustee does not believe there to be any Subordinated Claims, but to the extent they exist, the Trustee does not expect that any such Holders will receive any distributions under the Plan.

37.     There will be no recovery for holders of Equity Interests unless and until all Allowed Claims are paid in full.  At this time, the Trustee does not expect that holders of Equity Interests will receive any distributions under the Plan.

### iii.     The Voting Results

38.     On September 17, 2015, Prime Clerk, LLC ("Prime Clerk"), the Trustee's noticing and solicitation agent, filed the Voting Certification, certifying, among other things, the results of the ballot tabulation for the votes to accept or reject the Plan.  As set forth in the Voting Certification, 2,548 creditors voted on the Plan and, of those creditors, 2,547 voted to accept the Plan.[6]  The votes are allocated among the classes as follows:

Classes 1-7:    These classes were Unimpaired under the Plan and thus were not entitled to vote.  Accordingly, these classes were deemed to accept the Plan.

Class 8:        This Class was impaired and entitled to receive property under the Plan and thus was entitled to vote.  Class 8 voted to accept the Plan.

Class 9:        This Class was impaired and entitled to receive property under the Plan and thus was entitled to vote.  Class 9 voted to accept the Plan.

---

[6] The single affirmative vote to reject the Plan came from CP, whose Class 13 Claim was temporarily allowed in the amount of $1.00.

Class 10:        This Class was impaired and entitled to receive property under the Plan and thus was entitled to vote.  Class 10 voted to accept the Plan.

Class 11:        This Class was impaired and entitled to receive property under the Plan and thus was entitled to vote.  Class 11 voted to accept the Plan.

Class 12:        This Class was impaired and entitled to receive property under the Plan and thus was entitled to vote.  Class 12 voted to accept the Plan.

Class 13:        This Class was impaired and entitled to receive property under the Plan and thus was entitled to vote.  Class 13 voted to accept the Plan.

Class 14:        The creditors in this class are contemplated to receive no property under the Plan, and thus are deemed to reject the Plan.

Class 15:        The interests of the holders in this class are contemplated to be cancelled under the Plan, and such holders are contemplated to receive no property thereunder. Thus, such interest holders are deemed to reject the Plan.

### iv.    Objections to Confirmation

39.    Three objections were filed to confirmation (collectively, the "Objections").[7]

They can be summarized as follows:

(a)    MN/NB Railroads[8]: the Plan cannot be confirmed because: (i) it does not classify 1171(b) Claims (as defined below) as Administrative Expense Claims; and (ii) to the extent 1171(b) Claims are properly classified otherwise, (A) they should be classified separately from other Priority Claims to comply with 11 U.S.C. § 1123(a)(4) because the Plan subordinates them to other Priority Claims and (B) they were improperly designated as "Unimpaired," as the Plan does not guarantee they will be paid in full.  See D.E. 1656 (the "MN/NB RR Objection").

(b)    Wheeling: (i) the Plan actually impairs Wheeling's secured Claim, despite classifying such Claim as Unimpaired; and (ii) Wheeling is unable to evaluate the reasonableness of the Settlement Agreements.  See D.E. 1659 (the "Wheeling Objection").

(c)    CP: (i) third-party releases are only appropriate in "unusual circumstances," which are not present here; (ii) in entering into the Settlement Agreements, the Trustee violated Bankruptcy Code section

---

[7] In addition, the U.S. Trustee filed a "statement" with respect to confirmation [D.E. 1651] (the "U.S. Trustee Statement").  The U.S. Trustee Statement does not raise any issues with confirmation of the Plan, but rather reiterates certain confirmation requirements.  The Trustee submits that each such requirement is adequately briefed and satisfied herein.

[8] "MN/NB Railroads" means, together, Maine Northern Railway Company and New Brunswick Southern Railway Company Limited.

1125 by soliciting votes on the Plan prior to approval of the Disclosure Statement; (iii) the provisions of the Settlement Agreements cannot trump the Plan provisions; (iv) the Settlement Agreements cannot be approved absent compliance with the standards for approval under Bankruptcy Rule 9019; (v) the Plan's exculpation provision is too broad; (vi) certain Derailment Claims must be classified as Administrative Expense Claims and thus cannot be permitted to vote on the Plan;[9] (vii) ascertainability of the Effective Date is necessary for compliance with the "best interests test." *See* D.E. 1657 (the "CP Objection").[10]

Each of the Objections is addressed in the part of this Memorandum addressing the relevant confirmation requirement.

## ARGUMENT

40.     A plan may be confirmed if its proponent demonstrates by a preponderance of the evidence that such plan meets the applicable factors set forth in 11 U.S.C. § 1129(a) and (b). *See* In re Colfer, 159 B.R. 602, 608 (Bankr. D. Me. 1993) (stating that in seeking confirmation of a chapter 13 plan, "the burden rests on [the plan proponent] to persuade the court, by a preponderance of the evidence") (internal citations and footnote omitted); Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (footnote omitted); In re Bally Total Fitness of Greater N.Y., Inc., No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.").  If all the requirements of section 1129(a) are satisfied save (a)(8), the court can nonetheless confirm a plan if the elements of

---

[9] The CP Objection also reiterates the points set forth in the MN/NB RR Objection.

[10] As a threshold manner, as set forth *infra* at Section D, CP lacks standing to raise objections (i) through (vi).

section 1129(b) are met as to the rejecting class(es).  As discussed in further detail below, the

Plan satisfies all applicable factors and elements contained in sections 1129(a) and (b), and the

Objections are without merit and should be overruled.

**A.**    **The Plan Meets All Applicable Requirements of**
       **11 U.S.C. § 1129 and Thus Should be Confirmed**

  **i.**    ***Section 1129(a)(1)—Plan Compliance with the Bankruptcy Code***

41.    A court may confirm a plan if that plan, *inter alia*, "complies with the applicable

provisions of [the Bankruptcy Code]."  *See* 11 U.S.C. § 1129(a)(1).  Chief among the

provisions contemplated by § 1129(a)(1) is whether a plan complies with sections 1122 and

1123 of the Code, which provisions (a) address whether a plan properly classifies claims and

(b) mandate the contents of a plan.  *See* Kane v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 843 F.2d 636, 648-649 (2d Cir. 1988) ("Paragraph (1) of section 1129(a) requires that a

plan comply with applicable provisions of chapter 11, such as section 1122 and 1123,

*governing classification and contents of plan*.  It is doubtful that violations of Code provisions

unrelated to form and content of a plan, such as voting procedures, implicate subsection

1129(a)(1) at all.") (emphasis in original) (internal citations omitted); *see also* In re Sentinel

Mgmt. Group, Inc., 398 B.R. 281, 292 (Bankr. N.D. Ill. 2008) (stating that § 1129(a)(1) is

"aimed at compliance with 11 U.S.C. §§ 1122 and 1123.").  The Plan satisfies all of these

requirements and is therefore confirmable under § 1129(a)(1).

(a) *Section 1122—Classification of Claims and Interests*

42.    In this case, the Plan satisfies § 1122 of the Code because the Plan places all of

the creditors with substantially similar claims and all equity holders with substantially similar

interests in the same classes.  11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in

a particular class only if such claim or interest is substantially similar to the other claims or

interest in such class.").  Plan proponents may, however, place similar claims into different

16

classes if such separate classification aligns with the separate classes' differing rights.  *See*
Colfer, 159 B.R. at 606 (quoting Granada Wines, Inc. v. New England Teamsters & Trucking
Industry Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984) (separate classifications for unsecured
creditors justified "where the legal character of their claims is such as to accord them a status
different from the other unsecured creditors")).   Under the Plan, the secured creditors are
classified separately from one another based on their interests in different property of the
Debtor, as well as the different nature of those interests in and to that property, and are in
separate classes from the other creditors based on their secured position.  Other creditors are in
separate classes based on the unique nature of their claims or interests.  Specifically, (a) Holders
of Claims entitled to priority status under the Bankruptcy Code are classified separately from
other unsecured claims, (b) Holders of various sorts of Derailment Claims are separately
classified from one another in accordance with the differing legal characters of their claims, and
(c) Holders of General Unsecured Claims and Subordinated Claims are separately classified in
acknowledgement of their distinct legal rights.  Section 1122 is thus satisfied.

(b) *Section 1123(a)—Mandatory Contents of Plan*

43.    The Plan also satisfies Bankruptcy Code section 1123(a).  The Plan properly
classifies each of the Claims against the estate, specifies the treatment of each Class of Claims
in detail, and characterizes the Classes as either impaired or Unimpaired.  *See* 11 U.S.C.
§ 1123(a)(1)-(3) (requiring that a plan (1) designate classes of claims (other than certain
administrative claims) and interests,[11] (2) specify any unimpaired classes of claims or interests,
and (3) specify the treatment of any impaired classes of claims or interests).

---

[11] Certain Claims in Classes 8 and 12 may arise under Bankruptcy Code section 1171(a).  *See* Plan § 2.4.
Bankruptcy Code section 1171(a) affords claims administrative expense status.  *See* 11 U.S.C. § 1171(a).  The
Bankruptcy Code does not require a plan proponent to classify administrative claims, as such claim must, unless
otherwise agreed, be paid in full to confirm a chapter 11 plan (and thus their vote is not required).  *See* 11 U.S.C.
§ 1123(a)(1).  CP contends that 11 U.S.C. § 1123(a)(1) provides that a plan *may not* classify administrative claims
(as opposed to providing that a plan *need not*), and thus that Holders of Claims in Classes 8 and 12 were not

44.    Wheeling contends that notwithstanding Plan classification to the contrary, its Class 1 Claim is actually impaired.  Wheeling Obj., ¶ 11.  Wheeling is incorrect, and its Claim is correctly classified as Unimpaired.  The Plan specifically preserves Wheeling's rights with respect to the issue of whether the Settlement Payments constitute its collateral (and preserves the Trustee's rights to contest such assertion).  In particular, the Plan provides, in pertinent part:

> [T]he Holder of the Class 1 Claim shall (A) receive ***Cash from the sale or monetization of the Collateral securing such Claim***, if any, subject to the Trustee's right to recover certain costs and expenses pursuant to 506(c) of the Bankruptcy Code, and (B) retain all of its rights and obligations pursuant to the Wheeling Proceedings, as well as the right to assert that any future recoveries by the Trustee, including any Residual Assets or proceeds thereof, are Collateral securing the Class 1 Claim (and the Trustee shall reserve the right to contest such claims).

Plan, § 4.1(b).  As the Plan provides that Wheeling will receive the proceeds of its collateral, it has no basis to argue that its Claim is impaired.

45.    Likewise, the MN/NB Railroads assert that the Plan improperly classifies their asserted Claim as Unimpaired.  As an initial matter, and as set forth in the Plan and below, the Trustee contests that the MN/NB Railroads even have a Claim that is properly classified as anything but a Class 13 General Unsecured Claim.  But assuming *arguendo* that they do, the Plan provides, in pertinent part, that:

> [S]uch Claims shall be paid on the later of the Effective Date or thirty (30) days after the date such Claims become Allowed Claims ***in such amount and upon such terms as the Bankruptcy Court shall determine and as set forth in any Final Order*** allowing, in whole or in part, such Claims.

---

entitled to vote on the Plan.  This is incorrect.  With the consent of a class of administrative claimants, a plan proponent may impair such claims and, being impaired, must classify them.  The justification for CP's interpretation is telling: "that a majority of claimants holding priority claims should not be empowered to bind the minority to a variance with section 1129(a)(9)."  *See* CP Obj. ¶73.  Here, all members of the allegedly affected Class voted to accept the Plan, and in any event, CP lacks standing to raise an issue that affected parties have not raised.  *See infra*, Section D.  But even if it is the case that 1171(a) claims cannot be classified or vote, the Plan can be confirmed without the votes of the creditors in Classes 8 and 12, as all other Voting Classes voted to accept the Plan.  *See* Voting Cert.  Accordingly, as set forth below, the Plan nevertheless satisfies the relevant confirmation requirements.  The votes of Holders of Claims in Classes 8 and 12 still serve to demonstrate the consent of such parties to the Releases and Injunctions contained in the Plan.  *See infra*, Section E.

Plan, § 4.7(b).  As set forth below, the nature of 1171(b) Claims (to the extent valid) is that the priority of such claims is judicially determined.  *See* In re Boston & Maine Corp., 634 F.2d 1359, 1379 n.35 (1st Cir. 1980) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 424 (1978)) ("As under current law, ***the courts will determine the precise contours of the priority*** recognized by this subsection in each case.") (emphasis added and internal citations omitted). The Plan accordingly preserves 100% of the rights of Holders of 1171(b) Claims (though the Trustee maintains no such valid claims exist): the Plan treats such Claims in whatever manner this Court determines proper.[12]  Such Claims are thus properly unimpaired under the Plan.

46.     The Plan thus complies with sections 1123(a)(1)-(3).

47.     Moreover, the claims within each class are treated in an identical manner.  *See* 11 U.S.C. § 1123(a)(4) (requiring that a plan "provide the same treatment for each claim or interests of a particular class," unless a claimant or interest holder agrees to less favorable treatment).[13]

48.     Section 1123(a)(5) is satisfied because the Plan provides for appropriate means for its execution, including, but not limited to: (a) approval and implementation of the Settlement Agreements; (b) other sources of consideration for Plan distributions; (c) exhaustion of policies of Insurance Companies that are Contributing Parties; (d) execution of the WD Trust Agreement and funding and administration of the WD Trust; (e) management of the Post-Effective Date Estate; (f) duties and powers of the Estate Representative; (g) continued corporate existence and cancellation of existing agreements; and (h) authorization for certain effectuating transactions.  *See* 11 U.S.C. § 1123(a)(5) (requiring that a plan provide for

---

[12] Proper treatment of any valid 1171(b) Claim is briefed *infra* at paragraphs 90-93.

[13] The MN/NB Railroads contend that the Plan cannot, consistently with section 1123(a)(4), classify 1171(b) Claims as subordinate to other Priority Claims.  That contention is moot: as set forth above, the asserted Claims of MN/NB Railroads (to the extent such Claims are properly classified in Class 7) are Unimpaired and thus not entitled to vote.  So even if separately classified from the balance of other Priority Claims, they would have no ability to thwart the Plan, and their treatment under the Plan would be no different.

"adequate means for [its] implementation"). Accordingly, the requirements of Bankruptcy Code section 1123(a)(5) have been satisfied. As explained in further detail in the Plan and Disclosure Statement, distributions to creditors under the Plan will be effected by, *inter alia*, the following means:

> (a)    the remittance by the Settling Defendants to the Trustee or Monitor, as applicable, of the Settlement Payments, in accordance with their respective Settlement Agreements;

> (b)    the liquidation and/or monetization by the Trustee or Monitor, as applicable, of the Settlement Non-Cash Assets and the Residual Assets; and

> (c)    execution of the WD Trust Agreement and the funding of the WD Trust.

As stated in the Disclosure Statement, the proceeds from the Settlement Agreements and the liquidation of the Residual Assets should be sufficient to pay all of the secured, administrative and priority claims in full, provide a substantial distribution to Holders of Derailment Claims, as well as provide a distribution to Holders of General Unsecured Claims.

49.    Section 1123(a)(6) provides that a plan shall:

> provide for the inclusion in the charter of the debtor, if the debtor is a corporation . . . of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends . . . .

As provided in Article 6.6 of the Plan, the Post-Effective Date Estate's certificate of incorporation and bylaws shall be deemed amended to include a provision prohibiting the issuance of non-voting equity securities, thereby satisfying the requirements of Bankruptcy Code section 1123(a)(6).

50.     Section 1123(a)(7) is satisfied because the Plan's appointment of the Estate

Representative is lawful and appropriate, and will maximize the recovery on the Post-

Confirmation Causes of Action and ensure equitable distribution of the Residual Assets.  And

as this is a liquidating plan, there will be no need for future selection of officers and/or

directors.  *See* 11 U.S.C. § 1123(a)(7) (requiring that a plan "only contain provisions that are

consistent with the interests of creditors and equity security holders and with public policy with

respect to the manner of selection of any officer, director, or trustee under the plan and any

successor to [same]").     Finally, the Debtor is not an individual and, accordingly, section

1123(a)(8) is inapplicable to this Plan.[14]  The provisions of section 1123(a) are thus satisfied.

(c) *Section 1123(b)—Permissive Contents of Plan*

51.     The Plan contains certain provisions permitted (but not required) to be included

in plans in accordance with Bankruptcy Code section 1123(b).  Pursuant to Bankruptcy Code

sections 1123(b)(1) and 1123(b)(2), Article 3 of the Plan impairs or leaves Unimpaired, as the

case may be, each Class of Claims and Equity Interests, and Article 8 of the Plan provides for

the rejection of the executory contracts and unexpired leases of the Debtor not previously

assumed or rejected and not pending assumption pursuant to Bankruptcy Code section 365.

**(A) The Settlement Agreements**

52.     Pursuant to Bankruptcy Code section 1123(b)(3), the Plan implements the

settlement and compromise of various Claims and, most significantly, implements the

Settlement Agreements.  The Settlement Agreements (as well as the settlement and compromise

of various other Claims) are the product of extensive arm's-length negotiations and thus are fair

---

[14] Section 1123(a)(8) provides that a plan shall—

> *in a case in which the debtor is an individual*, provide for the payment to creditors
> under the plan of all or such portion of earnings from personal services performed by
> the debtor after the commencement of the case or other future income of the debtor as
> is necessary for the execution of the plan.

(emphasis added).

and equitable and in the best interest of the Debtor's Estate.  To evaluate whether a settlement is

fair and equitable, courts in the First Circuit consider factors including:

> (a)    the probability of success in the litigation being compromised;
>
> (b)    the difficulties, if any, to be encountered in the matter of collection;
>
> (c)    the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and
>
> (d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

In re Am. Cartage, Inc., 656 F.3d 82, 92 (1st Cir. 2011) (citing Jeffrey v. Desmond, 70 F.3d

183, 185 (1st Cir. 1995)).    As set forth in the Keach Declaration, the settlements and

compromises contained in the Plan, including the Settlement Agreements, constitute good faith

compromises and settlements pursuant to Bankruptcy Code section 363 and Bankruptcy Rule

9019(a) of all Claims, Equity Interests and controversies relating to the rights that a holder of a

Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any

distribution to be made on account thereof.  Such settlements, and in particular, each Settlement

Agreement, (i) will save the Trustee and the Debtor's estate the costs and expenses of

prosecuting disputes, the outcome of which is likely to consume substantial resources of the

Debtor's estate and require substantial time to adjudicate, and (ii) have (or has) funded the

distributions to be made under the Plan to the great benefit of the Debtor's estate, stakeholders

and all parties in interest.  *See* Keach Decl., ¶¶ 36, 46.  The Trustee thus believes that all factors

weigh in favor of approval of the Settlement Agreements and each other settlement or

compromise comprising the Plan.  *See* Keach Decl., ¶ 40.

53.    In addition, and despite CP's and Wheeling's contentions to the contrary, *see*

*generally* CP Obj., Wheeling Obj., under appropriate circumstances, settlement agreements can

be approved as reasonable despite their terms not being made public.  As an initial matter, both

CP and Wheeling lack standing to object to the reasonableness of the Settlement Agreements. As further set forth in the Trustee's Objection to Motion to Compel,[15] CP has no interest in the content of the Settlement Agreements: (i) to the extent CP is a Holder of a valid Administrative Expense Claim or Class 7 Claim, such Claims are Unimpaired and, in any event, would never be paid from the Settlement Payments, which are restricted funds; (ii) in CP's capacity as an alleged Holder of an Administrative Expense Claim, Class 7 Claim, or Class 13 Claim, CP has no economic interest in the Settlement Payments because no such funds will flow through the Plan to Holders of Class 13 Claims; and (iii) in CP's capacity as (the sole remaining) Non-Settling Defendant, CP remains unaffected by the Settlement Agreements because the Proposed Confirmation Order will include the Judgment Reduction Provision, providing CP the full rights to which it is entitled under applicable law. *See infra* ¶E.iii.127. Having no stake in the reasonableness of the Settlement Agreements, CP suffers no injury by allegedly being unable to judge the reasonableness of the Settlement Payments in such capacities. *See supra* section D. And as a secured creditor, Wheeling has no interest in the reasonableness of the Settlement Payments because, as set forth above, Wheeling's Claim is Unimpaired. *See* Plan, § 4.1; *see also supra*, ¶ 44. Given that its rights with respect to its Claim are Unimpaired, Wheeling suffers no injury by allegedly being unable to judge the reasonableness of the Settlement Payments in such capacities. The only Settlement Payment that Wheeling claims an interest in—the one payable under the Settlement Agreement with World Fuels Services Corporation, *et al.* ("World Fuels")—provides for a payment of $110 million. Wheeling's Claim does not exceed $4 million. Wheeling has no need to judge the reasonableness of any other settlements. *See supra* Section D. Accordingly, both CP and Wheeling lack standing to challenge the Settlement Agreements or their appropriateness under Bankruptcy Rule 9019.

---

[15] The "Objection to Motion to Compel" means the *Trustee's Objection to Canadian Pacific Railway Company's Motion to Compel the Production of Settlement Agreements and Memorandum in Support of Motion* [D.E. 1669].

54.      Moreover, and despite CP's and Wheeling's lack of standing, their assertions are

on the wrong side of the law.  Under nearly identical circumstances to the facts of this Chapter

11 Case, the United States District Court for the Southern District of New York had little

difficulty affirming the bankruptcy court's approval of a global tort settlement despite the fact

that the underlying settlement agreements were not made public.  *See* In re Dana Corp., 412

B.R. 53, 59-60 (S.D.N.Y. 2008).  As the Dana Court noted (in a rationale directly applicable

here):

> In this case, there were sufficient facts in the public record for the
> bankruptcy court to approve the settlement agreements even though the
> full settlement agreements were filed under seal.  There was substantial
> disclosure of the content of the agreements to the Committee.  As the
> bankruptcy court noted at the Evidentiary Hearing, "the basic terms of
> the settlement [agreements] have been exposed for all . . . they are
> available for any party to [sic] that wants to enter into a particular
> similar kind of settlement . . . ." (Tr. at 29.)  The number of settlement
> tort claimants, the total value of the settlement agreements, and the
> average settlement amount per individual claimant have all been
> disclosed to the Committee—indeed, these figures were all announced
> at the Evidentiary Hearing (Tr. at 16, 25.)  The substantive contents of
> the settlements were not concealed from the Committee and there was
> no failure to comply with Fed. R. Bankr. P. 9019.

Id. at 59-60.

55.      As set forth above, the Trustee has made public, including in the Disclosure

Statement, (a) the aggregate Settlement Funds, (b) the identities of each of the Released Parties,

and (c) a representative form of Settlement Agreement (the XL Settlement Agreement, attached

as Exhibit 3 to the Plan).  In addition, (x) counsel to CP has received unredacted copies of the

Settlement Agreements with World Fuels, Irving Oil Limited and CIT Group Inc., as well as

redacted copies of each additional Settlement Agreement pursuant to an order by the CCAA

Court, (y) certain Settling Defendants have made the amount of their own Settlement Payments

public, and (z) counsel to the Committee has received unredacted copies of each Settlement

Agreement.  Given the public record, the disclosure of the unredacted Settlement Agreements to

counsel to the Derailment Victims and counsel to the Committee (and the disclosure of redacted

versions of the Settlement Agreements to counsel to CP), the Trustee submits that the facts and

circumstances of this Chapter 11 Case justify approval of the Settlement Agreements despite

their remaining financial terms not being publicly available.  *See* Dana Corp., 412 B.R. at 59-

60.

### (B) Sale of the XL Policy Interests

56.    As a component of the XL Settlement Agreement (which was attached as

Exhibit 3 to the Plan), the XL Companies agreed to purchase MMA's and MMA Canada's

interests in the XL Policies (the "XL Policy Interests").  Bankruptcy Code section 363(m)

provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of [Bankruptcy Code] section [363] of a sale or
> lease of property does not affect the validity of a sale or lease under
> such authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed
> pending appeal.

11 U.S.C. § 363(m).

57.    The XL Settlement Agreement, including the purchase of the XL Policy

Interests, was negotiated and proposed, and has been entered into by the Trustee and the XL

Companies, in good faith, from arms-length bargaining positions, and without fraud or

collusion.  Each party to the XL Settlement Agreement was represented by counsel, and the sale

consideration to be realized by the Estate pursuant to the XL Settlement Agreement is fair and

reasonable.  The XL Companies are thus good faith purchasers of the XL Policy Interests for

value within the meaning of section 363(m) of the Bankruptcy Code and are entitled to the

protection thereof.  In particular, neither the Trustee, nor the XL Companies, nor any of their

representatives, have engaged in any conduct that would (i) cause or permit the XL Settlement

Agreement or the sale of the XL Policy Interests to be avoided under Section 363(n) of the

Bankruptcy Code; (ii) cause or permit any amounts, costs, attorneys' fees, expenses or punitive

damages to be recovered under Section 363(n) of the Bankruptcy Code; or (iii) prevent the

application of Section 363(m) of the Bankruptcy Code.   Accordingly, the reversal or

modification on appeal of the authorization to consummate the sale of the XL Policy Interests

contemplated by the XL Settlement Agreement should not affect the validity of the sale of the

XL Policy Interests to the XL Companies, unless such authorization is duly stayed pending

such appeal.

### (C) Exculpation, Releases and Injunctions

58.    Also pursuant to Bankruptcy Code sections 1123(b)(3), the Plan implements an

exculpation provision, the Releases, and the Injunctions.   The exculpation provision set forth in

Article 10.3 of the Plan is appropriate under applicable law because it is part of a Plan proposed

in good faith, was vital to the Plan formulation process and is appropriately limited in scope.

And despite CP's contention to the contrary,[16] the exculpation provision, including its carve-out

for gross negligence and willful misconduct, is consistent with established practice in this

jurisdiction and others.   *See*, *e.g.*, Nat'l Heritage Found. v. Highbourne Found., 760 F.3d 344,

346 n.2 (4th Cir. 2014) (approving "exculpation provision [ ] limited to acts or omissions taken

in connection [with] the bankruptcy case itself"); In re PWS Holding Corp., 228 F.3d 224 (3d

Cir. 2000) (approving exculpation provision protecting the officers, directors and employees of

the debtors and the reorganized debtors, as well as advisers and professionals, in connection

with the confirmation and consummation of the plan, so long as there was no willful

misconduct or gross negligence); In re S. Edge LLC, 478 B.R. 403, 403 (D. Nev. 2012)

---

[16] As set forth below, CP lacks standing to raise this issue.  *See infra*, Section D.

(approving exculpation provision relating generally to the Chapter 11 case, the disclosure statement, the confirmed plan or any document entered into during the Chapter 11 case).

59.    The Releases and Injunctions described in Article 10.5 and 10.6 of the Plan constitute good-faith compromises and settlements of the matters covered thereby.  Such compromises and settlements are made in exchange for the consideration identified in the Settlement Agreements; are in the best interests of the holders of Claims; are fair, equitable, and reasonable; and are integral elements of the Plan.  Each of the release, indemnification and exculpation provisions set forth in the Plan (a) is within the jurisdiction of the Court under 28 U.S.C. §§1334(a), (b) and (d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) is an integral element of the Settlement Agreements identified in the Plan; (d) confers material benefit on, and is in the best interest of the Debtor, the Estate and its creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Case; and (f) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

60.    Specifically, the releases by the Debtor, as set forth in Article 10.5(b)(i) of the Plan, are being provided as part of the Settlement Agreements, which themselves represent a global compromise that is supported by all major constituencies.  In addition, as set forth below in Section E, the third party releases and injunctions set forth in Article 10 of the Plan are appropriate.

61.    Such discretionary provisions comply with Bankruptcy Code section 1123(b) and, as set forth below, are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, the Trustee respectfully submits that Bankruptcy Code section 1123(b) is satisfied.

*(d) Section 1172—Contents of Railroad Reorganization Plan*

62.    Section 1172 provides, in pertinent part:

(a) In addition to the provisions required or permitted under section 1123 of this title, a plan—

(1)  shall specify the extent to and the means by which the debtor's rail service is proposed to be continued, and the extent to which any of the debtor's rail service is proposed to be terminated;

11 U.S.C. § 1172(a).  In addition, section 1165 provides that a trustee and the Court are to consider the public interest in applying this factor.  11 U.S.C. § 1165(a).  Early in this case, the Trustee determined that, in his business judgment, the interests of creditors as well as the public interest would best be served by the sale as a going concern of the railroad.  As set forth in greater detail in the Disclosure Statement, in May of 2014, the Trustee consummated the sale of substantially all the Debtor's and MMA Canada's assets as a going concern.  Thus, the Trustee facilitated the continuation of rail service by a third party provider and terminated the provision of rail service by the Debtor, in satisfaction of section 1172(a).[17]

63.    The Trustee thus submits that the Plan satisfies all of the requirements of sections 1122, 1123 and 1172, and therefore satisfies section 1129(a)(1).

### ii.    *Section 1129(a)(2)—Trustee Compliance with the Bankruptcy Code*

64.    Section 1129(a)(2) requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2); *see also* In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).  The legislative history to section 1129(a)(2) reflects that this provision is intended to require compliance with the disclosure and solicitation requirements under sections 1125 and 1126.  *See* H.R. Rep. No. 95-595 at 412 (1977); S. Rep. No. 95-989 at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires

---

[17] In addition, the Surface Transportation Board approved the sale of the Debtor's assets in accordance with section 1172(b).

that the proponent of the plan comply with the applicable provisions of chapter 11, such as

section 1125 regarding disclosure.").  The Trustee has complied with the applicable provisions

of the Code, including §§ 1125 and 1126.

65.    Section 1125 of the Code, in pertinent part, provides:

(b)    An acceptance or rejection of a plan may not be solicited after the
commencement of the case under [the Bankruptcy Code] from a holder of a
claim or interest with respect to such claim or interest, unless, at the time of or
before such solicitation, there is transmitted to such holder the plan or a
summary of the plan, and a written disclosure statement approved, after notice
and a hearing, by the court as containing adequate information. . . .

11 U.S.C. § 1125.

66.    As set forth above, on July 17, 2015, the Court entered the Disclosure Statement

Order.  The solicitation of votes and the provision of notice was proper and in compliance with

the Disclosure Statement Order, as set forth in the Voting Certification.  *See* Voting Cert. ¶¶ 4,

6, 7.  In addition, the Trustee and his present and former representatives, advisors, attorneys and

agents have fairly, in good faith within the meaning of Bankruptcy Code section 1125(e), and in

a manner consistent with the applicable provisions of the Disclosure Statement, the Disclosure

Statement Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules,

laws and regulations, solicited and tabulated votes on the Plan and participated in the activities

described in Bankruptcy Code section 1125, and are therefore entitled to the protections

afforded by Bankruptcy Code section 1125(e) and the Releases and exculpation provisions set

forth in Article 10 of the Plan.

67.    Contrary to CP's assertions,[18] a plan proponent's negotiation and execution of a

plan support agreement with various settling parties in advance of approval of a disclosure

statement does not violate Bankruptcy Code section 1125, which generally prohibits solicitation

---

[18] As set forth below, CP lacks standing to raise this issue.  *See infra*, Section D.

of votes to accept a plan in the absence of an approved disclosure statement.  *See* In re

Indianapolis Downs, LLC, 486 B.R. 286, 295-96 (Bankr. D. Del. 2013) (finding that "[i]t would

grossly elevate form over substance to contend that § 1125(b) requires designation of [plan

support agreement signatory] votes because they should have been afforded the chance to

review a court-approved disclosure statement prior to making or supporting a deal with the

Debtor.").   Indeed, courts have determined to interpret "solicitation" of votes narrowly, so as to

not unduly impede creditor negotiations in forming plan consensus.  *See*, *e.g.*, Century Glove,

Inc. v. First Am. Bank of N.Y., 860 F.2d 94, 101–02 (3d Cir. 1988) ("the term 'solicitation'

must be read narrowly.   A broad reading of § 1125 can seriously inhibit free creditor

negotiations . . . [and] we find no principled, predictable difference between negotiation and

solicitation of future acceptances.   We therefore reject any definition of solicitation which

might cause creditors to limit their negotiations."); *see also* In re Clamp–All Corp., 233 B.R.

198, 208 (Bankr. D. Mass. 1999) (stating that section 1125 was designed to "discourage the

undesirable practice of soliciting acceptance or rejection at a time *when creditors and*

*stockholders were too ill-informed to act capably in their own interests*.") (emphasis added).

68.    And in particular, negotiation and execution of "plan support agreements" does

not run afoul of an appropriately narrow interpretation of section 1125(b).  *See*, *e.g.*, In re

Heritage Org., 376 B.R. 783, 791-93 (Bankr. N. D. Tex. 2007) (declining to find any violation

of section 1125(b) where creditors negotiated and agreed to support plan term sheet prior to the

filing of a disclosure statement); In re Kellogg Partnership, 160 B.R. 336 (Bankr. D. Minn.

1993) (declining to find any violation of section 1125(b) where plan proponent had executed

post-petition, pre-disclosure statement agreement with pre-petition creditor); In re Texaco, Inc.,

81 B.R. 813, 815 (Bankr. S.D.N.Y. 1988) (settlement agreement between debtor and judgment

creditor, pursuant to which parties agreed to use best efforts to obtain confirmation of chapter

11 plan, did not violate statutory restrictions on solicitation of votes for plan, where no plan had been filed at time settlement agreement was signed). Like the restructuring support agreements or plan term sheets negotiation prior to the disclosure statement phase in these cases, the Settlement Agreements are not only lawful, but are a laudable (to coin a CP phrase) means of garnering support of a chapter 11 plan. When solicitation is properly understood, in fact, the Trustee did not, as a matter of law, solicit plan votes from Settling Defendants until <u>after</u> distribution of the Court-approved Disclosure Statement.

69.     Bankruptcy Code section 1126 provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. 11 U.S.C. § 1126. As set forth below (*see infra* at ¶ 36), in soliciting votes to accept the Plan, the Trustee complied with section 1126. The Trustee also believes that he has complied with any and all other requirements of the Bankruptcy Code, therefore, the requirements of § 1129(a)(2) have been satisfied.

### iii.     *Section 1129(a)(3)—Plan Proposed in Good Faith and Not by Any Means Forbidden by Law*

70.     Section 1129(a)(3) requires that the Plan be proposed in good faith and not by any means forbidden by law. Section 1129(a)(3) requires only that the plan is designed to achieve a goal allowed under chapter 11. *See* <u>In re Keach</u>, 243 B.R. 851, 857 (1st Cir. B.A.P. 2000) (§ 1129(a)(3) requires only honesty of purpose); <u>In re Waterville Valley Town Square Assoc.</u>, 208 B.R. 90, 96 (Bankr. D.N.H. 1997) (§ 1129(a)(3) merely requires that plan be proposed for a legitimate purpose); <u>In re RiverValley Fitness One L.P.</u>, No. 01–12829, 2003 WL 22298573, *3 (Bankr. D.N.H. Sept. 19, 2003) (good faith under § 1129(a)(3) is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the purpose and objectives of the Bankruptcy Code).

71.     Moreover, it is the plan's proposal which must be in good faith.  The "focus of 1129(a)(3) is upon the conduct manifested in obtaining the confirmation votes of a plan . . . and not necessarily on the substantive nature of the plan."  In re Dow Corning Corp., 244 B.R. 673, 675 (Bankr. E.D. Mich. 1999) (quoting In re Sovereign Group, 1984-21 Ltd., 88 B.R. 325, 328 (Bankr. D. Colo. 1988)).  A good faith finding is based upon the totality of the circumstances and a "lack of good faith generally references misconduct in the bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court."  In re River Village Assoc., 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993); *see also* BealBank, S.S.B. v. Waters Edge L.P., 248 B.R. 668, 668 (D. Mass 2000).

72.     In particular, the mere fact that a plan is a liquidating plan is insufficient to support a finding of a lack of good faith because the Bankruptcy Code specifically provides for such plans.  *See* 11 U.S.C. § 1123(b)(4); River Village, 161 B.R. at 141 ("The Bankruptcy Code specifically provides for liquidating plans.").

73.     The Trustee has proposed the Plan with the legitimate purpose of maximizing the value of the Debtor's estate to satisfy its obligations to creditors.  Additionally, and as discussed more fully below, the Plan and the compromises and settlements embodied therein have been proposed in good faith and not by any means forbidden by law, including applicable non-bankruptcy law.  Accordingly, the requirements of § 1129(a)(3) are met.

### iv.     *Section 1129(a)(4)—Payment of Certain Administrative Expenses Subject to Approval as Reasonable*

74.     Bankruptcy Code section 1129(a)(4) requires that certain administrative expenses paid by the plan proponent, the debtor or a person issuing securities or acquiring property under the Plan be subject to approval of the Bankruptcy Court as reasonable.  11 U.S.C. § 1129(a)(4).  Here, any payments for services or for costs and expenses covered by

§ 1129(a)(4) have been approved by, or are subject to the approval of, this Court as reasonable. *See* Plan § 2.1. Therefore, the requirements of § 1129(a)(4) are met.

### v.  Section 1129(a)(5)—Disclosure of Post-Confirmation Officers and Directors

75.  Bankruptcy Code section 1129(a)(5) provides that a plan may be confirmed if the proponent discloses (a) the identity of those individuals who will serve as management of the reorganized debtor and shows that such appointment is consistent with the interests of creditors, equity security holders and public policy and (b) the identity of any insider to be employed or retained by the reorganized debtor, and the compensation to be paid to any such insider. 11 U.S.C. § 1129(a)(5). In determining whether the post-effective date management of a debtor is consistent with the interests of creditors, equity security holders and public policy, a court must consider proposed management's competence, discretion, experience and affiliation with entities having interests adverse to the debtor. *See* In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989); *see also* In re W.E. Parks Lumber Co., Inc., 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis"). In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists. Sherwood Square Assocs., 107 B.R. at 878. The case law is also clear that a plan may contemplate the retention of the debtor's existing directors and officers. *See, e.g.*, In re Texaco Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (determining that section 1129(a)(5) was satisfied where plan disclosed debtor's existing directors and officers who would continue to serve in office after plan confirmation and such service was consistent with the interests of creditors); *see also* In re Trans World Airlines, Inc., 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995) (similar).

76.     As this is a liquidating Plan, no individual will serve post-confirmation as a director, officer or voting trustee of the Debtor, other than the Estate Representative, Robert J. Keach.  As the identity of the Estate Representative was disclosed in the Plan (*see* § 1.69), and because the Trustee submits that his appointment as Estate Representative is consistent with the interests of the Debtor's creditors and public policy, the Plan thus satisfies the requirements of Bankruptcy Code section 1129(a)(5).

### vi.     Section 1129(a)(6)—Disclosure of Applicable Rate Changes

77.     Bankruptcy Code section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in a plan.  *See* 11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) is inapplicable because the Debtor is not within the jurisdiction of any regulatory commissions.

### vii.     Section 1129(a)(7)—"Best Interests Test"

78.     Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class has either accepted the Plan, or will receive property of a value not less than the amount the holder would receive if the debtor were liquidating under chapter 7 of the Bankruptcy Code (a "Liquidation").  By its express terms, section 1129(a)(7) applies only to holders of impaired claims or equity interests.  11 U.S.C. § 1129(a)(7).  To the extent a holder of an impaired claim or interest votes to accept the plan, the best interests test is satisfied.  11 U.S.C. § 1129(a)(7)(A)(i).  Moreover, to the extent a holder of an impaired claim or interest would receive at least as great as a distribution pursuant to the proposed chapter 11 plan as it would in a chapter 7 liquidation, the best interests test is also satisfied.  11 U.S.C. § 1129(a)(7)(A)(ii).

79.    As an initial matter, given the voting results certified in the Voting Certification, the best interests tests only needs to be satisfied with respect to <u>two</u> creditors or interest holders: (a) Montréal Maine & Atlantic Corporation—the Debtor's parent ("<u>MMA Corp.</u>"), the only Equity Interest Holder (or creditor) in any of the Rejecting Classes, and (b) CP—the only other creditor that voted to reject the Plan.

80.    The Plan before this Court is a liquidating plan, following a going concern sale of the Debtor's business.  As detailed in the Disclosure Statement and the Caruso Declaration, conversion of these cases to chapter 7 at this point would not only incur additional cost to the Estate as a chapter 7 trustee familiarized himself/herself with these cases, but the Debtor's most significant assets—the Settlement Payments—are obtainable only in chapter 11.  Conversion would drastically reduce the amount of Assets available for distribution to the impaired Classes and, therefore, impaired Classes will receive more under the Plan than they would under a Liquidation.

81.    In particular, the difference between recoveries projected in the Disclosure Statement and recoveries projected in a Liquidation result primarily from that fact that in a Liquidation scenario:

(a)    all Settlement Agreements would terminate, thus eliminating the source for the vast majority of the funds distributable to Holders of Claims under the Plan;

(b)    Derailment Claims would no longer be channeled to MMA Canada and the WD Trust (as they are by agreement under the Plan), and would instead be assertable against the Debtor, greatly diluting recoveries for Holders of General Unsecured Claims; and

(c)    Derailment Claims would no longer be capped (as they are by agreement under the Plan), increasing the Estate's Claims exposure exponentially.

*See* Caruso Decl., ¶ 7.  And the Liquidation Analysis in the Disclosure Statement does not take into account the time it would take to allow a chapter 7 trustee to investigate all causes of action

and make all distributions, and the attendant decreased present value of distributions to Holders

of Claims, and thus is agnostic to the time value of money.

82.    As the Liquidation Analysis makes clear, the recoveries for Holders of all

Claims or Equity Interests that are impaired under the Plan will not be less (and in most cases,

will be far greater) than they would be in a Liquidation.  *See* Caruso Decl., ¶ 10.  And despite

CP's contention to the contrary, ascertainability of the exact date on which the Effective Date

will occur has no relation to satisfaction of the best interests test.  As an initial matter, it is quite

common for the effective date of a chapter 11 plan to be dependent upon satisfaction of various

conditions, the precise timing of which is uncertain at confirmation.  But more importantly, as

set forth above, the Liquidation Analysis is agnostic as to the time value of money, and so the

timing of the Effective Date is irrelevant to whether impaired creditors and Equity Interest

Holders are better off in a Liquidation.[19]

83.    Accordingly, the Plan satisfies § 1129(a)(7) regardless of whether each holder of

a claim or interest in each of the impaired classes votes in favor of the Plan.

> ### viii.    *Section 1129(a)(8)—Acceptance by All Impaired Classes*

84.    Section 1129(a)(8) requires that with respect to each class of claims or interests,

such class has either accepted the Plan or is not impaired under the Plan.    11 U.S.C.

---

[19] In addition, the case cited by CP to support its assertion that the fact that the Effective Date is "indeterminate" makes the "'best interests test' impossible to assess," CP Obj., ¶76, So. Pac. Trans. Co. v. Voluntary Purchasing Grps., 252 B.R. 373, 392 (W. D. Tex. 2000), is neither binding on this Court nor persuasive, in part given that it is entirely distinguishable from the facts of the Chapter 11 Case.  In Southern Pacific Transportation, the plan proponent put forth a liquidation analysis that discounted distributions in a chapter 7 liquidation at an "apparently arbitrary 30% discount rate," id. at 391, which had the effect of drastically reducing the present value of the creditor's recovery in a chapter 7 liquidation, in turn rendering such recovery less than the projected recovery under the proposed plan.  Under those facts, the timing of the effective date of the plan was extremely relevant to the best interests test—to the extent the effective date of the plan would not occur for a meaningful period of time, the difference in present value between the proposed distribution under the chapter 11 plan and projected recoveries under a chapter 7 liquidation would decrease.  In contrast, the Liquidation Analysis in this Chapter 11 Case is agnostic as to the time value of money.  Southern Pacific Transportation is thus entirely distinguishable and utterly irrelevant.  But more to the point, any delay in the Effective Date will be driven entirely by CP's prosecuting frivolous appeals.  CP can hardly complain about the effect of a delay that CP is, without basis, causing.

§ 1129(a)(8).    Acceptance, in turn, is governed by the provisions of section 1126 of the

Bankruptcy Code.   Section 1126(c) provides that a class has accepted the plan if the creditors

holding (a) at least two-thirds in amount and (b) one-half in number of allowed claims that have

voted on a plan have voted to accept the plan.   11 U.S.C. § 1126(c).

85.    As discussed above, Classes 1 through 7 are Unimpaired under the Plan

(collectively, the "Unimpaired Classes").    The Unimpaired Classes are deemed to have

accepted the Plan.   11 U.S.C. § 1126(f) (providing that a class that is not impaired under the

plan is "conclusively presumed" to have accepted the plan).   Classes 8 through 15 are impaired

under the Plan (collectively, the "Impaired Classes").    But as Holders of Claims or Equity

Interests (as applicable) in Classes 14 and 15 are not contemplated to receive any property

under the Plan, Holders in such Classes are deemed to reject the Plan.   11 U.S.C. § 1126(g)

(providing that a class not entitled to receive or retain any property under the Plan is "deemed

not to have accepted a plan").   As such, only Impaired Classes 8 through 13 are entitled to vote

on the Plan (collectively, the "Voting Classes").

86.    As set forth in the Voting Certification, each of the Voting Classes affirmatively

voted to accept the Plan.

87.    Thus, the only Classes of creditors who rejected the Plan are Classes 14 and 15,

which as set forth above, were deemed to reject the Plan (collectively, the "Rejecting Classes").

As discussed more fully below, despite the votes of the Rejecting Classes, the Plan can, and still

should, be "crammed down" pursuant to 11 U.S.C. § 1129(b).

### ix.    *Section 1129(a)(9)—Payment of Priority Claims*

88.    Section 1129(a)(9) requires that, unless the holder of such a claim agrees to less

favorable treatment, a plan provide as follows:

(A) with respect to a claim of a kind specified in section **507(a)(2)** or
**507(a)(3)** of [the Bankruptcy Code], on the effective date of the plan,

the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section **507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7)** of [the Bankruptcy Code], each holder of a claim of such class will receive –

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section **507(a)(8)** of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash –

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9) (emphasis added).

a)  *Administrative Claims*

89.     In accordance with Bankruptcy Code section 1129(a)(9)(A), Article 2 of the Plan

provides that "[e]xcept to the extent that a Holder . . . agrees to a less favorable treatment,"

Administrative Expense Claims[20] "shall be paid in full, in Cash, in an amount equal to the

unpaid portion of such Allowed Administrative Expense Claim within thirty (30) days

---

[20] The Plan defines Administrative Expense Claims as "any Claim constituting a cost or expense of administration of the Chapter 11 Case pursuant to sections 330, 365, 503(b), *507(a)(2)* or 507(b) of the Bankruptcy Code . . . .'" Plan § 1.2 (emphasis added).  There are no outstanding Claims of the kind specified in 11 U.S.C. § 507(a)(3).

following the later to occur of (a) the Effective Date and (b) the date on which such
Administrative Expense Claim shall become an Allowed Claim . . . ."  Plan § 2.1(b).  Thus,
section 1129(a)(9)(A) is satisfied.

90.    Despite MN/NB Railroads' and CP's assertions to the contrary, claims arising
under section 1171(b) of the Bankruptcy Code ("1171(b) Claims") are not entitled to
administrative expense priority.  The Plan classifies 1171(b) Claims as junior Priority Claims.
*See* Plan § 2.4.  Although the Trustee does not believe there to be any valid 1171(b) Claims, *see*
Plan § 4.7(b), to the extent any exist, the Plan provides that any such Claims shall be treated
junior to other Priority Claims.  Plan § 4.7.  This treatment is in accord with applicable law.

91.    Bankruptcy Code section 1171 preserves the priority of claims in pre-Code
equity receiverships.  *See* 8 COLLIER ON BANKRUPTCY ¶ 1171.02, pp. 107-9, 107 (16th ed.
2010) ("Colliers").  The House Bill proposed to continue the language of former Bankruptcy
Act Section 77(b).  In re Boston & Maine Corp., 634 F.2d 1359, 1379 n.35 (1st Cir. 1980)
(citing H. Rep. No. 95-595, 95th Cong., 1st Sess. 424 (1978)).  That bill provided, "As under
current law, ***the courts will determine the precise contours of the priority*** recognized by this
subsection in each case."  Boston & Maine, 634 F.2d at 1379 n.35 (quoting H.R. Rep. No. 95-
595, 95th Cong., 1st Sess. 424) (emphasis added).  "The [Bankruptcy Code] provision enacted
as 11 U.S.C. [§] 1171(b) follows the House Bill and substantially continues the language of
Section 77(b)."  Id.  Accordingly, it is the province of the courts to determine the priority of any
claims validly asserted as 1171(b) Claims.

92.    The specific claims protected by section 1171(b) are referred to as "six-month
claims," which are claims incurred where: (i) the claim arose within six months of the filing of
the petition; (ii) the obligation was incurred for a current and necessary operating expense in the
ordinary course of business; and (iii) the goods or services giving rise to the claim were not

furnished in reliance on the railroad's general credit. <u>Boston & Maine</u>, 634 F.2d at 1379-80, 1382. As an initial matter, the MN/NB Railroads' claims are prepetition claims arising from "[f]reight services provided to the Debtor in connection with *interline rail shipments*." *See* Claim Nos. 257-1, 259-1 (emphasis added). But pre-petition interline freight claims "do not qualify for any of the express special priorities created by the Act," including status as "six-month claims." <u>In re Boston & Maine Corp.</u>, 600 F.2d 307, 308, 310 (1st Cir. 1979); *see also* <u>In re McLean Industs., Inc.</u>, 103 B.R. 424, 426-27 (Bankr. S.D.N.Y. 1989) (declining to extend administrative priority to prepetition interline rail balances).

93.     Even putting aside the MN/NB Railroads' *per se* disqualification from six-month creditor status, the fact that MN/NB Railroads opted out of the Interline Settlement System and instead determined to settle their accounts payable and accounts receivable directly with MMA indicates that the MN/NB Railroads clearly relied on MMA's credit. *See* Caruso Decl, ¶ 17. This reliance is even more strongly demonstrated by the fact that the proceeds MMA received from the Interline Settlement System were arguably Wheeling's collateral. *See* Caruso Decl, ¶ 18. Because MN/NB Railroads stood behind Wheeling in entitlement to those proceeds, the MN/NB Railroads' credit risk was heightened, thus exacerbating their reliance on MMA's credit. *See* Caruso Decl., ¶ 18. For both of these reasons, the MN/NB Railroads' claims do not merit section 1171(b) status.

94.     Moreover, from a fairness standpoint, treating 1171(b) Claims as administrative claims would elevate "six-month claims" over statutory priority claims, such as wage claims, even though such wage claims were quintessentially "six-month claims" prior to the passage of the Bankruptcy Code. There is no authority anywhere that Congress had such intent:

> [I]nclusion of the six-month claim in the first priority places the claim too high in the priority scale of section 507. In general, *six-month claims should be below all of the section 507 priorities*. The manner of satisfying that priority should be consistent with treatment given to

> the section 507 priorities.  Since the six-month priority is an equitable
> one designed, at least in part, to promote certain prepetition claims over
> unsecured creditors, any treatment in in the plan which is consistent
> with that policy and fair to the section 507 priority claims is proper.
> Case-by-case analysis of the overall plan appears necessary.

Colliers, ¶ 1171.02 at 108.

95.     Indeed, on remand from the First Circuit in Boston & Maine, the District Court

of Massachusetts affirmed confirmation of a plan that subordinated "six-month claims" to

administrative claims and priority tax claims, but elevated such "six-month claims" above first-

lien claims.  In re Boston & Maine Corp., 46 B.R. 930, 946 (D. Mass. 1983).  Thus, the very

case relied upon by the MN/NB Railroads and CP resulted in the exact treatment provided by

the Plan: subordination of 1171(b) Claims to Administrative Expense Claims and Priority Tax

Claims.  1171(b) Claims are therefore properly classified under the Plan.

### b)  *Priority Tax Claims and Other Priority Claims*

96.     With respect to Bankruptcy Code section 1129(a)(9)(B), there are no outstanding

Claims of the kind specified in Bankruptcy Code sections 507(a)(1), (4), (5), (6) or (7), and thus

section 1129(a)(9)(B) is inapplicable.

97.     In accordance with Bankruptcy Code sections 1129(a)(9)(C), Article 2 of the

Plan provides that "[e]xcept to the extent that a Holder of an Allowed Priority Tax Claim[21]

agrees to a less favorable treatment, each Holder . . . shall receive . . . on the later of the

Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim,

or as soon as practicable thereafter, Cash in an amount equal to such Allowed Priority Tax

Claim."  Plan § 2.3.  Moreover, to the extent of any section 507(a)(8) Claims not classified as

---

[21] The Plan defines a Priority Tax Claim as "a Claim of a Governmental Unit of the kind entitled to priority in
payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code."  Plan § 1.106.

Priority Tax Claims, Article 4.7 of the Plan provides that any such Priority Claims[22] "shall be

paid in full on the later of the Effective Date or thirty (30) days after the date such Claims

become Allowed Claims." Thus, the Plan satisfies the requirements of section 1129(a)(9)(C).

Accordingly, the requirements of § 1129(a)(9) are satisfied.[23]

### x.      Section 1129(a)(10)—Acceptance by Impaired Class

98.      Section 1129(a)(10) requires that if a class of claims is impaired under the Plan,

at least one class of claims that is impaired must accept the Plan, without including any

acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10). In this case, each of the Voting

Classes voted to accept the Plan. Accordingly, section 1129(a)(10) has been satisfied.

### xi.      Section 1129(a)(11)—"Feasibility"

99.      Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may

be confirmed only if the Bankruptcy Court finds that the plan is not likely to be followed by a

further reorganization or liquidation of the debtor, *unless such reorganization or liquidation is*

*proposed in the plan*. 11 U.S.C. § 1129(a)(11) (emphasis added). The Plan is a plan of

liquidation, and accordingly, the Plan contemplates the liquidation of the Debtor's assets and

the winding up of the Debtor's estate by, among other things, making distributions to the WD

Trust and the Debtor's creditors. In the context of a liquidating plan, feasibility is established

by demonstrating (a) the plan proponent's ability to satisfy the conditions precedent to the

effective date and (b) the availability of sufficient funds to meet the plan proponent's post-

confirmation obligations to pay for the costs of administering and fully consummating the plan

and closing the chapter 11 case. As set forth in the Liquidation Analysis, the Trustee believes

---

[22] The Plan defines a Priority Claim as "any Claim (other than an Administrative Expense Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code . . . ." Plan § 1.105.

[23] The Trustee does not believe there to be any Claims of the kind specified in 11 U.S.C. § 1129(a)(9)(D) and, thus, that section is inapplicable.

that he has sufficient assets to satisfy the Debtor's obligations under the Plan and fully consummate the Chapter 11 Case without the need for further reorganization or liquidation. Therefore, the Plan does not run afoul of Bankruptcy Code section 1129(a)(11).

### xii.    Section 1129(a)(12)—Payment of Statutory Fees

100.    Bankruptcy Code section 1129(a)(12) requires the payment of all fees owed pursuant to 28 U.S.C. § 1930.  11 U.S.C. § 1129(a)(12).  Article 12.4 of the Plan provides for payment of all fees payable pursuant to 28 U.S.C. § 1930 in full on the Effective Date and thereafter as may be required.  Accordingly, section 1129(a)(12) has been satisfied.

### xiii.    Section 1129(a)(13)—Payment of Retiree Benefits

101.    Bankruptcy Code section 1129(a)(13) requires that a plan provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or court order pursuant to Bankruptcy Code section 1114 for the duration of the period that the debtor has obligated itself to provide such benefits.  11 U.S.C. § 1129(a)(13). The Debtor has no current or continuing post-confirmation obligations for retiree benefits. Accordingly, section 1129(a)(13) has been satisfied.

### xiv.    Section 1129(a)(14), (15) and (16)—Domestic Support Obligations, Unsecured Claims Against Individual Debtors and Transfers by Nonprofit Organizations

102.    The Debtor is not an individual with domestic support obligations, and thus section 1129(a)(14) is inapplicable.[24]  As the Debtor is not an individual, section 1129(a)(15) is

---

[24] 11 U.S.C. § 1129(a)(14) provides that a court shall confirm a plan only if, *inter alia*:

> (14) *If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation*, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.  (emphasis added).

inapplicable.[25]  The Debtor is not a nonprofit corporation and, therefore, section 1129(a)(16) is

inapplicable.[26]

**B.**    **The Plan Satisfies the "Cram-Down" Requirements of Section 1129(b)**

103.    Under § 1129(b) of the Bankruptcy Code, this Court may confirm the Plan,

notwithstanding the Trustee's failure to satisfy § 1129(a)(8), "if the plan does not discriminate

unfairly, and is fair and equitable, with respect to each class of claims or interests that is

impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).

104.    In relation to the "unfair discrimination" element, courts have held that "a

dissident class must receive treatment which allocates value to the class in a manner consistent

with the treatment afforded to other classes with similar legal claims against the debtor."

Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 47 (E.D. Pa. 1996).  In other

words, "[a] plan that does discriminate unfairly gives unequal treatment to creditors who are

similarly situated regarding legal rights and priority."  Id.

105.    Concerning the "fair and equitable" standard of § 1129(b) in relation to

unsecured claims and equity interests,[27] sections 1129(b)(2)(B) and (C) provide as follows:

---

[25] 11 U.S.C. § 1129(a)(15) provides that a court shall confirm a plan only if, *inter alia*:

> (15) *In a case in which the debtor is an individual* and in which the holder of an
> allowed unsecured claim objects to the confirmation of the plan—(A) the value, as of
> the effective date of the plan, of the property to be distributed under the plan on
> account of such claim is not less than the amount of such claim; or (B) the value of the
> property to be distributed under the plan is not less than the projected disposable
> income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-
> year period beginning on the date that the first payment is due under the plan, or
> during the period for which the plan provides payments, whichever is longer.
> (emphasis added).

[26] 11 U.S.C. § 1129(a)(16) provides that a court shall confirm a plan only if, *inter alia*:

> (16) All transfers of property under the plan shall be made in accordance with any
> applicable provisions of nonbankruptcy law that govern the transfer of property *by a
> corporation or trust that is not a moneyed, business, or commercial corporation or
> trust*.  (emphasis added).

[27] None of the Rejecting Classes contains secured Claims.

(2) . . .[T]he condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) With respect to a class of *unsecured claims*—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) *the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property* . . . .

(C) With respect to a class of *interests*—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) *the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property*.

11 U.S.C. § 1129(b)(2)(B), (C) (emphasis added).

106.    In this case, the Plan satisfies the requirements of section 1129(b).  As an initial matter, there is only one stakeholder in all of the Rejecting Classes: as set forth in the Voting Certification, (a) there are no Holders in Class 14, (b) MMA Corp. is the only Holder in Class 15, and (c) there are no other Rejecting Classes.  *See* Voting Cert., Ex. A.  In any event, with respect to section 1129(b)(1)'s requirement that a plan not "discriminate unfairly," Class 14 was created to accommodate any Holders of Claims that were subordinated to General Unsecured Claims, and thus which were inherently different from Class 13 Claims.  As it turns out, no such Claims exist, but in the event they did, they would not be receiving treatment "unequal [ ] [from] creditors who are similarly situated regarding legal rights and priority" because no such "similarly situated" creditors exist.  *See* Corestates Bank, 202 B.R. at 47.  In addition, there are

45

no other Classes of Equity Interests classified under the Plan, thus inherently rendering Class 15 Equity Interests unique and not "similarly situated" to stakeholders receiving property under the Plan. *See* id. Accordingly, the Plan does not unfairly discriminate against the stakeholders in the Rejecting Classes. *See* 11 U.S.C. § 1129(b)(1).

107.    With respect to 1129(b)(2)'s requirement that a plan be "fair and equitable," there are no Classes junior to any Rejecting Class that are receiving property under the Plan. Class 15 is the only Class junior to Class 14, and neither Class 14 nor Class 15 will receive any recovery under the Plan. Further, no senior Class is receiving more than full recovery on account of its Claims (including Claims for interest and other contractual rights). Accordingly, the Plan is fair and equitable to stakeholders in the Rejecting Classes. *See* 11 U.S.C. § 1129(b)(2)(B), (C) (providing that a plan is fair and equitable with respect to a class of unsecured claims or interests if any holder of a claim (if applicable) or interest that is junior to the dissenting class will not receive any property under the plan).

108.    The Plan thus satisfies the "cram down" requirements of Bankruptcy Code section 1129(b) with respect to the Rejecting Classes.

## C.    Other Bankruptcy Code Confirmation Requirements

109.    Bankruptcy Code section 1173 sets forth certain requirements for confirmation of a plan in a railroad reorganization. In particular, section 1173(a)(1) requires compliance with all applicable provisions of section 1129. As set forth above, section 1129 has been satisfied, in turn satisfying section 1173(a)(1). Section 1173(a)(2) is the corollary of the "best interests" test codified in section 1129(a)(7).[28] As set forth above and in the Caruso Declaration, section

---

[28] Specifically, section 1173(a)(2) provides that the court shall confirm a plan if—

> (2) each creditor or equity security holder will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value of property that each such creditor or equity security holder would so receive or retain if all of the operating railroad lines of the debtor were sold, and the proceeds of such

1129(a)(7) has been satisfied; for all the same reasons, section 1173(a)(2) has been satisfied as

well.  Section 1173(a)(3) is analogous to the "feasibility" test set forth in section 1129(a)(11),[29]

and as such is inapplicable to the Plan as it is a chapter 11 plan of liquidation (or is otherwise

satisfied as set forth above).  Section 1173(a)(4) requires that a plan be consistent with the

public interest to be confirmed.  For the reasons set forth above, the sale as a going concern of

the railroad to a third party for operation was consistent with the public interest.  *See* 8 Colliers

1165.02 ("consideration of the public interest in a railroad case" is satisfied with "the

continuation of service"); *see also supra*, ¶ A.i.62.  As the Plan is the only plan before the

Court, section 1173(b) is inapplicable.[30]

110.    Bankruptcy Code section 1129(c) provides, in pertinent part, that "the court may

confirm only one plan . . . ."  11 U.S.C. § 1129(c).  Other than the Plan (including previous

versions thereof), no other plan is being prosecuted in the Chapter 11 Case.  Accordingly, the

requirements of Bankruptcy Code section 1129(c) have been satisfied.

111.    Bankruptcy Code section 1129(d) provides that "the court may not confirm a

plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the

application of section 5 of the Securities Act of 1933."  11 U.S.C. § 1129(d).  No governmental

unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the

principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of

section 5 of the Securities Act.  And as evidenced by its terms, the principal purpose of the Plan

---

sale, and the other property of the estate, were distributed under chapter 7 of this title
on such date . . . .

[29] Section 1173(a)(3) provides that the court shall confirm a plan if—"(3) in light of the debtor's past earnings and
the probable prospective earnings of the reorganized debtor, there will be adequate coverage by such prospective
earnings of any fixed charges, such as interest on debt, amortization of funded debt, and rent for leased railroads,
provided for by the plan . . . ."

[30] Section 1173(b) provides: "If the requirements of subsection (a) of this section are met with respect to more than
one plan, the court shall confirm the plan that is most likely to maintain adequate rail service in the public interest."

is not such avoidance.  Accordingly, the requirements of Bankruptcy Code section 1129(d) have

been satisfied.

### D.      Certain Objecting Parties Lack Standing to Object to Confirmation

112.   In general, the concept of standing prohibits "a litigant [from] raising another

person's legal rights."  Allen v. Wright, 468 U.S. 737, 750–51 (1984).   In the context of

confirmation of a plan, this means that "[o]nly parties *adversely affected* by provisions of a plan

may raise an objection to confirmation based on such provisions."  In re Johns-Manville Corp.,

68 B.R. 618, 623–24 (Bankr. S.D.N.Y. 1987), *rev'd in part on other grounds*, 78 B.R. 407

(S.D.N.Y. 1986), *aff'd sub. nom*, Kane v. Johns–Manville Corp., 843 F.3d 636 (2d Cir. 1988)

(emphasis added); *see also* In re Gaston & Snow, No. 93-8517, 1996 WL 694421, at *7

(S.D.N.Y. Dec. 4, 1996) (finding that where creditor did not allege that he *specifically* would

receive more in a chapter 7 liquidation than under the plan, that creditor lacked standing to

object to the plan as failing to meet the best interests test more generally); In re Indianapolis

Downs, LLC, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (in ultimately approving third party

releases, finding that as a threshold matter, the objecting creditor "lack[ed] the requisite

standing to object to the third party release provision in the [p]lan" because such creditor had

"(1) been deemed to reject the Plan by virtue of its status as . . . not receiving a distribution and

is therefore not subject to the release provisions, or (2) voted to reject the Plan and indicated

that it will not grant the third party releases," and in neither case was subject to the release

provisions); In re Orlando Investors, L.P., 103 B.R. 593, 597 (Bankr. E. D. Pa. 1989) (finding

that non-releasing parties lacked standing to object to an alleged plan deficiency that did not

harm them, explaining that "[a]ny distributional faults in the proposed plan concern the

releasing limited partners, and they do not object to confirmation.  Therefore, it is difficult to

48

see how the rights of the objectors have been adversely affected by the inequality of treatment proposed by the plan, and difficult to accord them standing to raise this issue.").

113.   Like the objectors in Johns-Manville, Gaston & Snow, Indianapolis Downs, and Orlando Investors, CP lacks standing to object to confirmation because its rights are not harmed thereby.  In particular (and in the order of its objections, as summarized *supra* at ¶F.iv.39(c):

(a)   CP is not negatively affected by the Releases because of the Judgment Reduction Provision defined and described below.

(b)   The Settling Defendants' entry into the Settlement Agreements without first having reviewed a disclosure statement has no effect on CP.

(c)   Only those provisions of the Settlement Agreements as between the parties thereto trump the Plan provisions, and CP is not a party to any Settlement Agreement.[31]

(d)   As set forth above, counsel to CP already has both certain unredacted and redacted versions of the Settlement Agreements.  Also as set forth above, CP has no interest in the reasonableness of the Settlement Payments.  *See supra* ¶ A.i.53.

(e)   CP is unaffected by the Plan's exculpation provision, as it has asserted no claims against the professionals exculpated, nor could it.

(f)   CP is unaffected by whether certain Derailment Claims are entitled to vote on the Plan because, as set forth above, the Trustee has the requisite votes to confirm the Plan in any event, and any and all voting issues are moot.[32]

Accordingly, as a thresholde matter to consideration of the CP Objection, CP lacks standing to object to confirmation of the Plan on any of the grounds set forth in this paragraph 113.

---

[31] This objection of CP does not appear to relate to any confirmation requirement.  But to clarify the record, the so-called "paramountcy" provision only provides (as CP indeed quotes) that "[i]n the event of any inconsistency between the Plan or the Confirmation Order and the Settlement Agreement(s), the terms of the Settlement Agreement(s) will apply *with respect to the particular parties thereto* . . . ."  *See* Plan (s) 10.5(a) (emphasis added).  It thus has no effect on CP, and as a substantive matter is not inconsistent with any provision of the Bankruptcy Code.

[32] The Trustee acknowledges that, as a creditor whose claim was temporarily allowed at $1.00 for voting purposes and who rejected the Plan, CP has standing to assert that the "best interests test" was not met with respect to CP; however, as set forth above, that assertion is incorrect.

**E.     The Release, Exculpation, and Injunction Provisions
of the Plan Should Be Approved**

114.     The releases, injunctions, and exculpation provisions (collectively, the
"Releases") set forth in the Plan are consistent with applicable law.  ***First***, after unanimous
acceptance by Holders of Derailment Claims entitled to vote on the CCAA Plan, the Sanction
Order entered on July 13, 2015 approved the releases, injunctions and exculpation provisions
contained in the CCAA Order, which mirror the Releases in the Plan.  *See* Sanction Order, ¶ 87;
CCAA Plan § 5.1.  ***Second***, on August 26, 2015, the Court entered the Enforcement Order,
enforcing the Releases in the CCAA Plan in the United States regardless of whether
independently enforceable under U.S. law.  ***Third***, the Releases contained in the Plan are
consistent with First Circuit law independent of their approval in the CCAA Proceedings and
the Enforcement Order.

### *i.     Subject Matter Jurisdiction*

115.     As a threshold matter, this Court clearly has subject matter jurisdiction to grant
the Releases and Injunctions.  In the first instance, as the Releases and Injunctions are part of
the Plan (and confirmation is a "quintessential bankruptcy matter"), this Court has "arising
under" jurisdiction to consider the Releases and Injunctions.  *See* In re Charles Street African
Methodist Episcopal Church of Boston, 499 B.R. 66, 98-103 (Bankr. D. Mass. 2013).  While
"[i]t may or may not be appropriate for a court . . . to confirm a plan containing a third-party
release—and, if it is appropriate, the manner and degree of relation of the released claim to the
case are certainly factors in the analysis—but the court ***undoubtedly has jurisdiction to
adjudicate the plan, even without recourse to its related-to jurisdiction***.  Charles Street, 499
B.R. at 98-103 (citing Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 983–84 (1st Cir.
1995)) (emphasis added).

116. But even if the Court declined to adopt the recent, well-reasoned analysis of the Bankruptcy Court for the District of Massachusetts, the Court has jurisdiction to approve the Releases and Injunctions by virtue of its "related-to" jurisdiction. "The statutory grant of 'related to' jurisdiction is quite broad. Congress deliberately allowed the cession of wide-ranging jurisdiction to the bankruptcy courts to enable them to deal efficiently and effectively with *the entire universe of matters connected with bankruptcy estates*." In re Boston Reg. Med. Ctr., Inc., 410 F.3d 100, 105 (1st Cir. 2005) (emphasis added). Indeed, "bankruptcy courts ordinarily may exercise related to jurisdiction as long as the outcome of the litigation '*potentially [could] have some effect on the bankruptcy estate*, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate.'" Id. (quoting In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991)) (emphasis added); *see also* In re Chicago Invests., LLC, 470 B.R. 32, 95 (Bankr. D. Mass 2012) (reiterating that bankruptcy court has power to approve third party releases when it is appropriate to do so); In re Otero County Hosp. Assoc., Inc. v. Quorum Health Resources, LLC, 527 B.R. 719, 758 (Bankr. D.N.M. 2015) ("[B]ankruptcy court[s] [have] jurisdiction to adjudicate claims between third parties where the outcome of the litigation could have a conceivable effect on the bankruptcy estate."). As set forth in the Keach Declaration, to the extent any of the Contributing Parties is or becomes liable to any party who suffered damages arising from the Derailment, those parties will have claims against the Debtor, or against a party who has already asserted or who can in turn assert a claim against the Debtor, for, *inter alia*, contribution and indemnity. Keach Decl. ¶ 42. Indeed, many such claims arise under indemnification agreements or rights to indemnification arising under applicable non-bankruptcy law, which are alone sufficient to confer subject matter jurisdiction upon a bankruptcy court. *See* Virginia ex rel. Itegra REC LLC v. Countrywide Secs. Corp., No.

3:14-cv-706, 2015 WL 1237084, at *2 (E.D. Va. Mar. 17, 2015) (finding subject matter jurisdiction to consider a dispute even where none of the parties was a debtor, but debtor had an indemnification agreement with defendant). The release of indemnification, contribution, and other such claims against the Estate does not merely "*potentially* have *some* effect on the bankruptcy estate, such as altering debtor's rights," but would decimate recoveries for the Debtor's stakeholders. *See* Boston Reg. Med. Ctr., 410 F.3d at 105 (emphasis added); *see also* Otero County Hosp., 527 B.R. at 758 (finding "related-to" jurisdiction where outcome of litigation could have a "conceivable effect" on bankruptcy estate through adjudication of debtor's relative fault, even if debtor not a party). Accordingly, the Court also has "related-to" jurisdiction over confirmation of the Plan and approval of the Releases and Injunctions as they apply to each and every Released Party.[33]

---

[33] In a case, like New England Compounding, that is on nearly all-fours with this case, the Delaware bankruptcy court first approved a sale of substantially all of the debtors' assets, after the debtors were driven into chapter 11 by a flurry of personal injury suits. In re Blitz U.S.A., Inc., 2012 WL 5182985 (Bankr. D. Del. Oct. 16, 2012) (sale order). The debtors then filed a plan of liquidation providing for the creation of a tort claims trust, a buy-back of liability insurance policies, a channeling injunction, and third-party releases. In re Blitz U.S.A., Inc., 2013 WL 6825607 (Bankr. D. Del., Nov. 12, 2013) (Debtor's and Official Committee of Unsecured Creditors' Joint Plan of Liquidation). The court confirmed the liquidating plan. In re Blitz U.S.A., Inc., 2014 WL 2582976 (Bankr. D. Del., Jan. 30, 2014). As for voting on the liquidating plan, the court noted:

> As reflected in the Voting Declaration, 95.29% (81 out of 85) of the holders of Blitz Personal Injury Claims in Class 4(a) of the Plan that voted on the Plan and 100% (3 out of 3) of the holders of Blitz Personal Injury Claims in Class 4(b) of the Plan have voted to accept the Plan. On the record at the Confirmation Hearing, three of the parties that had originally voted against confirmation of the Plan announced that they were changing their votes to votes in support of the Plan. As a result of those announcements, only one vote against confirmation of the Plan in Class 4(a) remains, and that claimant did not object to confirmation of the Plan. Accordingly, the Plan has been overwhelmingly accepted by the classes of creditors affected by the Releases and the Channeling Injunction and there is no remaining objection to confirmation of the Plan.

Judge Walsh, found both subject matter jurisdiction to enter the releases and the "identity of interest" prong in the same facts:

> *Identity of Interest*. There is a substantial identity of interest between the Debtors and the Protected Parties, such that a Blitz Personal Injury Claim asserted against a Protected Party is essentially a claim against the Debtors.

Id. at *6. This same is true here: a Derailment Claim against any and all of the Contributing Parties and/or Released Parties is essentially a claim against the Debtor and MMA Canada. As the Blitz USA court found, the settling parties, plaintiffs and Debtors had, as they do here, a common interest:

ii.    **The Legal Standard for Granting Third-Party Releases**

117.    Under First Circuit law, the Bankruptcy Court can confirm the Plan including

the Releases in the Chapter 11 Case.  The First Circuit has addressed and tacitly approved the

concept of nonconsensual third-party releases in plans.  *See* <u>Monarch</u>, 65 F.3d at 975-76

(affirming bankruptcy court's confirmation of plan that contained third-party releases); *see also*

<u>G.S.F. Corp.</u>, 938 F.2d at 1474 (section 105(a) confers ample power to enjoin suit against

nondebtors during the pendency of chapter 11 case where court reasonably concludes that such

actions would entail or threaten adverse impact upon administration of chapter 11 case).[34]

118.    Given this guidance, lower courts in the First Circuit have followed suit.  In

confirming plans, nonconsensual third-party permanent injunctions or releases are permitted in

"exceptional circumstances" and are within the court's authority to issue under 11 U.S.C.

§§ 105(a), 1123(b).  *See*, *e.g.*, <u>In re New England Compounding Pharmacy, Inc.</u>, No. 12-19882

(HJB) (Bankr. D. Mass. May 20, 2015) [D.E. 1355] (confirming plan containing third-party

releases based on "exceptional" facts, over written objection of U.S. Trustee); <u>Charles Street</u>,

499 B.R. at 98-103 (finding subject matter jurisdiction and constitutional authority to approve

---

Each of the Protected Parties share a common goal of resolving their competing and interrelated claims and achieving a fair and equitable distribution of the Debtors' remaining assets through the Plan.  Absent the involvement of each of the Protected Parties, none of the settlements required for, or entered into in connection with, the confirmation of the Plan would be possible, and few, if any, assets would be available for distribution to the Debtors' Creditors.

<u>Id</u>. at *7.

[34] Direct authority for a nonconsensual third-party releases and channeling injunctions is found in the United States Supreme Court's decision in <u>U.S. v. Energy Resources Co.</u>, 495 U.S. 545 (1990) (affirming First Circuit decision that a bankruptcy court has authority to order IRS to treat tax payments made by chapter 11 debtor as trust fund tax payments, thus releasing potential insider "responsible persons" from liability, if the bankruptcy court determines that this designation is necessary to the success of a reorganization plan).  The Supreme Court's decision was grounded in 11 U.S.C. §§105(a), 1123(b)(5) and 1129.  <u>Energy Resources</u>, 495 U.S. at 549.  "These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."  <u>Id.</u>; *see also* Joshua M. Silverstein, *Hiding in Plain View:  A Neglected Supreme Court Decision Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 EMORY BANKR. DEV. J. 13 (Fall 2006) ("<u>Energy Resources</u> vindicates the pro-release position on every major issue concerning the validity of non-debtor releases.  Therefore, under existing precedent, bankruptcy courts possess the equitable power to extinguish claims against third parties.").

releases in a chapter 11 plan and adopting the Master Mortgage factors—described below—for

approval of such releases, but ultimately finding those factors not met); In re Chicago Invests.,

LLC, 470 B.R. 32, 95-96 (Bankr. D. Mass. 2012) (confirming plan containing third party

releases where released parties were supplying "substantial consideration," the "injunction was

essential to the reorganization because neither [the principal funding source] nor its related

entities would go forward without it," the affected creditors were being paid in full, and the

creditors had voted in favor of the plan).

119.    The approach in the First Circuit is in the majority: at least the Second, Third,

Fourth, Sixth, Seventh and Eleventh Circuits all allow for nonconsensual, nondebtor releases in

plans under certain circumstances.  See SEC v. Drexel Burnham Lambert Grp., Inc., 960 F.2d

285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third

party, provided the injunction plays an important part in the debtor's reorganization plan."); In

re Global Indus. Techs., Inc., 645 F.3d 201, 205 (3d Cir. 2011) (stating that "[f]or the Plan to be

approved as designed (i.e., with the inclusion of the [] Injunction), the debtors needed to show

that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C.

§ 105(a), which . . . requires showing with specificity that the [] Injunction is both necessary to

the reorganization and fair.") (citing Gillman v. Continental Airlines (In re Continental

Airlines), 203 F.3d 203, 214 (3d Cir. 2000)); Behrmann v. Nat'l Heritage Found., Inc., 663 F.3d

704, 712 (4th Cir. 2011) (noting that third-party injunctions are permissible and finding test

articulated in In re Railworks Corp., 345 B.R. 529, 536 (Bankr. D. Md. 2006) "instructive,"

which test considered whether (i) "there was overwhelming approval for the plan," (ii) there

was "a close connection between the causes of action against the third party and the causes of

action against the debtor," (iii) "the injunction is essential to the reorganization," and (iv) "the

plan of reorganization provides for payment of substantially all of the claims affected by the

injunction"); <u>In re Dow Corning Corp.</u>, 280 F.3d 648, 658 (6th Cir. 2002) (finding that a plan

provision "enjoining a non-consenting creditor's claim against a non-debtor" may be "an

appropriate provision of a reorganization plan pursuant to section 1123(b)(6)," but that the facts

at issue did not comport with the five-factor test articulated for such a finding); <u>In re Airadigm</u>

<u>Commc'ns, Inc.</u>, 519 F.3d 640, 657-58 (7th Cir. 2008) (finding that third-party release was

appropriate in this case because, among other things, (i) the release was limited to claims

"arising out of or in connection with" the reorganization and carved out willful misconduct and

(ii) the record demonstrated that the exit financer required the release to fund consummation of

the chapter 11 cases, which in turn was necessary for a successful reorganization); <u>SE Property</u>

<u>Holdings, LLC v. Seaside Engineering & Surveying, Inc. (In re Seaside Engineering &</u>

<u>Surveying Inc.)</u>, 780 F. 3d 1070, 1077-1080 (11th Cir. 2015) (noting 11th Circuit is with the

majority in allowing nonconsensual third party releases and correcting <u>Vitro</u>[35] court on this

point).[36]

120.    Courts within the First Circuit have adopted the <u>Master Mortgage</u>[37] test for

determining whether a permanent injunction or release in favor of a non-debtor third party is

warranted.  *See*, *e.g.*, <u>Chicago Invests.</u>, 470 B.R. at 95-96 (adopting <u>Master Mortgage</u> test when

determining whether third party injunctions will be allowed); *see also* <u>Charles Street</u>, 499 B.R.

at 100 (same).  The <u>Master Mortgage</u> test looks to five factors:

> (a)    An identity of interests between the debtor and the third party, such that a
> suit against the non-debtor is, in essence, a suit against the debtor or will
> deplete the assets of the estate;

---

[35] <u>In re Vitro S.A.B. DE C.V.</u>, 701 F.3d 1031, 1061 (2012).

[36] In addition, the minority of circuits that do not permit nonconsensual third-party releases would authorize the fully consensual releases contained in the Plan. *See*, *e.g.*, <u>In re Patriot Place, Ltd.</u>, 486 B.R. 773, 822 (Bankr. W.D. Tex. 2013) (emphasizing that 5th Circuit precedent only applies to nonconsensual releases); <u>Billington v. Winograde, (In re Hotel Mt. Lassen, Inc.)</u>, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) (noting that Ninth Circuit case law does not preclude consensual releases, and the same are common in bankruptcy cases).

[37] <u>In re Master Mtg. Inv. Fund, Inc.</u>, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

     (b)     The non-debtor has contributed substantial assets to the reorganization;

     (c)     The injunction is essential to the reorganization;

     (d)     A substantial majority of creditors agree to such injunction—specifically, the impacted class, or classes, has overwhelmingly voted to accept the proposed plan treatment; and

     (e)     The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

Master Mortg., 168 B.R. at 935.

121.     The plan proponent need not prove the existence of all five Master Mortgage factors.  *See* Charles Street, 499 B.R. at 100 ("These factors are neither exclusive nor conjunctive requirements."); Chicago Invests., 470 B.R. at 95 (same).  Rather, the factors are a "useful starting point."  Charles Street, 499 B.R. at 100.

122.     Indeed, canvassing Second Circuit authority, Judge Sean Lane from the Southern District of New York recently affirmed that consent by the affected class (similar to the fourth Master Mortgage factor) is not a requirement for approval of a third-party release where the appropriate standard has otherwise been met.  *See*, *e.g.*, In re Genco Shipping & Trading Ltd., 513 B.R. 233, 268-72 (Bankr. S.D.N.Y. 2014) (citing Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005)) (approving (i) "consensual" releases, where consent had been expressed by failing to check a box on the ballot opting out of the releases, even if such creditor voted to reject the plan; (ii) nonconsensual third-party releases for claims that would trigger indemnification or contribution claims against the debtors; and (iii) nonconsensual third-party releases in favor of all parties who provided substantial consideration to the plan by (a) agreeing to forego consideration to which they would otherwise be entitled, (b) providing new value to the debtors by agreeing to "backstop" or guaranty a rights offering, or (c) agreeing to exchange debt for equity in the reorganized debtor).

123.    Additional recent authority emphasizes that nonconsensual non-debtor releases can be a permissible feature even of liquidating chapter 11 plans where one or more of the <u>Master Mortgage</u> factors are present.  *See*, *e.g.*, <u>In re New England Compounding Pharmacy, Inc.</u>, No. 12-19882 (HJB) (Bankr. D. Mass. May 19, 2015), Tr. of Hr'g (the "<u>NECC Confirmation Transcript</u>") (approving third-party releases for settling defendants that contributed to a toxic tort trust in a liquidating chapter 11)[38]; <u>In re U.S. Fidelis, Inc.</u>, 481 B.R. 503, 518-21 (Bankr. E.D. Mo. 2012) (finding that the non-consensual nature of third-party releases did not render such releases impermissible *per se*).  In <u>U.S. Fidelis</u>, The court directly addressed the use of such releases in liquidating plans:  "This Case is—in bankruptcy vernacular—a 'liquidating 11.'"  <u>U.S. Fidelis</u>, 481 B.R. at 520.  The Court went on to apply its analysis specifically in the context of a liquidating chapter 11:

> A few courts suggest that compelled releases may not be appropriate in a liquidating 11 because the debtor necessarily does not need such extraordinary relief for the purpose of reorganizing.  The Court recognizes this concern and the possible abuse that could occur if the releases of non-debtors are commonly included in a plan of liquidation.  However, an orderly liquidation is a valid use of chapter 11 and one of its chief purposes—to ensure the best return for the unsecured creditors—should be promoted.  If the plan of liquidation ensures the best possible outcome for unsecured creditors and the releases therein are critical to confirmation of the plan, then the fact that the case is not a reorganization should not *per se* prohibit confirmation of the plan.

<u>Id.</u> at 520.

124.    With respect to the second <u>Master Mortgage</u> factor, consideration is "substantial" when the plan "replace[s] what it releases with something of indubitably equivalent value to the affected creditor," such as a settlement fund to which claims are channeled.  <u>Chicago Invests.</u>, 499 B.R. at 102; *see also* NECC Confirmation Transcript, 24:14-25:18 (explaining that the released parties' contribution in exchange for the releases is a

---

[38] Pertinent excerpts of the NECC Confirmation Transcript are attached hereto as <u>Exhibit A</u>.  Electronic copies of the entire transcript are available upon reasonable request of counsel to the Trustee.

settlement fund of approximately $200 million, without which "the likelihood of *any* creditor recoveries would be very dim, indeed.") (emphasis added); *cf.* In re Dow Corning Corp., 255 B.R. 445, 479 (E.D. Mich. 2000) (affirming the denial of confirmation of a plan containing third party releases where plan, *inter alia*, did not provide such a fund).

### iii.   The Releases and Injunctions Are Appropriate Under the Circumstances

125.    In this case, the Master Mortgage factors weigh heavily in favor of approving the Releases in the Plan.  In particular:

(a)    **Identity of Interest**.  The identity of interest test is met, as suits against the Settling Defendants would necessitate claims for indemnity and contribution against the Debtor, preventing any distribution until they were resolved, including from existing insurance proceeds.[39]  Such suits would also involve the Debtor in discovery and perhaps intervention, costing the Estate needed funds.

(b)    **Substantial Contribution**.  The Settling Defendants are contributing substantial and necessary Settlement Payments to the Indemnity Fund, totaling approximately $CAD446 million,[40] *none* of which would be available for distribution to the Debtor's creditors absent the Releases in the Plan.

(c)    **Essential to Plan**.  There is no chance of a plan of liquidation without the Releases—releases will be necessary even for a distribution of the insurance proceeds.  And absent the Plan, dismissal of the Chapter 11 Case is the only option, with no return to any creditor, including victims of the Derailment, other than through costly, time-consuming, and uncertain litigation.

(d)    **Consent**.  The claimants affected by the Releases have manifested their consent to such Releases through their affirmative and unanimous votes in favor two plans.  These are the only parties whose consent is relevant when assessing this factor.

(e)    **Mechanism for Substantial Payment**.  The Plan provides for a mechanism for payment of all, or substantially all, of the Claims affected by the Releases: the Indemnity Fund distributed in part via the WD Trust.

---

[39] Indeed, the United States District Court for the District of Maine emphasized the presence of such indemnity rights and "shared insurance" in finding that the wrongful death litigation in the United States was related to the Chapter 11 Case and in transferring such cases to Maine under 28 U.S.C. § 157(b)(5).

[40] This figure is based on CAD/USD exchange rates as of September 10, 2015.

126.    In addition, as set forth in the Keach Declaration (and in response to CP's

contention to the contrary), this Chapter 11 Case presents truly exceptional circumstances

warranting approval of the third-party releases.  *See generally* Keach Decl.; *see also* CP Obj.,

¶¶43-46.  In particular, this case began as administratively insolvent.  *See* Discl. Stmt. at 31.  It

was the Trustee's negotiation with, from the outset, the Debtor's secured creditors to obtain a

carve-out from their collateral to fund administration of the case that prevented its dismissal,

which would have produced little to no recovery for any creditor, including Derailment victims.

Id.  Having procured a means for funding the case, the Trustee and others set out to pursue

those potentially responsible for the Derailment in order to amass assets to compensate the

victims.  *See* Keach Decl., ¶ 31.  But absent the ability to assure those potentially responsible

parties that they would not be subject to further lawsuits, the Trustee would not have been able

to procure Settlement Payments to compensate the victims—no Settling Defendant would have

signed up to make any contribution, let alone the substantial ones made, if concerned that it

might be forced to defend itself in additional, subsequent litigation and face attendant additional

judgments.  *See* Keach Decl., ¶¶ 39, 47-49.  Offering those potentially responsible parties

releases from such risk was thus the only way to amass *any* assets for distribution to the

Debtor's creditors, short of years of lengthy and expensive litigation wrought with risk for the

victims.  Accordingly, and in addition to satisfaction of the relevant Master Mortgage factors,

this Chapter 11 Case presents the extraordinary circumstances that particularly lend themselves

to approval of third-party releases.  *See generally* New England Compounding, No. 12-19882

(HJB) (Bankr. D. Mass. May 19, 2015).

127.    Finally, the Confirmation Order provides for a judgment reduction in favor of

the Non-Settling Defendant.  Such a provision is equitable to the Non-Settling Defendant and is

otherwise consistent with applicable law; indeed, it is all that the Non-Settling Defendant is

entitled to.  *See*, *e.g.*, <u>Austin v. Raymark</u>, 841 F. 2d 1184 (1st Cir. 1988) (requiring a reduction in any damage award against non-settling defendants by the amount equivalent to the settling defendants' proportionate liability, and finding reasonable the reapportionment of insolvent defendant's liability as among other defendants); <u>In re Worldcom, Inc. ERISA Litigation</u>, 339 F. Supp. 2d 561 (S.D.N.Y. 2004) (over objection of non-settling defendant, approving settlement agreement that barred third-party claims against non-settling defendants, but which also included a proportionate judgment reduction formula, albeit one that reduced the judgment reduction credit to account for the insolvency of a settling defendant); <u>In re Tribune Co.</u>, 464 B.R. 208, 223-24 (Bankr. D. Del. 2011) (denying motion of non-settling defendant for reconsideration of order confirming plan, which included third-party releases with accompanying judgment reduction provision for non-settling defendant, as confirmation order preserved rights of non-settling defendant under applicable law); <u>Whyte v. Kivisto (In re Semcrude)</u>, No. 08–11525, 2010 WL 4814377, at *6-7 (Bankr. D. Del. Nov. 19, 2010) (finding fair and equitable a settlement that barred third-party claims against settling parties but also included a judgment reduction provision that left intact non-settling defendants' state law setoff/contribution rights).

128.    The Trustee thus submits that for the reasons set forth above, the Releases are appropriate under applicable law.

## CONCLUSION

Bankruptcy Code section 1129 is satisfied by the Plan, and the Trustee has satisfied all other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, orders of this Court, and other applicable rules and regulations.  The Trustee has worked diligently and in good faith to maximize the value of the assets of the Debtor's estate and to develop a Plan that will maximize the distributions to the Debtor's creditors, particularly the victims of the Derailment.  The Trustee is confident that the Plan provides for the best possible distribution to creditors and, moreover, that no other alternatives exist which would provide a greater distribution to creditors.  Accordingly, the Trustee respectfully requests that this Court confirm the Plan and enter such other and further relief as this Court deems necessary and appropriate.

Dated:  September 17, 2015        **ROBERT J. KEACH,**
**CHAPTER 11 TRUSTEE OF MONTREAL**
**MAINE & ATLANTIC RAILWAY, LTD.**

By his attorneys:

*/s/ Lindsay K. Zahradka*
Sam Anderson, Esq.
Lindsay K. Zahradka, Esq. (admitted *pro hac vice*)
**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**
100 Middle Street
P.O. Box 9729
Portland, ME 04104
Telephone: (207) 774-1200
Facsimile:  (207) 774-1127

# EXHIBIT A

*Excerpts from NECP Confirmation Hearing Transcript*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - WESTERN DIVISION
```
============================
```
IN THE MATTER OF:            . Case #12-19882-hjb
                             .
NEW ENGLAND COMPOUNDING      .
PHARMACY, INC.,              .
                             . Springfield, Massachusetts
                             . **May 19, 2015**
               Debtor.       . 10:15 a.m.
```
============================
```

TRANSCRIPT OF HEARING ON:
#1219 JOINT MOTION TO APPROVE PLAN SUPPORT AND SETTLEMENT
AGREEMENT WITH LIBERTY INDUSTRIES, INC.
#1289 JOINT MOTION FOR APPROVAL OF STIPULATIONS AND ORDER
RELATING TO PRESERVATION OF CERTAIN PARTIES' RIGHT TO SEEK
COMPARATIVE FAULT ALLOCATIONS UNDER THE FIRST AMENDED JOINT
PLAN OF REORGANIZATION
#1311 JOINT MOTION FOR ORDER APPROVING NON-MATERIAL
MODIFICATIONS TO THE FIRST AMENDED JOINT PLAN OF
REORGANIZATION
#1308 CONFIRMATION OF THE SECOND AMENDED JOINT PLAN OF
REORGANIZATION

BEFORE THE HONORABLE HENRY J. BOROFF

APPEARANCES:

For the Chapter 11       MICHAEL R. LASTOWSKI, ESQ.
Trustee, Paul D. Moore:  PAUL D. MOORE, ESQ.
                         Duane Morris LLP
                         1100 Market Street
                         Philadelphia, PA 19101

United States:           JENNIFER L HERTZ, ESQ.
Department of Justice:   Office of the United States Trustee
                         5 Post Office Square
                         10th Floor, Suite 1000
                         Boston, MA 02109

For the Official         DAVID J. MOLTON, ESQ.
Committee of             KIERSTEN A. TAYLOR, ESQ.
Unsecured Creditors:     Brown Rudnick LLP
                         Seven Times Square
                         New York, NY 10036

     1   settlements, which are subject to approval under Rule 9019.

     2   And as Your Honor no doubt has observed, we have filed

     3   declarations in support of each of those settlements,

     4   including Mr. Moore's declaration, but also declarations filed

     5   on behalf of the settling parties.  We would rest on those

     6   declarations, and again, on our confirmation hearing brief, in

     7   support of our 9019 presentation, unless Your Honor has a

     8   different preference.

     9          THE COURT:  No, you may rely on those declarations.

    10          MR. LASTOWSKI:  There was only one objection filed

    11   in opposition to confirmation, and that was filed by the

    12   Office of the United States Trustee.  And what I would -- and

    13   they objected to the plan's release provisions on a couple of

    14   specific grounds.

    15          I will not speak on behalf of Ms. Hertz.  When she

    16   has the podium, I'm sure she'll present her objection well.

    17   What I'd like to do, though, is just generally state why we

    18   think the releases are important and why we satisfy the

    19   relevant criteria.  And then I would turn the podium to Ms.

    20   Hertz, to state her objection.  And I think Mr. Molton would

    21   reply to her objection, if that's okay, Your Honor?

    22          THE COURT:  Yes.

    23          MR. LASTOWSKI:  We've cited in our brief, authority

    24   for the proposition that Your Honor can approve third-party

    25   releases.  As we note, the majority of circuit courts that

1    have addressed this issue, have found that under certain

2    circumstances, these releases may be approved.  In each

3    instance, the releases are subject to a very fact-intensive

4    test, and each case is very fact-specific.  But I think what

5    they all have in common is that each court characterizes the

6    facts before it, that is when they approve these releases, as

7    being extraordinary.

8         Your Honor, the plan proponents would urge you to

9    find that, in fact, this case, or more specifically the plan

10   and the facts surrounding it, are also extraordinary.  When

11   this case began, the estate was administratively insolvent and

12   the likelihood of recovery appeared dim, no doubt, to the

13   creditors of the estate.

14        After many months of negotiations and drafting and

15   mediations, we are now presenting to you a plan which has the

16   potential to provide distributions to creditors approaching

17   $200 million.  Again, we think this is extraordinary.  And I

18   would highlight the fact that if you were to look at the

19   liquidation analysis prepared by Mr. Darr, which is set forth

20   in his declaration, if on the other hand this case were not

21   confirmed, and the case were converted, it would go back into

22   a situation where it would be administratively insolvent, and

23   the likelihood of any creditor recoveries would be very dim,

24   indeed.

25        We've been able to assemble the funds for

1    distributions to creditors, of course, the settlement

2    agreement.  And as we've set forth -- as you will see in the

3    declarations, the settling parties were willing to make these

4    contributions, really only on the condition that at the end of

5    the day, there would be a confirmed plan providing them these

6    third-party releases.

7          Cases identify certain criteria that should be

8    reviewed before you approve third-party releases, and we would

9    submit that this case satisfies all of them.  And most

10   importantly, I would say, is that there is overwhelming

11   support for the plan.  We had this very, very broad

12   solicitation.  And in fact, no creditor of the estate has

13   filed an objection.  We have an objection from the U.S.

14   Trustee, but there's been no creditor objection whatsoever.

15         The releases are essential to the plan, as I've

16   explained.  The benefit of those releases, the settlements

17   would go into effect, and we would have distributions

18   approaching $200 million.

19         The settling parties would not have entered into

20   those agreements absent the condition that at the end of the

21   day there would be releases.  And also, there is an identity

22   of interest, as is required by the cases, that -- between the

23   debtor and these settling parties.  Because absent the

24   releases, these parties would have claims of indemnity and/or

25   contribution.  So in effect, claims against them are claims

1   against the debtor.

2          The final criteria (sic) that courts have addressed,

3   is a requirement that the plan provide a mechanism for the

4   payment of all or substantially all of the claims of the class

5   or classes affected by the injunction.  And the way that's

6   been interpreted, Your Honor, is that the plan provide for a

7   means of payment.  And what we have here is the establishment

8   of a tort trust with claims against the estate being channeled

9   into that tort trust for satisfaction of those claims.

10         So in brief, in terms of the criteria that have been

11  identified by courts, we submit that we've satisfied them all,

12  and in fact, the third-party releases and the channel

13  injunctions should be approved.

14         That's my very brief presentation.  I will turn the

15  podium over to the United States Trustee.  And again, Mr.

16  Molton will address -- will respond to their objection, once

17  it's been made.

18         THE COURT:  Thank you.

19         MS. HERTZ:  Your Honor, the U.S. Trustee has nothing

20  further to add with respect to his objection and rests on his

21  papers.

22         THE COURT:  The United States Trustee, in his

23  objection, set forth a standard that he thought ought to be

24  applied and said that it was going to be the burden of the

25  plan proponents to demonstrate that this case presented the

 1    kinds of exceptional circumstances that many courts have used

 2    to justify these kinds of third-party releases.  Does the

 3    United States Trustee have a position as to whether the plan

 4    proponents have met that burden?

 5         MS. HERTZ:  Your Honor, ultimately it's your

 6    decision as to whether the burden has been met.  But the U.S.

 7    Trustee does believe the burden has been met in this case,

 8    yes.

 9         THE COURT:  Thank you.  All right.

10         MR. MOLTON:  Judge, David Molton.  I guess I was

11    teed up to respond.  I'm not going to respond other than

12    saying one thing, is that we believe that the substantial

13    evidentiary record here supports the exceptional circumstances

14    in this case.  And we're glad that the U.S. Trustee agrees

15    with us.  Thank you.

16         THE COURT:  I have a number of questions about

17    particular provisions.  And I don't know whether they're best

18    addressed to Mr. Lastowski, Mr. Molton, but why don't I start

19    with them.  And whoever wants to respond can.

20         In the plan, section 6.07 -- it's on page 39 of the

21    second amended plan.  It talks about the estimation procedure

22    that is set forth in Section 502(c) of the Bankruptcy Code.

23    The third sentence begins:  "In the event that the bankruptcy

24    court estimates any disputed claim in classes A, B, C, D, or

25    E, the amount so estimated shall constitute either the allowed

1              THE COURT:  All right, thank you.

2              MR. MOORE:  Thank you.

3              MR. MOLTON:  One last -- Your Honor, one last point

4    before we go.  I was reminded by a number of parties of

5    something that I -- a number of -- all the interested parties

6    wanted me to do is thank some of the parties that couldn't

7    have been here today that helped bring us to here, and

8    specifically the team of mediators that was utilized to

9    accomplish the settlements.  And that's Professor Eric Green,

10   Carmin Reiss, Stanley Klein (ph.), and David Geronemus.

11             It's fair to say, Judge, that without them, we

12   wouldn't have had the success that we had in bringing this

13   plan to you today.  So I did want to give them a shout-out,

14   and had forgotten to do so earlier, and was glad to be

15   reminded of that.

16             THE COURT:  Thank you.  Well, from my perspective,

17   there are too many professionals here for me to thank, for the

18   risk of leaving somebody out.  But I wanted to comment that I

19   think that this plan and its associated trust agreements are

20   the best that could have been achieved for the hundreds of

21   people for whom there could be no full compensation.  And that

22   this is, in my view, the highest and best use of the

23   Bankruptcy Code, and evidence of the professionalism of the

24   bar in this district and in the affected districts.

25             Is there anything else to do today?

1              MR. MOLTON:  Nothing, Your Honor.

2              THE COURT:  All right.  So I'll look forward to

3     getting the third amended plan and the amended proposed order

4     and I will execute them if they are changed as we have

5     discussed today.  Thank you.

6              IN UNISON:  Thank you, Your Honor.

7     (End at 11:21 a.m.)

8                        * * * * * * * * * *

9

10

11

12              I certify that the foregoing is a true and accurate

13     transcript from the digitally sound recorded record of the

14     proceedings.

15     *Penina Wolicki*

16

17

18
       /s/ Penina Wolicki                          May 20, 2015
19
       _____
20
       AAERT Certified Electronic Transcriber        Date
21     (CET**D-569)
       eScribers, LLC
22     700 West 192nd Street, Suite #607
       New York, NY 10040
23     (973)406-2250
       operations@escribers.net
24

25

       #12-19882                                       05-19-2015