## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MAINE

|  |  |
|---|---|
| In re: | |
| | Bk. No. 13-10670 |
| MONTREAL MAINE & ATLANTIC RAILWAY, LTD. | Chapter 11 |
| Debtor. | |

### ORDER CONFIRMING TRUSTEE'S REVISED FIRST AMENDED PLAN OF LIQUIDATION DATED JULY 15, 2015 AND AUTHORIZING AND DIRECTING CERTAIN ACTIONS IN CONNECTION THEREWITH

**WHEREAS**, on March 31, 2015, Robert J. Keach, the chapter 11 trustee (the "Trustee") of Montreal Maine & Atlantic Railway, Ltd. (the "Debtor"), filed with the United States Bankruptcy Court for the District of Maine (the "Court") the *Trustee's Plan of Liquidation Dated March 31, 2015* [D.E. 1384] and the *Disclosure Statement for the Trustee's Plan of Liquidation Dated March 31, 2015* [D.E. No. 1385];

**WHEREAS**, on June 5, 2015, the Trustee filed with the Court the *Notice of Filing Plan Supplement* [D.E. 1450];

**WHEREAS**, on July 7, 2015, the Trustee filed with the Court the *Trustee's First Amended Plan of Liquidation Dated July 7, 2015* [D.E. 1495] and the *First Amended Disclosure Statement with Respect to Trustee's Plan of Liquidation Dated July 7, 2015* [D.E. No. 1497];

**WHEREAS**, on July 8, 2015, the Trustee filed with the Court the *Notice of Filing Revised Exhibits to Plan Supplement* [D.E. 1502];

**WHEREAS**, on July 15, 2015, the Trustee filed the *Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1534] (as may be amended in accordance with the

Disclosure Statement Order, the "Plan"[1]) and the *Revised First Amended Disclosure Statement with Respect to Trustee's Plan of Liquidation Dated July 15, 2015* [D.E. No. 1535] (as may be amended in accordance with the Disclosure Statement Order, the "Disclosure Statement");

WHEREAS, on July 17, 2015, this Court entered the *Order (I) Approving Proposed Disclosure Statement; (II) Establishing Notice, Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan* [D.E. 1544] (the "Disclosure Statement Order");

WHEREAS, on July 22, 2015, the Trustee filed the (a) *Notice of Order (I) Approving Proposed Disclosure Statement; (II) Establishing Notice, Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan* [D.E. 1548] and (b) *Notice to Holders of Derailment Claims of Order (I) Approving Proposed Disclosure Statement; (II) Establishing Notice, Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan* [D.E. 1549];

WHEREAS, also on July 22, 2015, the Trustee caused the Confirmation Hearing Notice to be published in the Bangor Daily News; Portland Press Herald; Wall Street Journal; and in the following Canadian newspapers: La Presse (in French); La Tribune (in French); The Gazette (in English); and The Sherbrooke Record (in English), as directed by the Disclosure Statement Order and as set forth in the *Certificate of Publication related to the Confirmation Hearing Notice* [D.E. 1622] (the "Certificate of Publication");

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or the Trustee's *Motion for an Order (I) Approving Proposed Disclosure Statement; (II) Establishing Notice, Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan* [D.E. 1432] (the "Disclosure Statement Motion"), as applicable.

**WHEREAS**, on July 24, 2015, the Trustee caused the Confirmation Hearing Notice to be published in L'Echo de Frontenac (in French), as directed by the Disclosure Statement Order and as set forth in the Certificate of Publication;

**WHEREAS**, Solicitation Packages conforming to the requirements of the Disclosure Statement Order were transmitted to creditors and parties-in-interest in accordance with the Disclosure Statement Order, as set forth in the *Affidavit of Service of Solicitation Materials and Chapter 15 Documents* [D.E. 1562] (the "Certificate of Service");

**WHEREAS**, on August 26, 2015, the Court entered the Chapter 15 Recognition and Enforcement Order [No. 15-20518, D.E. 74];

**WHEREAS**, the following objections to confirmation of the Plan were timely filed (collectively, the "Objections"): (a) *Objection of New Brunswick Southern Railway Company Limited and Maine Northern Railway Company to Confirmation of the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1656] (the "MN/NB Objection"); (b) *Canadian Pacific Railway Company's objection to trustee's July 15, 2015 plan of liquidation* [D.E. 1657] (the "CP Objection"); and (c) *Wheeling & Lake Erie Railway Company's Objection to Confirmation of the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1659] (the "Wheeling Objection");

**WHEREAS**, on September 17, 2015, Prime Clerk, LLC ("Prime Clerk"), the Trustee's noticing and solicitation agent, filed the *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1689] (the "Voting Certification") certifying the results of the ballot tabulation for the votes to accept or reject the Plan;

**WHEREAS**, on September 17, 2015, the Trustee filed the *Trustee's Memorandum of Law in Support of, and Omnibus Reply to Objections to, Confirmation of the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1684] (the "<u>Confirmation Brief</u>");

**WHEREAS**, on September 17, 2015, the Trustee filed the following declarations in support of confirmation of the Plan (collectively with the Settling Defendant Declarations in Support and the XL Declaration in Support, each as defined below, the "<u>Declarations in Support</u>"):

(a)      *Declaration of Robert J. Keach, Chapter 11 Trustee, in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1686];

(b)      *Declaration of Andrew Adessky, Monitor in the CCAA Case, in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1687]; and

(c)      *Declaration of Fred C. Caruso in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1688];

**WHEREAS**, on September 22 and 23, 2015, the Trustee filed the following declarations in support of confirmation of the Plan (collectively, the "<u>Settling Defendant Declarations in Support</u>"):

(a)      *Declaration of Stacey McLey in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1697];

(b)      *Declaration of Nancy A. Washington on behalf of the CIT Parties in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1698];

(c)      *Declaration of ConocoPhillips Company in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1699];

(d)      *Declaration of Edward A. Burkhardt (D&O Parties), Chairman of the Board of Directors of Montreal, Maine & Atlantic Railway, LTD., in*

4

*Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1700];

(e)    *Declaration of Devlar Energy Marketing, LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1701];

(f)    *Declaration of Enserco Energy, LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1702];

(g)    *Declaration of Richard Seymour of First Union Rail Corporation Regarding Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1703];

(h)    *Declaration of Enerplus Resources (USA) Corporation in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation* [D.E. 1704];

(i)    *Declaration of Oliver W.R. Champagne on behalf of General Electric Railcar Services LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1705];

(j)    *Declaration of Golden Eye Resources LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1706];

(k)    *Declaration of Halcon Resources Corporation in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1707];

(l)    *Declaration of Inland Oil & Gas Corporation in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1708];

(m)    *Declaration of Kodiak Oil & Gas Corp. (N/K/A Whiting Canadian Holding Company, ULC) in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1709];

(n)    *Declaration of Oasis Petroleum, LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1710];

(o)    *Declaration of Oasis Petroleum, Inc. in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1711];

(p)     *Declaration of Tracker Resources Development III, LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1712];

(q)     *Declaration of Whiting Petroleum Corporation in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1713];

(r)     *Declaration of the UTCC Parties in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1714];

(s)     *Declaration of QEP Resources, Inc. in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1715];

(t)     *Declaration of Edward A. Burkhardt on behalf of the Rail World Parties in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1716];

(u)     *Declaration of Shell Oil Company in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1717];

(v)     *Declaration of Slawson Exploration Company, Inc. in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1718];

(w)     *Declaration of SMBC Rail Services, LLC f/k/a Flagship Rail Services, LLC, and TLP Rail Trust I, a Delaware Statutory Trust in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1719];

(x)     *Declaration of Shell Trading (US) Company in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1720];

(y)     *Declaration of Trinity Industries, Inc. in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1721];

(z)     *Declaration of Trinity Industries Leasing Company in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1722];

(aa)    *Declaration of Trinity Rail Leasing 2012 LLC in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1723];

> (bb)  *Declaration of Trinity Tank Car, Inc. in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1724];
>
> (cc)  *Declaration of R. Alexander Lake, General Counsel of World Fuel Services Corporation, in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1725];
>
> (dd)  *Declaration of Incorr Energy Group, LLC in Support of Confirmation of the Trustee's Plan of Liquidation Dated July 15, 2015* [D.E. 1727]; and
>
> (ee)  *Declaration of Charlene Ridgeway on behalf of the Hartford Casualty Insurance Company in Support of Confirmation of Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015* [D.E. 1728].

**WHEREAS**, on September 22, 2015, the Trustee filed the *Declaration of D. Jackson Loughhead (XL Companies) in Support of Confirmation of the Trustee's Plan of Liquidation* [D.E. 1726] (the "XL Declaration in Support");

**WHEREAS**, this Court conducted a hearing on September 24, 2015 (the "Confirmation Hearing") to consider confirmation of the Plan; at the Confirmation Hearing, the parties introduced all testimony to be offered in support of, or in opposition to, confirmation of the Plan by declaration or proffer, the testimonial record was closed, subject to the rights of the parties to assert reserved evidentiary objections, and the Confirmation Hearing was continued to October 5, 2015 (and then subsequently continued to October 9, 2015 at 8:30 a.m. (ET));

**WHEREAS**, contingent upon entry of this Confirmation Order containing the judgment reduction provisions set forth herein at paragraphs 63 through 70 (and an amendment of the CCAA Approval Order to include substantially identical provisions), CP has agreed to (a) withdraw with prejudice the CP Objection; (b) withdraw with prejudice its motion seeking leave to appeal the CCAA Approval Order; and (c) dismiss with prejudice its appeal of the Chapter 15 Recognition and Enforcement Order;

**WHEREAS**, the Trustee has resolved all other Objections by provisions in this Confirmation Order set forth below;

**WHEREAS**, all parties in interest, including, without limitation, CP, have consented to entry of this Confirmation Order as a Final Order, and the Court therefore has constitutional authority under <u>Wellness Intern. Network, Ltd. v. Sharif</u>, 135 S. Ct. 1932 (2015) to enter this Confirmation Order as a Final Order[2]; notwithstanding such consent, in order to insure that this Confirmation Order will not be subject to any challenges as to any element hereof, under <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011) or its progeny, the Court will file this Confirmation Order with the United States District Court for the District of Maine (the "<u>District Court</u>") pursuant to Bankruptcy Rule 9033 as proposed findings of fact and recommended conclusions of law to the extent that any provision or element hereof was entered without constitutional authority and/or is merely within the Court's related-to jurisdiction;

**NOW, THEREFORE**, based upon the Court's review and consideration of (i) the documents filed in this case, (ii) the record of the Confirmation Hearing (including the statements of counsel in support of confirmation at the Confirmation Hearing and all testimony presented and evidence admitted at the Confirmation Hearing), (iii) the declarations filed in support of confirmation of the Plan, including the Voting Certification, the Certificate of Publication and the Declarations in Support, (iv) the Confirmation Brief, and (v) the entire record of this chapter 11 case (the "<u>Chapter 11 Case</u>") and the Chapter 15 Case; and this Court finding that (a) notice of the Voting Deadline, the Confirmation Objection Deadline, and the

---

[2] CP's consent to the entry by this Court of this Confirmation Order as a Final Order shall be without prejudice to CP's positions and rights with respect to this Court's constitutional authority to enter any other final order not inconsistent with this Confirmation Order, including without limitation in the adversary proceeding stylized as *Robert J. Keach v. World Fuel Services, Corp., et al*, No 14-1001 (Bankr. D. Me.). All of CP's and the Trustee's rights with respect to such other orders are fully reserved, except that the entry of the Confirmation Order as a Final Order shall not be the basis for an argument by the Trustee that the Bankruptcy Court has the constitutional authority to enter another type of Order as a Final Order.

Confirmation Hearing and the opportunity of any party in interest to object to confirmation of the Plan were adequate and appropriate, in accordance with Bankruptcy Rule 2002(b) and the Disclosure Statement Order, as to all parties to be affected by the Plan and the transactions contemplated thereby, and (b) the legal and factual bases presented at the Confirmation Hearing and as set forth in this Confirmation Order establish just cause for the relief granted herein; and after due deliberation thereon, and good cause appearing therefor, the Court hereby makes the following findings of fact, conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]

1.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of the Plan is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(L) and (O), and this Court has jurisdiction, as well as constitutional authority, to finally determine whether the Plan complies with the applicable provisions of the Bankruptcy Code, to determine whether the Plan should be confirmed and to enter and enforce a final order with respect hereto.  Venue of this Chapter 11 Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    <u>Chapter 11 and Chapter 15 Docket</u>.  Judicial notice is hereby taken of the docket of the Chapter 11 Case and Chapter 15 Case maintained by the Clerk of this Court, including, without limitation, all pleadings and other documents filed, all orders entered, and transcripts of, and all evidence and arguments made, proffered, or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Case and the Chapter 15 Case.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

### A.    Compliance with the Bankruptcy Rules and Local Rules

3.      The Plan complies with the applicable Bankruptcy Rules and Local Rules of the

United States Bankruptcy Court for the District of Maine (the "Local Rules"), including, without

limitation, Bankruptcy Rules 3016, 3017 and 3018.  In particular:

(a)      The Plan is dated and identifies the entity submitting it, thereby satisfying Bankruptcy Rule 3016(a) and Local Rule 3018-1.

(b)      The filing of the Disclosure Statement with the Court satisfies Bankruptcy Rule 3016(b).

(c)      All acts to be enjoined and identification of entities subject to such injunction under the Plan are set forth in specific and conspicuous bold text in the Plan and Disclosure Statement, thereby satisfying Bankruptcy Rule 3016(c).

(d)      The Trustee has given notice of the Confirmation Hearing and the Confirmation Objection Deadline as required by Bankruptcy Rule 3017(d) and Local Rule 3017-3.  Such notice, including by publication in several newspapers, including a newspaper of national circulation in both the United States and in Canada, in both French and English, was good and sufficient under the particular circumstances, and no other or further notice is or shall be required.  In addition, the opportunity of any party in interest to object to confirmation of the Plan was adequate, fair and reasonable, in accordance with Bankruptcy Rule 2002(b) and the Disclosure Statement Order, as to all parties to be affected by the Plan and the transactions contemplated thereby.

(e)      The Trustee has also provided further notice of the releases and injunctions in the Plan as required by Bankruptcy Rule 3017(f).  In addition to posting links providing all parties in interest with access to, among other documents, copies of the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Hearing Notice on the website maintained by Prime Clerk, Prime Clerk mailed the Voting Solicitation Packages to approximately 7,200 voting parties.  It also mailed Non-Voting Solicitation Packages and Notice Solicitation Packages (each including the Confirmation Hearing Notice), as applicable and in accordance with the Disclosure Statement Order, to approximately 1,300 additional non-voting parties who might be subject to the Releases and Injunctions.  Further, the Confirmation Hearing Notice was published in several U.S. and Canadian newspapers, in both French and English.  Such notice was good and sufficient under the circumstances, and no other and further notice is or shall be required.

(f)     Notice of the Voting Deadline was adequate, fair and reasonable, and the solicitation of votes to accept or reject the Plan satisfies Bankruptcy Rule 3018.  The Plan was transmitted to all creditors entitled to vote on the Plan, and sufficient time was prescribed for such creditors to vote to accept or reject the Plan, thereby satisfying the requirements of Bankruptcy Rule 3018.

B.     **Bankruptcy Code Sections 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

4.     The Trustee has met his burden of demonstrating that the Plan complies with the applicable provisions of the Bankruptcy Code by clear and convincing evidence, thus satisfying the requirements of section 1129(a)(1) thereof.

*i.     Sections 1122 and 1123(a)(1)—Proper Classification*

5.     The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to Bankruptcy Code sections 1122(a) and 1123(a)(1), Article 3 of the Plan provides for the separate classification of Claims and Interests into fifteen (15) Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims and statutory fees owed to the U.S. Trustee, which are addressed in Article 2 and 12.4 of the Plan and which are not required to be designated as separate Classes pursuant to Bankruptcy Code section 1123(a)(1)).  Valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan and the classifications were not done for any improper purpose. In addition, the creation of such Classes does not unfairly discriminate between or among holders of Claims or Interests.

6.     As required by Bankruptcy Code section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of Bankruptcy Code sections 1122(a) and 1123(a)(1) have been satisfied.

11

### ii.    Section 1123(a)(2)—Specification of Unimpaired Classes.

7.    Article 3 of the Plan specifies that Claims in Classes 1 through 7 are Unimpaired under the Plan.  Accordingly, the requirements of Bankruptcy Code section 1123(a)(2) have been satisfied.

### iii.    Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

8.    Article 3 of the Plan specifies the treatment of each impaired Class under the Plan, including Classes 8 through 15.  Accordingly, the requirements of Bankruptcy Code section 1123(a)(3) have been satisfied.

### iv.    Section 1123(a)(4)—No Discrimination.

9.    Pursuant to Bankruptcy Code section 1123(a)(4), Article 3 of the Plan uniformly provides for the same treatment of each Claim or Interest in a particular Class, unless the holder of a particular Claim has agreed to a less favorable treatment with respect to such Claim or Interest.  Accordingly, the requirements of Bankruptcy Code section 1123(a)(4) have been satisfied.

### v.    Section 1123(a)(5)—Adequate Means for Plan Implementation.

10.    Pursuant to Bankruptcy Code section 1123(a)(5), Article 5 and various other provisions of the Plan specifically provide in detail adequate and proper means for the Plan's implementation, including, but not limited to: (a) approval of the Settlement Agreements; (b) other sources of consideration for Plan distributions; (c) exhaustion of policies of Insurance Companies that are Contributing Parties; (d) execution of the WD Trust Agreement and funding and administration of the WD Trust; (e) management of the Post-Effective Date Estate; (f) duties and powers of the Estate Representative; (g) cancellation of existing agreements and continued corporate existence; and (h) authorization for certain effectuating transactions.  Accordingly, the requirements of Bankruptcy Code section 1123(a)(5) have been satisfied.

### vi.      Section 1123(a)(6)—Voting Power of Equity Securities.

11.     As provided in Article 6.6 of the Plan, the Post-Effective Date Estate's certificate of incorporation and bylaws shall be deemed amended to include a provision prohibiting the issuance of non-voting equity securities, thereby satisfying the requirements of Bankruptcy Code section 1123(a)(6).

### vii.     Section 1123(a)(7)—Selection of Officers and Directors.

12.     Article 6.1(a) of the Plan, regarding the selection of the Estate Representative, is consistent with the interests of creditors and equity security holders and with public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).

### viii.    Section 1123(b)—Discretionary Contents of the Plan.

13.     The Plan contains various provisions that may be construed as discretionary, but are not required for confirmation under the Bankruptcy Code.  As set forth below, such discretionary provisions comply with Bankruptcy Code section 1123(b) and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, Bankruptcy Code section 1123(b) is satisfied.

### (i)      Section 1123(b)(1)-(2)—Claims and Executory Contracts

14.     Pursuant to Bankruptcy Code sections 1123(b)(1) and 1123(b)(2), Article 3 of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, and Article 8 of the Plan provides for the rejection of the executory contracts and unexpired leases of the Debtor not previously assumed or rejected and not pending assumption pursuant to Bankruptcy Code section 365.

**(ii)**    **Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action**

15.    The Plan implements the Settlement Agreements as approved by this Confirmation Order.  The Settlement Agreements are the product of extensive good-faith, arm's-length negotiations among the Trustee, MMA Canada and the Contributing Parties, each of which was represented by counsel.  The Trustee has entered into the Settlement Agreements in exchange for fair and reasonable consideration.  The Settlement Agreements are (a) within the reasonable range of possible litigation outcomes; (b) fair, equitable and reasonable; and (c) an essential element of the resolution of the Chapter 11 Case and in the best interest of the Debtor's Estate.  The Settlement Agreements (i) are within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a) and (b); (ii) are an essential means of implementing the Plan pursuant to Bankruptcy Code section 1123(a)(5) and (b)(3); (iii) are an integral element of the transactions embodied in the Plan; (iv) confer material benefits on, and are in the best interests of, the Debtor, the Debtor's Estate and the Debtor's creditors; and (v) are vital to the overall objectives of the Plan to fully and finally resolve all Derailment-Related Causes of Action and claims among or against the parties in interest in the Chapter 11 Case.

16.    The release of Claims described in Article 10 of the Plan constitutes a good-faith compromise and settlement of the matters covered thereby.  Such compromises and settlements are made in exchange for the consideration identified in the Settlement Agreements; are in the best interests of the holders of Claims; are fair, equitable, and reasonable; and are integral elements of the Plan.  Each of the release, indemnification and exculpation provisions set forth in the Plan (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a) and (b); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) is an integral element of the Settlement Agreements identified in the Plan; (d) confers

material benefits on, and is in the best interest of, the Debtor, the Estate and its creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Case; and (f) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

17.     The third party releases and injunctions set forth in Article 10 of the Plan are appropriate because: (a) the Debtor and the third-party beneficiaries of the Releases and Injunctions share a unity of interest; (b) the third parties have contributed substantial assets which are to be distributed to holders of Claims under the Plan; (c) the third party releases and injunctions are essential to the Settlement Agreements and the Plan; (d) the creditors who are affected by the third party releases have voted overwhelmingly in favor of the Plan; (e) the Plan provides a mechanism to resolve and make payment towards Claims of the affected creditors through the CCAA Plan and the WD Trust, and the Trustee has provided notice to affected creditors sufficient to provide them with the opportunity adequately to protect their interests; and (f) the facts and circumstances of this Chapter 11 Case sufficiently establish extraordinary circumstances to warrant approval of the third party releases and injunctions.

18.     The releases by the Debtor, as set forth in Article 10.5(b)(i) of the Plan, are being provided as part of the Settlement Agreements, which themselves represent a global compromise that is supported by all major constituencies.  In addition, the injunctions set forth in Article 10 of the Plan are necessary and appropriate to carry out the provisions of the Bankruptcy Code for purposes of section 105(a) of the Bankruptcy Code.

19.     The exculpation provision set forth in Article 10.3 of the Plan shall be revised as follows (changes from the existing Plan language marked in bold italics):

> As of the Effective Date, none of (a) the Trustee, (b) *the Creditors' Committee,* (*c*) the Monitor, (*d*) MMA Canada, or (*e*) the members,

representatives, accountants, financial advisors, consultants and attorneys of the entities described in (a) through (*d*) of this paragraph shall have or incur any liability to any person for any act taken or omission in connection with or related to the Chapter 11 Case, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating this Plan (including soliciting acceptances or rejections thereof), (ii) the Disclosure Statement or any contract, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan or the Disclosure Statement, or (iii) any distributions made pursuant to this Plan, except for any acts determined by Final Order to have constituted willful misconduct, bad faith or gross negligence*; provided that in the event that the Creditors' Committee (including each member of the Creditor's Committee solely in such member's capacity, and the Creditor's Committee's counsel and counsel's authorized agents and representatives) violates or breaches the* <u>*Stipulation and Order Resolving Trustee's Motion for an Order Disbanding the Official Committee of Victims*</u> *[D.E. 1671], this provision shall be void* <u>*ab initio*</u> *with respect to the Creditors' Committee (including each member of the Creditor's Committee in such member's individual capacity, such members' representatives and agents, and the Creditor's Committee's counsel and counsel's authorized agents and representatives)*.

As modified, the exculpation provision is appropriate under applicable law because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and is appropriately limited in scope. The exculpation provision, including its carve-out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others.

### (iii)   Section 1123(b)(4)—Sale of XL Policy Interests to Good Faith Purchasers

20.    The XL Settlement Agreement was negotiated and proposed, and has been entered into by the parties to the XL Settlement Agreement, in good faith, from arms-length bargaining positions, and without fraud or collusion. Each party to the XL Settlement Agreement was represented by counsel. The sale consideration to be realized by the Debtor's bankruptcy estate pursuant to the XL Settlement Agreement is fair and reasonable. The XL Companies are good faith purchasers of MMA's and MMA Canada's interests in the XL Policies (the "<u>XL Policy Interests</u>") for value within the meaning of section 363(m) of the Bankruptcy

Code and are entitled to the protection thereof.  Neither the Trustee, nor the XL Companies, nor any of their representatives, have engaged in any conduct that would (i) cause or permit the XL Settlement Agreement or the sale of the XL Policy Interests to be avoided under Section 363(n) of the Bankruptcy Code; (ii) cause or permit any amounts, costs, attorneys' fees, expenses or punitive damages to be recovered under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code.

### ix.     *Section 1172—Contents of Railroad Reorganization Plan*

21.     The Trustee has sold the assets of the Debtor as a going concern, thus facilitating the continuation of rail service by a third party.  To the extent applicable, Bankruptcy Code section 1172(a) is thus satisfied, and no other provisions of section 1172 are applicable.

### C.     **Compliance with the Balance of Bankruptcy Code Section 1129(a)**

22.     Section 1129(a)(2).  The Trustee has complied with the applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code section 1125, thus satisfying the requirements of Bankruptcy Code section 1129(a)(2).  The Trustee and his present and former representatives, advisors, attorneys and agents have fairly, in good faith within the meaning of Bankruptcy Code section 1125(e), and in a manner consistent with the applicable provisions of the Disclosure Statement, the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules, laws and regulations, (a) solicited and tabulated votes on the Plan and (b) participated in the activities described in Bankruptcy Code section 1125, and are therefore entitled to the protections afforded by Bankruptcy Code section 1125(e) and the Releases, exculpation, and Third-Party Injunction provisions set forth in Article 10 of the Plan.

23.    <u>Section 1129(a)(3)</u>.  The Plan, and the compromises and settlements embodied

therein, have been proposed in good faith and not by any means forbidden by law, thus satisfying

the requirements of Bankruptcy Code section 1129(a)(3).

24.    <u>Section 1129(a)(4)</u>.  Subject to the provisions of Section 5.9 and 6.1 of the Plan,

all payments that have been made or are to be made under the Plan or by any person acquiring

property under the Plan, for services or for costs and expenses in, or in connection with the

Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been

approved by, or will be subject to the approval of, the Bankruptcy Court as reasonable, thus

satisfying the requirements of Bankruptcy Code section 1129(a)(4).

25.    <u>Section 1129(a)(5)</u>.  The Trustee has made available all necessary information

with respect to the identity of any individual proposed to serve, after confirmation of the Plan, as

a director, officer, or voting trustee or the successor to the Debtor under the Plan (including,

without limitation, the Estate Representative), and the appointment to such office of each

individual is consistent with the interests of creditors and equity security holders and with public

policy, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(5).

26.    <u>Section 1129(a)(6)</u>.  The Debtor's business does not involve the establishment of

rates over which any regulatory commission has jurisdiction or will have jurisdiction after

confirmation.  Thus, Bankruptcy Code section 1129(a)(6) is inapplicable to the Chapter 11 Case.

27.    <u>Section 1129(a)(7)</u>.  As demonstrated in the Liquidation Analysis, each holder of

a Claim or Interest in an impaired Class has accepted the Plan, or will receive or retain under the

Plan property having a value, as of the Effective Date, that is not less than the amount that such

holder would receive on account of such Claim or Interest if the Debtor were liquidated under

chapter 7 of the Bankruptcy Code.  The Plan therefore complies with the requirements of

Bankruptcy Code section 1129(a)(7) and the "best interests" test set forth therein, as reflected more fully in the evidence introduced on the record at the Confirmation Hearing.

28.    <u>Section 1129(a)(8)</u>.    Classes 1 through 7 are Unimpaired and thus are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f). Notwithstanding anything in the Plan to the contrary, to the extent that the State of Maine has an Allowed Claim for unpaid pre-petition railroad taxes, such Claim shall constitute a Class 7 Claim.

29.    Classes 8 through 13 are each Classes of impaired Claims and have each voted to accept the Plan, with unanimous voting results in each such Class save Class 13, where one creditor (out of sixty-one (61) voting creditors) voted to reject the Plan in the claim amount of $1.00.    The Voting Certification properly and correctly sets forth the tabulation of votes in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

30.    Classes 14 and 15 are each impaired and not receiving any property under the Plan and, as such, are presumptively deemed to have rejected the Plan (together, the "<u>Rejecting Classes</u>").    Accordingly, with respect to Classes 14 and 15, the Debtor sought confirmation of the Plan under Bankruptcy Code section 1129(b) rather than Bankruptcy Code section 1129(a)(8). Thus, although Bankruptcy Code section 1129(a)(8) has not been satisfied with respect to the Rejecting Classes, based upon the record before the Bankruptcy Court, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Class and thus satisfies Bankruptcy Code section 1129(b) with respect to such Classes.

31.    <u>Section 1129(a)(9)</u>.    The treatment of Administrative Expense Claims satisfies the requirements of Bankruptcy Code section 1129(a)(9)(A). The treatment of Priority Tax Claims

under Article 2 of the Plan satisfies the requirements of Bankruptcy Code 1129(a)(9)(C).  There are no Claims of the kind specified in Bankruptcy Code sections 507(a)(2), (5), (6) or (7).

32.   Section 1129(a)(10).  Class 8 (Derailment Moral Damages and Personal Injury Claims), Class 9 (Derailment Property Damage Claims), Class 10 (Derailment Government Claims), Class 11 (Derailment Property Subrogated Insurance Claims), Class 12 (Derailment Wrongful Death Claims) and Class 13 (General Unsecured Claims) are each impaired and have each voted to accept the Plan, without consideration of any acceptance of the Plan by insiders, thus satisfying the requirements of Bankruptcy Code section 1129(a)(10).

33.   Section 1129(a)(11).  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, except as provided in the liquidation provisions of the Plan.  The Plan is a plan of liquidation, following a going concern sale of the Debtor's assets earlier in the Chapter 11 Case.  Accordingly, the Plan contemplates the liquidation of the Debtor's assets and the winding up of the Debtor's estate by, among other things, making distributions to the WD Trust and the Debtor's creditors.  Therefore, because the Plan proposes the liquidation of the Debtor's estate, it is consistent with Bankruptcy Code section 1129(a)(11).

34.   Section 1129(a)(12).  On the Effective Date, and thereafter as may be required, the Estate Representative shall pay all fees payable pursuant to 28 U.S.C. § 1930, including all quarterly fees pursuant to 28 U.S.C. § 1930 that become due after the Effective Date, thus satisfying the requirements of Bankruptcy Code section 1129(a)(12).

35.   Section 1129(a)(13).  Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continuation, after the effective date, of all retiree benefits at the level established by agreement or by court order pursuant to section 1114 of the

Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. Because the Debtor does not have any such "retiree benefits," section 1129(a)(13) of the Bankruptcy Code is not applicable.

### D. Compliance with Bankruptcy Code Section 1129(b)— Confirmation of Plan Over Nonacceptance of Impaired Class

36.     To the extent required, the Trustee has met his burden of proving all applicable elements of section 1129(b) of the Bankruptcy Code by clear and convincing evidence.

37.     Notwithstanding the fact that the Rejecting Classes are deemed to have voted not to accept the Plan, the Plan may be confirmed pursuant to Bankruptcy Code section 1129(b)(1) because (i) Classes 8 through 13 are all impaired and have voted to accept the Plan, and (ii) the Plan satisfies the requirements of Bankruptcy Code section 1129(b) with respect to Classes 14 and 15. Specifically, (a) each member of Classes 14 and 15 will equally receive no distribution under the Plan, (b) Class 14 is junior to each of Classes 1 through 13, and (c) Class 15 is junior to Class 14. Thus, the Plan necessarily does not unfairly discriminate with respect to Holders in Classes 14 and 15. In addition, Class 15 is the only Class junior to Class 14, and there is no Class junior to Class 15; as such, no Holder of any Claim or Interest junior to Class 14 or 15 will receive any recovery under the Plan. Further, no senior Class is receiving more than full recovery on account of its Claims (including Claims for interest and other contractual rights).

38.     As a result, the Plan satisfies the requirements of Bankruptcy Code section 1129(b). Thus, the Plan may be confirmed even though Bankruptcy Code section 1129(a)(8) is not satisfied. Upon the occurrence of the Effective Date, the Plan shall be binding upon the members of, and holders of Interests in, the Rejecting Classes.

E.        **Other Bankruptcy Code Confirmation Requirements**

   i.        *Section 1173—Confirmation of Railroad Reorganization Plan*

39.      Section 1173(a)(1) requires compliance with all applicable provisions of section

1129.  As section 1129 has been satisfied, so too has section 1173(a)(1).

40.      For all the same reasons that section 1129(a)(7) has been satisfied, section

1173(a)(2) has been satisfied as well.

41.      For all the same reasons that section 1129(a)(11) has been satisfied (or is

inapplicable in a liquidation), so too has section 1173(a)(3) been satisfied (or is otherwise

inapplicable).

42.      Section 1173(a)(4) requires that a plan be consistent with the public interest.  The

sale of the Debtor's assets early in the chapter 11 case as a going concern to a third party was

consistent with the public interest, as it facilitated the continued operation of the railroad.

43.      As the Plan is the only plan before the Court, section 1173(b) is inapplicable

   ii.        *Section 1129(c)—-Only One Plan*

44.      Notwithstanding the other chapter 11 plan proposed in the Chapter 11 Case on

January 29, 2014 [D.E. 600], for which the Court refused to approve a disclosure statement (and

which plan was therefore not prosecuted), the Plan is the only plan confirmed by the Court in the

Chapter 11 Case and, accordingly, section 1129(c) is inapplicable to the Plan.

   iii.        *Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes*

45.      No governmental unit has requested that the Bankruptcy Court refuse to confirm

the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the

avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the

principal purpose of the Plan is not such avoidance.   Accordingly, the requirements of

Bankruptcy Code section 1129(d) have been satisfied.

**F.**        **Conditions to Confirmation and the Effective Date**

46.        Pursuant to Article 9.1 of the Plan, the conditions precedent to Confirmation, including but not limited to the following, have been satisfied: (a) entry of the CCAA Approval Order and (b) entry of the Chapter 15 Recognition and Enforcement Order.

47.        Section 9.3 of the Plan shall be superseded and replaced with the following:[4]

> The Effective Date shall not occur until (a) all of the conditions set forth in Section 9.1 have occurred; (b) **the CCAA Approval Order shall have been amended in order to incorporate the judgment reduction provisions set forth in paragraphs 63 through 70 of the Confirmation Order; (c)** the CCAA Approval Order**, as amended, shall have** ~~has~~ become a Final Order; (~~e~~**d**) **the Chapter 15 Recognition and Enforcement Order shall be amended so that it applies to the CCAA Approval Order as amended; (e)** the Chapter 15 Recognition and Enforcement Order**, as so amended, shall have** ~~has~~ become a Final Order; (~~d~~**f**) **the District Court has entered the Confirmation Order, pursuant to the filing of the same with such Court under Bankruptcy Rule 9033, or otherwise; (**~~e~~**g**) the Confirmation Order has become a Final Order; **(h)** the conditions to implementation of the CCAA Plan have been met; and (~~f~~**i**) the Plan Implementation Date shall have occurred.

48.        Pursuant to Article 9.3 of the Plan, as amended by the preceding paragraph, the following are the conditions precedent to the Effective Date that have not been satisfied as of the date hereof: (a) the CCAA Approval Order shall have been amended in order to incorporate the judgment reduction provisions set forth in paragraphs 63 through 70 of this Confirmation Order; (b) the CCAA Approval Order, as amended, shall have become a Final Order; (c) this Court's Chapter 15 Recognition and Enforcement Order shall be amended so as to apply to the CCAA Approval Order as amended in accordance with this paragraph; (d) the Chapter 15 Recognition and Enforcement Order, as so amended, shall have become a Final Order; (e) the conditions to implementation of the CCAA Plan have been met; (f) the District Court has entered the Confirmation Order, pursuant to the filing of the same with such Court under Bankruptcy Rule

---

[4] Changes from the version in the Plan are indicated in **bold underline**.

23

9033, or otherwise; (g) this Confirmation Order has become a Final Order; and (h) the Plan

Implementation Date (as defined in the CCAA Approval Order) shall have occurred.  Each of the

conditions precedent to the Effective Date is reasonably likely to be satisfied.

### IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

**A.**      **General Provisions Regarding Confirmation of the Plan
and Approval of the Plan Supplement**

49.      Approval.  The Plan, a true and correct copy of which is attached hereto as

Exhibit A and incorporated herein by reference, shall be and hereby is confirmed.   The

documents contained in the Plan Supplement, and any amendments, modifications and

supplements thereto, the Settlement Agreements, and all other documents and agreements related

thereto (including all exhibits and attachments thereto and documents referred to in such papers),

and  the  execution,  delivery  and  performance  thereof  by  the  Trustee  and  the  Estate

Representative, are authorized and approved as finalized, executed and delivered.   Without

further order or authorization of the Bankruptcy Court, the Trustee or the Estate Representative

and their successors are authorized and empowered to make all modifications to all documents

included as part of the Plan Supplement that are consistent with the Plan.  For the avoidance of

doubt, the Settlement Agreements may only be modified in accordance with their respective

terms.

50.      Confirmation Objections.  All confirmation objections and responses to the Plan,

including but not limited to the Objections, both filed and informal, to the extent not resolved,

withdrawn or otherwise addressed by this Confirmation Order or as set forth on the record at the

Confirmation  Hearing,  including  any  reservations  of  rights  contained  therein,  are  hereby

overruled on the merits.  All withdrawn objections are deemed withdrawn with prejudice.

51.     <u>Findings of Fact and Conclusions of Law</u>.   The findings of fact and the conclusions of law stated in this Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

52.     <u>Immediate Effect</u>.  This Confirmation Order shall be effective immediately upon its entry notwithstanding Fed. R. Bankr. P. 3020(e).

53.     <u>Binding Effect</u>.  The Plan and its provisions (including the Plan Supplement) shall be binding upon (i) the Debtor; (ii) any entity acquiring or receiving property (including cash) under the Plan; and (iii) any creditor or equity security holder of the Debtor, including, without limitation, any governmental unit, as such term is defined in Bankruptcy Code section 101(27); (iv) any Holder of a Derailment Claim; and (v) any existing or potential defendant named in or relating to any Derailment-Related Cause of Action, including any Non-Settling Defendants, whether or not the Claim or Interest of such creditor or equity security holder is impaired under the Plan and whether or not such creditor, equity security holder or governmental unit has accepted the Plan.

54.     <u>Plan Modifications</u>.  Subsequent to filing the Plan on July 15, 2015, the Trustee made certain non-material modifications to the Plan (the "<u>Plan Modifications</u>"), which are reflected in this Order.  Except as provided for by law, contract or prior order of this Bankruptcy Court, none of the modifications made since the commencement of solicitation adversely affects the treatment of any Claim against or Interest in the Debtor under the Plan.  The disclosure of the Plan Modifications on the record at the Confirmation Hearing and through the filing of this

Order as a proposed order constitute due and sufficient notice thereof.  Accordingly, pursuant to Bankruptcy Code section 1127(a), Bankruptcy Rule 3019 and Local Rule 3019-1, none of these modifications require additional disclosure under Bankruptcy Code section 1125 or resolicitation of votes under Bankruptcy Code section 1126 (especially in light of previously provided disclosures), nor do they require that holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan as modified by this Order shall constitute the Plan submitted for Confirmation by the Bankruptcy Court.

55.    <u>Deemed Acceptance of Plan as Modified</u>.  In accordance with Bankruptcy Code section 1127, Bankruptcy Rule 3019 and Local Rule 3019-1, all holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

56.    <u>Authorization</u>.  In accordance with the relevant provisions of the Plan, the Trustee, the Estate Representative and the WD Trustee are hereby authorized, without further Order of the Bankruptcy Court, to make all distributions and transfers of property required to be made under the Plan.  Except as otherwise expressly provided in Bankruptcy Code Section 1141, the Plan, or this Confirmation Order, confirmation of the Plan shall effect the full and final satisfaction, settlement, release, and discharge as against the Debtor of any and all legal and/or equitable Claims against and Interests in and to the Debtor, including, without limitation, any Claim or Interest that arose before the Confirmation Date, and any debt of a kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), whether or not (i) a proof of claim or interest is filed or deemed filed under Bankruptcy Code section 501; (ii) such claim or interest is allowed under Code section 502; or (iii) the holder of such claim or interest has accepted the Plan.

57.    <u>Plan Classification Controlling</u>.    The terms of the Plan shall govern the classification of Claims and Interests for purposes of the distributions to be made thereunder. The classifications set forth on the ballots tendered to or returned by the holders of Claims or Interests in connection with voting on the Plan pursuant to the Disclosure Statement and Disclosure Statement Order: (a) were set forth on the ballots for purposes of voting to accept or reject the Plan; (b) in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Trustee, Estate Representative or WD Trustee except for purposes of voting on the Plan.

58.    <u>General Settlement of Claims and Interests</u>.    As one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 1123 and in consideration for the classification, distributions, Releases and other benefits provided under the Plan, the provisions of the Plan shall, upon Consummation, constitute a good-faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan.  Such compromises and settlements, individually and in the aggregate, are reasonable and constitute proper exercises of the Trustee's business judgment.  All distributions made pursuant to the Plan to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

59.    <u>Approval of Settlements</u>.  The Settlements Agreements described in Article 5 of the Plan are expressly approved in all respects pursuant to Bankruptcy Rule 9019 as fair, equitable, reasonable and in the best interest of the Debtor's Estate and pursuant to Bankruptcy

Code section 1123(a)(5) and (b)(3), are binding upon all entities affected thereby, and shall be effectuated in accordance with the terms thereof.    Such compromises and settlements, individually and in the aggregate, are reasonable and constitute proper exercises of the Trustee's business judgment.    The Trustee and the Estate Representative are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments and certificates relating to such settlements and to perform their obligations thereunder.

### B.    Releases, Injunctions and Bar Order

60.    Item 9 on <u>Exhibit 2</u> to the Plan shall be revised as follows:[5]

> Edward A. Burkhardt, Larry Parsons, Steven J. Lee, Stephen Archer, Robert C. Grindrod, Joseph C. McGonigle, Gaynor Ryan, Donald Gardner, Jr., Fred Yocum, Yves Bourdon and James Howard, **individually and** in their capacity as directors and officers of MMA and MMAC, Montreal, Maine & Atlantic Corporation and/or LMS Acquisition Corporation (the "**D&O Parties**").

61.    **Releases**

(a)    **Settlement Agreement Releases Supplemented; No Impact on Rights to Object**.  Except as expressly provided in sections 10.5, 10.8 or 10.9 of the Plan, nothing in Section 10.5 of the Plan or otherwise in the Plan or this Confirmation Order, shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of the Settlement Agreements.  The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements.  The following releases shall be in addition to and are intended to supplement any releases included in the Settlement Agreements as between the parties to such Settlement Agreements.  In the event of any inconsistency between the Plan or this Confirmation Order and the Settlement Agreement(s), the terms of the Settlement Agreement(s) will apply with respect to the particular parties thereto; *provided*, *however*, that all Settlement Agreements are subject to Sections 10.5, 10.8 and 10.9 of the Plan.  Except as expressly set forth in the Settlement Agreements, nothing in the Plan or the Releases set forth herein or therein shall affect any rights of the Trustee or the Estate Representative to object to the allowance, amount, priority or secured status of the Claims of any party receiving a release under the Plan as provided in sections 502, 503, 506, 507, 509 or 510 of the Bankruptcy Code, including with respect to any right of setoff or recoupment, to the extent such Claims are not released, discharged or satisfied under any Settlement Agreement, under the Plan, or pursuant to this Confirmation Order.  Nothing herein

---

[5] Changes from the version filed with the Plan are indicated in **<u>bold underline</u>**.

or in the Plan shall affect any limitation contained in any Settlement Agreement with respect to the release granted to any Released Party.  Notwithstanding the definition of "Claim" in section 1.36 of the Plan, for the purposes of Article 10 of the Plan, including, without limitation, the Releases and Injunctions, as well as this Section B of this Order (paragraphs 60 through 73), "Claim" or "Claims" means, as the context requires, past, present and future claims, causes of action, obligations, rights, liens, suits, judgments, orders, application of any kind including for judicial review, remedies, interests, actions, liabilities, demands, duties, injuries, compensation, damages, expenses, fees, and/or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual responsibility or otherwise, whether statutory, at common law, civil law, public law or in equity, regardless of the legal theory, including but not limited to claims for breach of contract, tort, breach of the implied covenant of good faith and fair dealing, loss of support, loss of consortium, statutory or regulatory violations, for indemnity or contribution, for any damages either moral, material, bodily injury, punitive, exemplary or extra-contractual damages of any type, in any jurisdiction (i) in any way arising out of, based upon, or relating in any way, in whole or in part, directly or indirectly, whether through a direct claim, cross-claim, third-party claim, warranty claim, recursory claim, subrogation claim, forced intervention, contribution claim, indemnity claim, reimbursement claim, class action or otherwise, (A) to the Derailment, including any claims held or asserted by any Person for wrongful death, personal injury, emotional distress, loss of support, loss of consortium, property damage, economic loss, moral damage, material damage and bodily injury or environmental damage, remediation or exposure or (B) to the XL Policies, including the issuance thereof, coverage, reimbursement, or payment thereunder, and any act or omission of an insurer of any type for which a Holder of a Claim might seek relief in connection therewith, or (ii) that would otherwise constitute a claim as against MMA, MMA Canada or their Estates (A) provable in bankruptcy under the Bankruptcy and Insolvency Act, R.S.C. 1985, c.B-3, had MMA Canada become bankrupt on August 6, 2013 and/or (B) within the definition of "claim" set forth in section 101(5) of the Bankruptcy Code.  Without limiting the foregoing, "Claim" or Claims" for purposes of Article 10 of the Plan includes all Claims in Classes 8, 9, 10, 11 and 12.

(b)     **Releases by the Debtor and Estate Representative(s)**.  *Subject in all respects to the provisions of Sections 9.1 and 9.3 of the Plan and full performance under the applicable Settlement Agreement(s) applicable to the particular Released Parties, on the Effective Date, the Debtor, the Trustee, the Estate Representative(s) and the Estate shall unconditionally release, and hereby are deemed to forever unconditionally release, the Released Parties, including, without limitation, the Released Parties' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims (including any Claims assigned by the Other Released Parties to the Trustee, MMA Canada or their designee pursuant to a Settlement Agreement and including any Claims or Causes of Action for contribution, indemnity, reimbursement or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and Post-Confirmation Causes of Action, whatsoever (other than the right to enforce the obligations under the Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and*

29

*documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date relating in any way to the Debtor, the Derailment, the Chapter 11 Case, the Plan, the Disclosure Statement, the Estate, the XL Policies, and the Settlement Agreements; provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this release shall not extend, and shall not be construed as extending, to any Claim brought or that could be brought in the future by the Trustee, the Estate Representative or MMA Canada against any of the Affiliated Released Parties to the extent there is, or may be, coverage for such claims under the Great American Policy, and the assignment of rights under such policies to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage, or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion.*

(c)     **Releases in Favor of the Estate and Estate Representative(s)**.  *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of the Plan, and full performance under the applicable Settlement Agreement(s), and subject to any express limitations and/or obligations contained in each Released Party's respective Settlement Agreement, on the Effective Date, each of the Trustee, the Estate Representative(s), and the Estate shall be forever and unconditionally released from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever by the Released Parties and by all Persons or entities receiving consideration under the Plan (other than the right to enforce the obligations under the Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Debtor, including, without limitation, arising from the Derailment, the Chapter 11 Case, the Plan, the Disclosure Statement, any prepetition act or omission of the Debtor, the Estate, the XL Policies and the Settlement Agreements; provided, however, that this release shall not apply to any Claims arising in the ordinary course of business that are unrelated to the Derailment and that are held by Affiliates of any Contributing Party (unless such Claims are expressly released pursuant to any Settlement Agreement).  For the avoidance of doubt, the releases in this section do not extend to any breaches of the Settlement Agreement(s).*

(d)     **Releases by Affiliated Released Parties**.  *Subject in all respects to the provisions of Sections 9.1 and 9.3 of the Plan and the Affiliated Parties Settlement Agreement, on the Effective Date, each of the Affiliated Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Estate, the Trustee, the Estate Representative(s), the Creditors' Committee, the Creditors' Committee members, and the Other Released Parties, including, without limitation, the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Claims (including any Claims or Causes of Action for contribution,*

*indemnity, reimbursement or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands,  liabilities, suits, judgments, damages, rights, and causes of action whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Derailment, the Chapter 11 Case, the Plan, the Disclosure Statement, the Estate, or the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to (A) any Claims or rights, under the Great American Policy, assigned by the Affiliated Released Parties to the Debtor or to the Chapter 11 Trustee pursuant to the Affiliated Parties Settlement Agreement, (B) any right to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder, provided, however, that such assigned Claims or rights will not be asserted against Other Released Parties, or (C) any Claims or rights of any of the Rail World Parties and/or the D&O Parties (as defined in the CCAA Plan) to seek recovery from their insurers, including Hartford and the XL Companies, for any attorneys' fees, expenses or costs incurred prior to the Effective Date.*

*(e)   **Releases in Favor of Affiliated Released Parties**.  Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of the Plan and full performance under the Affiliated Parties Settlement Agreement, on the Effective Date, all persons and entities shall unconditionally release, and are hereby deemed to forever unconditionally release, the Affiliated Released Parties, including, without limitation, the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such),  from any and all Derailment Claims, Causes of Action, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and causes of action whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date relating in any way to the Derailment, the Debtor,  the Chapter 11 Case, the Plan, the Disclosure Statement, the Estate, and the negotiation or funding of the Settlement Agreements; provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this release shall not extend, and shall not be construed as extending to, any Claim brought or  that could be brought in the future by the Trustee, the Estate Representative,  MMA Canada or the Holders of Derailment Wrongful Death Claims (as applicable pursuant to the Affiliated Parties Settlement Agreement) against any of the Affiliated Released Parties (or certain of them, as applicable) to the extent there is, or may be, coverage for such claims under  the Great American Policy, but only to the extent such coverage is actually provided and without any obligation on the part of the Rail World Parties or the D&O Parties to make any payment or contribution to supplement what is actually obtained from the Great American Policy, and the assignment of rights under such policy to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage, or provide a defense to any such*

*insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion; <u>provided further</u>, <u>however</u>, that any right or recovery by Holders of Derailment Wrongful Death Claims pursuant to the action authorized by this subparagraph shall be, in all respects, subordinate to the claims of the Trustee and MMA Canada in the Great American Policy.*

(f)    **Releases by Other Released Parties**.    *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.5(b)(ii), 10.8 and 10.9 of the Plan and full performance under the Settlement Agreement(s) applicable to the particular Released Parties, on the Effective Date, each Other Released Party and all other Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Estate, the Trustee, the Estate Representative(s), the Creditors' Committee, the Creditors' Committee members, the Affiliated Released Parties, each other Other Released Party, and the foregoing Persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Derailment Claims and all other Claims (including any Claims or Causes of Action for contribution, indemnity, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution, indemnity, reimbursement or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and causes of action whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Derailment, the Debtor, the Chapter 11 Case, the Plan, the Disclosure Statement, the Estate, and the Settlement Agreements, including, without limitation, the Trustee's or the Trustee's counsel's negotiation of the Settlement Agreements or the funding of the Settlement Agreements; <u>provided</u>, <u>however</u>, that this release shall not apply to any Claims of Canada against MMA Canada, nor shall it apply to any Claims assigned by the Other Released Parties to the Trustee, MMA Canada or their designee pursuant to a Settlement Agreement (other than any Claims against any Other Released Parties), nor shall it apply to the right to enforce the rights and obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor nor shall it apply or be construed as applying to any Claims or claims or other rights to the extent preserved by any of the Other Released Parties in their respective Settlement Agreement(s) (other than any Claims against any Other Released Parties), <u>provided further</u>, <u>however</u>, that notwithstanding anything to the contrary in the Plan, this release shall not apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against one or more of their insurers; provided, further, however, that this release shall not apply to any Claims arising in the ordinary course of business that are unrelated to the Derailment and that are held by Affiliates of any of the Contributing Parties. For the avoidance of doubt, the releases in this section do not extend to any breaches of the Settlement Agreement(s).*

(g)    **Releases in Favor of Other Released Parties**.    *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of the Plan and full performance under the Settlement Agreement(s) applicable to the particular Other Released Parties, on the Effective*

*Date, all Persons and entities shall unconditionally release, and hereby are deemed to forever unconditionally release each of the Other Released Parties, including without limitation, the Other Released Parties' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims (including any claims or Causes of Action for contribution, indemnity, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution, reimbursement or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights (including any right of setoff, subrogation, contribution, indemnity, reimbursement or recoupment of any kind), remedies and causes of action whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise that are based upon, arise from and /or are related to events and/or circumstances that occurred on or prior to the Effective Date, relating in any way to the Derailment, the Debtor, the Chapter 11 Case, the Plan, the Disclosure Statement, the Estate, and the Settlement Agreements, including, without limitation, the Released Parties and the Released Parties' counsel's negotiation of the Settlement Agreements or the funding of the Settlement Agreements; provided, however, that this release shall not in any way limit the right of the Estate Representative to enforce the rights and obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in the Estate's favor nor shall it apply or be construed as applying to any Claims or other rights to the extent preserved by any of the Other Released Parties in their respective Settlement Agreement(s) (other than any Claims against any Other Released Parties, including, without limitation, Canada), provided further, however, that notwithstanding anything to the contrary in the Plan, this release shall not apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against any one or more of their insurers. For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, the releases in this section do not extend to any breaches of the Settlement Agreement(s).*

62.   **Injunctions**.

(a)   **No Impact on the Rights of the Parties to the Settlement Agreements**. **Nothing in Section 10.6 of the Plan or otherwise in the Plan or this Confirmation Order shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of their respective Settlement Agreements. The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements; provided, however, that no Settlement Agreement may restrain or limit the effect or scope of the releases set forth in Section 10.5 of the Plan as to any Released Party without the express written consent of such Released Party.**

(b)   **Injunction in Favor of the Debtor and Estate Representative(s)**. **Except as to the rights, claims or Claims created or expressly preserved by the Plan, the CCAA Plan, the Settlement Agreements, and this Confirmation Order, upon the Effective Date, the Debtor, the Trustee, and the Estate Representative(s) shall have and be entitled to**

an injunction forever barring and enjoining all Persons and/or entities from asserting against the Debtor any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether direct or indirect, contingent or actual, whether liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (A) the Debtor, (B) the Derailment or (C) the Estate, the Chapter 11 Case, the Plan, the Disclosure Statement, the Settlement Agreements and/or the XL Policies, except with regard to any claims and rights expressly reserved pursuant to Sections 10.3 and 10.5 of the Plan.

(c)    **Injunction in Favor of Affiliated Released Parties**.  Except as to the rights, claims or Claims created or expressly preserved by the Plan, the CCAA Plan, the Affiliated Parties Settlement Agreement, and this Confirmation Order, upon the Effective Date, all Persons and entities, including, without limitation, all Holders of Derailment Claims, Non-Settling Defendants, and other Persons, shall be, and are hereby deemed to be, permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting against the Affiliated Released Parties any and all Derailment Claims, Causes of Action and all other Claims, including, without limitation, any and all past, present and future rights, interests, obligations, damages (including punitive damages), demands (including demands for contribution, indemnity, reimbursement or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on tort, contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (A) the Debtor; (B) the Derailment, (C) the Estate, (D) the Chapter 11 Case, (E) the Plan, (F) the Disclosure Statement, (G) the Settlement Agreements and/or (H) the XL Policies, provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this injunction shall not extend, and shall not be construed as extending to, any Claim brought or that could be brought in the future by the Trustee, the Estate Representative, MMA Canada or the Holders of Derailment Wrongful Death Claims (as applicable pursuant to the Affiliated Parties Settlement Agreement) against the Affiliated Released Parties (or certain of them, as applicable) to the extent there is, or may be, coverage for such claims under the Great American Policy, but only to the extent such coverage is actually provided and without any obligation on the part of the Rail World Parties or the D&O Parties to make any payment or contribution to supplement what is actually obtained from the Great American Policy,

and the assignment of rights under such policy to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion; **provided further,** **however**, that any right or recovery by Holders of Derailment Wrongful Death Claims pursuant to the action authorized by this subparagraph shall be, in all respects, subordinate to the claims of the Trustee and MMA Canada in the Great American Policy.

(d) **Injunction in Favor of the Other Released Parties.** Except as to the rights and claims created or expressly preserved by the Plan, the CCAA Plan, the Settlement Agreements (provided that there are no preserved claims (or Claims) against Other Released Parties except as provided for in Exhibit 2 to the Plan), and this Confirmation Order, upon the Effective Date, all Persons and entities, including, without limitation, all Holders of Derailment Claims, Released Parties and Persons other than Released Parties shall be, and are hereby deemed to be, permanently barred, enjoined, and restrained from commencing, pursuing, prosecuting, continuing or asserting against the Other Released Parties any and all Derailment Claims, Causes of Action and all other Claims, including, without limitation, Claims or Causes of Action for any and all past, present and future rights (including any right of setoff, subrogation, contribution, indemnity, reimbursement or recoupment of any kind), interests (including creating, perfecting or enforcing any encumbrance of any kind against any one or more of the Other Released Parties), obligations, damages (including actual and/or punitive damages), demands (including any Claims or Causes of Action for contribution, indemnity, reimbursement, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees), and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on tort, contract, negligence, warranty, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance, including, without limitation, all Claims released pursuant to Section 10.5 of the Plan, whenever arising, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date in any way relating to or in connection with (A) the Debtor; (B) the Derailment, (C) the Estate, (D) the Chapter 11 Case, (E) the Plan, (F) the Disclosure Statement, (G) the Settlement Agreements and/or (H) the XL Policies (as to which, in the event of an inconsistency with the Plan, the XL Settlement Agreement will govern).

63. **Barred Persons and Barred Claims.** Without limiting the Releases and Injunctions set forth above, all (i) Non-Settling Defendants; (ii) Released Parties; (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan

under section 1126(f)-(g) of the Bankruptcy Code; and (iv) any other Persons that hold, have held or may hold a Claim (including a Derailment Claim) or Cause of Action, including, without limitation, Canadian Pacific Railway Company and any parent, affiliate or subsidiary thereof (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, continuing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere (each such venue, a "Trial Court"), any Claim (including a Derailment Claim) or Cause of Action against any of the Released Parties, including, without limitation, any personal injury, property damage, wrongful death, indemnity, contribution, reimbursement or subrogation claim, whether based upon a contract or otherwise, against any Released Party (including, without limitation, any claim against the Released Parties, whether or not denominated as for indemnity, contribution, reimbursement, or subrogation) arising out of or related in any way to the Derailment or to the claims released pursuant to the Releases, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims").  This Order is without prejudice to the position of any party as to the existence, in the absence of this Order, of any Barred Claim.[6]

64.    In the event that any Person asserts any Claim (including any Derailment Claim), Cause of Action, or any other claim, obligation, suit, judgment, damage, debt, right, remedy, cause of action, avoidance power or right, liability of any nature whatsoever, or legal or equitable remedy against any Person arising from or related to the Derailment, regardless of whether such claim, cause of action, right, or legal or equitable remedy may be asserted pursuant to the Bankruptcy Code or any other applicable law or contract, including, without limitation, any

---

[6] Notwithstanding anything to the contrary in this paragraph or this Order, neither this paragraph nor this Order shall apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against any one or more of their insurers.

claim for personal injury, property damage, wrongful death, indemnity (including contractual indemnity), contribution, reimbursement or subrogation relating in any way to the Derailment (collectively, the "Derailment-Related Causes of Action") and which results in a determination by a Trial Court (including, without limitation, by a jury impaneled by such Trial Court) that a Barred Person who is a Non-Settling Defendant is liable in damages (the "Initial Damages Determination") to a Person, including, without limitation, a Holder of a Derailment Claim, asserting a Derailment-Related Cause of Action against such Non-Settling Defendant (a "Plaintiff"), then, prior to final entry of any judgment, order or arbitration award with respect to such Initial Damages Determination in such Derailment-Related Cause of Action, the Plaintiff shall provide notice and a copy of this Order to the Trial Court.  In such case, for purposes of the Contribution/Indemnity Credit described below, such Trial Court (including, without limitation, a jury impaneled by such Trial Court) shall determine whether the Derailment-Related Cause of Action gives rise to Barred Claims on which any Released Party would have been liable to the Barred Persons in the absence of this Order.  Notwithstanding any finding referred to in section 10.7 of the Plan, the Trial Court, prior to final entry or final award of any verdict, judgment, order or arbitration award (the "Judgment"), shall determine any such Judgment against such Barred Person by reducing the Initial Damages Determination by an amount equal to the "Judgment Reduction Amount," which shall equal the greatest of:

> (a)      The "Settlement Credit," which shall be an available alternative regardless of whether the Trial Court determines that there is any liability on the part of any Released Parties and shall mean the Distribution received or to be received by such Plaintiff pursuant to the Plan or the CCAA Plan, including by way of payment by the WD Trust (the "Distribution"); *provided*, *however*, that the Settlement Credit shall be limited to the amount of the Distribution received or to be received by the Plaintiff with respect to the type of Derailment Claim asserted by Plaintiff against the Barred Person, so that, for example, the Barred Person shall not receive a

Settlement Credit for Distributions received by Plaintiff for a personal injury claim if the claim against the Barred Person is for property damage;

(b)      The "Insurance Credit," which shall mean the amount of coverage, if any, the Trial Court determines would have been recoverable to such Barred Person under any insurance policies owned by the Debtor or MMA Canada on account of such Plaintiff's Claim or Cause of Action but for the operation of the Order; or

(c)      The "Contribution/Indemnity Credit," which shall mean, in the event the Trial Court determines that the Barred Person could establish a valid indemnity or contribution claim against a Released Party but for the operation of this Order, an amount equal to the value, as determined by the Trial Court, of all contribution or indemnification claims (whether equitable or contractual), if any, that the Trial Court determines such Barred Person would be entitled to as against one or more Released Parties but for operation of the Order, which shall be equal to the aggregate proportionate shares of liability, if any, of the Released Parties, plus the contractual indemnification for which the Barred Person would, in the absence of this Order, be entitled to recover, as determined by the Trial Court at the time of entry of any judgment against any Barred Person, *provided however*, that any Contribution/Indemnity Credit with respect to the Debtor and/or MMA Canada, shall be allocated among the Plaintiff, the Barred Person and/or Released Parties other than the Debtor and/or MMA Canada determined to be liable, in whole or in part, by the Trial Court, such allocation (a) to the extent the Trial Court is located in the United States, shall be in accordance with the holding in, and methodology adopted by, Austin v. Raymark Indus., 841 F.2d 1184 (1st Cir. 1988) ("Austin"); or (b) to the extent the Trial Court is in Canada, shall be in accordance with applicable provincial law (*provided, however*, that such reference to Austin and/or such provincial law shall govern only with respect to the allocation of the proportionate liability of the Debtor and/or MMA Canada, and shall have no effect on the scope of the Contribution/Indemnity Credit (including, without limitation, that it extends to claims for contractual indemnity, if any). Without limiting the foregoing, if a Barred Person holds both contribution and indemnity claims against the same Released Party, the value of such claims shall not be combined to determine the amount of the Contribution/Indemnity Credit unless such Barred Person could simultaneously recover, in the absence of this Order, under both such contribution and indemnity claims as a matter of law. Notwithstanding the foregoing, nothing in this provision is intended to dictate the procedure in the Trial Court for determination of the Judgment Reduction Amount pursuant to and consistent with this provision, *provided, however*, in cases tried in the United States, the trial judge (or equivalent arbitrator, tribunal or panel) shall in the first instance determine the allocation of the proportionate liability of the Debtor and/or MMA Canada in accordance with Austin.

65.     For the avoidance of doubt, and notwithstanding anything to the contrary, nothing in paragraphs 63 and 64 shall in any way modify or affect the Releases and/or Injunctions in favor the Released Parties as set forth in paragraphs 61 and 62 of this Order, and nothing set forth herein shall be interpreted as providing that any Released Parties have any liability to any Person for any Claims (including Derailment Claims) or Causes of Action.  Furthermore, after this Order becomes a Final Order, the Trustee is ordered to use his best efforts to ensure that any Claims (including Derailment Claims) or Causes of Action against any Released Parties are promptly dismissed with prejudice.

66.     Nothing herein shall prejudice or operate to preclude the right of any Non-Settling Defendant to (a) provide notice of this Order to any Trial Court hearing a Derailment-Related Cause of Action at any point, (b) raise any issues, claims or defenses regarding the Judgment Reduction Amount, including, without limitation, the contractual liability and/or relative or comparative fault of any Person, including any Released Party, in any court or tribunal hearing any Derailment-Related Cause of Action in accordance with applicable law or procedure; or (c) take discovery of Released Parties in accordance with applicable law or procedure; *provided*, *however*, that nothing herein shall in any way modify or affect the Releases or Injunctions in favor of the Released Parties as set forth in paragraphs 61 and 62 of this Order.  For the avoidance of doubt, nothing herein shall (x) be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Derailment-Related Cause of Action or (y) prejudice or operate to preclude the rights of any Barred Person to assert any claims or causes of action that have not been released, enjoined, or discharged under the Plan or this Order.

67.     The judgment reduction and related provision in paragraphs 63 and 64 are the bases upon which CP has agreed to withdraw, with prejudice, its objections to the Plan and to

dismiss, with prejudice, its appeal of the Chapter 15 Recognition and Enforcement Order entered by this Court on August 26, 2015, as well as to withdraw, with prejudice, its pleading seeking leave to appeal the CCAA Approval Order.  Accordingly, to the extent there is any inconsistency between the judgment reduction and related provisions of paragraphs 63 and 64, on the one hand, and the Plan or other provisions of this Confirmation Order, on the other, paragraphs 63 and 64 shall govern as to judgment reduction; *provided further* that nothing in this paragraph 67 shall be deemed or construed to limit, modify or affect the Releases or Injunctions.

68.    If any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Barred Claims or any transaction underlying any Barred Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement.

69.    Each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendant in any manner that fails to conform to the terms of this Order, including, without limitation, the Judgment Reduction Amount provision set forth at paragraph 64 herein.

70.    This Court shall retain jurisdiction with respect to all matters concerning this Order, including, without limitation, hearing a petition for relief by a Barred Person or any other party in interest in the event that a court or tribunal hearing the Derailment-Related Cause of Action fails to apply the judgment reduction provisions of this Order.  However, to the extent that any of the Released Parties have made or make any oral or written submissions in support of this Order, those Released Parties shall not be considered to have submitted to personal jurisdiction in this Court based upon such submissions.

71.     <u>Terms of Pre-Plan Injunction and Stays</u>.  Unless otherwise provided in the Plan, this Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, entered in the Transferred WD Cases, or otherwise arising under applicable law in any court order and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order, *provided*, *however*, that to the extent against any remaining defendant that is not a Released Party as of the Effective Date, the Trustee will cooperate with the plaintiffs in the Transferred WD Cases in seeking a transfer of such cases to the forum selected by such plaintiffs, and will cooperate in seeking from the District Court, in the order transferring such cases, a finding that the Settlement Agreements and transactions with the Released Parties approved and implemented pursuant to the Plan were entered into in good faith pursuant to and in accordance with 740 ILCS 100/2(c).

72.     <u>Canadian Criminal Charges and Related Claims of Canada</u>.  Notwithstanding anything to the contrary in the Plan, this Confirmation Order or in any Settlement Agreement:

(a)     Nothing in the Plan shall release or provide an injunction to the benefit of any Person for fraud or criminal and quasi-criminal charges filed or that may be filed by Canada and, for greater certainty, for any fine or penalty arising from any such charges;

(b)     Nothing in the Plan shall bind or in any way limit the Director of Public Prosecutions of Canada acting pursuant to the Act respecting the Office of the Director of Public Prosecutions, S.C. 2006, c.9 § 121, as has been or may be amended or superseded;

(c)     Except for the terms and conditions of the Settlement Agreement entered into by Canada, no Settlement Agreement shall be binding upon Canada; and

(d)     Except with respect to entry of this Confirmation Order as may be entered with the assent of Canada, nothing in the Plan shall be construed as a waiver by Canada of sovereign immunity or as an attornment by Canada to any court of any jurisdiction outside Canada.

73.     <u>Claims of the United States of America</u>.

(a)     Notwithstanding any provision in the Plan or this Confirmation Order, as to the United States of America, its agencies, departments or agents (collectively, the "<u>United States</u>"), nothing in the Plan or this Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of the Debtor to the United States arising on or after the Effective Date; (2) any liability of the Debtor to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid defense of setoff against the Debtor or right of recoupment from the Debtor held by the United States with respect to a Claim; or (4) the United States from, subsequent to the Confirmation Date, pursuing any police or regulatory action against the Debtor.  As to the United States, nothing in the Plan or this Confirmation Order shall limit or expand the scope of the discharge granted to the Debtor pursuant to section 1141(d) of the Bankruptcy Code.

(b)     Further, as for Derailment Claims, if any, held by the United States, nothing in either this Confirmation Order or the Plan shall exculpate or release any Person for criminal charges brought by the United States, nor shall anything in this Confirmation Order or Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any such Person for such charges under such criminal laws.  Moreover, nothing in either this Confirmation Order or the Plan shall exculpate or release any Person from liability to the United States unrelated to the Derailment, nor shall anything in this Confirmation Order or Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any Person for such liability unrelated to the Derailment.

**C.      Matters Relating to Implementation of the Plan**

74.     <u>Release of Liens</u>.  Except as otherwise expressly provided in Bankruptcy Code section 1141, the Plan, or this Confirmation Order, all Claims of creditors against the Debtor whose Claims have attached to, or are secured by, property in which the Debtor has an interest are hereby discharged, and such claims are satisfied in full and forever released and discharged.

75.     <u>Vesting of Assets</u>.  Except as otherwise expressly provided in the Plan or this Confirmation Order, all property of the Debtor's Estate shall, as of the Effective Date, revest in the Post-Effective Date Estate free and clear of all interests, liens, claims and encumbrances of any kind and nature whatsoever.

76.  <u>Exhaustion of Insurance Policies</u>.

(a)  On the Effective Date, and upon full payment and performance under the XL Settlement Agreement, the XL Policies shall be deemed completely exhausted and any and all of the XL Companies' obligations under the XL Policies shall be, and are deemed to be, extinguished.

(b)  On the Effective Date, and upon full performance under the relevant Settlement Agreements (and subject to any exceptions contained in such Settlement Agreements), the policy of any Insurance Company that is a Contributing Party shall be deemed completely exhausted, and any and all of the Insurance Company's obligations under such policy shall be, and are deemed to be, extinguished.

77.  <u>The WD Trust</u>.  As of the Effective Date, the WD Trust shall be established pursuant to Article 5 of the Plan for the primary purpose of implementing the Plan on behalf of, and for the benefit of, the WD Trust Beneficiaries, and to serve as a mechanism for liquidating the WD Trust Assets in an expeditious but orderly manner for the benefit of WD Trust Beneficiaries and holders of Allowed Class 12 Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the WD Trust.  The WD Trust is organized and established as a trust pursuant to which the WD Trustee, subject to the terms and conditions contained herein and in the Plan, is to hold the WD Trust Assets and dispose of the same in accordance with the WD Trust Agreement and the Plan in accordance with Treasury Regulation section 301.7701-4(d). The WD Trust Agreement attached hereto is approved in its entirety.  In accordance with the Plan, the Trustee, in consultation with U.S. counsel to Holders of Derailment Wrongful Death Claims, has chosen Joe R. Whatley, Jr. to serve as the WD Trustee.  The WD Trustee shall be bonded in such amount as the Trustee or the U.S. Trustee shall reasonably request or, in the event of a dispute, as set by the Court.  The Trustee, with the consent of MMA Canada and the Monitor, shall designate the WD Trust to be the assignee of claims arising under the Carmack Amendment and assigned to the designee of the Trustee, MMA Canada and the Monitor under

the Settlement Agreements (the "Assigned Carmack Claims") upon the following conditions: (a) the WD Trustee shall retain Trustee's counsel to prosecute the Assigned Carmack Claims on terms and conditions reasonably satisfactory to the WD Trustee, given such counsel's knowledge of, and existing due diligence with respect to, such Assigned Carmack Claims; (b) settlement of the Assigned Carmack Claims shall require the consent of the Trustee and/or Estate Representative, the Monitor and MMA Canada, which consent shall not be unreasonably withheld; and (c) after full payment of any then-unpaid (i) Allowed Secured Claims, if any, where the Lien attaches to the proceeds of Assigned Carmack Claims; (ii) fees incurred in the prosecution or administration of the Assigned Carmack Claims; (iii) Administrative Expense Claims or claims for professional fees in the CCAA Case, and (iv) Allowed Priority Claims, including, without limitation, 1171(b) Claims (other than Derailment Claims), the remaining proceeds of the Assigned Carmack Claims shall be distributed to Holders of Derailment Claims in Classes 8-12 in the manner, and subject to the allocation and distribution procedures, provided in the Plan and the CCAA Plan.

78.     Quasi-Judicial Immunity.   The Estate Representative and the WD Trustee are entitled to quasi-judicial immunity to the fullest extent allowed by law in connection with their implementation of this Confirmation Order, the Plan, the WD Trust Agreement, and the Wrongful Death Claims Resolution Procedures.

79.     Section 1146 Exemption from Certain Taxes and Fees.   Pursuant to Bankruptcy Code section 1146(a), the issuance, transfer or exchange of a security, or the execution, delivery or recording of an instrument of transfer under the Plan, or authorized thereby, may not be taxed under any law imposing deed stamps, a stamp tax, a recording tax, a transfer tax, an intangible tax or similar tax.  To effectuate Bankruptcy Code section 1146(a), each recorder of deeds or

similar official for any county, city or governmental unit in which instruments of transfer of the property are to be recorded shall, pursuant to this Confirmation Order, be ordered and directed to accept such instruments for recording and promptly to record such instruments or deeds without payment of any documentary stamp tax, deed stamps, stamp tax, recording tax, transfer tax, intangible tax or similar tax.

80.     _Preservation of Causes of Action_.  Except as may be otherwise provided in the Plan, the Post-Effective Date Debtor shall retain all Causes of Action, which shall vest in the Post-Effective Date Debtor on the Effective Date.

**D.     Matters Related to Executory Contracts and Unexpired Leases**

81.     _Rejection of Executory Contracts_.  All executory contracts and unexpired leases that exist between the Debtor and any Person, _**except for the WD Trust Agreement, the Settlement Agreements (including the insurance policy rights and contractual rights, if any, assigned to the Trustee, MMA Canada and/or their designee pursuant thereto) and insurance policies related to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any D&O Insurance Policies)**_, shall be deemed rejected by the Debtor as of immediately prior to the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) is otherwise provided for under Sections 8.2 or 8.3 of the Plan.

(a)     Such rejection shall be deemed to constitute a breach of such contract or lease as of the date immediately before the Petition Date.

(b)     If an executory contract or unexpired lease is rejected pursuant to this Confirmation Order, then any Claim arising from or as a result of such

rejection must be filed with the Bankruptcy Court within thirty (30) days after notice of the Effective Date.  Nothing contained in this Confirmation Order shall constitute a determination that any such rejection gives rise to, or results in, a Claim or constitutes a waiver of any objections to such Claim by the Debtor or any party in interest.

82.    <u>Insurance Policies and Agreements</u>.    Except as set forth in the Settlement Agreements, Section 5.2 of the Plan, or this Confirmation Order, insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, without limitation, any D&O Insurance Policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, entry of this Confirmation Order constitutes (a) approval of the Debtor's assumption of such insurance policies and agreements pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date and (b) a finding that each such assumption is in the best interests of the Debtor and its Estate.  Unless otherwise determined by this Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement.  To the extent that this Court determines otherwise as to any such insurance policy or agreement, the Trustee reserves the right to seek the rejection of such insurance policy or agreement or other available relief.

**E.    Sale of XL Policy Interests to XL Companies Protected
Under 11 U.S.C. §363(m)**

83.    The sale of the XL Policy Interests contemplated by the XL Settlement Agreement to the XL Companies free and clear of all interests, is undertaken by the XL

Companies in good faith, as that term is used in section 363(m) of the Bankruptcy

Code.  Accordingly, the reversal or modification on appeal of the authorization to consummate

the sale of the XL Policy Interests contemplated by the XL Settlement Agreement shall not affect

the validity of the sale of the XL Policy Interests to the XL Companies, unless such authorization

is duly stayed pending such appeal.  The XL Companies are purchasers in good faith of the

Policy Interests and shall be entitled to all of the protections afforded by section 363(m) of the

Bankruptcy Code.

### F.        <u>Resolution of Certain Objections to Confirmation</u>

84.    In resolution of the Wheeling Objection:  (a) nothing in this Order, the Releases

and Injunctions or the Settlement Agreements shall limit or affect Wheeling's ability to contend,

and the Trustee's ability to contest, that Wheeling's security interest, if any, attaches to the

Settlement Payments (whether as original collateral, proceeds, products or otherwise); and (b) in

the event the Bankruptcy Court has not determined, prior to the Initial Distribution Date, the

amount of the Allowed Secured Claim of Wheeling as of such date, and including, without

limitation, whether any portion of the Settlement Payments constitutes collateral of Wheeling as

of such date, the Trustee shall set aside, and not distribute pending further order of the

Bankruptcy Court, $5,032,134.12 to secure any payment, to the extent required, with respect to

such Allowed Secured Claim, when and if determined; provided, however, that the Trustee shall

not be required to set aside under this provision any amount with respect to any potential claim

of Wheeling under section 502(h) of the Bankruptcy Code ("<u>Section 502(h) Claim</u>"); provided

further that in the event the Court determines: (a) that Wheeling would have a Section 502(h)

Claim upon payment of any transfer avoidable by the Trustee and/or any amount recoverable by

the Trustee under section 550 of the Bankruptcy Code (the "<u>Preference Amount</u>") if paid by

Wheeling; and (b) that such Wheeling 502(h) Claim would be secured by a security interest in

Settlement Payments (and that Wheeling has an unavoidable security interest in such Settlement Payments), the Trustee shall waive payment of the Preference Amount.

85.    In resolution of the MN/NB Objection, any 1171(b) Claims of the MN/NB Railroads shall be paid in full, in Cash, on the later of the Initial Distribution date or thirty (30) days after the date such Claims become Allowed Claims.  In the event the Bankruptcy Court has not determined, prior to the Initial Distribution Date, the existence of and/or the amount of any Allowed 1171(b) Claims of the MN/NB Railroads, if any, as of such date, the Trustee shall set aside, and not distribute pending further order of the Bankruptcy Court making such determination, $2,139,063.56 to secure any payment, to the extent required, with respect to such Allowed 1171(b) Claims, when and if determined.

### G.    Retention of Jurisdiction and Miscellaneous Matters

86.    <u>Professional Compensation</u>.  All Persons seeking an award of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 326, 328, 330, and 331 of the Bankruptcy Code or filing applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (collectively, "<u>Professional Compensation</u>") shall (a) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is ninety (90) days after the Effective Date, and (b) be paid in full, in Cash, by the Trustee or Disbursing Agent, as applicable, such amounts as are allowed by the Bankruptcy Court (i) within thirty (30) days after the date on which the order relating to any such Administrative Expense Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such Administrative Expense Claim and the Trustee or Disbursing Agent, as applicable.

87.     <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding entry of this Confirmation Order and the occurrence of the Effective Date, this Court shall and shall be deemed to retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and this Confirmation Order after the Effective Date, including, without limitation, for all of the purposes set forth in Article 11 of the Plan; *provided*, *however*, that the Court's retention of jurisdiction as set forth herein and in Article 11 of the Plan shall be subject to the limitation that such jurisdiction shall not exceed the lawful jurisdiction of the Court pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

88.     <u>Creditor's Committee</u>.  The Creditors' Committee shall continue in existence following entry of this Order until the Effective Date.  Upon the Effective Date, the Creditors' Committee shall be terminated and shall cease to exist, except with respect to any appeals pending on the Effective Date and all issue related to Professional Compensation.  Nothing herein shall limit the right of professionals retained by the Creditors' Committee or members of the Creditors' Committee to seek compensation or reimbursement for services rendered or expenses incurred prior to the Effective Date.

89.     <u>Order Governs</u>.  In the event of any conflict between the provisions of this Order and the provisions of the Plan, the provisions of this Order shall prevail and take precedence over the provisions of the Plan.

90.     <u>References to Plan Provisions</u>.  The failure specifically to include or to refer to any particular article, section or provision of the Plan, Plan Supplement or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of the Bankruptcy Court that the Plan and any related documents be confirmed and approved in their entirety.

91.     <u>Nonseverability of Plan Provisions Upon Confirmation</u>.  Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and the transactions related thereto and may not be deleted or modified except by the Trustee, who reserves the right to modify the Plan pursuant to Article 12 of the Plan; and (c) nonseverable and mutually dependent.

92.     <u>Final Order and Appeals</u>.  This Confirmation Order is a final order, and the time period by which any party in interest wishing to appeal entry of this Confirmation Order shall run from the date of the entry of this Confirmation Order.

93.     <u>Authorization to Consummate</u>.  The Trustee and the Estate Representative are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to satisfaction of the conditions precedent to the Effective Date set forth in Article 9 of the Plan.

94.     <u>Preservation of Claims Against Non-Settling Defendants</u>.  Nothing in this Order or in the Plan, or in the payment or receipt of Distributions under or pursuant to this Plan or the CCAA Plan, shall operate as or be deemed to be a determination that any Derailment Claim or other cause of action that may be asserted against any Non-Settling Defendant by any Person or Entity has been released, paid or satisfied in full.

95.     <u>Amended Plan</u>.  The Trustee shall file an amended Plan incorporating the modifications to the Plan set forth herein (the "<u>Amended Plan</u>").  The findings set forth in paragraphs 54 and 55 of this order shall apply and shall be deemed to apply to such Amended Plan.

96.     <u>Proposed Findings of Fact and Conclusions of Law</u>.  At the request of the parties and notwithstanding the consent of all necessary parties and the findings of constitutional

authority to enter final judgment above, the Court hereby files this Confirmation Order as proposed findings of fact and recommended conclusions of law (the "Proposed Findings and Conclusions") for review by the District Court pursuant to Bankruptcy Rule 9033, and requests that the District Court conduct such review on an expedited basis and enter these Proposed Findings and Conclusions as its own as soon as is reasonably practicable.

Dated: October 9, 2015 _____          /s/ Peter G. Cary _____

**The Honorable Peter G. Cary**
**Chief Judge, United States Bankruptcy Court**

EXHIBIT

**A**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

MONTREAL MAINE & ATLANTIC
RAILWAY, LTD.

                    Debtor.

Bk. No. 13-10670
Chapter 11

## TRUSTEE'S REVISED FIRST AMENDED PLAN OF LIQUIDATION DATED JULY 15, 2015 (AS AMENDED ON OCTOBER 8, 2015)

**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**

D. Sam Anderson, Esq.
Roma N. Desai, Esq.
Lindsay K. Zahradka, Esq.
Timothy J. McKeon, Esq.
100 Middle Street
P.O. Box 9729
Portland, Maine 04101-5029

*Counsel for Trustee*

Dated:  October 8, 2015, 2015

## TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS AND INTERPRETATION** ........................................................... 1

   **A.**      **Definitions.** ......................................................................................... 1

   **B.**      **Interpretation; Application of Definitions and Rules of Construction.** .............. 18

**ARTICLE 2 PROVISIONS FOR PAYMENT OF NON-CLASSIFIED CLAIMS** ............. 18

   *2.1.*    *Administrative Expense Claims.* ........................................................ 18

   *2.2.*    *Professional Compensation and Reimbursement Claims.* .......................... 19

   *2.3.*    *Priority Tax Claims.* ....................................................................... 19

   *2.4.*    *Section 1171(a), 1171(b), and Derailment Government Claims Not Administrative Claims.* ........................................................................................ 19

**ARTICLE 3 CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ..................... 20

**ARTICLE 4 TREATMENT OF CLAIMS AND EQUITY INTERESTS** ............................ 21

   *4.1.*    *Class 1: Wheeling Secured Claims.* .................................................... 21

   *4.2.*    *Class 2: FRA Secured Claims.* ......................................................... 22

   *4.3.*    *Class 3: MDOT Secured Claims.* ...................................................... 22

   *4.4.*    *Class 4: Bangor Savings Bank Secured Claims.* ................................... 22

   *4.5.*    *Class 5: State Income Tax Claims.* .................................................... 23

   *4.6.*    *Class 6: Municipal Tax Claims.* ........................................................ 23

   *4.7.*    *Class 7: Priority Claims.* ................................................................. 23

   *4.8.*    *Class 8: Derailment Moral Damages and Personal Injury Claims.* .............. 23

   *4.9.*    *Class 9: Derailment Property Damage Claims.* .................................... 24

   *4.10.*   *Class 10: Derailment Government Claims.* .......................................... 24

   *4.11.*   *Class 11: Derailment Property Subrogated Insurance Claims.* ................... 24

   *4.12.*   *Class 12: Derailment Wrongful Death Claims.* ..................................... 24

   *4.13.*   *Class 13: General Unsecured Claims.* ................................................ 26

   *4.14.*   *Class 14: Subordinated Claims.* ....................................................... 26

   *4.15.*   *Class 15: Equity Interests.* .............................................................. 26

**ARTICLE 5 SETTLEMENT AGREEMENTS; THE WD TRUST** .................................... 26

   *5.1.*    *Settlement Agreements.* .................................................................. 26

   *5.2.*    *Exhaustion of Insurance Policies.* ..................................................... 27

   *5.3.*    *Execution of WD Trust Agreement.* ................................................... 27

   *5.4.*    *Purpose of WD Trust.* ................................................................... 27

   *5.5.*    *Assets of the WD Trust.* ................................................................. 28

*5.6.*    *Governance of the WD Trust.* ...................................................................... 28

*5.7.*    *Role of the WD Trustee.* ........................................................................... 28

*5.8.*    *Investments.* ........................................................................................ 29

*5.9.*    *Fees, Costs and Expenses of the WD Trust.* ................................................... 29

*5.10.*    *Distribution of the WD Trust Assets.* .......................................................... 30

*5.11.*    *Resolving Liens.* ................................................................................... 32

*5.12.*    *Time of WD Trust Distributions.* ................................................................ 33

*5.13.*    *Tax Treatment of WD Trust.* ...................................................................... 33

*5.14.*    *Resolution of the Claims of Minors In Accordance With the WD Trust.* ............... 34

*5.15.*    *Access to Claims Information.* .................................................................... 35

*5.16.*    *Distribution of Surplus.* ........................................................................... 35

**ARTICLE 6** ...................................................................................................... **35**

*6.1.*    *Management of the Post-Effective Date Estate.* ............................................. 35

*6.2.*    *Duties and Powers of the Estate Representative.* ............................................ 36

*6.3.*    *Other Actions.* ..................................................................................... 38

*6.4.*    *Closing of the Chapter 11 Case.* ................................................................ 38

*6.5.*    *Cancellation of Existing Agreements.* .......................................................... 38

*6.6.*    *Continued Corporate Existence.* ................................................................ 39

*6.7.*    *Effectuating Documents and Further Transactions.* ......................................... 39

**ARTICLE 7 PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS** .................. **39**

*7.1.*    *Disallowance of Multi-Claimant or Class Proofs of Claim.* ............................... 39

*7.2.*    *Voting of Claims.* .................................................................................. 39

*7.3.*    *Acceptance by Impaired Classes of Claims.* .................................................. 39

*7.4.*    *Nonconsensual Confirmation.* ................................................................... 40

*7.5.*    *Date of Distributions.* ............................................................................. 40

*7.6.*    *Disbursing Agent.* ................................................................................. 40

*7.7.*    *Appointment of Disbursing Agent.* .............................................................. 40

*7.8.*    *Rights and Powers of Disbursing Agent.* ...................................................... 40

*7.9.*    *Expenses of Disbursing Agent.* .................................................................. 41

*7.10.*    *Delivery of Distributions.* ........................................................................ 41

*7.11.*    *Undeliverable and Unclaimed Distributions.* ................................................. 41

*7.12.*    *Distribution Record Date.* ....................................................................... 42

*7.13.*    *Manner of Payment.* ............................................................................... 42

*7.14.*    *Currency.* ................................................................................................. 42

*7.15.*    *Minimum Cash Distributions.* .............................................................. 42

*7.16.*    *Setoffs and Recoupment.* ...................................................................... 42

*7.17.*    *Interest and Penalty on Claims.* ........................................................... 42

*7.18.*    *No Distribution in Excess of Allowed Amounts.* ............................... 43

*7.19.*    *Allocation of Plan Distributions Between Principal and Interest.* ...... 43

*7.20.*    *Procedures for Treating Disputed Claims Other Than Class 12 Claims.* .............. 43

**ARTICLE 8 EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......... 44**

*8.1.*    Rejection of Executory Contracts and Unexpired Leases. ....................... 44

*8.2.*    *Approval of Rejection of Executory Contracts and Unexpired Leases.* ........ 44

*8.3.*    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.* ......................... 45

*8.4.*    *Rejection Claims of Officers and Directors of the Debtor.* ..................... 45

*8.5.*    *Benefit Plans.* ......................................................................................... 45

*8.6.*    *Reservation of Rights.* ............................................................................ 45

**ARTICLE 9 CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ......... 45**

*9.1.*    *Conditions to Confirmation.* .................................................................. 45

*9.2.*    *Date of Effective Date.* ........................................................................... 46

*9.3.*    *Conditions to Effective Date.* ................................................................. 46

*9.4.*    *Satisfaction of Conditions.* .................................................................... 46

*9.5.*    *Occurrence of Effective Date* ................................................................. 46

*9.6.*    *Substantial Consummation Upon Effective Date* ................................. 46

**ARTICLE 10 EFFECT OF CONFIRMATION ...................................................... 46**

*10.1.*    *Vesting of Assets.* ................................................................................... 46

*10.2.*    *Binding Effect.* ....................................................................................... 47

*10.3.*    *Exculpations and Limitation of Liability.* ............................................. 47

*10.4.*    *Preservation and Non-Waiver of Estate Defenses and Objections and Related Rights Reserved for the Debtor, its Successors in Interest, Creditors and Parties in Interest.* ............................................ 47

*10.5.*    *Releases.* ................................................................................................. 48

*10.6.*    *Injunctions.* ............................................................................................. 53

*10.7.*    *Terms of Pre-Plan Injunction and Stays.* ............................................. 55

*10.8.*    *Canadian Criminal Charges and Related Claims of Canada.* .............. 56

*10.9.*    *Claims of the United States of America* ................................................. 56

*10.10.* Barred Persons and Barred Claims. ...................................................... 56

**ARTICLE 11 RETENTION OF JURISDICTION**.................................................. **60**

    *11.1.* *Jurisdiction of Bankruptcy Court.*.......................................... 60

**ARTICLE 12 MISCELLANEOUS PROVISIONS** ................................................ **62**

    *12.1.* *Withdrawal of the Reference.* ................................................. 62

    *12.2.* *Dissolution of the Creditors' Committee.* ............................... 62

    *12.3.* *Quasi-Judicial Immunity.* ..................................................... 62

    *12.4.* *Payment of Statutory Fees.* ................................................... 62

    *12.5.* *Effectuating Documents and Further Transactions.*............... 62

    *12.6.* *Exemption from Transfer Taxes.*........................................... 63

    *12.7.* *Elimination of Vacant Classes; Deemed Acceptance.* ............ 63

    *12.8.* *Modification of Plan.* ............................................................ 63

    *12.9.* *Revocation or Withdrawal of Plan.* ...................................... 63

    *12.10.* Severability. ......................................................................... 64

    *12.11.* Schedules and Exhibits. ...................................................... 64

    *12.12.* Successors and Assigns. ...................................................... 64

    *12.13.* Governing Law. ................................................................... 64

    *12.14.* Notices................................................................................. 65

    *12.15.* Time. .................................................................................... 65

    *12.16.* Section Headings.................................................................. 65

    *12.17.* No Admissions. .................................................................... 65

## SCHEDULES

| | |
|---|---|
| Schedule A | Wrongful Death Claim Resolution Procedures |
| Schedule B | Derailment Moral Damages and Personal Injury Claims Matrix |
| Schedule C | Derailment Property Damage Claims Distribution Mechanism |

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | Amended CCAA Plan |
| Exhibit 2 | Released Parties |
| Exhibit 3 | XL Settlement Agreement |

Robert J. Keach, Esq., as chapter 11 trustee (the "Trustee") for Montreal Maine & Atlantic Railway, Ltd. ("MMA" or the "Debtor"), the debtor in the above-captioned chapter 11 case, hereby proposes the Revised First Amended Plan of Liquidation Dated July 15, 2015 (the "Plan") to all of the known creditors and Holders of interests of the Debtor, as authorized by section 1121(a) of title 11 of the United States Code (the "Bankruptcy Code"), and moves this Court to enter an order confirming the Plan pursuant to section 1129 of the Bankruptcy Code, including, if required, section 1129(b). This Plan proposes to resolve all Claims against and Equity Interests in the Debtor. **IN PARTICULAR, CREDITORS AND PARTIES IN INTEREST SHOULD REVIEW SECTIONS 10.5 AND 10.6 OF THIS PLAN, WHICH PROVIDE FOR THIRD-PARTY RELEASES AND INJUNCTIONS THAT MAY AFFECT THE RIGHT TO PURSUE CLAIMS AGAINST NON-DEBTOR PARTIES AFTER THE PLAN IS CONFIRMED. CREDITORS AND PARTIES IN INTEREST SHOULD ALSO NOTE THAT THIS PLAN IS COORDINATED WITH, AND DESIGNED TO FUNCTION IN TANDEM WITH, THE CCAA PLAN FILED ON BEHALF OF THE DEBTOR'S CANADIAN SUBSIDIARY IN ITS CCAA CASE IN CANADA (AND WHICH IS ATTACHED AS EXHIBIT 1 HERETO); THE CCAA PLAN SHOULD ALSO BE CAREFULLY CONSIDERED, AS SOME OF ITS PROVISIONS ARE INCORPORATED INTO THE PLAN BY REFERENCE.** The Trustee reserves the right to, among other things, alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date as set forth in Sections 12.8 and 12.9.

## ARTICLE 1

## DEFINITIONS AND INTERPRETATION

**A.    Definitions.** The following terms when used in the Plan shall, unless the context otherwise requires, have the following respective meanings:

*1.1.*    Additional WD Trust Assets means any Cash or Cash equivalent realized by the Estate Representative, solely in his capacity as such, after the Confirmation Date from or as a result of Settlement Agreements entered into prior to the Effective Date, and the proceeds of the sale, monetization, or liquidation of Settlement Non-Cash Assets that the Estate Representative is entitled to sell, monetize or liquidate, in whole or in part, for the benefit of the WD Trust in accordance with the Settlement Agreements, together with all earnings thereon.

*1.2.*    Administrative Expense Claim means any Claim constituting a cost or expense of administration of the Chapter 11 Case pursuant to sections 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including, without limitation, (a) any Claim under section 503(b)(9) of the Bankruptcy Code for the value of goods sold to the Debtor in the ordinary course of business and received by the Debtor within twenty (20) days before the Petition Date, (b) any actual and necessary cost and expense, incurred after the Petition Date, of preserving the Estate, (c) any actual and necessary cost and expense, incurred after the Petition Date, of operating the Debtor's business, (d) any indebtedness or obligation incurred or assumed by the Trustee during the Chapter 11 Case, and (e) any compensation for professional services rendered and reimbursement of expenses incurred after the Petition Date; *provided*, *however*, that (i) any fees or charges assessed against the Estate under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid

in accordance with Section 12.4 of the Plan; and (ii) claims under 11 U.S.C. § 1171, including any Derailment Claims, shall be <u>excluded</u> from this definition of Administrative Expense Claim.

*1.3.*   <u>Administrative Expense Claims Bar Date</u> means December 1, 2014, the date established by the Bankruptcy Court pursuant to the *Order Establishing the Deadline for Filing Administrative Claims and Approving the Form and Manner of Notice Thereof* [D.E. 1164] as the deadline by which any person or entity asserting an Administrative Expense Claim against the Debtor must file an application for allowance of an Administrative Expense Claim.

*1.4.*   <u>Administrative Expense Fund</u> means the fund maintained by the Trustee, and any successor to the Trustee, sufficient to pay the Administrative Expense Claims of the Trustee and the Trustee's professionals and the professionals retained by the Creditors' Committee, as well as of the Estate Representative and his professionals, which fund shall consist of the Estate's portion of the Settlement Payments (but not including the XL Indemnity Payment) allocable to payment of administrative expenses pursuant to the CCAA Plan and the Settlement Agreements, as well as such portion of Cash and proceeds of Residual Assets as the Trustee, in his reasonable discretion, shall determine is necessary to insure full payment of such Administrative Expense Claims, but, with respect to any portion of the Settlement Payments, subject to any cap on such allocation set forth in the CCAA Plan, as amended.

*1.5.*   <u>Affiliate</u> has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code, and shall include, without limitation, MMA Canada.

*1.6.*   <u>Affiliated Parties Injunction</u> means the injunction described in Section 10.6(b)(ii) of this Plan.

*1.7.*   <u>Affiliate Release</u> means the release set forth in Section 10.5(b)(iii) of this Plan.

*1.8.*   <u>Affiliated Parties Settlement Agreement</u> means the Settlement Agreement between and among the Trustee, MMA Canada and the Affiliated Released Parties.

*1.9.*   <u>Affiliated Released Parties</u> means the Rail World Parties, the Officers and Directors, Chubb and Hartford.

*1.10.*   <u>Allowed</u> means, with reference to any Claim against the Debtor, other than an Administrative Expense Claim, (a) any fixed Claim against the Debtor that has been listed by the Debtor in its Schedules (as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009 and any applicable Local Bankruptcy Rule) as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any Proof of Claim filed on or before the Bar Date (i) as to which no objection has been or is interposed in accordance with any applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court and as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order and to the extent such objection is determined in favor of the respective Holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or as provided in Section 7.20 of the Plan, and (e) any Claim filed in the

CCAA Case that is deemed filed in the Chapter 11 Case by virtue of the Bar Date Order and which would qualify as Allowed under subsection (b) of this paragraph 1.10 above; *provided*, *however*, that (1) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" and (2) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code. Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Claim" shall not, for any purpose under the Plan, include interest from and after the Petition Date or penalties assessed on any Claim.

  *1.11.* <u>Allowed Administrative Expense Claim</u> means an Administrative Expense Claim a request for payment of which was timely filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date and which has been allowed pursuant to a Final Order of the Bankruptcy Court, including, without limitation, the Confirmation Order, but Derailment Claims and Claims under 11 U.S.C. §1171(b) shall not be or become Allowed Administrative Expense Claims.

  *1.12.* <u>APA</u> means that certain Asset Purchase Agreement dated as of December 12, 2013 (as amended from time to time), by and among the Trustee, MMA Canada, and the Purchaser.

  *1.13.* <u>Asset Sale</u> means the sale of substantially all (but not all) of the Assets of the Debtor and MMA Canada to the Purchaser pursuant to the APA.

  *1.14.* <u>Asset Sale Consideration</u> means the total consideration paid and/or provided by the Purchaser under the APA including, without limitation, Cash and assumption of obligations of the Debtor and/or MMA Canada.

  *1.15.* <u>Assets</u> means any and all assets, property, property interests and property rights of the Debtor, whether tangible, intangible, vested, contingent, exclusive, joint, real, personal or mixed, that constitute property of the Estate.

  *1.16.* <u>Avoidance Actions</u> means any actions commenced, or that may be commenced before or after the Effective Date, pursuant to sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code, including, without limitation, such actions that arise under state law for fraudulent conveyance, insider preference, and other similar avoidance actions.

  *1.17.* <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

  *1.18.* <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Maine.

  *1.19.* <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any applicable local rules of the Bankruptcy Court.

*1.20.*   Bar Date means, as to a particular claim, the deadline for filing a Proof of Claim as to such Claim established by the Bar Date Order.

*1.21.*   Bar Date Order means the order of the Bankruptcy Court dated March 20, 2014 and entered at Docket No. 783 establishing deadlines for the filing of Proofs of Claim and establishing other claims filing procedures and requirements, as well as providing for the deemed filings in this Chapter 11 Case, of certain Derailment Claims for which Proofs of Claim were filed in the CCAA Case.

*1.22.*   Books and Privileges means all books and records of the Debtor, including, without limitation, all documents and communications of any kind, whether physical or electronic, the right to assert or waive any privilege, including, without limitation, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written, electronic, or oral), and rights to direct current or former agents, attorneys, advisors, and other professionals of the Debtor to deliver such documents or communications.

*1.23.*   Business Day means any day other than a Saturday, Sunday, or any other day on which commercial banks are required or authorized to close by law or executive order.

*1.24.*   Canada means the Attorney General of Canada, the Government of Canada, Her Majesty the Queen in Right of Canada and the departments, crown corporations and agencies including the Canadian Transportation Agency, and including all past, present and future Ministers, officers, employees, representatives, servants, agents, parents, subsidiaries and affiliated crown corporations and agencies, and their respective estates, successors and assigns.

*1.25.*   Cash means lawful currency of the United States of America or Canada, including but not limited to bank deposits, checks, and other similar items.

*1.26.*   Causes of Action means any and all Claims, Avoidance Actions, demands, rights, actions, rights of action, causes of action, judgments, proceedings, damages, accounts, defenses, affirmative defenses, rights of setoff, offsets, powers, privileges, licenses, franchises, third-party claims, counterclaims, cross-claims, actions for declaratory or injunctive relief, suits and other rights of recovery of the Debtor, the Trustee, and the Estate (but subject in all cases to the exculpation provisions of Section 10.3 and the release provisions of Section 10.5, and the injunctions set forth in Section 10.6 of the Plan), against or with respect to any Person, including without limitation, Claims of the Debtor, Trustee, or Estate against any affiliate, current or former officer, director or employee of the Debtor or any affiliate or property, wherever located, of any nature whatsoever, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, asserted or unasserted or pending as of the Effective Date, whether direct, indirect, derivative or on any other basis, whether existing or hereafter arising, whether arising in whole or in part prior to, on or after the Petition Date, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case or thereafter, in contract or in tort, at law or in equity, whether pursuant to any federal or state statute or common law or under any theory of law or equity, including, without limitation, the Trustee's Derailment Litigation as well as any available: (a) rights of setoff, counterclaim,

4

recoupment, replevin or reclamation, and Claims on contracts or for breaches of duties imposed by law; (b) rights to object to or seek estimation of Claims or Equity Interests; (c) Claims pursuant to section 362 of the Bankruptcy Code; (d) Claims, causes of action and defenses against any Person, including without limitation, for intentional or negligent misrepresentation, fraud, mistake, duress and usury, breach of fiduciary duty, malpractice, negligence, breach of contract, wrongful distribution, aiding and abetting, or inducement, and (e) Avoidance Actions.

*1.27.*   CCAA Approval Order means the Final Order of the CCAA Court sanctioning, conforming and/or confirming the CCAA Plan and, *inter alia*, approving and implementing the Releases and Injunctions.

*1.28.*   CCAA Case means the proceeding under the Canadian Companies' Creditors Arrangement Act of MMA Canada pending before the Québec Superior Court (Commercial Division) and designated by Court File No. 450-11-000167-134.

*1.29.*   CCAA Court means the court presiding over the CCAA Case.

*1.30.*   CCAA Plan means the Amended Plan of Compromise and Arrangement filed by MMA Canada in the CCAA Case and which CCAA Plan, *inter alia*, shall contain Releases and Injunctions for the benefit of Released Parties, a copy of the CCAA Plan is attached to this Plan as Exhibit 1.

*1.31.*   Chapter 11 Case means the Debtor's chapter 11 case.

*1.32.*   Chapter 15 Case means the case commenced or to be commenced under Chapter 15 of the Bankruptcy Code by the Monitor as the foreign representative of MMA Canada in the Bankruptcy Court for the purposes of, without limitation, obtaining the Chapter 15 Recognition and Enforcement Order.

*1.33.*   Chapter 15 Recognition and Enforcement Order means the order entered by the Bankruptcy Court, pursuant to 11 U.S.C. §§ 1507 and 1521, recognizing and enforcing to the fullest extent possible within the United States, the CCAA Approval Order.

*1.34.*   Chubb means the insurer under the Chubb Policy and any other entity providing or contributing to coverage or funding of coverage under the Chubb Policy.

*1.35.*   Chubb Policy means the insurance policy issued by Federal Insurance Company to Rail World, Inc. and Rail World Holdings LLC bearing Policy Number 8210 2375.

*1.36.*   Claim has the meaning set forth in section 101(5) of the Bankruptcy Code and, to the extent same would broaden the definition, as set forth in any order of the CCAA Court.

*1.37.*   Claimant means the Holder of a Claim.

*1.38.*   Claims Objection Date means the date that is one-hundred twenty (120) days from the last to occur of: (a) the Bar Date; (b) with respect to a specified Claim for which a creditor is allowed to file a Proof of Claim after the Bar Date, twenty (20) days after the date on which such Proof of Claim is to be filed; or (c) the Confirmation Date.  The failure to object to any Claim by

the Claims Objection Date shall not constitute a waiver, acceptance, or release of any Claim or Cause of Action against a creditor, including any Avoidance Actions.

*1.39.* <u>Class</u> means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122 of the Bankruptcy Code.

*1.40.* <u>Class 13 Cash</u> means any Cash generated from the monetization or liquidation of Residual Assets, any unencumbered Cash which was part of, or was generated from the Asset Sale Consideration or the Debtor's operations, and any surplus WD Trust Assets, as determined pursuant to Section 5.16 of the Plan, in all cases to the extent not used to fund the Administrative Expense Fund or to fund payments to Holders of Claims in Classes 1 through 7, inclusive, to the extent provided by the Plan.

*1.41.* <u>Collateral</u> means any property or interest in property of the Estate subject to a Lien, charge, encumbrance, or right of setoff to secure the payment or performance of a Claim, which Lien, charge, encumbrance, or right of setoff is not subject to avoidance under the Bankruptcy Code.

*1.42.* <u>Confirmation Date</u> means the date on which the Confirmation Order becomes a Final Order.

*1.43.* <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as the same may be amended, pursuant to section 1128(a) of the Bankruptcy Code.

*1.44.* <u>Confirmation Order</u> means the Order entered by the Bankruptcy Court confirming the Plan, as the same may be amended, pursuant to section 1129 of the Bankruptcy Code, which shall include, without limitation, approval of the Settlement Agreements and the Releases and Injunctions.

*1.45.* <u>Contingent Claim</u> means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the Debtor now or hereafter exists or previously existed.

*1.46.* <u>Contributing Parties</u> means the parties that have executed Settlement Agreements prior to the Effective Date.

*1.47.* <u>Creditors' Committee</u> means the official committee of Derailment victims appointed by the Bankruptcy Court on October 18, 2013.

*1.48.* <u>D&O Insurance Policies</u> means all primary and excess insurance policies of the Debtor, MMA Canada, the Rail World Parties, or a non-Debtor Affiliate that provides for, among other things, coverage for liability related to the actions or omissions of the directors or officers of the Debtor, MMA Canada or any of all of the Rail World Parties other than the XL

Policy, Indian Harbor Policy, the Chubb Policy and Hartford Policy, but specifically including, without limitation, the Great American Policy.

*1.49.* Debtor means Montreal Maine & Atlantic Railway, Ltd.

*1.50.* Derailment means the July 6, 2013 derailment of an unmanned train owned by the Debtor in Lac-Mégantic, Québec, including any and all events leading up to and related to such derailment and/or any and all consequences of such derailment, including, without limitation, the explosion, crude oil spill, fire and/or other consequences related to such derailment.

*1.51.* Derailment Claims means all Claims by any Persons or entities against the Debtor, MMA Canada or any other third-party, Person or entity arising out of or relating to the Derailment, including but not limited to those Claims set forth in Sections 1.52, 1.53, 1.55, 1.57 and 1.58.

*1.52.* Derailment Government Claims means any Derailment Claims held or asserted by any governmental, provincial or municipal entity, against the Debtor, MMA Canada, or any other person or entity including, without limitation, the province of Québec, Canada and/or the Village of Lac Mégantic, Québec, or any agency, division, or instrumentality of such entities.

*1.53.* Derailment Moral Damages and Personal Injury Claims means a liquidated or unliquidated Claim against the Debtor, MMA Canada or any other person or entity whether in the nature of or sounding in tort, contract, warranty, employer liability or any other theory of law, equity or admiralty, whatsoever, for, attributable to or arising under the laws of any jurisdiction, by reason of, directly or indirectly, physical, emotional or other personal injuries caused by, or allegedly caused by, or arising from, in whole or in part, directly or indirectly, the Derailment including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages (such as, without limitation, medical monitoring, personal or bodily injury, proximate, consequential, general and special damages) and punitive damages. Derailment Moral Damages and Personal Injury Claims shall include, without limitation, any Claim for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law, (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative or indirect Derailment Moral Damages and Personal Injury Claims of any kind whatsoever, whether in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, whatsoever.  Notwithstanding the foregoing, Derailment Moral Damages and Personal Injury Claims shall not include (a) Derailment Property Damage Claims, (b) Derailment Government Claims; (c) Derailment Wrongful Death Claims; (d) Derailment Property Subrogated Insurance Claims; and (e) any workers' compensation claim brought directly against the Debtor or a non-Debtor Affiliate by a past or present employee of the Debtor under an applicable workers' compensation statute and which would be covered by workers' compensation insurance or an applicable and fully funded self-insurance program.

*1.54.* Derailment Moral Damages and Personal Injury Claims Matrix means the matrix attached to this Plan as Schedule B.

*1.55.* Derailment Property Damage Claims means a liquidated or unliquidated Claim against, or any debt, obligation or liability of the Debtor, MMA Canada or any other person or

entity arising under the laws of any jurisdiction, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty, for, attributable to or arising by reason of, directly or indirectly, (a) property damages (whenever suffered), including, but not limited to, diminution in the value thereof, or environmental damage or economic loss to property; or (b) business interruption or loss of profits or earnings, in all cases caused by or allegedly caused by, directly or indirectly, the Derailment including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages, and also including, without limitation, any claim for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law, attributable to Derailment Property Damage Claims.  Derailment Property Damage Claims shall not include (a) Derailment Moral Damages and Personal Injury Claims, (b) Derailment Government Claims; (c) Derailment Wrongful Death Claims; (d) Derailment Property Subrogated Insurance Claims; and (e) any workers' compensation claim brought directly against the Debtor or a non-Debtor Affiliate by a past or present employee of the Debtor under an applicable workers' compensation statute, and which would be covered by workers' compensation insurance or an applicable and fully funded self-insurance program.

*1.56.*   Derailment Property Damage Claims Distribution Mechanism shall mean Schedule C attached to this Plan.

*1.57.*   Derailment Property Subrogated Insurance Claim means a liquidated or unliquidated Claim against, or any debt, obligation or liability of the Debtor, MMA Canada, or any other person or entity, arising under the laws of any jurisdiction, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty, for, attributable to or arising by reason of, directly or indirectly, (a) property damages (whenever suffered), including, but not limited to, diminution in the value thereof, or environmental damage or economic loss to property; or (b) business interruption or loss of profits or earnings caused or allegedly caused, directly or indirectly, by the Derailment and arising or allegedly arising, directly or indirectly, from acts or omissions of the Debtor, or its predecessors and which is held by an Insurance Company that (i) with respect to its obligations, has paid in full all amounts due to an insured who would, but for such payment, hold a Derailment Property Damage Claim; (ii) is subrogated to such insured's claim as a matter of law; and (iii) has timely filed a Proof of Claim in the Chapter 11 Case or the CCAA Case with respect to such Claim (and in the case of a Proof of Claim filed in the CCAA Case, is deemed, under the Bar Date Order, to have been timely filed in the Chapter 11 Case).

*1.58.*   Derailment Wrongful Death Claims means a liquidated or unliquidated Claim against the Debtor, MMA Canada, or any other person or entity arising under the laws of any jurisdiction, including, without limitation, held by an executor, administrator, decedent's estate or estate representative, or beneficiary of a decedent's estate, whether in the nature of or sounding in tort, contract, warranty, employer liability or any other theory of law, equity or admiralty, whatsoever, for, attributable to or arising under the laws of any jurisdiction, by reason of the death of an individual person caused, or allegedly caused, in whole or in part, directly or indirectly, by the Derailment  including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages (such as, without limitation, loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages) and punitive damages.  Derailment Wrongful Death Claims shall include, without limitation, any Claim for

8

contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law, (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative or indirect Derailment Wrongful Death Claims of any kind whatsoever, whether in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, whatsoever, except to the extent that such claims have been released or assigned to the Estate pursuant to a Settlement Agreement.    Notwithstanding the foregoing, Derailment Wrongful Death Claims shall not include (a) Derailment Government Claims; (b) Derailment Moral Damages and Personal Injury Claims; (c) Derailment Property Damage Claims; (d) Derailment Property Subrogated Insurance Claims; or (e) any workers' compensation claim brought directly against the Debtor or a non-Debtor Affiliate by a past or present employee of the Debtor under an applicable workers' compensation statute, and which would be covered by workers' compensation insurance or an applicable and fully funded self-insurance program.

*1.59.*    Disbursing Agent means the Person or entity appointed to make distributions pursuant to the Plan under Article 7 of the Plan.

*1.60.*    Disclosure Statement means that certain amended disclosure statement filed by the Trustee, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time.

*1.61.*    Disputed Claim means a Claim which the Debtor listed on its schedules as contingent, unliquidated or disputed or any Claim against the Debtor which has been the subject of a written objection filed with the Bankruptcy Court by the Claims Objection Date.

*1.62.*    Distribution Date means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent, on which the Disbursing Agent makes a distribution to Holders of Allowed Claims and/or the WD Trust.

*1.63.*    Distribution Record Date means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

*1.64.*    District Court means the United States District Court for the District of Maine.

*1.65.*    Effective Date means a date which is a Business Day and which is set in accordance with Section 9.2 of the Plan, and is the date upon which the Plan becomes effective.

*1.66.*    Equity Interest means the interest of any Holder of equity securities of the Debtor represented by issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in the Debtor, whether or not transferable, or any option, warrant, contractual or other right to acquire any such interest.

*1.67.*    Estate means the estate created in the Chapter 11 Case of the Debtor pursuant to section 541 of the Bankruptcy Code.

*1.68.*    Estate Injunction means the injunction described in Section 10.6(b)(i) of the Plan.

9

*1.69.*    Estate Representative means the Trustee or any successor in interest to the Trustee in such capacity, including, but not limited to, the Estate Representative, whether such successor is appointed under the Plan, the Confirmation Order, or otherwise.

*1.70.*    Exculpated Party means any of the Debtor, the Trustee, the Disbursing Agent, the WD Trustee, the Estate, the WD Trust, and their respective professionals retained after the Petition Date and approved by the Bankruptcy Court, each in their respective capacities.

*1.71.*    Final Order means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, amended, modified or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, or any other applicable U.S. or Canadian rule or procedure, may be filed relating to such order shall not prevent such order from being a Final Order.

*1.72.*    45G Proceeds shall have the meaning set forth in the FRA Adequate Protection Order.

*1.73.*    FRA shall mean the United States of America, through the Department of Transportation, Federal Railroad Administration.

*1.74.*    FRA Adequate Protection Order shall mean the order entered in the Chapter 11 Case at Docket No. 742.

*1.75.*    Funds for Distribution shall have the meaning set forth in the CCAA Plan.

*1.76.*    General Unsecured Claim means any Claim against the Debtor other than a Derailment Claim, Administrative Expense Claim, Secured Claim, Priority Tax Claim, Priority Claim, or Subordinated Claim.

*1.77.*    Governmental Unit has the meaning set forth in section 101(27) of the Bankruptcy Code.

*1.78.*    Great American means Great American Insurance Company, but strictly as the insurer under the Great American Policy.

*1.79.*    Great American Policy means the insurance policy issued by Great American to Montréal Maine & Atlantic Corporation, the Debtor and/or MMA Canada and bearing policy number DML 9924 836.

10

*1.80.* <u>Hartford</u> means The Hartford Casualty Insurance Company, together with its parents, subsidiaries, affiliates, officers and directors, but strictly as the insurer under the Hartford Policy.

*1.81.* <u>Hartford Policy</u> means the insurance policy issued by Hartford to Rail World, Inc. and bearing policy number 83 SBA PBO432 SA.

*1.82.* <u>Holder</u> means a creditor holding, including by assignment, a Claim against the Estate.

*1.83.* <u>Indian Harbor Policy</u> means the policy issued by Indian Harbor Insurance Company to the Debtor and bearing Policy No. RRL - 003723801.

*1.84.* <u>Initial Distribution</u> means the first distribution that the Disbursing Agent makes to Holders of Allowed Claims or the WD Trust.

*1.85.* <u>Initial Distribution Date</u> means the date occurring on or as soon as reasonably practicable after the Effective Date, but in no event more than one-hundred-and-twenty (120) days after the Effective Date, on which the Disbursing Agent makes the Initial Distribution to Holders of Allowed Claims or the WD Trust.

*1.86.* <u>Initial WD Trust Assets</u> means the share of the Settlement Payments allocable to Derailment Wrongful Death Claims, i.e. 24.1% of the Funds for Distribution and 53.3% of the Reallocated Dividends, which payments shall represent compensatory damages paid upon such Claims only and shall also be deemed to have been made pursuant to the Plan and pursuant to a "court order" necessary to satisfy the requirements of Internal Revenue Code section 468B.

*1.87.* <u>Injunctions</u> means, collectively, the Estate Injunction, the Affiliated Parties Injunction and the Third Party Injunction, as set forth in Section 10.6 of this Plan.

*1.88.* <u>Insurance Action</u> means any Claim, Cause of Action, or right of the Debtor, or of any Person or entity to the extent such Claim, Cause of Action or right is assigned to the Trustee or the Estate Representative pursuant to a Settlement Agreement, under the laws of any jurisdiction, against any Insurance Company, arising from or related to: (a) any such Insurance Company's failure to provide or pay under an insurance policy; (b) the refusal of any such Insurance Company to compromise and settle any Derailment Claim under or pursuant to any insurance policy; (c) the interpretation or enforcement of the terms of any insurance policy with respect to any Derailment Claim; or (d) any conduct of any Insurance Company constituting "bad faith" or other wrongful conduct under applicable law.

*1.89.* <u>Insurance Company</u> means any insurance company, insurance broker, or syndicate insurance broker, guaranty association, or any other entity that may have liability under an insurance policy.

*1.90.* <u>Lien</u> has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.91.* <u>Local Bankruptcy Rules</u> means the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maine, as amended from time to time.

*1.92.*   MMA Canada means Montreal Maine and Atlantic Canada  Co., the debtor in the CCAA Case.

*1.93.*   Monitor means Richter Advisory Group, Inc. the monitor appointed in the CCAA Case.

*1.94.*   Non-Settling Defendants means any and all Persons who are, could be or may be defendants in any cause of action brought or which could be brought in any court or other forum of competent jurisdiction (including, without limitation, administrative proceedings) asserting a Derailment Claim, including, without limitation, a claim for indemnity, contribution, reimbursement, or by way of subrogation, but who are not Released Parties.  Without limiting the foregoing, Non-Settling Defendants shall include Canadian Pacific Railway Company and any parent, subsidiaries, or affiliates thereof.

*1.95.*   Officers and Directors means the Officers and Directors of the Debtor and MMA Canada as of the date of the Derailment.

*1.96.*   Other Released Parties means the Released Parties other than the Affiliated Released Parties.

*1.97.*   "Person" or "Persons" shall mean (and include) a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company, limited liability partnership, or limited partnership, a proprietorship, joint venture trust, legal representative, or any other unincorporated association, business organization or enterprise, any government entity or other regulatory authority and any successor in interest, Governmental Unit, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity .

*1.98.*   Petition Date means August 7, 2013.

*1.99.*   Plan means the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015, as the same may be amended from time to time.

*1.100.*   Plan Implementation Date with respect to the CCAA Plan, shall have the meaning set forth in the CCAA Plan.

*1.101.*   Plan Supplement means the supplement or supplements, as amended or modified, to the Plan containing certain documents relevant to the implementation of the Plan and which shall include, but will not be limited to, the WD Trust Agreement.  The Plan Supplement shall be filed with the Bankruptcy Court by the Plan Supplement Filing Date.

*1.102.*   Plan Supplement Filing Date means the date that is no later than ten (10) calendar days before the deadline set to file objections to the approval of the Disclosure Statement.

*1.103.*   Post-Confirmation Causes of Action shall mean: (a) any and all Causes of Action, whether arising before or after the Petition Date and whether arising under state or federal law, constituting Avoidance Actions; (b) the Trustee's Derailment Litigation; (c) any Insurance

Action (except to the extent the underlying insurance policy constitutes a Settlement Non-Cash Asset); (d) any other litigation initiated by the Trustee before or after the Petition Date as to any Causes of Action; and (e) any and all proceeds, whether in the form of cash or otherwise, from any recoveries on or settlement of such Causes of Action.

*1.104.* Post-Effective Date Estate means the Estate, as preserved by this Plan and the Debtor, from and after the Effective Date.

*1.105.* Priority Claim means any Claim (other than an Administrative Expense Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code, and also means any Claim arising under section 1171(b) of the Bankruptcy Code.

*1.106.* Priority Tax Claim means a Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*1.107.* Pro Rata means, with respect to a particular Claim, as of a particular distribution date, the ratio (expressed as a percentage) of the amount of that particular Claim to the sum of the aggregate amount of all Allowed Claims of the same Class.

*1.108.* Proof of Claim means any proof of claim filed with the Bankruptcy Court or its duly appointed claims agent with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002, unless and to the extent that the Bankruptcy Court has ordered the use of a special or customized form for the particular type of Claim at issue, and in such case, the special or customized form of proof of claim, as well as any proof of claim filed with the CCAA Court and which would be deemed filed in the Bankruptcy Court by virtue of an order of the CCAA Court or the Bar Date Order.

*1.109.* Purchaser means Railroad Acquisition Holdings LLC, now doing business as Central Maine and Québec Railroad.

*1.110.* Rail World Parties means (a) Rail World Holdings, LLC; (b) Rail World, Inc.; (c) Rail World Locomotive Leasing LLC; (d) The San Luis Central R.R. Co.; (e) Pea Vine Corporation; (f) Montreal Maine & Atlantic Corp.; (g) LMS Acquisition Corp; (h) Earlston Associates, L.P.; and (i) each of the shareholders, directors, officers, members or partners of the foregoing (in such capacity only). For the avoidance of doubt, Rail World Parties also include Edward Burkhardt, solely in his capacity as director, officer and shareholder of the Rail World Parties.

*1.111.* Reallocated Dividends shall have the meaning set forth in the CCAA Plan.

*1.112.* Released Parties means (a) the Debtor;  (b) the Trustee and his agents, attorneys, accountants, financial advisors, restructuring consultants, and investment bankers; (c) MMA Canada's attorneys; (d) the Monitor and its employees and attorneys; (e) the WD Trustee and its respective agents, attorneys, accountants and financial advisors; (f) the Estate Representative and the Disbursing Agent and their respective agents, attorneys, accountants and financial advisors; (g) Contributing Parties; and (h) any Persons or entities designated as receiving a release in any Settlement Agreements (and only to the extent of the release set forth in that Settlement

Agreement) executed by any Contributing Party or Parties, the Trustee and MMA Canada. Released Parties shall include the persons or entities listed on Exhibit 2 to this Plan.

**1.113.** Releases means all of the releases set forth in Section 10.5 of this Plan.

**1.114.** Residual Assets means all Assets, if any, belonging to the Debtor, the Estate or MMA Canada and not sold in the Asset Sale, including, without limitation, real estate, Cash, personal property, intangibles, rights to payment, Post-Confirmation Causes of Action, and any other Causes of Action of the Debtor or the Estate not previously released or released pursuant to the Plan or included in the Initial WD Trust Assets, all of which Causes of Action are preserved under the Plan.

**1.115.** Sale Order means that certain Order Granting Motion to Sell entered by the Bankruptcy Court in the Chapter 11 Case on or about January 24, 2014, and authorizing the sale of Assets to the Purchaser.

**1.116.** Schedules means, collectively, the schedules of Assets and liabilities, schedules of executory contracts and unexpired leases, schedules of current income and expenditures and statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Chapter 11 Case, as may have been amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.117.** Secured Claim means a Claim, if any, that is secured by a valid, perfected, and enforceable Lien on property of the Debtor under applicable state law or by reason of a Final Order as well as on property in which the Estate has an interest to the extent of the value of such property or a Claim, if any, that is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff, in each case as determined in accordance with section 506(a) of the Bankruptcy Code, or as otherwise agreed upon in writing by the Trustee and the Holder of such Claim.

**1.118.** Settlement Agreements means any settlement agreement entered into, among the Trustee, MMA Canada and one or more of the Contributing Parties on or before the Effective Date of the Plan.

**1.119.** Settlement Non-Cash Assets means any rights, Assets, or property, other than Cash, transferred to the Trustee, the Monitor, MMA Canada, the Estate or the Estate Representatives, pursuant to any Settlement Agreement, this Plan or the CCAA Plan, including, without limitation, rights under or pursuant to the Chubb Policy, the Great American Policy, and any other D&O Insurance Policies or Policy specifically designated in such Settlement Agreement.

**1.120.** Settlement Payments means any payment funded or to be paid to the Trustee, the Monitor, or the Estate, the WD Trust or other designee of the Trustee or MMA Canada pursuant to a Settlement Agreement.

***1.121.*** <u>Subordinated Claims</u> means all Claims that are subordinated or subject to subordination to any or all General Unsecured Claims, including, without limitation, Claims that are subject to subordination pursuant to sections 509 and 510 of the Bankruptcy Code.

***1.122.*** <u>Tax Authority</u> means a federal, state, local, or foreign government, or agency, instrumentality, or employee thereof, court or other body (if any) charged with the administration of any law relating to Taxes.

***1.123.*** <u>Tax Code</u> means the United States Internal Revenue Code of 1986, as amended from time to time.

***1.124.*** <u>Tax Returns</u> means a return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Taxes, including any schedule or attachment thereto or amendment thereof, including any claim for a Tax refund.

***1.125.*** <u>Taxes</u> means all (a) federal, state, local, or foreign taxes, including, without limitation, all net income, alternative minimum, net worth or gross receipts, capital, value added, franchise, profits, estimated, property, transfer, and sales or use taxes; and (b) interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority or paid in connection with any item described in clause (a) hereof.

***1.126.*** <u>Third Party Injunction</u> means the injunction described in Section 10.6(b)(iii) of the Plan.

***1.127.*** <u>Transferred WD Cases</u> means the civil actions transferred pursuant to 28 U.S.C. §157(b)(5) in connection with the Chapter 11 Case to the District Court, originally filed in the Cook County, Illinois state court, and appearing on the docket of the District Court as Civil Action Nos. 00113-00130NT.

***1.128.*** <u>Travelers' Proceeds</u> shall have the meaning set forth in the FRA Adequate Protection Order.

***1.129.*** <u>Treasury Regulations</u> means the United States Department of Treasury regulations promulgated under the Tax Code.

***1.130.*** <u>Trustee's Derailment Litigation</u> means Adversary Proceeding No. 14-01001 filed in the Bankruptcy Court and captioned Robert J. Keach, solely in his capacity as the chapter 11 trustee for Montreal Maine & Atlantic Railway, Ltd., Plaintiff v. World Fuel Corporation, World Fuel Services, Inc., Western Petroleum Company, World Fuel Services, Canada, Inc., Petroleum Transport Solutions, LLC, Canadian Pacific Railway Company, Irving Oil Limited, and SMBC Rail Services, LLC, Defendants, including without limitation, all claims and counterclaims therein, as same may be amended from time to time.

***1.131.*** <u>Unclaimed Property</u> means any distribution of Cash or any other property made to the Holder of an Allowed Claim pursuant to the Plan that (a) is returned to the Disbursing Agent or WD Trustee as undeliverable and no appropriate forwarding address is received within the later of (i) ninety (90) days after the Effective Date and (ii) ninety (90) days after such attempted

distribution by the Disbursing Agent or WD Trustee is made to such Holder or (b) in the case of a distribution made in the form of a check, is not negotiated within ninety (90) days after remittance of the check and no request for re-issuance is made within such 90-day period.

*1.132.* Unimpaired means, with respect to any Claim, that such Claim is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*1.133.* Unliquidated Claim means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

*1.134.* U.S. Trustee means the United States Trustee for the District of Maine.

*1.135.* UST Fees means the quarterly fees paid and payable to the U.S. Trustee.

*1.136.* WD Trust means the trust organized under Delaware law and established under Article 5 of the Plan for the sole purpose of liquidating and distributing the WD Trust Assets to Holders of Allowed Derailment Wrongful Death Claims.

*1.137.* WD Trust Agreement means the agreement between the Debtor, the Trustee, and the WD Trustee governing the WD Trust, dated as of the Effective Date, to be filed with the Plan Supplement, as same may be amended from time to time.

*1.138.* WD Trust Assets means (a) the Initial WD Trust Assets, which the Estate Representative shall deliver, transfer or cause to be delivered or transferred, as applicable, to the WD Trust, (b) the Additional WD Trust Assets, which, following the Confirmation Date and as soon after receipt as is reasonably practicable, the Estate Representative shall deliver or cause to be delivered to the WD Trust, (c) any additional assets to be disbursed to the WD Trust from the Settlement Agreements in accordance with the Plan and the CCAA Plan, all of which shall constitute compensatory damages payable to the WD Trust Beneficiaries by order or judgment of a court of competent jurisdiction.

*1.139.* WD Trust Beneficiaries means Holders of Allowed Derailment Wrongful Death Claims.

*1.140.* WD Trust Distribution Procedures means the WD Trust Distribution Procedures as used and defined in the WD Trust Agreement, or as subsequently modified or amended, and including, without limitation, Schedule A to this Plan.

*1.141.* WD Trust Expenses means all costs, taxes, and expenses of, or imposed on, the WD Trust, including, but not limited to, WD Trustee compensation, employee compensation, insurance premiums, legal, accounting, and other professional fees and expenses, overhead, disbursements, and expenses relating to the implementation of the WD Trust Distribution Procedures up to a cap of $250,000, but excluding payments to Holders of Allowed Derailment Wrongful Death Claims or reimbursements of such payments.

*1.142.* WD Trustee means the Person designated on or before the Confirmation Date in accordance with the Plan to govern and administer the WD Trust on and after the Effective Date.

*1.143.* <u>Wheeling</u> shall mean Wheeling & Lake Erie Railway Company, a creditor of the Debtor.

*1.144.* <u>Wheeling Adversary Proceeding</u> shall mean Adversary Proceeding No. 13-01033 pending before the Bankruptcy Court and any claims and counterclaims therein.

*1.145.* <u>Wheeling Appeal</u> shall mean Wheeling's appeal of the order of the United States Bankruptcy Appellate Panel of the First Circuit dated December 9, 2014.

*1.146.* <u>Wheeling Orders</u> shall mean the orders of the Bankruptcy Court entered at Docket Nos. 376 and 1047 to the extent they affect any Claim or Lien, if any, of Wheeling.

*1.147.* <u>Wheeling § 506(c) Motion</u> shall mean the Trustee's Motion Seeking to Surcharge Wheeling's Collateral and filed at Docket No. 854.

*1.148.* <u>Wheeling § 363 Motion</u> shall mean Wheeling's Motion, filed at Docket No. 603 allegedly seeking to enforce certain of the Wheeling Orders.

*1.149.* <u>Wheeling Proceedings</u> mean the Wheeling Adversary Proceeding, the Wheeling Appeal, the Wheeling Orders, the Wheeling § 506(c) Motion, the Wheeling § 363 Motion, and any other proceeding or contested matter that may be initiated by or against Wheeling, including any Avoidance Action.

*1.150.* <u>Wrongful Death Claim Resolution Procedures</u> means the Wrongful Death Claim Resolution Procedures (including the points-based matrix) attached to this Plan as Schedule A.

*1.151.* <u>XL Additional Payment</u> means the payment of US $5 million to be paid to the Monitor and the Trustee pursuant to the XL Settlement Agreement.

*1.152.* <u>XL Companies</u> means Indian Harbor Insurance Company, XL Insurance, XL Group plc and their affiliates.

*1.153.* <u>XL Indemnity Payment</u> means the payment of CDN $25 million to be paid to the Monitor pursuant to the XL Settlement Agreement.

*1.154.* <u>XL Insurance</u> means the Canadian Branch of XL Insurance Company SE (formerly XL Insurance Company Limited).

*1.155.* <u>XL Policy</u> means the insurance policy issued by XL Insurance and bearing policy number RLC003808301.

*1.156.* <u>XL Policies</u> means the Indian Harbor Policy and the XL Policy.

*1.157.* <u>XL Settlement Agreement</u> shall mean the Settlement Agreement attached as <u>Exhibit 3</u> to this Plan.

**B.      Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  Whenever the words "include," "includes" or "including" are used in the Plan, they are deemed to be followed by the words "without limitation."  A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender and the neuter and words denoting the neuter shall include any applicable gender. Unless otherwise provided herein, in the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan, the definitive documentation shall control and shall be binding on the parties thereto. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE 2

## PROVISIONS FOR PAYMENT OF NON-CLASSIFIED CLAIMS

### 2.1.    *Administrative Expense Claims*.

(a)      <u>Allowance of Administrative Expense Claims</u>.    An Administrative Expense Claim, with respect to which a request for payment has been properly and timely filed shall become an Allowed Administrative Expense Claim if no objection to such request is filed by the Trustee with the Bankruptcy Court on or before the one-hundred-and-twentieth (120th) day after the Effective Date, or on such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the one-hundred-and twentieth (120th) day after the Effective Date. If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent Allowed by Final Order or as such Claim is settled, compromised, or otherwise resolved by the Trustee or the Estate Representative pursuant to Section 7.20 of the Plan.

(b)      <u>Payment of Allowed Administrative Expense Claims</u>.  Except to the extent that a Holder of an Allowed Administrative Expense Claim (other than a Claim covered by Section 2.2 or 2.3 of the Plan) agrees to a less favorable treatment, each Allowed Administrative Expense Claim (including any Allowed Claim asserted under section 503(b)(9) of the Bankruptcy Code) shall be paid in full, in Cash, in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim within thirty (30) days following the later to occur of (a) the Effective Date, or (b) the date on which such Administrative Expense Claim shall become an Allowed Claim; *provided*, *however*, that Allowed Administrative Expense Claims (other than a Claim covered by Section 2.2 or 2.3 of the Plan) against the Debtor representing liabilities incurred in the ordinary course of business by the Debtor shall be paid, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and

18

subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

### *2.2.     Professional Compensation and Reimbursement Claims.*

All Persons seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 326, 328, 330, and 331 of the Bankruptcy Code or filing applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (a) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is sixty (60) days after the Effective Date, and (b) be paid in full, in Cash, by the Trustee or Disbursing Agent, as applicable, such amounts as are allowed by the Bankruptcy Court (i) within thirty (30) days after the date on which the order relating to any such Administrative Expense Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such Administrative Expense Claim and the Trustee or Disbursing Agent, as applicable.

### *2.3.     Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim that has not already been paid in full shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter, Cash in an amount equal to such Allowed Priority Tax Claim.

### *2.4.     Section 1171(a), 1171(b), and Derailment Government Claims Not Administrative Claims*.

By agreement with Holders in the affected Class, all Derailment Wrongful Death Claims and Derailment Moral Damages and Personal Injury Claims, to the extent afforded administrative expense status under section 1171(a) of the Bankruptcy Code, shall be treated as Class 12 and Class 8 Claims respectively, as provided in the Plan, and shall not be Allowed Administrative Expense Claims.

Claims arising under section 1171(b) of the Bankruptcy Code, if any, shall not be treated as Allowed Administrative Expense Claims, but shall be treated as Allowed Priority (Class 7) Claims junior in priority to all other Allowed Priority (Class 7) Claims, to the extent Allowed by a Final Order of the Bankruptcy Court as Claims under section 1171(b).

By agreement with Holders in the affected Class, to the extent that any Derailment Government Claim might be an Allowed Administrative Expense Claim under applicable law, such Derailment Government Claim will not be treated or paid as an Administrative Expense Claim but shall be treated solely as a Class 10 Claim.

# ARTICLE 3

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the classes of Claims against, and Equity Interests in, the Debtor and specifies which of those Classes are impaired or Unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan under that Section.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Wheeling Secured Claims | Unimpaired | No |
| Class 2 | FRA Secured Claims | Unimpaired | No |
| Class 3 | MDOT Secured Claims | Unimpaired | No |
| Class 4 | Bangor Savings Bank Secured Claim | Unimpaired | No |
| Class 5 | State Income Tax Claims | Unimpaired | No |
| Class 6 | Municipal Tax Claims | Unimpaired | No |
| Class 7 | Priority Claims | Unimpaired | No |
| Class 8 | Derailment Moral Damages and Personal Injury Claims | Impaired | Yes |
| Class 9 | Derailment Property Damage Claims | Impaired | Yes |
| Class 10 | Derailment Government Claims | Impaired | Yes |
| Class 11 | Derailment Property Subrogated Insurance Claims | Impaired | Yes |
| Class 12 | Derailment Wrongful Death Claims | Impaired | Yes |
| Class 13 | General Unsecured Claims | Impaired | Yes |
| Class 14 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Equity Interests | Impaired | No (Deemed to Reject) |

*3.1.*    *Class 1* shall consist of all Allowed Secured Claims of any kind or nature held by Wheeling against the Debtor.

***3.2.*** **Class 2** shall consist of all Allowed Secured Claims of any kind or nature held by the United States of America, Department of Transportation, acting by and through the FRA against the Debtor.

***3.3.*** **Class 3** shall consist of all Allowed Secured Claims of any kind or nature held by Maine Department of Transportation ("<u>MDOT</u>") against the Debtor**.**

***3.4.*** **Class 4** shall consist of all Allowed Secured Claims of any kind or nature held by Bangor Savings Bank against the Debtor.

***3.5.*** **Class 5** shall consist of all Allowed Income Tax Claims of any kind or nature held by any state government, including Maine and Vermont, against the Debtor.

***3.6.*** **Class 6** shall consist of all Allowed Tax Claims of any kind or nature held by any municipality.

***3.7.*** **Class 7** shall consist of all non-Tax Priority Claims of any kind or nature against the Debtor, including Claims arising under section 1171(b) of the Bankruptcy Code.

***3.8.*** **Class 8** shall consist of all Allowed Derailment Moral Damages and Personal Injury Claims.

***3.9.*** **Class 9** shall consist of all Allowed Derailment Property Damage Claims.

***3.10.*** **Class 10** shall consist of all Allowed Derailment Government Claims.

***3.11.*** **Class 11** shall consist of all Derailment Property Subrogated Insurance Claims.

***3.12.*** **Class 12** shall consist of all Derailment Wrongful Death Claims.

***3.13.*** **Class 13** shall consist of all Allowed General Unsecured Claims of any kind or nature against the Debtor, including Allowed General Unsecured Claims arising from a deficiency of Collateral securing any Allowed Secured Claims.

***3.14.*** **Class 14** shall consist of all Subordinated Claims.

***3.15.*** **Class 15** shall consist of all Equity Interests in the Debtor.

# ARTICLE 4

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

***4.1.*** ***Class 1: Wheeling Secured Claims.***

(a)     <u>Impairment and Voting</u>.  Class 1 is unimpaired by the Plan. The Holder of the Class 1 Claim is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Wheeling Secured Claim (i) has been paid by the Trustee, in whole or in part, prior to the Effective Date;

(ii) has been or will be paid from the liquidation of its Collateral on and after the Petition Date, (iii) has been or will be paid pursuant to the CCAA Plan; or (iv) agrees to a less favorable treatment, the Holder of the Class 1 Claim shall  (A) receive Cash from the sale or monetization of the Collateral securing such Claim, if any, subject to the Trustee's right to recover certain costs and expenses pursuant to 506(c) of the Bankruptcy Code, and (B) retain all of its rights and obligations pursuant to the Wheeling Proceedings, as well as the right to assert that any future recoveries by the Trustee, including any Residual Assets or proceeds thereof, are Collateral securing the Class 1 Claim (and the Trustee shall reserve the right to contest such claims).  To the extent of any deficiency in the value of Collateral securing the Class 1 Claim, the Holder shall hold a Class 13 Claim in the amount of such deficiency.

### 4.2.    *Class 2: FRA Secured Claims.*

(a)    Impairment and Voting.  Class 2 is unimpaired by the Plan.  The Holder of the Class 2 claim is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  The Class 2 Claim is an Allowed Claim.  Except to the extent that the Holder of the Class 2 Claim (i) has been paid by the Trustee, in whole or in part, prior to the Effective Date; (ii) has been or will be paid pursuant to the CCAA Plan; or (iii) agrees to a less favorable treatment, the Holder of a Class 2 Claim shall (A) receive Cash from the sale or monetization of the Collateral securing such Claim, pursuant to the Sale Order and the APA, or otherwise; (B) retain its liens, if any, in Residual Assets, and (C) retain its rights pursuant to the FRA Adequate Protection Order, including any rights to some or all of the 45G Proceeds and the Travelers' Proceeds.  To the extent of any deficiency in the value of Collateral securing the Class 2 Claim, the Holder of the Class 2 Claim shall hold an Allowed Class 13 Claim in the amount of such deficiency.

### 4.3.    *Class 3: MDOT Secured Claims.*

(a)    Impairment and Voting.  Class 3 is unimpaired by the Plan.  The Holder of the Class 3 Claim is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  As a consequence of the Asset Sale, there is no value attributable to the Class 3 Claim.  See 11 U.S.C. § 506(a).  The Holder, of the Class 3 Claim shall receive a Class 13 Claim in the amount of such deficiency.

### 4.4.    *Class 4: Bangor Savings Bank Secured Claims.*

(a)    Impairment and Voting.  Class 4 is unimpaired by the Plan.  The Holder of the Class 4 Claim is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  The Holder of the Class 4 Claim was granted relief from the automatic stay and allowed to liquidate its Collateral, to the extent such Collateral was property of the Estate.  To the extent of any deficiency, see 11 U.S.C. § 506(a), the Holder of the Class 4 Claim shall have a Class 13 Claim in the amount of such deficiency.

### 4.5.    Class 5: State Income Tax Claims.

(a)    <u>Impairment and Voting</u>.  Class 5 is unimpaired by the Plan. The Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  The Trustee believes that any Class 5 Claims are the sole responsibility of non-Debtor Affiliates.  To the extent the Estate is obligated with respect to any Class 5 Claims, such Class 5 Claims will be paid in full, including any interest and penalties, on the later of the Effective Date, or thirty (30) days after the date such claims become Allowed Claims.

### 4.6.    Class 6: Municipal Tax Claims.

(a)    <u>Impairment and Voting</u>.  Class 6 claims are not impaired by the Plan. The Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  The Trustee believes that all Class 6 Claims were paid in full from the Asset Sale Consideration.  To the extent unpaid, such Class 6 Claims will be paid in full, including any interest and penalties, on the later of the Effective Date, or thirty (30) days after the date such claims become Allowed Claims.

### 4.7.    Class 7: Priority Claims.

(a)    <u>Impairment and Voting</u>.  Class 7 Claims are unimpaired by the Plan.  Each Holder of an Allowed Priority Claim in Class 7 is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  The Trustee believes that all Class 7 Claims, other than any Claims arising under section 1171(b), were paid in full from the Asset Sale Consideration.  To the extent unpaid, such Class 7 Claims, other than Claims, if any, arising under section 1171(b) of the Bankruptcy Code, shall be paid in full on the later of the Effective Date or thirty (30) days after the date such Claims become Allowed Claims.  With respect to Claims, if any, arising under section 1171(b) of the Bankruptcy Code and which, as a matter of law, are junior in priority to other Class 7 Claims, such Claims shall be paid on the later of the Effective Date or thirty (30) days after the date such Claims become Allowed Claims in such amount and upon such terms as the Bankruptcy Court shall determine and as set forth in any Final Order allowing, in whole or in part, such Claims.  The Trustee does not believe that there are any Claims arising under section 1171(b) of the Bankruptcy Code that will be Allowed.

### 4.8.    Class 8: Derailment Moral Damages and Personal Injury Claims.

(a)    <u>Impairment and Voting</u>.  Class 8 Claims are impaired by the Plan. Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

**(b)**    <u>Distributions</u>.  Class 8 Claims shall be satisfied solely in accordance with the terms of the CCAA Plan, and shall take nothing in addition thereto under this Plan. **HOLDERS OF CLASS 8 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS**

THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.

### 4.9. Class 9: Derailment Property Damage Claims.

(a)    <u>Impairment and Voting</u>.   Class 9 Claims are impaired by the Plan. Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Class 9 Claims shall be satisfied solely in accordance with the terms of the CCAA Plan, and shall take nothing in addition thereto under this Plan. **HOLDERS OF CLASS 9 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.**

### 4.10. Class 10: Derailment Government Claims.

**(a)**    <u>Impairment and Voting</u>.   Class 10 Claims are impaired by the Plan. Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Class 10 Claims shall be satisfied solely in accordance with the terms of the CCAA Plan, and shall take nothing in addition thereto under this Plan. **HOLDERS OF CLASS 10 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.**

### 4.11. Class 11: Derailment Property Subrogated Insurance Claims.

(a)    <u>Impairment and Voting</u>.   Class 11 Claims are impaired by the Plan. Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Class 11 Claims shall be satisfied solely in accordance with the terms of the CCAA Plan, and shall take nothing in addition thereto under this Plan. **HOLDERS OF CLASS 11 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.**

### 4.12. Class 12: Derailment Wrongful Death Claims.

(a)    <u>Impairment and Voting</u>. Class 12 Claims are impaired by the Plan.  Each Holder of an Allowed Derailment Wrongful Death Claim in Class 12 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent provided in the Affiliated Parties Settlement Agreement as to the Affiliated Released Parties, each Holder of a Class 12 Claim shall be enjoined from pursuing any Claim against the Released Parties as set forth in Article 10 of the Plan, and Allowed Derailment Wrongful Death Claims shall be channeled to the WD Trust, and each Holder of a Derailment Wrongful Death Claim shall receive, in complete settlement, satisfaction and discharge of his or her Allowed Derailment Wrongful Death Claim against the Released Parties, a share of the beneficial interests in the WD Trust, subject, however, to the preservation of Claims against parties other than Released Parties, as set forth below.  Distributions to Holders of Class 12 Claims by the WD Trustee shall be strictly in accordance with the Wrongful Death Claim Resolution Procedures, except to the extent otherwise provided in section 5.1 of the Plan.  Except as otherwise provided herein, each Class 12 Claimant remains entitled to any recovery from third parties or liability insurance proceeds that may be liable on or otherwise available to satisfy such Derailment Wrongful Death Claims in whole or in part, but only to the extent any such third parties or insurers are not Released Parties, *provided, however,* that notwithstanding anything herein or in the WD Trust Agreement to the contrary, to the extent that (i) a Holder of a Derailment Wrongful Death Claim realizes a recovery from any third party, other than in accordance with the Plan and pursuant to the WD Trust Agreement, on account of the Claimant's Derailment Wrongful Death Claim, and (ii) such third party  has filed a timely Proof of Claim against the Estate for contribution or indemnity based in whole or in part on its actual or potential liability obligations to such Claimant, (A) such third party's payment to such Claimant shall be presumed to be solely on account of that third party's own liability to such Claimant, and shall not be deemed to be a payment of the Derailment Wrongful Death Claim in full within the meaning of section 509(c) of the Bankruptcy Code until so agreed by the WD Trustee or otherwise so determined by the Bankruptcy Court, and (B) any distribution from the WD Trust to which such Holder of a Derailment Wrongful Death Claim would otherwise be entitled shall be reserved until such time as the third party's claim is resolved.  An entity that is liable with the Debtor on, or that has secured, an Allowed Derailment Wrongful Death Claim, and that pays such Allowed Derailment Wrongful Death Claim in full, shall, to the extent provided by Section 509 of the Bankruptcy Code, be subrogated to the rights of the Holder of such Allowed Derailment Wrongful Death Claim under and for purposes of the Plan, and such subrogated Claim shall be treated as a Class 12 Claim in accordance with the Plan, and to the extent that the entity's payment of the Allowed Derailment Wrongful Death Claim is not a payment in full, such entity shall be treated in accordance with Section 509 of the Bankruptcy Code, including, but not limited to, subordination of such entity's Claim(s) in accordance therewith.

***HOLDERS OF CLASS 12 CLAIMS MAY BE REQUIRED TO SUBMIT ADDITIONAL DOCUMENTATION REGARDING THEIR CLAIM AS PROVIDED BY THE WRONGFUL DEATH CLAIM RESOLUTION PROCEDURES.  HOLDERS OF CLASS 12 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.***

### 4.13.   Class 13: General Unsecured Claims.

(a)   <u>Impairment and Voting</u>.  Class 13 Claims are impaired by the Plan. Each Holder of an Allowed General Unsecured Claim in Class 13 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Each Holder of Allowed Class 13 Claims shall receive such Holder's Pro Rata share of the Class 13 Cash.

### 4.14.   Class 14:  Subordinated Claims.

(a)   <u>Impairment and Voting</u>.  Class 14 Claims are impaired.  Each Holder of a Class 14 Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Each Holder of a Class 14 Claim shall not be entitled to, and shall not receive or retain, any property or interest on account of such Claim under the Plan.

**HOLDERS OF CLASS 14 CLAIMS SHALL BE SUBJECT TO RELEASES AND INJUNCTIONS PRECLUDING PURSUIT OF ANY CLAIM AGAINST CERTAIN PARTIES IN ACCORDANCE WITH THIS PLAN AND THE CCAA PLAN, AS WELL AS THE CONFIRMATION ORDER, THE CHAPTER 15 RECOGNITION AND ENFORCEMENT ORDER AND THE CCAA APPROVAL ORDER.**

### 4.15.   Class 15: Equity Interests.

(a)   <u>Impairment and Voting</u>.  Class 15 is impaired by the Plan.  Each Holder of an Equity Interest in the Debtor is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  On the Effective Date, all existing Equity Interests in the Debtor shall be cancelled and extinguished and the Holders of Equity Interests in the Debtor shall not be entitled to, and shall not receive or retain, any property or interest on account of such Equity Interests under the Plan.

## ARTICLE 5

## SETTLEMENT AGREEMENTS; THE WD TRUST

### 5.1.   Settlement Agreements.

To the extent any Settlement Agreements have not been previously approved by the Bankruptcy Court, the entry of the Confirmation Order shall constitute approval of such Settlement Agreements by the Bankruptcy Court and the Bankruptcy Court's finding that, to the extent required under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Settlement Agreements are in the best interests of the Debtor, the Estate and all Holders of Claims in the Chapter 11 Case, are fair, equitable and reasonable, and have been entered into in good faith by all parties thereto.  Upon the occurrence of the conditions to effectiveness set forth in each of the Settlement Agreements, the Settlement Agreements shall be binding and

enforceable against the parties to the Settlement Agreements in accordance with their terms. However, nothing in the Plan or the Confirmation Order shall preclude a Released Party from exercising its rights to terminate a Settlement Agreement as provided for under such Settlement Agreement. To the extent not previously approved by the Bankruptcy Court, copies of the Settlement Agreements will be included in the Plan Supplement, although filed under seal (except for the XL Settlement Agreement attached hereto), and the provisions thereof are incorporated into this Plan, as if the same were fully set forth herein; *provided*, *however* that the terms of the Settlement Agreements are subject to Sections 10.8 and 10.9 of the Plan, and no Settlement Agreement may provide for a release in favor of MMA Canada as to any Claims of Canada, to the extent provided in the CCAA Plan. In accordance with the terms of any applicable Settlement Agreement(s), any and all otherwise applicable statutes of limitations or repose or other time-related limitations relating to the Released Parties and the Released Parties' Claims (as defined therein) shall be deemed to have been tolled for statute of limitations purposes during the period from the Execution Date (as defined therein) to the Plan Implementation Date (as defined therein) or the date that such Settlement Agreement becomes null and void pursuant to the Settlement Agreement.

### 5.2. *Exhaustion of Insurance Policies.*

(a)  On the Effective Date, and upon full payment and performance under the XL Settlement Agreement, the XL Policies shall be deemed completely exhausted and any and all of the XL Companies' obligations under the XL Policies shall be, and are deemed to be, extinguished.

(b)  On the Effective Date, and upon full performance under the relevant Settlement Agreements (and subject to any exceptions contained in such Settlement Agreements), the policy of any Insurance Company that is a Contributing Party shall be deemed completely exhausted and any and all of the Insurance Company's obligations under such policy shall be, and are deemed to be, extinguished.

### 5.3. *Execution of WD Trust Agreement.*

On or before the Effective Date, the Trustee or Estate Representative, on behalf of the Debtor, and the WD Trustee, on behalf of the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, shall execute the WD Trust Agreement, and shall perform all other necessary steps to establish the WD Trust.

### 5.4. *Purpose of WD Trust.*

The WD Trust shall be established for the sole purpose of implementing this Plan on behalf of, and for the benefit of, WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, and to serve as a mechanism for liquidating, converting to Cash and distributing the WD Trust Assets for the benefit of WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the WD Trust. The WD Trust is organized and established as a trust pursuant to which the WD Trustee, subject to the terms and conditions contained in the WD Trust Agreement and in this Plan, is to hold the WD

Trust Assets and dispose of the same in accordance with the WD Trust Agreement and this Plan in accordance with Treasury Regulation section 301.7701-4(d).

### 5.5.   Assets of the WD Trust.

As soon as practicable after the Effective Date, the Monitor shall pay to the Trustee (or the Estate Representative), or at the instruction of the Trustee (or the Estate Representative) shall pay directly to the WD Trust, the Initial WD Trust Assets and any Additional WD Trust Assets or other funds designated for distribution to Holders of Class 12 Claims and held by the Monitor. The WD Trust shall consist of (a) the Initial WD Trust Assets, which the Estate Representative shall deliver, transfer assign or cause to be delivered, transferred or assigned, as applicable, to the WD Trust, (b) the Additional WD Trust Assets, which, following the Confirmation Date and as soon after receipt as is reasonably practicable, the Estate Representative shall deliver or cause to be delivered to the WD Trust, and (c) any additional assets disbursed to the WD Trust in accordance with this Plan, including from the liquidation or monetization of Settlement Non-Cash Assets.  All Assets held by the WD Trust shall constitute the proceeds of Claims for compensatory damages only, paid to the WD Trust Beneficiaries pursuant to the judgment and/or order of a court of competent jurisdiction.

### 5.6.   Governance of the WD Trust.

The WD Trust will be administered by the WD Trustee.  The initial WD Trustee shall be selected by the Trustee, after consultation with U.S. counsel to the Holders of Derailment Wrongful Death Claims.   Subsequent appointments of WD Trustee(s) shall be made in accordance with the provisions of the WD Trust Agreement and this Plan.  Decisions with respect to all matters relating to the WD Trust shall be made by the WD Trustee, subject to the terms of the WD Trust Agreement.  The WD Trust Agreement shall govern the removal of any WD Trustee and appointment of any successor WD Trustee.  The WD Trust Agreement specifies that the WD Trustee shall be a resident of the United States.  The WD Trustee shall be bonded in such amount as the Trustee or the U.S. Trustee shall reasonably request or, in the event of a dispute, as set by the Bankruptcy Court.

### 5.7.   Role of the WD Trustee.

In furtherance of, and consistent with the purpose of, the WD Trust and this Plan, the WD Trustee shall, subject to the terms of this Plan and the WD Trust Agreement, (a) have the power and authority to hold, manage, sell and distribute the WD Trust Assets as set forth herein and in the WD Trust Agreement, (b) have the power and authority to hold, manage, sell and distribute Cash obtained through the exercise of its power and authority (c) have the exclusive power and authority to object to the allowance of, seek the disallowance of or compromise any Class 12 Claim, and (d) have the power and authority to perform such other functions as are provided in the WD Trust Agreement.  The WD Trustee shall be responsible for all decisions and duties with respect to the WD Trust and the WD Trust Assets, subject to the terms of this Plan and the WD Trust Agreement.  Subject to the provisions of the WD Trust Agreement, in all circumstances, the WD Trustee shall act in furtherance of the purpose of the WD Trust, and shall use commercially reasonable efforts to dispose of the WD Trust Assets and to make timely distributions and not unduly prolong the duration of the WD Trust.  In this respect, the WD

Trustee shall make distributions strictly in accordance with the Wrongful Death Claim Resolution Procedures unless permitted by a Final Order of the Bankruptcy Court or the District Court (in accordance with section 5.14 of this Plan), to deviate therefrom.

### 5.8.    Investments.

Investments of all assets, including monies, held in the WD Trust shall be administered, subject to the limitations and provisions set forth in this Section 5.8, in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs, and with the understanding that it is intended that distributions from the WD Trust to WD Trust Beneficiaries, which will have the effect of liquidating and terminating the WD Trust, will commence immediately upon or soon after the Effective Date of the Plan and will be completed soon thereafter.  The WD Trustee shall invest and reinvest the principal and income of the WD Trust and keep the funds of the WD Trust invested in interest-bearing accounts at an approved depository institution to be selected from the U.S. Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated May 18, 2015.  Each account shall be treated as a single fund without distinction between principal and income.  For purposes of this paragraph, "interest-bearing account" may include a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments, and maintenance of a constant $1.00 net asset value per share, to the extent the WD Trustee determines that such fund is consistent with provisions for investment set forth in Internal Revenue Service Revenue Procedure 94-45 or any successor guidance issued by the Internal Revenue Service.  All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the WD Trust as set forth herein.  In investing, reinvesting, exchanging, selling and managing the WD Trust accounts, the WD Trustee shall discharge its duties with respect to said accounts solely in the interest of the accomplishment of the purposes and objectives of the WD Trust.  Notwithstanding the foregoing, the WD Trustee shall make continuing efforts to make timely distributions and not unduly prolong the duration of the WD Trust, consistent with the limitations set forth in Internal Revenue Service Revenue Procedure 94-45 or any applicable successor authority.

### 5.9.    Fees, Costs and Expenses of the WD Trust.

(a)    The WD Trust shall pay from the WD Trust Assets (i) all WD Trust Expenses; (ii) any tax liability imposed on the WD Trust; (iii) all obligations or other liabilities incurred or assumed by the WD Trust (including but not limited to any reserves established by the WD Trust); (iv) all expenses reasonably necessary to meet contingent liabilities and to maintain the value of the WD Trust Assets during liquidation; and (v) all expenses reasonably necessary to satisfy any other obligations of the WD Trust set forth in this Plan, the Confirmation Order or the WD Trust Agreement.

(b)    The WD Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings, and shall be reimbursed from the WD Trust Assets for his or her reasonable expenses, including travel expenses, reasonably required and incurred in the performance of his or her duties, in each case subject to the terms and provisions of this Plan and the WD Trust Agreement.

(c)      The WD Trustee may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the WD Trustee determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice.  The WD Trustee may pay or appropriate funds from the WD Trust Assets necessary to pay the professionals for services rendered and expenses incurred after the Effective Date without any need for filing fee applications under the Bankruptcy Code or approval of any court, subject to the provisions of section 5.10 below.

### 5.10.    *Distribution of the WD Trust Assets.*

(a)      The WD Trustee shall distribute the proceeds of the WD Trust Assets strictly in accordance with this Plan, the Confirmation Order, the WD Trust Agreement and the Wrongful Death Claim Resolution Procedures, unless the Bankruptcy Court or the District Court, by Final Order, allows a deviation therefrom.  In connection with such distributions, and except as provided below in this section 5.10, the Trustee, the Post-Effective Date Estate and the Estate Representative shall have no responsibility or liability for (a) the creation, existence, operation or administration of the WD Trust; (b) any acts or omissions of the WD Trustee in administering the WD Trust; (c) any reimbursement and reporting obligations under applicable law or regulations; or (d) any payment or non-payment of Claims.  The WD Trust shall indemnify and hold harmless the Trustee, the Post-Effective Date Estate and the Estate Representative (but with recourse in all circumstances limited solely to the assets of the WD Trust, and without recourse to the WD Trustee personally or to any WD Trust Beneficiaries) from any and all claims, losses, causes of action, demands, liabilities, expenses, fees, including, but not limited to, attorneys' fees, and costs of any kind arising from or relating to (a) the creation, existence, operation or administration of the WD Trust; (b) any acts or omissions of the WD Trustee in administering the WD Trust; (c) any reimbursement or reporting obligations under applicable law or regulations; or (d) any payment or non-payment by the WD Trust to any WD Trust Beneficiary. Prior to making any distribution from the WD Trust, the WD Trust shall retain sufficient funds to meet the fees, costs and expenses of the WD Trust.

(b)      After having given the WD Trust Beneficiary fifteen (15) days' prior written notice of his intention to proceed with distribution, the WD Trustee in making any distribution to a Holder of a Derailment Wrongful Death Claim may pay to any lawyer or counsel for such Holder any fees due to such lawyer or counsel, including, without limitation, any contingent fees due and owing to such lawyer or counsel; distributions to any WD Trust Beneficiary who is represented by an attorney as established by documentary evidence satisfactory to the WD Trustee shall be made separately to the attorney (for fees) and to the WD Trust Beneficiary (for the net distribution) unless the WD Trust Beneficiary instructs the WD Trustee in writing to issue such payment jointly to the WD Trust Beneficiary and the attorney (or law firm) or to deliver such entire payment to such attorney (or law firm), for later distribution of the net amount to such WD Trust Beneficiary client by such attorney or firm.  If a WD Trust Beneficiary is not represented by an attorney, all distributions shall be made directly to the WD Trust Beneficiary.  Notwithstanding anything to the contrary in the foregoing it is further *provided*, *however*, that:

(i)     no payment or distribution of any kind shall be made to any lawyer or counsel allegedly representing the Holder of a Derailment Wrongful Death Claim unless such lawyer or counsel presents to the WD Trustee an executed engagement letter or other document that entitles such lawyer or counsel to such fees or distribution, including any contingent fee (a "Derailment Wrongful Death Client Engagement Letter"), *provided*, for the avoidance of doubt, that the Representation Order entered by the Quebec Superior Court on or about April 4, 2014 in the CCAA Case (the "Representation Order") together with any order assessing counsel fees pursuant thereto, shall also constitute a Derailment Wrongful Death Client Engagement Letter; and

(ii)    no such distribution or payment shall be made by the WD Trustee if: (i) the Derailment Wrongful Death Client Engagement letter has been held to be invalid or inoperative by a final order or ruling entered in any proceeding (including an administrative proceeding) initiated by a party with standing (as defined below) disputing the rights of such lawyer or counsel to fees before any court, administrative tribunal or other forum with jurisdiction over such agreements, in the United States or Canada (collectively a "Proceeding"), in which there was a challenge to the validity or operation of the Derailment Wrongful Death Client Engagement Letter; or (ii) any Proceeding is pending in which there is a challenge to the validity or operation of the Derailment Wrongful Death Client Engagement Letter, unless and until such Proceeding has been concluded by a final order or ruling in favor of the lawyer or counsel involved, and then the distribution to the lawyer or counsel shall be limited by the terms of any such final order or ruling issued in such Proceeding, to the extent such order or ruling contains any such limitations.

For the purposes of subparagraph (b)(ii) above, "party with standing" shall be limited to (x) the individual Holder of a Derailment Wrongful Death Claim in his or her capacity as a client or alleged client (or the parent or guardian of such client or alleged client, if a minor), or (y) any bar-affiliated or governmental entity that regulates the practice of law and is granted such standing as a matter of a governing statute or rule. Neither Class Counsel nor U.S. Counsel (each as defined below), shall be a "party with standing" for purposes of that section, whether or not such counsel holds a power of attorney or like document for such client, and, similarly, the Creditors Committee and its counsel shall not be a "party or parties with standing" under that provision. Holders of Derailment Wrongful Death Claims involved in a Proceeding shall receive the portion of their distributions on account of their Derailment Wrongful Death Claim not in dispute in such Proceeding at the same time and in the same manner as the Holders of other Derailment Wrongful Death Claims not involved in a Proceeding.

For the sole purpose of determining any contingent fee due, all Distributions to a WD Trust Beneficiary shall constitute and be deemed Distributions through and on account of the Derailment Wrongful Death Claims, if any, of the decedent's estate representative pursuant to which such WD Trust Beneficiary is to receive payment under the Wrongful Death Claims

Resolution Procedures, and subject to any contrary terms of any applicable engagement agreement or any other documentation that is acceptable to the WD Trustee, counsel to such decedent's estate representative shall be entitled to payment based upon the aggregate payment to WD Trust Beneficiaries who take or are deemed by this paragraph to take through such estates; *provided*, *however*, that application of this paragraph shall be subject to sub-paragraphs (b)(i) and (b)(ii) above and shall not result in the payment by any WD Trust Beneficiary of a fee, contingent or otherwise, to more than one attorney or law firm; and the amount of any contingent fee payable on account of any estate (and the WD Trust Beneficiary's taking through such estate) to U.S.-based counsel to the Holders of Derailment Wrongful Death Claims ("U.S. Counsel") will be calculated by first excluding any distributions (including fees) payable to Holders of Derailment Wrongful Death Claims represented solely by counsel appointed pursuant to the Representation Order (the "Class Representatives") and counsel appointed therein ("Class Counsel") pending in the Québec Superior Court, and no other fees contingent or otherwise shall be payable on such distributions. For the purposes of this section, a Holder of a Derailment Wrongful Death Claim shall be deemed to be solely represented by the Class Representatives and Class Counsel only if such Holder has (i) not delivered a notice of opt-out from representation in accordance with the Representation Order; (ii) has not signed an engagement agreement, engagement letter, power of attorney or similar document specifying terms of representation with U.S. Counsel; and (iii) has not filed a proof of claim in the Chapter 11 Case, prior to the Claims Bar Date, which designates U.S. Counsel (including local counsel in Bangor, Maine) as such Holder's counsel. For purposes of this section, such a proof of claim can constitute a Derailment Wrongful Death Client Engagement Letter, subject to any necessary terms of engagement being established by evidence satisfactory to the WD Trustee. Any dispute arising under this section 5.10, including any objection of any person or party to a determination by the WD Trustee as to legal representation or payment of fees (collectively, "Representation Disputes") shall be determined exclusively by *de novo* review before the Bankruptcy Court, subject, however to subparagraph (b)(ii) above in this section.

### *5.11. Resolving Liens.*

Before disbursing any WD Trust Assets to a WD Trust Beneficiary, the WD Trustee shall ensure that any Liens that the WD Trustee has received notice of and which may attach to any such distribution have been resolved or have been otherwise satisfied. To that end, the WD Trustee shall provide notice of the existence of any such Lien(s) to the WD Trust Beneficiary and, if applicable, his or her attorney, and it shall be the WD Trust Beneficiary's (or his or her attorney's) responsibility to resolve such Lien(s) against the WD Trust Beneficiary's anticipated distribution of WD Trust Assets within 120 days of notice from the WD Trustee. If the Lien has not been settled or otherwise resolved within this 120-day time period, with the WD Trust Beneficiary's consent, the WD Trustee may retain a firm with experience in resolving liens to satisfy the WD Trust's Beneficiary's obligations as represented by the Lien(s). Any payments made to resolve such Lien(s), together with the fees paid to the Lien resolution firm, shall be deducted from the WD Trust Beneficiary's distribution of WD Trust Assets prior to disbursement of the balance. Subject to the foregoing provisions this Section 5.11, any and all distributions to or for the benefit of WD Trust Beneficiaries shall be free and clear of any and all liens, security interests and encumbrances.

### 5.12.    *Time of WD Trust Distributions.*

Subject to the Wrongful Death Claim Resolution Procedures, the WD Trustee shall have the sole and absolute discretion to determine the timing of distributions of the proceeds of the WD Trust in the most efficient and cost-effective manner possible; *provided*, *however*, that the WD Trustee's discretion shall be exercised in a manner consistent with the express requirements of this Plan, the Wrongful Death Claim Resolution Procedures, and the requirements of taxation as a grantor trust under applicable Internal Revenue Service guidelines, rulings or other controlling authorities.  Absent cause, the WD Trustee will use best efforts to make distributions as quickly and efficiently as feasible, subject only to any delays necessitated by Section 5.14 of this Plan and any orders issued by the District Court under Section 5.14 of this Plan.

### 5.13.    *Tax Treatment of WD Trust.*

(a)    **WD Trust Assets Treated as Owned by Certain Creditors.**  For all United States federal income tax purposes, all parties (including the Estate Representative, the WD Trustee, WD Trust Beneficiaries and Holders of Allowed Class 12 Claims) shall treat the transfer of the WD Trust Assets to the WD Trust  as (i) a transfer of the WD Trust Assets (subject to any obligations related to those assets) directly to the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, followed by (ii) the transfer by such WD Trust Beneficiaries and Holders of Allowed Class 12 Claims of such WD Trust Assets to the WD Trust in exchange for beneficial interests in the WD Trust.  Accordingly, the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims shall be treated for federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the WD Trust Assets, if any, or any Disputed Claims reserve as described in Section 7.20 hereof).  All WD Trust Assets shall be treated solely as compensatory damages.

(b)    **Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from the Trustee, the Estate, the Post-Effective Date Estate or the Estate Representative to the WD Trust or any other Person or any government, governmental agency or any subdivision, department or other instrumentality thereof, pursuant to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to this Plan shall be exempt from the imposition and payment of any and all transfer taxes (including but not limited to any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of this Plan) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

(c)    **Tax Reporting.**  The WD Trustee shall file returns for the WD Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this

Section 5.13.  The WD Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The WD Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the WD Trust that are required by any Governmental Unit.  WD Trust taxable income or loss shall be allocated pro rata based on the total of Allowed Claims of the WD Trust Beneficiaries at the end of the taxable year.  As soon as possible after the Effective Date, the WD Trustee shall make a good faith valuation of the WD Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Estate Representative, the WD Trustee, the WD Trust Beneficiaries and holders of Allowed Class 12 Claims) for all state and federal income tax purposes.  The WD Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the WD Trust that are required by any Governmental Unit.  The WD Trustee may request an expedited determination of taxes of the WD Trust under section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the WD Trust for all taxable periods through the termination of the WD Trust.

(d)    **Withholding of Taxes and Reporting Related to WD Trust Operations.**  The WD Trust Assets, as compensatory damages for Derailment Wrongful Death Claims, are not subject to withholding and the WD Trustee shall not be required to withhold any taxes or other amounts from distributions to WD Trust Beneficiaries. The Confirmation Order shall absolve the WD Trustee of any such withholding duties or responsibilities.  To the extent that the operation of the WD Trust or the liquidation of the WD Trust Assets creates a tax liability imposed on the WD Trust, the WD Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the WD Trust payable without Bankruptcy Court order.

### 5.14.    *Resolution of the Claims of Minors In Accordance With the WD Trust.*

In connection with any Allowed Class 12 Claims in which the Holder is a minor, the WD Trustee shall notify the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor of the proposed distribution to such minor.  Such parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor shall move for approval of the allocation within ninety (90) days of his or her notification by the WD Trustee of the proposed distribution.

In the event that the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor does not so move for approval of the allocation within ninety (90) days of his or her notification by the WD Trustee of the proposed distribution, the WD Trustee shall submit the proposed distribution to the holder to the District Court for approval in accordance with 14 M.R.S.A. § 1605 and request that the District Court hold a hearing on the petition, and the petitioner and the Allowed Class 12 Claim Holder may attend any such hearing. The WD Trustee shall request that the District Court determine whether the proposed distribution is in the Allowed Class 12 Claim Holder's best interests and, if the proposed distribution is approved, that determination shall be embodied in an order which shall have the effect of a judgment.  Upon approval of the proposed distribution to such Holder of an Allowed Class 12

Claim, the WD Trustee shall request that the District Court authorize payment to the counsel of the minor, if any, of fees and disbursements to be paid from the distribution and further shall order that the remainder of the distribution be distributed in a manner that will best protect the interest of the minor.

### 5.15.   *Access to Claims Information.*

Upon request made to the Estate Representative on or after the Effective Date by the WD Trustee, the Estate Representative shall deliver to the WD Trustee, on an un-redacted basis, the relevant lists of Class 12 Claims and all Proofs of Claim and supporting documentation for purposes of effectuating the WD Trust and distributions to Holders of Allowed Class 12 Claims. The Confirmation Order shall include all findings and orders necessary to permit or facilitate such delivery and access, including with respect to any necessary confidentiality of such lists and the Proofs of Claim, subject to any further orders of the Bankruptcy Court.  The WD Trustee shall have access to the Books and Privileges to the extent reasonably required to discharge the duties of the WD Trustee; *provided*, *however*, that the WD Trustee shall have no control over and shall not have the capacity to waive any attorney-client privilege or work product immunity or privilege held by the Debtor or the Trustee.

### 5.16.   *Distribution of Surplus.*

The WD Trustee shall make all payments required to be paid to Holders of Allowed Class 12 Claims under this Plan, in accordance with the terms and conditions of the WD Trust Agreement, the Wrongful Death Claim Resolution Procedures, and this Plan.  If, and only if, the WD Trustee has made all distributions to WD Trust Beneficiaries permitted under the Wrongful Death Claim Resolution Procedures then the WD Trustee shall transfer any surplus WD Trust Assets to the Disbursing Agent who shall then distribute to the holders of Allowed Class 13 Claims their Pro Rata share of the remaining Cash, if any, of the WD Trust until such Class 13 Claims are paid in full.  (The Trustee does not anticipate surplus WD Trust Assets at this time.) For the avoidance of doubt, nothing in the Plan or the CCAA Plan shall limit or cap the recoveries available to victims of the Derailment outside the Plan and this Agreement as against parties other than Released Parties including, without limitation, under the laws of the State of Illinois or the State of Texas.

### ARTICLE 6

### 6.1.   *Management of the Post-Effective Date Estate.*

(a)      Estate Representative.  On the Effective Date, (i) the authority, power and incumbency of the persons then acting as directors and officers of the Debtor, and that of the Trustee, shall be terminated, (ii) such directors, officers and the Trustee shall be deemed to have been discharged pursuant to Bankruptcy Code section 350(a), and (iii) the Estate shall nonetheless be preserved pursuant to sections 1123(b)(3), 1123(b)(6) and 1172 of the Bankruptcy Code and Robert J. Keach shall be appointed as the sole representative of the Post-Effective Date Estate, and the sole officer and director of the Debtor in such capacity, to serve in accordance with the certificate of incorporation and the bylaws of the Debtor, as such may be

amended, and to carry out the provisions of the Plan, as well as to close the Case, as required, including without limitation by requesting the issuance of a final decree.

(b)    Compensation.    The Estate Representative shall be entitled to the same compensation and reimbursement of expenses as would be payable to a chapter 11 trustee under sections 326 and 330 of the Bankruptcy Code and shall file fee applications under the Bankruptcy Code for approval by the Bankruptcy Court of such fees and expenses.

(c)    Indemnification.    The Estate Representative shall have quasi-judicial immunity to the fullest extent allowed by law (and the same as would be afforded a chapter 11 trustee) and shall have no liability to the Debtor or its creditors, except for willful misconduct. The Estate shall indemnify and hold harmless the Estate Representative for any losses incurred in his or her capacity as such, except to the extent such losses were the result of the Estate Representative's willful misconduct.

(d)    Successor.    In the event the Estate Representative dies, is terminated or resigns for any reason, the Bankruptcy Court shall designate a successor on motion of any party in interest.

### 6.2.    Duties and Powers of the Estate Representative.

The Estate Representative shall have the power of a chapter 11 trustee (and of the sole officer of the Debtor), and, without limitation, shall have the power and authority to implement and administer the Plan, and to prosecute any action or cause of action necessary to implement the Plan, including, without limitation, to enforce the Releases and Injunctions and also including, without limitation, the following power and authority:

(a)    Claims.    The Estate Representative may object to, compromise or settle any or all Claims against the Debtor or the Estate, other than Class 12 Claims (distributions on account of which are strictly governed by and determined in accordance with the Wrongful Death Claim Resolution Procedures).

(b)    Selling, Monetizing or Liquidating Residual Assets.    The Estate Representative may, but is not required to, sell, monetize or liquidate the Settlement Non-Cash Assets and the Residual Assets, including, without limitation, through the prosecution of Post-Confirmation Causes of Action.

(c)    Abandoning Assets.    The Estate Representative may abandon or donate any Assets, if he concludes in his sole discretion that they are of no benefit or inconsequential value without the need for further order or notice.

(d)    Retention of Professionals.    After the Effective Date, the Estate Representative may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the Estate Representative determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice.    The Estate Representative may pay or appropriate funds necessary to pay the professionals for services rendered and expenses incurred after the Effective

Date; such professionals shall file fee applications under the Bankruptcy Code for approval by the Bankruptcy Court of such fees and expenses.  The Estate Representative may retain any firm previously retained by the Trustee.

(e)  <u>Books and Records</u>.  The Estate Representative shall maintain the Debtor's Books and Privileges, maintain accounts, make distributions and take other actions consistent with the Plan and the implementation of the Plan.  The Estate Representative shall have the responsibility of storing and maintaining the Debtor's books and records only until such time as he or she deems, in his or her sole discretion, such books and records may be abandoned or destroyed, and the Estate Representative shall have no liability to any party on account of such abandonment or destruction.  In addition to the materials to be provided to the WD Trustee pursuant to Section 5.15 of the Plan, at the time such materials are provided to the WD Trustee pursuant to Section 5.15 of the Plan, the Estate Representative shall provide the WD Trustee with copies of such of the Debtor's books and records as the WD Trustee may reasonably request in connection with the administration of the Wrongful Death Claim Resolution Procedures, and the Estate Representative shall have no liability to any party on account of such provision.  For purposes of this Section, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, together with books and records of the Debtor maintained by or in possession of third parties and all of the claims and rights of the Debtor in and to their books and records, wherever located.

(f)  <u>Agreements</u>.  The Estate Representative may enter into any agreement or execute any document which he deems to be required by or consistent with the Plan or necessary or appropriate to its implementation and perform all of obligations of the Post-Effective Date Estate.

(g)  <u>Investment Power</u>.  Management of all Residual Assets and investments of the Post-Effective Date Estate's Cash shall be administered, subject to the limitations and provisions set forth herein, in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs.  The Estate Representative shall invest and reinvest the Post-Effective Date Estates' Cash and keep the Post-Effective Date Estates' Cash invested in interest-bearing accounts at an approved depository institution to be selected from the U. S. Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated July 26, 2013.  Each account shall be treated as a single fund without distinction between principal and income.  For purposes of this paragraph, "interest-bearing account" includes a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments and maintenance of a constant $1.00 net asset value per share.  All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Post-Effective Date Estate as set forth herein.

(h)  <u>Tax Obligations</u>.  The Estate Representative shall (i) endeavor to complete and file the Debtor's or the Post-Effective Date Estates', as applicable, federal and state tax returns, (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Debtor under Bankruptcy Code section 505 for all taxable periods of the Debtor ending after the Petition Date as determined under applicable tax laws and (iii) represent the interest and account

of the Debtor, its Estate or the Post-Effective Date Estate, as applicable, before any taxing authority in all matters.

       (i)    <u>Reporting Duties</u>.   The Estate Representative shall be responsible for filing informational returns on behalf of the Debtor or the Post-Effective Date Estate, as applicable, and any other statements, returns or disclosures relating to the Debtor or the Post-Effective Date Estate, as applicable, that are required by any governmental unit or applicable law.

       (j)    <u>Reasonable Fees and Expenses</u>.   The Estate Representative may incur and pay and satisfy any reasonable and necessary fees and expenses in connection with the performance of his or her duties under the Plan without the need for further order or notice.

### 6.3.   *Other Actions.*

The Estate Representative may take all other actions not inconsistent with the provisions of the Plan which the Estate Representative deems reasonably necessary or desirable with respect to administering the Plan, including without limitation, to fully effectuate and enforce the Releases and Injunctions.  For the avoidance of doubt, to the extent any Settlement Agreement(s) require or authorize the Trustee to take certain action to enforce the provisions thereof, such obligations or authority shall become the obligations or authority of the Estate Representative.

### 6.4.   *Closing of the Chapter 11 Case.*

When all Disputed Claims have become Allowed Claims or have been disallowed by Final Order, and this Plan has been substantially consummated, the Estate Representative may, if he or she so elects in his or her sole discretion, seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  For the avoidance of doubt, the closing of the Chapter 11 Case shall not affect the obligations or authority of the Estate Representative under the Settlement Agreements, as successor to the Trustee.

### 6.5.   *Cancellation of Existing Agreements.*

Except for purposes of evidencing a right to distributions under this Plan or otherwise provided hereunder, on the Effective Date all of the agreements and other documents, except for and other than the WD Trust Agreement, the Settlement Agreements and insurance policies issued to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any D&O Insurance Policies), evidencing the Claims or rights of any Holder of a Claim against the Debtor, including any notes evidencing such Claims, shall be deemed cancelled.

*6.6.*   ***Continued Corporate Existence.***   The Debtor shall continue to exist after the Effective Date, with all powers of a corporation under the laws of the State of Delaware except for shareholder management (the "Post-Effective Date Debtor").   The Post-Effective Date Debtor's certificate of incorporation and bylaws shall be deemed amended to include a provision prohibiting the issuance of non-voting equity securities, thereby satisfying the requirements of Bankruptcy Code section 1123(a)(6).   The Estate Representative, as the sole officer and director of the Post-Effective Date Debtor, shall perform each of the actions provided for under this Plan without any requirement of further action by or consent or vote of the shareholders.   At the discretion of the Estate Representative, the Post-Effective Date Debtor shall be authorized, following the completion of all disbursements to Holders of Allowed Claims, other than Allowed Class 12 Claims, other transfers and other actions required under this Plan, including without limitation, the sale, monetization or liquidation of the Residual Assets, to file certificates of cancellation or dissolution.   The filing of such certificates of cancellation or dissolution shall be deemed authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without express or implied limitation, any action by the shareholders.   After the Effective Date, the shareholders shall have no power or authority with respect to the management, operation or other functions of the Post-Effective Date Debtor.

*6.7.*   ***Effectuating Documents and Further Transactions.***

Upon the Effective Date, the Estate Representative is authorized and directed to execute, deliver, file or record such contracts, releases and other agreements or documents and take such actions as he or she may deem to be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

## ARTICLE 7

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

*7.1.*   ***Disallowance of Multi-Claimant or Class Proofs of Claim.***

In accordance with the Bar Date Order, Claims evidenced by (a) Proofs of Claim joining or on behalf of two (2) or more claimants submitted without the prior approval of the Bankruptcy Court, or (b) by Proofs of Claim purporting to be on behalf of a class of claimants shall be and are hereby disallowed to the extent not previously disallowed.

*7.2.*   ***Voting of Claims.***

Each Holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 2 and Article 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

*7.3.*   ***Acceptance by Impaired Classes of Claims.***

Pursuant to section 1126(c) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to

section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.  If a Class contains Claims and none of such Claims votes, the Class is deemed to accept the Plan.

### 7.4. *Nonconsensual Confirmation.*

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, or as otherwise required by the Plan, or is not deemed to accept the Plan, the Debtor reserves the right to amend the Plan in accordance with Section 12.8 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtor intends to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 7.5. *Date of Distributions.*

Distributions to Holders of Claims shall be made on the Initial Distribution Date, and on any subsequent Distribution Dates, as provided in Article 2 and Article 4 of the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 7.6. *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent, except distributions to Class 12 Claims and WD Trust Beneficiaries (which distributions shall be made in accordance with the WD Trust Agreement and Article 5 of this Plan).  The Disbursing Agent shall be deemed to hold all property to be distributed under the Plan in trust for the entities entitled to receive the same.  The Disbursing Agent shall not hold an economic or beneficial interest in the property to be distributed under the Plan.

### 7.7. *Appointment of Disbursing Agent.*

The Estate Representative is hereby appointed as Disbursing Agent for all purposes under the Plan.

### 7.8. *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform the Disbursing Agent's duties under the Plan, (b) make all distributions contemplated by the Plan, (c) employ professionals to represent the Disbursing Agent with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (a) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability for distributions under the Plan to any party who does not hold an Allowed Claim at the time of distribution or who does not otherwise comply with the terms of the Plan; *provided, however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud, or criminal conduct of any such Person.

### 7.9.    *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, Taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Estate in the ordinary course of business, following approval of the Bankruptcy Court. Disbursements by the Disbursing Agent shall be treated as disbursements by the Estate Representative for the purpose of Section 6.1 of this Plan.

### 7.10.    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, and except as provided in Section 5.14, all distributions to any Holder of an Allowed Claim shall be made at the address of such Holder (a) as set forth on the Schedules filed with the Bankruptcy Court, (b) on the books and records of the Debtor, as applicable, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a Proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Schedules, or (c) as otherwise allowed under Section 4.5 of the CCAA Plan with respect to distributions to Representative Counsel (as defined in the CCAA Plan) with respect to Claims in Classes 8 and 9.

### 7.11.    *Undeliverable and Unclaimed Distributions.*

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each Holder, but no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder; *provided, however*, that all distributions under the Plan that are unclaimed for a period of six (6) months after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and any entitlement of any Holder of any Claims to such distributions shall be extinguished and forever barred.  The Trustee and Disbursing Agent shall have no further obligation to make any distribution to the Holder of such Claim on account of such Claim, and any entitlement of any Holder of such Claim to any such distributions shall be extinguished and forever barred; *provided, however*, that the Holder of such Claim may receive future distributions on account of such Claim by contacting the Disbursing Agent at some point prior to the final Distribution Date.  For the avoidance of doubt, the Disbursing Agent shall not be required to retain an outside investigator to determine the current address of any Holders of an Allowed Claim whose distribution is returned as undeliverable.

### *7.12.   Distribution Record Date.*

As of the close of business on the Distribution Record Date, the claims register shall be closed.  The Disbursing Agent shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as of the close of business on the Distribution Record Date.

### *7.13.   Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer.

### *7.14.   Currency.*

Where a Claim has been denominated in foreign currency on a Proof of Claim, the Allowed amount of such Claim shall be calculated in currency of the United States of America based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

### *7.15.   Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $100 to any Holder of an Allowed General Unsecured Claim; *provided, however*, that if any distribution is not made pursuant to this Section 7.15, such distribution shall be added to any subsequent distribution to be made on behalf of the Holder's Allowed General Unsecured Claim. The Disbursing Agent shall not be required to make any final distribution of Cash less than $50 to any Holder of an Allowed General Unsecured Claim. If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distribution to any Holder of Allowed General Unsecured Claims would be $50 or less, then no further distribution shall be made by the Disbursing Agent and any surplus Cash remaining in the Estate shall be donated and distributed to a charitable organization exempt from U.S. federal income tax under Section 501(c)(3) of the Internal Revenue Code selected by the Disbursing Agent.

### *7.16.   Setoffs and Recoupment.*

The Disbursing Agent may, but shall not be required to, setoff against or recoup from any Claim and from any payments to be made pursuant to the Plan in respect of such Claim any claims of any nature whatsoever that the Trustee may have against the Claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Trustee or the Disbursing Agent of any such claim it may have against such claimant.

### *7.17.   Interest and Penalty on Claims.*

Unless otherwise provided in the Plan or the Confirmation Order, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or penalties on any Claim.  Any

such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### 7.18.   *No Distribution in Excess of Allowed Amounts.*

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed Amount of such Claim, provided, however, that, notwithstanding any limit created by this section 7.18, distributions to Class 12 Claims shall be made in accordance with the Wrongful Death Claim Resolution Procedures, and provided, further, that nothing in this Plan, the CCAA Plan, or any other document shall constitute a determination of the amount of any claim or cause of action against any Person or entity that is not a Released Party or limit, discharge or modify any rights of any Holder of a Claim or cause of action against any Person or entity that is not a Released Party.

### 7.19.   *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for United States federal income tax purposes) and then, to the extent the distribution exceeds the principal amount of the Claim, to such other amounts.

### 7.20.   *Procedures for Treating Disputed Claims Other Than Class 12 Claims.*

(a)    <u>Estimation of Claims</u>.   The Estate Representative may at any time request that the Bankruptcy Court estimate any Claim, other than a Class 12 Claim, pursuant to section 502(c) of the Bankruptcy Code.   In the event that the Bankruptcy Court estimates any Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.   If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Estate Representative may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.   Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(b)    <u>Resolution of Disputed Claims</u>.   To the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the Proof of Claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Cash that would have been distributed to the Holder of the Disputed Claim if the Claim had been Allowed in full over the amount of Cash actually distributed on account of such Disputed Claim shall be available Cash.   *Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.*

# ARTICLE 8

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*8.1.*    Rejection of Executory Contracts and Unexpired Leases.

(a)    Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person, *except for the WD Trust Agreement, the Settlement Agreements (including the insurance policy rights and contractual rights, if any, assigned to the Trustee, MMA Canada and/or their designee pursuant thereto) and insurance policies related to, or insurance agreements entered into by the Debtor prior to the Petition Date (including, without limitation, any D&O Insurance Policies)* shall be deemed rejected by the Debtor as of immediately prior to the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) is otherwise provided for under Sections 8.2 or 8.3 of the Plan.

(b)    **Insurance Policies and Agreements**.    Except as set forth in the Settlement Agreements, Section 5.2 of the Plan, or the Confirmation Order, insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, without limitation, any D&O Insurance Policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.   To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary herein, this Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding that each such assumption is in the best interests of the Debtor and its Estate. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement.   To the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Trustee reserves the right to seek the rejection of such insurance policy or agreement or other available relief.

*8.2.    Approval of Rejection of Executory Contracts and Unexpired Leases.*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a), 1123(b)(2), and 1123(b)(6) of the Bankruptcy Code, of the assumption, assignment, and/or rejection of the executory contracts and unexpired leases treated pursuant to Section 8.1 of the Plan.

### 8.3.   *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.*

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan must be filed with the Bankruptcy Court and served upon the Trustee or the Estate Representative, as the case may be, no later than thirty (30) days after notice of the Effective Date. All such Proofs of Claim not filed within the time set forth in this Section 8.3 shall be forever barred from assertion against the Debtor and its Estate or its Assets.

### 8.4.   *Rejection Claims of Officers and Directors of the Debtor.*Notwithstanding section 8.1(a) of this Plan, in consideration for the releases and injunctions provided in this Plan and the Settlement Agreements, (a) all contracts or agreements between the Debtor and the former and current officers or directors of the Debtor, with the exception of the Settlement Agreements and any agreements entered into in connection with the Settlement Agreements, including the Affiliated Parties Settlement Agreement, are deemed rejected as of the Effective Date, without the need for any further action by the Estate Representative and (b) the Claims of such former and current officers or directors of the Debtor, if any, resulting from such rejection are hereby deemed waived.

### 8.5.   *Benefit Plans.*

All employment and severance policies, workers' compensation programs, and all compensation, bonus and benefit plans, policies, programs, and arrangements of the Debtor applicable to its present and former employees, officers and directors, including, without express or implied limitation, all savings plans, cash and equity or equity-based incentive plans, retirement plans, health care plans, disability plans, and life, accidental death, and dismemberment insurance plans shall be deemed terminated immediately prior to the Effective Date without any further action by the Bankruptcy Court or the Debtor.

### 8.6.   *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor that any contract or lease subject to this Article 8 is in fact an executory contract or unexpired lease or that the Debtor has any liability thereunder.

## ARTICLE 9

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

### 9.1.   *Conditions to Confirmation*.

This Plan shall not be confirmed unless the Confirmation Order (a) is in a form and substance satisfactory to the Trustee and is otherwise consistent and in accord with the Settlement Agreements, and (b) approves and implements, among other things, (i) the Settlement Agreements, to the extent any of the Settlement Agreements have not otherwise or previously been approved by the Bankruptcy Court, and (ii) the Releases and Injunctions set forth in this Plan. In addition, Confirmation of this Plan is conditioned upon the entry of the CCAA

Approval Order and the Chapter 15 Recognition and Enforcement Order.  The foregoing conditions to confirmation of this Plan are material and non-waivable.

### 9.2. *Date of Effective Date.*

The Effective Date shall occur on the later of: (a) the first Business Day following fifteen (15) days after the Confirmation Date, provided that a court of competent jurisdiction has not entered a stay of the Confirmation Order as of such date (in which instance, the Effective Date will not occur until such stay is dissolved); and (b) the first Business Day on which all other conditions to the Effective Date have been satisfied.

### 9.3. *Conditions to Effective Date.*

The Effective Date shall not occur until (a) all of the conditions set forth in Section 9.1 have occurred; (b) the CCAA Approval Order shall have been amended in order to incorporate the judgment reduction provisions set forth in paragraphs 63 through 70 of the Confirmation Order; (c) the CCAA Approval Order, as amended, shall have become a Final Order; (d) the Chapter 15 Recognition and Enforcement Order shall be amended so that it applies to the CCAA Approval Order as amended; (e) the Chapter 15 Recognition and Enforcement Order, as so amended, shall have become a Final Order; (f) the District Court has entered the Confirmation Order, pursuant to the filing of the same with such Court under Bankruptcy Rule 9033, or otherwise; (g) the Confirmation Order has become a Final Order; (h) the conditions to implementation of the CCAA Plan have been met; and (i) the Plan Implementation Date shall have occurred.

### 9.4. *Satisfaction of Conditions.*

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 9.5. *Occurrence of Effective Date* The Trustee shall cause the Effective Date to occur as soon as is practicable.

### 9.6. *Substantial Consummation Upon Effective Date* On the Effective Date, this Plan will be deemed to be substantially consummated under the applicable sections of the Bankruptcy Code.

## ARTICLE 10

## EFFECT OF CONFIRMATION

### 10.1. *Vesting of Assets.*

As of the Effective Date, the property of the Estate, other than Claims released pursuant to Section 10.5 of this Plan, shall vest in the Post-Effective Date Estate or such other entity as provided in this Plan.

(a)     From and after the Effective Date, the Estate Representative or WD Trustee, as the case may be, may dispose of, or cause to be disposed of, the assets of the Post-Effective Date Estate and the WD Trust, respectively, free of any restrictions of the Bankruptcy Code, but in accordance with the provisions, as the case may be, of this Plan and the WD Trust Documents.

(b)     As of the Effective Date, all assets of the Post-Effective Date Estate and the WD Trust shall be free and clear of all Claims, except as otherwise provided in this Plan or the Confirmation Order.

### 10.2.   *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind any Holder of a Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, all Holders of Derailment Claims, whether or not the Claim or Equity Interest of such Holder is impaired under this Plan, whether or not such Claim or Equity Interest has been filed or asserted against the Debtor and whether or not such Holder has accepted this Plan, and all other Persons, including, without limitation, any holders of a cause of action arising out of or related to the Derailment.

### 10.3.   *Exculpations and Limitation of Liability.*

As of the Effective Date, none of (a) the Trustee, (b) the Monitor, (c) MMA Canada, or (d) the members, representatives, accountants, financial advisors, consultants and attorneys of the entities described in (a) through (c) of this paragraph shall have or incur any liability to any person for any act taken or omission in connection with or related to the Chapter 11 Case, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating this Plan (including soliciting acceptances or rejections thereof), (ii) the Disclosure Statement or any contract, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan or the Disclosure Statement, or (iii) any distributions made pursuant to this Plan, except for any acts determined by Final Order to have constituted willful misconduct, bad faith or gross negligence.

### 10.4.   *Preservation and Non-Waiver of Estate Defenses and Objections and Related Rights Reserved for the Debtor, its Successors in Interest, Creditors and Parties in Interest.*

(a)     <u>No Limitation on Defenses, Set-Off or Right to Subordination as to Claims Against the Estate.</u>  Nothing in this Plan (other than the provisions of Sections 10.5 and 10.6 hereof), the Confirmation Order (other than the provisions therein corresponding to Sections 10.5 and 10.6 hereof), or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude any of the Estate's defenses, rights to set-off and/or rights to compel subordination as to any Claim or Administrative Expense Claim of any type asserted against the Estate, as otherwise allowed by law, including the right to assert as a defense, set-off or subordination, any claim that would ordinarily or otherwise have to be asserted in or brought by a cross-claim, cross-complaint or separate action.

(b)     **No Limitation on Right to Object to Claims or Administrative Expense Claims.**  Nothing in this Plan (other than the provisions of Sections 10.5 and 10.6 hereof), the Confirmation Order (other than the provisions therein corresponding to Sections 10.5 and 10.6 hereof), or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of (i) the Estate Representative and all his or her successors in interest to object to any Claim or Administrative Expense Claim or (ii) the WD Trustee and all his or her successors in interest to object to any Class 12 Claim (collectively, the "Permitted Objections").  The Permitted Objections may include, as part of any objection to any Claim or Administrative Expense Claim, a prayer for denial or disallowance of Claim or Administrative Expense Claim, reduction in amount by off-set, disgorgement of amounts previously paid and/or equitable subordination, as otherwise allowed by law, on any ground that could have been brought by way of lawsuit, adversary proceeding or contested matter but for (i) the releases contained in the Settlement Agreements; (ii) the exculpation contained in section 10.3 of this Plan; (iii) the Releases and Injunctions contained in this Plan; and (iv) the Confirmation Order.  In addition, the makers of the Permitted Objections may utilize whatever remedies and procedural vehicles are otherwise available under the law, including, if necessary, an adversary proceeding.  Objections to Claims shall be heard and determined by the Bankruptcy Court.

Nothing in this Plan (other than the provisions of sections 10.5 and 10.6 hereof), the Confirmation Order (other than the provisions therein corresponding to Sections 10.5 and 10.6 hereof), or the Settlement Agreements shall alter, enhance, waive, release or otherwise impair or preclude the right and ability of the Trustee or the Estate Representative, and all his successors in interest, to object to any Claim either for the purpose of determining the holder of such Claim's eligibility to vote on this Plan or the amount of such Claim.

### 10.5.   *Releases.*

(a)     **Settlement Agreement Releases Supplemented; No Impact on Rights to Object**.  Except as expressly provided in this section 10.5 or sections 10.8 or 10.9, nothing in this Section 10.5 or otherwise in this Plan or the Confirmation Order, shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of the Settlement Agreements.  The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements.  The following releases shall be in addition to and are intended to supplement any releases included in the Settlement Agreements as between the parties to such Settlement Agreements.  In the event of any inconsistency between this Plan or the Confirmation Order and the Settlement Agreement(s), the terms of the Settlement Agreement(s) will apply with respect to the particular parties thereto; provided, however, that all Settlement Agreements are subject to Sections 10.5, 10.8 and 10.9 of the Plan.  Except as expressly set forth in the Settlement Agreements, nothing in this Plan or the Releases set forth herein shall affect any rights of the Trustee or the Estate Representative to object to the allowance, amount, priority or secured status of the Claims of any party receiving a release under this Plan as provided in sections 502, 503, 506, 507, 509 or 510 of the Bankruptcy Code, including with respect to any right of setoff or recoupment, to the extent such Claims are not released, discharged or satisfied under any Settlement Agreement, under this particular Plan, or pursuant to the Confirmation Order. Nothing herein shall affect any limitation contained in any Settlement Agreement with respect to

the release granted to any Released Party.  Notwithstanding the definition of "Claim" in section 1.36 of the Plan, for the purposes of Article 10 of the Plan, including, without limitation,  the Releases and Injunctions, "Claim" or "Claims" means, as the context requires, past, present and future claims, causes of action, obligations, rights, liens, suits, judgments, orders, application of any kind including for judicial review, remedies, interests, actions, liabilities, demands, duties, injuries, compensation, damages, expenses, fees, and/or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual responsibility or otherwise, whether statutory, at common law, civil law, public law or in equity, regardless of the legal theory, including but not limited to claims for breach of contract, tort, breach of the implied covenant of good faith and fair dealing, loss of support, loss of consortium, statutory or regulatory violations, for indemnity or contribution, for any damages either moral, material, bodily injury, punitive, exemplary or extra-contractual damages of any type, in any jurisdiction (i) in any way arising out of, based upon, or relating in any way, in whole or in part, directly or indirectly, whether through a direct claim, cross-claim, third-party claim, warranty claim, recursory claim, subrogation claim, forced intervention, contribution claim, indemnity claim, reimbursement claim, class action or otherwise, (A) to the Derailment, including any claims held or asserted by any Person for wrongful death, personal injury, emotional distress, loss of support, loss of consortium, property damage, economic loss, moral damage, material damage and bodily injury or environmental damage, remediation or exposure or (B) to the XL Policies, including the issuance thereof, coverage, reimbursement, or payment thereunder, and any act or omission of an insurer of any type for which a Holder of a Claim might seek relief in connection therewith, or (ii) that would otherwise constitute a claim as against MMA, MMA Canada or their Estates (A) provable in bankruptcy under the Bankruptcy and Insolvency Act, R.S.C. 1985, c.B-3, had MMA Canada become bankrupt on August 6, 2013 and/or (B) within the definition of "claim" set forth in section 101(5) of the Bankruptcy Code. Without limiting the foregoing, "Claim" or Claims" for purposes of this Article 10 of the Plan includes all Claims in Classes 8, 9, 10, 11 and 12.

(b)    **Releases**.

(i)    **Releases by the Debtor and Estate Representative(s).**  *Subject in all respects to the provisions of Sections 9.1 and 9.3 of this Plan and full performance under the applicable Settlement Agreement(s) applicable to the particular Released Parties*, *on the Effective Date, the Debtor, the Trustee, the Estate Representative(s) and the Estate shall unconditionally release, and hereby are deemed to forever unconditionally release, the Released Parties, including, without limitation, the Released Parties' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims (including any Claims assigned by the Other Released Parties to the Trustee, MMA Canada or their designee pursuant to a Settlement Agreement, and including any Claims or Causes of Action for contribution, indemnity, reimbursement or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and Post-Confirmation Causes of Action, whatsoever (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and*

*documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date relating in any way to the Debtor, the Derailment, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, the XL Policies, and the Settlement Agreements; provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this release shall not extend, and shall not be construed as extending to, any Claim brought or that could be brought in the future by the Trustee, the Estate Representative or MMA Canada against any of the Affiliated Released Parties to the extent there is, or may be, coverage for such claims under  the Great American Policy, and the assignment of rights under such policies to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage, or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion.*

**(ii)** __Releases in Favor of the Estate and Estate Representative(s)__*. Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of this Plan, and full performance under the applicable Settlement Agreement(s), and subject to any express limitations and/or obligations contained in each Released Party's respective Settlement Agreement, on the Effective Date, each of the Trustee, the Estate Representative(s), and the Estate shall be forever and unconditionally released from any and all Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever by the Released Parties and by all Persons or entities receiving consideration under this Plan (other than the right to enforce the obligations under this Plan, the Settlement Agreements and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise,  that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Debtor, including, without limitation, arising from the Derailment, the Chapter 11 Case, this Plan, the Disclosure Statement, any prepetition act or omission of the Debtor, the Estate, the XL Policies and the Settlement Agreements; provided, however, that this release shall not apply to any Claims arising in the ordinary course of business that are unrelated to the Derailment and that are held by Affiliates of any Contributing Party (unless such Claims are expressly released pursuant to any Settlement Agreement).  For the avoidance of doubt, the releases in this Section 10.5(b)(ii) do not extend to any breaches of the Settlement Agreement(s).*

**(iii)** __Releases by Affiliated Released Parties__*. Subject in all respects to the provisions of Sections 9.1 and 9.3 of this Plan and the Affiliated Parties Settlement Agreement, on the Effective Date, each of the Affiliated Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Estate, the Trustee, the Estate Representative(s), the Creditors' Committee, the Creditors' Committee members and the Other Released Parties, including, without limitation, and the foregoing persons' and entities' respective attorneys and advisors (solely*

*in their respective capacities as such) from any and all Claims (including any Claims or Causes of Action for contribution, indemnity, reimbursement or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, transfer, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Derailment, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, the negotiation or funding of the Settlement Agreements; provided, however, that this release shall not apply to (A) any Claims or rights, under the Great American Policy, assigned by the Affiliated Released Parties to the Debtor or to the Trustee pursuant to the Affiliated Parties Settlement Agreement, (B) any right to enforce the obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder, provided, however, that such assigned Claims or rights will not be asserted against Other Released Parties, or (C) any Claims or rights of any of the Rail World Parties and/or the D&O Parties (as defined in the CCAA Plan) to seek recovery from their insurers, including Hartford and the XL Companies, for any attorneys' fees, expenses or costs incurred prior to the Effective Date.*

(iv)    **Releases in Favor of Affiliated Released Parties***. Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of this Plan and full performance under the Affiliated Parties Settlement Agreement, on the Effective Date, all persons and entities shall unconditionally release, and are hereby deemed to forever unconditionally release the Affiliated Released Parties, including, without limitation, the foregoing persons' and entities' respective attorneys and advisors (solely in their respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date relating in any way to the Derailment, the Debtor,  the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the negotiation or funding of the Settlement Agreements; provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this release shall not extend, and shall not be construed as extending to, any Claim brought or  that could be brought in the future by the Trustee, the Estate Representative,  MMA Canada or the Holders of Derailment Wrongful Death Claims (as applicable pursuant to the Affiliated Parties Settlement Agreement) against any of the Affiliated Released Parties (or certain of them, as applicable) to the extent there is, or may be, coverage for such claims under  the Great American Policy, and the assignment of rights under such policy to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage, or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs.*

*insured exclusion.*

   **(v)** **Releases by Other Released Parties.** *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.5(b)(ii), 10.8 and 10.9 of this Plan and full performance under the Settlement Agreement(s) applicable to the particular Released Parties, on the Effective Date, each Other Released Party and all other Released Parties shall unconditionally release, and hereby are deemed to forever unconditionally release, each of the Debtor, the Estate, the Trustee, the Estate Representative(s), the Creditors' Committee, the Creditors' Committee members, the Affiliated Released Parties, each additional Other Released Party, and the foregoing Persons' and entities' respective attorneys and advisors (solely in their respective capacities as such) from any and all Derailment Claims and all other Claims (including any Claims or Causes of Action for contribution, indemnity, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution, indemnity, reimbursement or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights, remedies and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise,  that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Derailment, the Debtor, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the Settlement Agreements, including, without limitation, the Trustee's or the Trustee's counsel's negotiation of the Settlement Agreements or the funding of the Settlement Agreements; provided, however, that this release shall not apply to any Claims of Canada against MMA Canada, nor shall it apply to any Claims assigned by the Other Released Parties to the Trustee, MMA Canada or their designee pursuant to a Settlement Agreement (other than any Claims against any Other Released Parties), nor shall it apply to the right to enforce the rights and obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in their favor nor shall it apply or be construed as applying to any Claims or claims or other rights to the extent preserved by any of the Other Released Parties in their respective Settlement Agreement(s) (other than any Claims against any Other Released Parties); provided further, however, that notwithstanding anything to the contrary in this Plan, this release shall not apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against one or more of their insurers; provided further, however, that this release shall not apply to any Claims arising in the ordinary course of business that are unrelated to the Derailment and that are held by Affiliates of any of the Contributing Parties.  For the avoidance of doubt, the releases in this Section 10.5(b)(v) do not extend to any breaches of the Settlement Agreement(s).*

   **(vi)** **Releases in Favor of Other Released Parties.** *Subject in all respects to the provisions of Sections 9.1, 9.3, 10.8 and 10.9 of this Plan and full performance under the Settlement Agreement(s) applicable to the particular Other Released Parties, on the Effective Date, all Persons and entities shall unconditionally release, and hereby are deemed to forever unconditionally release each of the Other Released Parties, including without limitation, the Other Released Parties' respective attorneys and advisors (solely in their*

*respective capacities as such), from any and all Derailment Claims, Causes of Action, and all other Claims (including any claims or Causes of Action for contribution, indemnity, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution, reimbursement or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), debts, obligations, demands, liabilities, suits, judgments, damages, rights (including any right of setoff, subrogation, contribution, indemnity, reimbursement or recoupment of any kind), remedies and causes of action, whatsoever, whether direct or indirect, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, whenever arising, in law, equity or otherwise that are based upon, arise from and /or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date, relating in any way to the Derailment, the Debtor, the Chapter 11 Case, this Plan, the Disclosure Statement, the Estate, and the Settlement Agreements, including, without limitation, the Released Parties and the Released Parties' counsel's negotiation of the Settlement Agreements or the funding of the Settlement Agreements; <u>provided</u>, <u>however</u>, that this release shall not in any way limit the right of the Estate Representative to enforce the rights and obligations under the Plan, the Settlement Agreements, and the contracts, instruments, releases and other agreements and documents delivered thereunder in the Estate's favor, nor shall it apply or be construed as applying to any Claims or other rights to the extent preserved by any of the Other Released Parties in their respective Settlement Agreement(s) (other than any Claims against any Other Released Parties, including, without limitation, Canada), <u>provided further</u>, <u>however</u>, that notwithstanding anything to the contrary in this Plan, this release shall not apply to any claims or Claims that the Irving Parties (as defined in their Settlement Agreement) have or may have against any one or more of their insurers.  For the avoidance of doubt, and notwithstanding anything in this Plan to the contrary, the releases in this Section 10.5(b)(vi) do not extend to any breaches of the Settlement Agreement(s).*

10.6.  **Injunctions.**

(a)  <u>**No Impact on the Rights of the Parties to the Settlement Agreements**</u>. **Nothing in this Section 10.6 or otherwise in this Plan or the Confirmation Order shall affect, release or otherwise limit the rights and duties of the parties to the Settlement Agreements to enforce or comply with the provisions of their respective Settlement Agreements.  The rights and duties of the parties under the Settlement Agreements are set forth in and shall be governed by the Settlement Agreements; <u>provided</u>, <u>however</u>, that no Settlement Agreement may restrain or limit the effect or scope of the releases set forth in Section 10.5 as to any Released Party without the express written consent of such Released Party.**

(b)  <u>**Injunctions**</u>.

(i)  <u>**Injunction in Favor of the Debtor and Estate Representative(s)**</u>. **Except as to the rights, claims or Claims created or expressly preserved by this Plan, the CCAA Plan, the Settlement Agreements, and the Confirmation Order, upon the Effective Date, the Debtor, the  Trustee, and the Estate Representative(s) shall have and be entitled to an injunction forever barring and enjoining all Persons and/or entities from asserting**

against the Debtor any past, present and future rights, interests, obligations, claims, causes of action, damages (including punitive damages), demands (including demands for contribution, indemnity or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether direct or indirect, contingent or actual, whether liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (A) the Debtor, (B) the Derailment or (C) the Estate, the Chapter 11 Case, this Plan, the Disclosure Statement, the Settlement Agreements and/or the XL Policies, except with regard to any claims and rights expressly reserved pursuant to Sections 10.3 and 10.5 above.

          (ii)        <u>Injunction in Favor of Affiliated Released Parties</u>.  Except as to the rights, claims or Claims created or expressly preserved by this Plan, the CCAA Plan, the Affiliated Parties Settlement Agreement, and the Confirmation Order, upon the Effective Date, all Persons and entities, including, without limitation, all Holders of Derailment Claims and Non-Settling Defendants, shall be, and are hereby deemed to be, permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting against the Affiliated Released Parties any and all Derailment Claims, Causes of Action and all other Claims, including, without limitation, any and all past, present and future rights, interests, obligations, damages (including punitive damages), demands (including demands for contribution, indemnity, reimbursement or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees) and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on tort, contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance from the beginning of the world to the Effective Date, in any way relating to or in connection with (A) the Debtor; (B) the Derailment, or (C) the Estate, (D) the Chapter 11 Case, (E) the Plan, (F) the Disclosure Statement, (G) the Settlement Agreements and/or (H) the XL Policies, provided, however, and without limiting any provision of the Affiliated Parties Settlement Agreement, including any provision that limits, conditions or affects any release or injunction in favor of the Affiliated Released Parties, this injunction shall not extend, and shall not be construed as extending to, any Claim brought or that could be brought in the future by the Trustee, the Estate Representative, MMA Canada or the Holders of Derailment Wrongful Death Claims (as applicable pursuant to the Affiliated Parties Settlement Agreement) against the Affiliated Released Parties (or certain of them, as applicable) to the extent there is, or may be, coverage for such claims under the Great American Policy, and the assignment of rights under such policy to the Estate, the Trustee or the Estate Representative shall not affect, reduce, discharge or diminish such coverage or provide a defense to any such insurer, or trigger any exclusion under any such policy, including, without limitation, any insured vs. insured exclusion.

(iii)    **Injunction in Favor of the Other Released Parties.  Except as to the rights and claims created or expressly preserved by this Plan, the CCAA Plan, the Settlement Agreements (provided that there are no preserved claims (or Claims) against Other Released Parties except as provided for in Exhibit 2), and the Confirmation Order, upon the Effective Date, all Persons and entities, including, without limitation, all Holders of Derailment Claims, Released Parties and other Persons, shall be, and are hereby deemed to be, permanently barred, enjoined, and restrained from commencing, pursuing, prosecuting, continuing or asserting against the Other Released Parties, any and all Derailment Claims, Causes of Action and all other Claims, including, without limitation, Claims or Causes of Action for any and all past, present and future rights (including any right of setoff, subrogation, contribution, indemnity, reimbursement or recoupment of any kind), interests (including creating, perfecting or enforcing any encumbrance of any kind against any one or more of the Other Released Parties), obligations, damages (including actual and/or punitive damages), demands (including any Claims or Causes of Action for contribution, indemnity, reimbursement, warranty, forced intervention, or seeking the enforcement, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against any one or more of the Other Released Parties or property of any one or more of the Other Released Parties, or otherwise), liabilities, expenses, fees (including, but not limited to, attorneys' fees, expert fees, consulting fees and other professional fees), and costs of any kind or any type whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on tort, contract, negligence, warranty, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect, incident, event or circumstance, including, without limitation, all Claims released pursuant to Section 10.5, whenever arising, that are based upon, arise from and/or are related to events and/or circumstances that occurred or existed on or prior to the Effective Date in any way relating to or in connection with (A) the Debtor; (B) the Derailment,  (C) the Estate, (D) the Chapter 11 Case, (E) the Plan, (F) the Disclosure Statement, (G) the Settlement Agreements and/or (H) the XL Policies (as to which, in the event of an inconsistency with the Plan, the XL Settlement Agreement will govern).**

### 10.7.    *Terms of Pre-Plan Injunction and Stays.*

Unless otherwise provided in this Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, entered in the Transferred WD Cases, or otherwise arising under applicable law in any court order and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order, provided, however, that to the extent against any remaining defendant that is not a Released Party as of the Effective Date, the Trustee will cooperate with the plaintiffs in the Transferred WD Cases in seeking a transfer of such cases to the forum selected by such plaintiffs, and will cooperate in seeking from the District Court, in the order transferring such cases, a finding that the Settlement Agreements and transactions with Released Parties approved and implemented pursuant to this Plan were entered into in good faith pursuant to and in accordance with 740 ILCS 100/2(c).

### 10.8.   *Canadian Criminal Charges and Related Claims of Canada.*

Notwithstanding anything to the contrary in this Plan, the Confirmation Order, or in any Settlement Agreement:

(a)   Nothing in this Plan shall release or provide an injunction to the benefit of any Person for fraud or criminal and quasi-criminal charges filed or that may be filed by Canada and, for greater certainty, for any fine or penalty arising from any such charges;

(b)   Nothing in this Plan shall bind or in any way limit the Director of Public Prosecutions of Canada acting pursuant to the Act respecting the Office of the Director of Public Prosecutions, S.C. 2006, c.9 § 121, as has been or may be amended or superseded;

(c)   Except for the terms and conditions of the Settlement Agreement entered into by Canada, no Settlement Agreement shall be binding upon Canada; and

(d)   Except with respect to entry of the Confirmation Order as may be entered with the assent of Canada, nothing in this Plan shall be construed as a waiver by Canada of sovereign immunity or as an attornment by Canada to any court of any jurisdiction outside Canada.

### 10.9.   *Claims of the United States of America*

Notwithstanding any provision in this Plan or the Confirmation Order, as to the United States of America, its agencies, departments or agents (collectively, the "United States"), nothing in this Plan or Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of the Debtor to the United States arising on or after the Effective Date; (2) any liability of the Debtor to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid defense of setoff against the Debtor or right of recoupment from the Debtor held by the United States with respect to a Claim; or (4) the United States from, subsequent to the Confirmation Date, pursuing any police or regulatory action against the Debtor.  As to the United States, nothing in this Plan or the Confirmation Order shall limit or expand the scope of the discharge granted to the Debtor pursuant to section 1141(d) of the Bankruptcy Code.

Further, as for Derailment Claims, if any, held by the United States, nothing in either the Confirmation Order or the Plan shall exculpate or release any Person for criminal charges brought by the United States, nor shall anything in the Confirmation Order or Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any such Person for such charges under such criminal laws.  Moreover, nothing in either the Confirmation Order or this Plan shall exculpate or release any Person from liability to the United States unrelated to the Derailment, nor shall anything in the Confirmation Order or Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any Person for such liability unrelated to the Derailment.

### 10.10.  Barred Persons and Barred Claims.

Without limiting the Releases and Injunctions set forth above, all (i) Non-Settling

Defendants; (ii) Released Parties; (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under section 1126(f)-(g) of the Bankruptcy Code; and (iv) any other Persons that hold, have held or may hold a Claim (including a Derailment Claim) or Cause of Action, including, without limitation, Canadian Pacific Railway Company and any parent, affiliate or subsidiary thereof (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, continuing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere (each such venue, a "Trial Court"), any Claim (including a Derailment Claim) or Cause of Action against any of the Released Parties, including, without limitation, any personal injury, property damage, wrongful death, indemnity, contribution, reimbursement or subrogation claim, whether based upon a contract or otherwise, against any Released Party (including, without limitation, any claim against the Released Parties, whether or not denominated as for indemnity, contribution, reimbursement, or subrogation) arising out of or related in any way to the Derailment or to the claims released pursuant to the Releases, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"). This section 10.10 is without prejudice to the position of any party as to the existence, in the absence of this section 10.10, of any Barred Claim.

In the event that any Person asserts any Claim (including any Derailment Claim), Cause of Action, or any other claim, obligation, suit, judgment, damage, debt, right, remedy, cause of action, avoidance power or right, liability of any nature whatsoever, or legal or equitable remedy against any Person arising from or related to the Derailment, regardless of whether such claim, cause of action, right, or legal or equitable remedy may be asserted pursuant to the Bankruptcy Code or any other applicable law or contract, including, without limitation, any claim for personal injury, property damage, wrongful death, indemnity (including contractual indemnity), contribution, reimbursement or subrogation relating in any way to the Derailment (collectively, the "Derailment-Related Causes of Action") and which results in a determination by a Trial Court (including, without limitation, by a jury impaneled by such Trial Court) that a Barred Person who is a Non-Settling Defendant is liable in damages (the "Initial Damages Determination") to a Person, including, without limitation, a Holder of a Derailment Claim, asserting a Derailment-Related Cause of Action against such Non-Settling Defendant (a "Plaintiff"), then, prior to final entry of any judgment, order or arbitration award with respect to such Initial Damages Determination in such Derailment-Related Cause of Action, the Plaintiff shall provide notice and a copy of the Confirmation Order to the Trial Court. In such case, for purposes of the Contribution/Indemnity Credit described below, such Trial Court (including, without limitation, a jury impaneled by such Trial Court) shall determine whether the Derailment-Related Cause of Action gives rise to Barred Claims on which any Released Party would have been liable to the Barred Persons in the absence of this section 10.10 or the Confirmation Order. Notwithstanding any finding referred to in section 10.7, the Trial Court, prior to final entry or final award of any verdict, judgment, order or arbitration award (the "Judgment"), shall determine any such Judgment against such Barred Person by reducing the Initial Damages Determination by an amount equal to the "Judgment Reduction Amount," which shall equal the greatest of:

(i)      The "Settlement Credit," which shall be an available alternative regardless of whether the Trial Court determines that there is any liability on the part

of any Released Parties and shall mean the Distribution received or to be received by such Plaintiff pursuant to the Plan or the CCAA Plan, including by way of payment by the WD Trust (the "Distribution"); *provided*, *however*, that the Settlement Credit shall be limited to the amount of the Distribution received or to be received by the Plaintiff with respect to the type of Derailment Claim asserted by Plaintiff against the Barred Person, so that, for example, the Barred Person shall not receive a Settlement Credit for Distributions received by Plaintiff for a personal injury claim if the claim against the Barred Person is for property damage;

(ii)     The "Insurance Credit," which shall mean the amount of coverage, if any, the Trial Court determines would have been recoverable to such Barred Person under any insurance policies owned by the Debtor or MMA Canada on account of such Plaintiff's Claim or Cause of Action but for the operation of this section 10.10 and the Confirmation Order; or

(iii)    The "Contribution/Indemnity Credit," which shall mean, in the event the Trial Court determines that the Barred Person could establish a valid indemnity or contribution claim against a Released Party but for the operation of this section 10.10 and the Confirmation Order, an amount equal to the value, as determined by the Trial Court, of all contribution or indemnification claims (whether equitable or contractual), if any, that the Trial Court determines such Barred Person would be entitled to as against one or more Released Parties but for operation of the Order, which shall be equal to the aggregate proportionate shares of liability, if any, of the Released Parties, plus the contractual indemnification for which the Barred Person would, in the absence of this section 10.10 and the Confirmation Order, be entitled to recover, as determined by the Trial Court at the time of entry of any judgment against any Barred Person, *provided however*, that any Contribution/Indemnity Credit with respect to the Debtor and/or MMA Canada, shall be allocated among the Plaintiff, the Barred Person and/or Released Parties other than the Debtor and/or MMA Canada determined to be liable, in whole or in part, by the Trial Court, such allocation (a) to the extent the Trial Court is located in the United States, shall be in accordance with the holding in, and methodology adopted by, Austin v. Raymark Indus., 841 F.2d 1184 (1st Cir. 1988) ("Austin"); or (b) to the extent the Trial Court is in Canada, shall be in accordance with applicable provincial law (provided, however, that such reference to Austin and/or such provincial law shall govern only with respect to the allocation of the proportionate liability of the Debtor and/or MMA Canada, and shall have no effect on the scope of the Contribution/Indemnity Credit (including, without limitation, that it extends to claims for contractual indemnity, if any). Without limiting the foregoing, if a Barred Person holds both contribution and indemnity claims against the same Released Party, the value of such claims shall not be combined to determine the amount of the Contribution/Indemnity Credit unless such Barred Person could simultaneously recover, in the

absence of this section 10.10 and the Confirmation Order, under both such contribution and indemnity claims as a matter of law. Notwithstanding the foregoing, nothing in this provision is intended to dictate the procedure in the Trial Court for determination of the Judgment Reduction Amount pursuant to and consistent with this provision, provided, however, in cases tried in the United States, the trial judge (or equivalent arbitrator, tribunal or panel) shall in the first instance determine the allocation of the proportionate liability of the Debtor and/or MMA Canada in accordance with Austin.

For the avoidance of doubt, and notwithstanding anything to the contrary, nothing in this section 10.10 shall in any way modify or affect the Releases and/or Injunctions in favor the Released Parties as set forth in Article 10, and nothing set forth herein shall be interpreted as providing that any Released Parties have any liability to any Person for any Claims (including Derailment Claims) or Causes of Action. Furthermore, after the Confirmation Order becomes a Final Order, the Trustee shall to use his best efforts to ensure that any Claims (including Derailment Claims) or Causes of Action against any Released Parties are promptly dismissed with prejudice.

Nothing herein shall prejudice or operate to preclude the right of any Non-Settling Defendant to (a) provide notice of the Confirmation Order to any Trial Court hearing a Derailment-Related Cause of Action at any point, (b) raise any issues, claims or defenses regarding the Judgment Reduction Amount, including, without limitation, the contractual liability and/or relative or comparative fault of any Person, including any Released Party, in any court or tribunal hearing any Derailment-Related Cause of Action in accordance with applicable law or procedure; or (c) take discovery of Released Parties in accordance with applicable law or procedure; *provided*, *however*, that nothing herein shall in any way modify or affect the Releases or Injunctions in favor of the Released Parties as set forth in Article 10. For the avoidance of doubt, nothing herein shall (x) be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Derailment-Related Cause of Action or (y) prejudice or operate to preclude the rights of any Barred Person to assert any claims or causes of action that have not been released, enjoined, or discharged under the Plan or the Confirmation Order.

The judgment reduction and related provisions in paragraphs 63 and 64 of the Confirmation Order are the bases upon which CP has agreed to withdraw, with prejudice, its objections to the Plan and to dismiss, with prejudice, its appeal of the Chapter 15 Recognition and Enforcement Order entered by this Court on August 26, 2015, as well as to withdraw, with prejudice, its pleading seeking leave to appeal the CCAA Approval Order. Accordingly, to the extent there is any inconsistency between the judgment reduction and related provisions of paragraphs 63 and 64 of the Confirmation Order, on the one hand, and the Plan or other provisions of the Confirmation Order, on the other, paragraphs 63 and 64 of the Confirmation Order shall govern as to judgment reduction; *provided further* that nothing in this section 10.10 or paragraphs 63 and 64 of the Confirmation Order shall be deemed or construed to limit, modify or affect the Releases or Injunctions.

If any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Barred Claims or any transaction

underlying any Barred Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement.

Each Plaintiff is enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendant in any manner that fails to conform to the terms of this section 10.10 and the Confirmation Order, including, without limitation, the Judgment Reduction Amount provision set forth in this section 10.10 and paragraph 64 of the Confirmation Order.

This Court shall retain jurisdiction with respect to all matters concerning the Confirmation Order, including, without limitation, hearing a petition for relief by a Barred Person or any other party in interest in the event that a court or tribunal hearing the Derailment-Related Cause of Action fails to apply the judgment reduction provisions of this section 10.10 and the Confirmation Order. However, to the extent that any of the Released Parties have made or make any oral or written submissions in support of the Confirmation Order, those Released Parties shall not be considered to have submitted to personal jurisdiction in this Court based upon such submissions.

# ARTICLE 11

## RETENTION OF JURISDICTION

### 11.1.   *Jurisdiction of Bankruptcy Court.*

Except as otherwise explicitly set forth in this Plan or the WD Trust Agreement as to those matters which are to be considered and determined by the District Court pursuant to an order withdrawing the reference as to those matters, or which are to be considered by a state court or the CCAA Court under any specific provision of this Plan, the Bankruptcy Court shall retain original and exclusive jurisdiction of matters arising under, and subject to any limitations contained in any Settlement Agreements, arising out of or related to the Chapter 11 Case and this Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for all matters, to the maximum extent permitted by law, including for, among other things, the following purposes:

(a)     To determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding relating to any Post-Confirmation Cause of Action, and any proceeding to implement and enforce the Releases and Injunctions;

(b)     To consider Disputed Claims, including objections, allowance, classification, priority, compromise, estimation or payment of any Claim, including Class 12 Claims at the request of the WD Trustee;

(c)     To hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for allowance and payment of Administrative Expense Claims, including awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(d)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)    To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of this Plan, the Releases, the Injunctions, the Settlement Agreements, the Confirmation Order or any other order of the Bankruptcy Court;

(f)    To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, the Settlement Agreements, any transactions or payments contemplated by any of the foregoing, or any agreement or other document governing or relating to any of the foregoing;

(h)    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate this Plan or to maintain the integrity of this Plan following consummation;

(i)    To recover all assets of the Debtor and property of the Estate, wherever located;

(j)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust established in furtherance of this Plan, including the WD Trust);

(l)    To hear and determine any other matters related to this Plan, the Disclosure Statement, the Confirmation Order, the Post-Confirmation Causes of Action, the WD Trust Agreement and related documents and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(m)    To enter a final decree closing the Chapter 11 Case;

*provided*, *however*¸ that nothing in this Section 11.1 shall, or shall be deemed to, impair any consent to non-exclusive jurisdiction or any venue provision set forth in any Settlement Agreement, or to affect any other limitations set forth therein.

# ARTICLE 12

## MISCELLANEOUS PROVISIONS

### 12.1.   *Withdrawal of the Reference.*

The rights of the Trustee, the Estate Representative, or the WD Trustee to move, pursuant to 28 U.S.C § 157(d) and Bankruptcy Rule 5011 for a withdrawal of the reference to the Bankruptcy Court of those matters under this Plan or the WD Trust Agreement which are to be considered and determined by the District Court, or which the Trustee or Estate Representative determines, in his sole discretion, require consideration by the District Court, shall be and hereby are expressly preserved, and such motion may be made at any time subsequent to the filing of this Plan.

### 12.2.   *Dissolution of the Creditors' Committee.*

Unless earlier disbanded by an order of the Bankruptcy Court, the Creditors' Committee shall dissolve on the Effective Date; *provided*, *however*, that (a) the Creditors' Committee shall continue to exist after the Effective Date for the purposes of opposing any pending appeals of the Confirmation Order and taking any actions related thereto, and the Creditors' Committee's professionals may seek compensation for and reimbursement of expenses related to such opposition and actions, if any, from the Post-Effective Date Estate, and (b) after dissolution of the Creditors' Committee, the Creditors' Committee's professionals shall retain their rights to pursue, review and object to any applications for compensation and reimbursement of expenses filed in accordance with Section 2.1 and 2.2 of this Plan.

### 12.3.   *Quasi-Judicial Immunity.*

The Confirmation Order shall provide that the Estate Representative and the WD Trustee are entitled to quasi-judicial immunity to the fullest extent allowed by law in connection with their implementation of the Confirmation Order, this Plan, the WD Trust Agreement, and the Wrongful Death Claim Resolution Procedures.

### 12.4.   *Payment of Statutory Fees.*

On the Effective Date, and thereafter as may be required, the Estate Representative shall pay all fees payable pursuant to 28 U.S.C. § 1930, including all quarterly fees pursuant to 28 U.S.C. § 1930 that become due after the Effective Date.

### 12.5.   *Effectuating Documents and Further Transactions.*

The Trustee, up to the Effective Date, and the Estate Representative, subsequent to the Effective Date, are authorized to execute, deliver, file or record such contracts, releases and other agreements or documents and take such actions as the Trustee or the Estate Representative, as the case may be, deem to be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### 12.6.   *Exemption from Transfer Taxes.*

Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan, including any bills of sale, or assignments executed in connection with any disposition of assets contemplated by this Plan (including transfers of assets to and by the WD Trust) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 12.7.   *Elimination of Vacant Classes; Deemed Acceptance.*

Any Class that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Any Class that is occupied as of such date by an Allowed Claim or such a temporary allowed claim and as to which no vote is cast shall be deemed to vote to <u>accept</u> the plan for purposes of Sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

### 12.8.   *Modification of Plan.*

The Plan may be amended, modified or supplemented by the Trustee in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  Prior to the Effective Date, the Trustee may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.  In addition, after the Effective Date, so long as such action does not materially adversely affect the treatment of Holders of Claims or Equity Interests under this Plan, the Estate Representative may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order.  Notwithstanding the foregoing, without the prior express consent of the relevant Contributing Parties, this Plan may not be amended pursuant to this paragraph if such amendment would adversely affect the Releases and Injunctions in favor of the Released Parties or the rights of any of the Released Parties under their respective Settlement Agreements as set forth herein.  Any such amendment, modification or supplement must be contained in a written document that is filed with the Bankruptcy Court, and must be discussed in advance with, and not objected to by, the Released Parties.

### 12.9.   *Revocation or Withdrawal of Plan.*

The Trustee reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date.  If the Trustee takes such action, this Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.  However,

notwithstanding the foregoing, the Trustee shall use his best efforts to obtain confirmation of this Plan as it is presently proposed.

### 12.10.  Severability.

Subject to Section 9.1, relative to conditions to Confirmation, if, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the plan proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation, except to the extent that such holding, alteration or interpretation, invalidates a condition to effectiveness of this Plan, any of the Releases in Section 10.5, any of the Injunctions in Section 10.6, or any other provision herein in a manner that would materially adversely affect the rights of any of the Released Parties under their respective Settlement Agreements, or requires any Released Party to pay more than the sum set forth in their respective Settlement Agreement(s).  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, and upon the Effective Date all such provisions are accordingly non-severable.  Notwithstanding the foregoing, to the extent that any alteration, or modification of this Plan or Confirmation Order would give rise to a right by a Released Party to terminate its respective Settlement Agreement(s), the Released Parties may exercise the right to terminate their respective Settlement Agreement(s) if and as provided for, and to the extent provided for, in their Settlement Agreement(s), and the effect of termination, if any, shall be as set forth in such Settlement Agreement.

### 12.11.  Schedules and Exhibits.

The schedules and exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

### 12.12.  Successors and Assigns.

All the rights, benefits and obligations of any person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

### 12.13.  Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Maine without giving effect to its principles of conflict of laws.

### 12.14.  Notices.

All notices, requests and demands to or upon the Trustee, the Creditors' Committee, the U. S. Trustee, or the WD Trustee shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Trustee:

> Robert J. Keach, Esq.
> BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
> 100 Middle Street
> P.O. Box 9729
> Portland, ME 04104
> Telephone: (207) 774-1200
> Facsimile: (207) 774-1127

If to the WD Trustee:

> Joe R. Whatley, Jr.
> 2001 Park Place North
> 1000 Park Place Tower
> Birmingham, AL 35203

If to the U.S. Trustee:

> Stephen G. Morrell, Esq.
> OFFICE OF THE UNITED STATES TRUSTEE
> 537 Congress Street
> Portland, ME 04101
> Telephone: (207) 780-3564

### 12.15.  Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.16.  Section Headings.

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

### 12.17.  No Admissions.

As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Action, the Plan shall not constitute or be construed as an admission of any fact or

liability, stipulation, or waiver, but rather as a statement made in settlement negotiations. The Plan shall not be admissible in any non-bankruptcy proceeding nor shall it be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, and Equity Interests in, the Debtor.

October 8, 2015                          **ROBERT J. KEACH,**
                                         **CHAPTER 11 TRUSTEE OF MONTREAL**
                                         **MAINE & ATLANTIC RAILWAY, LTD.**

                                         */s/ Robert J. Keach*
                                         By: Robert J. Keach, Esq.

## SCHEDULE A

**Wrongful Death Claim Resolution Procedures**

**Distribution Mechanism with Respect to the Wrongful Death Claims**

| Points Allocation Matrix | | |
|---|---|---|
| **Criteria** | **Points per Criteria** | |
| | | |
| **1.  Age of the decedents** | **Age of Decedent** | **Points** |
| | • Less than 18 | • 3 |
| | • 18 to less than 26 | • 8 |
| | • 26 to less than 60 | • 10 |
| | • 60 to less than 66 | • 8 |
| | • 66 and greater | • 3 |
| | | |
| **2.  If decedent survived by children** | **Age of Surviving Children** | **Points** |
| | • Less than 21 | • 15 |
| | • 21 to less than 31 | • 7 |
| | • 31 to less than 51 | • 5 |
| | • 51 and greater | • 3 |
| | | |
| **3.  If decedent is survived by a spouse** | **Annual Income of Decedent** | **Points** |
| | • Less than $20,000 | • 12.50 |
| | • $20,000 to less than $50,000 | • 15.00 |
| | • $50,000 to less than $75,000 | • 16.25 |
| | • $75,000 to less than $100,000 | • 17.50 |
| | • $100,000 and greater | • 18.75 |
| | | |
| **4.  If decedent is survived by a spouse but no children** | • If parents, 5 additional points | |
| | • If no parents, but siblings, then 2.5 points per sibling to a maximum of 7.5 points | |
| | | |
| **5.  If decedent is not survived by a spouse or child and the decedent is a minor** | • 10 points for each surviving parent and | |
| | • 5 points for each surviving sibling | |
| | | |
| **6.  If decedent is not survived by a spouse or child and the decedent is not a minor** | • 5 points for each surviving parent and | |
| | • 2.5 points for each surviving sibling | |
| | | |
| **7.  If decedent is survived by a child[1]** | • Set aside of 5% to parents and siblings with a potential reallocation to ensure a minimum payment of $25,000 to each parent and sibling | |

---

[1] As set forth in the CCAA Plan, in the event that, following review of the Derailment Property Damage Claims pursuant to the Claims Resolution Order (as defined in the CCAA Plan), the aggregate value of the Derailment Property Damage Claims is reduced below CAD$75 million, the distribution related to the difference between the amount of CAD$75 million and the revised aggregate value of these claims (the "Economic Savings") will be allocated as follows: (a) **first**, an amount up to CAD$884,000 to permit a payment of up to CAD$24,000 to each of the grandparents and grandchildren of the deceased, in which case the grandparents and grandchildren will be removed from Schedule B and included in this ¶7 of this Schedule A; (b) **second**, an amount of Economic Savings to permit the increase of the carve-out for parents, siblings, grandparents and grandchildren in this ¶7 of this Schedule A to increase from 5% up to the equivalent of 12.5%; and (c) **third**, on a pro-rata basis, to the value of the claims in the other categories described in Section 4.2(a), (b), (d) and (e) of the CCAA Plan.  For greater certainty, the total allocation of Economic Savings to increase the allocation to parents, siblings, grandparents and grandchildren to 12.5% in the wrongful death category shall not exceed CAD$4.9 million.

| Victim | Total Points | Allocation % | Estimated Potential Distribution |
|---|---|---|---|
| 1 | 68 | 4.83% | $5,374,000 |
| 2 | 23 | 1.65% | 1,830,000 |
| 3 | 32 | 2.29% | 2,548,000 |
| 4 | 20 | 1.43% | 1,592,000 |
| 5 | 15 | 1.07% | 1,194,000 |
| 6 | 20 | 1.43% | 1,592,000 |
| 7 | 6 | 0.43% | 478,000 |
| 8 | 38 | 2.68% | 2,985,000 |
| 9 | 28 | 1.97% | 2,189,000 |
| 10 | 14 | 1.00% | 1,115,000 |
| 11 | 23 | 1.65% | 1,831,000 |
| 12 | 16 | 1.15% | 1,274,000 |
| 13 | 20 | 1.43% | 1,592,000 |
| 14 | 28 | 1.97% | 2,189,000 |
| 15 | 40 | 2.86% | 3,185,000 |
| 16 | 52 | 3.69% | 4,100,000 |
| 17 | 28 | 1.97% | 2,189,000 |
| 18 | 25 | 1.79% | 1,990,000 |
| 19 | 23 | 1.65% | 1,830,000 |
| 20 | 40 | 2.86% | 3,185,000 |
| 21 | 17 | 1.22% | 1,353,000 |
| 22 | 18 | 1.29% | 1,433,000 |
| 23 | 25 | 1.79% | 1,990,000 |
| 24 | 21 | 1.47% | 1,632,000 |
| 25 | 23 | 1.65% | 1,831,000 |
| 26 | 55 | 3.94% | 4,379,000 |
| 27 | 25 | 1.79% | 1,990,000 |
| 28 | 53 | 3.76% | 4,180,000 |
| 29 | 40 | 2.86% | 3,185,000 |
| 30 | 31 | 2.18% | 2,428,000 |
| 31 | 20 | 1.43% | 1,592,000 |
| 32 | 23 | 1.65% | 1,830,000 |
| 33 | 25 | 1.79% | 1,990,000 |
| 34 | 40 | 2.86% | 3,185,000 |
| 35 | 13 | 0.93% | 1,035,000 |
| 36 | 13 | 0.93% | 1,035,000 |
| 37 | 45 | 3.19% | 3,543,000 |
| 38 | 21 | 1.47% | 1,632,000 |
| 39 | 25 | 1.79% | 1,990,000 |
| 40 | 30 | 2.15% | 2,388,000 |
| 41 | 23 | 1.61% | 1,791,000 |
| 42 | 41 | 2.95% | 3,284,000 |
| 43 | 40 | 2.86% | 3,185,000 |
| 44 | 40 | 2.86% | 3,185,000 |
| 45 | 13 | 0.93% | 1,035,000 |
| 46 | 53 | 3.76% | 4,180,000 |
| 47 | 31 | 2.24% | 2,488,000 |
| 48 | 40 | 2.86% | 3,185,000 |
| | **1,397** | **100.0%** | **$111,216,000** |

**The amounts above are prior to any fees that may be claimed by the claimants' attorneys or the Class Representatives, as applicable.**

**(all amounts are in Canadian dollars)**

# SCHEDULE B

**Derailment Moral Damages and Personal Injury Claims Matrix**

Distribution Mechanism with Respect to the Moral Damage and Personal Injury Claims

| | Points | Estimated # of claimants | Total points | % | Est. Dist. | Dist. per claimant |
|---|---|---|---|---|---|---|
| Trouble & Inconvenience | 5.0 | 3,700 | 18,500 | 24.9% | $11,677,000 | $3,160 |
| Evacuations | | | | | | |
| Per day of displacement | 1.0 | 1,850 | 10,370 | 14.0% | 6,545,000 | 630 |
| Maximum | 30.0 | | | | | per day |
| Red Zone/Yellow Zone | 50.0 | 140 | 7,000 | 9.4% | 4,418,000 | 31,560 |
| Grandparents and grandchildren (notes 1 & 5) | 15.0 | 50 | 750 | 1.0% | 473,000 | 9,460 |
| Post Traumatic Stress - short term (note 2) | 50.0 | 250 | 5,000 | 16.8% | 7,890,000 | 31,560 |
| Post Traumatic Stress - long term (note 2) | 100.0 | 250 | 10,000 | 33.7% | 15,780,000 | 63,120 |
| Bodily Injury | 50.0 | 2 | 100 | 0.1% | 63,000 | 31,500 |
| Buffer (note 3) | | | | | 2,000,000 | |
| Total (notes 1 & 4) | | | 74,220 | 100% | $48,846,000 | |

Note 1: This is a cumulative calculation, whereby one claimant can fall into more than one category, however wrongful death claimants and grandparents and grandchildren cannot claim for post-traumatic stress.

Note 2:  For those who have been given a medical diagnosis of post-traumatic stress, a depressive disorder, an anxiety disorder and/or otherwise remain under medical care for mental health issues arising from the disaster and for those who were present in the red zone at the time of the derailment. In order to qualify in this category and to determine if you qualify for short-term of long-term post-traumatic stress, further details will be required by the Monitor.

Note 3: To be used for any increase in the post-traumatic stress category (if any); thereafter, any unused portion will be distributed to all the other categories of moral damages on a pro rata basis.

Note 4: The final amounts may vary depending on further information received.

Note 5:  As set forth in the CCAA Plan, in the event that, following review of the Derailment Property Damage Claims pursuant to the Claims Resolution Order (as defined in the CCAA Plan), the aggregate value of the Derailment Property Damage Claims is reduced below CAD$75 million, the distribution related to the difference between the amount of CAD$75 million and the revised aggregate value of these claims (the "Economic Savings") will be allocated as follows: (a) first, an amount up to CAD$884,000 to permit a payment of up to CAD$24,000 to each of the grandparents and grandchildren of the deceased, in which case the grandparents and grandchildren will be removed from this Schedule B and included in ¶7 of Schedule A; (b) second, an amount of Economic Savings to permit the increase of the carve-out for parents, siblings, grandparents and grandchildren in ¶7 of Schedule A to increase from 5% up to the equivalent of 12.5%; and (c) third, on a pro-rata basis, to the value of the claims in the other categories described in Section 4.2(a), (b), (d) and (e) of the CCAA Plan.  For greater certainty, the total allocation of Economic Savings to increase the allocation to parents, siblings, grandparents and grandchildren to 12.5% in the wrongful death category shall not exceed CAD$4.9 million.

(all amounts are in Canadian dollars)

## <u>SCHEDULE C</u>

**Derailment Property Damage Claims Distribution Mechanism**

## Distribution Mechanism with Respect to the
## Property and Economic Damages Claims

- Property and Economic Damages Claims will be valued pursuant to the Claims Resolution Order.

- The value of the Property and Economic Damages Claims is currently estimated at $75 million.

- Following the valuation of the Property and Economic Damages Claims pursuant to the Claims Resolution Order, creditors having Proven Claims will be paid on a pro-rata basis.

- In the event that, following the review of these claims pursuant to the Claims Resolution Order, the aggregate value of the Property and Economic Damages Claims is reduced below $75 million, the difference between the amount of $75 million and the revised aggregate value of these claims will be allocated on a pro-rata basis to the value of the claims in the other categories described in Sections 4.2 (a) (b) (d) and (e).

**Any distributions made may be subject to fees that may be claimed by the claimants' attorneys or the Class Representatives, as applicable.**

**(all amounts are in Canadian dollars)**

# EXHIBIT 1

**Amended CCAA Plan**

Court File No. 450-11-000167-134

### SUPERIOR COURT
### (COMMERCIAL DIVISION)

SITTING AS A COURT DESIGNATED PURSUANT TO THE *COMPANIES'*
*CREDITORS ARRANGEMENT ACT*, R.S.C. C. C 36, AS AMENDED)

IN THE MATTER OF THE PLAN OF COMPROMISE AND ARRANGEMENT OF:

**MONTREAL, MAINE & ATLANTIC CANADA CO. (MONTREAL, MAINE & ATLANTIQUE
CANADA CIE)**

PETITIONER

AND

**RICHTER ADVISORY GROUP INC. (RICHTER GROUPE CONSEIL INC.)**

MONITOR

---

### AMENDED PLAN OF COMPROMISE AND ARRANGEMENT

pursuant to the *Companies' Creditors Arrangement Act*
concerning, affecting and involving

### MONTREAL, MAINE & ATLANTIC CANADA CO.

---

**June 8, 2015**

MTL_LAW\ 2333854\7

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| 1.1 | Defined Terms | 6 |
| 1.2 | Certain Rules of Interpretation | 14 |
| 1.3 | Currency | 15 |
| 1.4 | Successors and Assigns | 15 |
| 1.5 | Governing Law | 15 |
| 1.6 | Schedules | 15 |
| 2.1 | Purpose | 16 |
| 3.1 | Class of Creditors | 16 |
| 3.2 | Claims Procedure | 17 |
| 3.3 | Unaffected Claims | 17 |
| 3.4 | Treatment of Creditors | 18 |
| 3.5 | Voting Rights for Creditors | 19 |
| 3.6 | Interest | 20 |
| 3.7 | Duplicate Claims | 20 |
| 4.1 | Contributions to the Indemnity Fund | 20 |
| 4.2 | Distribution to Creditors | 20 |
| 4.3 | Additional Distributions to Creditors | 22 |
| 4.4 | Timing of Distributions to Creditors | 23 |
| 4.5 | Delivery of Distributions to Creditors | 23 |
| 4.6 | Allocation of Distributions | 24 |
| 4.7 | Transfer of Claims; Record Date for Distributions | 24 |
| 5.1 | Plan Releases and Injunctions | 25 |
| 5.2 | Timing of Releases and Injunctions | 26 |
| 5.3 | Claims against Third Party Defendants | 26 |
| 6.1 | Conditions Precedent to Implementation of Plan | 26 |

6.2    Monitor's Certificate ................................................................................27

6.3    Termination of Plan for Failure to Become Effective .........................................27

7.1    Administration Charge and Administration Charge Reserve..............................27

8.1    Binding Effect ........................................................................................28

8.2    Deeming Provisions .................................................................................28

8.3    Non-Consummation ..................................................................................28

8.4    Plan Amendment .....................................................................................29

8.5    Severability ............................................................................................29

8.6    Paramountcy ..........................................................................................30

8.7    Responsibilities of the Monitor ...................................................................30

8.8    Unclaimed Distributions ............................................................................30

8.9    Notices .................................................................................................31

8.10   Further Assurances .................................................................................32

8.11   No Preference .........................................................................................32

8.12   No Admission .........................................................................................32

| | |
|---|---|
| Schedule "A" | List of Released Parties |
| Schedule "B" | Settlement Agreements |
| Schedule "C" | Draft Canadian Approval Order |
| Schedule "D" | List of Existing Agreements |
| Schedule "E" | Distribution mechanism with respect to the Wrongful Death Claims |
| Schedule "F" | Distribution mechanism with respect to the Bodily Injury and Moral Damages Claims |
| Schedule "G" | Distribution mechanism with respect to the property and Economic Damages Claims |
| Schedule "H" | XL Settlement Agreement |

## PLAN OF COMPROMISE AND ARRANGEMENT
### (THE CAPITALIZED TERMS USED IN THIS DOCUMENT HAVE THE MEANING ASCRIBED THERETO IN SECTION 1.1 HEREOF)

**WHEREAS** on July 6, 2013, a train operated by MMAC derailed in the city of Lac-Mégantic, Quebec, Canada, causing numerous fatalities, bodily injuries, psychological and moral damages to thousands of people, and extensive property and environmental damages;

**WHEREAS** as a result of the numerous claims against MMAC and its parent company, MMA, arising out of the Derailment, along with the ensuing operational and financial impact arising therefrom, MMAC and MMA became insolvent;

**WHEREAS** numerous claims arising out of the Derailment have also been made against other persons and entities, including the Released Parties in both Canada and the United States of America;

**WHEREAS** on August 7, 2013, MMA filed a voluntary petition in the Bankruptcy Court for relief under Chapter 11 of the U.S. Bankruptcy Code;

**WHEREAS** on August 8, 2013, the Honourable Justice Castonguay of the CCAA Court granted an initial order in respect of MMAC (the "**Initial Order**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**");

**WHEREAS** on August 21, 2013, the United States Trustee appointed the Trustee having full rights and power under the Bankruptcy Code to act for and on behalf of MMA;

**WHEREAS** on September 4, 2013, the CCAA Court and the Bankruptcy Court adopted the Cross-Border Insolvency Protocol entered into between MMAC, the Monitor and the Trustee, the purpose of which is, *inter alia*, to facilitate the fair, open and efficient administration of the CCAA Proceeding and of the Bankruptcy Case for the benefit of the Creditors and interested parties;

**WHEREAS** through the concerted and coordinated efforts of MMAC, the Monitor and the Trustee, predicated on constituting an Indemnity Fund with a view to providing compensation for the Derailment Claims filed pursuant to the Claims Procedure Order, a number of Settlement Agreements have been reached with the Released Parties providing for contributions towards the Indemnity Fund;

**WHEREAS** the aforesaid Settlement Agreements are conditional upon obtaining for the Released Parties appropriate releases and the Injunction and Release enforceable both in Canada and the United States of America;

**WHEREAS** the Monitor will seek recognition and enforcement of this Plan and of the Canadian Approval Order from the Bankruptcy Court pursuant to Chapter 15 of the Bankruptcy Code;

**WHEREAS** the Trustee (for and on behalf of MMA) will file in the Bankruptcy Case the U.S. Plan, which will provide, among other things, for distribution of the Funds for Distribution in accordance with this Plan and the entry of the U.S. Approval Order;

**NOW THEREFORE**, MMAC hereby proposes this plan of compromise and arrangement pursuant to the CCAA.

## ARTICLE 1
## INTERPRETATION

### 1.1   Defined Terms

| | |
|---|---|
| Administration Charge | has the meaning ascribed thereto in Section 7.1 hereof. |
| Administration Charge Reserve | has the meaning ascribed thereto in Section 7.1 hereof. |
| Affected Claims | any and all Claims, other than any Unaffected Claim and any Claim referred to in Section 5.3. |
| Approval Date | the date on which the Approval Orders become Final Orders.  If the Canadian Approval Order, the Class Action Order and the U.S. Approval Order become Final Orders on different dates, the Approval Date is the latest date on which any of the Canadian Approval Order, the Class Action Order or the U.S. Approval Order becomes a Final Order. |
| Approval Orders | the Canadian Approval Order, the Class Action Order and the U.S. Approval Order, collectively. |
| Bankruptcy Case | the case styled *in re Montreal, Maine & Atlantic Railway Ltd., Bankr. D. Me. No. 13-10670.* |
| Bankruptcy Code | Title 11 of the United States Code. |
| Bankruptcy Court | United States Bankruptcy Court for the District of Maine, as presiding over the Bankruptcy Case. |
| Bodily Injury and Moral Damages Claims | shall have the meaning ascribed thereto in Section 3.5(b) hereof. |
| Business Day | a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in Montreal, Québec, Canada. |
| Canadian Approval Order | an Order, as set out in Schedule C hereof, entered in the CCAA Proceeding, which Order shall, among other things, (i) approve, sanction and/or confirm the Plan, (ii) approve the Settlement Agreements; (iii) authorize the Parties to undertake the settlement and the transactions contemplated by the Settlement Agreements; and (iv) provide for the Injunction and Release. |
| Canadian Professionals | the Monitor, Woods LLP, Gowling Lafleur Henderson LLP and the Claims Officer. |

| | |
|---|---|
| CCAA | has the meaning ascribed thereto in the recitals. |
| CCAA Court | Superior Court, Province of Quebec, as presiding over the CCAA Proceeding. |
| CCAA Filing Date | August 8, 2013. |
| CCAA Proceeding | *In the Matter of the Plan of Compromise or Arrangement of Montreal Maine & Atlantic Canada Co.*, Superior Court, Province of Quebec, No. 500-11-045094-139. |
| Chubb | Chubb & Son, a division of Federal Insurance Company, together with its parents, subsidiaries, affiliates, officers and directors, but strictly as insurer under the Chubb Policy. |
| Chubb Policy | That certain insurance policy bearing number 8210 2375 issued by Federal Insurance Company to Rail World, Inc. and Rail World Holdings LLC. |
| Claim or Claims | means, as the context requires, past, present and future claims, causes of action, obligations, rights, liens suits, judgments, orders, applications of any kind including for judicial review, remedies, interests, actions, liabilities, demands, duties, injuries, compensation, damages, expenses, fees, and/or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual responsibility or otherwise, whether statutory, at common law, civil law, public law or in equity, regardless of the legal theory, including but not limited to claims for breach of contract, tort, breach of the implied covenant of good faith and fair dealing, loss of support, loss of consortium, statutory or regulatory violations, for indemnity or contribution, for any damages either moral, material, bodily injury, punitive, exemplary or extra-contractual damages of any type, in any jurisdiction (a) in any way arising out of, based upon, or relating in any way, in whole or in part, directly or indirectly, whether through a claim that was, is, may or could have been asserted in the Canadian Class Action, or a direct claim, cross-claim, third-party claim, warranty claim, recursory claim, subrogation claim, forced intervention, contribution claim, class action or otherwise, to (i) the Derailment, including but not limited to any claims for wrongful death, survival, personal injury, emotional distress, loss of support, loss of consortium, property damage, economic loss, moral damage, material damage and bodily injury, statutory and common law product and manufacturing liability, negligence, or environmental damage, remediation, exposure or any claim that would constitute any right to an equitable remedy for breach of performance even if such breach does not give rise to a right of payment and/or or exposure; (ii) the Policies; (iii) the issuance of the Policies; (iv) insurance coverage under the Policies, |

reimbursement or payment under the Policies; (v) any act or omission of an insurer of any type for which a Claimant might seek relief in connection with the Policies; (vi) the Existing Agreements; or (b) that would otherwise constitute a claim as against MMA, MMAC or their Estates (i) provable in bankruptcy under the Bankruptcy and Insolvency Act, R.S.C. 1985, c.B-3, had MMAC become bankrupt on August 6, 2013; and/or (ii) within the definition of "claim" set forth in section 101(5) of the Bankruptcy Code; and/or (iii) that are advanced or could have been advanced in the Canadian Class Action.

Claimant                    any Person holding or potentially holding any Claim (including any transferee or assignee of a Claim) against (i) MMA, (ii) MMAC, (iii) to the extent applicable, the Estates, and/or (iv) any of the Released Parties.

Claims Bar Date             has the meaning ascribed thereto in the Claims Procedure Order.

Claims Officer              the court officer to be appointed pursuant to the Claims Resolution Order to adjudicate on the validity and quantum of any disputed Claims for the purpose of this Plan.

Claims Procedure            the procedure established for the filing of Claims in the CCAA Proceeding pursuant to the Claims Procedure Order.

Claims Procedure Order      the Amended Claims Procedure Order rendered on June 13, 2014, in the CCAA Proceeding by the CCAA Court, establishing, among other things, a claims procedure in respect of MMAC, as such Order may be amended, restated or varied from time to time.

Claims Resolution Order     an order of the CCAA Court establishing the procedure for determining the validity and quantum of any disputed Claims for the purpose of this Plan.

Class Action                the putative class action commenced on or about July 15, 2013, before the Superior Court, Province of Quebec, under court file 450-06-000001-132, including all subsequent amendments and all proceedings in this Court file, whether before or after the action is authorized to proceed as a class action.

Class Action Court          Superior Court, Province of Quebec, as presiding over the Class Action.

Class Action Order          an order, issued in the Class Action (i) confirming and declaring that the Canadian Approval Order and the U.S. Approval Order shall be binding and given full effect against parties designated and part of the Class Action, whether as a class representative, class member, named defendant/respondent or mis-en-cause, (ii) removing the allegations and conclusions against the Released Parties, and (iii) terminating the Class Action against the Released

Parties without costs.

| | |
|---|---|
| Class Representatives | has the meaning ascribed to "Class Action Plaintiffs" and to "Class Counsel" by the CCAA Court in the Representation Order. |
| Cook County Actions | the civil actions transferred pursuant to 28 U.S.C. §157(b)(5) in connection with the Bankruptcy Case to the District Court, originally filed in the Cook County, Illinois state court, and appearing on the docket of the District Court as Civil Action Nos. 00113-00130NT. |
| Creditors | collectively all Persons having Proven Claims and "Creditor" means any one of them. |
| D&O Parties | Edward A. Burkhardt, Larry Parsons, Steven J. Lee, Stephen Archer, Robert C. Grindrod, Joseph R. McGonigle, Gaynor Ryan, M Donald Gardner, Jr., Fred Yocum, Yves Bourdon and James Howard, each of whom is or was a director or officer of MMA, MMAC, Montreal, Maine & Atlantic Corporation and/or LMS Acquisition Corporation. |
| Derailment | July 6, 2013 derailment in Lac-Mégantic, Quebec, including any and all events leading up to and related to such derailment and/or any and all consequences of such derailment, including, without limitation, the explosion, crude oil spill, fire and/or other consequences related to such derailment. |
| Derailment Claims | the Proof of Claims filed under Schedules 1, 2, 3, 4 and 5 pursuant to the Claims Procedure Order. |
| Distribution Date | the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Proven Claims. |
| Effective Time | 8:00 a.m. (Montreal time) on the Plan Implementation Date. |
| Estates | the MMA bankruptcy estate and, to the extent applicable, the MMAC estate. |
| Existing Agreements | The contracts between MMAC and/or MMA and some of the Released Parties, listed in Schedule D hereto. |
| Final Order | an order of the CCAA Court, the Class Action Court or the Bankruptcy Court that has not been reversed, vacated, amended, modified or stayed and is no longer subject to further appeals, either because the time to appeal has expired without an appeal being filed, or because it has been affirmed by any and all courts with jurisdiction to consider any appeals therefrom. |
| Filing Date | August 8, 2013. |

| | |
|---|---|
| Funds for Distribution | the net amount of the Settlement Funds following payment to the Canadian Professionals of their CCAA Court-approved professional fees and disbursements and of the U.S. Professionals Bankruptcy Court-approved administrative expenses, for each group of professionals respectively up to a maximum amount equal to the amount of their share of the Administration Charge Reserve. |
| Great American | Great American Insurance Company, together with its parents, subsidiaries, affiliates, officers and directors. |
| Great American Policy | that certain policy of insurance bearing number DML 9924 836 issued by Great American to MMAC. |
| Government Claims | has the meaning ascribed thereto in Section 3.5(e) hereof. |
| Hartford | The Hartford Casualty Insurance Company, together with its parents, subsidiaries, affiliates, officers and directors, but strictly as insurer under the Hartford Policy. |
| Hartford Policy | that certain policy of insurance bearing number 83 SBA PBO432 SA issued by Hartford to Rail World Inc. |
| Indemnity Claims | has the meaning ascribed thereto in Section 3.5(f) hereof. |
| Indemnity Fund | trust accounts into which the Settlement Funds shall be paid. |
| Indian Harbor | Indian Harbor Insurance Company, but strictly as insurer under the Indian Harbor Policy. |
| Indian Harbor Policy | insurance policy issued by Indian Harbor to MMA, bearing number RRL003723801. |
| Injunction and Release | an order by the CCAA Court and the Bankruptcy Court permanently and automatically releasing, enjoining and forbidding the enforcement, prosecution, continuation and/or commencement of any Claim that any Person or Claimant holds or asserts or may in the future hold or assert against any of the Released Parties or that, with the exception of any claims preserved pursuant to Section 5.3 hereof against any Third Party Defendants that are not also Released Parties, could give rise to a Claim against the Released Parties whether through a cross-claim, third-party claim, warranty claim, recursory claim, subrogation claim, forced intervention or otherwise, arising out of, in connection with and/or in any way related to the Derailment, the Policies, MMA, and/or MMAC. The Injunction and Release order shall provide that any and all Claims against the Released Parties be permanently and automatically compromised, discharged and extinguished, that all Persons and Claimants, whether or not consensually, shall be deemed to have granted full, final, absolute, unconditional, complete and definitive releases of any and all Claims to the Released Parties and shall be permanently and forever barred, |

estopped, stayed and enjoined from (i) pursuing any Claim, directly or indirectly, against the Released Parties, (ii) continuing or commencing, directly or indirectly, any action or other proceeding with respect to any Claim against the Released Parties, (iii) seeking the enforcement, levy, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against the Released Parties or property of the Released Parties with respect to any Claim, (iv) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties with respect to any Claim, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Approval Orders to the full extent permitted by applicable law, and (vi) asserting any right of setoff, compensation, subrogation, contribution, indemnity, claim or action in warranty or forced intervention, recoupment or avoidance of any kind against any obligations due to the Released Parties with respect to any Claim or asserting any right of assignment of or subrogation against any obligation due by any of the Released Parties. The Injunction and Release order shall provide that it has no effect on the rights and obligations provided by the "*Entente d'assistance financière découlant du sinistre survenu dans la ville de Lac-Mégantic*" signed on February 19, 2014 between Canada and the Province. Notwithstanding the foregoing, the "Injunction and Release" shall not extend to and shall not be construed as extending to Unaffected Claims.

| | |
|---|---|
| Meeting | a meeting or meetings of the Creditors and Claimants to consider and vote on the Plan held pursuant to the Meeting Order and includes any meeting or meetings resulting from the adjournment thereof. |
| Meeting Order | an order of the CCAA Court directing the calling and holding of the Meeting. |
| MMA | Montreal, Maine & Atlantic Railway Ltd. |
| MMAC | Montreal, Maine & Atlantic Canada Co. |
| Monitor | Richter Advisory Group Inc. (Richter Groupe Conseil Inc.), in its capacity as Monitor in the CCAA Proceeding. |
| Non-Derailment Claims | has the meaning ascribed thereto in Section 3.5(g) hereof. |

| | |
|---|---|
| Person | means and includes an individual, a natural person or persons, a group of natural persons acting as individuals, a group of natural persons acting in collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or limited partnership, a proprietorship, joint venture, trust, legal representative, or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity. |
| Plan | This plan of compromise and arrangement in the CCAA Proceeding. |
| Plan Implementation Date | The Business Day on which the Monitor has filed with the CCAA Court the certificate contemplated in Section 6.2 hereof. |
| Plan Termination Date | January 29, 2016 |
| Policies | the Indian Harbor Policy, the XL Policy, the Chubb Policy and the Hartford Policy |
| Property and Economic Damages Claims | has the meaning ascribed thereto in Section 3.5(c) hereof. |
| Proof of Claim | the form of Proof of Claim for Creditors as approved by the Claims Procedure Order. |
| Proven Claim | a Claim finally determined, settled or accepted for voting and distribution purposes in accordance with the provisions of this Plan or the Claims Resolution Order. |
| Province | the Attorney General for the Province of Quebec. |
| Rail World Parties | means (i) Rail World Holdings, LLC; (ii) Rail World, inc.; (iii) Rail World Locomotive Leasing LLC ("RWLL"); (iv) The San Luis Central R.R. Co.; (v) Pea Vine Corporation; (vi) LMS Acquisition Corporation; (vii) Earlston Associates L.P.; (viii) Montreal, Maine & Atlantic Corporation; and (ix) each of the shareholders, directors and officers or members or partners of the foregoing, to the extent they are not D&O Parties. For the avoidance of doubt, Rail World Parties also includes Edward Burkhardt, solely in his capacity as director, officer and shareholder of the Rail World Parties. |
| Released Parties | the Persons listed in Schedule "A" hereto. |
| Representation Order | the order rendered on March 28, 2014 in the CCAA Proceeding by the CCAA Court appointing, as representatives of the class members designated in the Class Action and for the purposes of the CCAA Proceeding, the Class Action Plaintiffs and the Class Counsel (as these terms are defined in said order). |

| | |
|---|---|
| Settlement Agreements | collectively, those agreements whereby Third Party Defendants undertake to make acceptable monetary contributions toward the Indemnity Fund in consideration for being included as Released Parties in the Plan. Individually referred to as a "Settlement Agreement". |
| Settlement Funds | the aggregate monetary contributions payable under the Settlement Agreements, including the XL Indemnity Payment and the XL Additional Payment, before potential recovery on claims assigned to MMAC and the Trustee by certain of the Released Parties, which monetary contributions are estimated, as of the date hereof, at one hundred eighty-two million three hundred thousand Canadian dollars (CAD$182,300,000.00) plus ~~eighty-nine million four hundred thousand US dollars (US$89,400,000.00)~~ one hundred ninety-eight million nine hundred thousand US dollars (US$198,900,000.00). |
| Subrogated Insurer Claims | has the meaning ascribed thereto in Section 3.5(d) hereof. |
| Third Party Defendants | any Person with a risk of liability arising out of or related to the Derailment, including, without limitation, the defendants to the Class Action and the Cook County Actions. |
| Trustee | Robert J. Keach, in his capacity as chapter 11 Trustee appointed in the Bankruptcy Case, or such other Person(s) as may be approved by the Bankruptcy Court in the future to serve in such capacity in the Bankruptcy Case. |
| Unaffected Claims | has the meaning given to that term in Section 3.3 hereof. |
| U.S. Approval Order | (i) an Order entered in the Bankruptcy Case sanctioning, approving and/or confirming the U.S. Plan or (ii) an order entered in the Bankruptcy Case pursuant to the applicable sections of chapter 15 of the Bankruptcy Code, which order sanctions, recognizes and enforces the terms of the Canadian Approval Order. In either case, a "U.S. Approval Order" must, among other things, (a) approve the Settlement Agreements; (b) authorize the parties to undertake the settlement and the transactions contemplated by the Settlement Agreements; and (c) order the Injunction and Release. |
| U.S. Plan | the plan of liquidation, to be filed by the Trustee (for and on behalf of MMA) in the Bankruptcy Case, which shall provide, among other things, for the distribution of the Funds for Distribution in accordance with this Plan, the Canadian Approval Order and U.S. Approval Order. |
| U.S. Professionals | the Trustee, the Trustee's professionals and Paul Hastings LLP as counsel for the Official Committee of Victims as defined in the order authorizing the appointment of a victims' committee entered in the Bankruptcy Case on October 18, 2013. |

| | |
|---|---|
| XL Companies | Indian Harbor and XL Insurance. |
| XL Additional Payment | USD $5 million. |
| XL Indemnity Payment | CAD $25 million. |
| XL Insurance | the Canadian Branch of XL Insurance Company SE (formerly XL Insurance Company Limited) but strictly as insurer under the XL Policy. |
| XL Policy | insurance policy issued by XL Insurance, bearing number RLC003808301. |
| XL Settlement Agreement | the agreement attached as Schedule "H" and executed among the XL Companies, MMAC and the Trustee providing for the payment of the XL Indemnity Payment and the XL Additional Payment, which shall constitute a Settlement Agreement within the meaning of Section 1.1. |
| Website | the website maintained by the Monitor in respect of the CCAA Proceedings pursuant to the Initial Order at the following web address: http://www.richter.ca/en/insolvency-cases/m/montreal-maine-and-atlantic-canada-co. |
| Wrongful Death Claims | has the meaning ascribed thereto in Section 3.5(a) hereof. |
| Wrongful Death Victims | the spouse or common law partner, child, parent, and sibling of the persons deceased as a result of the Derailment. |

## 1.2    Certain Rules of Interpretation

For the purposes of this Plan:

(a)    any reference in the Plan to an Order, agreement, contract, instrument, release, exhibit or other document means such Order, agreement, contract, instrument, release, exhibit or other document as it may have been or may be validly amended, modified or supplemented;

(b)    the division of the Plan into "articles" and "sections" and the insertion of a table of contents are for convenience of reference only and do not affect the construction or interpretation of the Plan, nor are the descriptive headings of "articles" and "sections" intended as complete or accurate descriptions of the content thereof;

(c)    unless the context otherwise requires, words importing the singular shall include the plural and *vice versa*, and words importing any gender shall include all genders;

(d)    the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including

but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

(e)     unless otherwise specified, all references to time herein and in any document issued pursuant hereto mean local time in Montréal, Québec and any reference to an event occurring on a Business Day shall mean prior to 5:00 p.m. (Montréal time) on such Business Day;

(f)     unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next succeeding Business Day if the last day of the period is not a Business Day;

(g)     unless otherwise provided, any reference to a statute or other enactment of parliament or a legislature includes all regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation; and

(h)     references to a specified "article" or "section" shall, unless something in 'the subject matter or context is inconsistent therewith, be construed as references to that specified article or section of the Plan, whereas the terms "the Plan", "hereof", "herein", "hereto", "hereunder" and similar expressions shall be deemed to refer generally to the Plan and not to any particular "article", "section" or other portion of the Plan and include any documents supplemental hereto.

## 1.3    Currency

Any Claims denominated in a foreign currency shall be converted to Canadian dollars at the Bank of Canada noon exchange rate on the Filing Date.

## 1.4    Successors and Assigns

The Plan shall be binding upon and shall inure to the benefit of the heirs, administrators, executors, legal personal representatives, successors and assigns of any Person named or referred to in the Plan.

## 1.5    Governing Law

The Plan shall be governed by and construed in accordance with the laws of the Province of Québec and the federal laws of Canada applicable therein. All questions as to the interpretation or application of the Plan and all proceedings taken in connection with the Plan and its provisions shall be subject to the jurisdiction of the CCAA Court.

## 1.6    Schedules

The following Schedules to the Plan are incorporated by reference into the Plan and form part of the Plan:

| Schedule "A" | List of Released Parties |
| Schedule "B" | Settlement Agreements |
| Schedule "C" | Draft Canadian Approval Order |
| Schedule "D" | List of Existing Agreements |
| Schedule "E" | Distribution mechanism with respect to the Wrongful Death Claims |
| Schedule "F" | Distribution mechanism with respect to the Bodily Injury and Moral Damages Claims |
| Schedule "G" | Distribution mechanism with respect to the Property and Economic Damages Claims |
| Schedule "H" | XL Settlement Agreement |

The Settlement Agreements, save and except for the XL Settlement Agreement, shall not be attached to the copy of the Plan served on the interested parties and filed publicly with the CCAA Court or the Bankruptcy Court, and MMAC shall apply to the CCAA Court and Bankruptcy Court to have Schedule "B" filed on a sealed and confidential basis. The Settlement Agreements, save and except for the XL Settlement Agreement, shall not otherwise be made public in order to preserve the confidentiality of the settlements and terms therein.

## ARTICLE 2
## PURPOSE AND EFFECT OF THE PLAN

### 2.1   Purpose

The purpose of the Plan is:

(a)   to effect a full, final and irrevocable compromise, release, discharge, cancellation and bar of all Affected Claims against the Released Parties;

(b)   to effect the distribution of the Funds for Distribution and payment of the Proven Claims as set forth in Sections 4.2 and 4.3;

The Plan is put forward in the expectation that the Creditors, when considered as a whole, will derive a greater benefit from the implementation of the Plan than they would in the event of a bankruptcy of MMAC.

## ARTICLE 3
## CLASSIFICATION, VOTING AND RELATED MATTERS

### 3.1   Class of Creditors

The Creditors shall constitute a single class for the purposes of considering and voting on this Plan.

## 3.2    Claims Procedure

Creditors shall prove their respective claims, vote in respect of this Plan, and receive the distributions provided for under and pursuant to this Plan in accordance with the Claims Procedure Order, the Claims Resolution Order, the Meeting Order and this Plan. Any Person having a Claim that is not a Proven Claim is bound by such Orders, including that of being precluded from receiving a distribution under this Plan, and is forever barred and estopped from asserting such Claim against the Released Parties.

## 3.3    Unaffected Claims

Notwithstanding anything to the contrary herein, this Plan does not compromise, release, discharge, cancel, bar or otherwise affect:

(a)    the rights or claims of the Canadian Professionals and the U.S. Professionals for fees and disbursements incurred or to be incurred for services rendered in connection with or relating to the CCAA Proceeding or the Bankruptcy Case, including the implementation of this Plan and the U.S. Plan.

(b)    to the extent that there is, or may be, coverage for such Claims under any policy of insurance issued by Great American or any affiliate, including, without limitation, the Great American Policy, and only to the extent such coverage is actually provided, which coverage shall be assigned to the Trustee and MMAC and without any obligation on the part of the Rail World Parties or the D&O Parties to make any payment or contribution to supplement what is actually obtained by the Trustee or MMAC from such insurance policy (i) claims by MMAC or the Trustee (and only the Trustee, MMAC, their designee, or, to the extent applicable, the Estates) against the Rail World Parties and/or the D&O Parties; and (ii) claims by the holders of Wrongful Death Claims against Rail World, Inc., provided further, that any right or recovery by such holders of any right or recovery by such holders of Wrongful Death Claims pursuant to the action authorized by this subparagraph shall be, in all respects, subordinate to the claims of the Trustee and MMAC, and their successors under the Plan, in the above policies and (iii) claims by MMAC or the Trustee against the D&O Parties for any alleged breach of fiduciary duty or any similar claim based upon the D&O parties' authorization for payments to holders of notes and warrants issued pursuant to that certain Note and Warrant Purchase Agreement dated January 8, 2003 between MMA and certain noteholders (as amended from time to time) to the extent such payments arise from the sale of certain assets of MMA to the State of Maine.

(c)    claims by MMAC and the Trustee under applicable bankruptcy and non bankruptcy law to avoid and/or recover transfers from MMA, MMAC or MMA Corporation to the holders of notes and warrants issued pursuant to that certain Note and Warrant Purchase Agreement dated as of January 8, 2003 between MMA and certain noteholders (as amended from time to time) to the extent such payments arise from the distribution of proceeds from the sale of certain assets of MMA to the State of Maine.

(d)    claims or causes of action of any Person, including MMAC,  MMA and the Released Parties (subject to the limitations contained in their respective

Settlement Agreements), against third parties other than any of the Released Parties (subject to paragraph 3.3(e)).

(e)    claims or other rights preserved by any one of the Released Parties as set forth in Schedule A.

(f)    MMAC's obligations under the Plan, the Settlement Agreements, and the Approval Orders;

(g)    Claims against MMAC, except any Claims of the Released Parties other than Canada. However, subject to the Approval Orders becoming Final Orders, the Attorney General of Canada (i) has undertaken to irrevocably withdraw the Proof of Claim filed on behalf of Department of Transport Canada and the Proof of Claim filed on behalf of the Department of Public Safety and Emergency Preparedness, (ii) has agreed to the reallocation in favor of the Creditors of any and all dividends payable pursuant to this Plan or the U.S. Plan on the Proof of Claim filed on behalf of Canada Economic Development for Quebec Regions, as set forth in Section 4.3, and (iii) has agreed not to file any additional Proof of Claim under the CCAA Proceeding or the Bankruptcy Case;

(h)    any liability or obligation of and claim against the Third Party Defendants, insofar as they are not Released Parties, of whatever nature for or in connection with the Derailment, including but not limited to the Class Action and the Cook County Actions;

(i)    any Person for fraud or criminal and quasi-criminal charges filed or that may be filed and, for greater certainty, for any fine or penalty arising from any such charges;

(j)    any claims that any of the Rail World Parties and the D&O Parties may have to seek recovery from any of their insurers for any attorneys' fees, expenses and costs they have incurred prior to the Approval Date.

(k)    claims that fall under Section 5.1(2) of the CCAA, except that, in exchange for the consideration provided by or on behalf of the D&O Parties such D&O Parties shall benefit from the Injunction and Release with respect to any and all Claims related to the Derailment, to the exclusion of the Claims set forth in paragraph 3.3(b).

All of the foregoing rights and claims set out in this Section 3.3, inclusive, are collectively referred to as the **"Unaffected Claims"** and any one of them is an **"Unaffected Claim"**.

## 3.4    Treatment of Creditors

The Creditors shall receive the treatment provided for in this Plan on account of their Claims and, on the Plan Implementation Date, the Affected Claims will be compromised, released and otherwise extinguished against the Released Parties in accordance with the terms of this Plan.

### 3.5   Voting Rights for Creditors

Subject to this Plan, the Claims Procedure Order, the Claims Resolution Order and the Meeting Order, each Creditor shall be entitled to vote and for voting purposes each of such Claims shall be valued at an amount that is equal to the Creditor's Proven Claim, the whole subject to the following:

(a)   the aggregate of the votes of all Wrongful Death Victims having a Proven Claim for damages resulting from the death of a person as a consequence of the Derailment (for greater certainty, those Claims that fall under Schedule 1 of the Proof of Claim and were recognized as such or that were filed in the Bankruptcy Case) (collectively, the "**Wrongful Death Claims**" and, individually, a "**Wrongful Death Claim**") shall represent no more than 22.2% in value of all votes cast by Creditors;

(b)   the aggregate of the votes of all Creditors having a Proven Claim relating to the Derailment for damages resulting from bodily injuries suffered by themselves or another person and, without limitation, all claims for moral damages (for greater certainty, those Claims that fall under Schedules 2 and 3(a) of the Proof of Claim and were recognized as such or determined to be Bodily Injury and Moral Damages Claims or that were filed in the Bankruptcy Case) (collectively, the "**Bodily Injury and Moral Damages Claims**" and, individually, a "**Bodily Injury and Moral Damages Claim**") shall represent no more than 11.1% in value of all votes cast by Creditors;

(c)   the aggregate of the votes of all Creditors having a Proven Claim relating to the Derailment for damages suffered by an individual or a business not resulting from bodily injuries or death of a person (for greater certainty, those Claims that fall under Schedules 3(a) and 3(b) of the Proof of Claim and were recognized as such or that were filed in the Bankruptcy Case) (collectively, the "**Property and Economic Damages Claims**" and, individually, a "**Property and Economic Damages Claim**") shall represent no more than 8.3% in value of all votes cast by Creditors;

(d)   the aggregate of the votes of all Creditors having a Proven Claim in their capacity as subrogated insurers for claims directly resulting from the Derailment (for greater certainty, those Claims that fall under Schedule 4 of the Proof of Claim and were recognized as such) (collectively, the "**Subrogated Insurer Claims**" and, individually, a "**Subrogated Insurer Claim**") shall represent no more than 3.8% in value of all votes cast by Creditors;

(e)   the aggregate of the votes of all government entities or municipalities having a Proven Claim relating to the Derailment (for greater certainty, those claims that fall under Schedule 5 of the Proof of Claim and were recognized as such) (collectively, the "**Government Claims**" and, individually, a "**Government Claim**") shall represent no more than 48.5% in value of all votes cast by Creditors;

(f)   Creditors having a Proven Claim relating to the Derailment for contribution or indemnity (for greater certainty, those claims that fall under Schedule 6 of the Proof of Claim and were recognized as such) (collectively, the "**Indemnity**

Claims" and, individually, an "**Indemnity Claim**") shall represent 0% in value of all votes cast by Creditors.

(g)  Creditors having filed a Proof of Claim for damages unrelated to the Derailment (for greater certainty, those claims that fall under Schedule 7 of the Proof of Claim and were recognized as such) (collectively, the "**Non-Derailment Claims**" and, individually, a "**Non-Derailment Claim**") shall represent no more than 6.1% in value of all votes cast by Creditors.

## 3.6   Interest

Interest shall not accrue or be paid on any Claim from and after the Filing Date.

## 3.7   Duplicate Claims

A Creditor who has a Claim against more than one of MMAC, MMA or the Released Parties or has filed or is deemed to have filed claims both in the Bankruptcy Case and the CCAA Proceeding, in respect of the same debt or obligation, shall only be entitled to assert one Claim in respect of such debt or obligation, and any duplicate Claim filed by such Creditor will be disallowed for voting and distribution purposes under this Plan and the U.S. Plan so that only a single Claim remains under which said Creditors can exercise distribution rights.

## ARTICLE 4
## DISTRIBUTIONS

## 4.1   Contributions to the Indemnity Fund

Each of the Released Parties shall deliver to the Monitor the monies necessary to fully fund that amount of the Indemnity Fund which it is obligated to pay pursuant to the Settlement Agreements within such delay as has been agreed to pursuant to the Settlement Agreements and in any event within no more than 30 days after they have received written notice from the Monitor and the Trustee certifying that the Approval Orders become Final Orders, and such monies shall be held by the Monitor in trust in one or more interest bearing accounts and distributed by the Monitor in accordance with the terms of this Plan. Should this Plan be terminated for any reason in accordance with Section 6.3 or 8.3, such monies shall be returned by the Monitor, with any interest earned thereon, forthwith to the respective parties having contributed such monies. For greater certainty, any contributions to the Indemnity Fund received by the Monitor that are in U.S. Dollars shall be held by the Monitor in trust in U.S. Dollars and converted into Canadian Dollars on the Plan Implementation Date (save and except the portion to be remitted to the Trustee pursuant to Section 4.2(a)) and any contributions to the Indemnity Fund received by the Monitor that are in Canadian Dollars shall be held by the Monitor in trust in Canadian Dollars and not converted into U.S. Dollars.

## 4.2   Distribution to Creditors

The following Creditors having Proven Claims shall be entitled to distribution under this Plan as follows:

(a)     Creditors having Wrongful Death Claims shall, in the aggregate, receive 24.1% of the Funds for Distribution in full and final satisfaction of their Proven Claims as against the Released Parties. This amount will be remitted by the Monitor to the Trustee to fund a trust dedicated to the distribution to the Creditors having Wrongful Death Claims in accordance with the mechanism set forth in Schedule E hereto.

(b)     Creditors having Bodily Injury and Moral Damages Claims shall, in the aggregate, receive 10.4% of the Funds for Distribution in full and final satisfaction of their Proven Claims as against the Released Parties. This amount will be distributed by the Monitor in accordance with the mechanism set forth in Schedule F hereto.

(c)     Creditors having Property and Economic Damages Claims shall, in the aggregate, receive 9.0% of the Funds for Distribution in full and final satisfaction of their Proven Claims as against the Released Parties. This amount will be distributed by the Monitor in accordance with the mechanism set forth in Schedule G hereto.

(d)     Creditors having Subrogated Insurer Claims shall, in the aggregate, receive 4.1% of the Funds for Distribution in full and final satisfaction of their Proven Claims as against the Released Parties. This amount will be distributed by the Monitor on a *pro rata* basis amongst the Creditors having Subrogated Insurer Claims.

(e)     Creditors having Government Claims shall, in the aggregate, receive 52.4% of the Funds for Distribution in full and final satisfaction of their Proven Claims as against the Released Parties. This amount will be distributed by the Monitor on a *pro rata* basis amongst the Province, the City of Lac-Mégantic, the Attorney General of Canada (on behalf of Canada Economic Development for Quebec Regions) and the Commission de la Santé et de la Sécurité au Travail (CSST). For the purpose of this Plan, the Proven Claims of the Province, the City of Lac-Mégantic, the Federal Government of Canada (Economic Development of Canada, Quebec Regions) and the Commission de la Santé et de la Sécurité au Travail (CSST) are evaluated and established as follows:

    (i)     Province: CAD$409,313,000 (or ~~94~~89.9% of the Government Claims)

    (ii)    The City of Lac-Mégantic: ~~CAD$5,000,000~~CAD$20,000,000 (or 4.4% of the Government Claims)

    (iii)   The Attorney General of Canada (on behalf of Canada Economic Development for Quebec Regions): CAD$21,000,000 (or ~~4.8%~~4.6% of the Government Claims)

    (iv)    CSST: CAD$~~313,775~~4,915,257 (or ~~0.1%~~1.1% of the Government Claims)

For greater certainty, Creditors having Indemnity Claims and Non-Derailment Claims shall not be entitled to distribution under this Plan or the U.S. Plan in relation to the Indemnity Fund and shall have no right to any portion of the Funds for Distribution. However, the Creditors having Non-Derailment Claims against MMAC will be entitled to

distribution under the U.S. Plan, in accordance with its terms from any available net proceeds of the liquidation of MMA's assets.

Notwithstanding the foregoing, in the event that, following the review of the Property and Economic Damages Claims pursuant to the Claims Resolution Order, the aggregate value of the Property and Economic Damages Claims is reduced below $75 million, the distribution related to the difference between the amount of $75 million and the revised aggregate value of these claims ("Economic Savings") will be allocated ~~on a pro-rata basis to the value of the claims in the other categories described in Sections 4.2 (a) (b) (d) and (e)~~ as follows:

   i.   Firstly, an amount of up to $884,000 to permit a payment of up to $17,000 to each of the grandparents and grandchildren of the deceased, in which case the grandparents and grandchildren will be removed from Schedule "F" and included in paragraph 7 of Schedule "E";

   ii.   Secondly, an amount of Economic Savings to permit the increase of the overall carve-out for parents, siblings, grandparents and grandchildren to increase from 5% up to the equivalent of 12.5%;

   iii.   Thirdly, on a pro-rata basis, to the value of the claims in the other categories described in Sections 4.2 (a) (b) (d) and (e).

For greater certainty, the total allocation of Economic Savings to increase the allocation to parents, siblings, grandparents and grandchildren to 12.5% in the wrongful death category shall not exceed $5.1 million.

**4.3**    **Additional Distributions to Creditors**

With the agreement of the Province and the Federal Government of Canada (Economic Development of Canada, Quebec Region), any and all amounts payable pursuant to this Plan:

(a)    to the Province out of the XL Indemnity Payment (estimated at CAD$~~13,735,000~~13,383,000);

(b)    to the Attorney General of Canada (on behalf of Canada Economic Development for Quebec Regions) (estimated at CAD$~~6,936,000~~9,909,589);

    (collectively, the "**Reallocated Dividends**")

will be distributed to the Creditors having Proven Claims in respect of (i) Wrongful Death Claims, (ii) Bodily Injury and Moral Damages Claims and (iii) Property and Economic Damages Claims in accordance with the percentages set forth in subsection 4.2 (a) (b) and (c) hereof, namely:

    (i)    53.3% of the Reallocated Dividends will be distributed to the Creditors having Wrongful Death Claims;

    (ii)    26.7% of the Reallocated Dividends will be distributed to Creditors having Bodily Injury and Moral Damages Claims; and

(iii)    20.0% of the Reallocated Dividends will be distributed to Creditors having Property and Economic Damages Claims.

## 4.4    Timing of Distributions to Creditors

The Monitor shall hold the Settlement Funds in trust pending distribution thereof in accordance with the terms of this Plan and the Settlement Agreements, as applicable. Within 45 calendar days following the Plan Implementation Date, and receipt by the Monitor of any applicable tax ruling or clearance certificate, the Monitor shall make distributions to or on behalf of Creditors (including, without limitation, to the Trustee in accordance with Section 4.2(a) or to the Creditors' Representative Counsel in accordance with Section 4.5, to be held by such Representative Counsel in trust for such Creditors) in accordance with the terms of this Plan.

## 4.5    Delivery of Distributions to Creditors

Distributions to Creditors shall be made in accordance with the terms of this Plan, as applicable, by the Monitor: (A) at the addresses set forth in the Proofs of Claim filed by such Creditors in accordance with the Claims Procedure Order; (B) if applicable, at the addresses set forth in any written notices of address change delivered to the Monitor after the date on which any corresponding proof of claim was filed, provided such notice is received by the Monitor at least five (5) Business Days prior to the Plan Implementation Date; or (C) if applicable, and to the extent differing from the foregoing, at the address of such Creditors' respective legal representatives (the "**Representative Counsel**"), in trust for such Creditors, subject to the receipt by the Monitor at least five (5) business days prior to the Plan Implementation Date of a written instruction to that effect from said Creditors, it being understood that the class members in the Class Action, to the extent they have not sent an Opt-Out Notice (as these terms are defined in the Representation Order) within the prescribed delay, shall be deemed represented by the Class Counsel (as these terms are defined in the Representation Order) and said Class Counsel shall be considered as Representative Counsel duly authorized to receive the above-mentioned distribution in trust for all such class members. For greater certainty, and without limiting the foregoing:

(i)     With respect to the distributions to be made under this Plan to Representative Counsel, any disputes among the Creditors they represent and Representative Counsel with respect to the timing, allocation, quantum or other terms of the payment of the monies in question by Representative Counsel to and among those Creditors shall have no bearing or effect on the releases set out in the Settlement Agreements or this Plan, including, without limitation, the releases and injunctions in favour of the Released Parties (whether pursuant to the Settlement Agreements, the Plan, the U.S. Plan, the Approval Orders, or otherwise); and

(ii)    this Plan shall be effective and binding as and when set out in Section 6.2, and the fact that one or more of the Representative Counsel may be required or elect to commence or pursue further steps or proceedings or to otherwise resolve additional matters, issues or things

subsequent to the Plan Implementation Date in order to be lawfully entitled to make distributions to the Creditors they represent (including, without limitation, obtaining the approval by any Court of the payment of their respective professional fees and disbursements from the distributions in question) shall have no bearing or effect on the Settlement Agreements, this Plan, the U.S. Plan, or the Approval Orders, irrespective of the timing and outcome of such further steps and proceedings.

## 4.6    Allocation of Distributions

All distributions made to Creditors in respect of Proven Claims pursuant to this Plan shall be applied first in payment of the outstanding principal amount of the Proven Claim and only after the principal portion of any such Proven Claim is satisfied in full, to any portion of such Proven Claim comprising accrued and unpaid interest (but solely to the extent that interest is an allowable portion of such Proven Claim pursuant to this Plan or otherwise). In the event that the principal amount of all Proven Claims has been paid in full, each Creditor shall, at the request of the Monitor, be responsible for providing a representation and warranty with respect to its residency for purposes of the *Income Tax Act* (Canada). If any Creditor fails to provide satisfactory evidence that it is a resident of Canada for purposes of the *Income Tax Act* (Canada), then the Monitor shall have the right to:

(i)    assume and otherwise consider such Creditor to be a non-resident of Canada for the purposes of the *Income Tax Act* (Canada); and

(ii)    withhold any non-resident withholding tax that would be imposed under the *Income Tax Act* (Canada) based on such assumption from any amounts payable to such Creditor under this Plan,

until such time as such Creditor provides satisfactory evidence to the contrary to the Monitor, unless the non-resident withholding tax has already been remitted to the Canada Revenue Agency. For greater certainty, the distributions to be made pursuant to this Plan to Creditors having Proven Claims do not include, and are not intended to include, any amounts on account of interest on such Claims.

## 4.7    Transfer of Claims; Record Date for Distributions

Claims may be sold, transferred or assigned at any time by the holder thereof, whether prior or subsequent to the Plan Implementation Date, provided that:

(i)    Neither MMAC nor the Monitor shall be obligated to deal with or to recognize the purchaser, transferee or assignee of the Claim as the Creditor in respect thereof unless and until written notice of the sale, transfer or assignment is provided to the Monitor, such notice to be in form and substance satisfactory to the Monitor, acting reasonably within five (5) Business Days prior to the Plan Implementation Date

(ii)    only holders of record of Claims as at the date of the Meeting Order shall be entitled to attend, vote or otherwise participate at such meeting of Creditors; provided, however, that: (A) for the purposes of determining whether this Plan has been approved by a majority in number of the

Creditors only the vote of the transferor or the transferee, whichever holds the highest dollar value of such Claims will be counted, and, if such value shall be equal, only the vote of the transferee will be counted; and (B) if a Claim has been transferred to more than one transferee, for purposes of determining whether this Plan has been approved by a majority in number of the Creditors, only the vote of the transferee with the highest value of such Claim will be counted; and

(iii)    only holders of record of Claims as at five (5) Business Days prior to the Plan Implementation Date shall have the right to participate in the corresponding distribution provided for under Section 4.2 of this Plan.

## ARTICLE 5
## RELEASES AND INJUNCTIONS

### 5.1    Plan Releases and Injunctions

All Affected Claims shall be fully, finally, absolutely, unconditionally, completely, irrevocably and forever compromised, remised, released, discharged, cancelled and barred on the Plan Implementation Date as against the Released Parties.

All Persons (regardless of whether or not such Persons are Creditors or Claimants) shall be permanently and forever barred, estopped, stayed and enjoined from (i) pursuing any Claim, directly or indirectly, against the Released Parties, (ii) continuing or commencing, directly or indirectly, any action or other proceeding with respect to any Claim against the Released Parties, or with respect to any claim that, with the exception of any claims preserved pursuant to Section 5.3 hereof against any Third Party Defendants that are not also Released Parties, could give rise to a Claim against the Released Parties whether through a cross-claim, third-party claim, warranty claim, recursory claim, subrogation claim, forced intervention or otherwise, (iii) seeking the enforcement, levy, attachment, collection, contribution or recovery of or from any judgment, award, decree, or order against the Released Parties or property of the Released Parties with respect to any Claim, (iv) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties with respect to any Claim, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Approval Orders to the full extent permitted by applicable law, (vi) asserting any right of setoff, compensation, subrogation, contribution, indemnity, claim or action in warranty or forced intervention, recoupment or avoidance of any kind against any obligations due to the Released Parties with respect to any Claim or asserting any right of assignment of or subrogation against any obligation due by any of the Released Parties with respect to any Claim, and (vii) taking any actions to interfere with the Implementation or consummation of this Plan; provided, however, that the foregoing shall not apply to the enforcement of any obligations under the Plan.

Notwithstanding the foregoing, the Plan Releases and Injunctions as provided in this Section 5.1 (i) shall have no effect on the rights and obligations provided by the "*Entente d'assistance financière découlant du sinistre survenu dans la ville de Lac-Mégantic*" signed on February 19, 2014 between Canada and the Province, (ii) shall not extend to

and shall not be construed as extending to any Unaffected Claims.

## 5.2    Timing of Releases and Injunctions

All releases and injunctions set forth in this Article 5 shall become effective on the Plan Implementation Date at the Effective Time.

## 5.3    Claims against Third Party Defendants

AnyNotwithstanding anything to the contrary herein, any Claim of any Person, including MMAC and MMA, against the Third Party Defendants that are not also Released Parties: (a) is unaffected by this Plan; (b) is not discharged, released, cancelled or barred pursuant to this Plan; (c) shall be permitted to continue as against said Third Party Defendants; (d) shall not be limited or restricted by this Plan in any manner as to quantum to the extent that there is no double recovery as a result of the indemnification received by the Creditors or Claimants pursuant to this Plan; and (e) does not constitute an Affected Claim under this Plan. For greater certainty, and notwithstanding anything else contained herein, in the event that a Claim is asserted by any Person, including MMAC and MMA, against any Third Party Defendants that are not also Released Parties any and all right(s) of such Third Party Defendants to claim over, claim against or otherwise assert or pursue any rights or any Claim against any of the Released Parties at any time, shall be released and discharged and forever barred pursuant to the terms of this Plan and the Approval Orders.

## ARTICLE 6
## CONDITIONS PRECEDENT AND IMPLEMENTATION

## 6.1    Conditions Precedent to Implementation of Plan

The implementation of this Plan shall be conditional upon the fulfillment, or waiver (strictly with respect to Sections 6.1(e) and (f)), of the following conditions on or before the Plan Implementation Date:

(a)    Entry of the Canadian Approval Order

The Canadian Approval shall have been granted by the CCAA Court, including the granting by the CCAA Court of its approval of the compromises, releases and injunctions contained in and effected by this Plan.

(b)    Confirmation by the Trustee of the entry of the U.S. Approval Order

The Trustee shall have confirmed in writing to the Monitor that the U.S. Approval Order has been granted by the Bankruptcy Court, including the granting by the Bankruptcy Court of its approval of the compromises, releases and injunctions contained in and effected by this Plan.

(c)   Entry of the Class Action Order

The Class Action Order shall have been granted by the Superior Court, Province of Quebec.

(d)   Expiry of Appeal Periods

The Canadian Approval Order and the Class Action Order shall have become Final Orders and the Trustee shall have confirmed in writing to the Monitor that the U.S. Approval Order has become a Final Order.

(e)   Contributions

Each of the Released Parties shall have paid to the Monitor the amounts payable by it pursuant to its Settlement Agreement, in accordance with the terms of the Settlement Agreements.

(f)   Completion of Necessary Documentation

MMAC, the Monitor and the Trustee, as applicable, shall have obtained the execution and delivery by all relevant Persons of all agreements, settlements, resolutions, indentures, releases, documents and other instruments that are necessary to be executed and delivered to implement and give effect to all material terms and provisions of this Plan and the Settlement Agreements.

**6.2   Monitor's Certificate**

Upon the satisfaction of the conditions set out in Section 6.1 hereof, the Monitor shall file with the CCAA Court in the CCAA Proceeding and with the Trustee a certificate that states that all conditions precedent set out in Section 6.1 of this Plan have been satisfied and that the Plan Implementation Date has occurred.

**6.3   Termination of Plan for Failure to Become Effective**

If the Plan Implementation Date shall not have occurred on or before the Plan Termination Date, then, subject to further Order of the CCAA Court and the Bankruptcy Court, as applicable, this Plan shall automatically terminate and be of no further force or effect; provided that this Plan shall not automatically terminate pursuant to this section if the sole basis for the non-occurrence of the Plan Implementation Date is the pendency of any appeal or application for leave to appeal with respect to the Approval Orders.

### ARTICLE 7
### ADMINISTRATION CHARGE

**7.1   Administration Charge and Administration Charge Reserve**

The Settlement Funds, to the exclusion of the XL Indemnity Payment, up to a maximum of CAD$20 million, plus any applicable sales taxes for the Canadian Professionals (the "**Administration Charge Reserve**"), shall upon the Effective Time on the Plan Implementation Date be subject to an administration charge in favour of the Canadian Professionals and shall constitute a carveout in favour of the U.S. Professionals in order

to secure the payment of the fees, disbursements and entitlements owed or to be owed to them for the services rendered by them in connection with or relating to the CCAA Proceeding and the Bankruptcy Case (the "**Administration Charge**"). 60% of the Administration Charge Reserve shall be for the benefit of the Canadian Professionals and 40% shall be for the benefit of the U.S. Professionals. These funds shall be distributed to the Canadian Professionals pursuant to an order of the CCAA Court and to the U.S. Professionals pursuant to an order of the Bankruptcy Court. The Administration Charge shall rank in priority to any and all other hypothecs, mortgages, liens, security interests, priorities, charges, encumbrances, security or rights of whatever nature or kind or deemed trusts affecting the Settlement Funds, if any. The Administration Charge and the Administration Charge Reserve are established on the basis of incurred fees and disbursements as well as on an estimate of fees, disbursements and entitlements for which the Canadian Professionals and the U.S. Professionals could seek Court approval and are based on the Settlement Funds as presently constituted. The balance of the Administration Charge Reserve, if any, after payment of all fees, disbursements and entitlements of the Canadian Professionals and U.S. Professionals, shall form part of the Indemnity Fund, for distribution in accordance with the Plan.

## ARTICLE 8
## GENERAL

### 8.1   Binding Effect

On the Plan Implementation Date:

(a)   the Plan will become effective at the Effective Time;

(b)   the Plan shall be final and binding in accordance with its terms for all purposes on all Persons named or referred to in, or subject to the Plan and their respective heirs, executors, administrators and other legal representatives, successors and assigns; and

(c)   each Person named or referred to in, or subject to, the Plan will be deemed to have consented and agreed to all of the provisions of the Plan, in its entirety and shall be deemed to have executed and delivered all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

### 8.2   Deeming Provisions

In the Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

### 8.3   Non-Consummation

If the Approval Orders are not issued or if the Plan Implementation Date does not occur before the Plan Termination Date, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan or any Settlement Agreement, including the fixing or limiting to an amount certain any Claim, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan,

shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against the Released Parties or any other Person; (ii) prejudice in any manner the rights of the Released Parties or any other Person in any further proceedings involving MMAC and/or the Derailment; or (iii) constitute an admission of any sort by the Released Parties or any other Person.

## 8.4   Plan Amendment

MMAC reserves the right, at any time prior to the Plan Implementation Date, to amend, modify and/or supplement this Plan, provided that:

(i)     any amendment, modification or supplement to Articles 5 and 6 (including any defined terms contained therein) as well as any amendment, modification or supplement made to any other Article which affects the rights of Released Parties under their respective Settlement Agreement(s), may be made only with the written consent of the Released Parties or the affected Released Party, as the case may be, which can be provided at their sole discretion.

(ii)    any such amendment, modification or supplement must be contained in a written document that is filed with and approved by the CCAA Court, and must be discussed in advance with, and not objected to by the Released Parties and, if made following the Meeting, communicated to such of the Creditors and in such manner, if any, as may be ordered by the CCAA Court;

(iii)   any amendment, modification or supplement may be made unilaterally by MMAC following the Approval Orders, provided that it concerns a matter which, in the opinion of MMAC and the Monitor, acting reasonably, is of an administrative nature required to better give effect to the implementation of this Plan and to the Approval Orders and is not adverse to the financial or economic interests of the Creditors or the Released Parties; and

(iv)    any supplementary plan or plans of compromise or arrangement filed with the CCAA Court by MMAC and, if required by this Section 8.4, approved by the CCAA Court shall, for all purposes, be and be deemed to be a part of and incorporated in this Plan.

## 8.5   Severability

In the event that any provision in this Plan (other than Articles 5 and 6 and all defined terms contained therein or any other provision herein that would materially adversely affect the rights of any of the Released Parties under their respective Settlement Agreement(s), or requires any Released Party to pay more than the sum set forth in their respective Settlement Agreement(s)) is held by the CCAA Court to be invalid, void or unenforceable, the CCAA Court shall, following due notice to the parties in interest and a hearing on the issue, have the power to alter and interpret such term or provision to make it valid and enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered and interpreted.

Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Canadian Approval Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, as same may be recognized, enforced and given effect by the U.S. Approval Order.

## 8.6    Paramountcy

From and after the Plan Implementation Date, any conflict between: (A) this Plan; and (B) any information summary in respect of this Plan, or the covenants, warranties, representations; terms, conditions, provisions or obligations, express or implied, of any contract, mortgage, security agreement, indenture, loan agreement, commitment letter, document or agreement, written or oral, and any and all amendments and supplements thereto existing between MMAC and any Creditor, Released Party or other Person as at the Plan Implementation Date will be deemed to be governed by the terms, conditions and provisions of this Plan and the Approval Orders, which shall take precedence and priority. Notwithstanding the foregoing, the rights and duties of the parties under each of the Settlement AgreementAgreements are set forth in and shall be governed by thesaid Settlement AgreementAgreements. More particularly, the Plan Releases and Injunctions shall be in addition to and are intended to supplement any releases included in the Settlement Agreements as between the parties to such Settlement Agreements. In the event of any inconsistency between this Plan or the Approval Orders and thea Settlement AgreementAgreements, the terms of said Settlement AgreementAgreements will apply with respect to the rights and obligations of the parties thereto, as between themselves.

## 8.7    Responsibilities of the Monitor

The Monitor is acting in its capacity as Monitor in the CCAA Proceeding, and the Monitor will not be responsible or liable for any obligations of MMAC hereunder. The Monitor will have only those powers granted to it by this Plan, by the CCAA and by any Order of the CCAA Court in the CCAA Proceeding, including the Initial Order.

## 8.8    Unclaimed Distributions

If any Person entitled to a cash distribution pursuant to this Plan cannot be located on the Plan Implementation Date or at any time thereafter or otherwise fails to claim his/her/its distribution hereunder, then such cash or cash equivalent instruments shall be set aside and held in a segregated, non-interest-bearing account to be maintained by the Monitor on behalf of such Person. If such Person is located within six (6) months of the Plan Implementation Date, such cash (less the allocable portion of taxes (including withholding taxes), if any, paid by MMAC on account of such Person) and proceeds thereof, shall be paid or distributed to such Person. If such Person cannot be located within six (6) months of the Plan Implementation Date, any such cash, and interest and proceeds thereon, shall be remitted by the Monitor to a charitable association of its choice (if possible, in the Monitor's sole appreciation, dedicated to providing assistance to the victims of the Derailment), and such Person shall be deemed to have released its claim to such monies; provided, however, that nothing contained in this Plan shall require MMAC or the Monitor to attempt to locate such Person. Any distribution cheques

that have not been negotiated within three (3) months of issuance shall be cancelled by the Monitor, and any right or entitlement to such distribution shall be treated as an unclaimed cash or distribution pursuant to this Section 8.8.

**8.9     Notices**

Any notice or other communication to be delivered hereunder must be in writing and reference the Plan and may, subject as hereinafter provided, be made or given by personal delivery, ordinary mail or by facsimile or email addressed to the respective parties as follows:

(a)     If to MMAC

Montreal Maine & Atlantic Canada Co.
C/o Gowling Lafleur Henderson LLP
3700 – 1 Place Ville Marie
Montréal, Québec  H3B 3P4

Attention:     Me Patrice Benoit (patrice.benoit@gowlings.com)
Attention :    Me Pierre Legault (pierre.legault@gowlings.com)
Fax :          514-876-9550


(b)     If to the Monitor:

Richter Advisory Group
1981 McGill College Avenue, 11th Floor
Montréal, Québec  H3A 0G6

Attention:     Mr. Gilles Robillard (grobillard@richter.ca)
Attention:     Mr. Andrew Adessky (aadessky@richter.ca)
Fax:           514-934-3504

with a copy by email or fax (which shall not be deemed notice) to:

Attention:     Me Sylvain Vauclair (svauclair@woods.qc.ca)
Fax:           514-284-2046

(c)     If to the Trustee:

Robert J. Keach, Esq. (rkeach@bernsteinshur.com)
Bernstein Shur Sawyer & Nelson
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Fax: 207-774-1127

or to such other address as any party may from time to time notify the others in accordance with this section. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if

delivered, or on the day of faxing or emailing, provided that such day in either event is a Business Day and the communication is so delivered, faxed or emailed before 5:00 p.m. (Montréal time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day.

**8.10    Further Assurances**

MMAC and any other Person named or referred to in the Plan will execute and deliver all such documents and instruments and do all such acts and things as may be necessary or desirable to carry out the full intent and meaning of the Plan and to give effect to the transactions contemplated herein.

**8.11    No Preference**

Sections 38 and 95 to 101 of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 shall not apply to this Plan, save and except insofar as they may allow for the preservation or enforcement of (i) any claim brought or that could be brought in the future by the Trustee or MMAC (and only the Trustee, MMAC, their designee, or, to the extent applicable, the Estates) against the Rail World Parties and/or the D&O Parties but only to the extent that there is, or may be, insurance coverage for such claims under any policy of insurance issued by Great American, including, without limitation, the Great American Policy, and (ii) claims by the Trustee or MMAC (and only the Trustee, MMAC, their designee, or, to the extent applicable, the Estates) under applicable bankruptcy and non-bankruptcy law to avoid and/or recover transfers from MMA, MMAC or Montreal, Maine & Atlantic Corporation to the holders of notes and warrants issued pursuant to that certain Note and Warrant Purchase Agreement dated as of January 8, 2003 between MMA and certain noteholders (as amended from time to time) to the extent any such transfers arise from the distribution of proceeds from the sale of certain assets of MMA to the State of Maine, including any claims by or on behalf of the Trustee or the Estates against any of the D&O Parties for any alleged breach of fiduciary duty or any similar claim based upon the D&O Parties' authorization for payment of such notes, but any such breach of fiduciary duty or any similar claim shall be limited to recovery from the insurer under any policy of insurance issued by Great American, including, without limitation, the Great American Policy.

**8.12    No Admission**

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed as an admission by the Released Parties with respect to any matter set forth herein including, without limitation, liability on any Claim.

DATED as of the 31st8th day of MarchJune, 2015

## Schedule "A"   List of Released Parties

PLAN OF COMPROMISE AND ARRANGEMENT

concerning, affecting and involving

MONTREAL, MAINE & ATLANTIC CANADA CO.

### SCHEDULE A TO THE PLAN OF COMPROMISE AND ARRANGEMENT OF
### MONTREAL, MAINE & ATLANTIC CANADA CO.
### List of Released Parties

The list below consists of the parties who have executed settlement agreements with Montreal Maine & Atlantic Canada Co. ("MMAC") and Robert J. Keach in his capacity as Chapter 11 Trustee of Montreal, Maine & Atlantic Railway Ltd. (the "Trustee"); Nothing in this list shall supersede, effect, modify or amend any such settlement agreement and to the extent of any conflict between the descriptions in this list and any such settlement agreement, the settlement agreement shall govern. All such settlement agreements are subject to court approval and other conditions, and the inclusion of any person or entity on this list does not create or imply the release of such person or entity from any claim; in all respects, the settlement agreements, and the court orders pertaining to the settlement agreements, shall govern. The term "Affiliate" used in this Schedule "A" means with respect to any entity, all other entities directly or indirectly controlling, controlled by, or under direct or indirect common control with such entity. The other capitalized terms used herein have the meaning ascribed to them in the Plan. The Released Parties are as follows:

1.  **Devlar Energy Marketing LLC together with their parents Lario Oil & Gas Company and Devo Trading & Consulting Company (collectively "Devlar"),** as well as their subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers, (including St. Paul Fire and Marine Insurance Company and its direct and indirect parents, subsidiaries and Affiliates), but only to the extent of coverage afforded to Devlar by such insurers in relation to the Derailment.

2.  **Oasis Petroleum Inc. and Oasis Petroleum LLC (jointly, "Oasis"),** together with their parents, subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers (including St. Paul Fire and Marine Insurance Company and its direct and indirect parents, subsidiaries and affiliates) but only to the extent of coverage afforded to Oasis by such insurers in relation to the Derailment, as well as the entities identified in

MTL_LAW\2367966\4

VERSION ANGLAISE SEULEMENT

– 2 –

Schedule 2 hereto but strictly as non-operating working interest owners or joint venturers in the specific Oasis-operated wells that produced oil that was provided and supplied by Oasis that was transported in the train involved in the Derailment.

3.    **Inland Oil & Gas Corporation, Whiting Petroleum Corporation, Enerplus Resources (USA) Corporation, Halcón Resources Corporation, Tracker Resources, Kodiak Oil & Gas Corp. (now known as Whiting Canadian Holding Company, ULC) and Golden Eye Resources LLC**, together with each of their respective parents, subsidiaries, Affiliates, and each of their former and current respective employees, officers, directors, successors and permitted assignees and attorneys, but strictly as non-operating working interest owners or joint venturers in any wells that produced oil that was provided, supplied and transported in the train involved in the Derailment.

4.    **Arrow Midstream Holdings CCC. ("Arrow")** together with its parents, subsidiaries, Affiliates, successors, officers, directors, principals, employees, attorneys, accountants, representatives, and insurers. For the avoidance of doubt, Arrow shall include its current parent Crestwood Midstream Partners LP; and insurers mean only those insurers who have issued liability insurance policies to or in favor of Arrow actually or potentially providing insurance for Claims against Arrow arising from or relating to the Derailment, including without limitation, Commerce and Industry Insurance Company under policy no. 3023278 and National Union Fire Insurance Company of Pittsburg, Pa. under policy no. 41131539.

5.    **Marathon Oil Company ("Marathon"),** together with its parent, subsidiaries, successors and assigns, Affiliates, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to Marathon in relation to the Derailment), as well as the entities identified in schedule 5 attached hereto, but strictly as non-operating working interest owners or joint venturers in the specific Marathon-operated wells that produced and supplied oil that was transported on the train involved in the Derailment. For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of Marathon and that actually or potentially provided coverage for Claims relating to or

2

**VERSION ANGLAISE SEULEMENT**

- 3 -

arising from the Derailment, including, but not limited to, Yorktown Assurance Corporation policy number XSL-7-2013 and Old Maine Assurance Ltd. (reinsurance Agreement).

6.    **QEP Resources, Inc. ("QEP")**, together with its parents, subsidiaries, Affiliates, successors and assigns, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to QEP in relation to the Derailment), as well as those entities identified in schedule 6 attached hereto, but strictly as non-operating working interest owners or joint venturers in the specific QEP-operated wells that produced and supplied oil that was transported on the train involved in the Derailment. For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of QEP and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not be limited to, National Union Fire Insurance Company of Pittsburgh, Pa. (policy number 194-99-62); American Guarantee & Liability Insurance Company (policy number UMB6692611-02).

7.    **Slawson Exploration Company, Inc. ("Slawson")**, together with its parents, subsidiaries, Affiliates, successors and assigns, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to Slawson in relation to the Derailment), as well as those entities identified on schedule 7 attached hereto, but strictly as non-operating working interest owners in the specific Slawson-operated wells that produced oil that was transported on the train involved in the Derailment. For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of Slawson and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not be limited to, Federal Insurance Company (policy 3579 09 19 and 7981 72 74), Arch Specialty Insurance Company (policy EE00039761 03), and AIG (policy BE031941993).

8.    **Indian Harbor Insurance Company, XL Insurance, XL Group plc and their Affiliates** (strictly as insurers of MMA and MMAC).

3

**VERSION ANGLAISE SEULEMENT**

– 4 –

9.    **Edward A. Burkhardt, Larry Parsons, Steven J. Lee, Stephen Archer, Robert C. Grindrod, Joseph C. McGonigle, Gaynor Ryan, Donald Gardner, Jr., Fred Yocum, Yves Bourdon and James Howard, in their capacity as directors and officers of MMA and MMAC, Montreal, Maine & Atlantic Corporation and/or LMS Acquisition Corporation (the "D&O Parties").**

10.   **Hartford Casualty Insurance Company, together with its parents, subsidiaires, Affiliates, officers and directors** (strictly as insurer of Rail World, Inc.).

11.   **Chubb & Son, a division of Federal Insurance Company** (strictly as insurers of Rail World, Inc. and Rail World Holdings, LLC).

12.   **Rail World Holdings LLC; Rail World, Inc.; Rail World Locomotive Leasing LLC; The San Luis Central R.R. Co.; Pea Vine Corporation; LMS Acquisition Corporation; MMA Corporation; Earlston Associates L.P.,** and each of the shareholders, directors, officers or members or partners of the foregoing, to the extent they are not D&O Parties (the **"Rail World Parties"**). For the avoidance of doubt, (i) Rail World Parties also includes Edward A. Burkhardt, solely in his capacity as director, officer and/or shareholder of certain of the Rail World Parties; and (ii) the inclusion of the above entities within the definition of "Rail World Parties", except for the purpose of the settlement agreement executed with MMAC and the Trustee, shall not be construed to create or acknowledge an affiliation between or among any of the Rail World Parties.

13.   **General Electric Railcar Services Corporation, General Electric Company** and each of its and their respective parents, Affiliates, subsidiaries, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, managers, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of these, as well as any predecessors-

4

**VERSION ANGLAISE SEULEMENT**

– 5 –

in-interest of, or any assignors or vendors of any equipment involved in the Derailment to, any of the foregoing entities and any of the successors and assigns of any of the foregoing entities.

14. **Trinity Industries, Inc., Trinity Industries Leasing Company, Trinity Tank Car, Inc., and Trinity Rail Leasing 2012 LLC, Trinity Rail Group LLC, RIV 2013 Rail Holdings LLC, and Trinity Rail Leasing Warehouse Trust**, inclusive of each of their respective predecessors, agents, servants, employees, shareholders, officers, directors, attorneys, representatives, successors, assigns, parents, subsidiaries, Affiliates, limited liability companies, insurers, and reinsurers (but strictly to the extent of coverage afforded to the such parties by said insurers and reinsurers), including but not limited to whether such entities are in the business of leasing, manufacturing, servicing or administrating rail cars.

15. **Union Tank Car Company, the UTLX International Division of UTCC, The Marmon Group LLC and Procor Limited (the "UTCC Parties")**, and each of their respective predecessors, servants, employees, owners, members (strictly with respect to The Marmon Group LLC), shareholders, officers, directors, partners, associates, attorneys, representatives, successors, assigns, subsidiaries, Affiliates, and parent companies, insurers, and reinsurers listed in schedule 15 attached hereto, but strictly to the extent of coverage afforded to the UTCC Parties by said insurers and reinsurers, regardless of whether such entities are or were in the business of leasing, manufacturing, servicing, or administering rail car leases or otherwise.

16. **First Union Rail Corporation ("First Union")**, together with its parents, subsidiaries, Affiliates, officers, directors, predecessors, successors, assigns, servants, employees, shareholders, attorneys, representatives and insurers and reinsurers (strictly to the extent limited to coverage afforded to First Union, and including, but not limited to, Lexington Insurance Company (including pursuant to the Pollution Legal Liability Select Policy no. PL52675034 and Stand Alone Excess Liability Policy no. 018403252) and Superior Guaranty Insurance Company (including pursuant to Excess Liability Policy no. 404-1XSCI13)).

5

– 6 –

17.  **CIT Group, Inc.**, and its Affiliates, Federal Insurance Company solely in its capacity as an insurer of CIT Group, Inc. and its Affiliates and not in any other capacity, and Arch Insurance Group solely in its capacity as an insurer of CIT Group, Inc. and its Affiliates, and not in any other capacity.

18.  **ConocoPhillips Company ("ConocoPhillips"),** together with its subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to ConocoPhillips by such insurers in relation to the Derailment, as well as those entities identified in Schedule 18 hereto, but strictly as non-operating working interest owners in the specific ConocoPhillips operated wells that produced and supplied oil that was transported on the train involved in the Derailment.

19.  **Shell Oil Company and Shell Trading (US) Company,** together with their subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers' direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to Shell Oil Company and Shell Trading (US) Company, by such insurers in relation to the Derailment.

20.  **Incorr Energy Group LLC ("Incorr"),** together with its subsidiaires, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers but only with respect to coverage afforded by such insurers to Incorr in relation to the Derailment.

21.  **Enserco Energy, LLC**, together with its parent, subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers' direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to Enserco Energy, LLC, by such insurers in relation to the Derailment.

6

– 7 –

22.  **The Attorney General of Canada, the Government of Canada, Her Majesty the
Queen in Right of Canada and the departments, crown corporations and agencies
including the Canadian Transportation Agency, and including all past, present and
future Ministers, officers, employees, representatives, servants, agents, parent,
subsidiary and affiliated crown corporations and agencies, and their respective
estates, successors and assigns.**

23.  **(i) Irving Oil Limited, Irving Oil Company, Limited, Irving Oil Operations General
Partner Limited and Irving Oil Commercial G.P.**, (ii) any of their Affiliates (as
defined in the settlement agreement), (iii) any predecessors, successors and assigns of any
of the foregoing Persons named in clauses (i) and (ii) of this paragraph 23, and (iv) any
directors, officers, agents and/or employees of any of the foregoing Persons named in
clauses (i), (ii) and (iii) of this paragraph 23 (the **"Irving Parties"**), and the insurers listed
in Schedule 23 attached hereto, but only in their respective capacities as insurers of the
Irving Parties under the insurance policies listed by policy numbers in said Schedule 23
(the **"Irving Insurers"**).  Notwithstanding the foregoing or anything else in this list and
the Plan, the claims (including the Claims) and/or other rights that the Irving Parties have
(or may have) against their insurers (including but not limited to the Irving Insurers) or
any one or more of them under any applicable policies, at law, in equity or otherwise, are
fully preserved and said insurers (including but not limited to the Irving Insurers) are not
Released Parties in connection with said claims and/or other rights of the Irving Parties.

24.  **(i) World Fuel Services Corporation, World Fuel Services, Inc., World Fuel Services
Canada, Inc., Petroleum Transport Solutions, LLC, Western Petroleum Company,
Strobel Starostka Transfer LLC ("SST"), Dakota Plains Marketing LLC, Dakota
Plains Holdings, Inc., DPTS Marketing Inc., Dakota Plains Transloading LLC,
Dakota Petroleum Transport Solutions LLC (the "World Fuel Parties"),** (ii) any of
their Affiliates, (iii) any predecessors, successors and assigns of any of the foregoing
Persons named in clauses (i) and (ii) of this paragraph 24, and (iv) any directors, officers,
agents and/or employees of any of the foregoing Persons named in clauses (i), (ii) and
(iii) of this paragraph 24, and the insurers listed in schedule 24 attached hereto, but only

7

- 8 -

in their respective capacities as insurers under the insurance policies listed by policy
number in said schedule 24 (the **"World Fuel Insurers"**).   Notwithstanding the
foregoing or anything else in this list and the Plan, the claims (including the Claims)
and/or other rights that the World Fuel Parties have (or may have) against their insurers
(including but not limited to the World Fuel Insurers), SST or its insurers, or any one or
more of them under any applicable policies, at law, in equity or otherwise, are fully
preserved and SST, as well as said insurers (including but not limited to the World Fuel
Insurers) are not Released Parties in connection with said Claims and/or other rights of
the World Fuel Parties.

25.   **The SMBC Parties, namely: SMBC Rail Services, LLC f/k/a Flagship Rail Services,
LLC, and its respective predecessors, servants, employees, independent contractors,
owners, shareholders, officers, directors, associates, attorneys, accountants,
representatives, successors, assigns, agents, subsidiaries, affiliates, and parent
companies, and including without limitation Sumitomo Mitsui Financial Group,
Inc., Sumitomo Mitsui Finance & Leasing Company, Limited, Sumitomo Mitsui
Banking Corporation of Canada, Sumitomo Mitsui Banking Corporation, SMBC
Capital Markets, Inc., SMBC Leasing and Finance, Inc., SMBC Nikko Securities
America, Inc., JRI America, Inc., Manufacturers Bank, SMBC Global Foundation,
Inc., SMBC Financial Services, Inc., SMBC Cayman LC Limited, SMBC Capital
Partners LLC, SMBC Leasing Investment LLC, SMBC Marine Finance, Inc.,
Sakura Preferred Capital (Cayman), Limited, TLP Rail Trust I, FRS I, LLC, and
FR Holdings, LLC and its subsidiaries.   "SMBC Parties" also means TLP Rail
Trust I, a Delaware Statutory Trust, SMBC Rail Services, LLC, as the owner
participant and beneficiary of TLP Rail Trust I, and Wilmington Trust Company,
Trustee of TLP Rail Trust I.**   "SMBC Parties" also means Liberty Mutual Holding
Company, Inc. and its subsidiaries and affiliates, Liberty Mutual Group Inc., Liberty
Mutual Insurance Company, Liberty Insurance Underwriters Inc., Liberty Surplus
Insurance Corporation, and Liberty International Underwriters (collectively, **"Liberty"**)
and any reinsurers that Liberty has any policy, agreement, contract, or treaty with that

8

- 9 -

relates in any way to any of the SMBC Parties or any insurance policy issued by Liberty
to any of the SMBC Parties.

Notwithstanding the foregoing or anything else in this list, and without implying or
providing any limitation, the term "Settling Defendants" as used herein or above does not
include, and shall not be deemed to include Canadian Pacific Railway Company and (b) SMBC
Rail Services, LLC, (b) World Fuel Services Corporation, (c) World Fuel Services, Inc., (d)
World Fuel Services, Canada, Inc., (e) Petroleum Transport Solutions, LLC, (f) Western
Petroleum Co., (g) Strobel Starostka Transfer LLC, (h) Dakota Plains Marketing LLC, (i) Dakota
Plains Holdings, Inc., (j) DPTS Marketing Inc., (k) Dakota Plains Transloading LLC, (l) Dakota
Petroleum Transport Solution LLC.

9

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 2
## LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT VENTURERS IN OASIS OPERATED WELLS

Whiting Oil And Gas Corporation;
Hess Corporation;
Hess Bakken Investments II LLC
Continental Resources Inc;
Sinclair Oil And Gas Company;
Conoco Phillips Company;
Black Bear Resources, LLLP;
Castlerock Resources Inc;
Deep Creek Exploration;
Enerplus Resources Usa Corporation;
Fidelity E&P Company:
Fidelity Exploration &Production Co;
Inland Oil & Gas Corporation;
Jake Energy Inc.;
Kerogen Resources Inc;
Lilley & Company;
Lilley And Associates LLC;
Linn Energy Holdings LLC;
Lone Rider Trading Company;
Mayhem Oil And Gas Inc;
Missouri River Royalty Corp;
Nj Petroleum LLC;
Northern Energy Corporation;
Northern Oil & Gas Inc;
O.T. Cross Oil LLC;
Ottertail Land & Permit Services;
Penroc Oil Corporation;
Reef 2011 Private Drilling Fund LP;
Shakti Energy LLC;
Slawson Exploration Company Inc;
Statoil Oil & Gas LP;
WHC Exploration LLC;

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 5

### LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT VENTURERS IN MARATHON OPERATED WELLS

ALAMEDA ENERGY INC
ARTHUR FRANK LONG JR
BEARTOOTH RIDGE RESOURCES
CARL W STERUD JR
CHUGASH EXPLORATION LP
CONDOR PETROLEUM INC
CONTINENTAL RESOURCES INC
DISPUTED STATE-TRIBAL INTEREST
ENDEAVOR ENERGY RESOURCES LP
ENERPLUS RESOURCES CORPORATION
ESTATE OF KARL WILLIAM STERUD
ESTATE OF WALLACE HICKEL
EVERTSON ENERGY PARTNERS LLC
GADECO LLC
GOLDENEYE RESOURCES LLC
HALCON WILLISTON I LLC
HESS BAKKEN INVESTMENTS II LLC
ILAJEAN REAMS
JENNIFER BYSTROM
JOSEPHINE ANN KJONAAS
KOOTENAI RESOURCE CORP
LA PETROLEUM INC
LGFE-M LP
LINDA ELWOOD
LOUIS WALTER LONG
MARCIN PRODUCTION LLC
MICHAEL HARVEY STERUD
MISSOURI RIVER ROYALTY CORPORATION
MONTANA OIL PROPERTIES INC
MONTE TEDDY LONG
NATURAL RESOURCE PARTNERS LP
NORTHERN ENERGY CORP
NORTHERN OIL AND GAS INC
PETROGULF CORP
QEP ENERGY COMPANY
RAINBOW ENERGY MARKETING CORP
RONALD KNIGHT
S REGER FAMILY INC

**VERSION ANGLAISE SEULEMENT**

- 2 -

SLAWSON EXPLORATION COMPANY INC
SLAWSON RESOURCES COMPANY
SPOTTED HAWK DEVELOPMENT LLC
STEWART GEOLOGICAL INC
TDB RESOURCES LP
USG PROPERTIES BAKKEN II LLC
VERSA ENERGY LLC
VITESSE ENERGY LLC
VITESSE OIL LLC
W NORTH FUND II LP
ZAGOIL COMPANY LLC

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 6

## LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT VENTURERS IN QEP OPERATED WELLS

3LAND INC
ACTION REALTORS INC
ADELE L. SKODA
AMERADA HESS CORPORATION
ANDREW J HORVAT REVOCABLE TRUST
ARMSTRONG CHILDREN'S TRUST
ARMSTRONG MINERALS, LLC
AVALON NORTH LLC
BADLANDS HOLDING COMPANY
BANDED ROCK LLC
BIG PRAIRIE INVESTMENTS, LLC
BLACK STONE ENERGY COMPANY, LLC
BORGOIL RESOURCES, LLP
BRUCE P. IVERSON
BURLINGTON RESOURCES OIL & GAS
BXP PARTNERS III, LP
CHUGASH EXPLORATION LP
CONTINENTAL RESOURCES INC
COPPERHEAD CORPORATION
CRESCENT ENERGY, INC.
CRS MINERALS LLC
DAKOTA WEST LLC
DALE LEASE ACQUISITIONS 2011-B LP
DAVIS EXPLORATION
DEBRA KAY TORNBERG
DEEP CREEK EXPLORATION LLC
DEVON ENERGY PRODUCTION CO. LP
DIAMOND EXPLORATION INC
DORCHESTER MINERALS LP
DUANE A. IVERSON
E. W. BOWLES
ENDEAVOR ENERGY RESOURCES LP
ENERPLUS RESOURCES (USA)
ESTATE OF ROBERT J MCCANN JR
EZ OIL, LLC

**VERSION ANGLAISE SEULEMENT**

- 2 -

FORESTAR PETROLEUM GROUP
GAEDEKE WILLISTON BASIN HOLDINGS
GARY LEE MCCORMICK
GREEN RIVER ENERGY LLC
HALCON RESOURCES CORP COMPANY
HESS BAKKEN INVESTMENTS II LLC
HESS CORPORATION
INTERNATIONAL PETROLEUM CORPORATION
INTERNOS, INC.
J KAMP OIL LLC
JEFF GARSKE
JERALDINE BJORNSON
JJS WORKING INTERESTS LLC
JOEL ALM
JOHN B. BJORNSON
JT ENERGY, LLC
JTT OIL LLC
JUNE ANN GREENBERG
KENNETH STEVENSON
KODIAK OIL & GAS (USA) INC
L LOWRY MAYS
LANDSOUTH PROPERTIES, LLC
LEE MCCORMICK MARITAL TRUST
LEGION LAND & EXPLORATION CORP
LELAND STENEHJEM, JR.
LGFE-M L.P.
LINDSEY K MULLENIX
LMAC, LLC
LONE RIDER TRADING COMPANY
LONETREE ENERGY & ASSOCIATES
M & M ENERGY INC
MADDOX FAMILY TRUST
MARATHON OIL COMPANY
MBI OIL & GAS LLC
MCBRIDE OIL & GAS CORPORATION
MILBURN INVESTMENTS, LLC
MISSOURI RIVER ROYALTY COMPANY
MUREX PETROLEUM CORPORATION
NORTHERN ENERGY CORPORATION

**VERSION ANGLAISE SEULEMENT**

- 3 -

NORTHERN OIL AND GAS, INC.
NORTHLAND ROYALTY CORPORATION
NOWITZKI OIL & GAS LP
O. A. HANSON
OPINOR ANNA PTY KAISER FUND
PETROGLYPH ENERGY
PETROVAUGHN INC.
PHILIP R. BISHOP
PRADERA DEL NORTE, INC.
RALPH MADDOX FAMILY TRUST
RAVEN OIL PROPERTIES INC
REEF 2011 PRIVATE DRILLING FUND LP
ROBERT J. MCCORMICK
ROBERT POST JOHNSON
SCOTT ENERGY, LLC
SCOTT K. BJORNSON
SCOTT WARD
SIDNEY K. LEACH
SIERRA RESOURCES INC
SINCLAIR OIL & GAS COMPANY
SIXTY NINE OIL & GAS LP
SKLARCO LLC
SLAWSON EXPLORATION CO INC
SM ENERGY COMPANY
SOUTH FORK EXPLORATION, LLC
SPOTTED HAWK DEVELOPMENT LLC
SRP ENTERPRISES, INC.
STEVEN H HARRIS FAMILY LIMITED
STUBER MINERAL RESOURCES LLC
SUNDHEIM OIL CORPORATION
SUSAN D STENEHJEM
THE ERICKSON FAMILY TRUST
THE MILLENNIUM CORPORATION
THE TRIPLE T INC.
TIMOTHY J. RITTER
TL & JH KAISER SUPERANNUATION
TURMOIL INC
TWIN CITY TECHNICAL, LLC
USG PROPERTIES BAKKEN II LLC

**VERSION ANGLAISE SEULEMENT**

- 4 -

. VINNIE CORP
VINTAGE OIL & GAS, LLC
VIVIAN MCCORMICK WARREN
WESTERN ENERGY CORPORATION
WILLIAM G SEAL ESTATE
WOLF ENERGY LLC
XTO ENERGY INC
XTO OFFSHORE INC
ZACHARY D  VANOVER

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 7

## LIST OF NON OPERATING WORKING INTEREST OWNERS
## OR JOINT VENTURERS IN SLAWSON OPERATED WELLS

A.G. Andrikopoulos Resources, Inc.

Abercrombie Energy, Inc.

Alameda Energy, Inc.

Anthony J. Klein

Bakken HBT II, LP

Beartooth Ridge Resources, Inc.

Beck Sherven Legion Post #290

Benjamin Kirkaldie

BigSky Oil & Gas, LLC

Bob Featherer LLC

Brendall Energy, LLC

Burlington Northern & Sante Fe

C King Oil

Cedar Creek Wolverine, LLC

Centaur Consulting, LLC

Chugash Exploration, LP

Comanche Exploration Company

Continental Resources, Inc.

Craig A. Slawson

D. Sumner Chase, III 2001 Irr. Trust

David L. Hilleren

David W. Strickler Trust

Davis Exploration, LLC

Deep Blue, LLC

Dogwood Hill Farms, LLC

DS&S Chase, LLC

Enerplus Resources (USA) Corp

Formation Energy LP

Frederic Putnam

Gadeco, LLC

**VERSION ANGLAISE SEULEMENT**

- 2 -

Gaedeke Williston Basin, Ltd.

Gasco Limited Partnership

GHG Partners, LLC

Great Plains Oil Properties, LLC

Greenhead Energy, Inc.

Gulfport Energy Corporation

HRC Energy, LLC

Huston Energy Corporation

Icenine Properties, LLC

Inland Oil and Gas Corporation

James H Bragg

John Schell

Kenneth Lyson and Claudia G. Lyson

Kodiak Oil & Gas (USA), Inc.

Kootenai Resources Corporation

L D Davis & Marilyn Davis, JTS

Lario Oil and Gas Company

Linn Energy Holdings, LLC

Marcin Production, LLC

Mark Lee

Marshall & Winston, Inc.

Mary Newman

Melbby Gas III, LLC

Missouri River Royalty Corporation

Montana Oil Properties, Inc.

MRG Holdings, LLC

Mwiley Resources, Inc.

Nadel and Gussman Bakken, LLC

Northern Oil and Gas, Inc.

Oxy USA, Inc.

Pegasus Group Inc.

Petro-Huston, LLC

Petroshale (US) Inc.

Pine Oil Co.

**VERSION ANGLAISE SEULEMENT**

- 3 -

Pine Petroleum, Inc.

Piscato Oil, LLC

Polish Oil & Gas, Inc.

Raymond Resources Inc.

Riley Resources, Inc.

Robert A. Erickson & Cleo

S. Reger Family, Inc.

Sheringham Corporation

Slawson Resources Co.

Statoil Oil & Gas, LP

Stewart Geological, Inc.

Stuart F. Chase

Stuart F. Chase 2001 Irr. Trust

Thomas Lambert

Todd Slawson

Todd Slawson Trust

Tracker Resource Development III, LLC

U S Energy Development Corporation

USG Properties Bakken II, LLC

Vitesse Energy, LLC

Vitesse Oil, LLC

W B Oil LLC

Whiting Oil and Gas

Windsor Dakota, LLC

Zagoil Company, LLC

**VERSION ANGLAISE SEULEMENT**

**SCHEDULE 15**

**LIST OF UTCC'S INSURERS AND REINSURERS**

Canadian Insurance Companies

ACE INA Insurance

Chartis Insurance Company of Canada (n/k/a AIG Insurance Company of Canada)

Westport Insurance Corporation

U.S. Insurance Companies

ACE American Insurance Company

American Zurich Insurance Company

Lexington Insurance Company

North American Capacity Insurance Company

Starr Indemnity & Liability Company

Bermudian Insurance Companies

ACE Bermuda Insurance Ltd.

Allied World Assurance Company Ltd.

Argo Re Ltd.

Chartis Excess Limited (n/k/a American International Reinsurance Company Ltd.)

Chubb Atlantic Indemnity Ltd.

Hanseatic Insurance Company (Bermuda) Limited

Iron-Starr Excess Agency Ltd. / Ironshore Insurance Ltd. / Starr Insurance & Reinsurance
Limited

Starr Insurance & Reinsurance Limited

XL Insurance (Bermuda) Ltd.

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 18

## LIST OF NON-OPERATING INTEREST OWNERS OR JOINT VENTURERS IN BURLINGTON RESOURCES OIL & GAS COMPANY LP (A WHOLLY OWNED SUBSIDIARY OF CONOCOPHILLIPS) OPERATED WELLS

Continental Resources Inc.

Hess Corporation

Hess Bakken Investment II, LLC

JAG Oil Limited Partnership

Linn Energy Holdings LLC

Newfield Production Company

Northern Oil & Gas, Inc.

Twin City Technical LLC

WM ND Energy Resources II, LLC

QEP Energy Co.

Questar Exploration & Production Co.

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 23

## LIST OF IRVING INSURERS

1.  ACE INA Insurance
    - CGL 523952
    - XBC 602712

2.  Zurich Insurance plc, UK Branch
    - B0509E1149413
    - B0509E1181313

3.  Zurich Insurance Company Ltd
    - 8840960
    - 8838799

4.  AEGIS, Syndicate AES 1225
    - B0509E1149413

5.  Mitsui Sumitomo, Insurance Corporate Capital, Limited as sole member of Syndicate, 3210 at Lloyds
    - B0509E1181113

6.  QBE Casualty Syndicate 386
    - B0509E1181113

7.  QBE Syndicate 1886
    - B0509E1181113

8.  Underwriters at Lloyd's and Lloyd's Syndicates, Subscribing to Policy No. B0509HM231013, including the following
    - AEGIS Syndicate AES 1225
    - Syndicate CNP 4444
    - Syndicate MKL 3000
    - Syndicate HIS 33
    - Syndicate LIB 4472
    - Syndicate ANV 1861
    - Syndicate MFM 2468
    - Syndicate AUW 609
    - Syndicate TUL 1301

**VERSION ANGLAISE SEULEMENT**

- 2 -

- Syndicate SKD 1897

- Syndicate AML 2001

- Syndicate NAV 1221

- Syndicate TRV 5000

9. XL Insurance (Bermuda) Ltd.

- XLUMB-742875

10. Oil Casualty Insurance, Ltd.

- U920303-0313

11. Argo Re Ltd.

- ARGO-CAS-OR-000227.1

12. Chubb Atlantic Indemnity Ltd.

- 3310-17-91

13. Zurich Insurance Company Ltd

- 8838799

14. Iron-Starr Excess Agency Ltd.

- 1S0000822

15. AIG Excess Liability Insurance International Limited

- 1657346

16. ACE Bermuda Insurance Ltd.

- 1OC-1338/5

17. Liberty Mutual Insurance Company

- XSTO-631084-013

18. ACE Underwriting Agencies Limited, as managing agency of Syndicate 2488 at Lloyd's, and ACE European Group Limited

- B0509EI181413

**VERSION ANGLAISE SEULEMENT**

## SCHEDULE 24

### LIST OF WORLD FUEL INSURERS (Subject to Note 1 below)

1. Zurich American Insurance Company ("Zurich").  Zurich is included in Schedule A only with respect to its indemnity limits, and not with respect to its obligation to defend or pay defense costs to the World Fuel Parties.  Zurich is included on Schedule A solely with respect to the following policies:

     • Zurich American Insurance Company Policy GLO 5955601-00 (eff. 07/01/2013 – 07/01/2014); and
     • Zurich American Insurance Company Policy ZE 5761197-00 (eff. 07/01/2013 – 07/01/2014)

2. Federal Insurance Company (GL) ("Federal (GL)").  Federal (GL) is included in Schedule A only with respect to its indemnity limits, and not with respect to its obligation to defend or pay defense costs to the World Fuel Parties.  Federal (GL) is included on Schedule A solely with respect to the following policy:

     • Federal Insurance Company Policy 3597-82-72 NHO (eff. 11/07/2012 – 11/07/2013)

3. Alterra Excess & Surplus Insurance Company  ("Alterra"). Alterra is included on Schedule A solely with respect to the following policy:

     • Alterra Excess & Surplus Insurance Company Policy MAX3EC50000211 (eff. 11/07/2012 – 11/07/2013)

4. ACE Property and Casualty Insurance Company ("ACE"). Ace is included on Schedule A solely with respect to the following policy:

     • ACE Property and Casualty Insurance Company Policy XOO G27047026 (eff. 07/01/2013 – 07/01/2014)

5. Ironshore Specialty Insurance Company ("Ironshore"). Ironshore is included on Schedule A solely with respect to the following policy:

     • Ironshore Specialty Insurance Company Policy 001709800 (eff. 07/01/2013 – 07/01/2014)

6. *XL Insurance America, Inc. ("XL"). XL is included on Schedule A solely with respect to the following policy:

     • XL Insurance America, Inc. Policy US00065550LI13A (eff. 07/01/2013 – 07/01/2014)]
     • * settlement  subject to determination of WFS's ultimate derailment liability

MTL_LAW\2367966\4

**VERSION ANGLAISE SEULEMENT**

- 2 -

7. Federal Insurance Company and Chubb Custom Insurance Company (Pollution) ("collectively, Chubb"). Chubb is included on Schedule A solely with respect to the following policies:

   - Federal Insurance Company Policy 37313421 (eff. 10/1/2010 – 10/1/2020);
   - Chubb Custom Insurance Company Policy 37313810 (eff. 4/17/2012 – 4/17/2017); and
   - Chubb Custom Insurance Company Policy 37313496 (eff. 12/31/2010 – 12/31/2020)

8. Lexington Insurance Company and Chartis Specialty Insurance Company (collectively, "AIG"). AIG is included on Schedule A solely with respect to the following policies:

   - Lexington Insurance Company Policy PLS 5652718 (eff. 06/01/11 – 07/01/14);
   - Chartis Specialty Insurance Company Policy PLS 1951951 (eff. 07/01/11 – 07/01/14); and
   - Chartis Specialty Insurance Company PLS 18809548 (eff. 05/11/12 – 05/11/15)

9. Crum and Forster Specialty Insurance Company ("Crum & Forster"). Crum & Forster is included on Schedule A solely with respect to the following policies:

   - Crum & Forster Specialty Insurance Company Policy EPK 101162 (eff. 03/16/13-03/16/14); and
   - Crum & Forster Specialty Insurance Company Policy EFX 100400 (eff. 03/16/13-03/16/14)]

Note 1. Notwithstanding anything above or elsewhere in the Plan or the U.S. Plan, no insurer shall be included in this Schedule 24 or as a Released Party in the Plan or the U.S. Plan, or otherwise obtain the benefits of the Plan or the U.S. Plan, unless and until that insurer enters into a separate settlement agreement with the World Fuel Parties (mutually acceptable to the World Fuel Parties and that insurer) relating to insurance coverage for the Derailment. Any such separate settlement agreement between the World Fuel Parties and an insurer shall be specifically subject to the terms and conditions thereof, notwithstanding anything to the contrary in the Plan, the U.S. Plan, or the Approval Orders. The releases set forth in the Plan, the U.S. Plan, and the Approval Orders are not intended to, and shall not, extend to or otherwise release or discharge any Claims, rights, privileges, or benefits held by the World Fuel Parties against the World Fuel Insurers or any other insurer of the World Fuel Parties, which shall be governed by such separate settlement agreement between the World Fuel Parties and such World Fuel Insurer or other insurer of the World Fuel Parties.

# Schedule "E"  Distribution mechanism with respect to the Wrongful Death Claims

## PLAN OF COMPROMISE AND ARRANGEMENT

concerning, affecting and involving

MONTREAL, MAINE & ATLANTIC CANADA CO.

**Montreal Maine & Atlantic Canada Co.**
**Schedule E**
**Distribution Mechanism with Respect to the Wrongful Death Claims**

| Points Allocation Matrix | |
|---|---|
| **Criteria** | **Points per Criteria** |
| 1.  Age of the decedents | **Age of Decedent**        **Points**<br>• Less than 18           • 3<br>• 18 to less than 26     • 8<br>• 26 to less than 60     • 10<br>• 60 to less than 66     • 8<br>• 66 and greater         • 3 |
| 2.  If decedent survived by children | **Age of Surviving Children**    **Points**<br>• Less than 21          • 15<br>• 21 to less than 31     • 7<br>• 31 to less than 51     • 5<br>• 51 and greater        • 3 |
| 3.  If decedent is survived by a spouse | **Annual Income of Decedent**    **Points**<br>• Less than $20,000       • 12.50<br>• $20,000 to less than $50,000   • 15.00<br>• $50,000 to less than $75,000   • 16.25<br>• $75,000 to less than $100,000   • 17.50<br>• $100,000 and greater       • 18.75 |
| 4.  If decedent is survived by a spouse but no children | • If parents, 5 additional points<br>• If no parents, but siblings, then 2.5 points per sibling to a maximum of 7.5 points |
| 5.  If decedent is not survived by a spouse or child and the decedent <u>is a minor</u> | • 10 points for each surviving parent and<br>• 5 points for each surviving sibling |
| 6.  If decedent is not survived by a spouse or child and the decedent <u>is not a minor</u> | • 5 points for each surviving parent and<br>• 2.5 points for each surviving sibling. |
| 7.  If decedent is survived by a child | • Set aside of 5% to parents and siblings with a potential reallocation to ensure a minimum payment of $25,000 to each parent and sibling |

Montreal Maine & Atlantic Canada Co.
Schedule E
Distribution Mechanism with Respect to the Wrongful Death Claims

| Victim | Total Points | Allocation % | Estimated Potential Distribution |
|---|---|---|---|
| 1 | 68 | 4.83% | $ 5,374,000 |
| 2 | 23 | 1.65% | 1,830,000 |
| 3 | 32 | 2.29% | 2,548,000 |
| 4 | 20 | 1.43% | 1,592,000 |
| 5 | 15 | 1.07% | 1,194,000 |
| 6 | 20 | 1.43% | 1,592,000 |
| 7 | 6 | 0.43% | 478,000 |
| 8 | 38 | 2.68% | 2,985,000 |
| 9 | 28 | 1.97% | 2,189,000 |
| 10 | 14 | 1.00% | 1,115,000 |
| 11 | 23 | 1.65% | 1,831,000 |
| 12 | 16 | 1.15% | 1,274,000 |
| 13 | 20 | 1.43% | 1,592,000 |
| 14 | 28 | 1.97% | 2,189,000 |
| 15 | 40 | 2.86% | 3,185,000 |
| 16 | 52 | 3.69% | 4,100,000 |
| 17 | 28 | 1.97% | 2,189,000 |
| 18 | 25 | 1.79% | 1,990,000 |
| 19 | 23 | 1.65% | 1,830,000 |
| 20 | 40 | 2.86% | 3,185,000 |
| 21 | 17 | 1.22% | 1,353,000 |
| 22 | 18 | 1.29% | 1,433,000 |
| 23 | 25 | 1.79% | 1,990,000 |
| 24 | 21 | 1.47% | 1,632,000 |
| 25 | 23 | 1.65% | 1,831,000 |
| 26 | 55 | 3.94% | 4,379,000 |
| 27 | 25 | 1.79% | 1,990,000 |
| 28 | 53 | 3.76% | 4,180,000 |
| 29 | 40 | 2.86% | 3,185,000 |
| 30 | 31 | 2.18% | 2,428,000 |
| 31 | 20 | 1.43% | 1,592,000 |
| 32 | 23 | 1.65% | 1,830,000 |
| 33 | 25 | 1.79% | 1,990,000 |
| 34 | 40 | 2.86% | 3,185,000 |
| 35 | 13 | 0.93% | 1,035,000 |
| 36 | 13 | 0.93% | 1,035,000 |
| 37 | 45 | 3.19% | 3,543,000 |
| 38 | 21 | 1.47% | 1,632,000 |
| 39 | 25 | 1.79% | 1,990,000 |
| 40 | 30 | 2.15% | 2,388,000 |
| 41 | 23 | 1.61% | 1,791,000 |
| 42 | 41 | 2.95% | 3,284,000 |
| 43 | 40 | 2.86% | 3,185,000 |
| 44 | 40 | 2.86% | 3,185,000 |
| 45 | 13 | 0.93% | 1,035,000 |
| 46 | 53 | 3.76% | 4,180,000 |
| 47 | 31 | 2.24% | 2,488,000 |
| 48 | 40 | 2.86% | 3,185,000 |
| | 1,397 | 100.0% | $ 111,216,000 |

The above amounts are prior to any fees that may be claimed by the claimants attorneys
or the Class Representatives, as applicable.

**(all amounts are in Canadian dollars)**

**Schedule "F"**   **Distribution mechanism with respect to the Bodily Injury and Moral Damages Claims**

PLAN OF COMPROMISE AND ARRANGEMENT

concerning, affecting and involving

MONTREAL, MAINE & ATLANTIC CANADA CO.

Montreal, Maine & Atlantic Canada Co.
Schedule F
Distribution Mechanism with Respect to the Moral Damage Claims

| | Points | Estimated # of claimants | Total points | % | Estimated Distribution | Distribution per claim |
|---|---|---|---|---|---|---|
| Trouble & Inconvenience | 5.0 | 3,700 | 18,500 | 24.9% | $ 11,677,000 | $ 3,160 |
| Evacuations | | | | | | |
| Per day of displacement | 1.0 | 1,850 | 10,370 | 14.0% | 6,545,000 | 630 |
| Maximum | 30.0 | | | | | par jour |
| Red Zone/Yellow Zone | 50.0 | 140 | 7,000 | 9.4% | 4,418,000 | 31,560 |
| Grandparents and grandchildren | 15.0 | 50 | 750 | 1.0% | 473,000 | 9,460 |
| Post Traumatic Stress - short term (note 2) | 50.0 | 250 | 12,500 | 16.8% | 7,890,000 | 31,560 |
| Post Traumatic Stress - long term (note 2) | 100.0 | 250 | 25,000 | 33.7% | 15,780,000 | 63,120 |
| Bodily Injury | 50.0 | 2 | 100 | 0.1% | 63,000 | 31,500 |
| Buffer (note 3) | | | | | 2,000,000 | |
| Total (notes 1 & 4) | | | 74,220 | 100% | $ 48,846,000 | |

The above amounts are prior to any fees that may be claimed by the claimants' attorneys or the Class Representatives, as applicable.

Note 1: This is a cumulative calculation, whereby one claimant can fall into more than one category, however wrongful death claimants cannot claim for post traumatic stress.

Note 2: For those who have been given a medical diagnosis of post traumatic stress, a depressive disorder, an anxiety disorder and/or otherwise remain under medical care for mental health issues arising from the disaster and for those who were present in the red zone at the time of the derailment. In order to qualify in this category and to determine if you qualify for short term or long term post traumatic stress further details will be required by the Monitor.

Note 3: To be used for any increase in the post traumatic stress category (if any) and thereafter any unused portion will be distributed to all the other categories of moral damages on a pro rata basis.

Note 4: The final amounts may vary depending on further information received by the Monitor by August 31, 2015.

**(all amounts are in Canadian dollars)**