# **EXHIBIT 2**

## **Released Parties**

**List of Released Parties**

The list below consists of the parties who have executed settlement agreements with Montreal Maine & Atlantic Canada Co. ("MMAC") and Robert J. Keach in his capacity as Chapter 11 Trustee of Montreal, Maine & Atlantic Railway Ltd. (the "Trustee").  Nothing in this list shall supersede, effect, modify or amend any such settlement agreement and to the extent of any conflict between the descriptions in this list and any such settlement agreement, the settlement agreement shall govern.  All such settlement agreements are subject to court approval and other conditions, and the inclusion of any person or entity on this list does not create or imply the release of such person or entity from any claim; in all respects, the settlement agreements, and the court orders pertaining to the settlement agreements, shall govern.  The term "Affiliate" used in this Schedule "A" means with respect to any entity, all other entities directly or indirectly controlling, controlled by, or under direct or indirect common control with such entity.  The other capitalized terms used herein have the meaning ascribed to them in the Plan. The Released Parties are as follows:

1.   **Devlar Energy Marketing LLC together with their parents Lario Oil & Gas Company and Devo Trading & Consulting Company (collectively "Devlar"),** as well as their subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers, (including St. Paul Fire and Marine Insurance Company and its direct and indirect parents, subsidiaries and Affiliates), but only to the extent of coverage afforded to Devlar by such insurers in relation to the Derailment.

2.   **Oasis Petroleum Inc. and Oasis Petroleum LLC (jointly, "Oasis")**, together with their parents, subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers (including St. Paul Fire and Marine Insurance Company and its direct and indirect parents, subsidiaries and affiliates) but only to the extent of coverage afforded to Oasis by such insurers in relation to the Derailment, as well as the entities identified in Schedule 2 hereto but strictly as non-operating working interest owners or joint venturers in the specific Oasis-operated wells that produced oil that was provided and supplied by Oasis that was transported in the train involved in the Derailment.

3.      **Inland Oil & Gas Corporation, Whiting Petroleum Corporation, Enerplus Resources (USA) Corporation, Halcón Resources Corporation, Tracker Resources, Kodiak Oil & Gas Corp. (now known as Whiting Canadian Holding Company, ULC) and Golden Eye Resources LLC**, together with each of their respective parents, subsidiaries, Affiliates, and each of their former and current respective employees, officers, directors, successors and permitted assignees and attorneys, but strictly as non-operating working interest owners or joint venturers in any wells that produced oil that was provided, supplied and transported in the train involved in the Derailment.

4.      **Arrow Midstream Holdings CCC**. ("**Arrow**") together with its parents, subsidiaries, Affiliates, successors, officers, directors, principals, employees, attorneys, accountants, representatives, and insurers.  For the avoidance of doubt, Arrow shall include its current parent Crestwood Midstream Partners LP; and insurers mean only those insurers who have issued liability insurance policies to or in favor of Arrow actually or potentially providing insurance for Claims against Arrow arising from or relating to the Derailment, including without limitation, Commerce and Industry Insurance Company under policy no. 3023278 and National Union Fire Insurance Company of Pittsburgh, Pa. under policy no. 41131539.

5.      **Marathon Oil Company ("Marathon")**, together with its parent, subsidiaries, successors and assigns, Affiliates, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to Marathon in relation to the Derailment), as well as the entities identified in schedule 5 attached hereto, but strictly as non-operating working interest owners or joint venturers in the specific Marathon-operated wells that produced and supplied oil that was transported on the train involved in the Derailment.  For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of Marathon and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not limited to, Yorktown Assurance Corporation policy number XSL-7-2013 and Old Maine Assurance Ltd. (reinsurance Agreement).

6.     **QEP Resources, Inc. ("QEP")**, together with its parents, subsidiaries, Affiliates, successors and assigns, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to QEP in relation to the Derailment), as well as those entities identified in schedule 6 attached hereto, but strictly as non-operating working interest owners or joint venturers in the specific QEP-operated wells that produced and supplied oil that was transported on the train involved in the Derailment.  For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of QEP and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not be limited to, National Union Fire Insurance Company of Pittsburgh, Pa. (policy number 194-99-62); American Guarantee & Liability Insurance Company (policy number UMB6692611-02).

7.     **Slawson Exploration Company, Inc. ("Slawson")**, together with its parents, subsidiaries, Affiliates, successors and assigns, officers, directors, principals, employees, attorneys, accountants, representatives, insurers (to the extent strictly limited to coverage afforded to Slawson in relation to the Derailment), as well as those entities identified on schedule 7 attached hereto, but strictly as non-operating working interest owners in the specific Slawson-operated wells that produced oil that was transported on the train involved in the Derailment.  For the avoidance of doubt, insurers, as used in this definition, shall include all insurers that issued liability policies to or for the benefit of Slawson and that actually or potentially provided coverage for Claims relating to or arising from the Derailment, including, but not be limited to, Federal Insurance Company (policy 3579 09 19 and 7981 72 74), Arch Specialty Insurance Company (policy EE00039761 03), and AIG (policy BE031941993).

8.     **Indian Harbor Insurance Company, XL Insurance, XL Group plc and their Affiliates** (strictly as insurers of MMA and MMAC).

9.     **Edward A. Burkhardt, Larry Parsons, Steven J. Lee, Stephen Archer, Robert C. Grindrod, Joseph C. McGonigle, Gaynor Ryan, Donald Gardner, Jr., Fred Yocum, Yves Bourdon and James Howard, individually and in their capacity as directors**

**and officers of MMA and MMAC, Montreal, Maine & Atlantic Corporation and/or LMS Acquisition Corporation (the "D&O Parties")**.

10.     **Hartford Casualty Insurance Company, together with its parents, subsidiaries, Affiliates, officers and directors** (strictly as insurer of Rail World, Inc.).

11.     **Chubb & Son, a division of Federal Insurance Company** (strictly as insurers of Rail World, Inc. and Rail World Holdings, LLC).

12.     **Rail World Holdings LLC; Rail World, Inc.; Rail World Locomotive Leasing LLC; The San Luis Central R.R. Co.; Pea Vine Corporation; LMS Acquisition Corporation; MMA Corporation; Earlston Associates L.P.,** and each of the shareholders, directors, officers or members or partners of the foregoing, to the extent they are not D&O Parties (the "**Rail World Parties**"). For the avoidance of doubt, (i) Rail World Parties also includes Edward A. Burkhardt, solely in his capacity as director, officer and/shareholder of certain of the Rail World Parties; and (ii) the inclusion of the above entities within the definition of "Rail World Parties", except for the purpose of the settlement agreement executed with MMAC and the Trustee, shall not be construed to create or acknowledge an affiliation between or among any of the Rail World Parties.

13.     **General Electric Railcar Services Corporation, General Electric Company** and each of its and their respective parents, Affiliates, subsidiaries, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, managers, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of these, as well as any predecessors-in-interest of, or any assignors or vendors of any equipment involved in the Derailment to, any of the foregoing entities and any of the successors and assigns of any of the foregoing entities.

14. **Trinity Industries, Inc., Trinity Industries Leasing Company, Trinity Tank Car, Inc., and Trinity Rail Leasing 2012 LLC, Trinity Rail Group LLC, RIV 2013 Rail Holdings LLC, and Trinity Rail Leasing Warehouse Trust**, inclusive of each of their respective predecessors, agents, servants, employees, shareholders, officers, directors, attorneys, representatives, successors, assigns, parents, subsidiaries, Affiliates, limited liability companies, insurers, and reinsurers (but strictly to the extent of coverage afforded to the such parties by said insurers and reinsurers), including but not limited to whether such entities are in the business of leasing, manufacturing, servicing or administrating rail cars.

15. **Union Tank Car Company, the UTLX International Division of UTCC, The Marmon Group LLC and Procor Limited (the "UTCC Parties")**, and each of their respective predecessors, servants, employees, owners, members (strictly with respect to The Marmon Group LLC), shareholders, officers, directors, partners, associates, attorneys, representatives, successors, assigns, subsidiaries, Affiliates, and parent companies, insurers, and reinsurers listed in schedule 15 attached hereto, but strictly to the extent of coverage afforded to the UTCC Parties by said insurers and reinsurers, regardless of whether such entities are or were in the business of leasing, manufacturing, servicing, or administering rail car leases or otherwise.

16. **First Union Rail Corporation ("First Union")**, together with its parents, subsidiaries, Affiliates, officers, directors, predecessors, successors, assigns, servants, employees, shareholders, attorneys, representatives and insurers and reinsurers (strictly to the extent limited to coverage afforded to First Union, and including, but not limited to, Lexington Insurance Company (including pursuant to the Pollution Legal Liability Select Policy no. PL52675034 and Stand Alone Excess Liability Policy no. 018403252) and Superior Guaranty Insurance Company (including pursuant to Excess Liability Policy no. 404-1XSCI13)).

17. **CIT Group, Inc**., and its Affiliates, Federal Insurance Company solely in its capacity as an insurer of CIT Group, Inc. and its Affiliates and not in any other capacity, and Arch

Insurance Group solely in its capacity as an insurer of CIT Group, Inc. and its Affiliates, and not in any other capacity.

18. **ConocoPhillips Company ("ConocoPhillips")**, together with its subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to ConocoPhillips by such insurers in relation to the Derailment, as well as those entities identified in Schedule 18 hereto, but strictly as non-operating working interest owners in the specific ConocoPhillips operated wells that produced and supplied oil that was transported on the train involved in the Derailment.

19. **Shell Oil Company and Shell Trading (US) Company,** together with their subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers' direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to Shell Oil Company and Shell Trading (US) Company, by such insurers in relation to the Derailment.

20. **Incorr Energy Group LLC ("Incorr")**, together with its subsidiaries, Affiliates and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys and insurers but only with respect to coverage afforded by such insurers to Incorr in relation to the Derailment.

21. **Enserco Energy, LLC**, together with its parent, subsidiaries, Affiliates, and each of their former and current respective employees, officers and directors, successors and permitted assignees, attorneys, and insurers (and the insurers' direct and indirect parents, subsidiaries and Affiliates), but with regards to such insurers, only to the extent of coverage provided to Enserco Energy, LLC, by such insurers in relation to the Derailment.

22. **The Attorney General of Canada, the Government of Canada, Her Majesty the Queen in Right of Canada and the departments, crown corporations and agencies**

including the Canadian Transportation Agency, and including all past, present and future Ministers, officers, employees, representatives, servants, agents, parent, subsidiary and affiliated crown corporations and agencies, and their respective estates, successors and assigns.

23.    **(i) Irving Oil Limited, Irving Oil Company, Limited, Irving Oil Operations General Partner Limited and Irving Oil Commercial G.P.**, (ii) any of their Affiliates (as defined in the settlement agreement), (iii) any predecessors, successors and assigns of any of the foregoing Persons named in clauses (i) and (ii) of this paragraph 23, and (iv) any directors, officers, agents and/or employees of any of the foregoing Persons named in clauses (i), (ii) and (iii) of this paragraph 23 (the "**Irving Parties**"), and the insurers listed in Schedule 23 attached hereto, but only in their respective capacities as insurers of the Irving Parties under the insurance policies listed by policy numbers in said Schedule 23 (the "**Irving Insurers**").  Notwithstanding the foregoing or anything else in this list and the Plan, the claims (including the Claims) and/or other rights that the Irving Parties have (or may have) against their insurers (including but not limited to the Irving Insurers) or any one or more of them under any applicable policies, at law, in equity or otherwise, are fully preserved and said insurers (including but not limited to the Irving Insurers) are not Released Parties in connection with said claims (including any Claims) and/or other rights of the Irving Parties.

24.    **(i) World Fuel Services Corporation, World Fuel Services, Inc., World Fuel Services Canada, Inc., Petroleum Transport Solutions, LLC, Western Petroleum Company, Strobel Starostka Transfer LLC ("SST"), Dakota Plains Marketing LLC, Dakota Plains Holdings, Inc., DPTS Marketing Inc., Dakota Plains Transloading LLC, Dakota Petroleum Transport Solutions LLC (the "World Fuel Parties"),** (ii) any of their Affiliates, (iii) any predecessors, successors and assigns of any of the foregoing Persons named in clauses (i) and (ii) of this paragraph 24, and (iv) any directors, officers, agents and/or employees of any of the foregoing Persons named in clauses (i), (ii) and (iii) of this paragraph 24. and the insurers listed in schedule 24 attached hereto, but only in their respective capacities as insurers under the insurance policies listed by policy number in said schedule 24 (the "**World Fuel Insurers**").    Notwithstanding the

foregoing or anything else in this list and the Plan, the claims (including the Claims) and/or other rights that the World Fuel Parties have (or may have) against their insurers (including but not limited to the World Fuel Insurers), SST or its insurers, or any one or more of them under any applicable policies, at law, in equity or otherwise, are fully preserved and SST, as well as said insurers (including but not limited to the World Fuel Insurers) are not Released Parties in connection with said Claims and/or other rights of the World Fuel Parties.

25.     **The SMBC Parties, namely: SMBC Rail Services, LLC f/k/a Flagship Rail Services, LLC, and its respective predecessors, servants, employees, independent contractors, owners, shareholders, officers, directors, associates, attorneys, accountants, representatives, successors, assigns, agents, subsidiaries, affiliates, and parent companies, and including without limitation Sumitomo Mitsui Financial Group, Inc., Sumitomo Mitsui Finance & Leasing Company, Limited, Sumitomo Mitsui Banking Corporation of Canada, Sumitomo Mitsui Banking Corporation, SMBC Capital Markets, Inc., SMBC Leasing and Finance, Inc., SMBC Nikko Securities America, Inc., JRI America, Inc., Manufacturers Bank, SMBC Global Foundation, Inc., SMBC Financial Services, Inc., SMBC Cayman LC Limited, SMBC Capital Partners LLC, SMBC Leasing Investment LLC, SMBC Marine Finance, Inc., Sakura Preferred Capital (Cayman), Limited, TLP Rail Trust I, FRS I, LLC, and FR Holdings, LLC and its subsidiaries. "SMBC Parties" also means TLP Rail Trust I, a Delaware Statutory Trust, SMBC Rail Services, LLC, as the owner participant and beneficiary of TLP Rail Trust I, and Wilmington Trust Company, Trustee of TLP Rail Trust I.** "SMBC Parties" also means Liberty Mutual Holding Company, Inc. and its subsidiaries and affiliates, Liberty Mutual Group Inc., Liberty Mutual Insurance Company, Liberty Insurance Underwriters Inc., Liberty Surplus Insurance Corporation, and Liberty International Underwriters (collectively, "**Liberty**") and any reinsurers that Liberty has any policy, agreement, contract, or treaty with that relates in any way to any of the SMBC Parties or any insurance policy issued by Liberty to any of the SMBC Parties.

26.     Great American Insurance Company

Notwithstanding the foregoing or anything else in this list, and without implying or providing any limitation, the term "Released Parties" as used herein or above <u>does not include, and shall not be deemed to include</u> Canadian Pacific Railway Company.

## SCHEDULE 2
## LIST OF NON-OPERATING WORKING INTEREST OWNERS OR
## JOINT VENTURERS IN OASIS OPERATED WELLS

Whiting Oil And Gas Corporation;
Hess Corporation;
Hess Bakken Investments II LLC
Continental Resources Inc.;
Sinclair Oil And Gas Company;
Conoco Phillips Company;
Black Bear Resources, LLP;
Castlerock Resources Inc.;
Deep Creek Exploration;
Enerplus Resources Usa Corporation;
Fidelity E&P Company:
Fidelity Exploration &Production Co;
Inland Oil & Gas Corporation;
Jake Energy Inc.;
Kerogen Resources Inc.;
Lilley & Company;
Lilley And Associates LLC;
Linn Energy Holdings LLC;
Lone Rider Trading Company;
Mayhem Oil And Gas Inc.;
Missouri River Royalty Corp;
Nj Petroleum LLC;
Northern Energy Corporation;
Northern Oil & Gas Inc.;
O.T. Cross Oil LLC;
Ottertail Land & Permit Services;
Penroc Oil Corporation;
Reef 2011 Private Drilling Fund LP;
Shakti Energy LLC;
Slawson Exploration Company Inc.;
Statoil Oil & Gas LP;
WHC Exploration LLC;

## SCHEDULE 5

### LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT VENTURERS IN MARATHON OPERATED WELLS

ALAMEDA ENERGY INC
ARTHUR FRANK LONG JR
BEARTOOTH RIDGE RESOURCES
CARL W STERUD JR
CHUGASH EXPLORATION LP
CONDOR PETROLEUM INC
CONTINENTAL RESOURCES INC
DISPUTED STATE-TRIBAL INTEREST
ENDEAVOR ENERGY RESOURCES LP
ENERPLUS RESOURCES CORPORATION
ESTATE OF KARL WILLIAM STERUD
ESTATE OF WALLACE HICKEL
EVERTSON ENERGY PARTNERS LLC
GADECO LLC
GOLDENEYE RESOURCES LLC
HALCON WILLISTON I LLC
HESS BAKKEN INVESTMENTS II LLC
ILAJEAN REAMS
JENNIFER BYSTROM
JOSEPHINE ANN KJONAAS
KOOTENAI RESOURCE CORP
LA PETROLEUM INC
LGFE-M LP
LINDA ELWOOD
LOUIS WALTER LONG
MARCIN PRODUCTION LLC
MICHAEL HARVEY STERUD
MISSOURI RIVER ROYALTY CORPORATION
MONTANA OIL PROPERTIES INC
MONTE TEDDY LONG
NATURAL RESOURCE PARTNERS LP
NORTHERN ENERGY CORP
NORTHERN OIL AND GAS INC
PETROGULF CORP
QEP ENERGY COMPANY
RAINBOW ENERGY MARKETING CORP
RONALD KNIGHT
S REGER FAMILY INC

SLAWSON EXPLORATION COMPANY INC
SLAWSON RESOURCES COMPANY
SPOTTED HAWK DEVELOPMENT LLC
STEWART GEOLOGICAL INC
TDB RESOURCES LP
USG PROPERTIES BAKKEN II LLC
VERSA ENERGY LLC
VITESSE ENERGY LLC
VITESSE OIL LLC
W NORTH FUND II LP
ZAGOIL COMPANY LLC

## SCHEDULE 6

## LIST OF NON-OPERATING WORKING INTEREST OWNERS OR JOINT VENTURERS IN QEP OPERATED WELLS

3LAND INC
ACTION REALTORS INC
ADELE L. SKODA
AMERADA HESS CORPORATION
ANDREW J HORVAT REVOCABLE TRUST
ARMSTRONG CHILDREN'S TRUST
ARMSTRONG MINERALS, LLC
AVALON NORTH LLC
BADLANDS HOLDING COMPANY
BANDED ROCK LLC
BIG PRAIRIE INVESTMENTS, LLC
BLACK STONE ENERGY COMPANY, LLC
BORGOIL RESOURCES, LLP
BRUCE P. IVERSON
BURLINGTON RESOURCES OIL & GAS
BXP PARTNERS III, LP
CHUGASH EXPLORATION LP
CONTINENTAL RESOURCES INC
COPPERHEAD CORPORATION
CRESCENT ENERGY, INC.
CRS MINERALS LLC
DAKOTA WEST LLC
DALE LEASE ACQUISITIONS 2011-B LP
DAVIS EXPLORATION
DEBRA KAY TORNBERG
DEEP CREEK EXPLORATION LLC
DEVON ENERGY PRODUCTION CO. LP
DIAMOND EXPLORATION INC
DORCHESTER MINERALS LP
DUANE A. IVERSON
E. W. BOWLES
ENDEAVOR ENERGY RESOURCES LP
ENERPLUS RESOURCES (USA)
ESTATE OF ROBERT J MCCANN JR
EZ OIL, LLC

FORESTAR PETROLEUM GROUP
GAEDEKE WILLISTON BASIN HOLDINGS
GARY LEE MCCORMICK
GREEN RIVER ENERGY LLC
HALCON RESOURCES CORP COMPANY
HESS BAKKEN INVESTMENTS II LLC
HESS CORPORATION
INTERNATIONAL PETROLEUM CORPORATION
INTERNOS, INC.
J KAMP OIL LLC
JEFF GARSKE
JERALDINE BJORNSON
JJS WORKING INTERESTS LLC
JOEL ALM
JOHN B. BJORNSON
JT ENERGY, LLC
JTT OIL LLC
JUNE ANN GREENBERG
KENNETH STEVENSON
KODIAK OIL & GAS (USA) INC
L LOWRY MAYS
LANDSOUTH PROPERTIES, LLC
LEE MCCORMICK MARITAL TRUST
LEGION LAND & EXPLORATION CORP
LELAND STENEHJEM, JR.
LGFE-M L.P.
LINDSEY K MULLENIX
LMAC, LLC
LONE RIDER TRADING COMPANY
LONETREE ENERGY & ASSOCIATES
M & M ENERGY INC
MADDOX FAMILY TRUST
MARATHON OIL COMPANY
MBI OIL & GAS LLC
MCBRIDE OIL & GAS CORPORATION
MILBURN INVESTMENTS, LLC
MISSOURI RIVER ROYALTY COMPANY
MUREX PETROLEUM CORPORATION
NORTHERN ENERGY CORPORATION
NORTHERN OIL AND GAS, INC.

NORTHLAND ROYALTY CORPORATION
NOWITZKI OIL & GAS LP
O. A. HANSON
OPINOR ANNA PTY KAISER FUND
PETROGLYPH ENERGY
PETROVAUGHN INC.
PHILIP R. BISHOP
PRADERA DEL NORTE, INC.
RALPH MADDOX FAMILY TRUST
RAVEN OIL PROPERTIES INC
REEF 2011 PRIVATE DRILLING FUND LP
ROBERT J. MCCORMICK
ROBERT POST JOHNSON
SCOTT ENERGY, LLC
SCOTT K. BJORNSON
SCOTT WARD
SIDNEY K. LEACH
SIERRA RESOURCES INC
SINCLAIR OIL & GAS COMPANY
SIXTY NINE OIL & GAS LP
SKLARCO LLC
SLAWSON EXPLORATION CO INC
SM ENERGY COMPANY
SOUTH FORK EXPLORATION, LLC
SPOTTED HAWK DEVELOPMENT LLC
SRP ENTERPRISES, INC.
STEVEN H HARRIS FAMILY LIMITED
STUBER MINERAL RESOURCES LLC
SUNDHEIM OIL CORPORATION
SUSAN D STENEHJEM
THE ERICKSON FAMILY TRUST
THE MILLENNIUM CORPORATION
THE TRIPLE T INC.
TIMOTHY J. RITTER
TL & JH KAISER SUPERANNUATION
TURMOIL INC
TWIN CITY TECHNICAL, LLC
USG PROPERTIES BAKKEN II LLC
VINNIE CORP
VINTAGE OIL & GAS, LLC

VIVIAN MCCORMICK WARREN
WESTERN ENERGY CORPORATION
WILLIAM G SEAL ESTATE
WOLF ENERGY LLC
XTO ENERGY INC
XTO OFFSHORE INC
ZACHARY D  VANOVER

## SCHEDULE 7

## LIST OF NON OPERATING WORKING INTEREST OWNERS
## OR JOINT VENTURERS IN SLAWSON OPERATED WELLS

A.G. Andrikopoulos Resources, Inc.

Abercrombie Energy, Inc.

Alameda Energy, Inc.

Anthony J. Klein

Bakken HBT II, LP

Beartooth Ridge Resources, Inc.

Beck Sherven Legion Post #290

Benjamin Kirkaldie

BigSky Oil & Gas, LLC

Bob Featherer LLC

Brendall Energy, LLC

Burlington Northern & Sante Fe

C King Oil

Cedar Creek Wolverine, LLC

Centaur Consulting, LLC

Chugash Exploration, LP

Comanche Exploration Company

Continental Resources, Inc.

Craig A. Slawson

D. Sumner Chase, III 2001 Irr. Trust

David L. Hilleren

David W. Strickler Trust

Davis Exploration, LLC

Deep Blue, LLC

Dogwood Hill Farms, LLC

DS&S Chase, LLC

Enerplus Resources (USA) Corp

Formation Energy LP

Frederic Putnam

Gadeco, LLC

Gaedeke Williston Basin, Ltd.

Gasco Limited Partnership

GHG Partners, LLC

Great Plains Oil Properties, LLC

Greenhead Energy, Inc.

Gulfport Energy Corporation

HRC Energy, LLC

Huston Energy Corporation

Icenine Properties, LLC

Inland Oil and Gas Corporation

James H Bragg

John Schell

Kenneth Lyson and Claudia G. Lyson

Kodiak Oil & Gas (USA), Inc.

Kootenai Resources Corporation

L D Davis & Marilyn Davis, JTS

Lario Oil and Gas Company

Linn Energy Holdings, LLC

Marcin Production, LLC

Mark Lee

Marshall & Winston, Inc.

Mary Newman

Melbby Gas III, LLC

Missouri River Royalty Corporation

Montana Oil Properties, Inc.

MRG Holdings, LLC

Mwiley Resources, Inc.

Nadel and Gussman Bakken, LLC

Northern Oil and Gas, Inc.

Oxy USA, Inc.

Pegasus Group Inc.

Petro-Huston, LLC

Petroshale (US) Inc.

Pine Oil Co.

Pine Petroleum, Inc.

Piscato Oil, LLC

Polish Oil & Gas, Inc.

Raymond Resources Inc.

Riley Resources, Inc.

Robert A. Erickson & Cleo

S. Reger Family, Inc.

Sheringham Corporation

Slawson Resources Co.

Statoil Oil & Gas, LP

Stewart Geological, Inc.

Stuart F. Chase

Stuart F. Chase 2001 Irr. Trust

Thomas Lambert

Todd Slawson

Todd Slawson Trust

Tracker Resource Development III, LLC

U S Energy Development Corporation

USG Properties Bakken II, LLC

Vitesse Energy, LLC

Vitesse Oil, LLC

W B Oil LLC

Whiting Oil and Gas

Windsor Dakota, LLC

Zagoil Company, LLC

## SCHEDULE 15

## LIST OF UTCC'S INSURERS AND REINSURERS

<u>Canadian Insurance Companies</u>

ACE INA Insurance

Chartis Insurance Company of Canada (n/k/a AIG Insurance Company of Canada)

Westport Insurance Corporation

<u>U.S. Insurance Companies</u>

ACE American Insurance Company

American Zurich Insurance Company

Lexington Insurance Company

North American Capacity Insurance Company

Starr Indemnity & Liability Company

<u>Bermudian Insurance Companies</u>

ACE Bermuda Insurance Ltd.

Allied World Assurance Company Ltd.

Argo Re Ltd.

Chartis Excess Limited (n/k/a American International Reinsurance Company Ltd.)

Chubb Atlantic Indemnity Ltd.

Hanseatic Insurance Company (Bermuda) Limited

Iron-Starr Excess Agency Ltd. / Ironshore Insurance Ltd. / Starr Insurance & Reinsurance
Limited

Starr Insurance & Reinsurance Limited

XL Insurance (Bermuda) Ltd.

**SCHEDULE 18**

**LIST OF NON-OPERATING INTEREST OWNERS OR JOINT VENTURERS IN
BURLINGTON RESOURCES OIL & GAS COMPANY LP (A WHOLLY OWNED
SUBSIDIARY OF CONOCOPHILLIPS) OPERATED WELLS**

Continental Resources Inc.

Hess Corporation

Hess Bakken Investment II, LLC

JAG Oil Limited Partnership

Linn Energy Holdings LLC

Newfield Production Company

Northern Oil & Gas, Inc.

Twin City Technical LLC

WM ND Energy Resources II, LLC

QEP Energy Co.

Questar Exploration & Production Co.

## SCHEDULE 23

## LIST OF IRVING INSURERS

1. ACE INA Insurance
   - CGL 523952
   - XBC 602712
2. Zurich Insurance plc, UK Branch
   - B0509E1149413
   - B0509E1181313
3. Zurich lnsurance Company Ltd
   - 8840960
   - 8838799
4. AEGIS, Syndicate AES 1225
   - B0509E1149413
5. Mitsui Sumitomo, Insurance Corporate Capital, Limited as sole member of Syndicate, 3210 at Lloyds
   - B0509E1181113
6. QBE Casualty Syndicate 386
   - B0509E1181113
7. QBE Syndicate 1886
   - B0509E1181113
8. Underwriters at Lloyd's and Lloyd's Syndicates, Subscribing to Policy No. B0509HM231013, including the following
   - AEGIS Syndicate AES 1225
   - Syndicate CNP 4444
   - Syndicate MKL 3000
   - Syndicate HIS 33
   - Syndicate LIB 4472
   - Syndicate ANV 1861
   - Syndicate MFM 2468
   - Syndicate AUW 609
   - Syndicate TUL 1301

- Syndicate SKD 1897
- Syndicate AML 2001
- Syndicate NAV 1221
- Syndicate TRV 5000

9. XL Insurance (Bermuda) Ltd.
   - XLUMB-742875

10. Oil Casualty Insurance, Ltd.
    - U920303-0313

11. Argo Re Ltd.
    - ARGO-CAS-OR-000227.1

12. Chubb Atlantic lndemnity Ltd.
    - 3310-17-91

13. Zurich Insurance Company Ltd
    - 8838799

14. Iron-Starr Excess Agency Ltd.
    - 1S0000822

15. AIG Excess Liability Insurance International Limited
    - 1657346

16. ACE Bermuda Insurance Ltd.
    - 1OC-1338/5

17. Liberty Mutual Insurance Company
    - XSTO-631084-013

18. ACE Underwriting Agencies Limited, as managing agency of Syndicate 2488 at Lloyd's, and ACE European Group Limited
    - B0509EI181413

## SCHEDULE 24

### LIST OF WORLD FUEL INSURERS (Subject to Note 1 below)

1. Zurich American Insurance Company ("Zurich").  Zurich is included in Schedule A only with respect to its indemnity limits, and not with respect to its obligation to defend or pay defense costs to the World Fuel Parties.  Zurich is included on Schedule A solely with respect to the following policies:

   - Zurich American Insurance Company Policy GLO 5955601-00 (eff. 07/01/2013 – 07/01/2014); and
   - Zurich American Insurance Company Policy ZE 5761197-00 (eff. 07/01/2013 – 07/01/2014)

2. Federal Insurance Company (GL) ("Federal (GL)").  Federal (GL) is included in Schedule A only with respect to its indemnity limits, and not with respect to its obligation to defend or pay defense costs to the World Fuel Parties.  Federal (GL) is included on Schedule A solely with respect to the following policy:

   - Federal Insurance Company Policy 3597-82-72 NHO (eff. 11/07/2012 – 11/07/2013)

3. Alterra Excess & Surplus Insurance Company ("Alterra").  Alterra is included on Schedule A solely with respect to the following policy:

   - Alterra Excess & Surplus Insurance Company Policy MAX3EC50000211 (eff. 11/07/2012 – 11/07/2013)

4. ACE Property and Casualty Insurance Company ("ACE"). Ace is included on Schedule A solely with respect to the following policy:

   - ACE Property and Casualty Insurance Company Policy XOO G27047026 (eff. 07/01/2013 – 07/01/2014)

5. Ironshore Specialty Insurance Company ("Ironshore").  Ironshore is included on Schedule A solely with respect to the following policy:

   - Ironshore Specialty Insurance Company Policy 001709800 (eff. 07/01/2013 – 07/01/2014)

6. *XL Insurance America, Inc. ("XL").  XL is included on Schedule A solely with respect to the following policy:

   - XL Insurance America, Inc. Policy US00065550LI13A (eff. 07/01/2013 – 07/01/2014)]
   - * settlement  subject to determination of WFS's ultimate derailment liability

7. Federal Insurance Company and Chubb Custom Insurance Company (Pollution) ("collectively, Chubb").   Chubb is included on Schedule A solely with respect to the following policies:

- Federal Insurance Company Policy 37313421 (eff. 10/1/2010 – 10/1/2020);
- Chubb Custom Insurance Company Policy 37313810 (eff. 4/17/2012 – 4/17/2017); and
- Chubb Custom Insurance Company Policy 37313496 (eff. 12/31/2010 – 12/31/2020)

8. Lexington Insurance Company and Chartis Specialty Insurance Company (collectively, "AIG").  AIG is included on Schedule A solely with respect to the following policies:

- Lexington Insurance Company Policy PLS 5652718 (eff. 06/01/11 – 07/01/14);
- Chartis Specialty Insurance Company Policy PLS 1951951 (eff. 07/01/11 – 07/01/14); and
- Chartis Specialty Insurance Company PLS 18809548 (eff. 05/11/12 – 05/11/15)

9. Crum and Forster Specialty Insurance Company ("Crum & Forster").  Crum & Forster is included on Schedule A solely with respect to the following policies:

- Crum & Forster Specialty Insurance Company Policy EPK 101162 (eff. 03/16/13-03/16/14); and
- Crum & Forster Specialty Insurance Company Policy EFX 100400 (eff. 03/16/13-03/16/14)]

Note 1.  Notwithstanding anything above or elsewhere in the Plan or the CCAA Plan, no insurer shall be included in this Schedule 24 or as a Released Party in the Plan or the CCAA Plan, or otherwise obtain the benefits of the Plan or the CCAA Plan, unless and until that insurer enters into a separate settlement agreement with the World Fuel Parties (mutually acceptable to the World Fuel Parties and that insurer) relating to insurance coverage for the Derailment.  Any such separate settlement agreement between the World Fuel Parties and an insurer shall be specifically subject to the terms and conditions thereof, notwithstanding anything to the contrary in the Plan, the CCAA Plan, or the Approval Orders (as defined in the CCAA Plan).  The releases set forth in the Plan, the CCAA Plan, and the Approval Orders are not intended to, and shall not, extend to or otherwise release or discharge any Claims, rights, privileges, or benefits held by the World Fuel Parties against the World Fuel Insurers or any other insurer of the World Fuel Parties, which shall be governed by such separate settlement agreement between the World Fuel Parties and such World Fuel Insurer or other insurer of the World Fuel Parties.

# **EXHIBIT 3**

**XL Settlement Agreement**

EXHIBIT

1.158

EXECUTION COPY

## SETTLEMENT AGREEMENT

This Agreement is made as of the Execution Date by the XL Companies, the Trustee and

MMAC, and shall be effective as of the Approval Date.[1]

## RECITALS

WHEREAS, MMA and MMAC are insureds under a Railroad Liability Insurance Policy,

bearing number RRL003723801 and in effect from April 1, 2013 to April 1, 2014 (subject to any

extensions as may be or have been agreed between the parties), issued by Indian Harbor;

WHEREAS, MMA and MMAC are insureds under a Railroad Liability Insurance Policy,

bearing the number RLC003808301 and in effect from April 1, 2013 to April 1, 2014 (subject to

any extensions as may be or have been agreed between the parties), issued by XL Insurance;

WHEREAS, on July 6, 2013, a train operated by MMAC and MMA derailed in Lac-

Mégantic, Québec, Canada, causing numerous fatalities, bodily injury to hundreds of people, and

extensive property and environmental damage;

WHEREAS, on August 6, 2013, MMAC filed a petition for the issuance of an initial

order with the CCAA Court.

WHEREAS, Richter Advisory Group Inc. has been appointed as Monitor in connection

with the CCAA Proceeding;

WHEREAS, on August 7, 2013, MMA filed a voluntary petition in the Bankruptcy Court

for relief under chapter 11 of the Bankruptcy Code;

WHEREAS, on August 21, 2013, the United States Trustee appointed the Trustee, having

full rights and power under the Bankruptcy Code to act for and on behalf of MMA;

---

[1]    All capitalized terms used herein have the meanings contained in the definitions set forth in Section 1 of
this Agreement.

WHEREAS, various claims arising out of the Derailment have been made against MMA, MMAC, and other insureds under the Policies;

WHEREAS, the Parties wish to resolve all Claims that have arisen or could in the future arise relating to the Policies by agreeing to a global settlement relating to Claims and possible Claims against the XL Companies arising out of the Derailment or otherwise under the Policies;

WHEREAS, the Canadian Policy is the applicable policy in respect of any loss, cost or expense arising out of the Derailment, and covered losses arising out of the Derailment will substantially exceed the applicable CAN $25 million per occurrence limit in the Canadian Policy;

WHEREAS, the Parties recognize that, to the extent applicable, Quebec law provides that the proceeds of the Canadian Policy are property of the victims of the Derailment, and the Parties seek to establish a mechanism for promptly providing those victims with access to those proceeds;

WHEREAS, the parties also seek to achieve a global resolution of any and all other matters relating to the Policies, through a buy-back, by the XL Companies, of the Trustee's and MMAC's remaining interests in the Policies;

WHEREAS, through this Agreement, the Plan and the Approval Orders, the Parties seek to provide the XL Companies with the broadest possible release with respect to the Policies and to provide that the XL Companies shall have no further obligations to any Person for any and all Claims that have been, or could in the future be, asserted against the XL Companies in relation to the Policies and/or the Derailment;

WHEREAS, the XL Companies have sought, and the Trustee, MMAC and the Monitor have agreed, through the negotiations leading to this Agreement, to create a mechanism under

which all of the Directors, Officers and Employees, and all other Persons that assert any right or interest in the Policies have had reasonable opportunity to become a Settling Defendant and Released Party by entering into an appropriate settlement agreement.

WHEREAS, the Parties intend that this Agreement shall be approved in the Bankruptcy Case and CCAA Proceeding and given the effect by the U.S. Approval Order and the Canadian Approval Order.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties agree as follows:

I.     DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below.

1.1.    "Agreement" means this Settlement Agreement.

1.2.    "Approval Date" means the date on which the U.S. Approval Order and the Canadian Approval Order become Final Orders. If the U.S. Approval Order and the Canadian Approval Order become Final Orders on different dates, the Approval Date is the date on which the later order to become a Final Order becomes a Final Order.

1.3.    "Approval Orders" means the U.S. Approval Order and the Canadian Approval Order, collectively.

1.4.    "Bankruptcy Case" means the case styled *In re Montreal, Maine & Atlantic Railway Ltd.*, Bankr. D. Me. No. 13-10670.

1.5.    "Bankruptcy Code" means Title 11 of the United States Code.

1.6.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Maine, as presiding over the Bankruptcy Case.

1.7.    "Canadian Approval Order" means an order entered in the CCAA Proceeding, which Order shall be in form and substance acceptable to the XL Companies, and shall, among

- 3 -

other things, (i) approve, sanction and/or confirm the Canadian Plan, (ii) approve this

Agreement; (iii) authorize MMAC to undertake the settlement and the transactions contemplated

by this Agreement; (iv) authorize the sale of MMAC's remaining interest, in the Policies, if any,

to the extent permitted by law, to the XL Companies free and clear of any and all claims and

interests; (v) vest any and all interests in the XL Indemnity Payment; (vi) provide that the XL

Companies are good faith purchasers of MMAC's remaining interests in the Policies and, as

such, are entitled to all protections provided to a good-faith purchaser; and (vii) provide for the

Injunction.

  1.8. "Canadian Policy" means the insurance policy issued by XL Insurance, bearing

number RLC003808301.

  1.9. "Canadian Plan" means a plan of compromise or arrangement, to be filed by

MMAC in the CCAA Proceeding, which shall provide, among other things, for approval of this

Agreement and entry of the Canadian Approval Order, which Canadian Plan shall be in form and

substance acceptable to the XL Companies.

  1.10. "CCAA" means the Companies' Creditors Arrangement Act, R.S.C. c. C-36, as

amended.

  1.11. "CCAA Court" means the Superior Court, Province of Québec, as presiding over

the CCAA Proceeding.

  1.12. "CCAA Proceeding" means the case styled *In the Matter of the Plan of

Compromise or Arrangement of Montreal, Maine & Atlantic Canada Co.*, Superior Court,

Province of Québec, No. 500-11-045094-139.

  1.13. "CIT Group" means CIT Group, Inc.

1.14.   "Claim" means past, present and future claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual or otherwise, whether statutory, at common law or in equity, including but not limited to claims for breach of contract, breach of the implied covenant of good faith and fair dealing, statutory or regulatory violations, for indemnity or contribution, or punitive, exemplary or extra-contractual damages of any type, (a) arising out of, based upon, or relating in any way related to, in whole or in part, directly or indirectly, whether through a direct claim, cross-claim, third-party claim, subrogation claim, class action or otherwise, to (i) the Derailment, including any claims for wrongful death, personal injury, emotional distress, property damage, economic loss, or environmental damage, remediation or exposure; (ii) the Policies; (iii) the issuance of the Policies; (iv) insurance coverage under the Policies, reimbursement or payment under the Policies; (v) any act or omission of an insurer of any type for which a Claimant might seek relief in connection with the Policies, or (b) that would otherwise constitute a claim (i) provable in bankruptcy under the Bankruptcy and Insolvency Act, R.S.C. 1985, c.B-3, had MMAC become bankrupt on August 6, 2013; or (ii) within the definition of "claim" set forth in Section 101(5) of the Bankruptcy Code.

1.15.   "Claimant" means any Person holding or potentially holding any Claim against (i) MMA, (ii) MMAC, (iii) to the extent applicable, the Estates, (iv) any XL Company, and/or (v) any of the Released Parties.

1.16.   "Derailment" means the July 6, 2013 derailment in Lac-Mégantic, Québec.

- 5 -

EXECUTION COPY

1.17. "Directors, Officers and Employees" mean any and all persons or entities who qualify as an officer, director, partner, or employee under either of the Policies.

1.18. "Estates" means the MMA bankruptcy estate and, to the extent applicable, the MMAC estate.

1.19. "Execution Date" means the first day upon which all Parties have executed this Agreement.

1.20. "Final Order" means an order of the Bankruptcy Court or the CCAA Court that is no longer subject to further appeals, either because the time to appeal has expired without an appeal being filed, or because it has been affirmed by any and all courts with jurisdiction to consider any appeals therefrom.

1.21. "Indian Harbor" means Indian Harbor Insurance Company.

1.22. "Injunction" means an order by the CCAA Court and the Bankruptcy Court permanently releasing and enjoining the enforcement, prosecution, continuation or commencement of any (a) Claim that any Person or Claimant holds or asserts or may in the future hold or assert against the XL Companies arising out of, in connection with and/or in any way related to any of the Policies and (b) Claim against any Released Party and/or Settling Defendant arising out of, in connection with and/or in any way related to the Policies or the Derailment. The Injunction order shall provide that all Persons and Claimants, whether or not consensually, shall be deemed to have granted full and complete releases to the XL Companies and the Released Parties and shall be permanently and forever barred, estopped, stayed and enjoined from (i) pursuing any Claim against the XL Companies and the Released Parties, (ii) continuing or commencing any action or other proceeding with respect to any Claim against the XL Companies and the Released Parties, (iii) seeking the enforcement, attachment, collection or

- 6 -

recovery of any judgment, award, decree, or order against the XL Companies and the Released

Parties or property of the XL Companies and the Released Parties with respect to any Claim, (iv)

creating, perfecting, or enforcing any encumbrance of any kind against the XL Companies and

the Released Parties or the property of the XL Companies and the Released Parties with respect

to any Claim, and (v) asserting any right of setoff, subrogation, or recoupment of any kind

against any obligations due to the XL Companies and the Released Parties with respect to any

Claim, the whole to the extent that any such Claim Arises out of, is in connection with and/or in

any way related to the Derailment or the Policies.

1.23.    "MMA" means Montreal, Maine & Atlantic Railway Ltd.

1.24.    "MMAC" means Montreal, Maine and Atlantic Canada Co.

1.25.    "Monitor" means Richter Advisory Group Inc., in its capacity as Monitor in the

CCAA Proceeding, or such other entity as may be approved by the CCAA Court in the future to

serve in such capacity in the CCAA Proceeding.

1.26.    "Other Insurer" means any Person that provided, or claims or is alleged to have

provided, any insurance coverage to MMA, MMAC, any of their Directors, Officers and

Employees, or affiliates.

1.27.    "Parties" means the Trustee (for himself solely as a trustee, for MMA and for its

estate), MMAC, and the XL Companies.

1.28.    "Person" means and includes a natural person or persons, a group of natural

persons acting as individuals, a group of natural individuals acting in collegial capacity (e.g., as a

committee, board of directors, etc.), a corporation, partnership, limited liability company or

limited partnership, a proprietorship, joint venture, trust, legal representative, or any other

unincorporated association, business organization or enterprise, any government entity and any

successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.29.   "Plan" means the U.S. Plan and/or the Canadian Plan.

1.30.   "Policies" mean the U.S. Policy and the Canadian Policy.

1.31.   "Proceedings" mean the Bankruptcy Case and the CCAA Proceeding.

1.32.   "Rail World" means Rail World, Inc.

1.33.   "Released Parties" means any and all Persons with whom MMAC and the Trustee has executed or hereafter executes a settlement agreement substantially in the form of this Agreement (the "Settling Defendants") whereby the Settling Defendants are provided with a release of any Claim in connection with the Derailment, provided that Approval Orders are rendered approving such settlement agreements and providing the Injunction in favour of the Settling Defendants.

1.34.   "Settlement Amount" means the sum of the XL Indemnity Payment plus the XL Additional Payment, to be paid by the XL Companies pursuant to Section 2.1 of this Agreement.

1.35.   "Settling Defendant" has the meaning set forth in Section 1.33 of this Agreement.

1.36.   "Trustee" means Robert J. Keach, in his capacity as chapter 11 Trustee appointed in the Bankruptcy Case, or such other person as may be approved by the Bankruptcy Court in the future to serve in such capacity in the Bankruptcy Case.

1.37.   "U.S. Approval Order" means (x) an Order entered in the Bankruptcy Case sanctioning, approving and/or confirming the Plan, or (y) an order entered in the Bankruptcy Case pursuant to the applicable sections of chapter 15 of the Bankruptcy Code, which order recognizes and enforces the terms of the Canadian Approval Order. In either case, a "U.S. Approval Order" shall be in form and substance acceptable to the XL Companies, and must,

among other things, (i) approve this Agreement; (ii) authorize the Trustee to undertake the

settlement and the transactions contemplated by this Agreement; (iii) authorize the sale of the

MMA estate's remaining interest in the Policies to the XL Companies free and clear of any and

all claims and interests; (iv) vest any and all interests in the XL Indemnity Payment; (v) provide

that the XL Companies are good faith purchasers of the MMA estate's remaining interests in the

Policies and, as such, are entitled to all protections provided to a good-faith purchaser; and (vi)

provide for the Injunction.

1.38.   "U.S. Plan" means the plan of reorganization, to be filed by the Trustee in the

Bankruptcy Case, which shall provide, among other things, for approval of this Agreement and

entry of the U.S. Approval Order, which U.S. Plan shall be in form and substance acceptable to

the XL Companies.

1.39.   "U.S. Policy" means the insurance policy issued by Indian Harbor, bearing

number RRL003723801.

1.40.   "XL Companies" means Indian Harbor, XL Insurance, XL Group plc and their

affiliates.

1.41.   "XL Additional Payment" is US $5 million.

1.42.   "XL Indemnity Payment" is CDN $25 million.

1.43.   "XL Insurance" means the Canadian Branch of XL Insurance Company SE

(formerly XL Insurance Company Limited).

1.44.   "XL Policies" means the Canadian Policy and the U.S. Policy.

II.   SALE OF THE ESTATES' REMAINING INTERESTS IN THE POLICIES AND
PAYMENT OF THE SETTLEMENT AMOUNT

2.1.   Subject to all of the terms and conditions of this Agreement, in full and final

settlement of all responsibilities under and arising out of the Policies, the XL Companies shall

- 9 -

purchase from the Trustee and MMAC, and the Trustee and MMAC shall sell, convey, transfer
and deliver to the XL Companies, after payment of the Settlement Amount, MMA's and the
MMAC's remaining interests, if any and to the extent permitted by law, in each of the Policies,
free and clear of any and all Interests of any and all Persons.  Within five calendar days of
payment of the Settlement Amount, and upon request of the XL Companies, the Trustee and
MMAC shall execute and deliver to the XL Companies bills of sale, in form and substance
acceptable to the XL Companies, evidencing such sales of MMA's and the MMAC estate's
remaining interests in the Policies to the XL Companies, which sales shall be effective as of the
Approval Date.

     2.2.    Subject to all of the terms of this Agreement, in full and final settlement of all
responsibilities under and arising out of the Policies, including the sale of MMA's and the
MMAC estate's remaining interests in the Policies, XL Insurance shall pay the Settlement
Amount to the Monitor by no later than the 10th calendar day after Approval Orders become
Final Orders. The Trustee (to whom a portion of the Settlement Amount will be remitted by the
Monitor for distribution to some of the Claimants, the whole in accordance with the Plan),
MMAC and the Monitor covenant and agree that the proceeds of the XL Indemnity Payment
shall be distributed in accordance with the Plan.  The Trustee and MMAC intend to seek
authorization to use the entire amount of the XL Additional Payment for the payment of (i)
allowed administrative expenses in the Bankruptcy Case and (ii) the professional fees and
disbursements of the Monitor, the Monitor's counsel and MMAC's counsel in the CCAA
Proceeding.

     2.3.    The Parties agree that (i) the Settlement Amount is the total amount the XL
Companies are obligated to pay on account of any and all Claims of any kind made under or

related to the Policies; (ii) under no circumstance will the XL Companies ever be obligated to make any additional payments to MMA, MMAC, the Trustee, the Estates (where applicable), or any other Person in connection with the Policies; (iii) all limits of liability of the Policies, including all per occurrence and aggregate limits, shall be deemed fully and properly exhausted; (iv) the Settlement Amount is the full purchase price of MMAC's and the MMA estate's remaining interests in the Policies, and upon payment of the Settlement Amount, the XL Companies will be deemed to own MMAC's and the MMA estate's remaining interests in the Policies free and clear of any and all claims and interests of any Person, (v) subject to the terms of this Agreement and the occurrence of the Approval Date, the XL Companies shall have no further obligation to MMA, MMAC, the Trustee, the Estates (where applicable), or any other Person or Claimant under or related to the Policies for any Claim; and (vi) the Settlement Amount is at least equal to the fair value of MMAC's and the MMA estate's remaining interests in the Policies.

2.4.    Effective immediately upon payment of the Settlement Amount, and without any further action by any of the Parties, all of MMA's and MMAC's rights and the rights of all other Persons under and with respect to the Policies shall be permanently and irrevocably extinguished.

III.    BANKRUPTCY AND CCAA RELATED OBLIGATIONS

3.1.    By on or about March 31, 2015, MMAC shall file the Canadian Plan in the CCAA Proceeding, and shall use its best efforts to obtain entry of the Canadian Approval Order as a Final Order.  MMAC covenants and agrees that it will use its best efforts to obtain the Canadian Approval Order and that it will vigorously defend any objection to the Canadian Plan filed by any party or Person.

EXECUTION COPY

3.2.    By on or about March 31, 2015, Trustee shall file the U.S. Plan in the Bankruptcy Case and shall use his best efforts to obtain entry of the U.S. Approval Order as a Final Order. The Trustee covenants and agrees that he will use his best efforts to obtain the U.S. Approval Order and that he will vigorously defend any objection to the U.S. Plan filed by any Person.

3.3.    If either of the Approval Orders (or any other orders of the Bankruptcy Court or CCAA Court relating to this Agreement) shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), the Trustee and MMAC agree to take all reasonable steps to defend against such appeal, petition or motion, provided, however, that nothing herein shall preclude the Parties from consummating the transactions contemplated herein if the Approval Orders shall have been entered and have not been stayed and the XL Companies, in their sole discretion, waive in writing the requirement that each of the Approval Orders be a Final Order.

3.4.    Each of the Parties further agrees not to take any appeal from, or to seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, the Approval Orders or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be inconsistent with the terms hereof.

3.5.    The Trustee and MMAC agree to cooperate with the XL Companies and their representatives in connection with seeking approval of the Plans and the Approval Orders.  Such cooperation shall include consulting with the XL Companies, at their request, concerning the status of the Proceedings, including the status of the Plans and Approval Orders, and providing the XL Companies with draft copies of requested pleadings, notices, proposed orders and other documents relating to the Proceedings, the Plans, the Approval Orders and/or the service of the

- 12 -

Plans and Approval Orders as soon as reasonably practicable so as to afford the XL Companies a reasonable opportunity to review and comment on any such documents in advance of filing. The Trustee and MMAC further covenant and agree that they will not submit for approval in the Proceedings any motion, adversary proceeding, filing or other request the approval of which could conflict with, supersede, abrogate, nullify, modify or restrict the terms of the Agreement and the rights of the XL Companies hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Plans or the Approval Orders.

3.6.    In the event any Person asserts a Claim against any of the XL Companies after the Approval Date, arising out of or related to any matter released by this Agreement, the XL Companies shall notify the Trustee and/or MMAC and the Trustee and/or MMAC shall immediately seek an order from the CCAA Court and/or the Bankruptcy Court enjoining such Claim, as the XL Companies may elect and direct.

3.7.    On the same day that MMAC and the Trustee file the Plan, or as soon as practicable thereafter, MMAC (through the Monitor) and the Trustee shall serve copies of the Plan on (i) each Person known to the Trustee, MMAC or the XL Companies to have a Claim against any of them or the Estates through participating in the Proceedings, the filing of a lawsuit, or the filing of a proof of claim or other assertion of a Claim, or otherwise (or to his, her, or its proxy, representative or counsel of record); (ii) any and all Persons known to the Trustee, MMAC or the XL Companies entitled or allegedly entitled to insurance coverage under the Policies, including Rail World, the Directors, Officers and Employees, and any other additional insured (or Persons claiming to be additional insureds) or otherwise claiming to be entitled to

EXECUTION COPY

benefits under the Policies and those Persons falling within a policy definition of "named

insured"; (iii) all other Persons who or that have filed timely proofs of claim in the Proceedings;

(iv) all Persons on the master service lists maintained in the Proceedings; and (v) all other parties

in interest, including any Person who or that filed a notice of appearance and demand for service

of papers in the Proceedings. MMAC (through the Monitor) and the Trustee shall also provide

appropriate publication notice, and such further or other notice as may be required by the CCAA

Court (with respect to MMAC) or the Bankruptcy Court (with respect to the Trustee).  As soon

as reasonably practical after filing the Plan, the certificates of the service provided by mail and

by publication shall be filed by the Monitor in the CCAA Proceedings and by the Trustee in

the Bankruptcy Case.

IV.    RELEASE

    4.1.    Effective upon the Approval Date and the payment of the Settlement Amount, and

without any further action of the Parties:

    (a)    MMAC and the Trustee, on behalf of themselves and, to the extent

applicable, the Estates, hereby fully, finally, and completely remise, release, acquit and forever

discharge the XL Companies  from any and all Claims whether actual or alleged, known or

unknown, accrued or unaccrued, existing or potential, suspected or unsuspected with respect to,

relating to, or in any way arising out of the Policies.  The release of the XL Companies under

this Section 4.1 of the Agreement shall include, but shall not be limited to, any and all Claims for

coverage with respect to, relating to, or in any way arising out of the Policies whether for

property damage, bodily injury, personal injury, advertising injury, or any other form of loss,

expense, or other benefits, covered or potentially covered, under the Policies.  In addition,

MMAC and the Trustee, on behalf of themselves and, to the extent applicable, the Estates,

hereby withdraw any and all requests, demands, or tenders for defense or indemnity previously

EXECUTION COPY

submitted to the XL Companies under the Policies and further surrender, relinquish, and release any further right to tender or present any Claims whatsoever to the XL Companies under the Policies. Furthermore, by virtue of the foregoing releases and the Approval Orders, XL Companies shall have no duty to defend or indemnify MMA, MMAC, the Trustee and any other insured under the Policies, on behalf of themselves and the Estates, with respect to any past, present, or future Claim, nor shall XL Companies have any other duty or obligation whatsoever to any other Person with respect to any and all Claims arising out of, in connection with, and relating to the Policies.

(b)     The XL Companies hereby fully, finally, and completely remise, release, acquit and forever discharge MMA, MMAC, the Trustee, the Estates and all the Released Parties from any and all Claims whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, suspected or unsuspected with respect to, relating to, or in any way arising out of the Policies. The XL Companies also waive any and all rights, at law or contractual, of subrogation, indemnification, and/or contribution that they have, or may have, against any Person as a result of or on account of the payment of the Settlement Amount, including without limitation any rights based on any "Other Insurance" clause in the Policies.

4.2.    Releases Do Not Extend To Obligations Under The Agreement. The releases set forth in Section 4.1 of this Agreement are not intended to, and shall not, extend to or otherwise release or discharge any rights, privileges, benefits, duties, or obligations of any of the Parties by reason of, or otherwise arising under, this Agreement.

4.3.    Changes In Fact Or Law. The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Policies or otherwise and/or that the Parties may hereafter discover facts different from, or in addition to, those which they now

EXECUTION COPY

believe to be true with respect to any and all of the claims herein released. Nevertheless, the Parties hereby agree that the releases set forth above, and in the Plan and the Approval Orders, shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts. Moreover, the Trustee and MMAC understand that Claims that have been or may be asserted may increase or decrease in amount or in severity over time, that Claims that have been or may be asserted may include progressive, cumulative, unknown, and/or unforeseen elements, and that there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such Claims. Nevertheless, the Parties irrevocably and knowingly agree that the releases contained in Section 4.1 of this Agreement include a full and complete and irrevocable release and discharge from all known and unknown rights or Claims or interest arising out of, in connection with, and/or relating to, in any manner or fashion, the Policies.

4.4.    General Release. In furtherance of their express intent to fully, finally, and irrevocably release and discharge each other for all Claims, known and unknown, as set forth in this Section 4 of the Agreement, and in the Plan and the Approval Orders, each of the Parties expressly waives any and all rights it may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release as to Claims released herein, arising out of, in connection with, and/or relating to the Policies.

4.5.    Reinsurance. The releases set forth in this Section 4 of the Agreement shall not apply to or have any effect on the XL Companies' right to any claim for reinsurance in connection with the Policies; nor shall any matter related to the XL Companies' assertion of any claim to reinsurance affect the XL Companies' obligations under this Agreement.

EXECUTION COPY

4.6.    Beneficiaries Of Release. Subject to the other provisions of this Agreement, to the extent that the releases set forth in this Section 4 of the Agreement run to the favor of any Persons who are not signatories hereto, this Agreement is hereby declared to be made in and for their respective benefits and uses.

4.7.    No Assignment Of Claims. The Trustee on behalf of himself, MMA and the MMA estate, and MMAC, on behalf of itself and, to the extent applicable, the MMAC estate, warrant and represent that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims that they are releasing in this Agreement. Moreover, Trustee on behalf of himself, MMA and the MMA estate, and MMAC, on behalf of itself and the MMAC estate, represent, warrant, and agree that they will not in any way assist any Person in the establishment of any Claim against the XL Companies that arises out of, results from, or in any way relates to, the XL Companies' investigation, handling, defense, or settlement by the XL Companies of Claims released under this Agreement.

V.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES.

Each of the Parties separately represents and warrants as follows:

(a)    Subject to the entry of the Approval Orders, it has the requisite power and authority to enter into this Agreement and to perform the obligations imposed on it or him by this Agreement;

(b)    Subject to the Approval Date, the execution and delivery of, and the performance of the obligations contemplated by this Agreement have been approved by duly authorized representatives of the Party, and by all other necessary actions of the Party;

(c)    Each Party has expressly authorized its or his undersigned representative to execute this Agreement on the Party's behalf as its or his duly authorized agent;

EXECUTION COPY

(d)     This Agreement has been thoroughly negotiated and analyzed by its or his counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations, and for value and valuable consideration; and

(e)     Each Party will use its or his best efforts to seek entry of the Approval Orders.

VI.    MISCELLANEOUS PROVISIONS

6.1.    Conditions Precedent.  This agreement is conditioned on the Approval Orders becoming Final Orders, the form and substance of which shall be acceptable to the XL Companies to the extent of any provision affecting the XL Companies and/or the rights thereof, after all parties, known by the Trustee or MMAC to be insured or to claim to be insured under the XL Policies, receive notice of the Plans and Approval Orders and have an opportunity to be heard thereon.

6.2.    Termination Rights.  If the Bankruptcy Court or the CCAA Court declines to enter either of the Approval Orders, or if the Approval Orders are vacated or modified in a way that is not acceptable to the XL Companies, or are reversed on appeal such that they do not become Final Orders, the XL Companies, may terminate this Agreement by delivering written notice of such termination to the Trustee and MMAC.  In the event that this Agreement is terminated, (i) the Agreement shall be deemed null and void; (ii) the XL Companies shall not be obligated to pay the Settlement Amount pursuant to this Agreement; (iii) the XL Companies, MMAC and the Trustee shall have all of the rights, defenses and obligations under or with respect to any and all Policies that they would have had absent this Agreement; and (iv) any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that the Agreement becomes null and void pursuant to the terms of this Agreement.

6.3.    Amendments. Neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties (or their successors or assigns).

6.4.    No Precedential Value. The settlement reflected in this Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies. It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the XL Companies under any insurance policies issued to MMA, MMAC, or to any other Person, provided, however, that subject to the provisions of Section 6.15 of this Agreement, this Agreement may be used as evidence in any defense of the XL Companies of any obligation arising under the Policies.

6.5.    Agreement Voluntarily Entered Into By Each Of The Parties. This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

6.6.    Interpretation. This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, neither Party shall be presumptively entitled to have any provisions of the Agreement construed against the other Party in accordance with any rule of law, legal decision or doctrine.

6.7.    <u>No Admission of Liability</u>.  The Parties agree that this Agreement is the result of

a compromise of disputed issues of coverage, and that the execution and delivery of this

Agreement by any of the Parties shall not constitute or be construed as an admission of any

liability, a course of performance, or wrongdoing on the part of any of them.  The Parties

acknowledge that this Agreement is not, and cannot be construed as, any admission by the XL

Companies that any defense, indemnity, or other coverage obligation exists under the Policies,

or that XL Companies have any other obligation of any nature whatsoever with respect to the

Policies.  By entering into this Agreement, the Trustee, MMAC, and the XL Companies have not

waived nor will be deemed to have waived any right, obligation, privilege, defense or position it

may have asserted or might assert in connection with any claim, matter, Person, or insurance

policy outside the scope of this Agreement.  No Person other than the Parties hereto shall have

any legally enforceable rights or benefits under this Agreement except as specifically set forth in

Section 4.6 of this Agreement.

6.8.    <u>Attorneys' Fees, Costs, And Expenses</u>.  Each of the Parties shall bear its own

costs, attorneys' fees, and expenses in connection with the negotiations for and preparation of

this Agreement. Additionally, the attorneys' fees, expenses, and costs incurred by the XL

Companies for the investigation and defense of any claims prior to the Approval Date shall be

the sole responsibility of the XL Companies.  Notwithstanding the foregoing, the XL

Companies acknowledge that the Trustee and MMAC intend to seek authorization to use the

entire amount of the XL Additional Payment for the payment of (i) allowed administrative

expenses in the Bankruptcy Case and (ii) the fees and disbursements of the Monitor, the

Monitor's counsel and MMAC's counsel in the CCAA Proceeding.

6.9.    Entire And Integrated Agreement. This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters, and there are no promises, representations, warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

6.10.    No Third Party Beneficiaries. Except as set forth in Section 4.6 of this Agreement, nothing in this Agreement is intended or shall be construed to give any Person, other than the XL Companies, MMAC, and the Trustee (on behalf of himself as trustee, MMA, and the MMA estate) and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the XL Companies, MMAC and the Trustee (on behalf of himself as a trustee, MMA, and the MMA estate) as well as each of their successors and permitted assigns, and for the benefit of no other Person. Notwithstanding the foregoing, neither this Agreement nor the rights and obligations set forth herein shall be assigned without the prior written consent of the other Party, except that this Section shall not prohibit any assignment by the XL Companies (a) made by merger, consolidation, or operation of law or (b) to a Person who succeeds to all or substantially all of such Party's assets.

6.11.    Severability. If any provisions of this Agreement, or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or

EXECUTION COPY

unenforceable, the remainder of this Agreement, and application of such provisions to other

circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent

of the Parties.  Notwithstanding the foregoing, all of the conditions precedent in this

Agreement will remain in full force and effect following any determination that any other

provisions of this Agreement are invalid or unenforceable.

      6.12.   <u>Notice</u>.  Any notice or request required or desired to be given pursuant to this

Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid, or

email to the Parties at the addresses set forth below or to such other Persons as any of them may

designate in writing from time to time:

      (a)    As to the XL Companies:

> Anthony Vidovich
> General Counsel – Global Claims
> XL Group – Insurance
> 100 Constitution Plaza
> Hartford, CT  06103
> anthony.vidovich@xlgroup.com

      (b)    As to the Trustee:

> Robert J. Keach, Esq.
> Bernstein Shur Sawyer & Nelson
> 100 Middle Street
> P.O. Box 9729
> Portland, ME 04104-5029
> rkeach@bernsteinshur.com

      (c)    As to MMAC:

> Patrice Benoit
> patrice.benoit@gowlings.com
> -and-
> Pierre Legault
> pierre.legault@gowlings.com
> Gowlings Lafleur Henderson LLP
> 1 Place Ville Marie, suite 3700
> Montreal, Quebec H3B 3P4

EXECUTION COPY

With a simultaneous copy to the Monitor:

Andrew Adessky
AAdessky@richter.ca
-and-
Gilles Robillard
grobillard@richter.ca
Richter Advisory Group Inc.
1981 McGill College, 11e étage
Montréal (QC) H3A 0G6

6.13.   Headings.  The section titles, captions, and headings contained in this Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

6.14.   Recitals.  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

6.15.   Agreement Inadmissible.  Any evidence of the terms or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes establishing any rights, duties or obligations of the Parties, except in (a) an action or proceeding to enforce the terms or effect of this Agreement or the Injunction, (b) proceedings before the Bankruptcy Court or CCAA Court to secure the Approval Orders, or (c) any possible action or proceeding between the XL Companies and any of their reinsurers bearing responsibility for any of the XL Companies' obligations under this Agreement.  Except as set forth herein, this Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Parties' rights or obligations to each other or to any other Person.

6.16.   Additional Necessary Documents.  The Parties, and each of them, agree to execute such additional documents as may be reasonably required in order to carry out the purpose and intent of this Agreement, or to evidence anything contained herein.

6.17.   Execution in Counterparts.  This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

6.18.   Cross-Border Insolvency Protocol.  Each of the Parties hereby acknowledges and agrees that the Cross-Border Insolvency Protocol attached as Schedule C to this Agreement shall apply for purposes of any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby.

6.19.   This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which shall constitute one instrument.

6.20.   This Agreement constitutes the Parties' entire agreement and supersedes and replaces all prior written and oral agreements regarding the subject matter of this Agreement. Each Party acknowledges that no other Party or agent or attorney of any other Party has made any promise, representation or warranty, express or implied, which is not expressly contained in this Agreement.

6.21.   Rules of Construction.  As used in this Agreement, the singular  and masculine gender shall mean also the plural and feminine  or neuter, as may be appropriate, "it" shall include "he" and "she"; and "each" and "all" includes  "each" and "every."  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number  also include the plural or singular number,  respectively; (ii) the terms "hereof," "herein," "hereby"  and

EXECUTION COPY

derivative or similar words refer to this entire Agreement; (iii) the words "include," "includes"
or "including" shall be deemed to be followed by the words "without limitation," and (iv) the
word "or" shall be disjunctive but not exclusive. References to this Agreement and other
documents shall be deemed to include all subsequent amendments and other modification
thereto.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date set
forth, along with the respective signatures, below.

**XL Insurance:**

Cindy Guyatt
Canadian Chief Agent
XL Insurance Company SE

Dated: March 4, 2015

**Indian Harbor Insurance Company:**

Andrew J. Pinkes
Director and Executive Vice President

Dated: March 7, 2015

**Chapter 11 Trustee:**

Robert J. Keach
Chapter 11 Trustee
*In re Montreal, Main & Atlantic Railway, Ltd ,*
Bankr. D. Me. 13-10670

Dated: March __, 2015

**Montreal, Maine and Atlantic Canada Co.:**

Robert J. Keach
Sole Shareholder, in capacity as Chapter 11
Trustee, *In re Montreal, Main & Atlantic
Railway, Ltd.,* Bankr. D. Me. 13-10670

Dated: March __, 2015

- 25 -

EXECUTION COPY

derivative or similar words refer to this entire Agreement; (iii) the words "include," "includes"
or "including" shall be deemed to be followed by the words "without limitation," and (iv) the
word "or" shall be disjunctive but not exclusive. References to this Agreement and other
documents shall be deemed to include all subsequent amendments and other modification
thereto.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set
forth, along with the respective signatures, below.

**XL Insurance:**

**Chapter 11 Trustee:**

Robert J. Keach
Chapter 11 Trustee
*In re Montreal, Main & Atlantic Railway, Ltd.,*
Bankr. D. Me. 13-10670

Dated: March 23, 2015

Cindy Guyatt
Canadian Chief Agent
XL Insurance Company SE

Dated: March__, 2015

**Indian Harbor Insurance Company:**

**Montreal, Maine and Atlantic Canada Co.:**

Robert J. Keach
Sole Shareholder, in capacity as Chapter 11
Trustee, *In re Montreal, Main & Atlantic
Railway, Ltd.*, Bankr. D. Me. 13-10670

Dated: March __, 2015

Andrew J. Pinkes
Director and Executive Vice President

Dated: March__, 2015

- 25 -



## WRONGFUL DEATH TRUST AGREEMENT

THIS **WRONGFUL DEATH TRUST AGREEMENT**, dated as of _____, 2015 (the "Agreement") is between (i) Robert J. Keach, as chapter 11 trustee (the "Trustee") in the case of Montreal Maine & Atlantic Railway, Ltd. ("MMA" or the "Debtor") and (ii) Joe R. Whatley, Jr., or his successors, as trustee ("WD Trustee," and together with the Trustee, the "Parties").

## RECITALS

**WHEREAS**, on August 7, 2013 (the "Petition Date"), MMA filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"), thereby commencing Case No. 13-10670 (the "Chapter 11 Case").

**WHEREAS**, on _____, 2015, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law and Order Confirming the Trustee's Chapter 11 Plan* [D.E. __], which confirmed the *Trustee's Second Revised Amended Plan of Liquidation Dated October 8, 2015* [D.E. ___] (as may be amended, the "Plan");

**WHEREAS**, the Plan provides, among other things, as of the effective date of the Plan (the "Effective Date"), for: (a) the creation of the WD Trust and the creation of the beneficial interests in the WD Trust for the benefit of WD Trust Beneficiaries; (b) the transfer to the WD Trust of the WD Trust Assets; and (c) the administration and liquidation of the WD Trust Assets and the distribution of the proceeds therefrom to WD Trust Beneficiaries and holders of Allowed Class 12 Claims, if any, in accordance with this WD Trust Agreement, the Plan and the Confirmation Order;

**WHEREAS**, pursuant to Treasury Regulation Section 301.7701-4(d), the WD Trust is being created for the primary purpose of liquidating the WD Trust Assets in an expeditious but orderly manner for the benefit of WD Trust Beneficiaries and holders of Allowed Class 12 Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the WD Trust and the Plan;

**WHEREAS**, the WD Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to Sections 671-677 of the Tax Code, with WD Trust Beneficiaries and holders of Allowed Class 12 Claims to be treated as the grantors of the WD Trust and deemed to be the owners of the WD Trust Assets (subject to the rights of creditors of the WD Trust); and

**WHEREAS**, the Certificate of Trust of the WD Trust is being duly executed and filed by the WD Trustee, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. C. c. 38).

**NOW, THEREFORE**, this Agreement witnesseth and it is hereby declared, in

accordance with the Confirmation Order, as follows:

## ARTICLE 1

## DEFINITIONS

1.1    ***Incorporation of Definitions***.   Unless the context otherwise requires, all capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings assigned to them in the Plan.

## ARTICLE 2

## DECLARATION OF TRUST

2.1    ***Creation and Name***.  The WD Trust shall be deemed to have been created by the Trustee effective as of the time of filing of the Certificate of Trust.  The WD Trust shall bear the name "MMA Wrongful Death Trust" and the WD Trustee may, in connection with the exercise of its powers and duties hereunder, either use this name or such variation thereof as the WD Trustee sees fit.

2.2    ***Purpose***.

(a)    The WD Trust shall be established for the sole purpose of implementing the Plan on behalf of, and for the benefit of, WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, and to serve as a mechanism for liquidating, converting to Cash and distributing the WD Trust Assets for the benefit of WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the WD Trust.  The WD Trust is organized and established as a trust pursuant to which the WD Trustee, subject to the terms and conditions contained in this Agreement and in the Plan, is to hold the WD Trust Assets and dispose of the same in accordance with this Agreement and the Plan in accordance with Treasury Regulation section 301.7701-4(d).

(b)    In furtherance of, and consistent with the purpose of, the WD Trust and the Plan, the WD Trustee shall, subject to the terms of the Plan and this Agreement: (i) have the power and authority to hold, manage, sell and distribute the WD Trust Assets as set forth in the Plan and in this Agreement; (ii) have the power and authority to hold, manage, sell and distribute Cash obtained through the exercise of its power and authority; and (iii) have the power and authority to perform such other functions as are provided in this Agreement.

(c)    The WD Trustee shall be responsible for all decisions and duties with respect to the WD Trust and the WD Trust Assets, subject to the terms of the Plan and this Agreement.  Subject to the provisions of this Agreement, in all circumstances, the WD Trustee shall act in furtherance of the purpose of the WD Trust, and shall use commercially reasonable efforts to dispose of the WD Trust Assets and to make timely distributions and not unduly prolong the duration of the WD Trust.  In this respect, the WD Trustee shall make distributions strictly in accordance with the Wrongful Death Claim Resolution Procedures unless permitted by

a Final Order of the Bankruptcy Court or the District Court (in accordance with section 5.14 of the Plan) to deviate therefrom.

2.3     ***WD Assets***.

(a)     The WD Trust Assets shall consist of: (i) the Initial WD Trust Assets, which the Estate Representative shall deliver, transfer assign or cause to be delivered, transferred or assigned, as applicable, to the WD Trust; (ii) the Additional WD Trust Assets, which, following the Confirmation Date and as soon after receipt as is reasonably practicable, the Estate Representative shall deliver or cause to be delivered to the WD Trust; and (iii) any additional assets disbursed to the WD Trust in accordance with the Plan, including from the liquidation or monetization of Settlement Non-Cash Assets.  All assets held by the WD Trust shall constitute the proceeds of Claims for compensatory damages only, paid to the Beneficiaries pursuant to the judgment and/or order of a court of competent jurisdiction.

(b)     Upon transfer by the Estate Representative to the WD Trust of the assets set forth in this Section 2.3, the Estate Representative shall have (i) no further right or interest in or to any of the assets transferred to the WD Trust, except as otherwise provided herein, and (ii) no further liability, responsibility or obligation relating to the WD Trust and its assets other than the cooperation set forth in Section 2.4 hereof.

(c)     The transfer of the WD Trust Assets to the WD Trust shall be free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other persons and entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146 of the Bankruptcy Code.

(d)     To the extent any WD Trust Assets cannot be transferred to the WD Trust for any reason, including because of a restriction on transferability under applicable non-bankruptcy law that is not superseded by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such assets shall be retained by the Debtor (or any successor thereto); ***provided***, ***however***, that the proceeds of the sale of any such assets retained by the Debtor (or any successor thereto) shall nevertheless constitute WD Trust Assets and be turned over to the WD Trust pursuant to this Agreement as if such transfer had not been restricted under applicable non-bankruptcy law.  The WD Trustee may commence an action in the Bankruptcy Court to resolve any dispute regarding the allocation of the proceeds of any WD Trust Assets retained by the Debtor (or any successor thereto) pursuant to the Plan.

2.4     ***Further Assurances; Cooperation***.

(a)     The Estate Representative shall take such actions and deliver such certificates and other documents as the WD Trustee may reasonably request in order to effectuate, perfect, confirm and evidence the transfer and assignment to the WD Trust of the assets intended to be transferred and assigned pursuant to Section 2.3 hereof and the validity and efficacy of such transfer and assignment; ***provided***, ***however***, that the Estate Representative may decline any and all such requests if, in the Estate Representative's judgment, compliance with

3

such request is unlawful or would expose the Estate Representative and/or the Post-Effective Date Estate to liability; and ***provided further***, that any expenses by the Estate Representative incurred in connection with the forgoing actions shall be paid by the WD Trustee.

(b)     To the extent requested by the WD Trustee, the Estate Representative shall transfer to the WD Trust such claim files and other documents relating to the Derailment Wrongful Death Claims which are under his custody or control, to the extent permitted by the Bankruptcy Court.

(c)     Upon request made to the Estate Representative on or after the Effective Date by the WD Trustee, the Estate Representative shall deliver to the WD Trustee, on an un-redacted basis, the relevant lists of Class 12 Claims and supporting documentation for purposes of effectuating the WD Trust and distributions to Holders of Allowed Class 12 Claims.  The Confirmation Order shall include all findings and orders necessary to permit or facilitate such delivery and access, including with respect to any necessary confidentiality of such lists and the Proofs of Claim, subject to any further orders of the Bankruptcy Court.  The WD Trustee shall have access to the Books and Privileges to the extent reasonably required to discharge the duties of the WD Trustee; *provided*, *however*, that the WD Trustee shall have no control over and shall not have the capacity to waive any attorney-client privilege or work product immunity or privilege held by the Debtor or the Trustee.

## ARTICLE 3

## WD TRUSTEE

3.1     ***Number and Appointment***.  There shall be one WD Trustee of the WD Trust. The Trustee shall appoint the individual to serve as WD Trustee on or before the Confirmation Date.

3.2     ***Qualifications***.  The WD Trustee must be a natural person of good moral character and independent of the Debtor, the Estate Representative and the Released Parties, and any of their affiliates, present or future, who has attained the age of thirty (30) years, who is a resident of the United States, and whose experience and background are appropriate to the responsibilities of a Trustee hereunder; ***provided***, ***however***, that no individual shall be appointed as WD Trustee if such individual would be treated as, or would cause the WD Trust to be treated as, a "related person" (within the meaning of Treasury Regulation section 1.468B-1(d)(2)) to the Debtor.

3.3     ***Terms of Service***.

(a)     The WD Trustee shall serve for the duration of the WD Trust, subject to his or her earlier death, resignation or removal.

(b)     The WD Trustee may resign at any time by written notice to the Bankruptcy Court, specifying the date when such resignation shall take effect.  The WD Trustee shall attempt, where possible, to give notice of resignation not less than ninety (90) days before such resignation is to take effect.

(c)     The WD Trustee may be removed from office by the Bankruptcy Court upon his or her own motion or the motion of at least twenty (20) WD Trust Beneficiaries represented by at least three (3) independent and unaffiliated attorneys and a determination by the Bankruptcy Court that such removal is appropriate upon good cause shown.

3.4     *Appointment of Successor WD Trustees*.

(a)     In the event of the death, resignation, incapacity to serve as determined by the Bankruptcy Court or removal of a WD Trustee prior to the expiration of his or her term, a successor WD Trustee shall be appointed by the Bankruptcy Court on motion of any party in interest.  If the Bankruptcy Court no longer retains jurisdiction, or declines to exercise it, a successor WD Trustee shall be appointed by such other court of competent jurisdiction as is appropriate under the circumstances.

(b)     Upon the acceptance of office by any successor WD Trustee, all rights, titles, duties, powers and authority of the predecessor WD Trustee under this Agreement shall be vested in and undertaken by the successor WD Trustee without any further act being required. No successor WD Trustee shall be liable personally for any act or omission of his or her predecessor.

3.5     *Liability of WD Trustee; Quasi-Judicial Immunity*.  The WD Trustee is entitled to quasi-judicial immunity to the fullest extent allowed by law in connection with his or her implementation of the Confirmation Order, the Plan, this Agreement, and the Wrongful Death Claim Resolution Procedures.  The WD Trustee shall not be liable to the WD Trust, to any creditors, to any WD Trust Beneficiary or to any holders of Allowed Class 12 Claims except for such Trustee's own willful misconduct.  The WD Trustee shall not be liable for any act or omission of any agent or employee of the WD Trust unless the WD Trustee acted with willful misconduct in the selection or retention of such agent or employee.  All actions taken and determinations made by the WD Trustee, unless otherwise provided in or unless contrary to the provisions of this Agreement, the Plan, the Confirmation Order, and the Wrongful Death Claim Resolution Procedures, shall be final and binding upon all Persons having any interest in the WD Trust.

3.6     *Fees, Costs and Expenses of the WD Trust*.

(a)     The WD Trust shall pay from the WD Trust Assets (i) all WD Trust Expenses; (ii) any tax liability imposed on the WD Trust; (iii) all obligations or other liabilities incurred or assumed by the WD Trust (including but not limited to any reserves established by the WD Trust); (iv) all expenses reasonably necessary to meet contingent liabilities and to maintain the value of the WD Trust Assets during liquidation; and (v) all expenses reasonably necessary to satisfy any other obligations of the WD Trust set forth in the Plan, the Confirmation Order or the WD Trust Documents.

(b)     The WD Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of proceedings, and shall be reimbursed from the WD Trust Assets for his or her reasonable expenses, including travel

5

expenses, reasonably required and incurred in the performance of his or her duties, in each case subject to the terms and provisions of the Plan and this Agreement.

(c)     The WD Trustee may retain such law firms or attorneys, experts, advisors, consultants, investigators, appraisers, auctioneers, corporate management services, or other persons or professional firms as the WD Trustee determines, in his or her sole discretion, are necessary, desirable or appropriate to aid in the performance of his or her duties, without the need for further order or notice.  The WD Trustee may pay or appropriate funds from the WD Trust Assets necessary to pay the professionals for services rendered and expenses incurred after the Effective Date without any need for filing fee applications under the Bankruptcy Code or approval of any court, subject to the provisions of section 6.2 below.

3.7    *Indemnification*.

(a)     The WD Trustee or former WD Trustee, the Trustee and the Estate Representative (the "Indemnified Person(s)"), who was or is party, or is threatened to be made a party, to any threatened, pending, or completed action, suit or proceeding of any kind, whether civil, administrative or arbitrative, and whether brought by or against the WD Trust, (i) with respect to the WD Trustee, by reason of such WD Trustee being or having been an WD Trustee of the WD Trust, or by reason of such WD Trustee serving or having served in any capacity at the request of and on behalf of the WD Trust, (ii) with respect to the Trustee or the Estate Representative by reason of any act or omission of the Trustee, the Estate Representative with respect to the Debtor, the Plan, the Chapter 11 Case, this Agreement, or the Wrongful Death Claim Resolution Procedures, shall be and hereby is indemnified by the WD Trustee against expenses, costs and fees (including attorneys' fees), judgments, awards, costs, amounts paid in settlement, and liabilities of any kind incurred by such WD Trustee in connection with or resulting from such action, suit, or proceeding if he or she acted in good faith and, (x) with respect to the WD Trustee, in a manner the WD Trustee reasonably believed to be in or not opposed to the best interests of the WD Trust and (y) with respect to the Trustee or the Estate Representative, in a manner reasonably believed to be in furtherance of, or not opposed to, his or her fiduciary duties.

(b)     Reasonable expenses, costs and fees (including attorneys' fees) incurred by or on behalf of any such Indemnified Person in connection with any such action, suit, or proceeding, whether civil, administrative or arbitrative, including, without limitation expenses, costs and fees (including attorneys' fees) incurred by the Estate Representative related to the indemnity set forth in Section 3.7(a) above, may be paid by the WD Trustee in advance of the final disposition thereof upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount unless it shall be determined ultimately that such Indemnified Person is entitled to be indemnified by the WD Trustee.

(c)     The WD Trustee shall have the power, generally or in specific cases, to cause the WD Trust to indemnify the employees and agents of the WD Trust to the same extent as provided in this Section 3.7 with respect to the WD Trustee.

(d)     The WD Trustee may purchase and maintain customary and commercially reasonable amounts and types of insurance on behalf of an individual who is or was a WD

Trustee or agent of the WD Trust against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a WD Trustee, employee, or agent.

3.8     ***WD Trustee's Lien***.  The WD Trustee shall have a prior lien upon the WD Trust estate to secure the payment of any amounts payable (i) to him or her or (ii) to an Indemnified Person, in each case pursuant to Sections 3.6 and 3.7 hereof.  The lien to secure the payment of any amounts payable to the WD Trustee referred to in the immediately preceding sentence shall be subordinate to the lien to secure the payment of any amounts payment to an Indemnified Person referred to in the immediately preceding sentence.

3.9     ***Reliance by Persons Dealing with the WD Trust***.  Any Person dealing with the WD Trust may rely in good faith upon any certificate or other instrument signed by the WD Trustee, or upon any certificate or other instrument signed by any officer or agent of the WD Trust whose authority is evidenced by a certificate or other instrument signed by the WD Trustee, without the necessity of further inquiry by such Person into the authority of such WD Trustee, officer or agent to act on behalf of the WD Trust; ***provided***, ***however***, that disbursements or expenditures from the WD Trust made in respect of investments in accordance with Section 4.2 hereof and the investment policies duly adopted by the WD Trustee shall not require the approval of the District Court; and ***provided further*** that the WD Trustee may adopt by-laws concerning these matters that are more restrictive than the foregoing.

3.10     ***Actions by WD Trustee***.  Except as otherwise provided in this Agreement or as required by applicable law, all determinations by the WD Trustee shall be in accordance with this Agreement, the Plan, and the Wrongful Death Claim Resolution Procedures.

3.11     ***Bond***.  The WD Trustee shall be bonded in such amount as the Trustee or the Office of the United States Trustee (the "U.S. Trustee") shall reasonably request or, in the event of a dispute, as set by the Bankruptcy Court.

3.12     ***Duties***.  In all circumstances (except as set forth in this Agreement with respect to indemnification pursuant to Section 3.7 above), the WD Trustee shall act in the best interests of all WD Trust Beneficiaries and holders of Allowed Class 12 Claims and in furtherance of the purpose of the WD Trust, and shall use commercially reasonable efforts to dispose of the WD Trust Assets and to make timely distributions and not unduly prolong the duration of the WD Trust.

## ARTICLE 4

## FINANCIAL MANAGEMENT

4.1     ***Accounts; Segregation***.  The WD Trustee shall establish such funds and accounts with one of the financial institutions identified below for carrying out the purposes of the WD Trust.  The WD Trustee shall maintain a single account for the WD Trust Assets.

4.2     ***Investments***.  Investments of all assets, including monies, held in the WD Trust shall be administered in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs, and with the understanding that it is intended that distributions from the WD Trust to WD Trust Beneficiaries,

which will have the effect of liquidating and terminating the WD Trust, will commence immediately upon or soon after the Effective Date of the Plan and will be completed soon thereafter. The WD Trustee shall invest and reinvest the principal and income of the WD Trust and keep the funds of the WD Trust invested in interest-bearing accounts at an approved depository institution to be selected from the U.S. Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region One, dated May 18, 2015. Each account shall be treated as a single fund without distinction between principal and income. For purposes of this paragraph, "interest-bearing account" may include a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments, and maintenance of a constant $1.00 net asset value per share, to the extent the WD Trustee determines that such fund is consistent with provisions for investment set forth in Revenue Procedure 94-45 of the Internal Revenue Service ("IRS") or any successor guidance issued by the IRS. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the WD Trust as set forth herein. In investing, reinvesting, exchanging, selling and managing the WD Trust accounts, the WD Trustee shall discharge its duties with respect to said accounts solely in the interest of the accomplishment of the purposes and objectives of the WD Trust. Notwithstanding the foregoing, the WD Trustee shall make continuing efforts to make timely distributions and not unduly prolong the duration of the Trust, consistent with the limitations set forth in IRS Revenue Procedure 94-45 or any applicable successor authority.

4.3     *Trust Powers*.

(a)     Pursuant to the Confirmation Order, subject to the limitations set forth in this Agreement, and subject to the provisions and limitations of the Plan and the Wrongful Death Claim Resolution Procedures, the WD Trustee shall have the power to take any and all actions as, in the judgment and discretion of the WD Trustee, are necessary or advisable to effectuate the purposes of the WD Trust, including, without limitation, each power expressly granted in Section 4.3(b) of this Agreement and any power reasonably incidental thereto.

(b)     Without limiting the generality of Section 4.3(a) of this Agreement, and subject to the other provisions of this Agreement, the WD Trustee shall have the power:

(i)     to receive cash and other additions to the WD Trust assets from any source, provided such additions are made pursuant to the Plan, Confirmation Order or another order of the Bankruptcy Court, and to hold, administer, and distribute such additions as a part of the WD Trust assets;

(ii)     to invest and reinvest the funds of the WD Trust as provided in this Agreement;

(iii)     to rely upon any affidavit, certificate, letter, notice, telegram, or other paper, or upon any telephone conversation or other oral communication, believed by the WD Trustee to be genuine and sufficient and upon any other evidence believed by the WD Trustee to be genuine and sufficient, and to be protected and saved

harmless in respect of all payments or distributions made hereunder if made in good faith and without actual notice or knowledge of the changed condition or status of any person receiving payments or other distributions upon a condition;

(iv)    to indemnify the Indemnified Persons and employees and agents of the WD Trust, in accordance with Sections 3.7(a) and 3.8 hereof, to purchase insurance to effect such indemnification of the Estate Administrator, in accordance with such Sections 3.7(b) and 3.8 hereof, and to meet the obligations of the WD Trust under the Wrongful Death Claim Resolution Procedures;

(v)    to appoint such officers, hire such employees, and engage such legal, financial and other advisors and agents as are deemed necessary by the WD Trustee for the proper administration of the WD Trust and the Wrongful Death Claim Resolution Procedures (subject in all respects to the provisions and limitations of the Wrongful Death Claim Resolution Facility Procedures), and to compensate such officers, employees, advisers and agents for their services from the funds of the WD Trust;

(vi)    to enter into such other arrangements with third parties as are deemed by the WD Trustee to be useful in carrying out the purposes of the WD Trust (including, without limitation, engaging a financial institution and/or advisor to act as paying agent, depository, custodian or trustee with respect to funds, reserves or accounts created hereby or established pursuant hereto), and to compensate such third parties for their services;

(vii)    to institute any action or proceeding at law or in equity for the collection of the sums due the WD Trust, or otherwise to advance the interests of the WD Trust in a manner not inconsistent with the terms of the Plan or Confirmation Order, prosecute any such action or proceeding to judgment or final decree, enforce any such judgment or final decree, and collect in any manner provided by the law the monies adjudged or decreed to be payable; ***provided***, ***however***, that, regardless of any deficiency in the WD Trust or any other reason, the WD Trust may not institute any action or proceeding at law or in equity against the Debtor or against any other Person deemed to be released pursuant to the terms of Article 10 of the Plan, for the collection of any sums, other than as expressly provided for in the Plan, in respect of the Derailment Wrongful Death Claims, prosecute any such action or proceeding to judgment or final decree, or collect in the manner provided by law the monies adjudged or decreed to be payable;

(viii)    to assist with the administration of and effectuate the Wrongful Death Claim Resolution Procedures;

(ix)    to report to the Bankruptcy Court as described in Section 5.5 hereof; and

(x)    to do all other acts and things not inconsistent with the provisions of this Agreement, the Plan, the Confirmation Order, the Wrongful Death Claim Resolution Procedures which the WD Trustee may deem reasonably necessary or desirable for the proper management of the WD Trust, in the same manner and to the same extent as an individual might or could do with respect to his own property, subject to the limitations of applicable law governing the conduct of fiduciaries.

4.4    ***Accounting and Reporting***.

(a)    Until the WD Trust is terminated in accordance with this Agreement, as soon as practicable on or about the commencement of each fiscal year, the WD Trustee shall cause to be prepared budget and cash flow projections covering such fiscal year and such succeeding fiscal years for which the WD Trustee determines such projections are practicable and appropriate.

(b)    Until the WD Trust is terminated in accordance with this Agreement, the WD Trustee shall cause to be prepared at the end of each fiscal year an annual accounting containing financial statements of the WD Trust as of the end of such fiscal year, including, without limitation, a balance sheet of the WD Trust, a statement of receipts and disbursements, a statement of changes in net assets, and a supplementary schedule of investments and assets, listing both principal and income, reported on, subject to normal year-end adjustments, as to fairness of presentation in accordance with generally accepted accounting principles consistently applied, by the WD Trustee or by an accountant or financial officer or agent employed by the WD Trust.

(c)    Until the WD Trust is terminated in accordance with this Agreement, the WD Trustee shall cause to be prepared, within thirty (30) days of the end of each calendar quarter, a quarterly accounting containing (i) a report of all of the WD Trustee's significant activities related to the WD Trust and (ii) unaudited financial statements of the WD Trust as of the end of such quarter, including, without limitation, a balance sheet of the WD Trust, a statement of receipts and disbursements, including a statement of the compensation paid and expenses reimbursed to the WD Trustee for that quarter, a statement of changes in net assets, and a supplementary schedule of investments and assets, listing both principal and income, reported on, subject to normal year-end adjustments, as to fairness of presentation in accordance with generally accepted accounting principles consistently applied, by the WD Trustee or by an accountant or financial officer or agent employed by the WD Trust.

(d)      Upon the termination of the WD Trust in accordance with this Agreement, the WD Trustee shall cause to be prepared a final accounting consistent with terms of Section 4.4(b) hereof.

(e)      The WD Trustee shall deliver any and all reports he or she prepares, as and when prepared, pursuant to this Section 4.4 to the Estate Representative.

(f)      The WD Trustee shall cause the annual and quarterly accountings, as required by this Section 4.4, to be filed with the Bankruptcy Court.  The annual accountings, if any, shall be filed as soon as available, but in no event later than ninety (90) days following the end of each fiscal year.  The quarterly accountings, if any, shall be filed as soon as available, but in no event later than forty-five (45) days following the end of the quarter of the fiscal year to which such accounting relates.  The final accounting shall be filed as soon as available, but in no event later than forty-five (45) days after the date on which the WD Trust is terminated as provided herein.

## ARTICLE 5

## TAX MATTERS

5.1      *Income Tax Status*.  For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), this WD Trust shall be treated as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to Tax Code Sections 671-677.  The WD Trust shall at all times be administered so as to constitute a domestic trust for United States federal income tax purposes.  For all United States federal income tax purposes, all parties (including the Estate Representative, the WD Trustee, the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims) shall treat the transfer of the WD Trust Assets to the WD Trust as (a) a transfer of the WD Trust Assets (subject to any obligations related to those assets) directly to the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims, followed by (b) the transfer by such WD Trust Beneficiaries and Holders of Allowed Class 12 Claims of such WD Trust Assets to the WD Trust in exchange for beneficial interests in the WD Trust.   Accordingly, the WD Trust Beneficiaries and Holders of Allowed Class 12 Claims shall be treated for federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the WD Trust Assets.  All WD Trust Assets shall be treated solely as compensatory damages.

5.2      *Exemption from Transfer Taxes*.  Pursuant to section 1146(a) of the Bankruptcy Code, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from the Trustee, the Estate, the Post-Effective Date Estate or the Estate Representative to the WD Trust or any other Person or any government, governmental agency or any subdivision, department or other instrumentality thereof, pursuant to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other

11

documents without the payment of any such tax or governmental assessment. Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including but not limited to any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of the Plan) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

5.3     ***Tax Returns***.  The WD Trustee shall file returns for the WD Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 5.13 of the Plan.  The WD Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The WD Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the WD Trust that are required by any Governmental Unit.  WD Trust taxable income or loss shall be allocated pro rata based on the total of Allowed Claims of the WD Trust Beneficiaries at the end of the taxable year.  As soon as possible after the Effective Date, the WD Trustee shall make a good faith valuation of the WD Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Estate Representative, the WD Trustee, the WD Trust Beneficiaries and holders of Allowed Class 12 Claims) for all state and federal income tax purposes.  The WD Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the WD Trust that are required by any governmental unit.  The WD Trustee may request an expedited determination of taxes of the WD Trust under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the WD Trust for all taxable periods through the termination of the WD Trust.

5.4     ***Withholding of Taxes and Reporting Related to WD Trust Operations***.  The WD Trust Assets, as compensatory damages for Derailment Wrongful Death Claims, are not subject to withholding and the WD Trustee shall not be required to withhold any taxes or other amounts from distributions to WD Trust Beneficiaries.  The Confirmation Order shall absolve the WD Trustee of any such withholding duties or responsibilities.  To the extent that the operation of the WD Trust or the liquidation of the WD Trust Assets creates a tax liability imposed on the WD Trust, the WD Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the WD Trust payable without Bankruptcy Court order.

5.5     ***Valuation***.  As soon as possible after the Effective Date, the WD Trustee shall make a good faith valuation of the WD Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Estate Representative, the WD Trustee, WD Trust Beneficiaries and holders of Allowed Class 12 Claims) for all federal income tax purposes.  The WD Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the WD Trust that are required by any governmental unit.

5.6     ***Expedited Determination of Taxes***.  The WD Trustee may request an expedited determination of taxes of the WD Trust under Section 505 of the Bankruptcy Code for all returns

filed for, or on behalf of, the WD Trust for all taxable periods through the termination of the WD Trust.

## ARTICLE 6

## DISTRIBUTIONS

6.1     *Resolving Liens*.   Before disbursing any WD Trust Assets to a WD Trust Beneficiary, the WD Trustee shall ensure that any Liens that the WD Trustee has received notice of and which may attach to any such distribution have been resolved or have been otherwise satisfied.  To that end, the WD Trustee shall provide notice of the existence of any such Lien(s) to the WD Trust Beneficiary and, if applicable, his or her attorney, and it shall be the WD Trust Beneficiary's (or his or her attorney's) responsibility to resolve such Lien(s) against the WD Trust Beneficiary's anticipated distribution of WD Trust Assets within 120 days of notice from the WD Trustee.  If the Lien has not been settled or otherwise resolved within this 120-day time period, with the WD Trust Beneficiary's consent, the WD Trustee may retain a firm with experience in resolving liens to satisfy the WD Trust's Beneficiary's obligations as represented by the Lien(s).  Any payments made to resolve such Lien(s), together with the fees paid to the Lien resolution firm, shall be deducted from the WD Trust Beneficiary's distribution of WD Trust Assets prior to disbursement of the balance.  Subject to the foregoing provisions, any and all distributions to or for the benefit of WD Trust Beneficiaries shall be free and clear of any and all liens, security interests and encumbrances.

6.2     *Required Distributions*.

(a)     The WD Trustee shall distribute the proceeds of the WD Trust Assets strictly in accordance with this Plan, the Confirmation Order, the WD Trust Agreement and the Wrongful Death Claim Resolution Procedures, unless the Bankruptcy Court or the District Court, by Final Order, allows a deviation therefrom.  In connection with such distributions, and except as provided below in this section 6.2, the Trustee, the Post-Effective Date Estate and the Estate Representative shall have no responsibility or liability for (a) the creation, existence, operation or administration of the WD Trust; (b) any acts or omissions of the WD Trustee in administering the WD Trust; (c) any reimbursement and reporting obligations under applicable law or regulations; or (d) any payment or non-payment of Claims.  The WD Trust shall indemnify and hold harmless the Trustee, the Post-Effective Date Estate and the Estate Representative (but with recourse in all circumstances limited solely to the assets of the WD Trust, and without recourse to the WD Trustee personally or to any WD Trust Beneficiaries) from any and all claims, losses, causes of action, demands, liabilities, expenses, fees, including, but not limited to, attorneys' fees, and costs of any kind arising from or relating to (a) the creation, existence, operation or administration of the WD Trust; (b) any acts or omissions of the WD Trustee in administering the WD Trust; (c) any reimbursement or reporting obligations under applicable law or regulations; or (d) any payment or non-payment by the WD Trust to any WD Trust Beneficiary.  Prior to making any distribution from the WD Trust, the WD Trust shall retain sufficient funds to meet the fees, costs and expenses of the WD Trust.

(b)     After having given the WD Trust Beneficiary fifteen (15) days' prior written notice of his intention to proceed with distribution, the WD Trustee in making any

distribution to a Holder of a Derailment Wrongful Death Claim may pay to any lawyer or counsel for such Holder any fees due to such lawyer or counsel, including, without limitation, any contingent fees due and owing to such lawyer or counsel; distributions to any WD Trust Beneficiary who is represented by an attorney as established by documentary evidence satisfactory to the WD Trustee shall be made separately to the attorney (for fees) and to the WD Trust Beneficiary (for the net distribution) unless the WD Trust Beneficiary instructs the WD Trustee in writing to issue such payment jointly to the WD Trust Beneficiary and the attorney (or law firm) or to deliver such entire payment to such attorney (or law firm), for later distribution of the net amount to such WD Trust Beneficiary client by such attorney or firm.  If a WD Trust Beneficiary is not represented by an attorney, all distributions shall be made directly to the WD Trust Beneficiary.  Notwithstanding anything to the contrary in the foregoing it is further *provided*, *however*, that:

(i)  no payment or distribution of any kind shall be made to any lawyer or counsel allegedly representing the Holder of a Derailment Wrongful Death Claim unless such lawyer or counsel presents to the WD Trustee an executed engagement letter or other document that entitles such lawyer or counsel to such fees or distribution, including any contingent fee (a "Derailment Wrongful Death Client Engagement Letter"), *provided*, for the avoidance of doubt, that the Representation Order entered by the Quebec Superior Court on or about April 4, 2014 in the CCAA Case (the "Representation Order") together with any order assessing counsel fees pursuant thereto, shall also constitute a Derailment Wrongful Death Client Engagement Letter; and

(ii)  no such distribution or payment shall be made by the WD Trustee if: (i) the Derailment Wrongful Death Client Engagement letter has been held to be invalid or inoperative by a final order or ruling entered in any proceeding (including an administrative proceeding) initiated by a party with standing (as defined below) disputing the rights of such lawyer or counsel to fees before any court, administrative tribunal or other forum with jurisdiction over such agreements, in the United States or Canada (collectively a "Proceeding"), in which there was a challenge to the validity or operation of the Derailment Wrongful Death Client Engagement Letter; or (ii) any Proceeding is pending in which there is a challenge to the validity or operation of the Derailment Wrongful Death Client Engagement Letter, unless and until such Proceeding has been concluded by a final order or ruling in favor of the lawyer or counsel involved, and then the distribution to the lawyer or counsel shall be limited by the terms of any such final order or ruling issued in such Proceeding, to the extent such order or ruling contains any such limitations.

For the purposes of subparagraph (b)(ii) above, "party with standing" shall be limited to (x) the individual Holder of a Derailment Wrongful Death Claim in his or her capacity as a client or alleged client (or the parent or guardian of such client or alleged client, if a minor), or (y) any bar-affiliated or governmental entity that regulates the practice of law and is granted such

standing as a matter of a governing statute or rule.  Neither Class Counsel nor U.S. Counsel (each as defined below), shall be a "party with standing" for purposes of that section, whether or not such counsel holds a power of attorney or like document for such client, and, similarly, the Creditors Committee and its counsel shall not be a "party or parties with standing" under that provision.  Holders of Derailment Wrongful Death Claims involved in a Proceeding shall receive the portion of their distributions on account of their Derailment Wrongful Death Claim not in dispute in such Proceeding at the same time and in the same manner as the Holders of other Derailment Wrongful Death Claims not involved in a Proceeding.

For the sole purpose of determining any contingent fee due, all Distributions to a WD Trust Beneficiary shall constitute and be deemed Distributions through and on account of the Derailment Wrongful Death Claims, if any, of the decedent's estate representative pursuant to which such WD Trust Beneficiary is to receive payment under the Wrongful Death Claim Resolution Procedures, and subject to any contrary terms of any applicable engagement agreement or any other documentation that is acceptable to the WD Trustee, counsel to such decedent's estate representative shall be entitled to payment based upon the aggregate payment to WD Trust Beneficiaries who take or are deemed by this paragraph to take through such estates; *provided*, *however*, that application of this paragraph shall be subject to sub-paragraphs (b)(i) and (b)(ii) above and shall not result in the payment by any WD Trust Beneficiary of a fee, contingent or otherwise, to more than one attorney or law firm; and the amount of any contingent fee payable on account of any estate (and the WD Trust Beneficiary's taking through such estate) to U.S.-based counsel to the Holders of Derailment Wrongful Death Claims ("U.S. Counsel") will be calculated by first excluding any distributions (including fees) payable to Holders of Derailment Wrongful Death Claims represented solely by counsel appointed pursuant to the Representation Order (the "Class Representatives") and counsel appointed therein ("Class Counsel") pending in the Québec Superior Court, and no other fees contingent or otherwise shall be payable on such distributions.  For the purposes of this section, a Holder of a Derailment Wrongful Death Claim shall be deemed to be solely represented by the Class Representatives and Class Counsel only if such Holder has (i) not delivered a notice of opt-out from representation in accordance with the Representation Order; (ii) has not signed an engagement agreement, engagement letter, power of attorney or similar document specifying terms of representation with U.S. Counsel; and (iii) has not filed a proof of claim in the Chapter 11 Case, prior to the Claims Bar Date, which designates U.S. Counsel (including local counsel in Bangor, Maine) as such Holder's counsel.  For purposes of this section, such a proof of claim can constitute a Derailment Wrongful Death Client Engagement Letter, subject to any necessary terms of engagement being established by evidence satisfactory to the WD Trustee.  Any dispute arising under this section 5.10, including any objection of any person or party to a determination by the WD Trustee as to legal representation or payment of fees (collectively, "Representation Disputes") shall be determined exclusively by *de novo* review before the Bankruptcy Court, subject, however to subparagraph (b)(ii) above in this section.

(c)     Prior to making any WD Trust Distribution, the WD Trustee shall retain sufficient funds to meet the fees, costs and expenses of the WD Trust, including the following:

(i)     The WD Trustee, in consultation with the Estate Representative, shall retain sufficient funds to meet the reasonably anticipated

15

indemnification expenses of the WD Trust as provided in Section 3.7 hereof;

(ii)    The WD Trustee shall retain sufficient funds to pay all the fees and expenses of the WD Trust, including the WD Trustee's fees and expenses;

(iii)   The WD Trustee shall retain sufficient funds as are reasonably calculated to meet the ongoing expenses of the WD Trust, including any anticipated tax liabilities of the WD Trust, until termination pursuant to Section 7.4 hereof; and

(iv)   The WD Trustee shall retain sufficient funds to pay all fees and expenses actually incurred or reasonably anticipated to be incurred in implementing the Wrongful Death Claim Resolution Procedures.

The net monies in the WD Trust after the amounts required to be paid or retained therefrom in accordance with Section 6.2(c)(i)-(v) above have been so paid or retained shall be referred to as the "Net Trust Proceeds."

(d)     As soon as practicable after the Effective Date of the Plan, the WD Trustee shall (i) distribute to or for the benefit of WD Trust Beneficiaries and holders of Allowed Class 12 Claims such amounts from the Net Trust Proceeds as may be determined by the WD Trustee to be paid to or for the benefit of any WD Trust Beneficiary or holder of an Allowed Class 12 Claim in accordance with the Wrongful Death Claim Resolution Procedures.

(e)     The WD Trustee shall make all distributions of income at least annually; *provided*, *however*, that the Trustee may retain income to maintain the value of the WD Trust Assets or to pay claims and liabilities, including contingent liabilities and contested Claims, of the WD Trust.

6.3    ***Payment of the Derailment Wrongful Death Claims; Distribution to Minors***.

(a)     Payments shall be made to a WD Trust Beneficiary from the Net Trust Proceeds in accordance with the Wrongful Death Claim Resolution Procedures.

(b)     In accordance with the Wrongful Death Claim Resolution Procedures, the WD Trustee shall use reasonable efforts to confirm the identity of each WD Trust Beneficiary in relation to the relevant decedent prior to making distributions to any given WD Trust Beneficiary.  In the event that the WD Trustee is not, in his or her reasonable judgment, satisfied with evidence of the identity of any WD Trust Beneficiary, the WD Trustee may determine to withhold distributions to such WD Trust Beneficiary, and such WD Trust Beneficiary may adjudicate the disputed before the Bankruptcy Court.

(c)     Payment on account of a Claim of a WD Trust Beneficiary shall also constitute and be deemed payment on account of the Claims, if any, of the decedent's estate under which such WD Trust Beneficiary's Claim arises, and counsel to such decedent's estate

16

representative shall be entitled to payment based upon the aggregate payment to WD Trust Beneficiaries who take through such estates.

(d)     If the WD Trust Beneficiary is a minor, the WD Trustee shall withhold and reserve payment of the allocated distribution to such minor WD Trust Beneficiary until the WD Trustee receives notice that the District Court has approved said distribution to said minor WD Trust Beneficiary in accordance with the terms and procedures set forth in Section 5.14 of the Plan, and the WD Trustee shall make payment of the distribution to the minor WD Trust Beneficiary in the manner ordered by the District Court pursuant to Section 5.14 of the Plan.

(e)     The WD Trustee shall notify the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor of the proposed distribution to such minor.     Such parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor shall move for approval of the allocation within ninety (90) days of his or her notification by the WD Trustee of the proposed distribution.

(f)     In the event that the parent, guardian, guardian ad litem, adult spouse, next friend, or other representative of the minor does not so move for approval of the allocation within ninety (90) days of his or her notification by the WD Trustee of the proposed distribution, the WD Trustee shall submit the proposed distribution to the holder to the District Court for approval in accordance with 14 M.R.S.A. §1605 and request that the District Court hold a hearing on the petition, and the petitioner and the Allowed Class 12 Claim Holder may attend any such hearing.

(g)     The WD Trustee shall request that the District Court determine whether the proposed distribution is in the Allowed Class 12 Claim Holder's best interests and, if the proposed distribution is approved, that determination shall be embodied in an order which shall have the effect of a judgment.  Upon approval of the proposed distribution to such Holder of an Allowed Class 12 Claim, the WD Trustee shall request that the District Court authorize payment to the counsel of the minor, if any, of fees and disbursements to be paid from the distribution and further shall order that the remainder of the distribution be distributed in a manner that will best protect the interest of the minor.

(h)     The WD Trustee shall issue a Form 1099, any form required to be issued under federal law to non-United States residents, and any for required to be issued under Canadian law, as applicable, to each unrepresented WD Trust Beneficiary and holders of Allowed Class 12 Claims that receives a distribution pursuant to this Agreement in the amount of such distribution.

6.4   *Satisfaction of Class 12 Claims*.   The WD Trustee shall make all payments required to be paid to Holders of Allowed Class 12 Claims under the Plan in accordance with the terms and conditions of the WD Trust Agreement, the Wrongful Death Claim Resolution Procedures, and the Plan.  If, and only if, the WD Trustee has made all distributions to WD Trust Beneficiaries permitted under the Wrongful Death Claim Resolution Procedures, then the WD Trustee shall transfer any surplus WD Trust Assets to the Disbursing Agent, who shall then distribute to the holders of Allowed Class 13 Claims their Pro Rata share of the remaining Cash, if any, of the WD Trust until such Class 13 Claims are paid in full.  For the avoidance of doubt,

17

nothing in this Agreement, the Plan or the CCAA Plan shall limit or cap the recoveries available to victims of the Derailment outside the Plan and this Agreement as against parties other than Released Parties including, without limitation, under the laws of the State of Illinois or the State of Texas.

6.5     ***Delivery of Distributions; Undeliverable Distributions; Uncashed Checks***.

(a)     In the event that any distribution to any WD Trust Beneficiary or holder of an Allowed Class 12 Claim is returned as undeliverable, no further distributions to such WD Trust Beneficiary or holder of an Allowed Class 12 Claim shall be made unless and until the WD Trustee is notified of such WD Trust Beneficiary's, his or her attorney's, or holder of an Allowed Class 12 Claim's, as applicable, then-current address, at which time all missed distributions shall be made to such WD Trust Beneficiary, his or her attorney, or such holder of an Allowed Class 12 Claim, as applicable, without interest. All demands for undeliverable distributions shall be made on or before one hundred and eighty (180) days after the date such undeliverable distribution was initially made. Thereafter, the amount represented by such undeliverable distribution shall irrevocably revert to the WD Trust, and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the WD Trust, the Trustee, the Estate Representative, the Post-Confirmation Estate, and the Debtor and its property.

(b)     In the event that any distribution to any WD Trust Beneficiary or holder of an Allowed Class 12 Claim remains uncashed for one hundred and eighty (180) days, the amount represented by such undeliverable distribution shall irrevocably revert to the WD Trust, and any Claim in respect of such uncashed distribution shall be discharged and forever barred from assertion against the WD Trust, the Trustee, the Estate Representative, the Post-Confirmation Estate, and the Debtor and its property.

6.6     ***De Minimus Distributions***. The WD Trustee shall not be required to, but may in his sole and absolute discretion, make distributions to any WD Trust Beneficiary or holder of an Allowed Class 12 Claim of Cash in an amount less than twenty-five ($25) dollars. When distributions do not reach the $25 payment threshold, such payment that would have been made will be reserved for the benefit of such WD Trust Beneficiary or holder of an Allowed Class 12 Claim until subsequent distribution(s), if any, exceed the threshold on a cumulative basis.

6.7     ***WD Trust Beneficial Interests Are Not Securities***. Beneficial interests in the WD Trust shall not constitute "securities" and shall not be registered pursuant to the Securities Act of 1933, as amended, or any state securities law. However, if it should be determined that beneficial interests in the WD Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code shall apply to the WD Trust Beneficial Interests.

6.8     ***Rights of WD Trust Beneficiaries***. Each WD Trust Beneficiary shall be entitled to participate in the rights and benefits due to a WD Trust Beneficiary hereunder and under the Plan on account of its Allowed Class 12 Claim. Each WD Trust Beneficiary shall take and hold the same, subject to all the terms and conditions of the Plan and this Agreement. The interest of a WD Trust Beneficiary is hereby declared and shall be, in all respects, personal property.

18

# ARTICLE 7

## GENERAL PROVISIONS

7.1   ***Irrevocability***.   The WD Trust is irrevocable.   Neither the Debtor nor the Contributing Parties, nor any affiliate thereof, may hold any beneficial interest in the income or corpus of the WD Trust.

7.2   ***Plan and Confirmation Order Control***.   To the extent of any inconsistency between this Agreement and the Plan, the Plan shall control.   To the extent of any inconsistency between this Agreement and the Confirmation Order, the Confirmation Order shall control.

7.3   ***Recordation***.   This Agreement shall be recorded in such places as the WD Trustee shall deem necessary or advisable.

7.4   ***Termination***.   The WD Trust shall terminate automatically upon the date on which the Derailment Wrongful Death Claims have been finally allowed, disposed of and paid out, the payments identified in Sections 6.2 and 6.3 hereof have been made and the WD Trustee has certified that, in his/her judgment, the purposes of the WD Trust have been fulfilled, but in no event shall the WD Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the WD Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the WD Trust Assets.

If at any time the WD Trustee determines, in reliance upon such professionals as the WD Trustee may retain, that the expense of administering the WD Trust so as to make a final distribution to WD Trust Beneficiaries or holders of Allowed Class 12 Claims is likely to exceed the value of the assets remaining in the WD Trust, the WD Trustee may (a) reserve any amount necessary to dissolve the WD Trust, (b) donate any balance to a charitable organization (i) described in section 501(c)(3) of the Tax Code, (ii) exempt from United States federal income tax under section 501(a) of the Tax Code, (iii) not a "private foundation", as defined in section 509(a) of the Tax Code, and (iv) that is unrelated to the Debtor, the WD Trust, and any insider of the WD Trustee, and (c) dissolve the WD Trust.

7.5   ***Severability***.   Should any provision of this Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Agreement.

7.6   ***Headings***.   The headings used in this Agreement are inserted for convenience only and shall not affect the construction of any provisions of this Agreement.

7.7   ***Amendment***.   When necessary to carry out the purposes of the WD Trust, this Trust Agreement may be amended by an instrument signed by the WD Trustee and Estate Representative (if any); ***provided***, ***however***, that any such amendment must be consistent with

the Plan; and ***provided further***, that any such amendment that affects the rights of WD Trust Beneficiaries in a material way shall become effective only with the approval of the Bankruptcy Court, and after such notice and hearing as the Bankruptcy Court may direct.

7.8     ***Governing Law***.    The laws of the State of Delaware shall govern the interpretation and validity of the provisions of this Agreement and all questions relating to management, administration and investment of the WD Trust and the WD Trust Assets; ***provided***, ***however***, that the foregoing shall not determine choice of law with respect to the assertion of claims against parties other than the Released Parties.

7.9     ***Notice to WD Trustee***.    All notices, requests, and demands to or upon the WD Trustee to be effective shall be in writing (including by facsimile transmission or electronic mail) and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission or electronic mail, when received and telephonically confirmed, addressed to the WD Trustee at the following address:

> 2001 Park Place North
> 1000 Park Place Tower
> Birmingham, AL 35203

7.10     ***Retention of Jurisdiction***. Except as to matters that are reserved to District Court as provided herein and to the extent the reference to the Bankruptcy Court has properly been withdrawn, the Bankruptcy Court shall retain exclusive jurisdiction over any action or proceeding arising out of or relating to this Agreement or the WD Trust, and all claims in respect of such action or proceeding may be heard and determined in such Court.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as an instrument under seal as of _____, 2015.

TRUSTEE


_____
Robert J. Keach, as chapter 11 trustee of the Debtor



WD TRUSTEE


_____
Joe R. Whatley, Jr.