**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

_____

**BAP NO. EB 16-015**

_____

**Bankruptcy Case No. 13-10670-PGC**

_____

**MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,**
**Debtor.**

_____

**ROBERT J. KEACH, Chapter 11 Trustee,**
**Appellant,**

**v.**

**NEW BRUNSWICK SOUTHERN RAILWAY COMPANY LIMITED**
**and MAINE NORTHERN RAILWAY COMPANY,**
**Appellees.**

_____

**Appeal from the United States Bankruptcy Court**
**for the District of Maine**
**(Hon. Peter G. Cary, U.S. Bankruptcy Judge)**

_____

**Before**
**Feeney, Deasy, and Harwood,**
**United States Bankruptcy Appellate Panel Judges.**

_____

**Robert J. Keach, Esq., and Lindsay K. Zahradka, Esq., on brief for Appellant.**

**Alan R. Lepene, Esq., and Keith J. Cunningham, Esq., on brief for Appellees.**

_____

**October 21, 2016**

_____

**Feeney, Chief U.S. Bankruptcy Appellate Panel Judge.**

Robert J. Keach, the former chapter 11 trustee (the "Appellant"),[1] appeals the bankruptcy court's February 26, 2016 order (the "Order") overruling in part his objections to certain proofs of claim filed by New Brunswick Southern Railway Company Limited ("NBSR") and Maine Northern Railway Company ("MNR" and, collectively with NBSR, the "Irving Railroads"). The Appellant appeals the bankruptcy court's ruling that the Irving Railroads' claims qualified as so-called "six months claims" entitled to priority under § 1171(b).[2]   For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

### I.      Pre-Bankruptcy Events

From January 2003 until May 2014, Montreal, Maine & Atlantic Railway, Ltd. ("MMA") owned and operated an integrated, international shortline freight railroad system with its wholly owned Canadian subsidiary, Montreal, Maine & Atlantic Canada Co.[3]   This railroad system included 510 route miles of track in Maine, Vermont, and Québec, and was a substantial component of the rail transportation systems in northern Maine, northern New England, Québec,

---

[1]   The Appellant states that in accordance with the Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015 (as amended on October 8, 2015) (the "Plan"), upon the effective date of the Plan (which occurred on December 22, 2015), he is no longer the chapter 11 trustee of the bankruptcy estate, but is the Estate Representative of the Post-Effective Date Estate (as defined in the Plan).   He further states that, as the Estate Representative, he acquired all rights and duties with respect to the prosecution of this appeal and its underlying claims.   The appellees do not challenge these averments.

[2]   Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq.

[3]   MMA was formed in 2003 to acquire the assets of the Bangor & Aroostook Railroad Company and its affiliated railways ("Bangor & Aroostook") from their bankruptcy estates.   MMA commenced rail operations in January 2003.

and New Brunswick.   Among other things, it provided the shortest rail transportation route between Maine and Montréal, and was a "critical rail artery" between St. John, New Brunswick and Montréal.   In order to provide freight transportation services to customers throughout the system, MMA interchanged freight traffic with other railroads, including the Irving Railroads, with which its operations were interconnected.

### A.    The Interline Settlement System

MMA, like most railroads, participated in the Interline Settlement System (the "ISS"). The ISS provides a central clearing house for all participating railroads involved in the interchange of freight traffic among multiple rail carriers to settle accounts receivable and accounts payable arising from the interchange of such traffic.   Railroads participating in the ISS that originate traffic are known as "billing" or "originating" railroads and invoice the customer for all freight charges from the point of origin to the point of destination, even if the shipment is interchanged with other railroads along the route.   The customer is responsible for paying the billing railroad the entire invoice, and the billing railroad is responsible for paying the other railroads involved in the shipment along the line for their share of the freight charges.   Railroads participating in the ISS calculate on a monthly basis the accounts receivable and accounts payable arising from the interchange of traffic that are due and owing to each participant, and the payment of the net amount due and owing is made on the second business day of each month. One of the benefits of participating in the ISS is that billing railroads are obligated to pay the other participating railroads regardless of whether the customer pays the billing railroad.

### B.    The Relationship between MMA and the Irving Railroads

The business relationship between MMA and the Irving Railroads began in January 2003,

when MMA entered into a Commercial Agreement (the "Commercial Agreement") with NBSR

and one of NBSR's affiliates, Eastern Maine Railway Company ("EMR"),[4] setting forth various

terms and conditions governing the interchange of freight traffic between MMA and the Irving

Railroads.   Pursuant to the Commercial Agreement and a separate Interchange Agreement

between MMA and EMR, the Irving Railroads and MMA agreed to interchange freight traffic at

MMA's Brownville Junction Yard in Maine.   Section 2 of the Commercial Agreement, entitled

"Performance of Transportation Services," provided as follows:

> The parties agree that from and after the Effective Date, EMR/NBS[R] shall move
> loaded freight cars and associated empty cars between points located on its lines
> or reached by it under Canadian interswitch rules and Brownville Junction at rates
> as set out in this Agreement.   MMA shall act as the interline tariff carrier on a
> junction settlement basis.   By "junction settlement basis" the parties mean that
> MMA shall negotiate through rates and make contracts and provide quotations,
> and shall be responsible for car supply to the extent requested by NBS[R] and
> reasonably available from MMA and in rail cars customarily supplied by railroad
> carries, all in accordance with the provisions of this Agreement.   MMA shall
> continue to render one freight bill, and assess and collect the total amount of
> freight charges . . . and remit the portion pertaining to EMR/NBS[R's]
> transportation services to EMR/NBS[R] in accordance with the procedures in this
> Agreement.

At the evidentiary hearing described below, and while addressing the freight carried by

MMA to the interchange point with the Irving Railroads, Ian Simpson, general manager of the

Irving Railroads, explained that the interchange of freight traffic involved the decoupling of

---

[4]  NBSR operated various railroad lines in New Brunswick.   EMR operated a railroad line in Maine
which connected with NBSR's lines.   EMR is a "sister company" of NBSR.

freight cars from MMA's locomotives and connecting them to the Irving Railroads' locomotives, which then carried the freight cars to their final destination.

The Irving Railroads did not participate in the ISS.[5]   As a result, pursuant to the Commercial Agreement, MMA acted as the billing railroad when either of the Irving Railroads originated traffic and interchanged with MMA, as well as when MMA originated traffic and interchanged with either of the Irving Railroads.   MMA also collected from the ISS freight revenue attributable to freight services provided by the Irving Railroads in connection with shipments originated by other carriers that were interchanged by such carriers with MMA and then by MMA with the Irving Railroads.   Periodically, MMA and the Irving Railroads settled their accounts payable and receivable as between themselves.   Other than certain amounts for repair of cars owned or leased by MMA, the Irving Railroads' claims, as described below, arose from MMA's collection of funds either from customers or through the ISS and its failure to pay amounts due to the Irving Railroads.

## C.       The "Payment Swap" Arrangement

At the time MMA and the Irving Railroads began doing business, Karl Hansen, general manager of Corporate Credit and Finance for the Irving Railroads and their affiliated companies, had concerns MMA would not be able to pay the Irving Railroads due to the troubled history of MMA's predecessor, Bangor & Aroostook.   As a result, the Irving Railroads, together with certain of their affiliated paper companies, Irving Pulp and Paper, Limited, Irving Paper Limited,

---

[5]   According to Mr. Simpson, the Irving Railroads did not participate in the ISS for several reasons, including lack of resources and the existence of relationships with other carriers that rendered participation in the ISS unnecessary.   He also testified the decision not to participate in the ISS was not influenced in any way by the credit worthiness of MMA.

and J.D. Irving, Limited (collectively, the "Irving Paper Companies"), which were among MMA's largest customers, agreed with MMA on a process to settle their respective accounts receivable and accounts payable by concurrently exchanging payments through wire transfers of amounts owed to each other.   Included in this "payment swap" arrangement[6] were: (1) accounts payable owed by the Irving Paper Companies to MMA for freight services provided by MMA to the Irving Paper Companies; (2) accounts payable owed to MMA by the Irving Railroads for interline freight services provided by MMA; and (3) accounts receivable owed by MMA to the Irving Railroads for interline freight services provided by them.   Under this arrangement, the parties would determine, based upon the payment terms in effect between them, the amounts due from the Irving Railroads and the Irving Paper Companies to MMA, and the amounts due from MMA to the Irving Railroads, and then concurrently exchange cash payments in the agreed upon amounts.   Initially, the amounts owed to MMA by the Irving Railroads and the Irving Paper Companies each week greatly exceeded the amounts owed by MMA to the Irving Railroads. Mr. Hansen explained the reason for entering into this arrangement as follows: "I was determined that I was not going to take a credit risk, I was not relying on their credit to [e]nsure we got paid."

---

[6]   The Appellant characterizes this arrangement as a "triangular setoff," contending the Irving Paper Companies would "withhold payment" on MMA's accounts receivable until MMA agreed to pay the Irving Railroads and, therefore, those payments acted as "collateral for . . . a secured credit relationship." The Irving Railroads disagree with that characterization, contending they concurrently exchanged wire transfers of cash with MMA on the settlement date and, therefore, the arrangement was a "cash swap." The bankruptcy court referred to the arrangement as a "weekly payment swap system," finding the transfers were done "virtually simultaneously."   At the hearing, Mr. Hansen testified that if MMA did not pay, he would have "held the wire" but he would not have offset the amount owed by MMA from the amounts the Irving Paper Companies owed MMA because it was "too messy" from an accounting perspective.

### D.    The Agreement Regarding Oil Shipments

The payment swap arrangement worked well until the volume of crude oil shipments carried by MMA and interchanged with the Irving Railroads for delivery to refineries in St. John, New Brunswick began to increase significantly in 2012.   In the two years leading up to the bankruptcy filing, MMA benefited from the increased use of trains to move oil from the central and western regions of the United States to refineries in the east.   United States and Canadian oil drillers were producing oil faster than the new pipelines could be built, and trains were needed to transport crude oil to refineries.   During this time, MMA was hauling 500,000 barrels of oil monthly through Québec and Maine.   For the majority of such oil shipments, the originating railroad was Canadian Pacific Railway Company and its affiliates ("CP"), which participated in the ISS.   CP was the first railroad to haul the oil, and the shipment would then travel across the country over a number of railway lines until it eventually interchanged with MMA.   MMA would haul the oil over its lines and then interchange the freight with the Irving Railroads, which delivered the oil to its final destination at the Irving Oil refinery in St. John, New Brunswick.[7]

The payments for the oil shipments were processed through the ISS.   Because the Irving Railroads were not members of the ISS, they could not collect from the ISS for their share of freight interline charges.   Rather, the ISS paid MMA, and MMA paid the Irving Railroads pursuant to the terms of their payment arrangement.

Typically, MMA did not receive payments through the ISS until 45 to 60 days following the shipments.   Under the terms of payment in effect with the Irving Railroads, however, MMA

---

[7]  It is undisputed that Irving Oil is not affiliated with the Irving Railroads or the Irving Paper Companies.

was obligated to pay the Irving Railroads its share of the freight charges for oil shipments within 33 days of shipment.   This was not a problem when the Irving Paper Companies owed MMA more than MMA owed them.   But eventually, due to the significant increase in oil shipments carried by MMA and interchanged with the Irving Railroads for delivery to St. John, New Brunswick, the amounts owed by MMA for interline freight services provided by the Irving Railroads began to exceed the amounts owed by the Irving Paper Companies to MMA, and MMA did not have enough cash to make the simultaneous payments under the swap arrangement.

In order to address this situation, in July 2012, the parties agreed MMA would pay the Irving Railroads for their share of freight charges earned in connection with oil shipments promptly upon MMA's receipt of payment from the ISS, and in no event later than five days thereafter.   According to the Irving Railroads, the amounts owed to them for interline freight charges incurred in connection with oil shipments were "carved out of the swap arrangement, and instead, those charges would be paid to the Irving Railroads upon MMA's receipt of payment from the ISS of the amounts owed to MMA for such shipments."   As to "local" shipments (those which were originated either by MMA and interchanged with the Irving Railroads, or those originated by the Irving Railroads and interchanged with MMA), the swap arrangement remained in effect.

## II.      The Derailment and MMA's Bankruptcy Filing

On July 6, 2013, an unmanned train operated by MMA containing 72 tank cars filled with crude oil derailed in Lac-Mégantic, Québec, causing several large explosions, the death of 47 people, and significant property and environmental damage.   After the derailment, train activity was temporarily halted between Maine and Québec, resulting in the immediate loss of most of MMA's freight business and a drastic fall in MMA's gross revenues.

On August 7, 2013, MMA filed a chapter 11 petition in the U.S. Bankruptcy Court for the District of Maine, and the Appellant was subsequently appointed as the chapter 11 trustee.   On January 24, 2014, the bankruptcy court entered an order approving the sale of substantially all of MMA's assets as a going concern to Railroad Acquisition Holdings LLC.   The sale of MMA's assets closed on May 15, 2014.

On June 13, 2014, MNR and NBSR timely filed proofs of claim (collectively, the "Claims").[8]   In Claim 259-1, NBSR asserted claims in the aggregate amount of $2,164,471.30 arising from "[f]reight services provided to [MMA] in connection with interline rail shipments." Of the total amount claimed, NBSR asserted not less than $1,971,834.67 was "secured by equitable liens against all property of [MMA] under the Six Month[s] Rule applicable in federal court receiverships, and [we]re entitled to priority pursuant to 11 U.S.C. § 1171(b)," because such claims: (1) related to current operating expenses incurred by MMA that were necessary for

---

[8]   MNR also filed Proof of Claim No. 242-1, which was identical to Claim 257-1, and NBSR filed Proof of Claim 243-1, which was identical to Claim 259-1.   The Appellant objected to Claim Nos. 242-1 and 243-1 on the grounds that they were duplicate claims and should be disallowed in their entirety.   Prior to the hearing on the Appellant's objection, MNR and NBSR withdrew the duplicate claims.   Therefore, they were not at issue before the bankruptcy court, and are not at issue in this appeal.

the on-going operation of MMA's railroad; (2) were incurred within six months prior to the commencement of MMA's bankruptcy case; and (3) were for services provided by NBSR with the expectation they would be paid out of current operating revenue and not in reliance on MMA's general credit.

In Claim 257-1, MNR asserted claims in the aggregate amount of $355,101.19 arising from "[f]reight services provided to [MMA] in connection with interline rail shipments."  Of the total amount claimed, MNR asserted approximately $167,228.89 was entitled to priority under § 1171(b) for the same reasons advanced by NBSR in Claim 259-1.

On July 16, 2015, the Appellant filed the Plan and Revised First Amended Disclosure Statement ("Disclosure Statement").[9]  The Irving Railroads objected to confirmation of the Plan arguing, among other things, that it failed to provide the same treatment for allowed § 1171(b) claims as it provided for administrative expense claims—i.e., payment in full following confirmation of the Plan.

On October 9, 2015, the bankruptcy court entered an order confirming the Plan ("Confirmation Order").  The Confirmation Order provided, in relevant part:

> In resolution of the [Irving Railroads'] Objection, any 1171(b) Claims of the [Irving Railroads] shall be paid in full, in Cash, on the later of the Initial Distribution date or thirty (30) days after the date such Claims become Allowed Claims.  In the event the Bankruptcy Court has not determined, prior to the Initial Distribution Date, the existence of and/or the amount of any Allowed 1171(b) Claims of the [Irving Railroads], if any, as of such date, the Trustee shall set aside, and not distribute pending further order of the Bankruptcy Court making such determination, $2,139,063.56 to secure any payment, to the extent required, with respect to such Allowed 1171(b) Claims, when and if determined.

---

[9]  In the Disclosure Statement, the Appellant indicated that the Plan was a plan of liquidation of MMA's assets, as well as a plan which created and distributed a substantial settlement fund for the benefit of all victims of the derailment.

On October 19, 2015, the Appellant filed an objection to the Claims (the "Claims

Objection"), on the ground they were improperly asserted as priority claims and should be

allowed only as general unsecured claims.    Specifically, the Appellant argued, "as a matter of

controlling law in this circuit," pre-petition interline freight claims of the type asserted by the

Irving Railroads are general unsecured claims and do not qualify as six months claims entitled to

priority under § 1171(b), citing In re Boston & Maine Corp., 600 F.2d 307 (1st Cir. 1979)

("Boston & Maine I").    The Appellant also argued, in furnishing services to MMA, the Irving

Railroads relied—not on MMA's operating revenues at the time the service was provided—but

upon MMA's general credit and, as a consequence, their claims were not entitled to priority as

§ 1171(b) claims, citing In re Boston & Maine Corp., 634 F.2d 1359 (1st Cir. 1980) ("Boston &

Maine II").

In their response ("Irving Railroads' Response"), the Irving Railroads argued Boston &

Maine I was not applicable or controlling law on the issue because the court did not decide, or

even address, the issue of whether interline freight claims qualify as six months claims entitled to

priority in a railroad reorganization; rather, Boston & Maine I only addressed the question of the

timing of the payment of such claims.    The Irving Railroads also contended the question of

whether the interline freight claims asserted in Boston & Maine I were entitled to treatment as

priority claims under the plan of reorganization was addressed by the U.S. Court of Appeals for

the First Circuit in the subsequent case of Boston & Maine II.    According to the Irving

Railroads, in Boston & Maine II, the First Circuit reversed a decision of the district court ruling

those claims should be treated as general unsecured claims, holding instead that per diem claims,

such as those asserted by the interlining railroads, constituted six months claims entitled to

11

priority, if such claims: (1) represented a current operating expense necessarily incurred; (2) were incurred within six months before the reorganization petition was filed; and (3) the goods or services were delivered in the expectation that they would be paid for out of current operating revenues of the railroad, and not in reliance on the railroad's general credit.   And, the Irving Railroads maintained, the evidence clearly established the Claims satisfied the test articulated in Boston & Maine II.

On November 19, 2015, the parties filed stipulations with respect to the Claims Objection, in which they stipulated to certain facts and agreed the only issue to be addressed at the hearing on the Claims Objection was whether the Claims qualified as six months claims entitled to priority under § 1171(b); the amount of such Claims would be determined at a subsequent hearing, if required.

On November 20, 2015, the bankruptcy court held an evidentiary hearing during which Mr. Hansen and Mr. Simpson testified.   Following the hearing, the bankruptcy court took the matter under advisement, and directed the parties to submit post-trial briefs.   Both parties filed post-trial briefs on December 10, 2015.

On February 5, 2016, the bankruptcy court issued oral findings of fact and conclusions of law, determining the Claims were entitled to priority as six months claims under § 1171(b).   In its ruling, the bankruptcy court rejected the Appellant's contention that claims arising from interline freight services cannot, as a matter of law, qualify for priority under § 1171(b), stating:

> I read Boston [&] Maine II to have reversed the decision of the District Court, which denied priority treatment of the claims of interlining railroads which sought six-month priority status for their per diem claims. . . .   [A]s a matter of law, the mere fact that the claims are for interline freight services does not exclude them from possible priority consideration.

The bankruptcy court then stated "if the claimant railways can satisfy the judicially established three elements required for the 1171(b) claims [set forth in <u>Boston & Maine II</u>], then they're entitled to priority treatment."  Turning to the evidence, the bankruptcy court found the Claims satisfied each of the elements of the <u>Boston & Maine II</u> test.

As to the "necessity of the charges," the bankruptcy court looked at the testimony of Mr. Hansen and Mr. Simpson regarding the importance of the "critical rail artery" between St. John, New Brunswick and Montréal to MMA and found MMA's inability to interchange traffic with the Irving Railroads on that route would have had a significant adverse effect on MMA's operations, including possible loss of business with Irving Paper Companies as well as a reduction in revenue.  As to this prong, the bankruptcy court concluded:

> Based upon this and the other evidence adduced at the hearing, I conclude that the claimant railways satisfied their burden on the necessity issue.  I don't ascribe to the narrow view of what a necessity is.  I find that [ ] sufficient claims are for a current expense, goods and services and [ ] ordinary operation of the rail.

As to the second prong—whether the Claims were incurred within six months before the petition was filed—the bankruptcy court determined there had been "no meaningful challenge" to this asserted element.

As to the third prong—whether the goods or services were delivered in the expectation that they be paid for out of MMA's current operating revenues and not in reliance on MMA's general credit—the bankruptcy court concluded:

> Based on testimony . . . as well as other evidence presented at the hearing, I conclude that the claimant railways met their burden as to the third element of the 1171(b) claims.  Testimony shows that, in order to keep the interchange of services going between the parties, claimant railways agreed to wait for the ISS system to process payment and then to pay . . . them to MMA before MMA would pay the claimant railways.  I do not conclude that this was reliance on MMA's

13

credit, nor do I conclude that this was some sort of special security arrangement which excepts the claimant railways from the protection of the six-months rule. I didn't find anything in that deal or that arrangement that had incorporated common conditions of the commercial credit, security interests, and the like.

I do not find that the existence of the Wheeling line of credit changes my conclusion. Mr. Hansen was not aware that MMA had a line of credit with Wheeling, he so testified. Mr. Simpson admitted he was aware of it "anecdotally," but had no knowledge of how it "worked," and was not familiar with it. Nobody, according to the testimony, ever advised Mr. Hansen or Mr. Simpson that MMA's ability to pay claimant railroads was dependent on MMA being able to draw on the Wheeling line of credit.

So based upon the unique facts and my analysis of the equities asserted by MMA, on one hand, and [t]he claimant railroads, on the other, I conclude that the claimant railways have met their burden. The claims shall be allowed as 1171(b) claims.

Thereafter, the bankruptcy court entered the Order, which memorialized its ruling as

follows:

Based upon the unique facts of this matter and the Court's analysis of the equities asserted by MMA, on the one hand, and the [Irving Railroads], on the other, the [Irving Railroads] met their burden of establishing that the Asserted 1171(b) Claims qualify as claims that are entitled to priority under § 1171(b) of the Code because:

(1) the Asserted 1171(b) Claims represent current operating expenses that were necessarily incurred by MMA in connection with its on-going operations;

(2) the Asserted 1171(b) Claims were incurred within six months prior to the commencement of this case; and

(3) the services that are the subject of the Asserted 1171(b) Claims were provided to MMA with the expectation that they would be paid for out of the current operating revenues of MMA, and not in reliance on its general creditworthiness.

The Order also provided:

The Asserted 1171(b) Claims, to the extent allowed, are afforded priority status under § 1171(b). The amount of the Asserted 1171(b) Claims is not determined by this Order, and thus those Asserted 1171(b) Claims are not allowed in any

14

amount at this time.   The [Appellant]'s rights to object to the amount of the Asserted 1171(b) Claims are fully reserved.

The Appellant timely filed a notice of appeal of the Order, and a motion for leave to appeal.   The Irving Railroads filed a response to the motion for leave to appeal, stating they did not oppose the motion because they agreed the resolution of the pending appeal might advance the final disposition of litigation with the Appellant in several matters pending before the bankruptcy court.   In an order dated March 29, 2016, the Panel granted the motion for leave to appeal.[10]

## JURISDICTION

The Panel has jurisdiction to hear appeals from: (1) final judgments, orders and decrees; or (2) with leave of court, from certain interlocutory orders.   28 U.S.C. § 158(a); Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998).   A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."   Id. at 646 (citations omitted).   An interlocutory order, however, "only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits."   Id. (quoting In re American Colonial Broad. Corp., 758 F.2d 794, 801 (1st Cir. 1985)).

In the Order, the bankruptcy court ruled that the Claims would be afforded priority status under § 1171(b), but it did not determine whether the Claims would be allowed and if so, in what

---

[10]   The Panel exercised its discretion under 28 U.S.C. § 158(a)(3) to hear this interlocutory appeal because the Order involved a controlling issue of law, and because both parties agreed that resolution of this appeal could materially advance the ultimate termination of the claims adjudication process and the preference litigation pending in the bankruptcy court.

amount.   Thus, the Order did not resolve all of the issues relating to the Claims, and is

interlocutory.   As noted above, however, the Panel exercised its discretion under 28 U.S.C.

§ 158(a)(3) to hear this interlocutory appeal.

## STANDARD OF REVIEW

The Panel reviews a bankruptcy court's findings of fact for clear error and its conclusions

of law de novo.   See Castellanos Grp. Law Firm, L.L.C. v. F.D.I.C. (In re MJS Las Croabas

Props., Inc.), 545 B.R. 401, 417 (B.A.P. 1st Cir. 2016) (citation omitted).   The question as to

whether the bankruptcy court correctly held, as a matter of law, that interline freight claims may

qualify for priority status under § 1171(b) if they satisfy the test adopted by the First Circuit in

Boston & Maine II is a legal question which is subject to de novo review.   See United States v.

Cushing (In re Cushing), 401 B.R. 528, 532 (B.A.P. 1st Cir. 2009); Morad v. Xifaras (In re

Morad), 323 B.R. 818, 822 (B.A.P. 1st Cir. 2005).   The bankruptcy court's findings that the

Claims did, in fact, satisfy each of the elements of the Boston & Maine II test are findings of fact

subject to review under the clearly erroneous standard and should not be overturned unless this

Panel is left with "a 'strong, unyielding belief' that the bankruptcy judge made a mistake."

Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 69 (1st Cir. 2012) (quoting Cumpiano v. Banco

Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

## DISCUSSION

## I.    The Legal Standard

### A.    Claims Allowance

Sections 501 and 502 govern the filing and allowance of creditor claims in bankruptcy

proceedings.   When a debtor files for relief, each creditor is entitled to file a proof of claim

against the debtor's estate pursuant to § 501. Section 502(a) provides that a proof of claim filed under § 501 "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). When a party in interest objects to a proof of claim, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount," unless one of statutory grounds for disallowance applies. 11 U.S.C. § 502(b).

"A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also In re Long, 353 B.R. 1, 13 (Bankr. D. Mass. 2006) (citing Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 925 (1st Cir. 1993)). In order to rebut this prima facie evidence, the objecting party must produce "substantial evidence" in opposition to it. See In re Perron, 474 B.R. 310, 313 (Bankr. D. Me. 2012) (citations omitted); In re Long, 353 B.R. at 13; see also Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 504 (B.A.P. 1st Cir. 2009); United States v. Clifford (In re Clifford), 255 B.R. 258, 262 (D. Mass. 2000). If the objecting party produces substantial evidence in opposition to the proof of claim and thereby rebuts the prima facie evidence, the burden shifts to the claimant to establish the validity of its claim by a preponderance of the evidence. In re Long, 353 B.R. at 13 (citing Hemingway Transport, 993 F.2d at 925); In re Plourde, 418 B.R. at 504 (citations omitted).

Here, the Irving Railroads asserted unsecured claims, a portion of which they claimed were entitled to priority under § 1171(b). The Appellant did not challenge the Irving Railroads'

assertion of unsecured claims, but rather the priority asserted in the Claims.[11]   The bankruptcy

court determined the Appellant put forth sufficient evidence to negate the prima facie validity of

the Claims and the priority asserted for the Claims, and, therefore, the burden was on the Irving

Railroads to establish that the Claims were entitled to priority under § 1171(b).

### B.       Claims Entitled to Priority Under § 1171(b)

A fundamental principle of bankruptcy law requires that all unsecured creditors of an

equal class be treated in a like manner throughout the bankruptcy proceeding.   See In re CoServ,

L.L.C., 273 B.R. 487, 494 (Bankr. N.D. Tex. 2002) ("[T]he entire scheme of the Bankruptcy

Code favors equal (and simultaneous) treatment of equal allowed claims.").   Thus, payments to

unsecured creditors are distributed according to the priority schemes set forth in the Bankruptcy

Code.   Section 507 specifies the kinds of unsecured claims that are entitled to priority in

distribution and the order of such priority.   In chapter 11 cases, priority claims must be paid in

full in order to confirm a reorganization plan.   See 11 U.S.C. § 1129(a)(9).   Although § 507 is

the designated section governing priorities upon distribution of assets to unsecured creditors,

however, other sections of the Bankruptcy Code relate to and may have an effect on these

priorities.   One such section is § 1171(b), which accords certain claims the same priority in

railroad reorganization cases as would be recognized if a receiver in equity had been appointed.

Section 1171(b) provides:

> Any unsecured claim against the debtor that would have been entitled to priority
> if a receiver in equity of the property of the debtor had been appointed by a

---

[11]   Pursuant to the Order, the Appellant also reserved his right to object to the *amount* of the Claims.

Federal court on the date of the order for relief under this title shall be entitled to
the same priority in the case under this chapter.

11 U.S.C. § 1171(b).

Section 1171(b) codified a long-established equitable doctrine referred to as the "Six

Months Rule" which developed in railroad receivership cases based on the practice of allowing

railroad receivers to pay certain necessary expenses incurred in the period immediately preceding

the receivership.   See Boston & Maine II, 634 F.2d at 1366-1379.   Under the Six Months Rule,

railroad receivers were entitled to pay the unpaid claims of operations creditors arising in the six

months preceding the reorganization before paying mortgagees and secured creditors, giving

these claims a priority status.   "The justification for [the] doctrine was that it would be

inequitable to operating creditors, supplying the necessary services and products for the

railroad's continued existence and revenue generation, if the resulting operating revenue

benefited secured creditors, who were not entitled to the operating revenue of the railroad until a

receiver was appointed."   In re Jeans.com, Inc., 502 B.R. 250, 253 (Bankr. D.P.R. 2013)

(citation omitted) (internal quotations omitted).   "In essence, the rule gave pre-bankruptcy

unsecured claims of vendors and other operating creditors that arose within six months before the

receivership priority in payment over secured creditors."   Id. (citation omitted) (internal

quotations omitted).

The Six Months Rule was given statutory recognition in § 77(b) of the Bankruptcy Act of

1898 ("Bankruptcy Act"), 11 U.S.C. § 205(b) (repealed 1976), and then codified in § 1171(b) of

19

the Bankruptcy Code.[12]   Although the statute does not expressly mention the Six Months Rule,

it is well settled that § 1171(b) makes the doctrine applicable to railroad reorganizations and the

prior equity receivership law survived enactment of the statute.   See B & W Enters., Inc. v.

Goodman Oil Co. (In re B & W Enters., Inc.), 713 F.2d 534, 536 (9th Cir. 1983) ("[T]here is

little doubt that Congress intended that § 1171(b) operate to continue the Six Months Rule in

granting certain creditors priority.") (citing H.R. Doc. No. 137, 93d Cong., 1st Sess. 424 (1978);

Boston & Maine II, 634 F.2d at 1379-80 n.35; Alan N. Resnick and Henry J, Sommer, 5 Collier

on Bankruptcy ¶ 1171.02 (15th ed. 1979)).   Thus, the claims entitled to priority under § 1171(b)

are often referred to as "six months claims."

Section 1171(b) does not, however, set forth the terms or conditions which give rise to a

priority for six months claims.   Thus, it was left to the courts to "'determine the precise contours

of the priority recognized by this subsection'" in each case.   In re Michigan Interstate Ry. Co.,

87 B.R. 921, 926 (Bankr. E.D. Mich. 1988) (quoting H.R. Rep. No. 95-595, 95th Cong. 1st Sess.

at 424 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6380).   Here, the bankruptcy court

determined the First Circuit's decision in Boston & Maine II sets forth the applicable standard

for determining whether a claim is entitled to priority as a six months claim under § 1171(b).

Thus, we turn to the First Circuit's two opinions in the Boston & Maine Corp. case.

---

[12]   The language of § 1171(b) is substantively the same as that of § 77(b) for the former Bankruptcy Act.
Moreover, the legislative history of this section indicates that it is an expansion of the priorities afforded
under § 507.   The Senate Report on § 1171(b) indicates that the priority traditionally accorded by § 77(b)
of the former Bankruptcy Act is a priority for "claims by rail creditors for necessary services rendered
during the 6 months preceding the filing of the petition in bankruptcy."   S. Rep. No. 95-989, 95th Cong.
2d Sess. at 135, 136 (1978).

### C. The Boston & Maine Corp. Decisions

The First Circuit addressed interline claims in two appeals arising from the reorganization of the Boston & Maine Corp., formerly known as the Boston & Maine Railroad Co.   The first decision, Boston & Maine I, involved an appeal from the district court's refusal to order immediate payment of pre-petition "per diem" charges owed to certain interline carriers.[13] 600 F.2d at 307.   During the course of a 15-year dispute over the reasonableness of the per diem charges, the Interstate Commerce Commission (the "ICC") entered an order establishing the per diem rates that could properly be charged for the period from 1953 through August 1, 1969, and directing that interlining railroads pay per diem charges at the prescribed rates from August 1, 1969 onward.

After Boston & Maine Corp. filed its bankruptcy petition on March 12, 1970, several of its interline carriers sought an order compelling the trustee to pay immediately: (1) the difference between what Boston & Maine Corp. had actually paid for per diem charges that had accrued prior to August 1, 1969, and what should have been paid under the rates established by the ICC; and (2) per diem charges accruing on and after August 1, 1969 at the prescribed rates.   The interline carriers argued that because the trustee's operation of Boston & Maine Corp. was

---

[13]   The practice of "interlining" freight cars means loaning cars to one another rather than loading and unloading freight every time a shipment passes onto rails belonging to a different railroad.   Boston & Maine I, 600 F.2d at 307.   "Per diem" charges are charges owed by one railroad to another railroad for the use of that railroad's cars in connection with the interline shipment of freight.   Id.   The Appellant conceded below that per diem charges and interline freight charges are functionally equivalent for purposes of determining priority under § 1171(b).   See Trustee's Claims Objection at 10 ("Interline rail shipments are in the nature of 'per diem' charges under an interline settlement system like the ISS."). Thus, the Boston & Maine Corp. decisions are relevant to our inquiry.

21

subject to the jurisdiction of the ICC, and because the ICC had established the rates and had

ordered payment of the charges at specific times, neither the trustee nor the court had discretion

to defer their payment.   Id. at 308.

     The First Circuit rejected the interline carriers' argument, finding "there is no specific

provision in either the Bankruptcy Act or the Interstate Commerce Act giving the ICC the power

to override the reorganization court's discretion in setting the time for payment of claims against

the estate."   Id. at 310.   Citing with approval the Third Circuit's decision in In re Penn Central

Transportation Co., 553 F.2d 12 (3d Cir. 1977), the court held that the "'countless financial and

operating exigencies'" that arise on a daily basis in a reorganization proceeding mandate that the

reorganization court be free to exercise its discretion in approving payments of pre-petition

obligations during the course of the proceeding.   Boston & Maine I, 600 F.2d at 311-12.   Based

upon the circumstances present in the Boston & Maine Corp. reorganization, the court held that

the district court had not abused its discretion in refusing to order the immediate payment of the

pre-petition per diem charges.   Id.   The First Circuit did not address whether the pre-petition

per diem claims of the interline carriers would qualify for priority status as six months claims

under a plan of reorganization as might be eventually proposed in the case.

     The same per diem claims were again before the First Circuit in Boston & Maine II.   In

that case, the interline carriers, having lost the right to immediate payment of their per diem

claims at the outset of the bankruptcy, sought, among other things, priority in Boston & Maine

Corp.'s plan of reorganization for $3,000,000 of their claims that had accrued within six months

of bankruptcy.   The district court determined their claims were not entitled to priority.   See In

re Boston & Me. Corp., 468 F. Supp. 996 (D. Mass. 1979).   In rejecting the interline carriers'

claims of priority, the district court relied upon a line of authorities that had evolved from the

Supreme Court's decision in <u>Fosdick v. Schall</u>, 99 U.S. 235 (1879), which held that in order to

qualify for priority as a six months claim, the claimant was required to establish, among other

things, that the debtor railroad had generated a "current debt fund" (i.e., current earnings in

excess of operating expenses) out of which priority payments could be made. 468 F. Supp. at

1002. Finding that no current debt fund existed, the district court held the interline carriers'

claims did not qualify for priority under the Six Months Rule. <u>Id.</u> at 1008. The interline

carriers appealed.

Following a lengthy review of the relevant case law interpreting the equity receivership

rules that had developed in railroad receiverships and incorporated in § 77(b) of the Bankruptcy

Act, the First Circuit reversed, and ruled that per diem claims of interline carriers may be entitled

to priority under the Six Months Rule without regard to a current debt fund. Relying upon a

separate line of cases interpreting the Supreme Court's decision in <u>Miltenberger v. Logansport</u>

<u>Railway Co.</u>, 106 U.S. 286 (1882),[14] the First Circuit held that the district court had incorrectly

---

[14] <u>Miltenberger</u> is the seminal case on the Necessity of Payment Rule, which is another principle of
railroad receiverships and is often confused with the Six Months Rule. Whereas the Six Months Rule is
a rule of priority, the Necessity of Payment Rule is one of payment. <u>See In re Boston & Me. Corp.</u>, 468
F. Supp. at 1008. This rule developed to allow trustees to pay pre-petition debts under threats of
creditors in order to obtain continued supplies or services essential to the continued operation of the
debtor's business. <u>See In re B & W Enters., Inc.</u>, 713 F.2d at 537. <u>Miltenberger</u> involved an appeal of
an order directing a railroad receiver's immediate payment of certain pre-receivership claims. In
<u>Miltenberger</u>, interline railroads threatened to cease furnishing supplies and interline traffic exchanges
unless the railroad receiver immediately paid pre-receivership claims. The Supreme Court affirmed the
circuit court order directing the railroad receiver to pay the pre-receivership claims prior to
reorganization. In approving the payments, the Court gave the following justification: "Many
circumstances may exist which may make it necessary and indispensable to the business of the road and
the preservation of the property, for the receiver to pay pre-existing debts . . . where a stoppage of the

23

required, in addition to these criteria, the existence of a current debt fund as prerequisite for

according priority to these types of six months claims, stating:

> In any event, it must be concluded that the class of creditors entitled to the priority contemplated by Section 77(b) [of the Bankruptcy Act], is not limited to participation in the current debt (expense) fund defined in terms of Fosdick equitable restitution, but extends to participation in reorganization railway operating revenues essentially on the same basis as administration expenses incurred during the reorganization period.

Boston & Maine II, 634 F.2d at 1380.   As the First Circuit noted: "Miltenberger [wa]s

concerned, not with the 'diversion' [debt fund] precept of Fosdick, but with the more general

authority of the receivership court to accord priority status to pre-receivership claims in order to

prevent the stoppage of a business impressed with the public interest."   Id. at 1370.   Thus, the

First Circuit ruled that the per diem claims of the interline carriers were entitled to priority as six

months claims if each such claim met the following three criteria:

> (1) it represent[ed] a current operating expense necessarily incurred, (2) was incurred within six months before the reorganization petition was filed, and (3) the goods or services were delivered in the expectation that they would be paid for out of current operating revenues of the railroad, and not in reliance on the [rail]road's general credit . . . .

Id.[15]

---

continuance of such business relations would be a probable result, in case of non-payment."   106 U.S. at 312.

[15]   Other courts have similarly recognized these three criteria for priority as a six months claim.   See, e.g., In re Mich. Interstate Ry. Co., 87 B.R. at 922-26; see also In re New York, New Haven & Hartford R.R. Co., 278 F. Supp. 592, 596 (D. Conn. 1967).   Courts differ, however, as to whether claimants are entitled to establish any additional elements, such as the existence of a "current debt fund" as set forth in Fosdick and its progeny.

In its opinion, the First Circuit specifically identified "interline claims" as a type of claim which could qualify for priority as a six months claim, referring to the possible "stoppage of traffic interchange" as one of the "disastrous consequences" of failing to pay such claims.   Id. at 1377-78.   The court also cited with approval a number of cases which recognized interline freight claims as quintessential examples of six months claims.   For example, the First Circuit cited Southern Ry. Co. v. Flournoy, 301 F.2d 847 (4th Cir. 1962), in which the Fourth Circuit emphasized that, from Miltenberger forward, "public concern with the continued operation of the railroad has been a factor supporting the priority accorded general creditors."   634 F.2d at 1375. The Fourth Circuit accorded interline traffic balances and other interline accounts a priority over the mortgage bondholders, treating the six month limitation as preventing operating claims from undermining the mortgage through secret liens.   Id.   The First Circuit also cited Finance Co. v. Charleston, C. & C. R. Co., 62 F. 205, 208 (4th Cir. 1894), in which the court held that interline claims for freight and freight balances could be given priority depending upon the facts and circumstances of the particular case, and the character of the claims.   634 F.2d at 1371-72.   And the First Circuit noted that in In re Tenn. Cent. Ry. Co., 316 F. Supp. 1103, 1110 (M.D. Tenn. 1970), vacated on other grounds, 463 F.2d 73 (6th Cir. 1972), the court accorded a priority for claims for interline freight balances, relying in part on the special character of interline freight balances as collections for which the railroad had to account to connecting carriers.   634 F.2d at 1376.

Having found that the district court had failed to apply the correct legal standard in considering whether the interline carriers' per diem claims were to be accorded priority as six

months claims, the First Circuit remanded the case for further proceedings consistent with its

opinion.  Id. at 1382.  On remand, the district court held, "in accordance with the principles in

Boston & Maine [III]," that the interline carriers' per diem claims in the amount of $3,000,000

were to be treated as six months priority claims in the railroad's plan of reorganization, and were

to be paid in full and in cash on the effective date of the plan.  See In re Boston & Me. Corp., 46

B.R. 930, 941, 956 (D. Mass. 1983).

In this case, the bankruptcy court held that the three-part test set forth in Boston & Maine

II is the applicable standard in the First Circuit for determining whether the Claims were entitled

to priority as six months claims under § 1171(b).  Turning to the evidence, the bankruptcy court

found the Claims satisfied each element of that test.  The Appellant argues, however, that the

Claims are not entitled to priority under § 1171(b) for several reasons.  First, he argues that

interline freight claims of the type asserted by the Irving Railroads are not eligible, as a matter of

law, for priority under § 1171(b).  Second, the Appellant contends the bankruptcy court applied

incorrect legal standards and made clearly erroneous findings of fact when it determined the

Claims met the three criteria set forth in Boston & Maine II.

## II.    Whether the bankruptcy court erred in failing to rule that interline charges are not eligible, as a matter of law, for priority under § 1171(b)?

The Appellant argues that under post-Bankruptcy Code law, interline charges are general

unsecured claims that are not eligible, as a matter of law, for priority under § 1171(b).  In

support, he relies on three decisions: Union Pac. R.R. Co. v. Moritz (In re Iowa R.R. Co.), 840

F.2d 535 (7th Cir. 1988) ("Iowa Railroad"); Howard v. Burlington N. & Santa Fe Ry. Co. (In re

Bangor & Aroostook R.R. Co.), 320 B.R. 226 (Bankr. D. Me. 2005), aff'd, No. 06-141-B-H,

2007 WL 607867 (D. Me. Feb. 23, 2007) ("Bangor & Aroostook"); and In re McLean Indus.

26

Inc., 103 B.R. 424 (Bankr. S.D.N.Y. 1989) ("McLean Industries").   The Appellant, however,

fails to acknowledge that the First Circuit in Boston & Maine II specifically identified "interline

claims" as one type of claim which may be eligible for priority as a six months claim if certain

requirements are met.   Moreover, the cases cited by the Appellant do not stand for the

proposition that interline charges are ineligible, as a matter of law, for priority under § 1171(b).

     In Iowa Railroad, the court addressed whether interline balances were trust funds which

the debtor railroad was obligated to turn over to the interline carriers, or whether they were debt

obligations owed to the carriers.   The Seventh Circuit reversed the lower court's ruling that the

interline freight balances were trust funds, holding instead that the relationship of the bankrupt

railroad with its interline carriers was that of debtor and creditor.   In so holding, the court

observed:

> Interline operations have been common since the founding of American roads, so
> the treatment of interline balances also is an old subject.   See Miltenberger v.
> Logansport Ry., 106 U.S. 286, 293, 1 S. Ct. 140, 27 L. Ed. 117 (1882).   Until
> 1933, when Congress added § 77 to the old Code, 11 U.S.C. § 205 (1976), all
> railroad bankruptcies were handled as equity receiverships . . . The rules for
> equity receiverships permitted courts to enhance the priority of debts incurred as
> operating expenses within the six months prior to insolvency or necessary to the
> continued operation of the debtor.   See Miltenberger, 106 U.S. at 311.   Courts
> applied these principles, without extended discussion, to interline balances.   This
> approach assumed that interline balances are general, unsecured debts.   Not until
> 1967 did any interline creditor argue that the balances are "trust funds" or
> otherwise entitled to priority exceeding that available to other operating expenses.

840 F.2d at 537 (citations omitted).

     The court's reference to the historical assumption that interline balances are "general,

unsecured debts" does not, however, establish a per se rule that those debts are ineligible for

priority under current case law.   Moreover, the court characterized interline balances as

"general, unsecured debts" when rejecting the assertion that they should be viewed as trust funds

which the debtor was obligated to immediately turn over to the interline carriers. The <u>Iowa Railroad</u> court did not address whether the unsecured debts owed to interline freight carriers might qualify for priority under § 1171(b), and a "per se" ineligibility rule is an unwarranted interpretation of the court's discussion.

Similarly, the <u>Bangor & Aroostook</u> court did not address whether interline freight claims qualify for priority under § 1171(b). In <u>Bangor & Aroostook</u>, the trustee brought a preference action against a number of interline carriers which, through setoffs exercised within 90 days prior to the commencement of bankruptcy, had collected freight charges owed to them by the debtor. The interline carriers moved for summary judgment on the basis that the interline freight balances owed to them were trust funds. The court, relying in large part on <u>Iowa Railroad</u>, held that the interline carriers were "creditors, rather than trust beneficiaries" and denied their motions for summary judgment. 320 B.R. at 242. The court did not discuss whether the interline claims at issue might qualify for priority under § 1171(b). The Appellant argues, however, that if the <u>Bangor & Aroostook</u> court believed the interline creditors held priority six months claims, "the court would have granted the interline creditor[s] summary judgment." By declining to grant summary judgment, the Appellant infers that the court determined the interline creditors to have general unsecured claims as a matter of law. Such an argument is based on mere conjecture and lacks merit. Preference actions are rarely decided on a motion for summary judgment due to their factual nature, and, therefore, the <u>Bangor & Aroostook</u> court's failure to grant summary judgment is not support for a rule that interline creditors were ineligible, as a matter of law, to assert priority as six months claims.

The Appellant's reliance on McLean Industries also is misplaced. The debtor in McLean Industries was a steamship company, not a railroad, and therefore, the court held, § 1171(b) did not apply to the claims in that case. Thus, McLean Industries stands for the proposition that the Six Months Rule of priority does not apply in a non-railroad chapter 11 case. The Appellant, however, focuses upon the following dicta in the opinion to support his contention that in enacting the current version of the Bankruptcy Code, Congress "addressed and rejected the priority that the Bankruptcy Court afforded the Irving Railroads."

> Congress, in enacting the Bankruptcy Code, expressly rejected a proposal that debtor railroads be required to pay interline balances stating that to do so would distort the central bankruptcy principle of equality of treatment of unsecured creditors.

103 B.R. at 426 (citation omitted).

From that statement, the Appellant concludes that Congress rejected § 1171(b) priority for interline freight claims. The Appellant's interpretation, however, reflects his misreading of the legislative history leading up to enactment of the Bankruptcy Code. The relevant legislative history demonstrates Congress did not reject a proposal establishing priority status for interline freight claims.[16]

---

[16] "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (collecting authorities). Thus, if the statutory language is unambiguous, the court need not resort to legislative history to construe the plain text of the statute. Where statutory language is ambiguous, however, courts look to the statute's "historical context, its legislative history, and the underlying policies that animate its provisions" to determine legislative intent. Marrama v. Citizens Bank of Mass. (In re Marrama), 430 F.3d 474, 480 (1st Cir. 2005) (quoting United States v. Yellin (In re Weinstein), 272 F.3d 39, 48 (1st Cir. 2001)), aff'd, 549 U.S. 365 (2007). As the body of case law reflects, the language of § 1171(b) is not unambiguous and, therefore, it is appropriate to look to the legislative history.

Prior to the enactment of the Bankruptcy Code, there was a split among the circuits on the question of whether a railroad reorganization trustee had authority, without first seeking court approval, to pay interline balances when they came due under ICC rules.   In In re Penn Central Transp. Co., 486 F.2d 519 (3d Cir. 1973), and later in In re Penn Central Transp. Co., supra, the Third Circuit held that a trustee was not empowered to make immediate payment of interline balances absent authorization from the court.   The Seventh Circuit came to the opposite conclusion in Chicago, Rock Island & Pacific R.R. Co. v. Atchison, Topeka & Santa Fe Railway Co., 537 F.2d 906 (7th Cir. 1976) ("Rock Island"), holding that a trustee is bound by ICC rules to pay interline claims immediately as they come due, without the need for court authorization.

During the legislative process that resulted in the passage of the Bankruptcy Reform Act of 1978, Pub. L. 95-598, Nov. 6, 1978, 92 Stat. 2643, the bankruptcy bill introduced in the Senate, S. 2266, 95th Cong. (1977), contained provisions which would have codified the Seventh Circuit's holding in Rock Island by providing authority to a railroad's trustee to pay all pre-bankruptcy interline balances without the need for court approval.   The House version of the bankruptcy bill did not contain these provisions and in enacting the Bankruptcy Code the Senate capitulated.   As explained by the Seventh Circuit in Boston & Maine Corp. v. Chicago Pacific Corp., 785 F.2d 562 (7th Cir. 1986), which the McLean Industries court relied upon when making its statement regarding Congressional intent:

> Congress rejected our holding [in Rock Island] that the rules of the ICC, rather than principles of bankruptcy, should govern the question of whether prereorganization per diem charges should be *paid immediately*.

785 F.2d at 568-69 (emphasis added).

The provisions in the Senate bill rejected by Congress in enacting the Bankruptcy Code dealt only with the issue of whether interline charges could be *paid immediately* during the course of the bankruptcy, pursuant to ICC orders or rules, without the need for bankruptcy court approval.   See S. 2266, § 1169.   They did not address the priority to which such claims were entitled under a plan of reorganization, which is the issue to be resolved in this appeal.   That issue is addressed by § 1171(b), and the equity receivership rules which Congress incorporated into § 1171(b).

For the reasons set forth above, we are not persuaded by the cases cited by the Appellant and conclude the bankruptcy court did not err when it failed to rule that interline charges are not eligible, as a matter of law, for priority as six months claims under § 1171(b).   Rather, the bankruptcy court correctly ruled that the Claims could qualify for priority status under § 1171(b) if they satisfied the three-part test set forth in <u>Boston & Maine II</u>.

### III.    Whether the bankruptcy court erred in ruling that the Claims satisfied the <u>Boston & Maine II</u> test?

The Appellant does not challenge the bankruptcy court's determination that the Irving Railroads met their burden of establishing the Claims were incurred within the six-month period preceding the bankruptcy filing.   Thus, the focus in this appeal is on the other criteria under the <u>Boston & Maine II</u> test—whether the Claims were for a good or service, whether they represent current operating expenses necessarily incurred, and whether the services were delivered by the Irving Railroads with the expectation that they would be paid for out of MMA's current operating revenues of the railroad, and not in reliance on MMA's general credit.

### A.    Were the Claims for a good or service?

The Appellant argues the bankruptcy court erred by failing to consider his argument that the Claims did not involve a "good or service," as required under the Boston & Maine II test, and because the Irving Railroads failed to meet their burden of proof on this issue.   The Appellant argued below that the Irving Railroads did not provide a "good or service" because MMA's interchange of freight with the Irving Railroads involved nothing more than permission for MMA to use Irving Railroads' tracks for a fee.

Although the bankruptcy court did not expressly address the Appellant's contention in its oral ruling, it found that the Irving Railroads provided freight services to MMA that were more than mere use of their tracks.   The bankruptcy court specifically noted Mr. Hansen's testimony at the trial regarding the nature of the freight services provided by the Irving Railroads as they related to oil shipments, finding as follows:

> Beginning in 2012, the amounts owed by MMA for interline freight services provided by the claimant railways began to exceed the amounts owed by Irving to MMA.   As Mr. Hansen put it at trial, "Well, the shipment of oil would have been coming out of the Dakotas by [CP].   They would hit MMA's line, They would interchange with MMA,   Then the oil would come—the train would come down through until it hit NB Southern [NBSR]'s line, *NB Southern [NBSR] would transport it from then into St. John, New Brunswick.*"

(emphasis added).   Thus, the court expressly acknowledged that the Irving Railroads provided interline freight services to MMA and, specifically, that the Irving Railroads transported freight into St. John, New Brunswick.   The bankruptcy court also recognized Mr. Simpson's testimony at the trial regarding "the freight services provided to MMA."   Mr. Simpson explained that, with respect to freight carried by MMA to the interchange point with the Irving Railroads, the interchange of freight traffic involved the de-coupling of freight cars from MMA's locomotives

32

and connecting them to the Irving Railroads' locomotives, which then carried the freight cars to their final destination. The bankruptcy court specifically found that Mr. Simpson's "persuasive testimony" regarding the freight services provided to MMA was uncontroverted.

In his brief on appeal, the Appellant reasserts his contention that the freight services which were the basis for the Claims "consisted largely, if not entirely, of use of the track of the Irving Railroads by MMA." He does not, however, point to any evidence to support his contention. Rather, he argues that the bankruptcy court erred because the Claims originated, in part, from MMA's "role as collection agent for the Irving Railroads and its subsequent failure to remit amounts collected," rather than from any good or service provided to MMA.

Although the bankruptcy court did not specifically address this argument in its oral ruling, the issue was squarely determined by the bankruptcy court when it found, based on the evidence presented at the hearing, that the Irving Railroads provided freight services to MMA in accordance with the agreement between the parties. The record supports the bankruptcy court's ruling.

In considering the Appellant's argument that the bankruptcy court erred in this finding, we review how railway freight shipping operates. "The nation's railroads function in many ways as a single system." In re Penn Cent. Transp. Co., 486 F.2d at 521. The Bangor & Aroostook court described the system as follows:

> Shipping freight any distance by rail generally requires the services of several railroad lines. Shipments come and go throughout the country, originating and traveling on multiple railroads. Shippers routinely pay one carrier (the "collecting carrier") a charge for the entire journey. That amount includes the charges of each railroad along the way. Thus, with regard to inter-line shipments, each railroad may be at once the collecting carrier for some, receiving funds and accruing obligations to participating carriers; and for others a

participating carrier, accruing rights to freight charges for shipments which travel over its rails.

320 B.R. at 228.   Under this system, "[e]ach interline freight shipment triggers charges attributable to the services provided by each of several railroads."   Id. at 231.   "The collecting railroad takes in the entire fare – and owes prescribed portions of it to each participating carrier." Id.   "That there are multiple shipments and multiple parties is of no moment.   The circumstances reduce to sets of bilateral relationships in which one railroad owes freight charges to another, and the second owes freight charges back to the first."   Id.

The bankruptcy court found that the ISS provides a central clearing house for all participating railroads involved in the interchange of freight traffic among multiple rail carriers to settle accounts receivable and accounts payable arising from the interchange of such traffic. Because the Irving Railroads were not members of the ISS, they needed MMA to serve as their "front man," not only for the purpose of assessing and collecting the total amount of freight charges that otherwise would have been paid directly to the Irving Railroads for its transportation services, but also to negotiate freight rates, make contracts, and provide quotations for services to be rendered.   The Commercial Agreement provides clear evidence that the Irving Railroads were providing "transportation services" to MMA.   The stated purpose of the Commercial Agreement was "to establish the hauling of freight for MMA."   Moreover, Section 2 set forth the agreement between the parties regarding Irving Railroads' "Performance of Transportation Services":

> The parties agree that from and after the Effective Date, [the Irving Railroads] shall move loaded freight cars and associated empty cars between points located on its lines or reached by it under Canadian interswitch rules and Brownville Junction at rates as set out in this Agreement.   MMA shall act as the interline tariff carrier on a junction settlement basis.   By "junction settlement basis" the

34

> parties mean that MMA shall negotiate through rates and make contracts and
> provide quotations, and shall be responsible for car supply to the extent requested
> by NB[R]S and reasonably available from MMA and in rail cars customarily
> supplied by railroad carriers, all in accordance with the provisions of this
> Agreement.   MMA shall continue to render one freight bill, and assess and
> collect the total amount of freight charges . . . and *remit the portion pertaining to
> [the Irving Railroads'] transportation services to [the Irving Railroads]* in
> accordance with the procedures in this Agreement.

(emphasis added).   Thus, although MMA acted, in part, as the billing railroad and, therefore,

collected payments either directly from the customer or from the ISS, that does not change the

nature of the services provided by the Irving Railroads to MMA.

Based on the foregoing, the record supports the bankruptcy court's finding that the Irving

Railroads provided services to MMA by shipping freight across its railway lines pursuant to its

agreement with MMA, and, therefore, the "freight charges," which are the basis of the Claims,

all originated from the Irving Railroads' *service* of shipping freight pursuant to its agreement

with MMA.   Therefore, the bankruptcy court did not err in finding that the Claims satisfied this

requirement of the <u>Boston & Maine II</u> test.

### B.     Were the Claims for "current operating expenses necessarily incurred" by MMA?

To qualify for priority under § 1171(b), the Claims must be for current operating

expenses necessarily incurred by MMA in connection with its rail operations.   The Appellant

asserts an operating expense is "necessary" for purposes of § 1171(b) "when its non-payment

would cause the debtor railroad to cease, or clearly risk cessation of, operations."   Thus, the

Appellant maintains, claims satisfy this prong of the § 1171(b) test if they arise from goods or

services that are "indispensable to the continued performance of the transportation service."

The Appellant argues the bankruptcy court applied an improper legal standard because it held

35

that the Claims need only be for "current operating expenses," rather than considering whether

the services provided by the Irving Railroads were "indispensable" to MMA's business as a

going concern.   And, he contends, the services Irving Railroads provided to MMA were not

"necessary" or "indispensable" because the Irving Railroads' refusal to interchange freight with

MMA would not have shut down MMA's rail operations, and because they were required by

ICC rules to accept the interchange of traffic from MMA.

As to the applicable legal standard, the Appellant's articulation of an "end of the world"

or "doomsday" standard appears to be at odds with that articulated by the First Circuit in Boston

& Maine II.   In Boston & Maine II, the First Circuit indicated the test is not whether the

individual claimant has the power to shut down the operation of the railroad, but whether the

claim falls within a "class of claims" which are indispensable to the operation of the business.

634 F.2d at 1377-78.   In addressing the Supreme Court's decision in Miltenberger, which held

that interline freight claims were eligible for immediate payment, the First Circuit observed:

> The [Miltenberger] Court's rationale excludes the inference that only those
> creditors are entitled to priority of payment who demand immediate payment as
> a condition of continuing to supply a service or commodity of which they are
> monopolists.   The Court was defining the *classes* of claims payment of which
> was indispensable to the business of the [rail]road and which, "unless the receiver
> was authorized to provide for them at once, the business of the [rail]road would
> suffer great detriment."   [106 U.S.] at 311.

Boston & Maine II, 634 F.2d at 1377 (emphasis added) (footnote omitted) (citation omitted).

The First Circuit went on to identify interline claims as one of the "classes of claims" that

qualify for priority:

> The [Miltenberger] Court's depiction of the disastrous consequences of failing to
> pay labor claims – a work stoppage – or *interline claims – a stoppage of traffic
> interchange* – is directed to restricting the class of claims entitled to priority of
> payment to claims for those goods and services that are indispensable to the

> continued performance of the transportation service. . . .   *The test is not whether*
> *the claimant has the naked power to exert economic duress, but whether the*
> *expenses have the characteristics of those that the receiver pays from revenue as*
> *expenses of administration. . . .*

Id. at 1377-78 (emphasis added) (footnote omitted) (citation omitted).   Thus, the First Circuit

has specifically recognized that the interchanging of freight among railroads is indispensable to

the continued performance of a railroad's operations and, therefore, that interline claims such as

those asserted in the Claims fall within the "class of claims" which are entitled to priority under

§ 1171(b).   As a result, we conclude the bankruptcy court did not err by declining to adopt the

Appellant's "doomsday" approach to determining whether the Claims were for "current

operating expenses necessarily incurred" by MMA.

     The bankruptcy court found, based on the testimony of Mr. Hansen and Mr. Simpson, as

well as the statements in the Disclosure Statement, that the Irving Railroads met their burden of

establishing that the Claims satisfied the "necessity" element of the Boston & Maine II test.   The

evidence supports the bankruptcy court's finding.   As the bankruptcy court noted, in the

Disclosure Statement, the Appellant acknowledged the importance of the rail route serviced by

MMA and the Irving Railroads as being "[t]he shortest rail transportation route between Maine

and Montréal and a critical rail artery between Saint John, New Brunswick and Montréal."   That

route provided outlets for, among others, "major producers of paper, lumber, wood and

agricultural products in eastern and northern Maine," and "[i]n-bound transportation for

chemicals and other products used by paper producers and consumers in Maine."   Thus, there

was a public interest in continued rail service along this route.   The bankruptcy court also found

that the evidence established the importance of that "critical rail artery" to MMA's business

operations.   As the Appellant explained in the Disclosure Statement:

> In the two years leading up to the commencement of the Chapter 11 case, the
> Debtor had benefited from the dramatic increased use of trains to move oil from
> the central and western regions of the United States, specifically, the Bakken oil
> fields in North Dakota, to refineries in the east.   United States and Canadian oil
> drillers were producing oil faster than new pipelines could be built, and trains
> were needed to transport crude oil to refiners.   Prior to the Derailment, the
> Debtor had been hauling about 500,000 barrels of oil monthly through Québec
> and Maine.   Due to this business, the Debtor enjoyed a significant increase in
> gross revenue, and, for a short time, positive net operating income, although
> needed capital expenditures remained deferred and unfunded.

As the bankruptcy court noted, Mr. Simpson confirmed the importance of the rail artery between

Montréal and Saint John, New Brunswick to MMA, characterizing it as the most direct,

economical and practical route for the shipment of oil to refineries in Saint John, New

Brunswick.

The Appellant argues, however, that the services provided by the Irving Railroads were

not really necessary to MMA's operations, because if the Irving Railroads refused to accept an

interchange of traffic from MMA, there were alternate routes that could have been pursued.   The

bankruptcy court rejected this argument, however, as the evidence showed that without being

able to interchange traffic with the Irving Railroads, MMA lost essentially the entire St. John,

New Brunswick market, which is where the oil that was being produced in North Dakota was

being transported to over several years, prior to the derailment, and which was a source of

tremendous revenue for MMA.   If MMA would have been forced to choose alternative routes,

they would not have been competitive in terms of being able to successfully obtain the business

from the shippers in North Dakota, and they would have lost that particular business.   There

simply was no practical way for them to deliver the oil to St. John, New Brunswick without

interchanging with the Irving Railroads.   This would have had a substantial negative impact on

MMA's operations.   The bankruptcy court also pointed to testimony at the hearing which

established that the inability of MMA to interchange traffic with the Irving Railroads would have had a significant adverse impact on MMA's operations, including, among other things, the loss of business with the Irving Paper Companies, which were among MMA's largest customers, and a substantial reduction in revenue generated from the shipment of oil to the refineries in Saint John, New Brunswick.

The Appellant also argues that the Claims were not "necessary" because the Irving Railroads were required under applicable provisions of federal transportation law to accept the interchange of traffic from MMA. As the First Circuit remarked in Boston & Maine II, "the interlining of freight cars is mandatory under the Interstate Commerce Act, 49 U.S.C. [§§] 1(4), (10), (11), (14), (15), and (17)." 634 F.2d at 1362. Notwithstanding the requirement under the Interstate Commerce Act that railroads interline freight cars with Boston & Maine Corp., the First Circuit held their per diem claims were, nonetheless, entitled to priority as six months claims. Thus, the Appellant's argument that the Claims are not entitled to priority status because the Irving Railroads were required to accept the interchange of freight traffic is unpersuasive. Moreover, the inability of a railroad to refuse to interchange freight traffic under the ICC underscores how essential the interchange of freight traffic is to the railroad freight shipping system.

In light of the foregoing, we conclude the bankruptcy court applied the correct legal standard for determining whether the Claims were for operating expenses necessarily incurred in connection with MMA's rail operations, and the bankruptcy court did not err in determining that the Claims satisfied this part of the test.

**C.**     **Did the Irving Railroads deliver services to MMA with the expectation they would be paid from MMA's current operating revenue rather than relying on MMA's creditworthiness?**

The Appellant contends the bankruptcy court applied an improper legal standard in determining that the Claims satisfied this part of the § 1171(b) test.   According to the Appellant, "creditors with 'special security arrangements' do not benefit from the protections afforded six months creditors because the presence of such arrangements negates any possibility of reliance only upon immediate cash flow."   Therefore, he argues, the alleged "triangular setoff" arrangement between the parties establishes, as a matter of law, that the Irving Railroads provided services to MMA in reliance upon MMA's general creditworthiness rather than with the expectation that payment would be made from current operating revenue.   He maintains the bankruptcy court applied the wrong standard because it held that to disqualify a claim from § 1171(b) priority status, the "special security arrangement" must qualify as a security interest under the Uniform Commercial Code.   The Appellant further argues that, based upon the application of the wrong legal standard, the bankruptcy court erred in finding that the Irving Railroads provided services to MMA with the expectation that payment would be made from current operating revenue, rather than in reliance on MMA's general credit.

Again we turn to <u>Boston & Maine II</u> for guidance on the standard to be applied.   The First Circuit articulated the standard as follows:

> [W]hen the time comes to determine membership in the class it will be for the reorganization court to determine . . . whether the non-payment reflects an intentional extension of credit of the railroad, or the intervention of the reorganization petition before expiration of the ordinary billing and payment period, or some noncontractual indulgence or inadvertence on the part of the claimant, or deferment of payment on the part of the railroad; and whether, if the transaction giving rise to the claim had any credit term, it was compatible with a

general expectation of payment from current receipts or indicated reliance on the
railroad's general credit.

Id. at 1379-80 (footnote omitted).

The Appellant asserts, however, the bankruptcy court went further, and held, as a
matter of law, that the *only* security arrangement that would disqualify a creditor from the
protection of § 1171(b) is one in which "the would-be 1171(b) creditor enjoys a 'commercial
credit[] security interest[].'" In advancing this argument, the Appellant has misrepresented the
bankruptcy court's ruling. In ruling that the Irving Railways had met their burden of
establishing that services were provided with the expectation that they would be paid from
current operating revenues, as opposed to MMA's general creditworthiness, the bankruptcy court
singled out those services related to oil shipments interchanged by MMA with the Irving
Railroads, which were not part of the payment swap arrangement, and stated:

> Testimony shows that, in order to keep the interchange of services going between
> the parties, claimant railways agreed to wait for the ISS system to process
> payment and then to pay – the ISS to pay them to MMA before MMA would pay
> the claimant railways. I do not conclude that this was reliance on MMA's credit,
> nor do I conclude that this was some sort of special security arrangement which
> excepts the claimant railways from the protection of the six-months rule. I didn't
> find anything in that deal or that arrangement that had incorporated common
> conditions of the commercial credit, security interests, and the like.

The arrangement the bankruptcy court was discussing was completely separate from the payment
swap arrangement that the Appellant characterizes as a "triangular setoff." The bankruptcy
court simply found, based on the evidence presented, that nothing in the agreement of the parties
covering oil shipments incorporated characteristics of general credit extension or special security
arrangements. Thus, the bankruptcy court did not hold as a matter of law that only an Article 9

41

security interest would disqualify a claim from receiving § 1171(b) priority and, therefore, applied the correct legal standard.

The Appellant also argues that the bankruptcy court ignored the Irving Railroads' extension of credit and clearly erred in finding that they relied on MMA's current operating revenues.   The Appellant contends the Irving Railroads knowingly extended credit to MMA and then mitigated the credit risk they willingly assumed by unilaterally establishing a system of triangular setoffs using payables owed to MMA by the Irving Railroads and Irving Paper Companies as collateral to secure the payment of MMA's obligations to the Irving Railroads. He also argues the Irving Railroads relied entirely on that collateral and not on MMA's cash flow in securing such payments until they found themselves "undercollateralized," at which time they agreed to an additional payment arrangement pursuant to which MMA would collect amounts through the ISS system for their benefit and remit them on agreed credit terms.

Contrary to the Appellant's assertions, the bankruptcy court's findings are supported by the record.   The evidence presented at the hearing showed that, from the inception of their business relationship with MMA, the Irving Railroads were not willing to rely on the creditworthiness of MMA, which was the successor to the bankrupt Bangor & Aroostook railroad.   Mr. Hansen testified that the Irving Railroads did not in any way rely on MMA's general creditworthiness, stating:

> Q:  Mr. Hansen, in providing freight services in connection with the interchange of traffic with the MMA did the Irving [R]ailroads rely upon MMA's general creditworthiness?
>
> A:  Absolutely not.
>
> Q:  What did the Irving [R]ailroads rely upon?

A:  We relied on them being paid out of the ISS system, which I felt was secure, and that meant I would be paid shortly thereafter.

Q:  And were you secure that they could rely upon receiving money from the ISS system?

A:  That is correct.

The evidence showed MMA acquired its assets from Bangor & Aroostook out of bankruptcy, and there was a troubled history with respect to that railroad.   Mr. Hansen testified that, in order to avoid taking any credit risk, he created a "swap" arrangement with MMA that involved the Irving Paper Companies, which were affiliated with the Irving Railroads and were among the largest customers of MMA.   Pursuant to this arrangement, the parties, on a weekly basis, would simultaneously exchange wire transfers of the amounts each owed to the other. Often, the payments for freight services that MMA owed the Irving Railroads actually involved freight from the Irving Paper Companies that was being delivered from their mills in Canada to other destinations.   With this arrangement, he stated, the Irving Railroads were not relying on the general creditworthiness of MMA.   Rather, the source of the payment for the Irving Railroads was essentially the cash that was being paid to MMA by the Irving Paper Companies. Moreover, Mr. Hansen testified that, although the Irving Railroads may have had the ability to set off the amounts owed to MMA from the amounts MMA owed to it, they never did so.

Thus, the bankruptcy court's findings are supported by the record.

## CONCLUSION

For the reasons set forth above, we conclude the bankruptcy court did not err in ruling that the Claims qualified as six months claims entitled to priority under § 1171(b).   Thus, we **AFFIRM** the Order.